Xiaoning et al v. Yahoo! Inc, et al

Doc. 12 Att. 1

Case 4:07-cv-02151-CW     Document 12-2     Filed 06/21/2007     Page 1 of 44

# EXHIBIT A

Dockets.Justia.com

# No. 07-0016

IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

THE PRESBYTERIAN CHURCH OF SUDAN, REV. MATTHEW
MATHIANG DEANG, REV. JAMES KOUNG NINREW, NUER
COMMUNITY DEVELOPMENT SERVICES IN U.S.A., FATUMA
NYAWANG GARBANG, NYOT TOT RIETH, individually and on
behalf on the Estate of her husband JOSEPH THIET MAKUAC,
STEPHEN HOTH, STEPHEN KUINA, CHIEF
TUNGUARKUEIGWONG RAT, LUKA AWOL YOL, THOMAS
MALUAL KAP, PUOK BOL MUT, CHEF PATAI TUT, CHIEF PETER
RING PATAI, CHIEF GATLUAK CHIEK JANG, and on behalf of all
others similarly situated,

Plaintiffs-Appellants,

v.

TALISMAN ENERGY INC.,

Defendant-Appellee,

REPUBLIC OF THE SUDAN,

Defendant.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

BRIEF FOR THE UNITED STATES AS AMICUS CURIAE

MICHAEL J. GARCIA
  *United States Attorney*

DAVID S. JONES, (212) 637-2739
  *Assistant U.S. Attorney*
  *Southern District of New York*
  *86 Chambers Street, 3rd Floor*
  *New York, N.Y. 10007*

JOHN B. BELLINGER III
  *Legal Adviser*
  *Department of State*
  *Washington D.C. 20520*

JEFFREY S. BUCHOLTZ
  *Acting Assistant Attorney General*

DOUGLAS N. LETTER, (202) 514-3602
ROBERT M. LOEB, (202) 514-4332
LEWIS S. YELIN, (202) 514-3425
  *Attorney, Appellate Staff*
  *Civil Division, Room 7318*
  *U.S. Department of Justice*
  *950 Pennsylvania Ave., N.W.*
  *Washington, D.C.  20530-0001*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

INTRODUCTION AND INTEREST OF THE UNITED STATES . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    I.    The Alien Tort Statute Does Not Apply to Extraterritorial
        Claims. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    II.   Neither Civil Aiding and Abetting Nor Civil Conspiracy Liability
        Should Be Recognized under the Alien Tort Statute Absent
        Authorization by Congress. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

        A.   The Significant Policy Decision to Impose Civil Aiding and
              Abetting Liability for ATS Claims Should Be Made By
              Congress, Not the Courts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

        B.   *Central Bank*'s Rationale Applies Equally to Civil
              Conspiracy Claims under the ATS. . . . . . . . . . . . . . . . . . . . . 16

        C.   Practical Consequences for U.S. Foreign Relations
              Reinforce the Conclusion That Courts May Not Impose
              Liability on Aiding and Abetting or Civil Conspiracy
              Theories as a Matter of Federal Common Law under the
              ATS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

        D.   Civil Aiding And Abetting and Civil Conspiracy Liability
              Does Not Satisfy *Sosa*'s Threshold Requirement That an
              International Law Norm Be Both Firmly Established and
              Well Defined. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

    III.  The Invalidity of Plaintiffs' Civil Aiding and Abetting and Civil
        Conspiracy Claims Did Not Deprive the District Court of
        Jurisdiction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

CERTIFICATE OF COMPLIANCE: TYPE-VOLUME

CERTIFICATE OF COMPLIANCE: VIRUS PROTECTION

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## CASES

*Arbaugh v. Y&H Corp.*, 126 S. Ct. 1235 (2006) . . . . . . . . . . . . . . . . . . . . . 28

*Beck v. Prupis*, 529 U.S. 494 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18

*Bell v. Hood*, 327 U.S. 678 (1946) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 30

*Boim v. Quranic Literacy Institute*, 291 F.3d 1000 (7th Cir. 2002) . . . . . . . 14

*Cabello v. Fernandes-Larios*, 402 F.3d 1148 (11th Cir. 2005) . . . . . . . . . . . 17

*Central Bank of Denver v. First Interstate Bank*, 511 U.S. 164 (1994) . 13, 14, 20, 24, 25

*Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363 (2000) . . . . . . . . . 20, 21

*Dinsmore v. Squadron, Ellenoff, Plesent, Sheinfeld & Sorkin*, 135 F.3d 837 (2d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 25

*EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244 (1991) . . . . . . . . . . . . . . . . 8, 9

*Ex parte Poresky*, 290 U.S. 30 (1933) . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Filártiga v. Peña-Irala*, 630 F.2d 876 (2d Cir.1980) . . . . . . . . . . . . . . . . . . 6

*In re S. African Apartheid Litigation*, 346 F. Supp. 2d 538 (S.D.N.Y. 2004), *appeal pending*, No. 05-2326 (2d Cir.) . . . . . . . . . . . . . . . . . 10

*Kadic v. Karadžić*, 70 F.3d 232 (2d Cir.1995) . . . . . . . . . . . . . . . . . . . . . . 6

*Kiobel v. Royal Dutch Petroleum Corp.*, 456 F. Supp. 2d 457 (S.D.N.Y. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*O'Reilly De Camara v. Brooke*, 209 U.S. 45 (1907) . . . . . . . . . . . . . . . . . . 29

*Pinkerton v. United States*, 328 U.S. 640 (1946) . . . . . . . . . . . . . . . . . . . . . 27

*Presbyterian Church of Sudan v. Talisman Energy, Inc.*, No. 01-9882 (Aug. 30, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11, 22

*Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 374 F. Supp. 2d 331 (S.D.N.Y. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 453 F. Supp. 2d 633 (S.D.N.Y. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 30

*Sarei v. Rio Tinto*, __ F.3d __, 2007 WL 1079901 (9th Cir. Apr. 12, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 30

*Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004) . . 1-3, 5-7, 11, 13-15, 18, 23-25, 29

*Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774 (D.C. Cir. 1984) . . . . . . . 11

*United States v. Klintock*, 18 U.S. 144 (1820) . . . . . . . . . . . . . . . . . . . . . . . 9

*United States v. Palmer*, 16 U.S. 610 (1818) . . . . . . . . . . . . . . . . . . . . . . . 9

