Xiaoning et al v. Yahoo! Inc, et al                                                                                     Doc. 28

Case 4:07-cv-02151-CW     Document 28     Filed 06/29/2007     Page 1 of 27

Morton, H. Sklar, Executive Director
msklar@humanrightsusa.org
World Organization for Human Rights USA
2029 P Street NW, Suite 301
Washington, DC 20036
Telephone:  (202) 296-5702
Facsimile:  (202) 296-5704
[Admitted *Pro Hac Vice*]

Roger Myers (CA State Bar No. 146164)
roger.myers@hro.com
HOLME ROBERTS & OWEN LLP
560 Mission Street, 25th Floor
San Francisco, CA 94105-2994
Telephone:     (415) 268-2000
Facsimile:     (415) 268-1999

[Additional Attorneys Appear on Signature Page]

Attorneys for Plaintiffs
WANG XIAONING, YU LING, SHI TAO

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### OAKLAND DIVISION

| | |
|---|---|
| WANG XIAONING, YU LING, SHI TAO, and ADDITIONAL PRESENTLY UNNAMED AND TO BE IDENTIFIED INDIVIDUALS, <br><br> Plaintiffs, <br><br> v. <br><br> YAHOO, INC., a Delaware Corporation, YAHOO! HOLDINGS (HONG KONG), LTD., a Foreign Subsidiary of Yahoo!, ALIBABA.COM, INC. a Delaware Corporation, AND OTHER PRESENTLY UNNAMED AND TO BE IDENTIFIED INDIVIDUAL EMPLOYEES OF SAID CORPORATIONS, <br><br> Defendants. | **Case No. C07-02151 CW** <br><br> **TORT DAMAGES CLAIM** <br><br> **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR AN EARLY CASE MANAGEMENT CONFERENCE AND ORDER** <br><br> Date: July 2 or 26, 2007 (Proposed) <br> Time: TBD <br> Location: Courtroom 2 <br><br> Judge: Hon. Claudia Wilken |

1

# TABLE OF CONTENTS

TABLE OF CONTENTS ...............................................................................................i

TABLE OF AUTHORITIES ..................................................................................... iii

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR AN
  EARLY CASE MANAGEMENT CONFERENCE........................................ 1

I. Introduction – The Second Rescheduling of the Case Management
  Conference As Requested by Defendants Is Inappropriate and
  Unnecessary ............................................................................................ 1

II. Many Of The Underlying Arguments Upon Which The Defendants
  Base Their Request For An Alternative Case Management Process
  Are Based Upon Incorrect Assumptions or Mischaracterizations .................. 3

 A. Defendants Incorrectly Assume that Plaintiffs Will Be Inaccessible
 for Evidentiary Purposes............................................................................ 4

 B. Defendants' Motion Mischaracterizes the Standing Order as
 Describing the Case Management Process Itself, When in Fact It Only
 Describes the Contents of the Parties' Reports Subsequent to Those
 Procedures................................................................................................ 5

 C. Defendants' Motion Misinterprets the *Sosa* Vigilant Doorkeeping
 Requirement by Incorrectly Implying that Plaintiffs' Claims Fall Outside
 of the Narrow Class of Claims Suitable for ATCA Cases............................. 5

III. The Issues Raised by the Defendants Require the Further Factual and
  Issue Development that the Regular Case Management Process Is
  Designed To Provide ................................................................................ 8

 A. The Defendants' Personal Jurisdiction Challenges Are Not
 Conclusive, and    Require Further Factual Development and Legal
 Analysis Through the Regular Case Management Process and/or
 Preliminary Discovery ............................................................................... 9

 B. The Regular Case Management Process Will Best Facilitate the
 Fact Finding Process Necessary to Demonstrate the Impropriety of the
 Defendants Disclosing Internet User Information to Chinese Authorities............... 10

IV. Solicitation of the Views of the Political Branches of the U.S.
  Government On This Case Would Not Be Appropriate and Would
  Not Justify The Requested "Suspension" of the Case Management
  Process ................................................................................................. 11

 A. Since Immunity and Act of State Doctrine Issues Are Not Relevant
 to This Case, Soliciting a Statement of Interest From the Political
 Branches Would Be Inappropriate.............................................................. 12

 B. Even if a Statement of Interest Were Submitted, It Would Not Be
 Dispositive with Respect to Any Determinations of the Final Outcome
 of the Case ............................................................................................ 14

PLAINTIFFS' OPPOSITION TO     i
DEFENDANTS' MOTION FOR AN EARLY
CASE MANAGEMENT CONFERENCE     Case No. C07-02151 CW

C.    Because Determining the Justiciability of Claims Requires a Comprehensive Record of the Pleadings and Facts, the Regular Discovery and Case Management Process Should Not Be Delayed Pending Receipt of a Statement of Interest .................................................................. 19

V.    Conclusion .............................................................................................................. 21

Certificate of Compliance

# TABLE OF AUTHORITIES

## CASES

*Alexis Holyweek Sarei v. Rio Tinto, PLC*, Nos. 02-56256, 02-56390, 2007 WL 1079901 (9th Cir. Apr. 12, 2007)........................................................................15

*Baker v. Carr*, 369 U.S. 186 (1962)..............................................................12, 15

*Data Disc, Inc. v. Systems Technology Associates, Inc.*, 557 F.2d 1280, 1285 n.1 (9th Cir. 1977)...................................................................................................9

*Doe v. Qi*, 349 F. Supp.2d 1258 (N.D. Cal. 2004).......................................6, 7, 18

*Estados Unidos Mexicanos v. DeCoster*, 229 F.3d 332, 342 (1st Cir. 2000) .......13, 14

*In re Estate of Marcos Human Rights Litig.*, 978 F.2d 493, 500 (9th Cir. 1992).......14

*In re Nazi Era Cases Against German Defendants Litigation*, 129 F. Supp.2d 370, 375 (D.N.J. 2001)...............................................................................................20

