Xiaoning et al v. Yahoo! Inc, et al                                                    Doc. 33

Case 4:07-cv-02151-CW    Document 33    Filed 07/12/2007    Page 1 of 41

1   DANIEL M. PETROCELLI (S.B. #97802)
2   dpetrocelli@omm.com
    MATTHEW T. KLINE (S.B. #211640)
3   mkline@omm.com
    O'MELVENY & MYERS LLP
4   1999 Avenue Of The Stars
    Los Angeles, California 90067-6035
5   Main Number: (310) 553-6700
    Facsimile: (310) 246-6779
6
7   Attorneys for Defendant YAHOO!, INC. and
    Specially Appearing Defendant YAHOO!
8   HOLDINGS (HONG KONG), LTD.

9
                    UNITED STATES DISTRICT COURT
10                 NORTHERN DISTRICT OF CALIFORNIA
                         OAKLAND DIVISION
11

12  WANG XIAONING, YU LING, SHI TAO,        Case No. C07-02151 CW
    and ADDITIONAL PRESENTLY
13  UNNAMED AND TO BE IDENTIFIED            **REPLY MEMORANDUM IN SUPPORT**
    INDIVIDUALS,                            **OF DEFENDANT YAHOO!, INC.'S**
14                                          **MOTION FOR AN EARLY CASE**
                    Plaintiff,              **MANAGEMENT CONFERENCE AND**
15                                          **ORDER**
          v.
16                                          Date:       July 26, 2007
    YAHOO!, INC., a Delaware Corporation,   Time:       TBD
17  YAHOO! HOLDINGS (HONG KONG),            Location:   Courtroom 2
    LTD., a Foreign Subsidiary of Yahoo!,
18  ALIBABA.COM, INC. a Delaware            Judge:      Hon. Claudia Wilken
    Corporation, AND OTHER PRESENTLY
19  UNNAMED AND TO BE IDENTIFIED
    INDIVIDUAL EMPLOYEES OF SAID
20  CORPORATIONS,
21
                    Defendant.
22

23

24

25

26

27

28
    C07-02151 CW
    REPLY RE YAHOO!'S MOT. FOR AN
    EARLY CASE MGMT. CONF. AND ORDER

1

## TABLE OF CONTENTS

2

**Page**

3    I.    INTRODUCTION ......................................................................................................... 1

4    II.    *SOSA* REQUIRES A CAUTIOUS, COLLABORATIVE APPROACH ............................ 2

5        A.    Plaintiffs' Claims Are Not Exempt from *Sosa* ......................................................... 2

6        B.    The United States Government Has Not Endorsed This Lawsuit ............................ 4

7        C.    Plaintiffs' Choice Not To Sue the PRC Does Not Exempt this Case from

8            *Sosa* ........................................................................................................................... 5

9        D.    Plaintiffs' Remaining Arguments Are Without Merit ............................................ 7

10    III.    PLAINTIFFS ARE NOT ENTITLED TO IMMEDIATE DISCOVERY ......................... 8

11    IV.    YAHOO!'S PURPOSE IS NOT DELAY ....................................................................... 10

12        A.    The Purpose of Phase I ........................................................................................... 10

13        B.    The Purpose of Phase II ......................................................................................... 12

14        C.    The Question of Prejudice ...................................................................................... 13

15    V.    PLAINTIFFS KNEW YAHOO! WOULD BE FILING THIS MOTION ....................... 14

16    VI.    THE COURT HAS THE POWER TO GRANT THE RELIEF REQUESTED .............. 14

17    VII.    CONCLUSION ........................................................................................................... 15

18

19

20

21

22

23

24

25

26

27

28

1

# TABLE OF AUTHORITIES

2

Page

3

## CASES

4

*Abeles v. State Bar of Cal.*,
  9 Cal. 3d 610 (Cal. 1973) ................................................................................................. 10

5

*Allen v. Bayer Corp.*,
  460 F.3d 1227 (9th Cir. 2006) .......................................................................................... 15

6

*Banco Nacional de Cuba v. Sabbatino*,
  376 U.S. 432 (1964) ........................................................................................................... 5

7

*Bertucelli v. Carreras*,
  467 F.2d 215 (9th Cir. 1972) .............................................................................................. 8

8

*Bowoto v. Chevron*,
  No. C 99-02506, 2006 U.S. Dist. LEXIS 63209, (N.D. Cal. Aug. 21, 2006) ..................... 3

9

10

*Citicasters Co. v. Country Club Communs.*,
  44 U.S.P.Q.2D (BNA) 1223 (C.D. Cal. 1997) ................................................................. 15

11

*Clinton v. Jones*,
  520 U.S. 706 (1997) ......................................................................................................... 15

12

*DeShazier v. Williams*,
  Case No. CV F 06-0591, 2006 U.S. Dist. LEXIS 64906, (E.D. Cal. Aug. 29,
  2006) ................................................................................................................................ 8, 9

13

14

*DM Research, Inc. v. College of Am. Pathologists*,
  170 F.3d 55 (1st Cir. 1999) ............................................................................................. 1, 8

15

*Doe v. Qi*,
  349 F. Supp. 2d 1258 (N. D. Cal. 2004) .................................................................... *passim*

16

*Estate of Rabinowitz*,
  7 Cal. Rptr. 3d 723 (2003) ............................................................................................... 10

17

*Freeman v. Employment Stds. Admin.*,
  71 Fed. Appx. 638 (9th Cir. July 24, 2003) ..................................................................... 15

18

19

*In re Sinaltrainal Litigation*,
  474 F. Supp. 2d 1275 (S.D. Fl. 2006) ................................................................................ 9

20

*In re South African Apartheid Litig.*,
  346 F. Supp. 2d 554 (S.D.N.Y. 2004) ............................................................................. 6, 7

21

*Meredith v. Ionian Trader*,
  279 F. 2d 471 (2d Cir. 1960) ........................................................................................... 10

22

*Mujica v. Occidental Petroleum*,
  381 F. Supp. 2d 1194 (C.D. Cal. 2005) ............................................................................. 5

23

24

*Pueblo of Santa Rosa v. Fall*,
  273 U.S. 319 (1927) ......................................................................................................... 10

25

*Sarei v. Rio Tinto*,
  __ F.3d __, 2007 WL 1079901, (9th Cir. Apr. 12, 2007) ............................................... 6, 7

26

*Sosa v. Alvarez-Machain*,
  542 U.S. 728 (2004) ..................................................................................................... *passim*

27

28

**TABLE OF AUTHORITIES**
**(continued)**

Page

*United States v. Batiste*,
 868 F.2d 1092 (9th Cir. 1989) ........................................................................................ 14, 15

*United States v. Wolf*,
 352 F. Supp. 2d 1199 (W.D. Okla. 2004) ........................................................... 10

*Xuncax v. Gramajo*,
 886 F. Supp. 192 (D. Mass. 1995) ....................................................................... 9

**STATUTES**

CAL. CIV. PROC. § 367 ........................................................................................... 9

CAL. PROB. CODE § 4121 ..................................................................................... 10

CAL. PROB. CODE § 4122 ..................................................................................... 10

CAL. PROB. CODE § 4263(A)(1) ............................................................................ 10

CAL. PROB. CODE § 4459 ..................................................................................... 10

**OTHER AUTHORITIES**

2-8 MOORE'S FEDERAL PRACTICE,
 CIVIL § 8.04(4) (2007) ..................................................................................... 8

5 CHARLES A. WRIGHT & ARTHUR R. MILLER,
 FEDERAL PRACTICE AND PROCEDURE § 1224 (1990) ....................................... 8

Bill Nichols, *China prisoners' supporters look to Bush*,
 USA TODAY (Apr. 18, 2006) .......................................................................... 13

Curtis A. Bradley et al., Sosa, *Customary International Law and the Continuing
 Relevance of* Erie,
 120 HARV. L. REV. 870, 924-29 (2007) ......................................................... 3

Library of Congress, Congressional Research Service Report for Congress,
 *China-U.S. Relations: Current Issues and Implications for U.S. Policy*, at
 CRS-20 (Kerry Dumbough, ed. updated January 20, 2006),
 http://fpc.state.gov/documents/organization/
 61492.pdf. ...................................................................................................... 13

*Morton Sklar on Yahoo! human rights lawsuit* (Apr. 21, 2007),
 http://www.brightcove.com/title.
 jsp?title=769385554&channel=27638673 (audio webcast at 06:23-8:16) ............... 6

Scott Shane, *Suit Over C.I.A. Program*,
 N.Y. TIMES, May 31, 2007 ............................................................................ 12

**RULES**

FED. R. CIV. PROC. 8 ............................................................................................. 8

FED. R. CIV. PROC. 11 ........................................................................................... 8

FED. R. CIV. PROC. 12(E) ...................................................................................... 9

FED. R. CIV. PROC. 16 ......................................................................................... 15

FED. R. CIV. PROC. 17 ........................................................................................... 9

FED. R. CIV. PROC. 26(C) ..................................................................................... 15

C07-02151 CW C07-02151 CW

**TABLE OF AUTHORITIES**
**(continued)**

Page

FED. R. EVID. 602 ................................................................................................................ 12

**FOREIGN LAW**

Zhong hua ren min gong he guo min shi su song fa [1991Civil Procedure Law
 (P.R.C.)] at Art. 59 ........................................................................................................ 10

Zui gao ren min fa yuan guan yu shi yong <zong hua ren min gong he guo min shi
 su song fa> ruo gan went i de yi jian, (Opinions of the Supreme People's Court
 on Certain Issues Concerning Application of PRC Civil Procedure Law 2002),
 SUP. PEOPLE'S CT. GAZ., Art. 69 ................................................................................... 10

1    I.    **INTRODUCTION**

2          Plaintiffs want this Court to treat this case as if it were run of the mill.  It is not, and the

3    case management order Yahoo! proposes makes sense and should be granted.

4          Plaintiffs assert that Yahoo! can be held liable for aiding and abetting human rights abuses

5    allegedly committed by the Chinese government, against its own citizens, on its own soil.

6    Plaintiffs do not allege that Yahoo! engaged in a single act of abuse, intended such acts to occur,

7    or even initiated any contact with the government.  Rather, plaintiffs seek to hold Yahoo! liable

8    solely because one of its indirect Chinese subsidiaries, acting pursuant to Chinese law, provided

9    information to the Chinese government in response to the Chinese equivalent of a subpoena.

