Xiaoning et al v. Yahoo! Inc, et al                                                                    Doc. 38

Case 4:07-cv-02151-CW    Document 38    Filed 07/13/2007    Page 1 of 35

1   Morton H. Sklar, Executive Director
    msklar@humanrightsusa.org
2   World Organization for Human Rights USA
3   2029 P Street NW, Suite 301
    Washington, DC  20036
4   Telephone:   (202) 296-5702
    Facsimile:   (202) 296-5704
5   [Admitted *Pro Hac Vice*]

6
    Roger Myers (CA State Bar No. 146164)
7   roger.myers@hro.com
    HOLME ROBERTS & OWEN LLP
8   560 Mission Street, 25th Floor
9   San Francisco, CA  94105-2994
    Telephone:   (415) 268-2000
10  Facsimile:   (415) 268-1999

11
    Attorneys for Plaintiffs
12  [Additional Counsel Appear on Signature Page]

13                  UNITED STATES DISTRICT COURT
14                 NORTHERN DISTRICT OF CALIFORNIA
                          OAKLAND DIVISION
15

16  WANG XIAONING, YU LING, SHI TAO, and        CASE NO. C07-02151 CW
17  ADDITIONAL PRESENTLY UNNAMED
    AND TO BE IDENTIFIED INDIVIDUALS,
18
19              Plaintiffs,

20       v.                                     SECOND AMENDED COMPLAINT
                                                  FOR TORT DAMAGES
21  YAHOO! INC., a Delaware Corporation,
    YAHOO! HONG KONG, LTD., a Foreign
22  Subsidiary of Yahoo!, ALIBABA.COM INC., a    JURY TRIAL DEMANDED
    Delaware Corporation AND OTHER
23  PRESENTLY UNNAMED AND TO BE
24  IDENTIFIED CORPORATE DEFENDANTS
    AND UNNAMED AND TO BE IDENTIFIED
25  INDIVIDUAL EMPLOYEES OF SAID
    CORPORATIONS,
26                  Defendants.

27

28

Second Amended Complaint                                    Case No. C 07-02151 CW
#29504 v1

**SECOND AMENDED COMPLAINT**

Plaintiffs, by and through their attorneys, allege upon personal knowledge and belief as to their own circumstances, and upon information and belief (based on the investigation of counsel) as to all other matters, that substantial evidentiary support exists or will exist after a reasonable opportunity for further investigation and discovery as a result of trial proceedings, in support of the following:

1.    Named Plaintiffs and additional unnamed and to be identified Plaintiffs (hereinafter referred to collectively as "Plaintiffs") have been and are being subjected to grave violations of some of the most universally recognized standards of international law, including prohibitions against torture, cruel, inhuman, or other degrading treatment or punishment, arbitrary arrest and prolonged detention, and forced labor, for exercising their rights of freedom of speech, association, and assembly, at the hands of Defendants through Chinese officials acting under color of law in the People's Republic of China (referred to herein as "the PRC" or "China").

2.    To commit these violations of specific, universal, and obligatory standards of international law, Defendants willingly provided Chinese officials with access to private e-mail records, copies of email messages, e-mail addresses, user ID numbers, and other identifying information about the Plaintiffs and the nature and content of their use of electronic communications.  This information, available only to the Defendants, was voluntarily provided to Chinese officials by Defendant Yahoo! Inc. and its agents, alter egos, and/or other affiliated entities, including but not limited to wholly-owned subsidiaries Yahoo! HK and Yahoo! China.  In addition, there are positive indicators that Defendant Alibaba.com, as well as various subsidiaries and affiliates of Yahoo! Inc., have also, under the control and supervision of Defendant Yahoo Inc., continued to provide PRC officials with this information for various unnamed and to be identified Plaintiffs after Alibaba.com Inc. acquired control over Yahoo! China in October 2005.  These disclosures served and are continuing to serve as the basis for the acts of persecution and torture that occurred and are occurring as a direct result of the Defendants' activities.  By providing internet user identification information to the PRC, Defendants knowingly and willfully aided and abetted in the

commission of torture and other major abuses violating international law that caused Plaintiffs' severe physical and mental pain and suffering.

3.     Plaintiffs' claims are actionable under the Alien Tort Statute (ATS), 28 U.S.C. § 1350, and the Torture Victim Protection Act (TVPA), 28 U.S.C. § 1350, because their injuries resulted from violations of specific, universal, and obligatory standards of international law as embodied in a number of treaty obligations binding on the United States and implemented domestically here in the United States by a number of statutes including the TVPA.

4.     Defendants' conduct also violates California state laws, including prohibitions against battery, false imprisonment, assault, intentional infliction of emotional distress, negligence, negligent supervision, and the California Business & Professions Code § 17200.

5.     Defendants' conduct also breaches United States law under the Electronic Communications Privacy Act by exceeding their authorization to access and control highly private and potentially damaging information concerning Plaintiffs' electronic communications, in violation of 18 U.S.C. § 2701, by unlawfully and knowingly divulging Plaintiffs' electronic communication contents and user information, in violation of 18 U.S.C. § 2702, and by intentionally acquiring and/or intercepting the contents of electronic communications sent by and/or received by Plaintiffs through their use of computers, routing equipment and other electronic devices which were part of, and utilized in, Defendants' electronic communications systems, in violation of 18 U.S.C. § 2511.

6.     Plaintiffs seek general, compensatory, and punitive damages for their injuries, as well as declaratory and injunctive relief to hold Defendants accountable for their unlawful actions, and to secure the Defendants' assistance in obtaining the Plaintiffs' release from prison.  Plaintiffs also seek relief that would prevent them from similarly harming others in the future.

**JURISDICTION AND VENUE**

7.     This Court has jurisdiction over Plaintiffs' claims under 28 U.S.C. § 1331 (federal question jurisdiction), 28 U.S.C. § 1350 (Alien Tort Statute) and 28 U.S.C. § 1350 (Torture Victim Protection Act).  The Alien Tort Statute provides federal jurisdiction for "any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States."  The

3

1  Torture Victim Protection Act supplements and confirms the ATS by providing federal court

2  jurisdiction for acts of torture, as defined by 28 U.S.C. § 1350.  The Electronic Communications

3  Privacy Act, 18 U.S.C. § 2701 *et seq*., provides federal jurisdiction for civil claims arising from

4  unauthorized disclosure of electronic communications and customer information.

5        8.    This Court also has supplemental jurisdiction over claims arising from violations of

6  state law because, pursuant to 28 U.S.C. § 1367, the facts in the claims arising from state law are so

7  related to the Plaintiffs' claims under federal laws that they form part of the same case or

8  controversy under Article III of the United States Constitution.

9

10                          **INTRADISTRICT ASSIGNMENT**

11       9.    Assignment and venue in the San Francisco/Oakland Division is proper pursuant to

12 Local Rule 3-2(c) and (d) because Defendants Yahoo! Inc. and Alibaba.com Inc. are located in, do

13 business in, and/or have major business contacts with this district and division. Other named and

14 unnamed Defendants are similarly subject to the jurisdiction of this court by virtue of their corporate

15 ties and/or business contacts and activities in this jurisdiction.

16

17                              **PARTIES**

18                              *Plaintiffs*

19       10.   Plaintiff **Wang Xiaoning** is a subject, citizen, and resident of the People's Republic

20 of China.   He sues on behalf of himself for the injuries, including severe pain and suffering, he has

21 endured as a result of his torture, cruel, inhuman, or other degrading treatment, and arbitrary arrest

22 and prolonged detention inflicted upon him as a result of the Defendants' actions aiding and abetting

23 Chinese government officials in committing these major human rights abuses.  Specifically, Wang

24 Xiaoning was arrested and unlawfully and arbitrarily detained and prosecuted for publishing and

25 circulating through the Internet electronic journals and articles that supported democratic reform in

26 China and for communicating with other democracy advocates. He also sues for compensation for

27 property seized by government officials in conjunction with his arbitrary arrest and prolonged

28 detention.  He is serving a ten-year sentence at Beijing Municipal No. 2 Prison, a forced labor prison

for political prisoners, under severe conditions of prolonged confinement that are highly abusive in nature. He has served almost four years of his ten-year sentence, and has been imprisoned for almost five years.