STATUTES

1 Stat. 112, §§ 8, 25 (April 30, 1790) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

18 U.S.C. § 1962(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17

18 U.S.C. § 1964(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17

18 U.S.C. § 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

18 U.S.C. § 2333 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

18 U.S.C. § 371 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

28 U.S.C. § 1350 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 12

28 U.S.C. § 1604 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

28 U.S.C. § 1605(a)(5) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

28 U.S.C. § 517 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

42 U.S.C. § 1985 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Comprehensive Anti-Apartheid Act of 1986, Pub. L. No. 99-440, §§ 4,
    101, 304-05, 100 Stat. 1086 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

## RULES

Fed. R. App. P. 29(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

## EXECUTIVE MATERIALS

National Security Decision Directive 187 (Sept. 7, 1985) . . . . . . . . . . . . 19

## INTERNATIONAL AUTHORITIES

G.A. Res. 56/83 & Annex, art. 16, U.N. Doc. A/RES/56/83 (Jan. 28,
    2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

G.A. Res. 59/35, U.N. Doc. A/RES/59/35 (Dec. 2, 2004) . . . . . . . . . . . . 24

*Prosecutor v. Blaškić*, No. IT-95-14-A (ICTY App. Chamber, July 29,
    2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Prosecutor v. Musema*, ICTR-96-13-A, Judgment (Trial Chamber Jan. 27,
    2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Rome Statute of the Int'l Criminal Court, art. 25(3), U.N. Doc.
    A/CONF.183/9 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

OTHER AUTHORITIES

Brief of the United States as Amicus Curiae, *In re S. African Apartheid Litigation*, No. 05-2326 (2d Cir.) (pending)  . . . . . . . . . . . . . . . . . . . . . 6

IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

No. 07-0116

THE PRESBYTERIAN CHURCH OF SUDAN, et al.,

Plaintiffs-Appellants,

v.

TALISMAN ENERGY INC. AND REPUBLIC OF THE SUDAN,

Defendant-Appellee.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

BRIEF FOR THE UNITED STATES AS AMICUS CURIAE

## INTRODUCTION AND
## INTEREST OF THE UNITED STATES

Pursuant to 28 U.S.C. § 517 and FRAP 29(a), as well as this Court's order of April 16, 2007, the United States submits this amicus brief in support of affirmance of the district court's judgment.

In *Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004), the Supreme Court held that, in enacting the Alien Tort Statute (ATS) in 1789, Congress established jurisdiction in the federal courts to "hear claims in a very limited category defined by the law of nations and recognized at common law." 542 U.S. at 712; *see* 28 U.S.C. § 1350 (ATS). "Uppermost in the legislative mind appears to have been" three particular offenses, which, unless redressed, could threaten "serious consequences in

international affairs": "violations of safe conducts, infringement of the rights of ambassadors, and piracy."  *Sosa* 542 U.S. at 720, 715.

Although the Court "found no basis to suspect that congress had any examples in mind beyond those * * * three primary offenses" (*id*. at 724), it nevertheless held that federal courts retain limited discretion under the ATS to exercise lawmaking power to recognize a "narrow class" (*id*. at 729) of contemporary international law norms as the basis for claims under federal common law.  However, the Supreme Court repeatedly admonished the lower courts to exercise "great caution in adapting the law of nations to private rights" (*id*. at 728; *see id*. at 725), enumerating "a series of reasons" why the courts must engage in "vigilant doorkeeping" (*id*. at 725, 729).

In particular, the Supreme Court explained that "any claim based on the present-day law of nations [must] rest on a norm of international character accepted by the civilized world and defined with a specificity comparable to the features of the 18th-century paradigms we have recognized." *Id*. at 725.  Moreover, it directed courts to take into account "the practical consequences of making [a] cause available to litigants in the federal courts" in considering whether a norm is "sufficiently definite to support a cause of action" under the ATS.  *Id*. at 732–33.

The Supreme Court made abundantly clear that it conceived of at most a "relatively modest set of actions" that would satisfy this standard.  *Id*. at 720.  It also

questioned whether purely extraterritorial claims are cognizable under the ATS, especially those claims requiring courts to review the propriety of a foreign sovereign's conduct towards its own citizens, and it cautioned that such claims "should be undertaken, if at all, with great caution." *Id.* at 727–28.

The United States has a significant interest in the proper construction and application of the ATS.  As the Supreme Court acknowledged, judicial recognition of private causes of action in U.S. courts under U.S. law based on standards drawn from international law can have serious implications for the foreign relations of the United States — especially where, as here, the conduct occurred in a foreign country and involved a foreign government's treatment of its own nationals.  It would be extraordinary for such conduct to be governed by judge-made law *of the United States*. For such reasons, the Court admonished that "recognizing such causes should make courts particularly wary of impinging on the discretion of the Legislative and Executive Branches in managing foreign affairs." *Id.* at 727.

Plaintiffs here, current and former residents of Sudan, brought this case as a putative class action against Talisman Energy, a Canadian company, and the Republic of the Sudan.  Plaintiffs allege that the Government of Sudan committed serious violations of international human rights and humanitarian law against the non-Muslim populations living near oil concessions located in southern Sudan, and that

Talisman is liable under the ATS for these violations based on theories of aiding and abetting and conspiracy liability. Over the years of this litigation, Talisman filed multiple motions to dismiss and for judgment on the pleadings, which the district court denied, and a motion for summary judgment, which the district court granted, giving rise to this appeal. *See Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 453 F. Supp. 2d 633 (S.D.N.Y. 2006).

The United States Government has condemned the Government of Sudan for abhorrent violations of human rights over the course of the twenty-one-year North-South civil war in Sudan. In September 2001, President Bush named Senator John Danforth Special Envoy on Sudan. Senator Danforth and other U.S. officials subsequently played a critical role in brokering the Comprehensive Peace Agreement that finally ended the war in January 2005.

While plaintiffs' allegations are exceedingly serious, this Court should affirm the district court's judgment in favor of Talisman because the purely extraterritorial claims asserted here are not cognizable under the ATS. Moreover, because of the many cautions the Supreme Court gave about judicial expansion of federal common law in this context, it would be inappropriate for a court to recognize claims for aiding and abetting or conspiracy liability under the ATS, in the absence of legislative

direction. For this additional reason, the Court should affirm the district court's judgment.[1]

## ARGUMENT

## I.    The Alien Tort Statute Does Not Apply to Extraterritorial Claims.

In evaluating plaintiffs' claims post-*Sosa*, courts must address a critical (and in this case dispositive) issue identified by the Supreme Court: whether federal courts can properly announce and project the common law *of the United States* extraterritorially to resolve disputes centered in foreign countries. *See Sosa*, 542 U.S. at 727–28 ("It is one thing for American courts to enforce constitutional limits on our own State and Federal Governments' power, but quite another to consider suits under rules that would go so far as to claim a limit on the power of foreign governments over their own citizens, and to hold a foreign government or its agent has transgressed those limits. * * * Since many attempts by federal courts to craft remedies for the

---

[1] The United States expresses no view on the district court's determination that plaintiffs failed to adduce sufficient admissible evidence to proceed to trial on their claims, or on any other issue not discussed in this brief, including whether a suit might be maintained against a defendant that had itself committed genocide.