*In re South African Apartheid Litigation*, 238 F. Supp.2d 1379 (JPML 2002) ............7

*Insurance Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694 (1982)...........................................................................................................9

*Kadic v. Karadzic*, 70 F.3d 232, 249 (2nd Cir. 1995)........................................16

*National Coalition Government of Union of Burma v. Unocal, Inc*, 176 F.R.D. 329, 339 (C.D.Cal. 1997).................................................................................13

*Pfizer, Inc. v. Government of India*, 434 U.S. 308, 319 (1978) .............................14

*Renee v. Geary*, 501 U.S.312, 316 (1991) ........................................................20

*Sabbatino v. Banco Nationale de Cuba*, 376 U.S. 398 (1964)................................12

*Siderman de Blake v. Republic of Argentina*, 965 F.2d 699, 714-15 (9th Cir. 1992)............7, 14

*Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004)....................................6, 7, 12, 15

*Wells Fargo & Co. v. Wells Fargo Express Co.*, 556 F.2d 406, 430 n.24 (9th Cir. 1977) .........................................................................................................9

## OTHER AUTHORITIES

135 Cong. Rec. H. 6423, October 2, 1989 ....................................................17, 18

138 Cong. Rec. S. 2667, March 3, 1992. ......................................................17, 18

Country Reports on Human Rights Practices, (Mar. 6, 2007) *available at* http://www.state.gov/g/drl/rls/hrrpt/2006/78771.htm. ...................................19, 20

Derek Baxter, *Protecting the Power of the Judiciary: Why the Use of State Department "Statements of Interest" in Alien Tort Statute Litigation Runs Afoul of Separation of Power Concerns*, 37 Rutgers L.J. 807, 825 n.103 (2006) ...............15

Standing Order for All Judges of the N.D. Cal., Contents of Joint Case Mgmt. Statement (effective Mar. 1, 2007). .......................................................................5

*The Internet in China: A Tool for Freedom or Suppression?, p. 156,  available at* http://commdocs.house.gov/committees/intlrel/hfa26075.000/hfa26075_0f.htm ......................................................................................................................11

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR AN EARLY CASE MANAGEMENT CONFERENCE**

**I.    Introduction – The Second Rescheduling of the Case Management Conference As Requested by Defendants Is Inappropriate and Unnecessary**

This submission is being filed in opposition to the Defendants' Motion for an Early Case Management Conference.  Plaintiffs previously filed an Opposition to Defendants' Motion to have an early hearing on their request on July 2.  The present Opposition rejects the Defendants' suggestion that an Early Case Management Conference be held at all, on grounds that such an early conference is unnecessary and inappropriate, that the matters and issues that the Defendant would like to raise in the proposed earlier Conference can all be more effectively dealt with as part of the regular case management process, and that the Court should not be placed in the position of altering for a second time the scheduling for the case management process, especially given that the Defendants successfully sought and obtained an amendment of the Scheduling Order just a few days ago.  Plaintiffs believe that the regular case management conference, just rescheduled at the Defendants' request for September 18, and the regular case management process leading up to that conference, are the more appropriate mechanisms for the Parties and the Court to consider and decide how best to deal with these matters.

In their Motion, Defendants point to a number of issues and concerns they cite as reasons why an early conference should be scheduled, and as matters that they propose to address at that special court hearing.  Plaintiffs agree that these issues, and several others that are important to the Plaintiffs, are relevant to these proceedings and must be raised and addressed at the appropriate time, but not at this stage of the proceedings, nor in the manner that the Defendants propose to deal with them.  Instead, their proper consideration, even for preliminary planning purposes, requires exactly the kind of fact gathering and development, and information sharing, that the regular case management process is designed to produce.  These regularly scheduled

procedures should be allowed to proceed and to accomplish their purposes before alternative, extraordinary methods of the type the Defendants propose are applied.

Plaintiffs note, at the outset, that the July 26 date being proposed for the special Conference is just one day earlier than the date (July 27) originally set for the Initial Case Management Conference by the Court.  The Defendants successfully sought a change in this July 27 date just a few days ago on the basis of the Defendants' attorneys' vacation and travel plans. Why, if the underlying goal of the defendants was anything other than to unnecessarily delay and add to the complexity of the case management process, are the Defendants now seeking an additional case management conference on July 26, instead of using the originally scheduled conference of July 27 to deal with these matters?  Why a change in that date was required in the first place given the present Motion for the second change, has not been adequately or logically explained or justified.

With respect to the merits of the issues and concerns that the Defendants cite, Plaintiffs note initially that all (or certainly the vast majority) of these matters would and should be raised as part of the regular case management and ADR process.  The purpose of the ADR and case management procedures is precisely to provide an efficacious means for the Parties to share and discuss the information and issues that advance the litigation process, to identify the issues in contention, and to provide the Court with a summary of the information and arguments that are needed to decide how the case should best be handled, and hopefully, resolved.  Plaintiffs believe that the true motivation of the Defendants, first in seeking a postponement in the case management schedule generally, and now in asking for a fractured (or bifurcated as the Defendants describe it) approach to the case management process is, pure and simple, to unnecessarily delay the progress of the litigation.  This underlying goal is indicated most directly by their request to have discovery and the regular case management process "suspended" until the

1  views of the United States government on the case can be solicited and obtained.

2      Rather than adopt the Defendants' piecemeal approach, whose primary purpose appears to be

3  to delay the effective completion of the case management process, Plaintiffs urge the Court to

4  reject the Defendants' Motion in its entirety, and to maintain the newly rescheduled case

5  management schedule as ordered by the Court on June 19, with the September 18 Initial Case

6  Management Conference used to consider any issues that have been (and will be) raised, and to

7  decide how they best should be handled, after the full benefits of the ADR and case management

8  process have been brought to bear on these matters, as intended by the Court's regular Rules and

9  procedures.