10   Based on this theory of liability—and the sparsest of factual allegations—plaintiffs seek

11   immediate discovery and the normal pre-trial schedule.

12         There is no basis for proceeding in this manner.  "The price of entry, even to discovery, is

13   for the plaintiff to allege a factual predicate concrete enough to warrant further proceedings . . . ."

14   *DM Research, Inc. v. College of Am. Pathologists*, 170 F.3d 53, 55 (1st Cir. 1999).  Plaintiffs fail

15   this basic test, and the caution embodied in Yahoo!'s case management proposal is required given

16   the myriad policy concerns this case implicates.

17         To be clear, plaintiffs ask this Court to hold that companies have a legal duty to disobey

18   local law in certain countries where they do business and, in particular, to refuse requests for

19   information from the PRC.  *See* Mot. at 4 n.3.  Such an unprecedented ruling would dramatically

20   impact foreign policy; impede law enforcement efforts around the world; be a direct affront to the

21   Chinese government; and radically expand the scope of the ATS and the other sources of law on

22   which plaintiffs rely.  Before this Court takes such a dramatic step, or even recognizes that it has

23   subject matter jurisdiction to hear plaintiffs' claims, it should proceed with "great caution" and

24   solicit the views of the political branches.  *Sosa v. Alvarez-Machain*, 542 U.S. 692, 728 (2004).

25         Great caution is also warranted because plaintiffs' complaint and their proposed means of

26   proving their case are so speculative.  For example:

27         •    Most of plaintiffs' amended complaint is alleged based on "information and belief," or

28              facts plaintiffs *hope* to discover—*not* facts they know.  Plaintiffs rely on "information and

C07-02151 CW
REPLY RE YAHOO!'S MOT. FOR AN
EARLY CASE MGMT. CONF. AND ORDER

belief" not to allege facts uniquely known to *defendants*, but rather to describe what allegedly happened to *plaintiffs themselves*.  Such pleadings are insufficient and improper.

- Other than citing hearsay sources, plaintiffs cannot explain how it is they will prove their case.  This proof issue is a real one, and time should not be wasted litigating a case that cannot be proven.

- Finally, this case is so unusual that plaintiffs' counsel cannot communicate with two of the three plaintiffs.  Indeed, given this lack of access, it is unclear whether counsel even have the appropriate authority to prosecute this case on these two plaintiffs' behalf.

In light of these unique circumstances—and given that at least two of the defendants and two of the plaintiffs have no business being named as parties in this case—Yahoo! proposed a case management order that would allow the Court and parties to address this case in a logical, expeditious manner.  The purpose of this proposal was not to delay, but to make sure that (a) the proper parties were identified at the outset; and (b) plaintiffs' theories were properly tested before an expensive and politically sensitive discovery process began.

Plaintiffs oppose this proposal, arguing that this case deserves no special treatment under *Sosa* or otherwise; that they are entitled to discovery right away; that Yahoo!'s real purpose is delay; that Yahoo! broke a deal it made regarding the schedule; and that Yahoo!'s request is not lawful.  Each of plaintiffs' arguments is without merit, as we explain below.

## II.    *SOSA* REQUIRES A CAUTIOUS, COLLABORATIVE APPROACH.

Plaintiffs make various arguments why—despite *Sosa*—this Court need not proceed with caution or take the time to solicit and receive the views of the political branches before defendants file their motions to dismiss on substantive grounds.  Plaintiffs' arguments fail.

### A.    Plaintiffs' Claims Are Not Exempt from *Sosa*.

Plaintiffs first argue that *Sosa*'s requirement of vigilant door-keeping does not apply to their claims, because they have alleged violations of norms against "torture" and "long-term arbitrary detention" that "have been fully recognized and accepted by Congress and by the courts as appropriate foundations for ATCA and TVPA lawsuits."  Opp. at 6.  They assert that *Sosa* made "crystal clear that the weighing of political and foreign policy concerns was not appropriate

1    in [this] special category of cases." *Id.*  Plaintiffs are wrong for at least three reasons.

2          *First*, even assuming plaintiffs were right about the "acceptance" of all the theories under

3    which they sue—and they are not—plaintiffs do not raise only torture and detention claims.  They

4    have also sued for "cruel, inhuman or degrading punishment" for exercising "free speech and free

5    association" rights and "forced labor."  Am. Compl. ¶¶ 75-78, 90-91.  They also sue on several

6    California tort law theories and under California's unfair competition statute.  *See id.* at 22-26.

7    Unless plaintiffs are willing to abandon these claims, this Court must proceed with great caution

8    and solicit the views of the political branches before announcing that plaintiffs have to a right to

9    sue private parties based on the acts of the Chinese government, and based on these far from

10   "definite" and "accepted" sources of law.  *Sosa*, 542 U.S. at 732.

11         *Second*, plaintiffs' torture and detention claims are far from sufficiently established, given

12   they are made against corporate defendants and on an aiding-and-abetting theory.  As *Sosa* noted,

13   one crucial consideration when determining whether a norm is "sufficiently definite to support a

14   cause of action" is "whether international law extends the scope of liability for a violation of a

15   given norm *to the perpetrator being sued,* if the defendant is a private actor such as a corporation

16   or individual."  542 U.S. at 732 & n.20 (all emphases added unless otherwise indicated).  Even

17   assuming plaintiffs have alleged cognizable torture and detention claims—and they have not—

18   such claims apply only to state actors.  They do not apply to private actors such as corporations.

19   *See, e.g., Bowoto v. Chevron,* No. C 99-02506, 2006 U.S. Dist. LEXIS 63209, at *7-37 (N.D. Cal.

20   Aug. 21, 2006).  They especially do not apply on the indirect, aiding and abetting theory of

21   liability plaintiffs espouse, which, contrary to *Sosa*, would open the doors to waves of ATS

22   litigation of this sort.  *See, e.g.,* Curtis A. Bradley et al., Sosa, *Customary International Law and*

23   *the Continuing Relevance of* Erie, 120 HARV. L. REV. 870, 924-29 (2007).

24         *Third*, the only thing *Sosa* makes "crystal clear" is that weighing foreign policy is

25   essential even assuming the norms at issue are "sufficiently definite to support a cause of action."

26   *Id. Sosa* went out of its way to note that the requirement that a norm be sufficiently definite and

27   "clearly defined" was "*not meant to be the only principle* limiting the availability of relief in the

28   federal courts for violations of customary international law."  *Id*. at 733 n.21.  Other limiting

1    principles included, *inter alia*, "a policy of case-specific deference to the political branches." *Id*.

2          In fact, in *Doe v. Qi*, 349 F. Supp. 2d 1258 (N. D. Cal. 2004), this Court rejected the

3    precise argument made by plaintiffs' counsel here.  In *Qi*, plaintiffs "argue[d] that where a court

4    is presented with a claim based on international norms" of "definite content and acceptance

5    among civilized nations," it was "no longer . . . suitable or appropriate to weigh the proposed

6    standard against potential political or foreign policy consequences." *Id*. at 1290.  This Court

7    disagreed, holding that plaintiffs "misread *Sosa*." *Id*.  According to this Court, *Sosa* required "a

8    high degree of specificity and clarity in finding an enforceable common law claim under the

9    ATCA.  However, [*Sosa*] *in no way intimated* that once that standard is met, that no consideration

10    may be given to similar concerns in determining whether such a case may proceed." *Id*.  *Qi* also

11    expressly rejected the argument—repeated by plaintiffs here, *see* Opp. 7, 15-17—that this policy

12    of case-specific deference does not apply to claims under the TVPA or to the other sources of law

13    on which they base their complaint.  As this Court noted, *Qi*, 349 F. Supp. 2d at 1291 n.22:

14          nothing in *Sosa* suggests that case-specific considerations of deference to political
15          branches should be limited only to common law claims under the ATCA.  The basis
          for such deference . . . is rooted in overarching considerations of separation of powers
16          and the dangers of judicial interference with foreign relations committed to the
          political branches.  These concerns obtain whether an international law claim is based
17          on statute or common law premised on a clear norm of customary international law.

18          **B.    The United States Government Has Not Endorsed This Lawsuit.**

19          Plaintiffs repeatedly suggest their lawsuit raises no foreign policy concerns and that

20    soliciting the State Department's views is unnecessary, because the United States has "single[d]

21    out China for special criticism for their arbitrary detention and torture practices."  Opp. at 8.

22          These arguments are misguided as well.  *First*, plaintiffs neglect to mention that while the

23    United States has been critical of human rights abuses in China, it has consistently encouraged

24    American companies to do business there.  The real question this Court needs to ask the executive

25    branch is not whether it thinks China has a good or bad record on human rights (we know the

26    answer to that question), but rather whether this lawsuit—and the theory of liability plaintiffs

27    have espoused—will negatively impact the United States' foreign policy agenda, including its

28    ability (a) to promote human-rights reform through diplomatic channels, and (b) to promote such

C07-02151 CW
REPLY RE YAHOO!'S MOT. FOR AN                    - 4 -
EARLY CASE MGMT. CONF. AND ORDER

1    reform by encouraging American investment in China. If this Court rules that American

2    companies doing business in China may not respond to Chinese law enforcement requests for

3    information made in accord with valid legal process, then American companies will either be far

4    more hesitant to invest, or they will risk serious sanction by the Chinese government when they

5    refuse to abide by local law. Indeed, plaintiffs' own sources recognize that companies like

6    Yahoo! are "obliged to abide by laws in countries where [they] do[] business." Human Rights

7    Watch Letter at 2 ¶ 3 (quoted in Am. Compl. ¶ 24), www.hrw.org/press/2002/08/yahoo-

8    ltr073002.htm. Plaintiffs obscure this fact, *cf.* Opp. at 10, because they now want to deny it.