11.     Plaintiff **Yu Ling** is a subject, citizen, and resident of the People's Republic of China, and is the wife of 27 years of Plaintiff Wang Xiaoning. She sues on behalf of herself for the injuries, including pain and suffering, she has endured as a result of her husband's torture, cruel, inhuman, or other degrading treatment, and arbitrary arrest and prolonged detention inflicted upon him as a result of the Defendants' actions aiding and abetting Chinese government officials in committing these major human rights abuses. Specifically, as a result of her husband's unlawful and arbitrary arrest and detention, Yu Ling has suffered extreme emotional distress and financial hardship. She also sues for compensation for property seized by government officials in conjunction with her husband's arbitrary arrest and prolonged detention.

12.     Plaintiff **Shi Tao** is a subject, citizen, and resident of the People's Republic of China. He sues on behalf of himself for his injuries, including severe pain and suffering, resulting from torture, cruel, unusual, or other degrading treatment or punishment, arbitrary arrest and prolonged detention, and forced labor that were inflicted upon him as a result of the Defendants' actions in making possible, and aiding and abetting Chinese government officials in committing, these major human rights abuses. Specifically, Plaintiff Shi Tao was arrested and unlawfully and arbitrarily detained and prosecuted for emailing messages, notes and journalistic dispatches describing government restrictions on journalists imposed in connection with the 15th anniversary of the Tiananmen Square crackdown on democracy advocates. He also sues for compensation for property seized by government officials in conjunction with his arbitrary arrest and prolonged detention. He currently is serving the third year of a ten-year sentence for "divulging state secrets abroad" at Chishan Prison of Hunan Province, a high-security prison with a documented system of forced labor and torture, and has been in detention for almost four years.

13.     Additional Plaintiffs temporarily designated as "**Presently Unnamed and To Be Identified Plaintiffs**" are citizens of China currently living in China or in exile in other countries, such as the United States, who were arbitrarily detained, arrested, tortured, subjected to cruel,

Second Amended Complaint                                                                 Case No. C07-02151 CW
#29504 v1

inhuman, or degrading treatment or punishment, and/or subjected to forced labor, as a result of Defendants' actions in aiding and abetting these violations of United States and international law, including federal and state laws that provide civil actions for Defendants' acts. At the time of filing, Plaintiffs and their attorneys have identified at least 60 individuals arbitrarily imprisoned in China for expressing their support for free elections, democracy, or human rights through Internet communications or use, whose arrests and detention, based on information currently available through reliable sources including the United States Department of State may be linked to actions by the Defendants that revealed their Internet and electronic communication identifying information to PRC officials. Additional information about their arrests and detention, and their treatment in detention, for these unnamed individuals, as well as information about how the Defendants may be responsible for their abuse, will be obtained during discovery and described in greater detail during these proceedings. Their inclusion in this lawsuit is critical both in order to identify the extent of the Defendants' role in enabling these abuses, as well as to curb, prevent and remedy current corporate practices of the Defendants that are directly responsible for these abuses. Such Plaintiffs may also include others located outside of China who have been or are currently being adversely affected by the Defendants' practices.

### *Defendants*

14.    Defendant **Yahoo! Inc.** is incorporated in Delaware. Its principal place of business has been located in California since 1994. Its corporate headquarters are in Sunnyvale, California, in Santa Clara County. Yahoo! Inc. operates a business concerned primarily with facilitating the distribution of and access to electronic communication and information. The company's major activities include supplying and operating Internet service, web-based personal e-mail accounts, news portals, and a search engine, all designed to facilitate electronic communication and the sharing of information. By the nature of its activities, Yahoo! has access to and maintains identifying information about individuals using its electronic services.

15.    Yahoo! Inc. is the parent company and ultimate owner of the entire issued share capital of Yahoo! Hong Kong Limited. During the incidents related to the arrest and detention of plaintiffs Wang Xiaoning and Shi Tao, Yahoo! Inc. exercised significant control over Yahoo! China.

It did so via its organizational relationship with Yahoo! Hong Kong Limited (formerly Yahoo! Holdings (Hong Kong) Limited), which was the parent company of Yahoo! China. In addition, Yahoo! Inc. exercised functional control and supervision over important aspects of the operations of Yahoo! China. This included supervision and control of policy and legal decisions made by Yahoo! China's Legal Team, including issues and activities relevant to the subject of this complaint, where the Yahoo! China legal team reported directly to and took direction from the legal team of Yahoo! Inc. Given both Yahoo! Inc.'s ownership and supervision of Yahoo! Hong Kong Limited and their relationship to the legal team of Yahoo! China, Yahoo! Inc. was uniquely positioned to review and approve the specific practices and policies that led to the arbitrary arrest, arbitrary detention and torture of the Plaintiffs Wang and Shi as outlined in this complaint. Prior to October 2005 and at the time of the allegations made in this petition relating to Plaintiffs Wang, Shi and Yu, there was a unity of ownership and positive indicators of a unity of interest between the personality of Yahoo! Hong Kong Limited (formerly Yahoo! Holdings Hong Kong Limited) and the personality of Yahoo! Inc.

16.      Yahoo! Inc. has supervised the business operations of Yahoo! in China under the name Yahoo! China since 1999. Yahoo! Inc. has conducted business in China directly, through its wholly-owned subsidiary Yahoo! HK, its former strategic partner Alibaba.com, and, since December 19, 2006, primarily through Alibaba.com's successor in this strategic partnership, Alibaba.com Group Services Limited. In addition to directly owning and controlling the operations of Yahoo! Hong Kong (and therefore Yahoo! operations in China) from the period prior to 2002 until the organizational changes that were made in 2005, Yahoo! Inc. has consistently exercised the function of controlling the organizational structures dictating the management and operation of Yahoo! activities in China. For example, it was Yahoo! Inc., and not Yahoo! China itself, that was the contractual party involved in transferring ownership of Yahoo! China to Alibaba.com. For Yahoo! Inc. to have controlled these organizational and structural decisions, they had to be functionally in charge of the decision making process with respect to China operations.

17.      Prior to October 2005, operational, management, strategic, and business decisions for Yahoo! China were made under the direction from Yahoo! Inc. or its appointed international

operations management team.  Even following the change in ownership of Yahoo! China in October 2005, Yahoo! Inc. can still be held responsible for similar ongoing abuses, as it has continued to exercise substantial control and oversight of Yahoo! China, "caus[ing] each member of the China Group to…carry on the China Business in, and only in, the Ordinary Course of Business, in substantially the same manner" as conducted prior to the change in ownership, including the maintenance of "all Governmental Approvals and other Consents necessary for, or otherwise material to, the China Business." (Stock Purchase and Contribution Agreement by and between Yahoo! Inc. and Alibaba.com Corporation, Dated as of August 10, 2005).

18.    Matters related to the specific personal information disclosures of Plaintiffs Wang, Shi and other unnamed Plaintiffs within that time period were handled locally by the legal team of Yahoo! China which reported directly to the legal team of Yahoo! Inc.  This line of authority and accountability indicates that although Yahoo! China was legally owned by Yahoo HK at the time of the disclosures, it was managed and controlled actually and ultimately by Yahoo! Inc.  According to testimony provided to Congress by the General Counsel of Yahoo! Inc., the decision to disclose internet user information by Yahoo! China may have been directly reviewed and approved by Yahoo! Inc.

19.    Defendant **Yahoo! Hong Kong Ltd.** (formerly known as Yahoo! Holdings (Hong Kong), Ltd.) (Yahoo! HK), is a wholly owned subsidiary of Yahoo! Inc. based in Hong Kong.  Prior to a change in ownership and corporate structure on October 24, 2005, and during the incidents in question for the named Plaintiffs, Yahoo! HK was the business entity, partner, alter ego and/or agent of Yahoo! Inc. responsible for operating and managing Yahoo! China, subject to the control and supervision of Defendant Yahoo! Inc.  Through its wholly owned subsidiary, Beijing Yahoo! Consulting and Service Company Limited (Beijing Yahoo!), and the Technical Services Agreement that existed between Peking University Founder Group (PUFG) and Beijing Yahoo!, Yahoo! HK controlled and operated Yahoo! China, maintaining the ability throughout the period in question to appoint and replace all members of the board of directors of Beijing Yahoo!.  This organizational structure of ownership and control of Yahoo! China operations by Yahoo! HK remained intact until Yahoo! Inc. formed a strategic partnership with Defendant Alibaba.com Inc. (Alibaba.com) in

October 2005, transferring major portions of its responsibilities for China operations to Alibaba.com. In December 2006, Alibaba.com underwent its own corporate restructuring and, upon best information and belief, the strategic partnership controlling China operations was transferred at that point from Alibaba.com to Alibaba.com Group Services Ltd. (Alibaba Group).