This Court has ordered the appeal in *Kiobel v. Royal Dutch Petroleum Corp.*, Nos. 06-4800, 06-4876, to be heard in tandem with this case. Although the United States will not file an amicus brief in the *Kiobel* case, we note that our arguments here are equally applicable to the *Kiobel* district court's determination that claims for aiding and abetting liability are available under the ATS. *See Kiobel v. Royal Dutch Petroleum Corp.*, 456 F. Supp. 2d 457, 463–64 (S.D.N.Y. 2006).

violation of new norms of international law would raise the risk of adverse foreign policy consequences, they should be undertaken, if at all, with great caution.").[2]

The answer to that question should be "no." As we explain below (and as we have argued in a pending appeal in this court),[3] Congress enacted the ATS to provide a mechanism through which certain private insults to foreign sovereigns in the United States — where the United States might be charged with responsibility for the resulting injuries — could be remedied in federal courts. In the late 18th-century, the law of nations included "rules binding individuals for the benefit of other individuals," the violation of which "impinged upon the sovereignty of the foreign nation." *Sosa*, 542 U.S. at 715. Such violations, "if not adequately redressed[,] could rise to an issue of war." *Ibid.* Violations of safe conducts, infringement of the rights of ambassadors, and piracy came within this "narrow set." *Ibid.* But under the Articles of Confederation, "[t]he Continental Congress was hamstrung by its inability to cause

---

[2] We recognize that this Court's prior opinions have assumed that purely extraterritorial claims are cognizable under the ATS. *See, e.g., Kadic v. Karadžić*, 70 F.3d 232 (2d Cir.1995); *Filártiga v. Peña-Irala*, 630 F.2d 876 (2d Cir.1980). However, because *Sosa* clarified the standard courts should apply in considering claims under the ATS, and because the Supreme Court noted that the extraterritorial reach of the ATS is a question courts must address, this Court may no longer simply assume the ATS encompasses extraterritorial claims.

[3] *See* the United States' amicus curiae brief in *In re S. African Apartheid Litigation*, No. 05-2326 (2d Cir.) (pending).

6

infractions of treaties, or the law of nations to be punished." *Id.* at 716 (quotation marks omitted).

The Continental Congress urged state legislatures to authorize suits "for damages by the party injured, and for the compensation to the United States for damages sustained by them from an injury done to a foreign power by a citizen." *Ibid.* (quotation marks omitted). Most states failed to respond to the Congress' entreaty. Physical assaults on foreign ambassadors in the United States, and the absence of a federal forum for redress of the ambassadors' claims, led to significant diplomatic protest. *Id.* at 716–17. After ratification of the Constitution, the First Congress adopted the ATS to remedy this lacuna, thereby reducing the potential for international friction. *Id.* at 717–18.

This history shows that Congress enacted the ATS to provide a forum for adjudicating alleged violations of the law of nations occurring within the territory or jurisdiction of the United States and for which the United States therefore might be deemed responsible by a foreign sovereign. There is no indication whatsoever that Congress intended the ATS to apply — or to authorize U.S. courts to apply U.S. law — to purely extraterritorial claims, especially to disputes that center on a foreign government's treatment of its own citizens in its own territory. Indeed, the

recognition of such claims would directly conflict with Congress' purpose in enacting the ATS, which was to *reduce* diplomatic conflicts.

Since the early years of the Republic, there has been a strong presumption "that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States." *EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 248 (1991) (quotation marks omitted). The Supreme Court "assume[s] that Congress legislates against the backdrop of the presumption against extraterritoriality." *Ibid.* Thus, "unless there is the affirmative intention of the Congress clearly expressed," in "the language [of] the relevant Act," the Court presumes a statute does not apply to actions arising abroad. *Ibid.* (quotation and alteration marks omitted).

The ATS does not "clearly express[]" Congress' intent to authorize the courts to project common law claims to conduct within the jurisdiction of foreign sovereigns. Indeed, the evidence is to the contrary. The same Congress that enacted the ATS enacted a statute criminalizing piracy, assaults on ambassadors, and violations of safe conduct — the three historic paradigm violations of the law of nations identified by *Sosa*. 1 Stat. 112, §§ 8, 25 (April 30, 1790). That statute was written in general terms and contained no geographic limitation. But in a case involving acts of piracy committed by persons within the jurisdiction of a foreign sovereign, the Supreme

Court held that the statute did not apply to such violations. *United States v. Palmer*, 16 U.S. 610, 630–34 (1818). Noting that the statute was entitled "'an act for the punishment of certain crimes *against the United States*,'" the Supreme Court explained that Congress intended to punish "offences against the United States, not offences against the human race." *Id*. at 632 (emphasis added). It is inconceivable that the same Congress, in enacting the ATS, meant to authorize an extension of the common law of the United States to regulate conduct in a foreign country (especially conduct involving a foreign government's treatment of its own nationals), which would go well beyond conduct Congress sought to reach in the criminal statute.[4]

The presumption against extraterritoriality "serves to protect against unintended clashes between our laws and those of other nations which could result in international discord." *Arabian Am. Oil*, 499 U.S. at 248. That danger is especially grave in suits under the ATS, where a court's projection of the common law of the United States abroad, with damages liability under U.S. law, can interfere with a foreign sovereign's choice about how to resolve conflicts within its jurisdiction. Thus, for example, in the apartheid litigation, plaintiffs seek to hold multinational

---

[4] In *United States v. Klintock*, the Supreme Court held that the statute considered in *Palmer* did apply to acts of piracy committed on the high seas. 18 U.S. 144 (1820). But crimes committed on the high seas arise outside the jurisdiction of any sovereign.

9

corporations that did business with South Africa liable for the harms committed by the apartheid regime, despite the fact that the litigation is inconsistent with South Africa's own reconciliation efforts. *See In re S. African Apartheid Litigation*, 346 F. Supp. 2d 538 (S.D.N.Y. 2004), *appeal pending*, No. 05-2326 (2d Cir.). And the Government of Canada in its amicus filing in this case has explained that the district court's recognition of plaintiffs' purely extraterritorial claims against a Canadian corporation has "create[ed] friction in Canada – United States relations." Canada Br. 13.