10  

11  **II.**    **Many Of The Underlying Arguments Upon Which The Defendants Base Their Request For An Alternative Case Management Process Are Based Upon Incorrect Assumptions or Mischaracterizations**

12  

13      Defendants request an alternative approach to the case management process that features

14  "bifurcating certain issues," "soliciting statements of interest from the political branches" of the

15  U.S. Government, and placing "a hold on discovery" and other elements of the regular pre-trial

16  and case management process while these initial procedures are completed.  Def. Yahoo! Inc.'s

17  Mot. for an Early Case Mgmt. Conference and Order 1:4, 1:24 (filed June 21, 2007). (hereinafter

18  "Def. Mot.").  Plaintiffs are unalterably opposed to this proposed approach, the substantial delays

19  in the litigation process that it inherently is designed to produce, and its effect of undercutting and

20  bypassing the regular case management process that has already been approved and scheduled by

21  the Court and previously changed at the Defendants' behest.  Plaintiffs point out that many of the

22  proposals are based upon incorrect assumptions and mischaracterizations, placing into serious

23  question the need and justification for the highly unusual procedures and variations from

24  established court practice that the Defendants request.

PLAINTIFFS' OPPOSITION TO            3
DEFENDANTS' MOTION FOR AN EARLY                              Case No. C07-02151 CW
CASE MANAGEMENT CONFERENCE

## A. Defendants Incorrectly Assume that Plaintiffs Will Be Inaccessible for Evidentiary Purposes

To provide just a few examples of the incorrect assumptions and mischaracterizations that form the foundation for the Defendants' Motion, they suggest on page 2, lines 2-6 of their Motion that the Plaintiffs cannot "prosecute this case…in light of the circumstances that they cannot give testimony or communicate with their counsel." Def. Mot. 2:4-6. Neither of these assumptions is correct. One of the Plaintiffs in the case, Yu Ling, came to the United States from China when the complaint was filed. Another potential Plaintiff, the mother and legally designated representative of Plaintiff Shi Tao, also traveled to South Africa and then to the U.S. from China in the past few weeks to accept the Committee to Protect Journalists' Golden Pen International Press Freedom Award on behalf of her son, and to check on the status of the present case by stopping in the U.S. on her trip back to China. While communication with and access to those Plaintiffs being detained in China most certainly is restricted and heavily monitored and censored, they do communicate with their family members, and through them with their counsel, including their Chinese lawyers who have been representing them (to little avail) in that country. Nor do we believe that it is appropriate for the Defendants to seek to cite the unlawful detention and communications restrictions imposed on Shi Tao and Wang Xiaoning as a basis for claiming that their lawsuit cannot be carried out in U.S. courts, and for seeking dismissal of their claims.

As with so many of the other issues the Defendants seek to cite as justification for the "alternative" forms of case management they are proposing, the question of how problems associated with limited access to some of the Plaintiffs impacts the litigation is not one that can or should be handled summarily. This question requires exactly the kind of detailed information disclosure and discussion between the Parties that the regular case management system is designed to produce, so that the Court will have the information, documentation and legal

analyses necessary to properly evaluate and make decisions on these matters for case

management purposes.

**B.  Defendants' Motion Mischaracterizes the Standing Order as Describing the Case Management Process Itself, When in Fact It Only Describes the Contents of the Parties' Reports Subsequent to Those Procedures**

A second example of the incorrect and inaccurate assumptions underlying the Defendants'

Motion is their citation to sections 15, 16, and 20 of the Standing Order for All Judges of the

Northern District of California on the Contents of the Joint Case Management Statement.  *See*

Def. Mot., Standing Order for All Judges of the N.D. Cal., Contents of Joint Case Mgmt.

Statement (effective Mar. 1, 2007).  That Standing Order refers to the information that the Parties

must include in the Case Management Statement to be submitted to the Court (due on September

7th in the present case under the Jointly Stipulated Schedule approved by the Court on June 19th).

These are not guidelines on how the case management system should be handled, as the

Defendants imply, but rather on what the contents of the Parties' reports (joint or separate) to the

Court on the Case Management Process must cover.  By definition, that report cannot be filed

until after the case management process has (at least partially) taken place, initial disclosures and

discussions have occurred, and issues in dispute identified and addressed (at least initially) by the

parties.  Those are exactly the steps, mandated by the Court's Standing Order and regular case

management procedures, that the Defendants are seeking to bypass, undercut, and substantially

delay through the proposals they have made.  Their proposals therefore must be recognized as

being inconsistent with the Standing Order and the case management process, not in furtherance

of these procedures.

**C.  Defendants' Motion Misinterprets the *Sosa* Vigilant Doorkeeping Requirement by Incorrectly Implying that Plaintiffs' Claims Fall Outside of the Narrow Class of Claims Suitable for ATCA Cases**

The vigilant door-keeping "cautions" expressed in *Sosa* do not apply to cases such as this

where the human rights violations cited as the bases for the claims, such as torture and long-term arbitrary detention, have been fully recognized and accepted by Congress and by the courts as appropriate foundations for ATCA and TVPA lawsuits.  The Supreme Court in its *Sosa* decision made crystal clear that the weighing of political and foreign policy concerns was not appropriate in the special category of cases, such as those arising under the TVPA, where a very explicit determination had been made by Congress that U.S. courts were authorized to exercise jurisdiction and make determinations in cases involving torture abuses.

Defendants incorrectly suggest that an early Case Management Conference and the adoption of a "tailored" or "bifurcated" Case Management Order will fulfill the "duty of 'vigilant doorkeeping' to make sure ATS claims fall within the 'narrow class' of claims allowed," that the Supreme Court described in *Sosa*.  Def. Mot. 3:17-19 (citing *Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004)). However, the very same case law cited by Defendants as justification for their argument says exactly the opposite.  This case precedent confirms that Plaintiffs' allegations clearly fall within this "narrow class" of actions that the courts have recognized as justiciable. *Sosa,* 542 U.S. at 729.