9           *Second*, in making arguments about the State Department's positions, plaintiffs fail to

10   mention that the United States has frequently recognized that lawsuits challenging human rights

11   abuses abroad can impede U.S. foreign policy, even if a component of U.S. policy is to criticize

12   the very abuses being challenged. The United States generally has made the judgment that there

13   are more effective means of promoting and protecting human rights than private litigation.[1]

14   Indeed, as plaintiffs' counsel well know from *Qi*, although the State Department has condemned

15   human-rights abuses in China, it also believes lawsuits of this sort are not the answer and actually

16   harm its mission. *See* 349 F. Supp. 2d at 1296.[2] Indeed, the United States has expressed its direct

17   opposition to lawsuits of this sort that proceed on an aiding-and-abetting theory of liability.[3]

18          **C.    Plaintiffs' Choice Not To Sue the PRC Does Not Exempt this Case from *Sosa*.**

19          Plaintiffs further suggest that soliciting a statement of interest would be inappropriate in

20   this case because the Chinese government and its officials are not defendants. *See* Opp. at 13.

21

22   [1] *See, e.g.*, *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 432 (1964) ("[t]he dangers of
     such adjudication are present regardless of whether the State Department has, as it did in this

23   case, asserted that the relevant act violated international law"); *Mujica v. Occidental Petroleum*,
     381 F. Supp. 2d 1164, 1194 (C.D. Cal. 2005) (State Department asserted that despite officially

24   condemning the actions of the Colombian military, adjudicating the legality of those actions
     would threaten U.S. interests, including the U.S. government's "approach to encouraging the

25   protection of human rights in Colombia").

26   [2] *See also* Statement of Interest of the United States, *Doe v. Qi*, Case No. C02 0672 CW (EMC),
     Tab A at 2-3, 7 (filed Jan. 16, 2004) (attached as Ex. A) (condemning human rights abuses by

27   PRC, but urging that diplomatic means are far more effective than litigation).

     [3] *See* Mot. Ex. A at 12-27 (Br. of the US. as Amicus Curiae, *The Presbyterian Church of Sudan v.*
28   *Talisman*, U.S. Court of Appeal for the Second Circuit, Case No. 07-0016 (filed May 15, 2007)).

1   That the plaintiffs made the tactical choice not to sue the PRC—the only alleged direct tortfeasor

2   in this case—is irrelevant to the *Sosa* analysis.  The claims in this case directly implicate the

3   propriety of actions taken by the Chinese government.  Indeed, in a public interview, plaintiffs'

4   lead counsel admitted as much:

5       The U.S. Government outlaws these kinds of behaviors [against people] who are in
        favor of free press and free speech.  *So when Yahoo! says that the people involved are*
6       *just abiding by Chinese law, that may be the case, but the laws are unlawful in terms*
        *of U.S. and international law and U.S. law requires just the opposite. . . .*
7           Foreign governments have the right to request information from Yahoo!
        pursuant to court orders . . . .  China is using it to persecute people for the
8       communication of ideas.  And that's not something the United States government or a
        United States corporation should go along with.[4]

9   Plaintiffs could scarcely more directly challenge the ability of the Chinese government to pass

10  laws prohibiting certain forms of speech, its ability to investigate those who commit these crimes,

11  or its ability to incarcerate, try, and penalize those who break the law.  Granted, plaintiffs make

12  torture claims as well, which are discussed above, but their complaint is far broader.  It alleges

13  that detaining plaintiffs for engaging in acts of political "speech" amounts to "arbitrary arrest"

14  and "prolonged detention" in violation of international law.  Am. Compl. ¶¶ 83-88.

15      The Act of State doctrine counsels against U.S. courts passing judgment on the acts of

16  foreign governments, and it is widely recognized that courts may dismiss a case on this ground

17  even if the foreign government is not a named defendant.  *See, e.g.*, *Sarei v. Rio Tinto*, __ F.3d

18  __, 2007 WL 1079901, at *11 (9th Cir. Apr. 12, 2007) ("certain acts of [the Papua New Guinea

19  government] are at issue, even if [it] is not a named defendant").  Similarly, *Sosa*'s policy of case-

20  specific deference and the political question doctrine apply whenever a case threatens to interfere

21  with foreign relations.  It does not matter whether a foreign state is named as a defendant, as

22  litigation can threaten foreign policy when it is premised on the notion that a corporation aided

23  and abetted the government's alleged misconduct.  Unsurprisingly, courts regularly request and

24  give credence to the views of U.S. government even in cases, such as this one, where the foreign

25  state, who is the alleged tortfeasor, has not been sued.  *See, e.g.*, *id.* at *2-3; *In re South African*

26  *Apartheid Litig.*, 346 F. Supp. 2d 538, 554 (S.D.N.Y. 2004).

27

28  [4] *Morton Sklar on Yahoo! human rights lawsuit* (Apr. 21, 2007), http://www.brightcove.com/title.
    jsp?title=769385554&channel=27638673 (audio webcast at 06:23-8:16).

1

### D.     Plaintiffs' Remaining Arguments Are Without Merit.

2

Plaintiffs suggest that soliciting the views of the political branches would "not be

3

appropriate," Opp. at 11, and go so far as to claim that soliciting those views would be "an

4

unauthorized and uncalled for reliance on the political process[] that is antithetical to the principle

5

of the rule of law." Opp. 12. *Sosa* is directly contrary. It makes clear that courts must consider

6

the potential foreign relations consequences of adjudicating ATS cases in deciding (1) whether to

7

recognize the particular international law claims asserted; (2) whether to allow plaintiff to sue the

8

particular defendants named; and (3) whether, even if such a claim exists, deference to the

9

political branches requires dismissing the case. *See* 542 U.S. at 724-28, 732 n.20, 733 n.21.

10

Plaintiffs further contend that "the prevailing trend has been to insulate court cases from

11

political influences, and to substantially reduce opportunities for the intrusion of political and

12

foreign policy considerations into the adjudicatory process." Opp. 17. It is not clear what "trend"

13

plaintiffs reference, but refusing to solicit or take account of the views of the political branches is

14

nothing more than a violation of *Sosa*'s command. It would also be inconsistent with the practice

15

of many courts, including this one, adjudicating these sorts of cases. *See, e.g.*, *Rio Tinto*, 2007

16

WL 1079901, at *7; *Apartheid Litig.*, 346 F. Supp. 2d at 554; *Qi*, 349 F. Supp. 2d at 1296-1303.

17

Plaintiffs' also argue that *Sosa*'s "case-specific deference to the political branches" is

18

limited to situations where a "special mechanism" has been established to permit resolution of the

19

claims elsewhere. Opp. at 7. This argument, too, is without merit. As this Court recognized in

20

*Qi*, such deference applies broadly, whenever "the dangers of judicial interference with foreign

21

relations committed to the political branches" are implicated. 349 F. Supp. 2d at 1291 n.22.

22

Finally, plaintiffs' assertion that a statement of interest might not be dispositive, *see* Opp.

23

14-19, does not mean one should not be solicited. This Court used such a statement to narrow

24

plaintiffs' claims in *Qi*, 349 F. Supp. 2d at 1301-03, even if it did not dismiss the case outright.

25

For all these reasons, the Court should grant Yahoo!'s motion, which will allow this Court

26

and the parties to brief motions to dismiss *after* the views of government have been obtained,

27

assuming plaintiffs' claims even survive Phase I.

28

1    **III.    PLAINTIFFS ARE NOT ENTITLED TO IMMEDIATE DISCOVERY.**

2           Plaintiffs also resist Yahoo!'s case management proposal, arguing they are entitled to

3    "discovery" and "fact gathering," right away.  Opp. at 1-3.  Plaintiffs fail to mention that "the

4    price of entry, *even to discovery*, is for the plaintiff to allege a factual predicate concrete enough

5    to warrant further proceedings, which may be costly and burdensome."  *DM Research, Inc. v.*

6    *College of Am. Pathologists*, 170 F.3d 53, 56 (1st Cir. 1999); *DeShazier v. Williams*, Case No.

7    CV F 06-0591, 2006 U.S. Dist. LEXIS 64906, *18 (E.D. Cal. Aug. 29, 2006) (same).

8           In addition to the defects in plaintiffs' legal theories discussed above, their complaint fails

9    even the most basic pleading standards set forth in Rules 8 and 11 of the Federal Rules of Civil

10   Procedure ("Rule").  The primary defect—and proof that this case is anything but a normal one—

11   comes in the very first sentence of the complaint:  Plaintiffs "allege upon personal knowledge *and*

12   *belief* as to *their own circumstances* . . . that substantial evidentiary support exists *or will exist*

13   *after a reasonable opportunity* for further investigation and discovery."  Am. Compl. at 1:1-5.

14          Rule 8 does not require detailed factual pleading, but it *does* require pleading facts

15   sufficient to state a claim.  Plaintiffs' "belief" that some evidence will turn up in discovery is

16   insufficient.  Pleadings based on "information and belief" are allowed, but *only* when the

17   information is "peculiarly within the knowledge of *defendants*."  *Bertucelli v. Carreras*, 467 F.2d

18   214, 215 (9th Cir. 1972); *accord* 5 CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL

19   PRACTICE AND PROCEDURE § 1224 (1990); 2-8 MOORE'S FEDERAL PRACTICE, CIVIL § 8.04(4)

20   (2007).  Plaintiffs' own "circumstances" should be uniquely within their own "knowledge."

21   There can be no legitimate reason for plaintiffs to have pled what happened to them based on

22   "*belief*," unless defendants' concerns about plaintiffs' inability to prosecute this case, provide

23   competent testimony, or even communicate with their counsel are all real.

24          Plaintiffs, moreover, have an affirmative obligation under Rule 11(b)(3) "specifically [to]

25   identify" any factual allegations that lack evidentiary support at the time of filing.  The complaint

26   fails to do so.  Instead, it states generally that some or all of its allegations may or may not have

27   evidentiary support, and puts the burden on defendants to sort through the claims for themselves.

28   Such vague, ambiguous pleadings do not adequately put defendants on notice of the allegations

1   against which they must defend.  At a minimum, defendants will require a more definite

2   statement, pursuant to Rule 12(e), before they can fully respond to plaintiffs' claims.  Only after

3   such issues are addressed in Phase I should merits issues be addressed in Phase II.[5]

4          In addition to requiring a more definite statement, this Court should also require plaintiffs

5   to make a factual proffer before allowing this case to proceed.  Plaintiffs seek expensive,

6   burdensome discovery from defendants, but refuse even to positively allege *their own injuries*.