20.     Yahoo! Hong Kong's connection to and responsibility for the abuses set out in this complaint during the period when it exercised control over China operations are indicated by the use of the Yahoo! Hong Kong seal on the documents sent to PRC officials providing them with private internet user information, and by various indices of its ownership and control of Yahoo! China operations at the time of the events in question.

21.     Defendant **Alibaba.com, Inc.** (Alibaba.com) is a Chinese company engaged in electronic commerce and communications, operating the world's largest online marketplaces for both international and Chinese trade.  Alibaba.com is incorporated in Delaware and conducts its U.S. business from offices in Santa Clara and Newark, California.  On October 24, 2005 Alibaba.com became the owner and operator of Yahoo! China through a Stock Purchase and Contribution Agreement with Yahoo! Inc., whereby Yahoo! Inc received 46 percent (40 percent on a fully diluted basis) of the outstanding common stock of Alibaba.com in exchange for $1.0 billion in cash and what is described in the aforementioned agreement as the contribution (transfer) of Yahoo! China to Alibaba.com.  On December 19, 2006 Alibaba.com was subject to a corporate reorganization.  As a result of this restructuring, Alibaba.com relinquished its ownership of Yahoo! China to Alibaba.com Group Services Limited. Alibaba.com presently operates as a wholly owned subsidiary of Alibaba Group.

22.     Upon best information and belief, Alibaba.com may have acquired liability for Yahoo! China's previous actions based on its purchase and control of Yahoo! China in October 2005 and further may be liable for disclosures made by Yahoo! China during the period of its ownership of that entity between October, 2005 and December, 2006.  It may also be liable for disclosures and abuses subsequent to its transfer of Yahoo! China to Alibaba.com Group Services Limited due to its continued affiliation and connection with the operations of Yahoo! China through Alibaba.com Group Services Limited, of which it is a part.

23.    The additional, presently **Unnamed and To Be Identified Corporate Defendants** listed in the caption heading of this case are presently unnamed and to be identified corporate entities that contributed to or aided and abetted the violations of international law suffered by Plaintiffs as set out in this complaint, either directly or indirectly via their corporate ties. Additional information about these unnamed entities will be obtained during discovery, allowing the Parties to ascertain the exact nature and extent of the relationships between these unnamed entities and the already identified Defendants.  Identifying information about them and the role they played in the abuses will be identified and described in greater detail during the course of these proceedings.

24.    The additional, presently **Unnamed Individual Defendants** listed in the caption heading of this case are presently unnamed and to be identified employees of the Defendant companies, and/or other persons whose individual actions contributed to or aided and abetted the violations of international law suffered by Plaintiffs as set out in this complaint.  Identifying information about them and the role they played in the abuses are expected to be identified and described in greater detail during these proceedings.

## STATEMENT OF FACTS

### *General Facts*

25.    Journalists, human rights advocates, democracy supporters and other Internet users in China have been subjected to a pattern of arbitrary criminal prosecution, imprisonment, and torture as a result of their expression of ideas that are perceived to be in opposition to the positions or policies of the government of the PRC on a variety of politically disfavored topics, such as the Tiananmen Square massacre, democratic reform, human rights advocacy, opposition to corruption or disagreement with government policies generally.  As a result of the expression of their views, these "dissidents" are subjected to arbitrary arrest, criminal prosecution, and persecution in violation of numerous protections for fundamental rights involving the exercise of freedom of expression, association, press and assembly under the Chinese Constitution and international law.

26.    Since the arrival of electronic communications and the Internet in China, official controls have been imposed to monitor and censor electronic communications on a widespread basis,

1    in order to keep track of the access and use of Internet information sources, including expression and

2    communication related to what are considered certain politically sensitive topics, such as democracy

3    support and human rights.  As a result, "dissident" journalists, human rights activists, and other

4    Internet users' personal communications and activities are carefully censored and monitored.

5           27.    Once these "dissidents" are identified and targeted through the Internet monitoring

6    and censorship program, they face a well documented pattern of systematic arbitrary arrest and

7    prolonged detention, incommunicado detention, extrajudicial killings, torture, cruel, inhuman or

8    degrading treatment and punishment, and forced labor.  Sometimes, these abuses lead to death in

9    custody.  Despite Chinese laws prohibiting these violations of both domestic law and international

10   human rights standards, authorities carry out these abuses under color of law within a culture of

11   impunity.

12          28.    In or around the Spring of 2002, Yahoo! Inc. signed an official, voluntary agreement

13   that had the effect of directly involving Yahoo! in the censoring and monitoring of on-line content

14   and communication by its Chinese users.  Alibaba.com has also signed this voluntary agreement.

15   This agreement was in the form of the Internet Society of China's "Public Pledge on Self-Discipline

16   for the Chinese Internet Industry" (referred to herein as "the Public Pledge").  The Internet Society

17   of China is a government-affiliated professional organization, and the Public Pledge is described as

18   being voluntary, not required by government regulation, although pressures to sign the Pledge and to

19   abide by its requirements as a prerequisite for doing business in China are considerable. By signing

20   the Public Pledge, Yahoo! Inc. voluntarily agreed to help monitor and censor electronic

21   communication use involving information that, according to the Internet Society of China, could

22   "jeopardize state security" or "disrupt social stability," and to report any offending on-line

23   expression or communication to PRC authorities.

24          29.    A number of human rights organizations responded to news of the Defendants signing

25   this pledge by alerting Defendants that by helping the censors, and by identifying people who could

26   be accused of anti-government speech or communication, the Defendants would be placing many

27   innocent individuals, who were merely expressing their views or communicating with others, at risk

28   of arbitrary arrest, prolonged arbitrary detention, forced labor, and torture as a result of their lawful

1   exercise of free speech and free association rights.   For example, on July 30, 2002, Human Rights

2   Watch sent a letter to Yahoo! Inc. Chairman and Chief Executive Officer Terry Semel, expressing

3   concern that Yahoo! Inc. signed the Public Pledge, and alerting Yahoo! Inc. of the dangers to

4   Internet users associated with their company's cooperation with monitoring and censoring efforts.

5   This letter notified Yahoo! Inc. that it was common in China for people to be arbitrarily arrested for

6   expressing disfavored views.  The letter pointed out that "In China … any public expression of

7   views that differ from those of the state, and provision of information not deemed politically

8   acceptable, may be considered 'harmful' and may result in a prison sentence," mistreatment, torture,

9   and execution.  The letter also stated that, by upholding the Public Pledge, Defendants would risk

10  assisting such human rights violations, clearly pointing out that "there is a strong likelihood that

11  Yahoo will assist in furthering such human rights violations" through support of these monitoring

12  and censorship activities.  The letter urged Yahoo! Inc. to withdraw from the Public Pledge and to

13  state its support for internationally recognized standards of free expression.  Human Rights Watch

14  also sent copies of this letter to Jerry Yang, Co-Founder and Director of Yahoo! Inc., Chris Castro,

15  Chief Communications Officer and Senior Vice President of Yahoo! Inc., John Costello, Chief

16  Global Marketing Officer of Yahoo! Inc., and Jon Sobel, Vice President, General Counsel, and

17  Secretary of Yahoo! Inc.

18      30.    A subsequent 2002 Amnesty International report also provided Defendants notice that

19  the Defendants' involvement in the monitoring and censorship program presented a grave risk to

20  Internet users, and subjected them to arbitrary detention and torture.  On November 26, 2002,

21  Amnesty International published "State Control of the Internet in China," documenting Chinese

22  officials' use of electronic evidence to prosecute Chinese democracy advocates for exercising their

23  freedom of expression over the Internet. This report, as well as the numerous press releases and news

24  articles publicizing it, noted that Yahoo! Inc. had signed the Public Pledge and pointed out that

25  compliance with the pledge could lead to violations of international human rights norms.

26  Furthermore, the report documented that 21 prisoners in China had already suffered arbitrary arrest

27  and prolonged arbitrary detention, torture, and death in custody as punishment for the "crime" of

28

1  using the Internet to exercise their right to freedom of expression, and to communicate and obtain

2  information concerning human rights or democracy.