A court in the United States is not well-positioned to evaluate what effect adjudication of claims asserted under the ATS may have on a foreign sovereign's efforts to resolve conflicts, or the effect such adjudication will have on foreign state's diplomatic relations with the United States. It is precisely to avoid "unintended clashes" with such efforts that the Supreme Court requires Congress to speak clearly when it intends for legislation to apply extraterritorially. Congress has not done so in the ATS. Accordingly, claims under the ATS should not be recognized if they arise within the jurisdiction of another sovereign.

In an unpublished opinion, the district court here nevertheless rejected the United States' argument (made in a statement of interest submitted to the district court) that the ATS does not recognize purely extraterritorial claims. *Presbyterian*

*Church of Sudan v. Talisman Energy, Inc.*, No. 01-9882 (Aug. 30, 2005).  The district court held that the argument had been presented to the Supreme Court in *Sosa*, "but the Court adopted a different standard," requiring ATS claims to be defined with the specificity of the three 18th-century paradigms.  Aug. 30 Op. 7 n.5.

The district court misunderstood *Sosa*.  The Supreme Court was quite explicit that the "requirement of clear definition is not meant to be the only principle limiting the availability of relief in the federal courts for violations of customary international law." *Sosa*, 542 U.S. at 733 n.21.  The Court did not need to address in detail other limitations, because the requirement of clear definition "dispose[d] of this case." *Ibid*. And the Supreme Court expressly noted the serious "risks of adverse foreign policy consequences" that could flow from recognition of claims concerning "'the conduct of foreign officials in their own countries with respect to their own citizens.'" *Id*. at 728 (quoting *Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774, 813 (D.C. Cir. 1984) (Bork, J., concurring).  For that reason, the Court cautioned that such claims "should be undertaken, if at all, with great caution." *Id*. at 727–28.

With these considerations in mind, plaintiffs' claims here are not cognizable under the ATS — i.e., courts may not apply the law of the United States in the form of judge-made federal common law to regulate and award damages for the alleged conduct — because there is no indication that Congress intended the ATS to apply

11

to suits arising in the jurisdiction of a foreign sovereign, especially to suits against foreign corporations that require a court to review a foreign government's treatment of its own citizens.

**II.  Neither Civil Aiding and Abetting Nor Civil Conspiracy Liability Should Be Recognized under the Alien Tort Statute Absent Authorization by Congress.**

> **A.  The Significant Policy Decision to Impose Civil Aiding and Abetting Liability for ATS Claims Should Be Made By Congress, Not the Courts.**

The Supreme Court has made plain that the creation of civil aiding and abetting liability is a legislative act that the courts should not undertake without Congressional direction.  That admonition has special force here, where there is no indication in either the language or history of the ATS that Congress intended such a vast expansion of suits in this sensitive foreign policy area.

First, as a textual matter, the ATS speaks to a "civil action by an alien for a tort only, committed in violation of the law of nations."  28 U.S.C. § 1350.  An aiding and abetting claim is not brought against the primary party who "committed" a tort in violation of the law of nations.  Rather, allowing aiding and abetting liability for ATS common law claims would extend liability not only to the primary wrongdoer, but also to those who allegedly gave aid and assistance to the primary tortfeasor.  By its very terms, the ATS simply does not suggest such third-party liability.

12

Even where Congress expressly establishes domestic *criminal* aiding and abetting liability, whether to impose such liability for *civil* claims as well is a separate legislative judgment requiring legislative action.  The Supreme Court's ruling in *Central Bank of Denver v. First Interstate Bank*, 511 U.S. 164 (1994), is key to this case.  There, the Court explained that there is no "general presumption" that a federal statute should be read to extend aiding and abetting liability to the civil context.  In the criminal law context "aiding and abetting is an ancient *  *  * doctrine" (*id.* at 181), but its extension to permit civil redress is not well established: "the doctrine has been at best uncertain in application" (*ibid.*).  While in the criminal context the government's prosecutorial judgment serves as a substantial check on the imposition of criminal aiding and abetting liability, there is no similar check on civil aiding and abetting liability claims.  *Cf. Sosa*, 542 U.S. at 727.

Significantly, *Central Bank* noted that, while there is a general criminal aiding and abetting statute (*see* 511 U.S. at 176 (citing 18 U.S.C. § 2)), "Congress has not enacted a general civil aiding and abetting statute — either for suits by the Government * * * or for suits by private parties" (*id.* at 182).  The Court concluded, "when Congress enacts a statute under which a person may sue and recover damages from a private defendant for the defendant's violation of some statutory norm, *there is no general presumption that the plaintiff may also sue aiders and abettors*."  *Ibid.*

13

(emphasis added). Thus, under *Central Bank*, a court must not presume that there is any right to assert a civil aiding and abetting claim under the ATS.[5]

Moreover, in *Central Bank*, the Court explained that adoption of aiding and abetting liability for civil claims would be "a vast expansion of federal law." 511 U.S. at 183. Such an expansion of the law, the Court held, required legislative action, and could not be carried out through the exercise of federal common law. *Ibid.* So, too, under the ATS. Reading this statute's implicit and limited authorization for courts to announce federal common law to permit courts to impose aiding and abetting liability would vastly increase its scope and range to cover not only those persons most responsible for violating a narrow set of international-law norms, but also any persons who aid and assist the primary wrongdoer. That would be inconsistent with Congress' "limited, implicit sanction to entertain a handful of international law *cum* common law claims." *Sosa*, 542 U.S. at 712. Indeed, such a construction would represent precisely the type of "aggressive role in exercising" jurisdiction under the ATS the

---

[5] The United States successfully argued in favor of aiding-and-abetting liability under 18 U.S.C. § 2333, a statute providing a civil cause of action for those injured by an act of international terrorism. *See Boim v. Quranic Literacy Institute*, 291 F.3d 1000 (7th Cir. 2002). However, that argument was based on that statute's particular context, language, and purposes. The court of appeals made clear that a different result would apply in the absence of an express cause of action (as is true here). To adopt aiding-and-abetting liability in that context would be to improperly "pile inference upon inference." *Id.* at 1019.

Supreme Court warned against, in light of the "general practice * * * to look for legislative guidance before exercising innovative authority over substantive law." *Id.* at 726. The question, moreover, is whether courts may *now* fashion a rule of federal common law imposing damages liability on an aiding and abetting theory. *Central Bank* controls the present-day law-making power of the federal courts on that question. Without a clear directive from Congress, courts may not recognize aiding and abetting claims under the ATS, thereby vastly increasing that statute's scope.