Defendants' motion implies that *Sosa's* doorkeeping requirement precludes cases raising political questions, whereas *Sosa* only holds that doorkeeping is required to evaluate whether or not an allegation brought under ATS falls under a clear and well-accepted norm of customary international law, and whether the balancing tests called for under *Baker v. Carr* and *Sabbatino* have been met.  *Sosa,* 542 U.S. at 733 n.21.  Defendants cite two cases as a means of defining the bounds of this "narrow class."  *See* Def. Mot. 3 (citing *Sosa*, 542 U.S. at 692 and *Doe v. Qi*, 349 F. Supp.2d 1258 (N.D. Cal. 2004).  *Sosa* states that an ATS allegation that is a violation of well-established and universally accepted human rights standards is justiciable, and specifically recognizes torture as a violation of the law of nations that meets these standards.  *Sosa,* 542 U.S.

1    at 762.  Following *Sosa,* the District Court for the Northern District of California has stated that

2    "it is well established that torture constitutes *jus cogens* violations."  *Qi*, 349 F. Supp.2d at 1296

3    (citing *Siderman de Blake v. Republic of Argentina*, 965 F.2d 699, 714-15 (9th Cir. 1992)).  *Qi*

4    further found that arbitrary detention and cruel, inhuman or degrading treatment are also

5    actionable under ATS.  *Qi,* 349 F. Supp.2d at 1296.  Thus, the claims at issue in the present case

6    cannot be dismissed as the Defendants suggest simply because they have political or foreign

7    policy overtones.

8    

9    It would be a waste of this court's and both parties' time to adopt the tailored Case

10   Management Order proposed by Defendants when the cases cited by Defendants as justification

11   for the appropriateness of such a plan clearly state that Plaintiffs' specific allegations fall squarely

12   within the "narrow class of claims allowed" to be brought under ATS.  Moreover, it is generally

13   the role of the courts, not the executive, to interpret the law of nations and thus whether or not a

14   specific violation is actionable under ATS.  The Supreme Court in *Sosa* did note the possibility of

15   "case-specific deference to the political branches" where interference with a special mechanism

16   (the South Africa Truth and Reconciliation Commission for example) that had been established

17   locally to resolve those types of claims would result from a U.S. court action.  *Sosa*, 542 U.S. at

18   733 n. 21.  The district court held that the U.S. claims would directly "interfere with policy

19   embodied by [South Africa's] Truth and Reconciliation Commission," a stance which the U.S.

20   endorsed both as a matter of foreign policy and via a Statement of Interest (hereafter "SOI") to

21   the court.  *In re South African Apartheid Litigation*, 238 F. Supp.2d 1379 (JPML 2002)).

22   However, unlike the plaintiffs in the *Apartheid* case, the Plaintiffs in the instant case seek relief

23   for claims which are not justiciable in any form in China, let alone in a form that has been

24   endorsed by the United States.  In enacting the ATCA and especially the TVPA, Congress made

25   clear its intention to provide a judicial forum in the U.S. for dealing with claims involving torture

abuses, and that these types of claims should not be precluded because of foreign policy overtones.  Defendants are misapplying and misconstruing the statements in *Sosa* when they suggest that the *Sosa* standards preclude this lawsuit.

### D.  Defendants Misrepresent Plaintiffs' Purpose in Initiating This Litigation

Defendants claim that the Plaintiffs' case "challenges several decades of U.S. foreign policy toward China, in that one of its stated aims is to curtail American investment in China," similarly grossly mischaracterizes reality.  Def. Mot. 3:24-25.  Plaintiffs have brought these claims, not to curtail investment in China as Defendants claim, but to both obtain relief for the abuses they have suffered as a result of Defendants' actions and to encourage other companies operating in oppressive regimes such as China to think carefully and conscientiously about how to responsibly do business in these countries without enabling the most serious form of abuses that these regimes inflict upon their citizens.  Nor are Plaintiffs "challenging" decades of U.S. foreign policy.  If anything, the lawsuit confirms and supports ongoing efforts by the U.S. Government to bring attention to and to present these abuses, including the annual State Department human rights country reports that single out China for special criticism of their arbitrary detention and torture practices.

### III.    The Issues Raised by the Defendants Require the Further Factual and Issue Development that the Regular Case Management Process Is Designed To Provide

Since the Defendants have sought in their Motion to bring a number of important issues and questions to the Court's attention, Plaintiffs feel obliged to quickly highlight a few key points in response, not to address and explore these issues in depth, or to seek resolution of these matters at this point in the process, but to further indicate the premature nature of seeking a conference with the Court to address them on an earlier basis, and the value and importance of maintaining and carrying out the regular case management process to develop these issues for proper and more complete presentation to the Court.  Proper treatment of these issues requires the more

informed factual and analytical basis that the case management system offers, even for

preliminary discussions regarding the proper handling of these issues in early stages of the

litigation process.  Among the specific issues identified by the Defendants as justification for

seeking an early conference that demonstrate why that approach would be premature, and why the

regular case management process is needed to properly address these matters on a more effective

basis are those described below:

   A.  **The Defendants' Personal Jurisdiction Challenges Are Not Conclusive, and
        Require Further Factual Development and Legal Analysis Through the Regular
        Case Management Process and/or Preliminary Discovery**

   Defendants seek to raise a number of issues or questions concerning whether the Court can

exercise personal jurisdiction over various Yahoo! entities.   These matters cannot be resolved as

simply as the Defendants suggest.  Due to the complex corporate structure of Yahoo!, Inc. and its

affiliates, major changes in the organizational structure that have taken place in recent years

(perhaps in part with a view towards attempting to shield various corporate entities from liability)

and the difficulty in finding much of the critical information regarding the organizational

structures and responsibilities of the entities in the public domain, some limited preliminary

disclosure and factual development is required before the Court can properly consider these

issues.  A useful analogy that can be drawn is to the authority of courts to order discovery on

jurisdictional issues even before the court has determined whether it has personal jurisdiction over

a particular defendant.  *See, e.g.*, *Insurance Corp. of Ireland, Ltd. v. Compagnie des Bauxites de