7   Defendants should not be forced to defend themselves, at considerable expense, against phantom

8   allegations that even plaintiffs acknowledge may have no basis in evidence.  *See, e.g.*, *DeShazier*,

9   2006 U.S. Dist. LEXIS 64906, at *18 ("Conclusory allegations in a complaint, if they stand alone,

10  are a danger sign that the plaintiff is engaged in a fishing expedition."); *In re Sinaltrainal*

11  *Litigation*, 474 F. Supp. 2d 1273, 1275 (S.D. Fl. 2006) (noting in ATS cases "there is . . . a risk

12  that vague, conclusory, and attenuated allegations will allow individuals (and often the interest

13  groups that finance or otherwise support their litigation) to engage in unwarranted international

14  'fishing expeditions' [and] abuse the judicial process in order to pursue political agendas").

15         That plaintiffs make their allegations on "belief" as to their own circumstances raises a

16  final concern: counsels' authority to represent plaintiffs.  In plaintiffs' responsive brief to our

17  motion to shorten time, counsel assert only that they have contact with plaintiff Yu Ling and the

18  mother of Shi Tao, whom they assert is his legal representative.  The brief further implies that

19  communications with plaintiffs Wang and Shi are exclusively through members of their families.

20  Under both the ATS and the TVPA, plaintiffs Wang and Shi must sue on their own behalf, *see*

21  *Xuncax v. Gramajo*, 886 F. Supp. 162, 192 (D. Mass. 1995), yet even now plaintiffs suggest they

22  may add Shi's mother as a plaintiff, *see* Opp. at 4, even though she lacks standing, as this Court

23  held in *Qi*, 349 F. Supp. 2d at 1313.  Indeed, under federal and California law, every action must

24  be prosecuted by the real party in interest or a representative of that party authorized by law—

25  such as a guardian, executor, or party authorized by statute to bring suit—unless that real party

26  lacks capacity to bring suit.  *See* FED. R. CIV. P. 17; CAL. CIV. PROC. CODE § 367.  Plaintiffs'

27  _____

28  [5] Plaintiffs have suggested they might again amend their complaint.  Because amendment will not
    remove the difficult threshold issues the complaint raises, phasing of this case still makes sense.

1  counsel have said they represent Shi and Wang, but have not provided us with evidence that they

2  are prosecuting this suit with plaintiffs' express authority or through legally executed and binding

3  powers of attorney.  The law requires such documentation.[6]

4       Unless defendants' are provided such evidence, it will be prudent to bring a motion to

5  dismiss the case on the basis that the suit is unauthorized—at least by Wang and Shi.  *See Pueblo*

6  *of Santa Rosa v. Fall*, 273 U.S. 315, 319 (1927); *Meredith v. Ionian Trader*, 279 F. 2d 471, 474

7  (2d Cir. 1960); *United States v. Wolf*, 352 F. Supp. 2d 1195, 1199 (W.D. Okla. 2004); *Abeles v.*

8  *State Bar of Cal.*, 9 Cal. 3d 603, 610 (Cal. 1973).  These representation issues are not idle

9  concerns.  Counsel are aware of at least one ATS case in which plaintiffs' counsel prosecuted the

10 case for six years.  After the case settled and judgment was entered, several plaintiffs filed

11 motions to vacate the judgment and start the case all over again, on the theory that counsel lacked

12 authority to settle their claims.  The court denied plaintiffs' motion, in large because plaintiffs had

13 executed valid powers of attorney on which defendants relied.  Proceeding here without such

14 safeguards exposes defendants and the Court to a number of risks, ranging from wasting

15 resources to treading on sensitive foreign policy grounds for no reason.

16 **IV.    YAHOO!'S PURPOSE IS NOT DELAY.**

17      **A.    The Purpose of Phase I**

18      Yahoo!'s purpose in filing this motion—like Alibaba.com, Inc.'s in joining it—is first, in

19

---

20 [6] In California, a plaintiff may grant a general power of attorney with broad powers to sue on his
   or her behalf.  *See* CAL. PROB. CODE §§ 4263(a)(1), 4459.  But it must be dated, signed "either (1)
21 by the principal or (2) in the principal's name by another adult in the principal's presence and at
   the principal's direction," and "acknowledged before a notary public or [] signed by at least two
22 witnesses."  *Id*. §§ 4121, 4122; *Estate of Rabinowitz*, 7 Cal. Rptr. 3d 722, 723 (2003).  In China, a
   party may appoint an agent to represent her in a civil action only by submitting to the People's
23 Court a power of attorney, bearing her signature or seal, that specifies the subject matter and the
   limits of authority granted.  An agent must have special authority to recognize, withdraw, or
24 modify claims; to become involved in mediation; to file a counterclaim or to lodge an appeal on
   behalf of the principal.  *See* Zhong hua ren min gong he guo min shi su song fa [1991Civil
25 Procedure Law (P.R.C.)] at Art. 59.  A carte blanche power of attorney, which fails to name the
   powers granted, precludes an agent any of the above.  *See* Zui gao ren min fa yuan guan yu shi
26 yong <zong hua ren min gong he guo min shi su song fa> ruo gan went i de yi jian, (Opinions of
   the Supreme People's Court on Certain Issues Concerning Application of PRC Civil Procedure
27 Law 2002), SUP. PEOPLE'S CT. GAZ., Art. 69.  Other than general assurances, plaintiffs' counsel
   have not confirmed they obtained such documents, nor produced them to defendants.
28

1   Phase I, to define who the proper parties are to this suit, if anyone.  Plaintiffs pled no facts to

2   suggest that YHKL is subject to this Court's jurisdiction.  Nor do any exist.  YHKL should be

3   dismissed from this case without delay.  Plaintiffs seek to keep it in the case indefinitely and

4   subject it to various forms of discovery.  Merely naming YHKL as a defendant was not enough.

5   Plaintiffs need a good faith basis to subject YHKL to suit.  Plaintiffs have none.

6       Plaintiffs similarly have been unable to identify a single fact that connects Alibaba.com,

7   Inc. to the allegations made in the case.  Indeed, defendants' moving papers highlighted how the

8   amended complaint, on its face, refutes plaintiffs' conclusory and undifferentiated allegation that

9   "defendants" disclosed information about them to the Chinese government.  In response,

10  plaintiffs are silent.  Their opposition brief never mentions Alibaba.com, Inc., let alone articulates

11  any basis for suing it.  Alibaba.com, Inc., like every other Alibaba entity, had no connection to

12  Yahoo! China when the alleged disclosures were made regarding plaintiffs, and it does not and

13  did not maintain Yahoo! China user information, the subject matter of the alleged disclosures.

14  This Court should allow Alibaba.com, Inc. to brief this single issue before it is forced to spend

15  time and money briefing various issues in this case, such as the scope of international law and

16  whether this Court should decline to hear this case on grounds such as international comity, the

17  act of state doctrine, or the scope of the various federal statutes and California law.

18      Plaintiffs Yu and Shi equally have no place in this case, and their claims should be

19  dismissed in Phase I.  Yu lacks standing to bring claims on behalf of her husband, *see Qi*, 349 F.

20  Supp. 2d at 1313, and her own claims, which she brings under California law, are paper thin and

21  have no merit.  Plaintiffs' counsel know so little about Shi that they do not even allege that he

22  suffered from specific acts of torture or forced labor.  Instead, they say that, because his prison is

23  notoriously abusive, one can merely assume he was abused.  *See* Am. Compl. ¶¶ 57, 64.  Even if

24  that surmise is plausible, cases may not proceed in American courts based on such speculation.

25      Finally, Phase I should be used to test questions like whether plaintiffs can prove their

26  case given the fact of their incarceration, and whether their counsel have the authority or ability to

27  prosecute the case.  Plaintiffs should also be forced to state their claims more definitively so that

28  whatever defendants, if any, remain in Phase II, know what allegations they are actually

1    defending against.  To get around these pleading and proof problems, plaintiffs suggest they

2    might add new plaintiffs to the case and that their representatives will testify for them.  *See* Opp.

3    at 4.  But plaintiffs have yet to amend their complaint to include such plaintiffs or clarify their

4    claims, and the witnesses plaintiffs presently propose (Shi's mother and Wang's wife) lack

5    sufficient personal knowledge to give competent testimony.  *See* Fed. R. Evid. 602.  Plaintiffs

6    further suggest that State Department reports provide the necessary proof.  *See* Opp. at 18.

7    Again, they are wrong.  This Court has recognized such reports do not provide "specific and

8    direct evidence substantiating the particular abuses allegedly suffered by . . . individual

9    Plaintiffs."  *Qi*, 349 F. Supp. 2d at 1311 n.39.

10           **B.    The Purpose of Phase II**

11           As Phase I unfolds, defendants will ask the Court to solicit the views of the Department of

12    State, Department of Justice, and perhaps foreign governments regarding the impact of this case

13    on foreign policy and global law enforcement efforts.  Taken to its logical conclusion, plaintiffs'

14    theory of the case could mean that a judge in Amsterdam could require any company with a

15    connection to the Netherlands not to respond to American law enforcement requests in marijuana

16    prosecutions, because laws prohibiting the use of the drug violate an international norm the Dutch

17    court recognizes.  More likely, if plaintiffs' case is allowed to proceed, corporations could fear

18    complying with American requests for information or assistance in terrorism cases, on the theory

19    that some court in the United States or abroad could rule that aiding and abetting the United

20    States' "War on Terror" violates international norms.  Indeed, such a lawsuit was recently filed

21    against a Boeing subsidiary, on the theory that it assisted the CIA in a so-called "extraordinary

22    rendition" of terrorism suspects, which led to the suspects' apprehension and alleged torture.  *See*

23    Scott Shane, *Suit Over C.I.A. Program*, N.Y. TIMES, May 31, 2007.

24           Before this Court receives any briefing—or much less makes any rulings (which will no

25    doubt be cited in other cases)—it should have the views of the political branches regarding this

26    case.  There is no reason to force defendants to brief the merits issues in this case in the blind and

27    without the benefit of these views, especially when resolution of the Phase I issues may dispose

28    of the case entirely and will keep the parties busy and productive in the coming months.