3      31.    Particularly in light of these notifications, along with general and well-publicized

4  documentation of Chinese human rights abuses, including those in the U.S. Department of State

5  Country Reports on human rights abuses dealing with China, and all other nations' human rights

6  practices, Defendants had every reason to know and understand that the electronic communication

7  user information they provided to authorities could well be used to assist in the infliction of such

8  abuses as arbitrary arrest, torture, cruel, inhuman, or other degrading treatment, and prolonged

9  detention and/or forced labor, to punish what might be viewed by authorities as pro-democracy or

10 human rights activities.  Despite this knowledge and understanding, Defendants turned over specific

11 identifying information about the Plaintiffs and their electronic communications to officials who

12 used this information as a basis for arbitrarily arresting, detaining, and torturing the Plaintiffs.  There

13 are positive indications that this policy of disclosure continues to the present day, and has affected a

14 large number of the presently unnamed and to be identified Plaintiffs, in addition to the named

15 Plaintiffs.

16     32.    While in custody, Plaintiffs were subjected to torture, cruel, inhuman or degrading

17 treatment, forced labor, and arbitrary, prolonged and indefinite detention, for expressing their free

18 speech rights and for using the Internet to communicate about democracy and human rights matters.

19     33.    Defendants greatly benefited from these violations of the Plaintiffs' fundamental

20 human rights through their continued and expanded conduct of business in the PRC, the second-

21 largest Internet market in the world with at least 110 million users.  Defendants provided identifying

22 information about the Plaintiffs, in violation of the privacy agreements and assurances made to the

23 Defendants' customers and users, that led to their arbitrary arrest, indefinite detention and torture, in

24 order to obtain the approval and support of PRC officials and their agreement to allow them to

25 continue conducting and expanding the Defendants' business interests in the PRC.

26

27

28

*Specific Facts*

<u>Wang Xiaoning</u>

34.    From 2000 to 2001, Wang Xiaoning edited *Free Forum of Political Reform*, and from 2001 to 2002, he edited *Commentaries on Current Political Affairs*, electronic journals containing articles written by Wang and others calling for democratic reform and a multi-party system in China.

35.    During this same time period, Wang posted additional pro-democracy articles on websites in China and abroad.   From 2000 to 2001, Wang Xiaoning published his journals and articles on an e-mail subscriber list, "aaabbbccc" Yahoo! Group.

36.    In 2001, administrators noticed the political content of Wang's writings and blocked him from sending messages to the "aaabbbccc" Yahoo! Group.

37.    With this means of dissemination blocked to him, Wang Xiaoning continued to publish his writings by electronically sending his journal on an anonymous basis to individual e-mail addresses until he was arbitrarily detained in 2002.

38.    Yahoo! HK provided identifying information to police, linking Wang Xiaoning to his anonymous e-mails and other pro-democracy Internet communications.

39.    On September 1, 2002, approximately ten security police raided Wang Xiaoning's home and arbitrarily detained Wang Xiaoning without informing him or his family of the charges against him.  On the same day, police searched his home and seized two computers, personal computer files, e-mail records, written notes, address books, and manuscripts.

40.    Wang was not formally arrested and charged until almost a month later, on September 30, 2002.

41.    From September 1, 2002 to May 2004, Wang was held at the Detention Center of Beijing State Security Bureau, where he suffered severe abuse at the hands of the prison officials. The officials kicked and beat Wang repeatedly to force him to confess to having engaged in "anti-state" activities and to turn over the names of other persons with whom he had communicated. Prison guards commanded and instructed other prisoners to use psychological tactics against Wang to break his resolve so that he would confess, and also as punishment for his writings.  During the more than twenty months that he was arbitrarily detained at the Detention Center, Wang was often

14

barred from going outside.  These abuses had severe physical and psychological effects on Wang. When his wife was finally able to see him approximately six months after his arbitrary and unlawful detention, Wang was very weak, showed no emotional expression, and exhibited severe respiratory difficulties.

42.     On July 25, 2003, the Beijing Municipal First Intermediary People's Court tried Wang Xiaoning on charges of "incitement to subvert state power," advocating the establishment of an alternative political party, and communicating with an overseas organization the Chinese government considers "hostile."

43.     On September 12, 2003, after almost thirteen months of arbitrary detention, the court sentenced Wang to ten years in prison and two additional years of deprivation of political rights.

44.     The court specifically relied on evidence supplied by Defendants to identify and convict Wang Xiaoning.  The judgment noted that Yahoo! HK informed investigators that a mainland China-based e-mail account (bxoguh@yahoo.com.cn) was used to set up Wang Xiaoning's "aaabbbccc" Yahoo! Group, and that the e-mail address ahgq@yahoo.com.cn, which Wang Xiaoning used to post e-mails to that Yahoo! Group, was also a mainland China-based account maintained by Wang Xiaoning.  Defendants were cited in the court decision as instrumental in causing the Plaintiff's arrest and criminal prosecution.

45.     Additional evidence cited by the judgment included the following pro-democracy, non-violent statements attributed to Wang Xiaoning as having appeared in his electronic communications:

"Without the multi-party system, free elections and separation of powers, all types of political reform will come to nothing."

"We should never forget that China is still a totalitarian and despotic country."

"The Four Basic Principles [of Chinese Communist government] are the biggest obstacle to the establishment of the democratic system [in China]."

"In today's China, the workers and peasants are pressed under the lowest level of society. Thousands upon thousands of workers lost their job and many peasant workers are bitterly oppressed and exploited. However, they have no right to go on strike, no freedom to organize their own union and cannot find anything by which to secure their basic rights."

"The main reason that the Chinese Communist Party has been able to retain power in spite of being so corrupt is that China does not yet have a party that can replace the Communist Party."

46.    In May 2004, authorities transferred Wang to the Beijing Prison No. 2. Upon his transfer, authorities warned Wang Xiaoning that if he appealed the judgment against him, he would be denied any opportunity for parole, reduction of sentence for good behavior, or other privileges. Despite these warnings, Wang Xiaoning filed his appeal with the Supreme People's Court, citing that his arrest and conviction for free expression of his opinions was illegal under Chinese and international law. Rejecting these arguments, the court denied his appeal on December 22, 2004. Through his wife, Yu Ling, Wang Xiaoning appealed his case again, but the courts rejected his application for appeal on July 1, 2006.

47.    Wang Xiaoning has continued to suffer severe physical, psychological, and emotional abuse as a result of the court's decision that his writings and beliefs were subversive. Beijing Municipal No. 2 Prison, where Wang is unlawfully incarcerated, is a secretive, high-security forced labor prison where serious and "special control" prisoners are held, particularly political prisoners. Wang has been subjected to a severe form of treatment in this prison. He is held in a cell with nine other inmates and subjected to malnourishment. The prison guards deny Wang any access to recreation or even sunlight for weeks and even months at a time, even though the standard at the prison is to allow prisoners outside once a day. Prison officials refused to allow Wang to see his mother before her death in September 2005. Wang's access to family members is strictly limited, with his wife allowed to see him at most for only one half hour per month. Prison officials scrutinize

1    all written correspondence to and from Wang, severely limiting his ability to communicate with

2    anyone outside the prison, including his wife.

3                                              Yu Ling

4         48.     Yu Ling and her family have endured severe psychological and emotional suffering

5    as a direct result of the arbitrary detention of her husband on September 1, 2002.  She and her family

6    have suffered from the loss of Wang's presence and the lack of information about his location, the

7    charges against him, his treatment, and his well-being.

8         49.     Yu Ling was present on September 1, 2002, when security police raided the house she

9    shared with her husband, Wang Xiaoning.  Some of the property that security police seized that day

10   – including one of the computers – was Yu Ling's property.

11        50.     Since Wang Xiaoning was illegally detained, Yu Ling has been subjected to

12   continued police surveillance, which caused her to fear for her own safety and personal security.

13   She feared that the police would arbitrarily arrest her and subject her to physical abuse like her

14   husband.  These fears were reinforced by the actions of her family and friends, who no longer

15   contacted her out of their own fears for their personal safety and respectability, and also because the

16   police required people coming to visit her to register their names.  Because of the surveillance and

17   out of sincere concern for herself and her family, friends, and neighbors, Yu Ling isolated herself

18   and took extra care not to raise the suspicions of the officials toward her or her family and friends.

19   Yu Ling has suffered from extreme depression and guilt over these events.

20        51.     The arbitrary detention of her husband Wang Xiaoning placed Yu Ling in an

21   extremely embarrassing position with her family.  Due to the implications of his arrest, the danger it

22   could cause to her family, and the heightened importance of appearance and status in China, Yu Ling

23   kept the truth of Wang's arbitrary detention from her immediate family.  At her mother's funeral, Yu

24   Ling's siblings confronted her and accused her husband of being a bad man for not attending the

25   funeral.  In the midst of her extreme grief over the passing of her mother, Yu Ling had to tell her

26   brothers and sisters the truth that her husband Wang could not attend because he was in prison.