In *Sosa*, the Supreme Court warned courts against assuming a legislative function in "craft[ing] remedies" where resolution of the legal issue could adversely implicate foreign policy and foreign relations. *Id.* at 727. The hesitation mandated by *Sosa* in deciding whether to recognize and enforce an international law norm as a matter of federal common law under the ATS, when coupled with the teaching of *Central Bank* that the decision whether to adopt aiding and abetting liability for a civil claim is a legislative policy judgment, leads to the unmistakable conclusion that aiding and abetting liability should not be recognized under the ATS, absent further Congressional action. Ultimately, the questions of whether and how to expand the reach of civil liability under the ATS beyond the primary tortfeasor would present difficult policy and foreign relations considerations that must be determined by the political branches, not by individual federal courts.

B.    *Central Bank*'s Rationale Applies Equally to Civil Conspiracy Claims under the ATS.

The same rationale informing the Supreme Court's decision not to recognize civil aiding and abetting liability in *Central Bank* applies to claims of conspiracy liability.  Although Congress has enacted a general criminal conspiracy statute (*see* 18 U.S.C. § 371), there is no general civil conspiracy statute.  Rather, when Congress wishes to impose civil liability for conspiracy to violate a particular norm, it does so statute by statute. *See, e.g.,* 18 U.S.C. §§ 1962(d), 1964(c) (Racketeer Influenced and Corrupt Organizations (RICO) Act); 42 U.S.C. § 1985 (conspiracy to interfere with civil rights).  Indeed, this Court has already held that "the Supreme Court's reasoning in *Central Bank* applies not only to aiding and abetting claims, but to conspiracy claims as well." *Dinsmore v. Squadron, Ellenoff, Plesent, Sheinfeld & Sorkin*, 135 F.3d 837, 841 (2d Cir. 1998).

Thus, as with aiding and abetting, adoption of conspiracy liability for civil claims under the ATS would be a vast expansion of federal law, which should not be undertaken by the courts through the exercise of federal common law, in the absence of guidance from Congress.  As with aiding and abetting liability, recognition of conspiracy liability under the ATS presents difficult policy and foreign relations considerations that should be determined by the political branches.

Plaintiff rely on *Cabello v. Fernandes-Larios*, 402 F.3d 1148 (11th Cir. 2005) to support their contention that civil conspiracy liability is cognizable under the ATS. Pls.' Br. 77, 80–81. *Cabello* is the only court of appeals decision issued after *Sosa* to recognize civil aiding and abetting and civil conspiracy liability under the ATS.[6] However, *Cabello* does not even mention *Sosa* let alone consider whether judicial expansion of federal common law to recognize civil aiding and abetting and conspiracy liability is consistent with the framework *Sosa* established for recognizing claims under the ATS. Nor does *Cabello* mention *Central Bank* or consider whether it would be appropriate for a court to recognize civil conspiracy liability in the absence of congressional direction. Thus, *Cabello* is of no persuasive value.

Plaintiffs also rely on *Beck v. Prupis*, 529 U.S. 494 (2000) to support their contention that federal courts should imposes conspiracy liability under the ATS, relying on the "federal common law of civil conspiracy." Pls.' Br. 27 n.83. But *Beck* involved a claim under RICO, a statute in which Congress expressly provided for claims of civil conspiracy. *See* 18 U.S.C. §§ 1964(c), 1962(d); *Beck*, 529 U.S. at 500. In construing that statutory cause of action, the Supreme Court looked to common

---

[6] The Ninth Circuit had recognized secondary civil liability under the ATS in *Sarei v. Rio Tinto*, but has since issued a revised opinion in that case expressly reserving the question. *See Sarei v. Rio Tinto*, __ F.3d __, 2007 WL 1079901, at *6 (9th Cir. Apr. 12, 2007).

law conspiracy tort principles only because, when Congress codifies a common law standard, it "presumably knows and adopts" the background common law principles associated with that standard. *Beck*, 529 U.S. at 501 (quotation marks omitted). *Beck* therefore underscores *Central Bank*'s and *Dinsmore*'s holdings that, absent clear direction from Congress, courts should not expand the scope of civil liability under federal law by imposing aiding and abetting or conspiracy liability.

C. **Practical Consequences for U.S. Foreign Relations Reinforce the Conclusion That Courts May Not Impose Liability on Aiding and Abetting or Civil Conspiracy Theories as a Matter of Federal Common Law under the ATS.**

In *Sosa*, the Supreme Court warned that a court's limited federal common-law-making authority to recognize causes of action under the ATS must be exercised with "great caution" and "war[iness]," particularly where the exercise of common-law authority could impinge upon the political branches' discretion "in managing foreign affairs." 542 U.S. at 724–725, 727. A court deciding whether to announce a federal common law rule imposing aiding and abetting or conspiracy liability under the ATS must consider the practical consequences, including the foreign policy effects of such a ruling. *See id*. at 732–33 (courts must consider "the practical consequences of making [a] cause available to litigants" under the ATS); *id*. at 733 n.21 (noting, in discussing other possible limiting principles, that "there is a strong argument that

18

federal courts should give serious weight to the Executive Branch's view of the case's impact on foreign policy"). Those consequences reinforce the conclusion that courts may not impose aiding and abetting or conspiracy liability as a matter of federal common law under the ATS.

1. One of the "practical consequences" of embracing civil aiding and abetting or civil conspiracy liability for ATS claims would be an uncertainty that would interfere with the ability of the U.S. Government to employ its full range of foreign policy options when interacting with regimes whose policies, including domestic policies, the United States would like to influence. In some circumstances, U.S. Government policy may be to broadly prohibit trade and investment with another country. But in other cases, the Government may determine that commercial interaction is desirable in encouraging reform and gaining leverage. For example, in the 1980s (under a policy relevant to No. 05-2326, pending before this court), the United States both supported economic ties with black-owned companies and used limited sanctions to encourage the South African government to end apartheid. *See* Pub. L. No. 99-440, §§ 4, 101, 304-05, 100 Stat. 1086; National Security Decision Directive 187 (Sept. 7, 1985), *available at* http://www.fas.org/irp/offdocs/nsdd/nsdd-187.htm.

19

Individual federal judges exercising their own judgment after the fact by imposing aiding and abetting or conspiracy liability under the ATS for working with oppressive regimes would generate significant uncertainty concerning private liability, which would deter many businesses from such economic engagement, and so would frustrate the ability of the Executive Branch to pursue that strategy should it choose to do so. No matter how the Executive Branch were to craft economic engagement policies, companies would likely become targets of ATS aiding and abetting or conspiracy suits, and the fact-specific nature of those claims would expose them to protracted and uncertain proceedings in U.S. courts. *Cf. Central Bank*, 511 U.S. at 188–189.