Guinee*, 456 U.S. 694 (1982) (allowing discovery aimed at establishing foreign company's

contacts with the forum state); *Data Disc, Inc. v. Systems Technology Associates, Inc.*, 557 F.2d

1280, 1285 n.1 (9th Cir. 1977); *Wells Fargo & Co. v. Wells Fargo Express Co.*, 556 F.2d 406,

430 n.24 (9th Cir. 1977) (stating that discovery "should be granted where pertinent facts bearing

on the question of jurisdiction are controverted…or where a more satisfactory showing of the

facts is necessary") (internal citation omitted).  The Court should allow the fact development and disclosure process of the case management system to run its course, or provide for some type of preliminary discovery to take place, before trying to address these complex jurisdictional questions.  The Defendants' suggestion that the Court can summarily address these issues on an early basis without providing an opportunity to develop the necessary factual information through the case management process makes no logical sense.

**B.    The Regular Case Management Process Will Best Facilitate the Fact Finding Process Necessary to Demonstrate the Impropriety of the Defendants Disclosing Internet User Information to Chinese Authorities**

Similarly, Defendants' suggestion that they were obliged to comply with information requests from law enforcement authorities in China, and that their actions in this regard were necessary and lawful, requires a far more in-depth analysis than Defendants suggest.  The issues relating to Defendants' actions in complying with Chinese authorities' requests for personal information of internet users is very complex and will require the benefit of the regular case management process to reveal the extent to which such requests were legitimate, whether Defendants had reason to know that complying with those requests would produce major human rights abuses, and whether their approach comported with accepted business practices and U.S law.  The fact finding and discussion that will occur during the regular case management process will make it possible to determine what the prevailing and reasonable industry practices of other companies doing business in repressive countries might be, and will reveal the extent to which Defendants' actions deviated from such reasonable standards.  For example, at a hearing before the U.S. House of Representatives Committee on International Relations on February 15, 2006, Jack Krumholtz, Managing Director of Federal Government Affairs and Associate General Counsel of Microsoft Corporation, testified that his company follows the practice of making sure that "[c]ustomers' personal information is stored on servers located in the United States, so requests for that

information from the Chinese have to be handled under procedures that are provided under the U.S.-China Mutual Legal Assistance Treaty" and pursuant to U.S. law.  *The Internet in China: A Tool for Freedom or Suppression?, p. 156, available at* http://commdocs.house.gov/committees/intlrel/hfa26075.000/hfa26075_0f.htm.  Elliot Schrage, Vice President for Corporate Communications and Public Affairs, Google, Inc., also testified to this issue, noting that Google "made a fundamental, strategic decision that we were not going to offer services like G-mail or Blogger, services that provide us commercial value, . . . [and] that we would not provide those services inside of China because we did not want to be put in a position where we would have possess[ion] of data that might create the kinds of problems we are discussing today." *Id.* at 157 (referring to "privacy and confidentiality of information").  The transcript of this hearing provides an apt illustration of how other companies, similarly situated to Defendants, took affirmative steps to avoid compromising users' private information in order to avoid, as Mr. Schrage put it, "be[ing] in a position to give it," and place these users in jeopardy. *Id.*  The regular case management process must be adhered to in order that both Parties be afforded the opportunity through initial fact gathering and disclosures to fully explore whether the acts of the Defendants in providing the information to China should be considered reasonable and appropriate under the circumstances.

**IV.    Solicitation of the Views of the Political Branches of the U.S. Government On This Case Would Not Be Appropriate and Would Not Justify The Requested "Suspension" of the Case Management Process**

One of the "bifurcated" procedures that the Defendants seek to press upon the Court in place of the regular case management process would be to solicit the views of the "political branches" of the U.S. Government on the case (Def. Mot. 3:10), and to suspend the discovery and case management process until these views can be obtained.  In support of this approach they cite the potential for the case to "impact foreign relations," and the claim that the case "challenges

PLAINTIFFS' OPPOSITION TO
DEFENDANTS' MOTION FOR AN EARLY
CASE MANAGEMENT CONFERENCE

Case No. C07-02151 CW

several decades of U.S. foreign policy towards China." *Id.* at 3:23-24. They also cite the Supreme Court's urging of "caution" in passing judgment on the acts of sovereign governments and foreign officials in the case of *Sosa v. Alvarez-Machain.* *Sosa,* 542 U.S. at 692. All of these arguments are misleading and misplaced and do not constitute a valid basis for "suspending" the litigation as has been requested.

This case has been filed against Yahoo! Inc. and its affiliates, not against the Government of China or its officials. To the extent that the actions of the Government of China relate to the litigation, or that the case impacts foreign relations, these matters must be assessed pursuant to the standards that the U.S. Supreme Court set out in the cases of *Baker v. Carr*, 369 U.S. 186 (1962), and *Sabbatino v. Banco Nationale de Cuba*, 376 U.S. 398 (1964), recognizing that U.S. Courts retain jurisdiction over legal disputes despite potential political or foreign relations implications where clear and well-established legal standards are applicable to the matter in dispute that courts traditionally are called upon to apply. Nor do these supposed foreign policy issues implications justify suspension of the regular discovery and case management procedures, as Defendants are proposing.

## A. Since Immunity and Act of State Doctrine Issues Are Not Relevant to This Case, Soliciting a Statement of Interest From the Political Branches Would Be Inappropriate

Plaintiffs do not accept the Defendants' underlying premise that solicitation of the Government's views is appropriate or necessary. Plaintiffs submit that a solicitation of the Government's views would amount to an unauthorized and uncalled for reliance on the political process, that is antithetical to the principle of the rule of law and to the requirement that an impartial, objective and non-political determination be made of the legal issues and claims that have been presented, without reference to or reliance upon political considerations. Plaintiffs believe that this approach would violate principles set out by Congress in the TVPA mandating

that these types of issues and cases be adjudicated by the courts without giving deference to the political and diplomatic processes.