C.     **The Question of Prejudice**

Plaintiffs will not be prejudiced by the delay for Phase II to begin.  As one can see from the allegations in the complaint, plaintiffs cannot meaningfully participate in the prosecution of this case and may not be able to do so until they are released from prison several years from now. Plaintiffs have identified no real prejudice if Yahoo!'s motion is granted.  First, the notion that discovery of defendants will shed light on plaintiffs' condition or the alleged mistreatment they suffered at the hand of the PRC—the very basis of all their claims—is a non-starter.  Defendants have no access to such proof; only plaintiffs and the PRC do.

Second, plaintiffs' counsel have argued in our "meet and confer" conferences and suggested in their recent brief, *see* Opp. at 21, that any delay in this case, even of a few weeks, will mean plaintiffs will have to remain in prison longer.  To be clear, no schedule in this case, no court order, and no action defendants could undertake could guarantee or even likely affect plaintiffs' condition except in a negative way.  The U.S. government has long urged the release of political prisoners in China, but with only limited success and only by pursuing careful diplomatic channels.[7]  Moreover, as this Court has recognized, it would "risk enormous implications for our foreign relations" to issue an injunction requiring the Chinese government to take any action, much less to release two prisoners it considers (even if wrongly) threats to its national security. *Qi*, 349 F. Supp. 2d at 1301.

The only real prejudice here would be if plaintiffs' case were allowed to proceed before this Court determines who the proper parties are, whether plaintiffs' counsel have the ability to prosecute the case, whether this case is justiciable, and whether plaintiffs have even stated a

---

[7] *See, e.g.*, Bill Nichols, *China prisoners' supporters look to Bush*, USA TODAY (Apr. 18, 2006) ("Human rights activists say prisoner releases have declined since Hu [Jintao] became China's leader in 2002.")' Library of Congress, Congressional Research Service Report for Congress, *China-U.S. Relations: Current Issues and Implications for U.S. Policy*, at CRS-20 (Kerry Dumbough, ed. updated January 20, 2006), http://fpc.state.gov/documents/organization/61492.pdf. ("The PRC government periodically has acceded to this White House pressure and released early from prison political dissidents. . . .  On March 4, 2004, for instance, the PRC released on medical parole one of its best-known political prisoners . . . .  The same day, the U.S. government announced that it would not introduce a resolution criticizing China's human rights record at the 61st Session of the U.N. Commission on Human Rights . . . .").

1   claim.  To force defendants to expend a great deal of money defending this speculative case and

2   to respond to discovery, where producing such discovery might violate Chinese law, makes no

3   sense until these threshold questions are answered.

4         In short, defendants do not propose any delay at all.  They propose that the Court and the

5   parties march through this case, but do so in a meaningful and sensible fashion.

6   **V.      PLAINTIFFS KNEW YAHOO! WOULD BE FILING THIS MOTION.**

7         Plaintiffs contend they were surprised by Yahoo!'s motion and they would not have

8   agreed to the stipulated schedule the Court ordered had they known Yahoo! would file this brief.

9   *See* Opp. at 2; Decl. of Morton Sklar *passim*.  Plaintiffs' argument is erroneous.  In our very first

10  conversation with plaintiffs' counsel, we raised the issue of filing this motion, bifurcating the

11  case, and plaintiffs' and their counsel's ability to prosecute it.  Indeed, in the joint stipulation

12  providing for a brief continuance, which plaintiffs' counsel signed, Yahoo! expressly "reserve[d]

13  [its] right to seek further enlargement of time and propose a modified case management plan."

14  Joint Stip. Request For Order Enlarging Time To Respond To Compl. & Extending Initial

15  Deadlines ¶ 3 (filed June 18, 2007).  As the accompanying declaration made clear:

16         [T]he case raises a numerous issues that will require extensive motion practice and
           briefing.  Given the nature of the case, we will also request that the Court seek the
17         views of the U.S. government and perhaps other authorities regarding the impact
           of this case on foreign and other government policies. . . .
18              I have discussed the scheduling and other issues presented in this Joint
           Stipulation with Joseph Cyr, counsel for Alibaba.com, Inc., and Morton Sklar,
19         counsel for plaintiffs, *including my proposal to have an early case management
           conference in this case and to request a schedule to address sequentially certain
20         threshold matters, such as the question whether YHKL is subject to jurisdiction in
           this case. . . .  Defendants anticipate promptly filing a motion to address case
21         management issues.*

22  Decl. Of Daniel Petrocelli ¶¶ 7, 9 (filed June 18, 2007).  Though we quoted both these sources in

23  our motion, *see* Mot. at 11, plaintiffs offered no response to them.

24  **VI.     THE COURT HAS THE POWER TO GRANT THE RELIEF REQUESTED.**

25         Finally, plaintiffs suggest the Court lacks the authority under the Local Rules or otherwise

26  to grant the relief Yahoo! seeks.  *See* Opp. at 5:3-24.  Plaintiffs are mistaken.  It is a "well-settled

27  principal that a district court has broad discretion to manage its own calendar," *United States v.*

28  *Batiste*, 868 F.2d 1089, 1092 (9th Cir. 1989), and "has broad discretion to stay proceedings as an

incident to its power to control its own docket," *Clinton v. Jones*, 520 U.S. 681, 706 (1997). This power is construed broadly, enabling the court to "manage cases so that disposition is expedited, wasteful pretrial activities are discouraged, the quality of the trial is improved, and settlement is facilitated." *Allen v. Bayer Corp.*, 460 F.3d 1217, 1227 (9th Cir. 2006).

Rule 16 recognizes the need to adopt special procedures "for managing potentially difficult or protracted actions that may involve complex issues, multiple parties, difficult legal questions, or unusual proof problems." *Id.* Such decisions are entrusted to the court's discretion. For example, one district court found it appropriate to stay proceedings while awaiting an advisory opinion from administrative agencies. *Citicasters Co. v. Country Club Communs.*, 44 U.S.P.Q.2D (BNA) 1223 (C.D. Cal. 1997). Discovery can also be delayed or denied pursuant to Rule 26(c), upon a showing of good cause. *See* Fed. R. Civ. P. 26(c); *Telemac Corp. v. Teledigital, Inc.*, 450 F. Supp. 2d 1107, 1110-11 (N.D. Cal. 2006) (Wilken, J.) (patent case). It is also within the court's power to change case management conference dates. Local Rule 16-2 specifically allows a party to "seek relief from an obligation imposed by FRCivP 16 or 26 or the Order Setting Initial Case Management Conference."[7]

## VII.    CONCLUSION

For the foregoing reasons, Yahoo!'s motion should be granted.

Dated: July 12, 2007

DANIEL M. PETROCELLI
MATTHEW T. KLINE
O'MELVENY & MYERS LLP

By:_____
        Daniel M. Petrocelli
Attorneys for Defendant
YAHOO!, INC.

CC1:766529.5

---

[7] Indeed, in an unpublished appeal from a Northern District of California case, the Ninth Circuit held it was squarely within the court's inherent power to change the date of a case management conference. *See Freeman v. Employment Stds. Admin.*, 71 Fed. Appx. 638 (9th Cir. July 24, 2003) (unpublished, decided without oral argument). Citing *Batiste*, 868 F. 2d at 1091, the court held that plaintiff's "contention that it was improper for the district court to change the case management conference date is unavailing" because "a district court has broad discretion to manage its own calendar." *Freeman*, 71 Fed. Appx. at 638.

# EXHIBIT A

1  DANIEL MERON
   Acting Assistant Attorney General
2  KEVIN V. RYAN
   United States Attorney
3  VINCENT M. GARVEY
   Deputy Branch Director
4  ALEXANDER K. HAAS
   Trial Attorney, Civil Division
5  Federal Programs Branch
   U.S. Department of Justice
6  Post Office Box 883, Room 1030
   Washington, D.C.  20044
7  Telephone:  (202) 307-3937
   Facsimile:  (202) 616-8470
8
   Attorneys for the United States
9

10              UNITED STATES DISTRICT COURT

11          FOR THE NORTHERN DISTRICT OF CALIFORNIA

12  _____
                                     )
13  JANE DOE I, et al.,              )   No. C 02 0672 CW (EMC)
                                     )   No. C 02 0695 CW (EMC)
14       Plaintiffs,                 )
                                     )   STATEMENT OF INTEREST
15            v.                     )
                                     )   OF THE UNITED STATES
16  LIU QI, et al.,                  )
                                     )
17       Defendants.                 )
    _____ )
18                                   )
    PLAINTIFF A, et al.,             )
19                                   )
         Plaintiffs,                 )
20                                   )
              v.                     )
21                                   )
    XIA DEREN, et al.,               )
22                                   )
         Defendants.                 )
23  _____ )

24       By letter dated November 7, 2003, this Court solicited

25  "the State Department's position regarding Magistrate Judge

26  Chen's Report and Recommendation and Plaintiffs' objections"

27  related to the above-captioned cases.  See Letter from U.S.

28  STATEMENT OF INTEREST OF THE UNITED STATES, C 02 0672 CW (EMC) &
    C 02 0695    CW (EMC)

1  District Judge Claudia Wilken to William Howard Taft, IV of

2  November 7, 2003.  Pursuant to 28 U.S.C. §§ 516-517, the

3  Attorney General, on behalf of the Department of State,

4  hereby submits the following.

5       Attached hereto as Exhibit A is a letter, dated January

6  14, 2004, from William H. Taft, IV, Legal Adviser, U.S.

7  Department of State, to Peter D. Keisler, Assistant Attorney

8  General, in response to the Court's request for the

9  Department of State's position.[1]/

10

11                          Respectfully submitted,

12                          DANIEL MERON
                            Acting Assistant Attorney General
13                          KEVIN V. RYAN
                            United States Attorney
14

15                          *Alexander K. Haas*

16                          VINCENT M. GARVEY
                            Deputy Branch Director
17                          ALEXANDER K. HAAS
                            Trial Attorney, Civil Division
18                          Federal Programs Branch
                            U.S. Department of Justice
19                          20 Massachusetts Ave., NW, 7221
                            Washington, D.C.  20001
20                          Telephone:  (202) 307-3937
                            Facsimile:  (202) 616-8470
21                          Attorneys for the United States

22  Dated:  January 16, 2004

23  _____

24       [1] The brief for the United States in support of the petition
    for certiorari in Sosa v. Alvarez-Machain, a case referenced in the
25   attached letter from the Legal Adviser, was filed on September 25,
    2003.  It can be found at the Solicitor General's website. See
26   website of the Office of Solicitor General, at
    http://www.usdoj.gov/osg/briefs/2003/0responses/
27   2003-0339.resp.html (last visited Jan.16, 2004).