27        52.     These psychological and emotional injuries have caused Yu Ling physical injury.

28   She cannot eat or sleep due to the emotional distress caused by her husband's absence, has lost a

1   substantial amount of weight, and is consumed by the plight of her husband, and by her efforts to

2   assist him.

3       53.    Since the arbitrary detention of her husband Wang Xiaoning on September 1, 2002,

4   Yu Ling has had to devote many hours to her husband's defense.  This has taken her away from

5   work, resulting in lost income.  She has also had to pay several attorneys a substantial amount of

6   money to defend her husband.  Yu and her family have also suffered financially from the loss of

7   Wang Xiaoning's income.  Her son has attempted to replace his father's lost salary but a company

8   that offered him work terminated the contract when it learned of Wang Xiaoning's conviction.

9                                          Shi Tao

10      54.    From February 2002 to May 2004, Shi Tao worked as a reporter and head of the

11  Editorial Department for *Contemporary Business News* (*Dangdai Shangbao*) in Changsha, Hunan

12  Province, China.  From May 2004 until his arbitrary arrest and prolonged arbitrary detention on

13  November 23, 2004, Shi Tao worked as a freelance journalist, in Taiyuan, Shanxi Province, China.

14      55.    As a reporter, Shi Tao wrote about corruption by government officials in China.  As a

15  freelance writer, he published numerous political commentaries calling for democratic reform of the

16  Chinese government, as well as several books of poetry.

17      56.    In April 2004, Shi Tao published an essay, "The Most Disgusting Day," that criticized

18  the Chinese government for detaining an activist member of the Tiananmen Mothers, an

19  organization of mothers whose children were killed by the Chinese government in its 1989

20  crackdown on the internal democracy movement and demonstrators in Tiananmen Square.  Tao

21  published the essay under a pseudonym on an Internet forum.

22      57.    On April 20, 2004, at a staff meeting at the offices of the publication *Contemporary

23  Business News*, Shi Tao was advised of a document sent by the CCP's Central Propaganda Bureau,

24  alerting journalists to the security concerns and government preparations in anticipation of the

25  upcoming 15th anniversary of the 1989 Tiananmen Square massacre. Later that night, Shi Tao sent

26  his notes from this staff meeting, under an alias, to the New York-based Web site *Democracy Forum*

27  (*Minzhu Tongxun*), using his personal Yahoo! e-mail account.

28

58.     Between April 20, 2004 and November 23, 2004, Yahoo! HK gave Chinese officials and investigators information linking Shi Tao to the anonymous email he sent to Democracy Forum, including the account holder information for the email address, the IP address and physical address of the computer from which the email was sent, and the date and time the email was sent and its contents.  Defendants also supplied to the prosecuting officials the physical address of the office where the offending electronic communication took place, thereby linking the anonymous email message to Shi Tao.

59.     On November 23, 2004, Shi Tao was detained mid-day in a street near his home in Taiyuan, Shanxi Province. As he was walking on the street, several people suddenly accosted and kidnapped him, placed a hood over his head and transported him thousands of miles away to Changsha, Hunan Province.  His house was subsequently searched and police seized his computer, papers, and other property without a warrant.

60.     After 21 days of detention, Shi Tao was formally arrested and charged on December 14, 2004, but the charges were not made public.

61.     Up to and during his trial, Shi Tao was held at Changsha Detention Center, where officials are known to physically abuse and torture detainees on a regular basis.  Survivors of the prison describe being handcuffed and shackled for weeks at a time and chained to a door plank. Officials typically prohibit visits from family members as they believe isolation contributes to a more rapid reeducation of the detainee and a repudiation of their "unlawful" conduct.

62.     On February 24, 2005, Chinese authorities revoked the credentials of Shi Tao's defense attorney for representing activists accused of "adopting positions and making statements contrary to the law and the Constitution" and "defiling and slandering the Communist Party and government."  On March 4, 2005, seven days before Shi Tao's trial, authorities placed his defense attorney under house arrest, presumably for the "crime" of properly defending his client.

63.     On March 11, 2005, the Changsha Municipal Intermediate People's Court in Hunan Province tried Shi Tao in a closed hearing.  To no one's surprise, given what had happened to his prior attorney, Shi Tao's court-appointed replacement attorney entered a guilty plea on Shi Tao's behalf.

64.    On April 30, 2005, the court sentenced Shi Tao to ten years imprisonment for "illegally providing state secrets overseas." In its verdict, the court specifically made reference to and cited the Internet user information that Defendants had supplied to Chinese officials as evidence against Shi Tao:

> "Account holder information furnished by Yahoo! Holdings (Hong Kong) Ltd., which confirms that for IP address 218.76.8.201 at 11:32:17 p.m. on April 20, 2004, the corresponding user information was as follows: user telephone number 0731-4376362 located at the Contemporary Business News office in Hunan."

65.    On May 4, 2005, Shi Tao appealed the judgment to the Hunan Province High People's Court on the ground that because the police used items seized without a warrant, the evidence against him was illegal, and that because the information he provided to *Democracy Forum* was a reflection of public sentiment, he could not be accused of revealing a state secret. At the appellate court's hearing, the court refused to hear the arguments presented by Shi Tao's legal defense, failed to respond to the evidence presented by the defense, and closed the hearing to the public despite Chinese Criminal Procedure Law provisions that appeal hearings, even for state secrets cases, should be open to the public unless there are enumerated exceptional circumstances. The court denied Shi Tao's appeal on June 2, 2005.

66.    On March 30, 2006, Shi Tao, through his legal representative, filed a formal complaint with the Hong Kong Privacy Commissioner, requesting an investigation of the Defendants' actions divulging Shi Tao's private information. The Privacy Commissioner accepted the complaint and conducted an investigation. The Privacy Commissioner's report, made public on March 14, 2007, concluded that because Hong Kong's privacy ordinance only regulates the actions of companies in Hong Kong and in Shi Tao's case the information was disclosed in China to Chinese officials, his office did not have jurisdiction over the incident.

67.    Since his appeal was denied in June 2005, Shi Tao has been incarcerated at Chishan Prison of Hunan Province, Area 6, a high-security prison known for holding political prisoners and violent criminals serving long sentences. Shi Tao shares a cell with more than ten other inmates. His health and mental state have deteriorated sharply in the prison. He suffers from an ulcer and a

1    heart ailment, as well as skin lesions induced by the prison's damp conditions.  He has very little

2    contact with people outside the prison.  The prison officials monitor his written communications.

3    68.    Chishan Prison uses a severe system of forced labor, in which prisoners work in dark,

4    dust-filled factories, starting before dawn and working for sixteen hours or more, in conditions

5    intended to destroy their physical and mental capacities.  Shi Tao has served as a forced laborer in

6    these workshops.  Detainees in this prison rarely see daylight.  Former prisoners have reported that

7    inmates are denied sleep and forced to labor for long hours under bright lights, which harm their

8    vision and in some cases cause blindness and other disabilities. Prisoners convicted of violent crimes

9    are placed in charge of the workshops to intimidate their fellow inmates.  They are encouraged to

10   target their attention and abuse on the political prisoners.  Guards in Chishan Prison also abuse and

11   torture the political prisoners with constant violence and intimidation. Survivors of the prison have

12   described the systemic use of torture and other cruel, inhuman or degrading treatment or punishment

13   by prison guards.  Prisoners also are denied necessary medical care, a particularly important

14   consideration for Shi Tao considering his ulcer, heart ailment, and skin lesions.

15   69.    In addition to his physical and psychological injuries, Shi Tao has suffered extreme

16   emotional distress.  He has even lost his family, since his wife divorced him in 2006.

17   70.    In October 2005, the Committee to Protect Journalists named Shi Tao one of three

18   annual recipients of its International Press Freedom Award.  Amnesty International has declared Shi

19   Tao a prisoner of conscience as he was imprisoned solely for peacefully exercising his right to

20   freedom of expression and opinion. The United States Department of State Country Report on

21   Human Rights Practices in China for 2006, published March 6, 2007, names Shi Tao as a political

22   prisoner, imprisoned for exercising the right to free expression.