The determination of whether to pursue such a policy is precisely the type of foreign affairs question that is constitutionally vested in the political branches and over which the courts lack institutional authority and ability to decide. *See Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 384–386 (2000). Importantly, judicial recognition of civil aiding and abetting or conspiracy liability under the ATS could undermine the ability of the Executive to employ a range of diplomatic tools in attempting to induce improvements in foreign human rights practices. The selection of the appropriate tactics, and the proper balance between rewards and sanctions, may vary significantly from country to country and requires difficult policymaking

20

judgments that can be rendered only by the federal political branches. *See Crosby*, 530 U.S. at 375–385.

Civil aiding and abetting and civil conspiracy liability would also have a deterrent effect on the free flow of trade and investment more generally, because it would create uncertainty for those operating in countries where abuses might occur. The United States has an interest in promoting the free flow of trade and investment, both into and out of the United States, in order to increase jobs domestically. Indeed, imposing aiding and abetting or conspiracy liability could also have a potential deterrent effect on investments *within* the United States because of the concern of ATS jurisdiction based on contacts here and the exposure of such investments to attachment to satisfy adverse judgments. Apart from this national economic interest, the United States has broader foreign policy interests in using trade and investment to promote economic development in other countries and improve the standard of living overseas as a way of promoting stability, democracy and security.

2.    Another important practical consideration is that encouraging the proliferation of ATS suits through judicial imposition of civil aiding and abetting or conspiracy liability would inevitably lead to greater diplomatic friction for the United States.   Such liability would trigger a wide range of ATS suits with plaintiffs challenging the conduct of foreign nations — conduct that would otherwise be

21

immune from suit under the Foreign Sovereign Immunities Act (FSIA).[7]  Allegations of aiding and abetting or conspiracy liability would afford plaintiffs the ability, in effect, to challenge the foreign government's conduct by asserting claims against those alleged to have aided and abetted or conspired with the government.

Experience has shown that ATS suits asserting aiding and abetting or conspiracy liability often trigger foreign government protests, both from the nations where the alleged abuses occurred, and, in cases (such as this one) against foreign corporations, from the nations where the corporations are based or incorporated (and therefore regulated).  As the district court in this case observed, the State Department received a diplomatic note from Canada raising significant concerns about United States courts' expansive exercise of jurisdiction under the ATS in a manner that disrupts Canada's own efforts to use economic engagement in Sudan, combined with sanctions, in an attempt to bring about a peaceful resolution of Sudan's internal disputes.  Aug. 30 Op. 4–5.  The serious diplomatic friction that would result from judicial recognition of civil aiding and abetting and conspiracy claims under the ATS could lead to a lack of cooperation on important foreign policy objectives.

---

[7] Under the FSIA, foreign governments are immune from suit, subject to certain specified exceptions.  28 U.S.C. § 1604.  For tort claims, foreign governments generally cannot be sued unless the tort occurs within the United States.  *See id.* § 1605(a)(5).

Thus, serious foreign policy and other consequences relating to U.S. national interests reinforce the conclusion that courts may not properly impose civil aiding and abetting or conspiracy liability as a matter of federal common law under the ATS — especially for conduct that occurred in a foreign country, beyond the reach of U.S. law, involving a foreign nation's treatment of its own nationals.

**D.    Civil Aiding And Abetting and Civil Conspiracy Liability Does Not Satisfy *Sosa*'s Threshold Requirement That an International Law Norm Be Both Firmly Established and Well Defined.**

Whatever other considerations are relevant, under *Sosa*, a necessary requirement in determining whether an international law norm may properly be recognized and enforced as part of an ATS federal common law cause of action is that the international law principle must be both sufficiently established and well defined. The Supreme Court did not provide any definitive methodology for assessing when international law norms meet these standards.  The Court explained, however, that the principle at issue must be both "accepted by the civilized world" and "defined with a specificity," and in both respects the norms must be "comparable to the features of the 18th-century paradigms" — i.e., "violation of safe conducts, infringement of the rights of ambassadors, and piracy."  *Sosa*, 542 U.S. at 724–25.

1.  There is no international norm for civil aiding-and-abetting liability or civil conspiracy for suits brought by private parties that is "accepted by the civilized world."

23

Virtually the only international source even to mention non-criminal aiding-and-abetting liability is Article 16 of the International Law Commission's Draft Articles on Responsibility of States for International Wrongful Acts, which have been commended by the U.N. General Assembly to states for their consideration. *See* G.A. Res. 59/35, U.N. Doc. A/RES/59/35 (Dec. 2, 2004); G.A. Res. 56/83 & Annex, art. 16, U.N. Doc. A/RES/56/83 (Jan. 28, 2002). That draft article has no relevance here because it would extend liability only to *States* that aid and abet the wrongful act of another State. *See Sosa*, 542 U.S. at 732 & n.20 (court considering whether to recognize cause of action must consider "whether international law extends the scope of liability for a violation of a given norm to the perpetrator being sued"). And there is no international source of which we are aware to recognize general civil conspiracy liability.

In holding that civil aiding and abetting liability is available under the ATS, the district court relied entirely on international practice regarding criminal aiding and abetting. *See Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 374 F. Supp. 2d 331, 340 (S.D.N.Y. 2005). As discussed above, however, there is no "general presumption" in U.S. law that criminal aiding-and-abetting liability extends liability to the civil context. Rather, the general presumption under our domestic law is that such an extension requires an independent legislative policy choice. *Central Bank*,

511 U.S. at 182.  The limited federal common-law-making power of the federal courts under the ATS is governed by that rule.

Moreover, the decision to charge a person for an international crime is a grave matter requiring careful exercise of prosecutorial judgment by government officials. That prosecutorial judgment serves as a substantial practical check on the application of the criminal aiding-and-abetting standard.  Opening the doors to civil aiding-and-abetting claims in U.S. courts through the ATS could not be more different.  Any aggrieved aliens, anywhere in the world, could potentially bring an ATS suit in the United States, claiming that a private party aided or abetted abuses committed abroad against them by a foreign government.  Such a "vast expansion" of civil liability by judicial imposition of an aiding-and-abetting rule (*Central Bank*, 511 U.S. at 183), would contradict *Sosa*'s admonitions that the ATS supplies jurisdiction over only a modest set of claims (542 U.S. at 720).