The solicitation of a SOI would be inappropriate in this case given both the dual facts that neither a foreign government nor foreign officials are defendants in this case, and that the U.S. Government has very clearly and frequently taken the position that major human rights abuses are taking place in China on a systemic basis that violates international law.

Since the Defendants in this case are not the Government of China, nor officials of that Government, issues of immunity and the act of state doctrine are not relevant. Courts have solicited a SOI from the U.S. Government when a lawsuit concerns the direct involvement of a foreign government as a party to such a lawsuit. In *National Coalition Government of Union of Burma v. Unocal, Inc*, for example, the court requested a SOI from the Government, reasoning that, "a court presented with a foreign government's lawsuit must consider whether the Executive Branch has demonstrated its willingness to allow that government to assert its claims in the United States court system." *National Coalition Government of Union of Burma v. Unocal, Inc*, 176 F.R.D. 329, 339 (C.D.Cal. 1997); *see also Estados Unidos Mexicanos v. DeCoster*, 229 F.3d 332, 342 (1st Cir. 2000) (where one party to the lawsuit was a government entity, "[t]he district court commendably invited comment from the U.S. Department of State"). Due in part to the court's deference to the government's SOI, the case was dismissed as to the NCGUB. This result can be explained by the fact that this portion of the *Unocal* case concerned a government-in-exile (the NCGUB), "not…formally recognized by the United States," and therefore involved questions that would inevitably reflect on the U.S.'s treatment of another nation's sovereignty. *Id.* at 340. The district court in *Unocal* concluded that "permitting the NCGUB to sue in its capacity as the purported government-in-exile of Burma would clearly require the court to 'interfere in sensitive matters of foreign policy," yet still left the door open for individual plaintiffs to litigate against

Unocal in subsequent lawsuits. *Id.* at 340 (citing *Pfizer, Inc. v. Government of India*, 434 U.S. 308, 319 (1978)).

Unlike the plaintiff in *Unocal*, however, no party in the instant case is an actual or purported government entity or official, and thus no "sensitive matter of foreign policy" is directly implicated. Although it may be appropriate for a court to solicit the U.S. Government's statement of interest when a lawsuit names a foreign government or a foreign official as a party, these are not the circumstances of the instant case. Moreover, it is a well-established principle in cases alleging torture that "the act of state doctrine should not be applied…because no state can claim the right to engage in these practices" as a matter of government or government approved policy. Derek Baxter, *Protecting the Power of the Judiciary: Why the Use of State Department "Statements of Interest" in Alien Tort Statute Litigation Runs Afoul of Separation of Power Concerns*, 37 Rutgers L.J. 807, 825 n.103 (2006); *see also In re Estate of Marcos Human Rights Litig.,* 978 F.2d 493, 500 (9th Cir. 1992); *Siderman*, 965 F.2d at 717. Since acts of torture are not considered to be legitimate state actions, they are not entitled to the protection of the act of state doctrine and thus the act of state concerns that Defendant seeks to raise are not implicated in the instant case.

**B. Even if a Statement of Interest Were Submitted, It Would Not Be Dispositive with Respect to Any Determinations of the Final Outcome of the Case**

Even if the Court should determine that obtaining a SOI is appropriate in order to clarify the Government's views on this case, it is well established that such a request is not necessarily controlling with respect to any final determinations of justiciability. The *Sosa* court's statement that there is a "strong argument that federal courts should give serious weight to the Executive Branch's view of the case's impact on foreign policy," goes on to suggest that the deference given by a court to the Executive has always varied on a case-by-case basis to be determined by the court, based on a variety of factors that must be weighed and balanced. *Sosa,* 542 U.S. at 733.

1  The recent Ninth Circuit holding in *Alexis Holyweek Sarei v. Rio Tinto, PLC* illustrates this

2  principle.  *Alexis Holyweek Sarei v. Rio Tinto, PLC***,** Nos. 02-56256, 02-56390, 2007 WL

3  1079901 (9th Cir. Apr. 12, 2007). There, the Court of Appeals for this Circuit held that "the SOI

4  submitted in this case, even when given serious weight, does not establish that any of the final

5  three *Baker* factors is 'inextricable from the case,'" and therefore "we hold that none of the

6  plaintiffs' claims present nonjusticiable political questions." *Id.* (citing *Baker*, 369 U.S. at 217).

7  Moreover, as the Court in *Rio Tinto* noted, "[t]he Supreme Court has been clear that 'it is error to

8  suppose that every case or controversy which touches foreign relations lies beyond judicial

9  cognizance,' and that the doctrine 'is one of "political questions," not of "political cases."'" *Id.* at

10  *8 (quoting *Baker,* 369 U.S. at 211, 217).  The Ninth Circuit then concluded that the plaintiffs'

11  claims in *Rio Tinto* did not present non-justiciable political questions because they "relate to a

12  foreign conflict in which the United States had little involvement (so far as the record

13  demonstrates), and therefore that merely 'touch [upon] foreign relations.'" *Id.* at *8 (citing *Baker*,

14  369 U.S. at 211).

15      Since all ATS cases by definition "touch foreign relations" in the sense that they relate to

16  actions taken by foreign governments abroad, this fact alone does not preclude litigating these

17  issues, and should not be used as a justification for "suspending" the case management process as

18  the Defendants request.  To assert otherwise would defeat the very nature and purpose of the

19  TVPA statute, which Congress specifically designed to allow foreign nationals to seek relief for

20  abuses committed outside the United States where no remedy in their home country is available.