28  STATEMENT OF INTEREST OF THE UNITED STATES, C 02 0672 CW (EMC) &
    C 02 0695    CW (EMC)                - 2 -

THE LEGAL ADVISER

DEPARTMENT OF STATE

WASHINGTON

January 14, 2004

Honorable Peter D. Keisler
Assistant Attorney General
Civil Division
United States Department of Justice
Washington, D.C. 20530

         Re:   *Jane Doe I, et al. v. Liu Qi, et al.*, C-02-0672
               CW; *Plaintiff A, et al. v. Xia Deren, et al.*, C-
               01-0695 CW

Dear Mr. Keisler:

       By letter dated November 7, U.S. District Court Judge
Claudia Wilken invited the Department of State to submit
its views, by January 16, 2004, regarding the June 11
Report and Recommendation of U.S. Magistrate Judge Edward
Chen and the July 24/25 objections of plaintiffs thereto in
the above-captioned cases.  (By way of background, I am
enclosing a copy of the United States' statement of
interest filed by your predecessor with Judge Chen on
September 27, 2002 that attached a copy of my September 25,
2002 letter in response to Judge Chen.)  I am writing now
to ask that you please file a copy of this letter with
Judge Wilken, in response to her November 7 letter, in
whatever manner you deem most appropriate.

       As you know, the United States Supreme Court has
recently granted certiorari in *Sosa v. Alvarez-Machain*,
2003 WL 22070605 (Dec. 1, 2003), which implicates issues
that would appear to be central to the District Court's
disposition of the above-captioned cases.  On December 9,
the U.S. Court of Appeals for the Ninth Circuit in *Doe v.
Unocal*, Nos. 00-56603 and 00-57197 (copy attached) ordered
a suspension of further proceedings in that case pending
the Supreme Court's decision in *Sosa*.

In light of the above, it would seem appropriate for Judge Wilken similarly to postpone the *Liu* and *Xia* litigation.  If, however, Judge Wilken intends to dispose of the above-captioned cases before the Supreme Court decides, we would appreciate an opportunity to submit additional substantive comments in response to her November 7 request.

Thank you for your assistance.

Sincerely,

William H. Taft, IV

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

**FILED**

DEC - 9 2003

CATHY A. CATTERSON
CLERK, U.S. COURT OF APPEALS

JOHN DOE I, individually & as
Administrator of the Estate of his deceased
child Baby Doe I, & on behalf of all others
similarly situated; JANE DOE, I, on behalf of
herself, as Administratrix of the Estate of her
deceased child Baby Doe I & on behalf of all
others similarly situated; JOHN DOE II;
JOHN DOE III; JOHN DOE IV; JOHN DOE
V; JANE DOE II; JANE DOE III; JOHN
DOE VI; JOHN DOE VII; JOHN DOE VIII;
JOHN DOE IX; JOHN DOE X; JOHN DOE
XI, on behalf of themselves & all others
similarly situated & Louisa Benson on behalf
of herself & the general public,

    Plaintiffs - Appellants,

  v.

UNOCAL CORPORATION, a California
Corporation; TOTAL S.A., a Foreign
Corporation; JOHN IMLE, an individual;
ROGER C. BEACH, an individual,

    Defendants - Appellees.

Nos. 00-56603
     00-57197

D.C. No. CV-96-06959-RSWL



JOHN ROE III; JOHN ROE vII; JOHN ROE VIII; JOHN ROE X,

Plaintiffs - Appellants,

v.

UNOCAL CORPORATION; UNION OIL COMPANY OF CALIFORNIA,

Defendants - Appellees.

Nos. 00-56628
00-57195

D.C. No. CV-96-06112-RSWL

**ORDER**

SCHROEDER, Chief Judge:

This case is withdrawn from submission pending issuance of the Supreme Court's decision in Sosa v. Alvarez-Machain, 2003 WL 22070605 (Dec. 1, 2003).

2

1  ROBERT D. McCALLUM, JR.
   Assistant Attorney General
2  VINCENT M. GARVEY
   Deputy Branch Director
3  ALISON N. BARKOFF
   Trial Attorney, Civil Division
4  Federal Programs Branch
   U.S. Department of Justice
5  Post Office Box 883, Room 1020
   Washington, D.C.  20044
6  Telephone:  (202) 514-5751
   Facsimile:  (202) 616-8470
7
8  Attorneys for the United States

9              UNITED STATES DISTRICT COURT

10        FOR THE NORTHERN DISTRICT OF CALIFORNIA

11  _____
                               )
12  JANE DOE I, et al.,        )      No. C 02 0672 CW (EMC)
                               )      No. C 02 0695 CW (EMC)
13       Plaintiffs,           )
                               )      STATEMENT OF INTEREST
14          v.                 )      OF THE UNITED STATES
                               )
15  LIU QI, et al.,            )
                               )
16       Defendants.           )
                               )
17  _____)
                               )
18  PLAINTIFF A, et al.,       )
                               )
    Plaintiffs,                )
19                             )
            v.                 )
20                             )
    XIA DEREN, et al.,         )
21                             )
         Defendants.           )
22  _____)

23        By letter dated May 3, 2002, and by order dated August 5,

24  2002, this Court "solicit[ed] the Department of State's opinion

25  on a number of issues" related to the above-captioned cases,

26  including whether the cases are barred by the Foreign Sovereign

27  Immunities Act, 28 U.S.C. §§ 1330, 1605-07, or are nonjusticiable

28  STATEMENT OF INTEREST OF THE UNITED STATES, C 02 0672 CW(EMC), C 02 0695 CW(EMC)

1  under the act of state doctrine. <u>See</u> Letter from U.S. Magistrate

2  Judge Edward M. Chen to William Howard Taft, IV of May 3, 2002;

3  Court's Aug. 5, 2002 Order.  Pursuant to 28 U.S.C. §§ 516-617,

4  the Attorney General, on behalf of the Department of State,

5  hereby submits the following.

6      Attached hereto as Exhibit A is a letter, dated September

7  25, 2002, from William H. Taft, IV, Legal Advisor, U.S.

8  Department of State, to Robert D. McCallum, Jr., Assistant

9  Attorney General, which explains the Department of State's views

10  on the issues raised by the Court.

11

12                              Respectfully submitted,

13                              ROBERT D. McCALLUM, JR.
                                Assistant Attorney General
14

15                              _Alison N. Barkoff_
                                VINCENT M. GARVEY
16                              Deputy Branch Director
                                ALISON N. BARKOFF
17                              Trial Attorney, Civil Division
                                Federal Programs Branch
18                              U.S. Department of Justice
                                Post Office Box 883, Room 1020
19                              Washington, D.C.  20044
                                Telephone:  (202) 514-5751
20                              Facsimile:  (202) 616-8470
                                Attorneys for the United States
21
   Dated:   September 26, 2002
22  ///

23  ///

24  ///

25  ///

26  ///

27  ///

28
   STATEMENT OF INTEREST OF THE UNITED STATES, C 02 0672 CW(EMC), C 02 0695 CW(EMC)

## CERTIFICATE OF SERVICE

I am over the age of 18 years and not a party to the within action. I am employed by the United States Department of Justice, Civil Division, Federal Programs Branch. My business address is 901 E Street, N.W., Washington, D.C. 20004.

On <u>September 26, 2002</u>, I served <u>STATEMENT OF INTEREST OF THE UNITED STATES</u> on the persons named below, by enclosing a copy in an envelope addressed as shown below and placing the envelope for collection and mailing on the date and at the place shown below following our ordinary business practices. I am readily familiar with the practice of this office for collection and processing correspondence for mailing. On the same day that correspondence in placed for collection and mailing, it is deposited in the ordinary course of business within the United States Postal Service in a sealed envelope with postage fully prepaid.

Date of mailing: <u>September 26, 2002</u>. Place of mailing: <u>Washington, D.C.</u> Persons to whom mailed:

Joshua Sondheimer
The Center for Justice & Accountability
870 Market Street, Suite 684
San Francisco, CA 94102
Attorney for plaintiffs in <u>Doe v. Liu Qi</u>

Terri E. Marsh
1333 Connecticut Ave., N.W.
Suite 608
Washington, D.C. 20008
Attorney for plaintiffs in <u>Doe v. Liu Qi</u>

Paul Hoffman
Schonbrun DeSimone Seplow Harris & Hoffman LLP
723 Ocean Front Walk
Venice, CA 90291
Attorney for plaintiffs in <u>Doe v. Liu Qi</u>

///

STATEMENT OF INTEREST OF THE UNITED STATES, C 02 0672 CW(EMC), C 02 0695 CW(EMC)

1    Karen Parker
     154 5th Avenue
2    San Francisco, CA 94118
     Attorney for plaintiffs in <u>Plaintiff A v. Xia Deren</u>
3
     Morton Sklar
4    World Organization Against Torture USA
     1725 K St., N.W., Suite 610
5    Washington, D.C. 20006
     Attorneys for plaintiffs in <u>Plaintiff A v. Xia Deren</u>
6
     I declare under penalty of perjury under the laws of the
7
United States of America that the foregoing is true and correct.
8
Executed on <u>September 26, 2002</u>, at Washington, D.C.
9

10                            _Alison N. Barkoff_
                              Alison N. Barkoff
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
     STATEMENT OF INTEREST OF THE UNITED STATES, C 02 0672 CW(EMC), C 02 0695 CW(EMC)

THE LEGAL ADVISER

DEPARTMENT OF STATE

WASHINGTON


September 25, 2002


Honorable Robert D. McCallum
Assistant Attorney General
Civil Division
United States Department of Justice
10th Street & Constitution Avenue, N.W.
Washington, D.C. 20530

     Re:  *Doe, et al. v. Liu Qi, et al.*, and *Plaintiff A,
           et al. v. Xia Deren*, Civil Nos. C 02-0672 CW
           (EMC) and C 02-0695 CW (EMC) (N.D. Cal.)