23

24   **CAUSES OF ACTION**

25   71.    Plaintiffs' causes of action arise under and violate the following laws, agreements,

26   conventions, resolutions, and treaties:

27   (a)    Alien Tort Statute, 28 U.S.C. § 1350;

28   (b)    Torture Victim Protection Act, 28 U.S.C. § 1350;

(c)    Convention against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment G.A. res. 39/46, annex, 39 U.N. GAOR Supp. (No. 51) at 197, U.N. Doc. A/39/51 (1984), *entered into force* June 26, 1987;

(d)    International Covenant on Civil and Political Rights, G.A. res. 2200A (XXI), 21 U.N. GAOR Supp. (No. 16) at 52, U.N. Doc. A/6316 (1966), 999 U.N.T.S. 171, *entered into force* Mar. 23, 1976;

(e)    Universal Declaration of Human Rights (1948) G.A. res. 217A (III), U.N. Doc A/810 at 71;

(f)    Charter of the United Nations (1945), **adopted** June 26, 1945, 59 Stat. 1031, T.S. 993, 3 Bevans 1153 (*entered into force* October 24, 1945);

(f)    International Labor Organization Convention No. 29 Concerning Forced or Compulsory Labor (1930), *adopted* June 28, 1930, 39 U.N.T.S. 55 (*entered into force* May 1, 1932).

(g)    The Electronic Communications Privacy Act, 18 U.S.C. § 2701, § 2702, and §2511; and

(h)    Statutes and common law of the State of California, including but not limited to assault and battery, false imprisonment, negligence, intentional infliction of emotional distress, negligent infliction of emotional distress, and unfair business practices.

### FIRST CLAIM FOR RELIEF

**(Torture, a Violation of International Law for Which the Alien Tort Statute and the Torture Victim Protection Act Provide Relief)**

**(By Wang Xiaoning, Shi Tao and Other Plaintiffs Against All Defendants)**

72.    Plaintiffs re-allege and incorporate by reference the facts and allegations set forth in paragraphs 1 through 47 and 54 through 70 of this Complaint as if fully set forth herein in this First Claim for Relief.

73.    The Defendants' acts described in this Complaint caused direct and severe physical and mental pain and suffering to the Plaintiffs and placed them at severe risk of personal injury and/or death in connection with their participation in, and support of, the peaceful exercise of their

rights of free speech and communication, free association, and the right to hold, exercise and express their political beliefs.

74.    Because Defendants' acts described herein violated multiple provisions prohibiting torture on an absolute basis including: (1) treaties binding on the United States, (2) statutes adopted by the Congress of the United States implementing those treaty obligations, (3) international and domestic judicial decisions applying and interpreting the prohibition against cruel, inhuman, or degrading treatment or punishment, (4) administrative regulations and international and domestic judicial decisions applying and interpreting the prohibition against torture, and (5) a number of specific, universal, and obligatory standards that are recognized to be part of customary international law, these acts constitute "tort[s] ... committed in violation of the law of nations or a treaty of the United States" under the Alien Tort Statute (ATS), 28 U.S.C. § 1350.

75.    These acts also specifically constitute torture in violation of the Torture Victim Protection Act (TVPA), 28 U.S.C. § 1350.

76.    Defendants aided and abetted and/or ratified these acts of torture in violation of international, federal, and state law. These violations and actions meet the definition of torture under the meaning of the TVPA, the ATS, and international treaties and U.S. laws and regulations, as well as customary international law, which condemn torture on an absolute basis, irrespective of the reasons why the abuses are inflicted.

77.    The Plaintiffs are therefore entitled on this basis to compensatory and punitive damages, in amounts to be established at trial, and to such other declaratory and/or injunctive relief as may be deemed appropriate.

### SECOND CLAIM FOR RELIEF

**(Cruel, Inhuman or Degrading Punishment or Treatment or Punishment, Violations of International Law for Which the Alien Tort Statute Provides Relief)**

**(By Wang Xiaoning, Shi Tao and Other Plaintiffs Against All Defendants)**

78.    Plaintiffs re-allege and incorporate by reference the facts and allegations set forth in paragraphs 1 through 47 and 54 through 70 of this Complaint as if fully set forth herein in this Second Claim for Relief.

79.    These acts of cruel, inhuman, or degrading treatment or punishment suffered by the Plaintiffs designated in this Second Claim for Relief, including physical injury and the severe physical and mental suffering associated therewith, were inflicted upon them by the joint and collusive actions of the Defendants and PRC government officials acting under color of law, through unlawful or unauthorized actions prohibited by international law.

80.    These acts had the intent and the effect of grossly humiliating, debasing, intimidating, and punishing the Plaintiffs, forcing them to act against their will and conscience, inciting fear and anguish, and seeking to break their physical and/or moral resistance.

81.    These acts of cruel, inhuman, or degrading treatment or punishment were inflicted on the Plaintiffs for purposes that include, among others, preventing them from exercising their free speech and free association rights, and punishing them for exercising their right to have and communicate political beliefs.

82.    Because the acts described herein violated the prohibitions against cruel, inhuman, or degrading punishment or treatment including: (1) treaties binding on the United States, (2) statutes adopted by the Congress of the United States implementing those treaty obligations, (3) international and domestic judicial decisions applying and interpreting the prohibition against cruel, inhuman, or degrading treatment or punishment, (4) administrative regulations and international and domestic judicial decisions applying and interpreting the prohibition against cruel, inhuman or degrading treatment or punishment, and (5) a number of specific, universal, and obligatory standards that are recognized to be part of customary international law, these acts constitute "tort[s] ... committed in violation of the law of nations or a treaty of the United States" under the Alien Tort Statute, 28 U.S.C. § 1350.

83.    Defendants knowingly aided and abetted and/or ratified these abuses, and did not act to prevent or punish these violations of human rights as embodied in international law.

84.    Defendants are liable for aiding and abetting and/or ratification of the commission of these abuses under this cause of action.

85. The Plaintiffs are therefore entitled on this basis to compensatory and punitive damages in amounts to be established at trial, and to such other declaratory and/or injunctive relief as may be deemed appropriate.

### THIRD CLAIM FOR RELIEF

**(Arbitrary Arrest and Prolonged Detention, a Violation of International Law for Which the Alien Tort Statute and the Torture Victim Protection Act Provide Relief)**

**(By Wang Xiaoning, Shi Tao and Other Plaintiffs Against All Defendants)**

86. Plaintiffs re-allege and incorporate by reference the facts and allegations set forth in paragraphs 1 through 47 and 54 through 70 of this Complaint as if fully set forth herein in this Third Claim for Relief.

87. These acts of arbitrary arrest and long-term detention suffered by the Plaintiffs designated in this Third Claim for Relief, including arrest and detention for an unlawful purpose in violation of the rights to freedom of speech, association, and assembly, were inflicted upon them by the joint and collusive actions of the Defendants and government officials acting under color of law, albeit through unlawful or unauthorized actions and for unlawful and unauthorized purposes.

88. These acts caused direct physical and mental pain and suffering upon the Plaintiffs, caused loss of liberty and property, and placed them at severe risk of personal injury in connection with their participation in, and support of, the peaceful exercise of their rights of free speech and free association, and their rights to hold, exercise and express their political beliefs.

89. Because the acts described herein violated provisions prohibiting arbitrary arrest and prolonged detention including: (1) treaties binding on the United States, (2) statutes adopted by the Congress of the United States implementing those treaty obligations, (3) international and domestic judicial decisions applying and interpreting the prohibition against arbitrary arrest and prolonged detention, (4) administrative regulations and international and domestic judicial decisions applying and interpreting the prohibition against arbitrary arrest and prolonged detention, and (5) a number of specific, universal, and obligatory standards that are recognized to be part of customary international law, these acts constitute "tort[s] ... committed in violation of the law of nations or a treaty of the United States" under the Alien Tort Statute, 28 U.S.C. § 1350.

90.     Defendants aided and abetted in the carrying out of these abuses, and did not act to prevent or punish these violations of human rights as embodied in international and domestic law.

91.     Defendants are liable for aiding and abetting and/or ratifying these abuses, as specified in this cause of action.

92.     The Plaintiffs are therefore entitled on this basis to compensatory and punitive damages, in amounts to be established at trial, and to such other declaratory and/or injunctive relief as may be deemed appropriate.

### FOURTH CLAIM FOR RELIEF

**(Forced Labor, a Violation of International Law for Which the Alien Tort Claims Act and the Torture Victims Protection Act Provide Relief)**

**(By Shi Tao and Other Plaintiffs Against All Defendants)**

93.     Plaintiffs re-allege and incorporate by reference the facts and allegations set forth in paragraphs 1 through 47 and 54 through 70 of this Complaint as if fully set forth herein in this Fourth Claim for Relief.