A similar analysis applies to plaintiffs' conspiracy claims.  As noted, there is no international law norm of general civil conspiracy liability.  And just as it would be inappropriate for a court to recognize civil aiding and abetting liability as a matter of federal common law in the absence of any direction from Congress, it would be equally inappropriate for a court to vastly expand civil liability under the ATS by recognizing conspiracy liability without Congressional guidance.  *See Dinsmore*, 135

25

F.3d at 841.  In addition, just as with aiding and abetting liability, expanding conspiracy liability to the civil context would eliminate the important check on the criminal conspiracy standard that is provided by the exercise of prosecutorial discretion.

2.  Because there is no international norm for civil aiding-and-abetting liability or civil conspiracy for suits brought by private parties that is "accepted by the civilized world," in order to adjudicate a claim for civil liability based on either conspiracy to violate or aiding and abetting an asserted violation of international law, a federal court would be required to confront a host of issues not addressed by international law, including allocation of liability among multiple tortfeasors, the standard of causation, and whether it is appropriate to impose liability on an alleged aider and abettor or conspirator where the primary tortfeasor is immune from suit.

In addition, in devising a standard for civil aiding and abetting, the court would have to decide whether to adopt the *mens rea* requirement plaintiffs urge (*see* Pls.' Br. 69–70), under which liability is triggered by mere knowledge that one's actions will assist another to commit a crime, or a standard requiring an intent to assist the commission of the crime.  *Compare, e.g. Prosecutor v. Blaškić*, No. IT-95-14-A, ¶ 49 (ICTY App. Chamber, July 29, 2004) ("[K]nowledge on the part of the aider and abettor that his acts assist in the commission of the principal perpetrator's crime

suffices for the *mens rea* requirement of this mode of participation.") *with* Rome Statute of the Int'l Criminal Court, art. 25(3), U.N. Doc. A/CONF.183/9 (1998) (imposing aiding and abetting liability when a defendant acts "*for the purpose* of facilitating the commission" of a crime) (emphasis added).

In creating a standard for civil conspiracy liability, the court would have to fashion additional rules governing the type of agreement establishing a civil conspiracy, what acts qualify as furthering the conspiracy, and rules governing withdrawal from the conspiracy. The court would also have to decide whether to impose conspiracy liability for the unintended but foreseeable consequences of a criminal agreement, as plaintiffs urge, or to impose conspiracy liability only for acts that were the intended result of the conspiracy. *Compare* Pls.' Br. 79 n.84 (relying on joint criminal enterprise — not conspiracy — case from the International Criminal Tribunal for the former Yugoslavia) *and Pinkerton v. United States*, 328 U.S. 640, 646–47 (1946) *with Prosecutor v. Musema*, ICTR-96-13-A, Judgment, ¶ 192 (Trial Chamber Jan. 27, 2000) ("[T]he *mens rea* of the crime of conspiracy to commit genocide * * * rests on the concerted intent to commit genocide.").

Such wholesale law-making in developing standards for civil liability is a far cry from the careful and narrow steps envisioned in *Sosa*. The caution mandated by *Sosa*, when coupled with the teaching of *Central Bank* and *Dinsmore* that the decision

whether to adopt aiding-and-abetting or conspiracy liability for a civil claim is typically a legislative policy judgment, leads inexorably to the conclusion that a court may not impose such liability under the ATS absent further Congressional action.

## III.    The Invalidity of Plaintiffs' Civil Aiding and Abetting and Civil Conspiracy Claims Did Not Deprive the District Court of Jurisdiction.

Talisman argues that the district court lacked subject matter jurisdiction over plaintiffs' civil aiding and abetting and civil conspiracy claims because those claims are not defined in international law with the specificity *Sosa* requires. Talisman Br. 32–34. While plaintiffs' claims are not valid (as we argued above) insofar as they would require the extraterritorial application of U.S. law (in the form of federal common law) and judicial imposition of civil secondary liability and civil conspiracy liability in the absence of Congressional guidance, the invalidity of plaintiffs' claims did not affect the district court's subject matter jurisdiction under the ATS.

Failure to state a claim does not generally affect a court's subject matter jurisdiction (*see Arbaugh v. Y&H Corp.*, 126 S. Ct. 1235, 1242–45 (2006)), unless the claim is so "plainly unsubstantial" that it falls outside of the statutory grant of jurisdiction (*Ex parte Poresky*, 290 U.S. 30, 32 (1933)).  For that reason, "it is well settled that the failure to state a proper cause of action calls for a judgment on the

28

merits and not for a dismissal for want of jurisdiction." *Bell v. Hood*, 327 U.S. 678, 682 (1946).

In *Sosa*, the Supreme Court recognized that, under the ATS, federal courts have limited "residual common law discretion" (542 U.S. at 738) to recognize a "narrow class" (*id*. at 729) of federal common law tort claims brought by aliens based on international norms "defined with a specificity comparable to the features of the 18th-century paradigms" (*id*. at 725), subject as well to the non-extraterritoriality restriction described above and other limitations described in *Sosa*. Under this standard, a district court would lack ATS jurisdiction over claims that are not recognizable as torts. *See, e.g., O'Reilly De Camara v. Brooke*, 209 U.S. 45, 52 (1907) ("[W]e think it plain that where, as here, the jurisdiction of the case depends upon the establishment of a 'tort only in violation of the law of nations, or of a treaty of the United States,' it is impossible for the courts to declare an act a tort of that kind when the Executive, Congress, and the treaty-making power all have adopted the act."). A district court would also lack jurisdiction under the ATS over claims that did not purport to involve a violation of the law of nations, or those asserted by United States citizens. But at the present time, a court does not lack jurisdiction over an alien's colorable claim for a tort alleged in violation of the law of nations, even if it turns out that the claim is not well-defined as required by *Sosa*, or involves extraterritorial

conduct.  *See Sarei v. Rio Tinto, PLC*, __ F.3d __, 2007 WL 1079901, at *4 (9th Cir. Apr. 12, 2007) ("[T]he district court had subject matter jurisdiction under the [ATS] so long as plaintiffs alleged a nonfrivolous claim by an alien for a tort in violation of international law.").   In that circumstance, the district court will have ATS jurisdiction but should dismiss the plaintiff's suit for failure to state a claim.  *See Bell*, 327 U.S. at 682.

Plaintiffs here have asserted colorable tort claims in violation of international norms.  The ultimate invalidity of those claims does not deprive the district court of subject matter jurisdiction.[8]

---

[8] However, one plaintiff, Nuer Community Development Services in USA, is a non-profit Minnesota corporation.  453 F. Supp. 2d at 661.  Because it is not an alien, the district court lacked ATS jurisdiction over its claims, as the district court properly held.  *Ibid*.