21  *See* 138 Cong. Rec. S. 2667, March 3, 1992. Although this case may indeed have political

22  overtones, Defendants wrongly assume that this fact automatically removes these issues from the

23  Court's jurisdiction, which is not true.

24      The legislative history recognizes that TVPA litigation may have some implications on

PLAINTIFFS' OPPOSITION TO
DEFENDANTS' MOTION FOR AN EARLY                                    Case No. C07-02151 CW
CASE MANAGEMENT CONFERENCE

foreign policy, but that the concerns for creating accountability for torture override. Congress explained that one of the most enduring principles of U.S. foreign policy was a commitment to individual human rights and the rule of law, and that the United States has sought to assume a special responsibility in the world community to promote human rights and prevent or discourage torture. 135 Cong. Rec. H. 6423, October 2, 1989. The purpose of the TVPA was to ensure that courts assumed this role because "one of the ways in which the United States can promote and enforce peremptory norms of international law is through enforcement of human rights in our own domestic courts." *Id.* At a Congressional hearing, Senator Grassley asked whether the proposed Bill would improperly involve the judicial branch in foreign affairs. Senator Specter replied that the proposed TVPA would not improperly involve the judicial branch in foreign affairs, because "[t]orture is universally condemned by the family of nations. No nation officially supports or condones torture. Therefore, I do not expect that this Act will entangle the judiciary in sensitive foreign policy matters." *Id.* Congressmen Broomfield explained during House debate, "There are, of course, situations in which application of this statute could create difficulties in our relations with friendly countries. But this is a small price to pay in order to see that justice is done for the victims of torture." 137 Cong. Rec. H. 11244, November 25, 1991.

Defendants' assertion is also inconsistent with the great majority of case law, which shows that cases touching on foreign relations can certainly be justiciable. The Defendants' position is not an accurate reading of the controlling standard set out in *Baker* and *Sabbatino*, and not consistent with substantial case law precedent. In fact, the Second Circuit noted that "judges should not reflexively invoke the [political question doctrine and act of state doctrine] to avoid difficult and somewhat sensitive decisions in the context of human rights." *Kadic v. Karadzic*, 70 F.3d 232, 249 (2nd Cir. 1995) (holding that "[n]ot every case 'touching foreign relations' is nonjusticiable" and that "[a]lthough these cases present issues that arise in a politically charged

context, that does not transform them into cases involving nonjusticiable political questions").

There is no doubt that this case has political and foreign policy overtones, that there are individuals, businesses and even governments who have strong views on how this case might impact future litigation and corporate practice. However, Congress and most U.S. courts have moved away from the position that these cases should be decided with these political or foreign policy concerns as the sole and controlling consideration. To the contrary, and consistent with our legal system's strong commitment to the rule of law, the prevailing trend has been to insulate court cases from political influences, and to substantially reduce opportunities for the intrusion of political and foreign policy considerations into the adjudicatory process, especially where the legal standards to be applied are clear and expressly recognized. Therefore, the presence of these potentially sensitive issues does not divest the court of jurisdiction, and certainly does not justify "suspending" the regular court process pending solicitation and receipt of the U.S. Government's views.

Plaintiffs dispute Defendants' claim that the lawsuit "challenges three decades" of U.S. foreign policy. Def. Mot. 3:24. The exact opposite is true. Consistently, for a number of years, the U.S. Department of State Country Reports on Human Rights, and annual reports on International Religions Freedom have placed China at or near the top of the list of the most serious human rights violators. For example, the most recent Country Report on Human Rights Practices in China, released March 6, 2007, notes that "the [Chinese] government's human rights record remained poor, and in certain areas deteriorated…[with] an increased number of high-profile cases involving the monitoring, harassment, detention, arrest, and imprisonment of journalists, writers, activists, and defense lawyers, many of whom were seeking to exercise their rights under law," citing the use of "torture and coerced confessions of prisoners" and "stricter control and censorship of the Internet" as well. Country Reports on Human Rights Practices,

1    (Mar. 6, 2007) *available at* http://www.state.gov/g/drl/rls/hrrpt/2006/78771.htm.

2        In fact, the Report specifically references the parties in the present case and the subject

3    matter of this litigation in terms very critical of the Government of China.  The Report states that

4    "citizens writing on the Internet were detained, arrested, and sentenced on state secrets and

5

6    subversion charges during the year" and specifically refers to the role played by the Defendants in

7    producing these results.  *Id.*  The Report makes specific reference by name to Plaintiff Shi Tao,

8    noting that "Yahoo provided information to security authorities, including access to private e-mail

9    accounts, used in the prosecution of journalist Shi Tao" and more importantly that "Yahoo's

10   Chinese Web site issued a joint proposal calling for the Internet industry to…accept government

11   supervision."  *Id.*  The U.S. Department of State has thus directly acknowledged the very abuses

12   for which Plaintiffs seek relief in this case, and has gone on record criticizing the Government of

13   China's and the Defendants' actions in this case in the clearest of terms.  Defendants contend that

14   "reliance on generalized reports about abuses in China [ ] is inadmissible hearsay."  Def. Mot.

15

16   7:3. However, the very case Defendants cite to support this contention notes that "[t]he State

17   Department's annual human rights reports have been held to fall within the public records

18   exception to the hearsay rule under *Fed. R. Evid. 803(8)*, and is thus admissible." *Qi*, 349 F.

19   Supp.2d at 1310 n. 39.   It is clear, therefore, that the U.S. Government has consistently and

20   frequently publicly condemned the very abuses for which Plaintiffs seek remedy.  Delaying the

21   case management process to solicit the U.S. Government's opinions on these grounds is therefore

22   without merit, particularly given the fact that the Department of State has itself officially

23   acknowledged the illegality of the abuse of one of the specific Plaintiffs in this case.

24

25       Moreover, the House Report on the TVPA suggest that far from interfering with foreign

26   policy, the maintenance of TVPA lawsuits of this type is in fact mandated by U.S. treaty

27   obligations.  It points out that the Convention Against Torture essentially obligated State parties

28

PLAINTIFFS' OPPOSITION TO                    18
DEFENDANTS' MOTION FOR AN EARLY                              Case No. C07-02151 CW
CASE MANAGEMENT CONFERENCE

to "adopt measures to ensure that [those committing these abuses] are held accountable for their acts." H.R. Rep. 103-367 *3.