Dear Mr. McCallum:

    By letter dated May 3, U.S. Magistrate Judge Edward M.
Chen of the Northern District of California solicited the
Department of State's views on several issues in connection
with the above-captioned case.  Encl 1.  Magistrate Chen
asked that we respond before July 5, either by letter or
statement of interest pursuant to 28 U.S.C. § 517.  On June
25, the Department of Justice sought and received an
extension of time to August 9.  On July 25, the District
Court consolidated proceedings in the *Plaintiff A v. Xia
Deren* case with *Liu*, and referred that case also to
Magistrate Judge Chen.  On August 5, Magistrate Chen
vacated the previous briefing schedule, and invited the
State Department to provide its views on either or both of
these cases by September 27.  We ask that you please file a
copy of this response to these requests with Magistrate
Chen in whatever manner you deem most appropriate under the
circumstances.

    In *Liu*, the gravamen of plaintiffs' complaint is that
the defendant, as Mayor of Beijing, People's Republic of
China ("PRC"), either knew or should have known about
various human rights abuses that were allegedly perpetrated
against adherents to the Falun Gong movement in Beijing,
and that he was under a duty under both Chinese and

- 2 -

international law to prevent such actions.[1]  The complaint
alleges that Defendant Liu "planned, instigated, ordered,
authorized, or incited police and other [PRC] security
forces to commit the abuses suffered by Plaintiffs, and had
command or superior responsibility over, controlled, or
aided and abetted such forces in their commission of such
abuses.  The acts alleged herein…were carried out in the
context of a nationwide crackdown against Falun Gong
practitioners." Compl., ¶ 2.

In *Liu*, all but one of the plaintiffs are aliens; four
apparently reside in the United States.  Federal subject
matter jurisdiction is alleged to lie under customary
international law, the Torture Victims Protection Act
(TVPA), 28 U.S.C. § 1350, note, the Alien Tort Statute
(ATS), 28 U.S.C. § 1350, and 28 U.S.C. § 1331.  Id., ¶ 3.

As noted in Magistrate Chen's May 3 letter, a default
was entered in favor of the plaintiffs on March 12.
Plaintiffs subsequently moved for judgment by default.  In
reviewing that motion, the Court has asked for the
Department's views on two questions: (1) whether the case
is barred under the Foreign Sovereign Immunities Act
("FSIA"), and (2) whether the Court should find the case
"nonjusticiable" under the Act of State doctrine.  We
address these issues in turn.

Before turning to the questions posed by the Court, we
would note Magistrate Chen's subsequent invitation to
provide the Department's views in the *Xia* case.  From our
review of that complaint, we conclude, as did Magistrate
Chen in his August 5 order, that the relevant issues
involved in both cases are "similar, if not identical."  In
these circumstances, we see no need to comment separately
on the *Xia* case; the views as expressed below regarding *Liu*
may be taken to apply *mutatis mutandis* to *Xia*.  At the same
time, we note that the complaint in *Xia* is unambiguous in
asserting that the defendant was acting in his official
capacity.

We also stress our deep concern about the human rights
abuses that have been alleged in these complaints.  The
United States has repeatedly made these concerns known to
the Government of the PRC and has called upon it to respect

---

[1] We note that the Complaint caption refers to "Liu Qi, and Does 1-5,
inclusive," but we have not found specific reference in the complaint
to any defendants other than Mr. Liu.

- 3 -

the rights of all its citizens, including Falun Gong
practitioners.  Our critical views regarding the PRC
Government's abuse and mistreatment of practitioners of the
Falun Gong movement are a matter of public record and are
clearly set forth in the Department's annual human rights
reports, the most recent version of which may be found at
http://www.state.gov/drl/rls/hrrpt/2001/eap/8289.htm.

    With respect to the FSIA, Magistrate Chen asked
specifically whether the exception to immunity under 28
U.S.C. § 1605(a)(7) applies to the case against *Liu*.  In
our considered opinion, the exception under 28 U.S.C. §
1605(a)(7) does not apply by its terms, since the Peoples'
Republic of China has never been designated as a state
sponsor of terrorism within the meaning of subsection (A)
of that provision.  Nor, in our view, does the "tort"
exception under 28 U.S.C. § 1605(a)(5) apply since none of
the acts in question occurred in the United States.  It
does not appear to us that any other exception of the FSIA
would be relevant to the facts alleged in the complaint.
Therefore, if the FSIA is the appropriate legal framework
for determining the issue, the action would have to be
dismissed.  See 28 U.S.C. §§ 1330, 1604 (immunity unless
there is exception under 28 U.S.C. §§ 1605-1607).

    Whether the FSIA applies to this case presents a
number of issues for the Court to determine.  We understand
that, since *Chuidian v. Philippine National Bank*, 912 F.2d
1095 (9th Cir. 1990), the practice in the 9th Circuit has
been to evaluate claims brought against individual foreign
government officials in United States federal courts
according to whether the allegations giving rise to the
suit were performed in an official capacity.  Where the
conduct is found to be official, the courts have deemed the
action to be, in effect, a claim against the foreign state,
and have applied the analytical framework of the FSIA.
Other jurisdictions have also adopted this approach.  See,
e.g., *Byrd v. Corporacion Forestal Y Industrial de Olancho
S.A.*, 182 F.3d 380, 388-89 (5th Cir. 1999); *El-Fadl v.
Central Bank of Jordan*, 75 F.3d 668, 671 (D.C. Cir. 1996).[2]

    The following considerations may be relevant given
this framework.  As noted above, the only named defendant
in *Liu* is Beijing's Mayor, Mr. Liu Qi.  The allegations of

_____
[2] The Executive Branch has not specifically endorsed the approach of
*Chuidian*, but recognizes that it is controlling law in the 9th Circuit
in which these cases arise.

- 4 -

the complaint are directed solely towards actions he
allegedly took, or failed to take, as a senior official of
the Chinese Government, in implementation of official
policy.  What is at issue, in the words of the complaint,
is the "Chinese government's crackdown on Falun Gong," and
more particularly the "[a]buses being committed by police
and security forces in Beijing against the Falun Gong."
Compl., ¶¶ 31, 32.  The acts and omissions attributed to
Mayor Liu are characterized as part of this "widespread
governmental crackdown"; the duties he is said to have
violated derived from his official position.  The complaint
specifically alleges that "[a]s the Mayor of the City of
Beijing, Defendant Liu held and holds the power not only to
formulate all important provincial policies and policy
decisions, but also to supervise, direct and lead the
executive branch of the city government, which includes the
operation of the Public Security Bureau of Beijing, under
which the police operate, and other security forces."  Id.,
¶ 34.[3]

        It is noteworthy in this regard that the 9th Circuit
has previously held that the FSIA is not rendered
inapplicable because of alleged violations of customary
international law by the officials of a foreign state
defendant.  *Siderman de Blake v. Argentina*, 965 F.2d 699
(9th Cir. 1992), *cert. denied*, 507 U.S. 1017 (1993).  See
also *Argentine Republic v. Amerada Hess*, 488 U.S. 428
(1989)(FSIA is exclusive basis for suit against foreign
state notwithstanding alleged violations of international
law by its officials).  Because suits against current
officials may well constitute the "practical equivalent" of
suits against the sovereign, and because denial of immunity
in such circumstances would allow "litigants to accomplish
indirectly what the [FSIA] barred them from doing
directly," *Chuidian*, *supra* at 1101-02, we believe the
courts should be especially careful before concluding that
the FSIA is inapplicable to a suit against a current
official relating to the implementation of government
programs.  Cf., *Saudi Arabia v. Nelson*, 507 U.S. 349, 361
(1993)("the intentional conduct alleged here (the Saudi
Government's wrongful arrest, imprisonment and torture of

_____

[3] As is described more fully below, this is one of a series of suits in
U.S. courts against Chinese officials for actions allegedly taken
against Falun Gong practitioners.  This pattern may reinforce the
inference from the complaint that, at bottom, this suit is directed at
PRC government policies rather than past conduct of a specific
official.

- 5 -

Nelson) ... boils down to abuse of the power of its police
by the Saudi Government, and however monstrous such abuse
undoubtedly may be, a foreign state's exercise of the power
of its police has long been understood ... as peculiarly
sovereign in nature"). Otherwise, plaintiffs could evade
the FSIA altogether by the simple expedient of naming a
high level foreign official as a defendant rather than a
foreign state.

We acknowledge the expanding body of judicial
decisions under the TVPA holding *former* foreign government
officials liable for acts of torture and extrajudicial
killing despite (or indeed because of) the fact that the
defendants abused their governmental positions. See, e.g.,
*Xuncax v. Gramajo*, 886 F. Supp. 162 (D.Mass. 1995); *Hilao
v. Estate of Marcos*, 103 F.3d 767 (9th Cir. 1996); *Cabello
Barreuto v. Fernández Larios*, 205 F.Supp.2d 1325 (N.D.Fla.
2002). The principal aim of the TVPA was to codify the
decision of the Second Circuit in *Filartiga v. Pena-Irala*,
630 F.2d 876 (2d Cir. 1980), by providing an explicit
statutory basis for suits against former officials of
foreign governments over whom U.S. courts have obtained
personal jurisdiction, for acts of torture and
extrajudicial killing committed in an official capacity.
The Senate Report on the TVPA states that "[b]ecause all
states are officially opposed to torture and extrajudicial
killing … the FSIA should normally provide no defense to an
action taken under the TVPA against a *former* official"
(emphasis supplied).[4]

At the same time, the TVPA was not intended to
override otherwise existing immunities from U.S.
jurisdiction, as courts have recognized in suits brought
under these statutes against *current or sitting* foreign
governmental officials.[5] See, e.g., *Saltany v. Reagan*, 702

---

[4] As this sentence indicates, Congress anticipated that, although it
would not normally be so, in some cases involving officials who had
left office, exercise of jurisdiction under the TVPA would still be
inappropriate. See, e.g., S. Rep. No. 102-249, at *8 ("To avoid
liability by invoking the FSIA, a former official would have to prove
an agency relationship to the state, which would require that the state
admit some knowledge or authorization of relevant acts.")(internal
quotation marks omitted). The cases before Magistrate Chen do not pose
the question of how *Chiudian* should be applied to such former
officials.
[5] Dealing with sitting officials is a component of the President's power
over the nation's foreign relations. See, e.g., *United States v.
Curtiss-Wright Corp.*, 299 U.S. 304, 320 (1936) (describing "the very
delicate, plenary and exclusive power of the President as the sole

- 6 -

F. Supp. 319 (D.D.C. 1988); *Lafontant v. Aristide*, 844 F. Supp. 128 (E.D.N.Y. 1994); *Tachiona v. Mugabe*, 169 F.Supp.2d 259 (S.D.N.Y. 2001). These cases are consistent with relevant international authority, such as the decisions of the International Court of Justice in the *Yerodia* case (*Case Concerning the Arrest Warrant of 11 April 2000 – Democratic Republic of the Congo v. Belgium*, Judgment of Feb. 14, 2002) and the European Court of Human Rights in *Al-Adsani v. The United Kingdom* (No. 35763/97, Judgment of Nov. 21, 2001).