94.     The Plaintiffs were placed in fear for their lives, were deprived of their freedom, and were forced to suffer severe physical and mental abuse associated with forcing them into working in the prison factories in inhumane conditions, by the joint and collusive actions of the Defendants and government officials acting under color of law, through unlawful or unauthorized actions.

95.     Because the acts described herein violated provisions prohibiting forced labor including: (1) treaties binding on the United States, (2) international and domestic judicial decisions applying and interpreting the prohibition against forced labor, and (3) administrative regulations and international and domestic judicial decisions applying and interpreting the prohibition against forced labor, and (4) a number of specific, universal, and obligatory standards that are recognized to be part of customary international law, these acts constitute "tort[s] ... committed in violation of the law of nations or a treaty of the United States" under the Alien Tort Claims Act, 28 U.S.C. § 1350.

96.     Defendants aided and abetted in the carrying out of these abuses, and did not act to prevent or punish these violations of human rights as embodied in international and domestic law.

97.     Defendants are liable for aiding and abetting and/or ratifying this cause of action.

98.     The Plaintiffs are therefore entitled on this basis to compensatory and punitive damages to be established at trial, and to such other declaratory and/or injunctive relief as may be deemed appropriate.

### FIFTH CLAIM FOR RELIEF

### (Battery)

### (By Wang Xiaoning, Shi Tao and Other Plaintiffs Against All Defendants)

99.     Plaintiffs re-allege and incorporate by reference the facts and allegations set forth in paragraphs 1 through 47 and 54 through 70 of this Complaint as if fully set forth herein in this Fifth Claim for Relief.

100.     On information or belief, Defendants intentionally committed acts that resulted in harmful or offensive treatment of Plaintiffs' persons, and produced bodily harm.  Plaintiffs did not consent to the contact and treatment that caused injury, damage, loss or harm to Plaintiffs.

101.     The acts described constitute battery, actionable under the laws of California and the United States.

102.     Defendants are liable for aiding and abetting and/or ratifying these abuses, as specified in this cause of action.

### SIXTH CLAIM FOR RELIEF

### (Assault)

### (By Wang Xiaoning, Shi Tao and Other Plaintiffs Against All Defendants)

103.     Plaintiffs re-allege and incorporate by reference the facts and allegations set forth in paragraphs 1 through 47 and 54 through 70 of this Complaint as if fully set forth herein in this Sixth Claim for Relief.

104.     On information or belief, Defendants' conduct caused Plaintiffs to be subjected to numerous batteries and/or intentional invasions of their rights to be free from offensive and harmful contact, and said conduct demonstrated that Defendants had a present ability to subject Plaintiffs to immediate, intentional, offensive and harmful touching.

105.     The acts described herein constitute assault, actionable under the laws of California and the United States.

27

106.    Defendants are liable for aiding and abetting and/or ratifying these abuses, as set forth in this cause of action.

### SEVENTH CLAIM FOR RELIEF

### (False Imprisonment)

**(By Wang Xiaoning, Shi Tao and Other Plaintiffs Against All Defendants)**

107.    Plaintiffs re-allege and incorporate by reference the facts and allegations set forth in paragraphs 1 through 47 and 54 through 70 of this Complaint as if fully set forth herein in this Seventh Claim for Relief.

108.    On information or belief, Defendants intentionally and unlawfully exercised force or the express or implied threat of force to restrain, detain or confine Plaintiffs on an arbitrary and unlawful basis.  The restraint, detention or confinement compelled Plaintiffs to stay or go somewhere against their will for some appreciable time.  Plaintiffs did not consent to this restraint, detention or confinement.

109.    Defendants' actions constituted false imprisonment under standards of law applied by California and the United States.

110.    Defendants are liable for aiding and abetting and/or ratifying these abuses as specified in this cause of action.

### EIGHTH CLAIM FOR RELIEF

### (Intentional Infliction of Emotional Distress)

**(By All Plaintiffs Against All Defendants)**

111.    Plaintiffs re-allege and incorporate by reference the facts and allegations set forth in paragraphs 1 through 70 of this Complaint as if fully set forth herein in this Eighth Claim for Relief.

112.    On information or belief, Defendants intended to cause Plaintiffs to suffer emotional distress, or, in the alternative, (a) Defendants engaged in the conduct adversely affecting Plaintiffs with reckless disregard of the high probability that it would cause Plaintiffs to suffer severe abuses and emotional distress, (b) Plaintiffs were present at the time the outrageous conduct and these results occurred and (c) the Defendants knew that Plaintiffs were present and would be adversely affected.

28

113.    Plaintiffs suffered severe abuse and emotional distress as a result of the conduct of the Defendants.

114.    Defendants' conduct constitutes the intentional infliction of emotional distress and is actionable under the laws, standards, and causes of action as set forth in this complaint.

115.    Defendants are liable for aiding and abetting and/or ratifying these abuses as set forth in this cause of action.

## NINTH CLAIM FOR RELIEF

### (Negligence)

### (By All Plaintiffs Against All Defendants)

116.    Plaintiffs re-allege and incorporate by reference the facts and allegations set forth in paragraphs 1 through 70 of this Complaint as if fully set forth herein in this Ninth Claim for Relief.

117.    On information or belief, Defendants failed to use ordinary or reasonable care in order to avoid injury to Plaintiffs. Defendants' negligence was a cause of injury, damage, loss or harm to Plaintiffs.

118.    As a result of these acts, Plaintiffs suffered harm including, but not limited to, severe emotional distress. Defendants' conduct constitutes negligence and is actionable under the causes of action as set forth in this complaint.

119.    Defendants are liable for aiding and abetting and/or ratifying these abuses as specified in this cause of action.

## TENTH CLAIM FOR RELIEF

### (Violation of the California Business & Professional Code §§ 17200 *et seq*., Unfair Business Practices)

### (By All Plaintiffs Against All Defendants)

120.    Plaintiffs re-allege and incorporate by reference the facts and allegations set forth in paragraphs 1 through 70 of this Complaint as if fully set forth herein in this Second Claim for Relief.

121.    Plaintiffs bring this cause of action on behalf of themselves, pursuant to Business and Professions Code § 17204.  The Defendants' conduct as alleged herein has been and continues to be deleterious to Plaintiffs, and Plaintiffs are seeking to enforce important rights affecting the public

29

interest within the meaning of the Code of Civil Procedure § 1021.5.227.  Plaintiffs also seek compensation for the loss of their property and the personal financial impacts they have suffered as a result of Defendants' unfair business practices.

122.    The California Business and Professions Code §§ 17200 *et seq.* prohibits "unfair competition," defined as any "unlawful, unfair, or fraudulent business act or practice."  These acts or practices consist of those forbidden by law.

123.    The unlawful, unfair, and fraudulent business acts and practices described herein constitute ongoing and continuous unfair business practices within the meaning of Business and Professions Code §§ 17200 *et seq.*, as they are prohibited by state, federal, and international laws including but not limited to: (1) Electronic Communications Privacy Act, 18 U.S.C. § 2701 *et seq.*; (2) Alien Tort Statute, 28 U.S.C. § 1350; (3) Torture Victim Protection Act, 28 U.S.C. § 1350; (4) 18 U.S.C. § 2450 (federal statute criminalizing torture); (5)  Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment; (6)  International Covenant on Civil and Political Rights; (7)  Universal Declaration of Human Rights; (8) Charter of the United Nations; (9) International Labor Organization Convention No. 29 Concerning Forced or Compulsory Labor; and (10) Statutes and common law of the State of California, including but not limited to assault and battery, false imprisonment, negligence, intentional infliction of emotional distress, and negligent infliction of emotional distress.  Defendant's acts described herein also violate universal, specific, and obligatory customary international law, which prohibit aiding and abetting, and conspiracy to commit, violations of *jus cogens* human rights norms.

124.    Defendants' practices described herein offend established public policies and involve business practices that are immoral, unethical, oppressive, unscrupulous and/or substantially injurious to customers.

125.    Such practices include, but are not limited to, the unwarranted provision of internet users' private electronic communication information or records in order to be permitted to engage in business in China, with the knowledge that such information would substantively support the torture, battery, threats, and further intimidation of persons who used Defendants' services in China.

1    Members of the public have been in the past and will in the future likely be damaged by these

2    practices.

3        126.    Defendants have also acted contrary to public policy by infringing upon the freedom

4    of speech and expression of the general public.  Members of the public have been in the past and will

5    in the future likely be harmed by these practices.

6        127.    The conduct as alleged herein constitutes clear violations of customary international

7    law, federal law, and the laws of California.