30

## CONCLUSION

For the foregoing reasons, the Court should affirm the district court's grant of summary judgment to the defendant-appellee.

Respectfully submitted,

MICHAEL J. GARCIA
*United States Attorney*

JEFFREY S. BUCHOLTZ
*Acting Assistant Attorney General*

DAVID S. JONES, (212) 637-2739
*Assistant U.S. Attorney*
*Southern District of New York*
*86 Chambers Street, 3rd Floor*
*New York, N.Y. 10007*

DOUGLAS N. LETTER, (202) 514-3602
ROBERT M. LOEB, (202) 514-4332
LEWIS S. YELIN, (202) 514-3425
*Attorney, Appellate Staff*
*Civil Division, Room 7318*
*U.S. Department of Justice*

JOHN B. BELLINGER III
*Legal Adviser*
*Department of State*
*Washington D.C. 20520*

*950 Pennsylvania Ave., N.W.*
*Washington, D.C. 20530-0001*

*Attorneys for Amicus Curiae*
*United States of America*

May 15, 2007

31

## CERTIFICATE OF COMPLIANCE:
## TYPE-VOLUME

Pursuant to Fed. R. App. P. 32(a)(7)(C), I certify that this brief uses proportionately spaced font and contains 6,994 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

_____

Lewis S. Yelin
*Attorney for Amicus Curiae*
*United States of America*

Date: May 15, 2007

## CERTIFICATE OF COMPLIANCE:
## VIRUS PROTECTION

Pursuant to Local Rule 32(a)(1)(E), I certify that I scanned the PDF copy of this brief for viruses and that no virus was detected. I scanned the PDF copy with Trend Micro OfficeScan Client for Windows v. 6.5 using virus pattern file no. 4.467.00 (released on May 14, 2007).

_____

Lewis S. Yelin
*Attorney for Amicus Curiae*
   *United States of America*

Date: May 15, 2007

## CERTIFICATE OF SERVICE

I certify that on this 15th day of May, 2007, I caused the foregoing Brief for the Appellees to be filed with the Court and served on counsel by causing by causing one copy to be sent by e-mail to briefs@ca2.uscourts.gov and by causing 10 copies to be delivered by OVERNIGHT DELIVERY to:

> Thomas Asreen
> Acting Clerk of Court
> U.S. Court of Appeals
>    for the Second Circuit
> 500 Pearl Street
> New York, NY 10007
> (212) 857-8500

and by further causing one copy to be sent by e-mail (to lead counsel for appellants and appellees) and two copies to be delivered by OVERNIGHT DELIVERY to:

Paul L. Hoffman
Adrienne J. Quarry
Schonbrun DeSimone Seplow
Harris & Hoffman
723 Ocean Front Walk
Venice, CA 90291
(310) 396-0731

Carey D'Avino
Stephen Whinston
Keino Robinson
Berger & Montague, P.C.
1622 Locust Street
Philadelphia, PA 19103
(215) 875-3088

Lawrence Kill
John O'Connor
Stanley Bowker
Anderson Kill & Olick, P.C.
1251 Avenue of the Americas
New York, NY 10020
(212) 278-1000

Richard Heinmann
Elizabeth Cabraser
Daniel E. Seltz
Steven E. Fineman
Rachel Geman
Lieff, Cabraser, Heimann & Bernstein, LLP
780 Third Avenue, 48th Floor
New York, NY 100 17
(212) 355-9500

Mark Diamond
64 Fulton Street, Suite 300
New York, NY  10038
(212) 227-3377


William J. Aceves
Professor of Law
California Western School of Law
225 Cedar Street
San Diego, CA  92101
(619) 515-1589

Jennifer M. Green
Katherine Gallagher
Center for Constitutional Rights
666 Broadway, 7th floor
New York, NY  10012
(212) 614-6431


Jonathan W. Cuneo
R. Brent Walton
Cuneo Gilbert & LaDuca, LLP
507 C Street, NE
Washington, DC  20002
(202) 789-3960

James J. Dillon
Foley Hoag LLP
155 Seaport Blvd.
Boston, MA  02210
(617) 832-1000

Marco B. Simons
Richard L. Herz
Earthrights International
1612 K Street NW, Suite 401
Washington, DC  20006
(202) 466-5188

Judith Brown Chomsky
Michael Poulshock
Law Office of Judith Brown Chomsky
8120 New Second Street
Elkins Park, PA 19027
(215) 782-8367

Terrence P. Collingsworth
Derek Baxter
Natacha Thys
International Labor Rights Fund
2001 S Street NW, Suit 420
Washington, DC  20009
(202) 347-4100

Karen M. Asner
Milana Salzman
White & Case LLP
1155 Avenue of the Americas
New York, NY  10036
(212) 819-8200

Janet Walker
Professor of Law
Osgood Hall Law School of York University
4700 Keele Street
Toronto, Ontario
Canada  M3J 1P3
(416) 736-5580

H. Scott Fairley
Theall Group LLP
4 King Street West, Ste. 1410
Toronto, Ontario
Canada  M5H 1B6
(416) 304-6185

Robin S. Conrad
Amar D. Sarwal
National Chamber Litigation
    Center, Inc.
1615 Street, NW
Washington, DC  20062
(202) 463-5337

Christopher Greenwood, CMG,
QC
Essex Court Chambers
24 Lincoln's Inn Fields
London  WC2A 3EG
United Kingdom
011 44 207 813 8000

Michael D. Ramsey
University of San Diego
    School of Law
San Diego, CA  92110
(619) 260-4145

Joseph P. Cyr
Marc J. Gottridge
Scott W. Reynolds
Andrew M. Behrman
Lovells
590 Madison Avenue
New York, NY  10022
(212) 909-0600

Daniel J. Popeo
Richard A. Samp
Washington Legal Foundation
2009 Massachusetts Ave., NW
Washington, DC  20036
(202) 588-0302

John Townsend Rich
Paul R. Friedman
William F. Sheehan
Goodwin Procter LLP
901 New Fork Ave., NW
Washington, DC  20001
(202) 346-400 0

Samuel Estreicher
NYU School of Law
40 Washington Square South
New York, NY  10012
(212) 998-6226

James Crawford
Whewell Professor
    of International Law
University of Cambridge
5 Cranmer Road
Cambridge  CB3 9BL
United Kingdom
011 44 1223 335 358

_____

Lewis S. Yelin
*Attorney for Amicus Curiae*
    *United States of America*