It is true that a request for a SOI may also be considered necessary or appropriate where agreements or declarations exist between two governments that purport to settle the very issues that parties would seek to litigate. In *In re Nazi Era Cases Against German Defendants Litigation*, for example, the plaintiff sought recovery from a German company for forced labor during World War II. *In re Nazi,* 129 F. Supp.2d at 370. The court ruled that recovery was precluded because the lawsuit challenged the validity of a diplomatic agreement addressing these issues, and "since the United States has spoken to the validity of the Foundation [established by the agreement] via its Statement of Interest" reiterating therein its support of the Foundation through an Executive Agreement it had formed with Germany. *Id.* at 387. The district court reasoned that "based on the weight of history" and in light of the SOI and Executive agreement it was "clearly demonstrate[d] that the claims against German Industry presently before the Court constitute political questions best left to the political branches." *Id.* The defendants in the instant case can point to no existing Executive Agreement, let alone a treaty, that would create a conflict with an international agreement and bring the plaintiffs' claims into the political question category.

### C. Because Determining the Justiciability of Claims Requires a Comprehensive Record of the Pleadings and Facts, the Regular Discovery and Case Management Process Should Not Be Delayed Pending Receipt of a Statement of Interest

Defendants' request for a bifurcated and premature case management schedule includes the contention that before proceeding in this case, a SOI from the "political branches" of the United States should be solicited by the Court. To support this contention, Defendant cites the possibility of an outright dismissal based on the allegation that "plaintiffs' case potentially violates the 'act of state' doctrine, poses nonjusticiable 'political questions,' or should be

dismissed under the doctrine of 'international comity.'"  Def. Mot. 4:11-13. However, delaying the regular case management schedule while awaiting such a submission falsely presupposes that a SOI from the United States would be both appropriate and dispositive with respect to these issues, when in fact there is no indication based on current case law to believe this to be true.

Whether a SOI would indeed be appropriate, and should affect the outcome of this case, is a question for this court to review after receiving more adequate information about the circumstances of the case, and whether these political views would be relevant pursuant to the *Baker* and *Sabbatino* standards.  In *Renee v. Geary*, the Supreme Court applied the *Baker* and *Sabbatino* balancing tests in holding that "proper resolution of the justiciability issues presented here requires examination of the pleadings and record to determine the nature of the dispute and the interests of the parties in having it resolved in this judicial proceeding." *Renee v. Geary*, 501 U.S.312, 316 (1991).  *See also In re Nazi Era Cases Against German Defendants Litigation*, 129 F. Supp.2d 370, 375 (D.N.J. 2001) (relying on *Renee* to support the principle that "[t]o resolve a justiciability issue, a Court should examine the pleadings and the record to determine the nature of the underlying dispute and the interests of the parties in having the dispute resolved").  This type of balancing cannot take place theoretically or in a vacuum, but must make use of the fact development, the pleadings and the case management process is designed to produce. Without this opportunity for factual and analytical development of these issues, or even the benefit of the Defendants' response to Plaintiffs' complaint, this Court should not be put in the position of making premature determinations of whether or not solicitation of a SOI is appropriate or necessary.  Under no circumstances is the suspension of the regular court process warranted pending resolution of these questions.

Suspending regular case management procedures pending solicitation and submission of a SOI by the U.S. Government could cause significant and unnecessary delays in the litigation

process.  In the most recent ATCA/TVPA case litigated by the Plaintiffs' counsel where a Statement of Interest from the U.S. Government was solicited, it took almost five months from the time the request by the Court was made until the Government's views were submitted to the Court.  *Li Weixun v. Bo Xilai*, Case No. 1:04CV00649 (D.D.C.).  That type of delay should not be encouraged, especially where Plaintiffs remain in detention in China and are subject to great personal risk, and where additional individuals are at risk of having personal information disclosed by the Defendants in a similar way, potentially leading to their arbitrary arrest and torture.

**V. Conclusion**

For the foregoing reasons, and given the inappropriateness of the Defendants' seeking a second amendment to the Case Management schedule that was ordered by the Court on June 19, Defendants' Motion should be denied in its entirety.  Since the Defendants' Motion is without merit, and a summary denial is justified, no Motions Hearing is necessary or appropriate.

Respectfully submitted this 29th day of June, 2007,

MORTON SKLAR
THERESA HARRIS
WORLD ORGANIZATION FOR HUMAN
RIGHTS USA

By: */s/ Morton Sklar*
_____
     Morton Sklar

ROGER MYERS
HOLME ROBERTS & OWEN LLP

By: */s/ Roger Myers*
_____
     Roger Myers

Attorneys for Plaintiffs
WANG XIAONING, YU LING and SHI TAO

Karen Parker
(CA State Bar No. 112486)
Association of Humanitarian Lawyers
154 5th Avenue
San Francisco, CA 94118
Telephone: (415) 668-2752
E-mail: ied@agc.org

*With the assistance of:*
Albert Ho Chun-Yan
Legal Representative for Shi Tao
Hong Kong

Rebecca Babarsky, University of Michigan
   Law School
Shannon Barrows, University of Chicago Law
   School
Paul Bozzello, Harvard Law School
               *Legal Interns*

1

**CERTIFICATE OF COMPLIANCE**

2

This opposition on behalf of the Plaintiffs in the above captioned case complies with all

3

Federal and Local Rule requirements, including the page limit of 25 pages for the narrative text

4

set out in Rule 7-3(a).  It is written in 12 point Times New Roman font and covers a total of 7,006

5

words and 21 pages.

6

Signed and Certified to this 29th day of June, 2007.

7

8

By: */s/ Morton Sklar*_____

9
Morton Sklar
Executive Director

10
World Organization for Human Rights USA
2029 P Street NW, Suite 301

11
Washington, DC 20036

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' OPPOSITION TO
DEFENDANTS' MOTION FOR AN EARLY                    Case No. C07-02151 CW
CASE MANAGEMENT CONFERENCE