In response to Magistrate Chen's second set of questions ("Should the Court find the case nonjusticiable under the Act of State doctrine? What effect will adjudication of this suit have in the foreign policy of the United States?"), we respectfully offer the following observations for the Court's consideration.

Litigation in U.S. courts challenging the legality of a foreign government's actions, or inactions, taken within its own territory, can present sensitive dimensions, as recognized in a number of decisions of the U.S. Supreme Court. See, e.g., *Underhill v. Hernandez*, 168 U.S. 250, 252 (1897); *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 428 (1964); *W.S. Kirkpatrick & Co., Inc. v. Environmental Tectonics Corporation, Int'l*, 493 U.S. 400, 405 (1990)). Cf., *Baker v. Carr*, 362 U.S. 186 (1962). The Court has recognized that the judiciary should approach such litigation with the utmost care and circumspection.

We note that *Liu* is only one of several recent cases brought in U.S. federal courts by Falun Gong adherents against high-level PRC officials--typically, under the ATS and the TVPA. The case just added to these proceedings, *Plaintiff A et al. v. Xia Deren*, is but the most recent example. See also, e.g., *Peng, et al. v. Zhao*, No. 01 Civil 6535 (DLC) (SDNY) (default judgment in nominal amount of $1 entered, December 26, 2001; defendant Zhao Zhifei was said to be the Department Head of the Public Security

organ of the federal government in the field of international relations"). If Congress intended to alter the balance of power between the Executive and Legislative Branches in the area of foreign policy, Congress would be required to adopt a clear statement of that intent. "[T]he 'clear statement' rule," which "was originally articulated to guide interpretation of statutes that significantly alter the federal-state balance," should also be applied to "statutes that significantly alter the balance between Congress and the President." *Armstrong v. Bush*, 924 F.2d 282, 289 (D.C.Cir. 1991).

- 7 -

Bureau of Hubei Province); *Jin, et al.* v. *Ministry of State Security*, et al., No. 02-CV-627 (DDC)(case pending); *Petit, et al.* v. *Ding*, No. CV 02-00295 (D. HI)(case pending) (defendant Ding Guangen is said to be the Deputy Chief, Falun Gong Control Office, and Minister for Media and Propaganda, Central Committee of the Chinese Communist Party of the PRC). In our judgment, adjudication of these multiple lawsuits, including the cases before Magistrate Chen, is not the best way for the United States to advance the cause of human rights in China.

The United States Government has emphasized many times to the Chinese Government, publicly and privately, our strong opposition to violations of the basic human rights of Falun Gong practitioners in China. We have made clear, on repeated occasions, our absolute and uncompromising abhorrence of human rights violations such as those alleged in the complaint, in particular torture, arbitrary detention, interference with religious freedom, and repression of freedom of opinion and expression.  The Executive Branch has many tools at its disposal to promote adherence to human rights in China, and it will continue to apply those tools within the context of our broader foreign policy interests.

We believe, however, that U.S. _courts_ should be cautious when asked to sit in judgment on the acts of foreign officials taken within their own countries pursuant to their government's policy.[6]  This is especially true when (as in the instant cases) the defendants continue to occupy governmental positions, none of the operative acts are alleged to have taken place in the United States, personal jurisdiction over the defendants has been obtained only by alleged service of process during an official visit, and the substantive jurisdiction of the court is asserted to

---

[6] As the Department of State testified before the Senate Committee on the Judiciary during its consideration of the TVPA, "From a foreign policy perspective, we are particularly concerned over the prospect of nuisance or harassment suits brought by political opponents or for publicity purposes, where allegations may be made against foreign governments or officials who are not torturers but who will be required to defend against expensive and drawn-out legal proceedings.  Even when the foreign government decl nus to defend and a default judgment results, such suits have the potential of creating significant problems for the Executive's management of foreign affairs. … We believe that inquiry by a U.S. court into the legitimacy of foreign government sanctions is likely to be viewed as highly intrusive and offensive." S. Hrg. 101-1284 on S. 1629 and H.R. 1662 (June 22, 1990) at 28 (Prepared Statement of David P. Stewart).

- 8 -

rest on generalized allegations of violations of norms of
customary international law by virtue of the defendants'
governmental positions.  Such litigation can serve to
detract from, or interfere with, the Executive Branch's
conduct of foreign policy.

We ask the Court in particular to take into account
the potential for reciprocal treatment of United States
officials by foreign courts in efforts to challenge U.S.
government policy.  In addressing these cases, the Court
should bear in mind a potential future suit by individuals
(including foreign nationals) in a foreign court against
U.S. officials for alleged violations of customary
international law in carrying out their official functions
under the Constitution, laws and programs of the United
States (e.g., with respect to capital punishment, or for
complicity in human rights abuses by conducting foreign
relations with foreign regimes accused of those abuses).
The Court should bear in mind the potential that the United
States Government will intervene on behalf of its interests
in such cases.

If the Court finds that the FSIA is not itself a bar
to these suits, such practical considerations, when coupled
with the potentially serious adverse foreign policy
consequences that such litigation can generate, would in
our view argue in favor of finding the suits non-
justiciable.  However, if the Court were to determine that
dismissal is not appropriate, we would respectfully urge
the Court to fashion its final orders in a manner that
would minimize the potential injury to the foreign
relations of the United States.

Sincerely,

William H. Taft

William H. Taft, IV


Enclosures:
    As stated.

**UNITED STATES DISTRICT COURT**
NORTHERN DISTRICT OF CALIFORNIA
UNITED STATES COURTHOUSE
450 GOLDEN GATE AVENUE
SAN FRANCISCO, CA 94102



CHAMBERS OF
EDWARD M. CHEN
UNITED STATES MAGISTRATE JUDGE

MAY 16 2002

May 3, 2002

The Honorable William Howard Taft, IV
Office of the Legal Adviser
United States Department of State
2201 C Street N.W.
Washington, DC 20520

      Re:   *Jane Doe I, et al. v. Liu Qi, et al.*, C-02-0672 CW (EMC) (Northern District of California)

Dear Mr. Taft:

On February 2, 2002, six individual plaintiffs, each of whom is a Falun Gong practitioner, brought suit against Liu Qi, who has served as the mayor of Beijing of the People's Republic of China since February, 1999. The plaintiffs are citizens of various countries, including the People's Republic of China, France, Sweden, Israel, and the United States. Four currently reside in the United States. The suit contends that each of the plaintiffs was subject to arrest and detention under harsh conditions, including the use of unreasonable force and torture, in connection with China's crackdown on the Falun Gong practitioners. The suit contends that the City of Beijing has been a focal point of the repression and persecution against the Falun Gong and that the defendant Liu knew or should have known that Beijing police and other security forces were engaged in a pattern and practice of severe human rights abuses against Falun Gong practitioners. The complaint asserts that defendant Liu had a duty both under customary international law and Chinese law to prevent police and other security forces under his authority from engaging in abuses. The complaint asserts five causes of action under the Torture Victim Protection Act and Alien Tort Claims Act. Enclosed is a copy of the complaint filed herein.

Defendant Liu was served while passing through San Francisco International Airport, apparently on his way to the Winter Olympics. Having failed to respond to the complaint, the Court entered a default on March 12, 2002. Plaintiffs now move for judgment by default. This motion has been assigned to me by the District Judge in this case for a Report and Recommendation. Enclosed is a copy of the plaintiffs' motion for judgment by default.

Having reviewed the complaint and plaintiffs' motion, the Court has determined that it would be appropriate to solicit the Department of State's opinion on a number of issues. In particular, the Court would appreciate the Department of State's views on the following issues:

1.     Is this case barred under the Foreign Sovereign Immunities Act ("FSIA")? Please address, *inter alia*:

    a.     Whether the exception from immunity under 28 U.S.C. § 1605(a)(7) applies.

    b.     In determining both whether the FSIA applies and whether 28 U.S.C. § 1605(a)(7) applies, what law and facts must be demonstrated to establish defendant Liu was acting within or outside the scope of his authority? Must the court determine defendant's scope of his authority under Chinese law; if so the Court requests translated version of all applicable law material to this determination.

2.     Should the Court find the case nonjusticiable under the Act of State doctrine? What effect will adjudication of this suit have in the foreign policy of the United States?

If the Department of State believes a response to some or all of the above questions from the People's Republic of China is appropriate, it may invite the appropriate representative thereof to submit its written views to the Court as well.

The Court would appreciate your consideration of this matter and your communication of the State Department's position regarding these issues. The Court leaves to your discretion whether your response is best submitted in the form of a letter or a Statement of Interest filed pursuant to 28 U.S.C. § 517. A copy should be sent to plaintiffs' counsel. The Court would appreciate a response by July 5, 2002.

Thank you for attention and cooperation.

Yours very truly,

Edward M. Chen
U.S. Magistrate Judge

EMC/ld
Enc.
cc:     Joshua Sondheimer, Esq., The Center for Justice & Accountability, 870 Market Street, Suite 684, San Francisco, CA 94102 (*Plaintiffs' counsel*)
Michael S. Sorgen, Esq., Law Offices of Michael Sorgen, 240 Stockton Street, 9th Floor, San Francisco, CA 94108(*Plaintiffs' counsel*)
Terri Marsh, Esq., Law Offices of Terri Marsh, 3133 Connecticut Avenue, NW, Suite 608, Washington, DC 20008 (*Plaintiffs' counsel*)