8        128.    The furtherance of Defendants' role in the stream of commerce by providing

9    information which results in the aforementioned business practices creates an unfair business

10   advantage over competitors that do not utilize such practices from within California and the United

11   States.

12       129.    Plaintiffs seek injunctive relief, disgorgement of all profits resulting from these unfair

13   business practices, restitution and other appropriate relief on behalf of themselves and members of

14   the general public as provided in Business and Professions Code § 17203.

15                          ***ELEVENTH CLAIM FOR RELIEF***

16       **(Violation of the Electronic Communications Privacy Act, 18 U.S.C. § 2701, §2702,**
         **and §2511, Unlawful Access to Stored Communications)**
17
18            **(By Wang Xiaoning, Shi Tao and Other Plaintiffs Against All Defendants)**

19       130.    Plaintiffs re-allege and incorporate by reference the facts and allegations set forth in

20   paragraphs 1 through 47 and 54 through 70 of this Complaint as if fully set forth herein in this First

21   Claim for Relief.

22       131.    Upon information and belief, Defendants violated the rights of Plaintiffs herein by

23   intercepting, disclosing, and/or intentionally using electronic communication between Plaintiffs and

24   other persons.  The right of a civil action arises under 18 U.S.C. 2707(a), which provides that any

25   person aggrieved by any violation of the Electronic Communications Privacy Act, "in which the

26   conduct constituting the violation is engaged in with a knowing or intentional state of mind may, in a

27   civil action, recover from any person or entity, other than the United States, which engaged in that

28   violation such relief as may be appropriate."

132.    Defendants exceeded their authorization to access and control private information concerning Plaintiffs' electronic communications, in violation of 18 U.S.C. § 2701.

133.    Defendants unlawfully and knowingly divulged Plaintiffs' electronic communication contents and user information, in violation of 18 U.S.C. § 2702.

134.    Defendants intentionally acquired and/or intercepted the contents of electronic communications sent by and/or received by Plaintiffs through the use of an electronic device. Defendants intentionally acquired the communications that had been sent from or directed to Plaintiffs through their use of computers and other electronic devices which were part of, and utilized in, Defendants' electronic communications system, in violation of 18 U.S.C. § 2511 and pursuant to 18 U.S.C. § 2520.

135.    Defendants unlawfully accessed and used, and voluntarily disclosed, the contents of the intercepted communications to enhance their business in China.  This disclosure was not necessary for the operation of Defendants' system or to protect Defendants' rights or property.

136.    Plaintiffs are "person[s] whose … electronic communication is intercepted … or intentionally used in violation of this chapter" within the meaning of 18 U.S.C. § 2520.

137.    Defendants are liable directly and/or vicariously for this cause of action.

138.    Plaintiffs therefore seek remedy as provided for by 18 U.S.C. § 2520, including such preliminary and other equitable or declaratory relief as may be appropriate, damages consistent with subsection (c) of that section to be proven at trial, punitive damages to be proven at trial, and a reasonable attorney's fee and other litigation costs reasonably incurred.

## ABSENCE OF AVAILABLE AND EFFECTIVE REMEDIES IN CHINA

139.    These claims are not precluded by the need or failure to exhaust local remedies as set out in the Torture Victim Protection Act since Plaintiffs have made every effort to seek local remedies in China and Hong Kong, and their efforts have proven pointless and futile.

140.    Plaintiff Wang Xiaoning has attempted to utilize domestic remedies, pleading the laws of China, but the Chinese courts have convicted him and rejected his appeals in violation of Chinese and international law and have rejected all other efforts to challenge the actions taken

1   against him. He exhausted all remedies available to him in the Chinese courts when the courts

2   rejected his second appeal on July 1, 2006.

3       141.    Under Chinese law, Plaintiff Yu Ling would have a civil claim for her injuries were

4   her husband's conviction overturned. She has supported her husband's appeals not only to end the

5   abuses he is suffering and exonerate him, but also to establish her own right to a remedy. When the

6   courts rejected her husband's second appeal on July 1, 2006, Yu Ling lost any chance for local

7   remedies as well.

8       142.    Plaintiff Shi Tao has similarly appealed his conviction in the Chinese courts, and lost.

9   He then filed a complaint with the Hong Kong Privacy Commission to challenge the Defendants'

10  actions. The Commissioner dismissed Shi Tao's complaint, finding that jurisdictional restrictions

11  prohibited the Commission from holding the Defendants responsible despite evidence from Chinese

12  court documents that the company and its agents played a material part in the convictions. This

13  outcome exhausts all of Shi Tao's possible remedies in Hong Kong and precludes the other Plaintiffs

14  from filing similar complaints under the privacy laws of Hong Kong.

15      143.    Any further efforts to obtain relief in China could well result in serious reprisals

16  against those making allegations of wrongdoing on the part of high level officials in the PRC, as well

17  as against the local attorneys representing the complainants. High level officials of the PRC are

18  involved in the abuses alleged in this complaint and in the ratification of these abuses. Taking into

19  consideration that the PRC government used the courts of China to secure Plaintiffs' prolonged

20  arbitrary arrests and detentions, using a highly controlled judicial process to do so, and taking into

21  account the PRC government's refusal and/or inability to properly and effectively investigate acts of

22  torture, cruel, inhuman or degrading treatment or punishment, and arbitrary arrest and prolonged

23  detention and bring the perpetrators to justice, and given further other substantial indicators of

24  governmental acquiescence in the violations of international law and its unwillingness to support

25  legal initiatives that might be undertaken in PRC to obtain relief for Plaintiffs, efforts to secure

26  remedies for them in the PRC, including lawsuits in Chinese courts, must be considered futile. The

27  actions taken by the PRC government to revoke the license of Plaintiff Shi Tao's criminal defense

28  attorney and place him under house arrest just days before his trial, as well as similar actions against

Chinese human rights attorneys who defend persons accused of the types of charges for which Plaintiffs Wang Xiaoning and Shi Tao were convicted, further indicate the futility of using the Chinese judicial system to secure relief.

144.    For these reasons, requirements for further exhaustion of efforts to obtain local relief should be considered waived and satisfied.

**STATEMENT PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 11(b)(3)**

145.    Due to the unique circumstances of this case, specifically the fact that a substantial amount of the information is unavailable without the Defendants' cooperation, the factual allegations in paragraphs, 15, 16, 19, 21 and 22 are made because they "are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery," pursuant to Rule 11(b)(3). Fed. R. Civ. P. 11(b)(3)

**PRAYER FOR RELIEF**

WHEREFORE, the Plaintiffs pray for judgment against Defendants Yahoo! Inc., Yahoo! HK, Alibaba, and Other Presently Unnamed and to be Identified Individual Employees of Said Corporations, as follows:

(a)    For actual and compensatory damages to each of the Plaintiffs according to proof to be established at trial;

(b)    For punitive and exemplary damages according to proof to be established at trial;

(c)    For declaratory relief determining that the actions of the Defendants constituted violations of international law, specifically, that such violations included prohibited acts of torture, cruel, inhuman or degrading treatment, and arbitrary arrest and prolonged detention for the peaceful and exchange of ideas, views, and political beliefs in violation of the Convention Against Torture, numerous other international treaty obligations binding on the United States, and domestic laws and regulations implementing such standards, including the Torture Victim Protection Act, and other enumerated causes of action in this Complaint;

1       (d)     For affirmative action by the Defendants to secure the release of the detainees;

2       (e)     For injunctive relief to stop any further disclosures of user information in order to

3                prevent such aforementioned abuses from taking place in the future;

4       (f)     For costs of the litigation, including, attorneys' fees; and

5       (g)     For such other relief as the Court deems just and proper.

7  Respectfully submitted this 13th day of July, 2007,

MORTON SKLAR
THERESA HARRIS
WORLD ORGANIZATION FOR HUMAN
RIGHTS USA

By: */s/ Morton Sklar*
    Morton Sklar

ROGER MYERS
HOLME ROBERTS & OWEN LLP

By: */s/ Roger Myers*
    Roger Myers

Attorneys for Plaintiffs

Karen Parker
(CA State Bar No. 112486)
Association of Humanitarian Lawyers
154 5th Avenue
San Francisco, CA 94118
Telephone: (415) 668-2752
E-mail: ied@agc.org

*With the assistance of:*
Albert Ho Chun-Yan
Legal Representative for Shi Tao
Hong Kong

Rebecca Babarsky, University of Michigan
  Law School
Shannon Barrows, University of Chicago Law
  School
Paul Bozzello, Harvard Law School
*Legal Interns*