Xiaoning et al v. Yahoo! Inc, et al                                                                    Doc. 65

Case 4:07-cv-02151-CW    Document 65    Filed 08/27/2007    Page 1 of 51

1    DANIEL M. PETROCELLI (S.B. #97802)
     dpetrocelli@omm.com
2    MATTHEW T. KLINE (S.B. #211640)
     mkline@omm.com
3    O'MELVENY & MYERS LLP
     1999 Avenue of the Stars, 7th Floor
4    Los Angeles, CA  90067-6035
     Telephone:    (310) 553-6700
5    Facsimile:    (310) 246-6779
     Attorneys for Defendant YAHOO!, INC and Special
6    Appearing Defendant YAHOO! HONG KONG,
     LTD.
7

8                    UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF CALIFORNIA
9                          OAKLAND DIVISION

10   WANG XIAONING, YU LING, SHI          Case No.  C07-02151 CW
     TAO, and ADDITIONAL PRESENTLY
11   UNNAMED AND TO BE IDENTIFIED         DEFENDANT YAHOO!, INC.'S MOTION
     INDIVIDUALS,                         TO DISMISS PLAINTIFFS' SECOND
12                                        AMENDED COMPLAINT; PROPOSED
                         Plaintiffs,      ORDER
13
                 v.                       Date:     November 1, 2007
14                                        Time:     2 p.m.
     YAHOO! INC., a Delaware Corporation, Location: Courtroom 2
15   YAHOO! HONG KONG, LTD., a Foreign
     Subsidiary of Yahoo!, AND OTHER      Judge:    Hon. Claudia Wilken
16   PRESENTLY UNNAMED AND TO BE
     IDENTIFIED INDIVIDUAL
17   EMPLOYEES OF SAID
     CORPORATIONS,
18
                         Defendants.
19

20   TO PLAINTIFFS AND THEIR COUNSEL OF RECORD:

21          PLEASE TAKE NOTICE THAT ON November 1, 2007, at 2 p.m., defendant Yahoo!,

22   Inc. ("Yahoo!") will and hereby does move to dismiss, with prejudice, plaintiffs' second amended

23   complaint ("complaint"), which was filed July 30, 2007.  Yahoo! brings this motion pursuant to

24   Rules 12(b)(1), (6), and (7) of the Federal Rules of Civil Procedure.  This motion is based on this

25   notice of motion and motion, the following memorandum of points and authorities, the pleadings

26   on file in this matter, the reply memorandum Yahoo! intends to file, and any further argument the

27   Court might allow.

28
     C07-02151 CW
     YAHOO!'S MOT. TO DISMISS SEC. AM.
     COMPL

1    Without waiving its objection to the exercise of personal jurisdiction in this case, specially

2  appearing defendant Yahoo! Hong Kong, Ltd. ("YHKL") joins this motion.

3        Dated: August 27, 2007                DANIEL M. PETROCELLI
                                                MATTHEW T. KLINE
4                                               O'MELVENY & MYERS LLP

5

6                                               By: _____

7                                                     Daniel M. Petrocelli
                                                Attorneys for Defendant Yahoo! Inc and for
8                                               specially appearing defendant Yahoo! Hong
                                                Kong, Ltd.
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

I.    INTRODUCTION .................................................................................................. 1

II.   SUMMARY OF PLAINTIFFS' ALLEGATIONS ........................................... 2

III.  PLAINTIFFS CLAIMS ARE NOT JUSTICIABLE ...................................... 4

    A.   This Case Should Be Dismissed Under The Act Of State Doctrine. ............... 5

        1.   This Case Directly Challenges Sovereign Acts of the PRC............................ 5

        2.   The *Sabbatino* Factors All Favor Dismissal ................................................ 8

    B.   This Case Should Be Dismissed Under Principles Of International Comity.................... 12

    C.   This Case Should Be Dismissed Under The Political Question Doctrine ........................ 14

IV.   PLAINTIFFS HAVE FAILED TO STATE A COGNIZABLE CLAIM .......................... 15

    A.   Plaintiffs Have Failed To State A Claim Under The ATS............................................ 15

        1.   Plaintiffs' Allegations Do Not Meet Sosa's "High Bar" ................................ 15

        2.   The ATS Does Not Apply Extraterritorially................................................... 16

        3.   The Norms Plaintiffs Invoke Are Not Actionable Under The ATS.............. 16

        4.   Defendants Cannot Be Held Liable On Plaintiffs' ATS Theories .................. 19

    B.   Plaintiffs Have Failed to State a Claim Under the TVPA................................... 23

    C.   Plaintiffs Have Failed To State A Claim Under ECPA ...................................... 24

    D.   Plaintiffs Have Failed to State a Claim Under California Law....................... 27

        1.   The Foreign Affairs Doctrine Preempts Plaintiffs' California Claims .......................... 27

        2.   Plaintiffs Cannot Establish Their Intentional Tort Claims............................. 28

        3.   Plaintiffs Do Not State a Claim for Negligence ............................................. 29

        4.   Plaintiffs Do Not State a Claim For Unfair Competition................................ 31

    E.   Defendants' Communications With The PRC Are Protected From Liability .................. 32

        1.   The Communications Are Protected Under Federal Law............................... 32

        2.   Plaintiffs' Claims Are Barred By California's Statutory Privilege................ 35

        3.   Plaintiffs' International Law Claims Are Similarly Barred ........................... 36

V.    PLAINTIFFS FAILED TO JOIN AN INDISPENSABLE PARTY ..................................... 36

    A.   The PRC is a Necessary Party........................................................................ 37

    B.   The PRC Cannot be Joined ............................................................................ 37

**TABLE OF CONTENTS**
(Continued)

C. The PRC is Indispensable ................................................................................. 38

VI. PLAINTIFFS' COUNSEL MAY LACK AUTHORITY TO BRING THIS SUIT........... 39

VII. CONCLUSION ........................................................................................... 40

# TABLE OF AUTHORITIES

**Page**

## CASES

*Abdullahi v. Pfizer, Inc.*, 2002 WL 31082956, at *5 (S.D.N.Y. Sept. 17, 2002)........................20

*Aldana v. Del Monte Fresh Produce, N.A., Inc.*, 416 F.3d 1242 (11th Cir. 2005) ...............17, 23

*American Ins. Ass'n v. Garamendi*, 539 U.S. 396 (2003)................................................14, 27, 28

*Ameritech Corp. v. McCann*, 403 F.3d 908 (7th Cir. 2005) ........................................................27

*Anderman v. Fed. Rep. of Austria*, 256 F. Supp. 2d 1098 (C.D. Cal. 2003)...............................15

*Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428 (1989) ..............................25

*Arndt v. UBS AG*, 342 F. Supp. 2d 132 (S.D.N.Y. 2004) .............................................................23

*Artiglio v. Corning Inc.*, 18 Cal. 4th 604 (Cal. 1998) ..................................................................30

*Baker v. Carr*, 369 U.S. 186 (1962)............................................................................................14

*Baker v. Superior Ct.*, 129 Cal. App. 3d 710 (Cal. Ct. App. 1982) .............................................31

*Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398 (1964).........................................5, 8, 10, 11

*Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955 (2007) ...........................................................2, 15, 18

*Berlin Democratic Club v. Rumsfeld*, 410 F. Supp. 144 (D.C. D.C. 1976) .................................25

*Beroiz v. Wahl*, 84 Cal. App. 4th 485 (Cal. Ct. App. 2000) (Mexico).........................................36

*Bigio v. Coca-Cola Co.*, 239 F.3d 440 (2d Cir. 2000) .................................................................12

*Bohach v. City of Reno*, 932 F. Supp. 1232 (D. Nev. 1996) ........................................................27

*Bonneville Power Admin. v. FERC*, 422 F.3d 908 (9th Cir. 2005)...............................................24

*Borg v. Boas*, 231 F.2d 788 (9th Cir. 1956).................................................................................33

*Boulware v. State of Nev. Dept. of Human Res.*, 960 F.2d 793 (9th Cir. 1992) .........................35

*Branch v. Tunnell*, 14 F.3d 449 (9th Cir. 1994)............................................................................3

*Brown v. Edwards*, 721 F.2d 1442 (5th Cir. 1984).....................................................................33

*Cabello v. Fernandez-Larios*, 402 F.3d 1148 (11th Cir. 2005) ..................................................24

*Capri Trading Corp. v. Bank Bumiputra Malaysia Berhad*, 812 F. Supp. 1041
(N.D. Cal. 1993)......................................................................................................................38

*Center for Biological Diversity v. FPL Group, Inc.*, 2006 WL 2987634 at *4-6
(Cal. Superior Ct., Oct. 13, 2006) (Sabraw, J.)......................................................................32

*Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S.
164 (1994)................................................................................................21, 22, 24

*Christensen v. Superior Ct.*, 54 Cal. 3d 868 (Cal. 1991) ............................................................29

*Cohen v. McIntyre*, 16 Cal. App. 4th 650 (Cal. Ct. App. 1993) ..................................................31

*Colgan v. Leatherman Tool Group, Inc.*, 135 Cal. App. 4th 663
(Cal. Ct. App. 2006)................................................................................................................32

*Conroy v. Regents of University of California*, 151 Cal. App. 4th 132
(Cal. Ct. App. 2007)................................................................................................................29

*Consol. Rendering Co. v. Vermont*, 207 U.S. 541 (1908)..............................................................7

**TABLE OF AUTHORITIES**
**(Continued)**

*Corrie v. Caterpillar, Inc.*, 403 F. Supp. 2d 1019 (W.D. Wa. 2005) ..........................5, 14, 16, 24

*Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363 (2000) ....................................................14

*Daro v. Superior Court*, 151 Cal. App. 4th 1079 (2007) ............................................................31

*Davidson v. City of Westminster*, 32 Cal. 3d 197 (Cal. 1982) ....................................................29

*Davis v. United States*, 192 F.3d 951 (10th Cir. 1999) ..............................................................37

*Dawavendewa v. Salt River Project Agr. Imp. & Power Dist.*, 276 F.3d 1150
   (9th Cir. 2002)........................................................................................................37, 38, 39

*Dayton Coal & Iron Co. v. Barton*, 183 U.S. 23 (1901) ..............................................................7

*Doe I v. Exxon Mobil Corp.*, 393 F. Supp. 2d 20 (D.D.C. 2005).................................20, 23, 24

*Doe v. Qi*, 349 F. Supp. 2d 1258 (N.D. Cal. 2004)..............................................................passim

*Doe v. Saravia*, 348 F. Supp. 2d 1112 (E.D. Cal. 2004)........................................................17, 24

*Doe v. Unocal*, Supp. Br. for the U.S. as Amicus Curiae, Case No. 00-56603
   at 12-13 (9th Cir. Aug. 25, 2004)........................................................................................10

*Dorn v. Mendelzon*, 196 Cal. App. 3d 933 (Cal. Ct. App. 1987)................................................36

*Dragon Capital Partners L.P. v. Merrill Lynch Capital Servs. Inc.*, 949 F. Supp.
   1123 (S.D.N.Y. 1997) ..........................................................................................................38

*E. & J. Gallo Winery v. Andina Licores, S.A.*, Case No. CV F 05-0101, 2006 U.S.
   DIST. LEXIS 47206, at *24 (E.D. Cal. June 30, 2006) (Ecuador)........................................36

*E.O. v. Openbaar Ministerie*, HR 18 Apr. 1995, NJ 1995, 619, *reproduced in* 28
   NETH. Y.B. INT'L L. 336-38 (1997) ......................................................................................19

*Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*,
   365 U.S. 127 (1961).............................................................................................................35

*EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244 (1991) ................................................................16

*EEOC v. Peabody Western Coal Co.*, 400 F.3d 774 (9th Cir. 2005) ..........................................38

*Enahoro v. Abubakar*, 408 F.3d 877 (7th Cir. 2005)..........................................................16, 17

*Estate of Rabinowitz*, 114 Cal. App. 4th 635 (2003) ................................................................39

*Estate of Stephens*, 28 Cal. 4th 665 (Cal. 2002)........................................................................29

*Evers v. Custer County*, 745 F.2d 1196 (9th Cir. 1984) ............................................................35

*Fermino v. Fedco, Inc.*, 7 Cal. 4th 701 (Cal. 1994) ..................................................................29

*Fiol v. Doellstedt*, 50 Cal. App. 4th 1318 (Cal. Ct. App. 1996) ................................................29

*Foltz v. Moore McCormack Lines, Inc.*, 189 F.2d 537 (2d Cir. 1951)........................................33

*Forro Precision, Inc. v. Int'l Bus. Machs.*, 673 F.2d 1045 (9th Cir. 1982) ................................35

*Freedman v. America Online, Inc.*, 412 F. Supp. 2d 174 (D. Conn. 2005) ................................26

*Friedman v. Merck & Co.*, 107 Cal. App. 4th 454 (Cal. Ct. App. 2003)....................................30

*Gerard v. Ross*, 204 Cal. App. 3d 968 (Cal. Ct. App. 1988) ....................................................28

*Guinto v. Marcos*, 654 F. Supp. 276 (S.D. Cal. 1986)..........................................................6, 17

*Hagberg v. Calif. Fed. Bank FSB*, 32 Cal. 4th 350 (2004) ..................................................35, 36

*Hamid v. Price Waterhouse*, 51 F.3d 1411 (9th Cir. 1995) ......................................................26

*Hamilton v. Martinelli & Associates*, 110 Cal. App. 4th 1012 (Cal. Ct. App. 2003) ..................30

**TABLE OF AUTHORITIES**
(Continued)

*Herrle v. Estate of Marshall*, 45 Cal. App. 4th 1761 (Cal. Ct. App. 1996) ...............................30

*Holmes v. Eddy*, 341 F.2d 477 (4th Cir. 1965) ...........................................................................33

*Howard v. Superior Court*, 2 Cal. App. 4th 745 (Cal. Ct. App. 1992) .....................................28

*Ibrahim v. Titan Corp.*, 391 F. Supp. 2d 10 (D.C. D.C. 2005) .................................................20

*Ileto v. Glock*, 194 F. Supp. 2d 1040 (C.D. Cal. 2002)..............................................................30

*In re Calpine Corp. Sec. Litig.*, 288 F. Supp. 2d 1054 (N.D. Cal. 2003).....................................3

*In re Estate of Ferdinand Marcos*, 25 F.3d 1467 (9th Cir. 1994)................................................6

*In re Estate of Marcos Human Rights Litig.*,978 F.2d 493 (9th Cir. 1992) ...............................20

*In re Quarles*, 158 U.S. 532 (1895) ...............................................................12, 32, 33

*In re Republic of the Phil.*, 309 F.3d 1143 (9th Cir. 2002) ........................................................37

*In re Retail Chemists Corp*, 66 F. 2d 605 (2d Cir. 1933)............................................................39

*In re South Af. Apartheid Litig.*, 346 F. Supp. 2d 538 (S.D.N.Y. 2004) ........................20, 21, 24

*Interamerican Refining Corp. v. Texaco Maracaibo, Inc.*, 307 F. Supp. 1291
(D. Del. 1970) ..............................................................................................................................34

*Joo v. Japan*, 413 F.3d 45 (D.C. Cir. 2005)...............................................................................14

*Kadic v.Karadzic*, 70 F.3d 232 (2d Cir. 1995)...........................................................................20

*Khulumani et al. v. Barclay Nat'l Bank Ltd., et al.*, No. 05-2141 (2nd Cir. 2005).....................21

*Knight v. Jewett*, 3 Cal. 4th 296 (Cal. 1992) ..............................................................................30

*Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134 (Cal. 2003)..............................32

*Liu v. Republic of China*, 892 F.2d 1419 (9th Cir. 1989) .......................................................8, 12

*Matar v. Dicther*, Case No. 05 Civ. 10270 (WHP), Statement of Interest of the
U.S. at 22 (S.D.N.Y. Nov. 29, 2006).........................................................................................11

*McDonald v. Smith*, 472 U.S. 479 (1985)...................................................................................33

*Meredith v. Ionian Trader*, 279 F. 2d 471 (2d Cir. 1960).......................................................2, 39

*Morales v. Coop. of Am. Physicians, Inc*, 180 F.3d 1060 (9th Cir. 1999)..................................35

*Moser v. Ratinoff*, 105 Cal. App. 4th 1211 (Cal. Ct. App. 2003) ..............................................30

*Mujica v. Occidental Petroleum Corp.*, 381 F. Supp. 2d 1164 (C.D. Cal. 2005)...........23, 24, 28

*Noel v. River Hills Wilsons, Inc.*, 113 Cal. App. 4th 1363 (Cal. Ct. App. 2003).........................36

*Oregon Natural Res. Council v. Mohla*, 944 F.2d 531 (9th Cir. 1991) .....................................35

*Palmer v. Roosevelt Lake Log Owners Ass'n.*, 551 F. Supp. 486 (D. Wash. 1982) ...................35

*Panama Processes, S.A. v. Cities Services Co.*, 650 F.2d 408 (2d Cir. 1981)............................35

*Pollock v. Williams*, 322 U.S. 4 (1944).......................................................................................18

*Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82 (D.C. Cir. 2002)...........18, 24

*Pueblo of Santa Rosa v. Fall*, 273 U.S. 315 (1927)..................................................................2, 39

*Quarles, Vogel v. Gruaz*, 110 U.S. 311 (1884)...........................................................................33

*Radiation Sterilizers, Inc. v. U.S.*, 867 F. Supp. 1465 (E.D. Wash. 1994) ................................35

*Ratzlaf v. United States*, 510 U.S. 135 (1994) ...........................................................................24

**TABLE OF AUTHORITIES**
(Continued)

*Ricci v. State Bd. of Law Examiners*, 569 F.2d 782 (3d Cir. 1978) ............................................. 37

*Rivendell Forest Prods., Ltd. v. Canadian Forest Prods.*, 810 F. Supp. 1116
(D. Colo. 1993) .............................................................................................................................. 13

*Rosenbloom v. Hanour Corp.*, 66 Cal. App. 4th 1477 (Cal. Ct. App. 1998) .............................. 30

*Saffro v. Elite Racing, Inc.*, 98 Cal. App. 4th 173 (Cal. Ct. App. 2002) .................................... 30

*Sale v. Haitian Ctrs. Council*, 509 U.S. 155 (1993) .................................................................... 25

*Sarei v. Rio Tinto*, 456 F.3d 1069 (9th Cir. 2006) ...................................................................... 20

*Saudi Arabia v. Nelson*, 507 U.S. 349 (1993) ............................................................................. 38

*Shipping Ltd. v. Flota Mercante Grancocolombiana, S.A.*, 830 F.2d 449
(2d Cir. 1987) ................................................................................................................................. 15

*Small v. United States*, 544 U.S. 385 (2005) ............................................................................... 25

*Societe Internationale Pour Participations Industrielles et Commerciales,
S.A. v. Rogers*, 357 U.S. 197 (1958) ...................................................................................... 33, 35

*Societe Nationale Industrielle Aerospatiele v. United States Dist. Court for the
Dist. of Iowa*, 482 U.S. 522 (1987) .............................................................................................. 12

*Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004) .................................................................... passim

*Southern California Housing Rights Center v. Los Feliz Towers Homeowners
Assoc.*, 426 F. Supp. 2d 1061 (C.D. Cal. 2005) .......................................................................... 32

*Swaaley v. U. S.*, 376 F.2d 857 (Ct. Cl. 1967) ............................................................................ 33

*Tel-Oren v. Lybian Arab Republic*, 726 F.2d 774 (D.C. Cir. 1984) ........................................... 20

*The Presbyterian Church of Sudan v. Talisman Energy, Inc.*, Case No. 07-0016,
at 5-12 (2d Cir. May 15, 2007) ( ............................................................................................ passim

*Timberland Lumber Co. v. Bank of America*, 549 F.2d 597 (9th Cir. 1977) .............................. 34

*U.S. v. New York Tel. Co.*, 434 U.S. 159 (1977) ......................................................................... 33

*Underhill v. Hernandez*, 168 U.S. 250 (1897) .............................................................................. 5

*United Mine Workers of Am. v. Pennington*, 381 U.S. 657 (1965) ............................................. 35

*United States v. Angulo-Hurtado*, 165 F. Supp. 2d 1363 (N.D. Ga. 2001) ............................... 25

*United States v. Brodie*, 174 F. Supp. 2d 294 (E.D. Pa. 2001) ............................................ 33, 34

*United States v. Cotroni*, 527 F.2d 708 (2d Cir. 1975) .......................................................... 25, 26

*United States v. Denman*, 100 F.3d 399 (5th Cir. 1996) ............................................................. 26

*United States v. Gatlin*, 216 F.3d 207 (2d Cir. 2000) ................................................................. 25

*United States v. Hambrick*, 55 F. Supp. 2d 504 (W.D. Va. 1999) .............................................. 26

*United States v. Luong*, 471 F.3d 1107 (9th Cir. 2006) .............................................................. 26

*United States v. Peterson*, 812 F.2d 486 (9th Cir. 1987) ............................................................ 25

*United States v. Smith*, 5 Wheat. 153 (1820) ................................................................. 17, 18, 22

*United States v. Toscanino*, 500 F.2d 267 (2d Cir. 1974) .......................................................... 25

*United States v. Wolf*, 352 F. Supp. 2d 1195 (W.D. Okla. 2004) ............................................... 39

*Video Int'l Prod. v. Warner-Amex Cable Commc'n*, 858 F.2d 1075 (5th Cir. 1988) ................. 35

*Vieth v. Jubelirer*, 514 U.S. 267 (2004) ...................................................................................... 14

**TABLE OF AUTHORITIES**
**(Continued)**

*Walker v. USAA Casualty Ins. Co.*, 474 F. Supp. 2d 1168 (E.D. Cal. 2007)...............32

*Wang v. Yahoo!, Inc.*, Order Denying Def. Yahoo!'s Mot. for Early Case Mgt.
    Conf. & Order at 4:19-5:19 (filed July 31, 2007) ...............................................4, 5

*White v. Trans Union LLC*, 462 F. Supp. 2d 1079 (C.D. Cal 2006) ........................32

*Wilbur v. Locke*, 423 F.3d 1101 (9th Cir. 2005) ....................................................36, 38

*Wiwa v. Royal Dutch Petroleum*, 2002 U.S. Dist. LEXIS 3293 at *37-40
    (S.D.N.Y. 2002) ...................................................................................................20

*Yahoo!, Inc. v. La Ligue Contre Le Racisme et L'Antisemitisme*, 169 F. Supp. 2d
    1181 (N.D. Cal. 2001), *rev'd on other grounds*, 433 F.3 1199 (9th Cir. 2006)...............6, 12

*Zschernig v. Miller*, 389 U.S. 429 (1968) ...............................................................27

**STATUTES**

18 U.S.C. § 1513..................................................................................................25
18 U.S.C. § 2......................................................................................................21
18 U.S.C. § 2511............................................................................................24, 25
18 U.S.C. § 2701............................................................................................24, 27
18 U.S.C. § 2702....................................................................................24, 25, 26, 27
18 U.S.C. § 2711..................................................................................................26
28 U.S.C. § 1350............................................................................................15, 21, 26
28 U.S.C. § 1350, note....................................................................................23, 24
28 U.S.C. §1604..................................................................................................37
28 U.S.C. §1605..................................................................................................37
Cal. Civ. Code §47..............................................................................................27
CAL. CIV. PROC. CODE § 367.................................................................................39
CAL. PROB. CODE § 4303 .......................................................................................40
CAL. PROB. CODE §§ 4121 ....................................................................................39
CAL. PROB. CODE §§ 4122 ....................................................................................39
CAL. PROB. CODE §§ 4263 ....................................................................................39
CAL. PROB. CODE §§ 4459 ....................................................................................39
California Business and Professions Code § 17204................................................31, 32
FED. R. CIV. P. 12 ...............................................................................................15
FED. R. CIV. P. 17 ...............................................................................................39
FED. R. CIV. P. 19 ...............................................................................................37, 38

**OTHER AUTHORITIES**

1993 Country Reports on Human Rights Practices, Bureau of Democracy, Human
    Rights, and Labor, U.S. Department of State (Jan. 31, 1994)................................19

4 W. BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND 67 (1769) at 67 ......19

Administrative Measures on Internet Bulletin Services (P.R.C.) [attached in
    Exhibit B].............................................................................................................34

**TABLE OF AUTHORITIES**
(Continued)

BUREAU OF ECONOMIC AND BUSINESS AFFAIRS, OECD GUIDELINES FOR MULTINATIONAL ENTERPRISES 5 (2002) .......................................................... 13

Caroline Uyttendaele & Joseph Dumortier, *Free Speech on the Information Superhighway*, 16 J. MARSHALL J. COMPUTER & INFO. L. 905 (1998) ................... 6

Civil Procedure Law (P.R.C.) [attached in Appendix B] ........................................ 39

Criminal Law (P.R.C.) [attached in Appendix B] .................................................. 34

Criminal Procedure Law (P.R.C.) [attached in Appendix B] .................................. 34

Curtis A. Bradley et al., Sosa, *Customary International Law and the Continuing Relevance of* Erie, 120 HARV. L. REV. 870, 924-29 (2007) ..................... 20, 21, 22

Daria Vaisman, *Turkey's Restriction, Europe's Problem* ¶¶ 2-3 ................................ 6

Evans J.R. Revere, Acting Assistant Sec'y for East Asian and Pacific Affairs, *The Bush Administration's Second-Term Foreign Policy Toward East Asia*, Remarks to Center for Strategic Int'l Studies Conference (May 17, 2005) ........... 9

Judgment of Huang Qi, Congressional-Executive Committee on China Virtual Academy, http://www.cecc.gov/pages/virtualAcad/exp/expsecurity.php ............. 6

Letter from Hon. John B. Bellinger III to Hon. Peter D. Keisler re: *Li Weixum, et al. v. Bo Xilai*, No. 1:04CV00649 (DDC) (July 24, 2006) ...................................... 9

Measures for the Administration of Internet E-mail Services (P.R.C.) [attached in Appendix B] ....................................................................................................... 34

*Morton Sklar on Yahoo! human rights lawsuit* (Apr. 21, 2007), (webcast at 06:23-8:16) ................................................................................................................... 6

Office of the Privacy Comm'r for Personal Data, Hong Kong, Report Published under § 48(2) of the Personal Data (Privacy) Ordinance (Cap. 486), Report No.: R07-3619 (Mar. 14, 2007) ........................................................................... 3

Opinions of the Supreme People's Court on Certain Issues Concerning Application of PRC Civil Procedure Law 2002 (P.R.C.) [attached in Appendix B] ................ 39

Ratifications Of The Fundamental Human Rights Conventions By Country,"http://www.ilo.org/ilolex/english/docs/declworld.htm ............................ 19

Regulations on Telecommunications (P.R.C.) [attached in Appendix B] ................ 34

Reporters Without Borders Briefs for July 2007, *Spain: Gara and Deia Journalists Now Face Charges of "Insulting King* ...................................................................... 6

RESTATEMENT (SECOND) OF TORTS § 598 cmt. d (1977) .......................................... 33

RESTATEMENT (THIRD) OF FOREIGN RELATIONS (1987) ................................. passim

Robert B. Zoellick, Deputy Sec'y of State, *Whither China: From Membership to Responsibility?*, Remarks to National Committee on U.S.-China Relations (Sept. 21, 2005) .................................................................................................... 9

Ronald J. Krotoszynski, *A Comparative Perspective on the First Amendment*, 78 TUL. L. REV. 1549 (2004) ................................................................................. 6

Scott Shane, *Suit Over C.I.A. Program*, N.Y. TIMES, May 31, 2007 ....................... 11

Sionaidh Douglas-Scott, *The Hatefulness of Protected Speech*, 7 WM. & MARY BILL OF RTS. J. 305 (1999) ............................................................................... 6, 17

State Security Law (P.R.C.) [attached in Appendix B] ........................................... 34

**TABLE OF AUTHORITIES**
(Continued)

Statement of Interest of the United States, *Doe v. Qi*, Case No. C02 0672 CW (EMC) (filed Jan. 16, 2004) .............................................................................................. 9

Statement of Interest of U.S., *Doe v. Qi* at 8 (death penalty example).............................................................................. 11

Thomas J. Christensen, Deputy Assistant Sec'y for East Asian and Pacific Affairs, U.S.-China Relations, Statement Before the House Committee on Foreign Affairs, Subcommittee on Asia, the Pacific and the Global Environment (Mar. 27, 2007) ...................................................................................................................................... 9

U.S. Dep't of State, Bureau of East Asian and Pacific Affairs, *Background Note: China* (Jan. 2007)................................................................................................................. 9

William J. Clinton, Remarks by the President at Signing of China Permanent Normal Trade Relations (Oct. 10, 2000)................................................................................ 9

World Organization for Human Rights USA, "Major lawsuit filed by Human Rights USA against Yahoo! highlights the internet company's complicity in human rights abuses in China (Apr. 18, 2007)........................................................................ 10

**RULES**

Federal Rules of Civil Procedure, Rule 12........................................................................passim

Federal Rules of Civil Procedure, Rule 19................................................................................. 2

1

I.       **INTRODUCTION**

2           This is a lawsuit by citizens of China imprisoned for using the internet in China to express

3    political views in violation of China law. It is a political case challenging the laws and actions of

4    the Chinese government.  It has no place in the American courts.  Yahoo! deeply sympathizes

5    with the plaintiffs and their families and does not condone the suppression of their rights and

6    liberty by their government.  But Yahoo! has no control over the sovereign government of the

7    People's Republic of China ("PRC"), the laws it passes, and the manner in which it enforces its

8    laws.  Neither Yahoo! Inc. or YHKL therefore, can be held liable for the independent acts of the

9    PRC just because a former Yahoo! subsidiary in China obeyed a lawful government request for

10   the collection of evidence relevant to a pending investigation.

11          There are numerous legal grounds why plaintiffs' complaint cannot proceed:

12          *First*, plaintiffs' claims are not justiciable under *Sosa v. Alvarez-Machain*, 542 U.S. 692

13   (2004), the act of state doctrine, principles of international comity, and the political question

14   doctrine.  The complaint challenges the actions of the PRC in enacting and enforcing laws

15   proscribing certain types of speech deemed inimical to its government.  Litigating this case thus

16   risks violating international law principles of sovereignty, interfering with U.S. foreign policy,

17   and jeopardizing the U.S. law enforcement interests.

18          *Second*, plaintiffs have failed to state a claim under the Alien Tort Statute ("ATS"), the

19   Torture Victim Protection Act ("TVPA"), the Electronic Communications Privacy Act ("ECPA"),

20   and the California laws on which they rely.  Among other infirmities, plaintiffs' ATS and TVPA

21   theories are not actionable against corporate actors, ECPA does not apply extraterritorially, and

22   plaintiffs' California claims are preempted.

23          *Third*, plaintiffs' claims contravene federal, California, and international law—each of

24   which expressly protects defendants from civil liability for communicating with law enforcement

25   officials regarding investigations.  Whether they responded to the PRC's requests voluntarily or

26   under compulsion of PRC law (the complaint seeks to obscure that it was plainly the latter),

27   defendants' conduct was plainly privileged.

28          *Fourth*, the complaint files to join the PRC or PRC officials who allegedly harmed

C07-02151 CW
YAHOO!'S MOT. TO DISMISS SEC. AM.
COMPL.

1    plaintiffs, and who are "necessary" and "indispensable" parties under Rule 19 of the Federal

2    Rules of Civil Procedure ("Rule").

3        *Fifth*, this case should not proceed unless counsel of record for plaintiffs establish their

4    authority to represent plaintiffs in this case. *See Pueblo of Santa Rosa v. Fall*, 273 U.S. 315, 319

5    (1927); *Meredith v. Ionian Trader*, 279 F. 2d 471, 474 (2d Cir. 1960).

6    **II.    SUMMARY OF PLAINTIFFS' ALLEGATIONS[1]**

7        **Plaintiff Wang Xiaoning.**  From 2000 to 2002, Wang worked in mainland China as a

8    author and editor of pro-democracy publications.  Compl., ¶¶ 32-35.  PRC authorities arrested

9    Wang and charged, tried, and convicted him of "incitement to subvert state power," advocating

10   the establishment of an alternative political party, and communicating with an overseas enemy

11   organization.  *Id*. ¶¶ 37-40.  Wang was taken into custody on September 1, 2002, charged on

12   September 30, 2002, tried and convicted in July 2003, and sentenced to a 10-year prison term on

13   September 12, 2003.  *See id.* ¶¶ 37-41.  While in prison, Wang suffered brutal treatment at the

14   hands of the PRC as punishment for his political activities.  *See id.* ¶¶ 39, 43-44.  Wang is

15   allowed only limited contact with outsiders; it is unclear whether he has any contact with his

16   counsel or authorized this lawsuit.  *See id.* ¶ 45.

17       **Plaintiff Shi Tao.**  Shi Tao worked as a reporter and editor at the *Contemporary Business*

18   *News* in mainland China and wrote articles advocating political reform.  *See id.* ¶¶ 52-55.  On

19   April 20, 2004, from his place of employment, Shi published anonymously a document the PRC

20   considered to be a "state secret."  *See id.* ¶¶ 55-56, 62-63.  PRC authorities arrested Shi on

21   November 23, 2004 and charged him on December 14; he pled guilty on March 11, 2005.  *See id.*

22   ¶¶ 57-61.  On April 30, 2005, Shi was sentenced to 10 years in prison and is currently

23   incarcerated at a Chinese prison known for abusive treatment of prisoners.  *See id.* ¶¶ 62-66.

24   Given the vague allegations about his specific circumstances, it is unclear whether Shi's counsel

25   have contact with him or the authority to represent him.  *See id.* ¶¶ 59, 65-66.  Before filing this

26   suit, Shi brought an action against YHKL before the Hong Kong Privacy Commissioner.  *See id.*

27

28   [1] Solely for purposes of this motion, the facts alleged in plaintiffs' complaint, filed July 30, 2007, are all assumed true.  See *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1985 (2007).

1    ¶ 64.  The Commissioner rejected Shi's claim.  *See id*.

2         ***Yu Ling.***  Yu Ling is Wang's wife.  *See id*. ¶ 11 She and "her family have endured severe

3    psychological and emotional suffering as a direct result of [Wang's] arbitrary detention."  *Id*. ¶

4    46.  She has been "subjected to continued police surveillance," including seizure of her computer.

5    *Id*. ¶¶ 47-48.  Yu's "emotional injuries have caused [her] physical injury," and devoting time to

6    Wang's legal defense has cost her time and money.  *Id*. ¶¶ 50-51.

7         ***Yahoo! and YHKL.***  Plaintiffs have sued Yahoo! and YHKL.  Yahoo! is a Delaware

8    corporation and its primary place of business is Sunnyvale, California.  Yahoo! is an internet

9    portal and provides email and other internet-based services.  YHKL, which is based in Hong

10   Kong, is Yahoo!'s indirect subsidiary and has a portal business in Hong Kong.  *See id*. ¶¶ 14-15.

11        Plaintiffs allege Yahoo! and YHKL controlled the operations of Yahoo! China, an internet

12   portal serving mainland China.  *See id*. ¶¶ 15-17.  Having used Yahoo! China email accounts and

13   group lists to publish political literature, *see id*. ¶¶ 33-34, 55, plaintiffs rest their claims on two

14   pivotal allegations: defendants "willingly" provided information regarding plaintiffs' online

15   activities to the PRC and were "instrumental" to "causing the Plaintiff[s'] arrest and criminal

16   prosecution," *id*. ¶¶ 2, 42, 44, 62.

17        Although the success of this motion in no way turns on refuting these two assertions, the

18   very documents cited in the complaint undermine both.[2]  As the Hong Kong Privacy

19   Commissioner concluded in Shi's case, *see* Compl. ¶ 64 (citing ruling), "the disclosure of

20   Information in the circumstances of the case *was not a voluntary act initiated by [YHKL] but was*

21   *compelled under the force of PRC law*."[3]  (All emphases added unless otherwise indicated.)  And,

22   plaintiffs' criminal judgments do not show that defendants divulged plaintiffs' identities, caused

23   _____

24   [2] On a motion to dismiss, the court may consider documents described in, but not attached to, a
     complaint.  *See Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994); *In re Calpine Corp. Sec.
     Litig.*, 288 F. Supp. 2d 1054, 1076 (N.D. Cal. 2003).

25   [3] Exhibits are attached in Appendix A.  *See* Ex. A (Office of the Privacy Comm'r for Personal
     Data, Hong Kong, Report Published under § 48(2) of the Personal Data (Privacy) Ordinance
26   (Cap. 486), Report No.: R07-3619, at ¶ 8.25 (Mar. 14, 2007),
     http://www.pcpd.org.hk/english/publications/files/Yahoo_e.pdf ("Hong Kong Commissioner's
27   Report")).  The Report also explains that Yahoo! China's Privacy Policy and Terms of Service
     clearly informed users that their information would be disclosed in response to law enforcement
28   requests.  *Id*. at 8.37-8.39.

1   them to be investigated, or provided proof essential to their convictions.[4]

2       ***Claims and Relief Sought.***  The complaint contains claims under the ATS, TVPA, and

3   ECPA; a variety of international law sources; and six California law theories.  *See* Compl. at 3-6.

4   Shi asserts 11 causes of action.  Wang asserts 10; unlike Shi, he does not make a forced labor

5   claim.  *See id.* at ¶¶ 69-136.  Yu asserts three California law claims—for intentional infliction of

6   emotional distress, negligence, and unfair business practices.  *See id.* at ¶¶ 109-27.  Plaintiffs seek

7   compensatory and punitive damages, as well as declaratory relief determining defendants violated

8   international law, injunctive relief to prevent defendants from complying with future requests for

9   information, and "affirmative action by the Defendants to secure the release of the detainees."

10   **III.**    **<u>PLAINTIFFS CLAIMS ARE NOT JUSTICIABLE</u>**

11       *Sosa v. Alvarez-Machain*, 542 U.S. 692, 728 (2004), instructs courts to proceed in ATS

12   cases with "great caution."  Trial courts have a duty of "vigilant door keeping," obligating them

13   to consider a variety of prudential concerns before exercising jurisdiction.  *Id*. at 729; *see also*

14   *Wang v. Yahoo!, Inc.*, Order Denying Def. Yahoo!'s Mot. for Early Case Mgt. Conf. & Order at

15   4:19-5:19 (filed July 31, 2007) ("Order").  As this Court has recognized, "[a]lthough it is one

16   thing for American courts to enforce limits on their own government's power, . . . it is 'quite

17   another to consider suits under rules that would go so far as to claim a limit on the power of

18   foreign governments over their own citizens, and to hold that a foreign government or its agents

19   has transgressed those limits.'"  *Id*. at 5:1-6 (quoting *Sosa*).  Three justiciability doctrines that

20   reflect these constitutional and prudential concerns—the act of state doctrine, the doctrine of

21   international comity, and the political question doctrine—compel dismissal here.

22

23

---

24   [4] Wang's and Shi's judgments—both in the original Chinese and translated into English—are attached as Exhibits B and C, respectively. Both judgments cite various sources of evidence—including physical evidence, witnesses, and plaintiffs' confessions—on which plaintiffs'

25   convictions rested. With regard to defendants, all Wang's judgment states is that YHKL provided records that showed that two Yahoo! China email accounts had been set up by users in China.

26   See Ex. B at 6, ¶ e, f. And in Shi's case, the judgment shows that the information YHKL provided merely helped confirm that an email in the case was sent from Shi's place of

27   employment—not that Shi sent it. *Id*. at 4-5, Compl. ¶ 62. *Indeed, contrary to the suggestion that the PRC learned about Wang's identity from defendants, the judgment discloses that Wang*

28   *published articles using his real name.* See Ex. B at 11, ¶ 4 and 21, ¶ a.

A.    **This Case Should Be Dismissed Under The Act Of State Doctrine.**

The act of state doctrine provides that "[e]very sovereign State is bound to respect the independence of every other sovereign State, *and the courts of one country will not sit in judgment on the acts of the government of another done within its own territory*." *Underhill v. Hernandez*, 168 U.S. 250, 252 (1897). This doctrine is rooted in the recognition that "[t]he conduct of the foreign relations . . . is committed by the Constitution to the Executive and Legislative . . . departments." *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 423 (1964).

**1.    This Case Directly Challenges Sovereign Acts of the PRC.**

As this Court recently observed, "[t]he claims in this case directly implicate the propriety of actions taken by the Chinese government." Order at 6:22-27. Indeed, the case "require[s] the court to sit in judgment" of at least three sovereign acts of the PRC. *Corrie v. Caterpillar, Inc*., 403 F. Supp. 2d 1019, 1032 (W.D. Wa. 2005). Each is addressed in turn.

a.  Judging PRC Speech Laws. By its express terms, plaintiffs' complaint is a facial attack on criminal laws in China banning political speech. One of the complaint's recurring and critical allegations is that the PRC had no right to detain plaintiffs for publishing political literature.[5] However, "free speech" rights as we understand them in the United States are not the law in China.[6] As one Chinese court has summarized the law:

---

[5] *See, e.g.*, Compl. ¶ 23 ("*As a result of the expression of their views*, these 'dissidents' are subjected to arbitrary arrest, criminal prosecution, and persecution *in violation of numerous protections for fundamental rights involving the exercise of freedom of expression, association, press and assembly under the Chinese Constitution and international law*."); ¶ 27 ("by helping the censors, and by identifying people who could be accused of anti-government speech or communication, the Defendants would be placing many *innocent individuals, who were merely expressing their views or communicating with others*, at risk of arbitrary arrest, prolonged arbitrary detention, forced labor, and torture *as a result of their lawful exercise of free speech and free association rights*"); ¶ 85 ("These acts of arbitrary arrest and long-term detention suffered by the Plaintiffs designated in this Third Claim for Relief, including arrest and detention *for an unlawful purpose in violation of the rights to freedom of speech, association, and assembly*").

[6] Article 35 of the Chinese Constitution recognizes "freedom of speech" as a right citizens enjoy, but other parts of the Constitution and PRC law limit this right and prohibit various forms of speech. Translations of these and other Chinese law sources cited in this motion are included in Appendix B accompanying this motion. See Appendix B, ex. 1, Constitution of the PRC, Articles 1, 28, 51, and 53; ex. 2, State Security Law (P.R.C), Article 4; ex. 4 Criminal Law (P.R.C.), Article 105; ex 6, Law on Protecting State Secrets (P.R.C.), Article 24; ex. 10, Management Provisions on Electronic Bulletin Services in Internet (P.R.C.), Article 9.

1
2
3

> "This court believes that freedom of speech is a political right of the citizens of China, but when exercising this right, no one may harm the interests or security of the nation, and may not use rumor mongering or defamation to incite subversion of the national regime. Therefore, the court takes note that the defense counsel takes a standpoint that only stresses the right of the accused, and ignores his duties."[7]

4      No matter how strenuous our disagreement, every sovereign nation has a right to regulate

5  speech within it borders.  *See Yahoo!, Inc. v. La Ligue Contre Le Racisme et L'Antisemitisme*, 169

6  F. Supp. 2d 1181, 1186 (N.D. Cal. 2001), *rev'd on other grounds*, 433 F.3 1199 (9th Cir. 2006)

7  (en banc).  Because American law is unique in the protections it afforded to free speech—even

8  among Western democracies—courts have recognized that our First Amendment does not reflect

9  customary international law.  *See Guinto v. Marcos*, 654 F. Supp. 276, 280 (S.D. Cal. 1986)

10 "(cited favorably by *In re Estate of Ferdinand Marcos*, 25 F.3d 1467, 1475 (9th Cir. 1994)).[8]

11      Despite all this, plaintiffs' claims all proceed from the premise that international law is

12 violated not only when the PRC acts to enforce its laws prohibiting political speech, but when

13 companies assist the PRC in enforcing these laws.[9]  Endorsement of this theory of liability

14 requires the Court to consider and declare unlawful the Chinese government's prohibitions on

15
16
17
18
19
20
21
22
23
24
25
26
27
28

---

[7] Judgment of Huang Qi, Congressional-Executive Committee on China Virtual Academy http://www.cecc.gov/pages/virtualAcad/exp/expsecurity.php

[8] *See also, e.g.*, Sionaidh Douglas-Scott, *The Hatefulness of Protected Speech*, 7 WM. & MARY BILL OF RTS. J. 305, 309 (1999) (As "Ronald Dworkin recently commented: 'The United States stands alone even among democracies, in the extraordinary degree to which its [C]onstitution protects freedom of speech and of the press.'"); Ronald J. Krotoszynski, *A Comparative Perspective on the First Amendment*, 78 TUL. L. REV. 1549 (2004) (German speech protections more limited than those in the U.S.); Caroline Uyttendaele & Joseph Dumortier, *Free Speech on the Information Superhighway*, 16 J. MARSHALL J. COMPUTER & INFO. L. 905 (1998) (free speech more limited in Europe; speech subject to restrictions when it harms the public order); Daria Vaisman, *Turkey's Restriction, Europe's Problem* ¶¶ 2-3, http://www.opendemocracy.net/ democracy-turkey/free_speech_3952.jsp (French law makes it a crime to insult foreign heads of state); Reporters Without Borders Briefs for July 2007, *Spain: Gara and Deia Journalists Now Face Charges of "Insulting King,"* http://www.rsf.org/article.php3?id_article=23090 (journalists who published satire of king "face[d] charges of 'insulting the king' under article 491 of the criminal code").

[9] *See, e.g., supra* n.5; Compl. ¶ 124 ("Defendants have also acted contrary to public policy by infringing upon the freedom of speech and expression of the general public."); *Morton Sklar on Yahoo! human rights lawsuit* (Apr. 21, 2007), http://www.brightcove.com/title.jsp?title=7693 85554&channel=27638673 (webcast at 06:23-8:16) ("The U.S. Government outlaws these kinds of behaviors [against people] who are in *favor of free press and free speech.  So when Yahoo! says that the people involved are just abiding by Chinese law, that may be the case, but the laws are unlawful in terms of U.S. and international law and U.S. law requires just the opposite. . . .* Foreign governments have the right to request information from Yahoo! pursuant to court orders . . . .  China is using it to persecute people for the communication of ideas.  And that's not something the United States government or a United States corporation should go along with.").

1    speech.  This would be a direct affront to the PRC's sovereignty.  *See Yahoo!*, 169 F. Supp. 2d at

2    1186 ("A basic function of a sovereign state is to determine by law what forms of speech and

3    conduct are acceptable within its borders.").

4         b. Judging the PRC's Treatment of Plaintiffs.  The complaint also requires the Court to

5    question the PRC's criminal cases against Wang and Shi—from the lawfulness of their arrest, to

6    the fairness of their trials and appeals, to their treatment in prison.  *See* Compl. ¶¶ 37-45, 57-63.

7    Plaintiffs allege that the PRC violated their rights at every turn: "[h]igh level officials of the PRC

8    are involved in the abuses"; the PRC is "falsely imprison[ing]" plaintiffs.  *Id.* ¶¶ 45, 141, 105-08.

9    Plaintiffs even ask this court to order defendants to take "affirmative action . . . to secure

10   [plaintiffs'] release."  *Id.* at 34 ¶ (d).  Adjudicating the legitimacy of plaintiffs' prosecution,

11   conviction, and incarceration—much less granting quasi-habeas corpus relief—openly and

12   directly challenges the PRC's sovereignty.

13        c. Judging the PRC's Ability to Gather Evidence.  Plaintiffs also seek an order that would

14   require defendants to selectively violate China's laws, including orders compelling disclosure of

15   evidence.  *See* Compl. at 6 (plaintiffs seek "injunctive relief to stop any further disclosures of user

16   information in order to prevent such . . . abuses from taking place in the future").

17        Defendants cannot be expected, let alone ordered, to violate another nation's laws.  Like

18   any sovereign state, China requires companies operating within its jurisdiction to comply with its

19   laws.  *Cf. Dayton Coal & Iron Co. v. Barton*, 183 U.S. 23, 24 (1901).  This sovereign power, as

20   has long been recognized, includes the right to compel the production of evidence.  *See Consol.

21   Rendering Co. v. Vermont*, 207 U.S. 541, 552 (1908).  Article 45 of the PRC Criminal Procedure

22   Law provides that "the public security organs shall have the authority to collect or obtain

23   evidence" in connection with investigations. [10]  Anyone who receives such a request "shall

24   provide truthful evidence," and may not "falsif[y], conceal[], or destroy[]" evidence.  Compliance

25   with these requests is mandatory and may not be challenged in the Chinese courts.[11]  It would be

---

[10] Appendix B, Tab 4.

[11] Section 2 of Article 1 of the People's Supreme Court's Judicial Interpretations on the People's Republic of China Administrative Procedure Law (Appendix B, Tab 9) specifically provides that the people' courts shall not accept cases initiated by citizens, legal persons, or other organizations

1  a serious affront to the PRC's sovereignty even to entertain the issue of whether companies can

2  disregard such requests.

3  **2.  The *Sabbatino* Factors All Favor Dismissal**

4  Courts consider four factors in determining whether to dismiss on "act of state" grounds:

5  - *First*, courts examine the "degree of codification or consensus concerning [the]

6  particular area of international law." *Sabbatino*, 376 U.S. at 428.  The less consensus,

7  the stronger the argument is for declining jurisdiction.

8  - *Second*, courts consider the case's impact on "foreign relations"; the greater the

9  impact, the greater the "justification" for dismissing the case. *Id*.

10  - *Third*, a court has greater authority to hear a case if "the government which

11  perpetrated the challenged act of state is no longer in existence." *Id*.

12  - *Fourth*, courts in the Ninth Circuit consider "whether the foreign state was acting in

13  the public interest." *Liu v. Republic of China*, 892 F.2d 1419, 1432 (9th Cir. 1989).  If

14  the state was so acting, the court has less leeway to proceed with the case.[12]

15  *The First Factor*.  There is nothing remotely close to "codification or consensus" under

16  international law to support plaintiffs' claims. *Sabbatino*, 376 U.S. at 428.  As explained in

17  Section V.E, *infra*, U.S., California, and international law all treat communications with law

18  enforcement officials as privileged acts that cannot give rise to liability.  It is likewise an axiom

19  of international law that "a state may not require a person . . . to refrain from doing an act in

20  another state that is required by the law of that state."  RESTATEMENT (THIRD) OF FOREIGN

21  RELATIONS § 441 (1987).  The first *Sabbatino* strongly favors dismissal.

22  *The Second Factor*.  The implications of this case for foreign relations—the most

23  important *Sabbatino* factor, *see Doe v. Qi*, 349 F. Supp. 2d 1258, 1296 (N.D. Cal. 2004)—can

24  _____

25  concerning the acts of state public security agencies and state security bureaus that are authorized
by the PRC Criminal Procedure Law.  Article 28 of Provisions on the Procedures for the
Handling of Administrative Review Cases by Public Security Bodies states that certain cases,

26  including "objections concerning criminal judicial acts such as compulsory measures and criminal
investigation measures carried out in accordance with laws in criminal cases" may not be heard.

27  [12] Although it militates in favor of dismissal, defendants disagree that this fourth factor is an
appropriate consideration under *Sabbatino*.  Because Ninth Circuit law included it, defendants

28  simply note their objection to preserve it.

1  hardly be overstated.  A cornerstone of U.S. foreign policy is maintaining strong and carefully

2  managed relations with the PRC.[13]  Unlike rogue or smaller states, often implicated in ATS cases,

3  China is a world power, a significant trading partner, and a fellow permanent member of the U.

4  N. Security Council.[14]  It can be expected to act decisively in protecting its sovereignty and

5  guarding against perceived encroachments on its authority.[15]  Both the Executive Branch and

6  China have expressed the strong view that the United States must manage its relations with the

7  PRC without interference from the courts.[16]

8          Though openly critical of China's human rights record, the United States has made the

9  policy judgment to actively engage China, promote investment there by American companies,

10  and take a "carrot" rather than "stick" approach to urging reform.[17]  As the Executive Branch has

11  consistently urged, ATS cases can threaten U.S. foreign policy toward countries like China,

12

13  [13] *See, e.g.*, Robert B. Zoellick, Deputy Sec'y of State, *Whither China: From Membership to Responsibility?*, Remarks to National Committee on U.S.-China Relations (Sept. 21, 2005), *available at* http://www.state.gov/s/d/former/zoellick/rem/53682.htm.

14  [14] *See, e.g.*, Thomas J. Christensen, Deputy Assistant Sec'y for East Asian and Pacific Affairs,

15  U.S.-China Relations, Statement Before the House Committee on Foreign Affairs, Subcommittee on Asia, the Pacific and the Global Environment (Mar. 27, 2007), http://www.state.gov/p/eap/rls/rm/2007/82276.htm; Evans J.R. Revere, Acting Assistant Sec'y for East Asian and Pacific

16  Affairs, *The Bush Administration's Second-Term Foreign Policy Toward East Asia*, Remarks to Center for Strategic Int'l Studies Conference (May 17, 2005),

17  http://www.state.gov/p/eap/rls/rm/2005/46420.htm; UN Security Council, Membership in 2007, http://www.un.org/sc/members.asp.

18  [15] *See, e.g.*, U.S. Dep't of State, Bureau of East Asian and Pacific Affairs, *Background Note:*

19  *China* (Jan. 2007), http://www.state.gov/r/pa/ei/bgn/18902.htm.

20  [16] *See, e.g.*, Ex. E (Statement of Interest of the United States, *Doe v. Qi*, Case No. C02 0672 CW (EMC), Tab A at 2-3, 7 (filed Jan. 16, 2004) (condemning human rights abuses by PRC, but urging that diplomatic means are far more effective than litigation)); Ex. F (Letter from Hon. John

21  B. Bellinger III to Hon. Peter D. Keisler re: *Li Weixum, et al. v. Bo Xilai*, No. 1:04CV00649 (DDC) at 2-3 (July 24, 2006) (same)).

22  [17] *See, e.g.*, *id.*; William J. Clinton, Remarks by the President at Signing of China Permanent Normal Trade Relations (Oct. 10, 2000), http://www.clintonfoundation.org/legacy/101000-

23  speech-by-president-at-signing-of-china-pntr.htm ("the more China opens its markets, the more it unleashes the power of economic freedom, the more likely it [will] be more fully liberate the

24  human potential of its people"); U.S. Dep't of State, Bureau of East Asian and Pacific Affairs, Background Note: China (Jan. 2007), http://www.state.gov/r/pa/ei/bgn/18902.htm ("*For seven*

25  *consecutive administrations, U.S. policy has been to encourage China's opening and integration into the global system.*  As a result, China has moved from being a relatively isolated and poor

26  country to one that is a key participant in international institutions . . . .  The State Department's annual China human rights and religious freedom reports have noted China's well-documented

27  abuses of human rights . . . . .  At the same time, *China's economic growth and reform since 1978 has improved dramatically the lives of hundreds of millions of Chinese, increased social mobility,*

28  *and expanded the scope of personal freedom.*").

1  where "constructive [economic] engagement has been advocated as a means of advancing human

2  rights." Ex. D (*Doe v. Unocal*, Supp. Br. for the U.S. as Amicus Curiae, Case No. 00-56603 at

3  12-13 (9th Cir. Aug. 25, 2004).

4      This case is a prime example. It is an admitted effort by plaintiffs and their counsel to

5  "convince other U.S. companies to think twice before doing business with the Chinese

6  government."[18] Indeed, the very purpose of this lawsuit is to attack specific laws in China and the

7  PRC's ability and authority to enforce them.

8      This Court's opinion and analysis in *Doe v. Qi* are instructive. In *Qi*, 349 F. Supp. 2d at

9  1264, plaintiffs sued two PRC officials, accusing them of commanding the torture of proponents

10  of Falun Gong. After considering the views of the U.S. and Chinese governments regarding the

11  policy impact of the case, the Court declined to dismiss the case in its entirety, choosing instead

12  to craft a narrow default judgment affording limited declaratory relief. *See id.* at 1266. The

13  Court reasoned that the PRC officials' acts of torture so clearly violated Chinese and international

14  law, as well as U.S. policy statements condemning such torture, that it would not contradict U.S.

15  foreign policy to declare that the two officials had deviated from these norms. *See id.* at 1266-

16  67.

17      Here, based on plaintiffs' strategic framing of their complaint, no such compromise is

18  available. Plaintiffs have chosen not to name the PRC, PRC prison guards, or PRC law

19  enforcement personnel as defendants. But considering a declaration on whether defendants did

20  anything wrong—let alone the monetary and injunctive relief plaintiffs seek—does not obviate

21  litigating the legitimacy of Chinese laws regulating speech and the PRC's ability to enforce them.

22  Undertaking such litigation might well be viewed as a profound rebuke of the PRC and risk

23  poisoning U.S. relations with a significant world power. It might also provoke the PRC into

24  precipitously reacting to the perceived encroachment by cracking down more harshly on political

25  speech or even harming plaintiffs. *Cf. Sabbatino*, 376 U.S. at 423 (act-of-state doctrine rests on

26

27  ────────────
[18] World Organization for Human Rights USA, "Major lawsuit filed by Human Rights USA
    against Yahoo! highlights the internet company's complicity in human rights abuses in China,
28  (Apr. 18, 2007), http://humanrightsusa.blogspot.com/search/label/human%20rights.

1    the "strong sense of the Judicial Branch that its engagement in the task of passing on the validity

2    of foreign acts of state may hinder rather than further this country's pursuit of goals both for itself

3    and for the community of nations").

4         In contrast to *Qi*, the policy implications of this case extend well beyond a mere

5    reaffirmation that the United States condemns torturing political dissidents.  Entertaining this

6    lawsuit may invite challenges to U.S. policy and threaten American law enforcement efforts.  For

7    example, were this Court to rule, as plaintiffs request, acted wrongfully in respecting the PRC's

8    official requests for evidence, nothing would stop courts in other countries from issuing similar

9    rulings about American processes and laws.  A court in France could issue an injunction

10   mandating that French companies doing business in America refuse to provide evidence in cases

11   where the defendant might be subject to the death penalty.  The Executive Branch is clearly

12   opposed to inviting such responses and has recognized this as a real threat.  *See* Ex. E (Statement

13   of Interest of U.S., *Doe v. Qi* at 8 (death penalty example)); Ex. G (*Matar v. Dicther*, Case No. 05

14   Civ. 10270 (WHP), Statement of Interest of the U.S. at 22 (S.D.N.Y. Nov. 29, 2006).  Similarly,

15   corporations doing business in the United States could reasonably fear that complying with

16   American requests for information might subject them to civil liability in the United States or

17   abroad.  Suits under the ATS challenging the U.S. "War on Terror," *see* Scott Shane, *Suit Over*

18   *C.I.A. Program*, N.Y. TIMES, May 31, 2007, are one recent example.  To follow the path plaintiffs

19   urge would seriously risk undermining U.S. law enforcement efforts.

20        These policy concerns dramatically distinguish this case from *Qi*, where the defendants

21   were accused of engaging in and commanding acts of universally condemned violence, or the

22   more typical ATS case where a corporate defendant is accused of hiring rogue military forces to

23   commit abuses on its behalf to protect a major infrastructure project.  Here, the issue is whether

24   defendants violated international, U.S., and California law by complying with Chinese law in

25   connection with a criminal investigation.  American courts cannot be placed in the position of

26   deciding whether law enforcement activities carried out by a foreign state are illegitimate—at

27   least not without significantly jeopardizing U.S. foreign relations and law enforcement interests.

28   For these reasons, the second and "central" *Sabbatino* factor mandates dismissal.

1    *The Third Factor.*  As this Court held in *Qi*, 349 F. Supp. 2d at 1303, the third *Sabbatino*

2    factor "clearly weighs in favor of applying the act of state doctrine," because "the PRC still

3    exist[s]."  Nor is there any evidence that the PRC has retreated from or repudiated its position that

4    plaintiffs should be incarcerated or that it has a right to enforce its own criminal laws.  *Cf. Bigio*

5    *v. Coca-Cola Co.*, 239 F.3d 440, 453 (2d Cir. 2000) (declining to dismiss under act-of-state

6    doctrine where government  "ha[d] apparently repudiated the acts in question").

7    *The Fourth Factor.*  This final factor—"whether the foreign state was acting in the public

8    interest," *Liu*, 892 F.2d at 1432—also favors dismissal.  The creation and enforcement of laws

9    regulating speech within a sovereign's borders are quintessentially acts of a sovereign serving the

10    public's interest.  *See Yahoo!*, 169 F. Supp. 2d at 1186.  That the government is China and the

11    laws are inimical to our beliefs does not change the analysis or conclusion.  *Cf. In re Quarles*, 158

12    U.S. 532, 535-36 (1895) ("It is the duty and the right . . . of every citizen to assist in prosecuting,

13    and in securing the punishment of, any breach of the peace of the United States.").

14    Again, *Qi* is instructive.  This Court rejected the argument that torture and arbitrary

15    detention of Falun Gong members were actions in the public interest, even though the PRC had

16    argued they posed a threat to public health and safety.  *See Qi*, 349 F. Supp. 2d at 1306.  Unlike

17    *Qi*, this case implicates not only the PRC's treatment of political dissidents, but also the propriety

18    of China's laws regulating speech, the right of the PRC to compel assistance to enforce its laws,

19    and ultimately the independence of the sovereign government of China.

20    **B.    This Case Should Be Dismissed Under Principles Of International Comity**

21    Comity counsels courts to decline jurisdiction in cases that call into question executive,

22    legislative, or judicial acts of foreign states.  *See Societe Nationale Industrielle Aerospatiele v.*

23    *United States Dist. Court for the Dist. of Iowa*, 482 U.S. 522, 544 n.27 (1987).  The Restatement

24    (Third) of Foreign Relations Law, sets forth eight factors to determine "[w]hether exercise of

25    jurisdiction over a person or activity is unreasonable."  Restatement, *supra*, § 403.[19]  All eight

26    ─────────────────────────
[19] (a) the link of the activity to the territory of the regulating state, *i.e.,* the extent to which the

27    activity takes place within the territory, or has substantial, direct, and foreseeable effect upon or in the territory;

28    (b) the connections, such as nationality, residence, or economic activity, between the regulating state and the person principally responsible for the activity to be regulated, or between that state

1   factors militate against exercising jurisdiction in this case:

2       • The first two factors are satisfied because the indisputable locus of this case is China.

3           *See id.* at § 403(a), (b).

4       • The third, fifth, and sixth factors are satisfied because evidence-gathering laws are

5           "traditional" and important parts of law enforcement efforts the world over. *See id.* at

6           § 403(c), (e), (f). The PRC's prohibitions on speech, while misguided, are not

7           uncommon, and a sovereign's ability to legislate and enforce its own laws is both

8           "generally accepted" and an important part of the "international political, legal, [and]

9           economic system." *Id.* at § 403(c), (e).

10      • The fourth factor is satisfied because companies doing business abroad have a

11          "justified expectation" that they should comply with local law. *Id.* at § 403(d).

12          Plaintiffs' own authorities recognize companies are "obliged" to do so. Human Rights

13          Watch Letter at 2 ¶ 3 (quoted in Compl. ¶ 27). The U.S. government mandates

14          compliance as well. *See* BUREAU OF ECONOMIC AND BUSINESS AFFAIRS, OECD

15          GUIDELINES FOR MULTINATIONAL ENTERPRISES 5 (2002).

16      • The seventh and eighth factors are satisfied because the PRC has an exceedingly

17          strong interest in compliance with its sovereign orders. See RESTATEMENT, *supra*, §

18          403(g), (h). Other sovereign states would no doubt object to an American court

19          prescribing which laws American companies (*e.g.*, Yahoo!), and foreign companies

20          (*e.g.*, YHKL) must obey when doing business in countries other than the U.S. *See id.*

21          §§ 403(g), (h); *Rivendell Forest Prods., Ltd. v. Canadian Forest Prods.*, 810 F. Supp.

22          1116, 1119 (D. Colo. 1993).

23

24      and those whom the regulation is designed to protect;
        (c) the character of the activity to be regulated, the importance of regulation to the regulating
25      state, the extent to which other states regulate such activities, and the degree to which the
        desirability of such regulation is generally accepted;
26      (d) the existence of justified expectations that might be protected or hurt by the regulation;
        (e) the importance of the regulation to the international political, legal, or economic system;
27      (f) the extent to which the regulation is consistent with the traditions of the international system;
        (g) the extent to which another state may have an interest in regulating the activity;
28      and
        (h) the likelihood of conflict with regulation by another state.

1    **C.    This Case Should Be Dismissed Under The Political Question Doctrine**

2    This case presents a nonjusticiable "political question," *Vieth v. Jubelirer*, 514 U.S. 267,

3    277-78 (2004), and should be dismissed because it "challenges the official acts of an existing

4    government in a region where diplomacy is delicate and U.S. interests are great." *Corrie*, 403 F.

5    Supp. 2d at 1032.  In cases that "touch on foreign relations," the political question doctrine

6    requires the Court to undertake a "discriminating analysis of the particular question posed, in

7    terms of the history of its management by the political branches, of its susceptibility to judicial

8    handling in light of its nature and posture." *Baker v. Carr*, 369 U.S. 186, 211-12 (1962).

9    Consideration of the traditional "political question" factors set forth in *Baker v. Carr*,

10    confirm that this case should be dismissed.  First, management of foreign relations is plainly

11    "commit[ed]" to the coordinate "political branches." *Id.* at 217; *American Ins. Ass'n v.*

12    *Garamendi*, 539 U.S. 396, 414 (2003); *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363,

13    383-86 (2000).  Second, this court could not entertain plaintiffs' complaint without expressing a

14    "lack of respect" for Executive Branch policy toward China, *Baker*, 369 U.S. at 217, which

15    disfavors lawsuits such as this one, encourages investment, encourages compliance with local

16    law, and elects to use diplomatic pressure to improve human rights. *Cf. Corrie*, 403 F. Supp. 2d

17    at 1032 ("For this court to preclude sales of Caterpillar products to Israel would be to make a

18    foreign policy decision and to impinge directly upon the prerogatives of the executive branch of

19    government.").  Third, were it allowed to proceed, this lawsuit would represent "multifarious

20    pronouncements by various departments on one question." *Baker*, 369 U.S. at 217.

21    "Dismissal is appropriate if *any one* of these . . . factors is 'inextricable' from the case."

22    *Corrie*, 403 F. Supp. 2d at 1032 (quoting *Alperin*, 410 F.3d at 544); *Joo v. Japan*, 413 F.3d 45,

23    49-53 (D.C. Cir. 2005).  Here, all three factors are present; practical concerns, which help guide

24    the political question analysis, also counsel in favor dismissal.  Given Shi's and Wang's

25    unavailability to give testimony in this case, the parties' inability to depose PRC officials

26    regarding plaintiffs' allegations, and the unavailability of other witnesses and documents in

27    China, *see* Def. Yahoo!, Inc.'s Mot. For An Early Case Mgmt. Conf. & Order at 6-7, 10-11 (filed

28    June 21, 2007), "there is a very real possibility that the parties might not be able to compile all the

1   relevant data, thus making any adjudication of this case both difficult and imprudent." *Anderman*

2   *v. Fed. Rep. of Austria*, 256 F. Supp. 2d 1098, 1112 (C.D. Cal. 2003); *see also O.N.E. Shipping*

3   *Ltd. v. Flota Mercante Grancocolombiana, S.A.*, 830 F.2d 449, 453 (2d Cir. 1987) (act of state

4   doctrine requires dismissal "[w]hen the causal chain between a defendant's alleged conduct and

5   plaintiff's injury cannot be determined without an inquiry into the motives of the foreign

6   government").

7   **IV.    PLAINTIFFS HAVE FAILED TO STATE A COGNIZABLE CLAIM**

8       Even if justiciable, plaintiffs' complaint  must be dismissed because it fails to state a claim

9   upon which relief can be granted.  *See* FED. R. CIV. P. 12(b)(6); *Bell Atl. Corp. v. Twombly*, 127

10  S. Ct. 1955, 1964-65 (2007).  Plaintiffs' claims under the ATS, TVPA, ECPA, and California law

11  all fail as a matter of law.  Moreover, defendants' conduct is privileged and not actionable.

12      **A.    Plaintiffs Have Failed To State A Claim Under The ATS**

13      On their face, plaintiffs' four ATS claims—the First through Fourth Claims for Relief—

14  have no basis in law.

15          **1.  Plaintiffs' Allegations Do Not Meet Sosa's "High Bar"**

16      In *Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004), the Supreme Court established a

17  framework for addressing ATS claims.  *Sosa* held that, while the ATS grants district courts

18  jurisdiction over "any civil action by an alien for a tort only, committed in violation of the law of

19  nations," 28 U.S.C. § 1350, the statute itself does not create a cause of action, *see Sosa*, 542 U.S.

20  at 713-14.  If any cause of action exists under the ATS, the law of nations must provide it.  *Sosa*

21  set a "high bar" for recognizing such claims, holding that "the ATS [may] furnish jurisdiction"

22  for only a "relatively modest set of actions."  *Id.*  at 720, 727.  As *Sosa* observed, courts "have no

23  congressional mandate to seek out and define new and debatable violations of the law of nations,"

24  such claims may have "collateral consequences" on the "foreign relations of the United States,"

25  and widespread recognition of ATS claims would permit civil suits to proliferate "without the

26  check imposed by prosecutorial discretion."  *Id.*  at 727-28.

27      To overcome *Sosa*'s high bar, plaintiffs face three burdens.  They must establish that the

28  specific facts of their case amount to a violation of "definable, universal and obligatory"

1   international norm that is "accepted by the civilized world and defined with . . . specificity." *Id.*

2   at 720, 725.  They must show that "international law extends the scope of liability for a violation

3   of a given norm *to the perpetrator being sued.*"  *Id.* at 732 & n.20.  They must overcome the

4   many prudential reasons to dismiss an ATS case, including objections from the "political

5   branches."  *See id.* at 728 n.23.  Plaintiffs meet none of these burdens.

6              **2.  The ATS Does Not Apply Extraterritorially.**

7        The text of the ATS says nothing about the statute's extraterritorial application to aliens

8   not harmed on American soil.  Absent such a "clear express[ion]" from Congress in the "language

9   of" the ATS, the statute cannot be read to apply beyond outside our nation's boundaries.  *EEOC*

10  *v. Arabian Am. Oil Co.*, 499 U.S. 244, 248 (1991).  In the wake of *Sosa*, the United States has

11  argued forcefully that the ATS should not apply where plaintiffs alleged they were harmed abroad

12  by their own governments.  *See, e.g.*, Br. of the U.S. as Amicus Curiae, *The Presbyterian Church*

13  *of Sudan v. Talisman Energy, Inc.*, Case No. 07-0016, at 5-12 (2d Cir. May 15, 2007) ("U.S.

14  Talisman Br.").  Not only does the text of the ATS *not* mention extraterritorial claims, *see id.* at

15  8-9, a review of the legislative history in 1789—when Congress enacted the ATS—shows the

16  statute was enacted to do nothing more than provide foreigners with a forum to bring suit in the

17  United States if they were injured here, *see id.* at 6-8.  Although several courts in this circuit,

18  including this one, have assumed that the ATS may apply extraterritorially, *cf. id.* at 6 n.2,

19  federal statutes should presumptively *not* be so construed, *see id.* at 9-10.

20             **3.  The Norms Plaintiffs Invoke Are Not Actionable Under The ATS.**

21       Even if the ATS applies, plaintiffs' claims for torture and cruel and inhuman punishment

22  are preempted, and their claims for free speech and forced labor cannot be recognized under *Sosa*.

23       a.  Preemption.  Plaintiffs Shi and Wang's "First and Second Claims for Relief" are for

24  "Torture" and "Cruel, Inhuman, or Degrading Treatment or Punishment" in violation of the ATS

25  and TVPA.  Compl. at 22-23.  In enacting the TVPA, Congress occupied the field and precluded

26  enforcement of these international law norms under the ATS.  *See Enahoro v. Abubakar*, 408

27  F.3d 877, 886 (7th Cir. 2005); *Corrie v. Caterpillar, Inc*., 403 F. Supp. 2d 1019, 1025 (W.D. Wa.

28  2005).  Although some courts have disagreed with this conclusion, *see, e.g.*, *Doe v. Saravia*, 348

1    F. Supp. 2d 1112, 1145 (E.D. Cal. 2004); *Aldana v. Del Monte Fresh Produce, N.A., Inc.*, 416

2    F.3d 1242, 1251 (11th Cir. 2005), no post-*Sosa* opinion to the contrary binds this court, and the

3    reasoning in *Enahoro* is most persuasive.  As *Enahoro* explained, and *Sosa* made clear:

4         "Since many attempts by federal courts to craft remedies for the violation of new
          norms of international law would raise risks of adverse foreign policy

5         consequences, they should be undertaken, if at all, with great caution." [*Sosa*, 542
          U.S. at 727-28.] It is [thus] hard to imagine that the *Sosa* Court would approve of

6         common law claims based on torture and extrajudicial killing when Congress has
          specifically provided a cause of action for those violations and has set out how

7         those claims must proceed.

8    408 F.3d at 885-86.  Shi and Wang's First and Second Claims for Relief stand or fall on whether

9    they can meet the standards Congress set forth in TVPA.  Plaintiffs' failure to state a claim under

10   the TVPA, and their torture claims specifically, are addressed in Sections IV.C and VII.B, *infra*.

11        b.  Free Speech.  Shi and Wang's "Third Claim for Relief" is for "Arbitrary Arrest and

12   Prolonged Detention."  Compl. at 24-25.  The complaint alleges plaintiffs were wrongly arrested

13   and detained "for an unlawful purpose in violation of the rights to freedom of speech, association,

14   and assembly" and because of their "participation in, and support of, the peaceful exercise of their

15   rights of free speech and free association."  *Id.* ¶¶ 85-86.  As explained above, the right to free

16   expression is not guaranteed in China, *see, e.g., People's Republic of China v. Huang Qi*

17   (Chengdu Munic Intermediate People's Court, Feb. 22, 2003), many parts of the Western world,

18   *see, e.g.*, Douglas-Scott, *supra*, at 309, or by the law of nations, *see Guinto v. Marcos*, 654 F.

19   Supp. 276, 280 (S.D. Cal. 1986).

20        *Sosa* instructs that "federal courts should not recognize private claims under federal

21   common law for violations of any international law norm with less definite content and

22   acceptance among civilized nations than the historical paradigms familiar when [the ATS] was

23   enacted."  542 U.S. at 732.  Plaintiffs' arbitrary detention claim, which rests on the premise that

24   plaintiffs may not be incarcerated for engaging in political speech, comes nowhere close.

25        *Sosa*, 542 U.S. at 730-31, pointed to the Supreme Court's definition of the law of piracy in

26   *United States v. Smith*, 5 Wheat. 153 (1820), as an example of the "specificity with which the law

27   of nations" must be defined before courts recognize a claim under the ATS.  In *Smith*, the Court,

28   listing 20 pages of citations dating back centuries, noted that  "[t]here is scarcely a writer on the

1    law of nations who does not allude to piracy as a crime of *settled and determinate* nature; and

2    whatever may be the diversity of definitions, in other respects, *all* writers concur in holding that

3    robbery, or forcible depredations upon sea, *animo furandi*, is piracy." *Id.* at 161.  There is no

4    such international consensus either *protecting* the right to engage in political speech or

5    *prohibiting* nations from criminalizing it.

6        c. Forced Labor.  Plaintiff Shi's "Fourth Claim for Relief" is for "Forced Labor."  Compl.

7    ¶¶ 91-96.  However, the complaint fails to describe what labor Shi was forced to do and instead

8    describes the conditions at his prison generally.  *See id.* ¶ 66.  As this Court and others have

9    recognized, "whether a claim under the [ATS] lies . . . turns on whether the specific facts (not the

10   general characterization of the claim) violates international norms."  *Qi*, 349 F. Supp. 2d at 1278;

11   *Sosa*, 542 U.S. at 737-38 (while "some policies of arbitrary detentions" might be actionable,

12   plaintiffs' detention was not); *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82,

13   93-94 (D.C. Cir. 2002); *see also Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1964-65 (2007) [a]

14   formulaic recitation of the elements of a cause of action will not do.").

15       Shi's claim must also be rejected because forced labor in prison, however offensive, is far

16   from universally condemned.  There is no "settled and determinate" definition of forced labor on

17   which "all writers concur."  *Smith*, 5 Wheat. at 161.  Plaintiffs rely on the definition found in the

18   1930 Forced Labor Convention of the International Labor Organization, *see* Compl. ¶69 (f), but

19   the Convention's broad definition ("all work or service which is extracted from any person under

20   the menace of penalty and for which said person has not offered himself voluntarily," Convention

21   art. 2), is riddled with exceptions, including one for prison labor.[20]  The Supreme Court of the

22

---

23   [20] *See, e.g., id.* art. 2 (excluding from definition "[a]ny work or service exacted from any person
     as a consequence of a conviction in a court of law, provided that the said work or service is
24   carried out under the supervision and control of a public authority and that the said person is not
     hired to or placed at the disposal of private individuals, companies or associations"); *see also id.*
25   art. 7 (permitting local "chiefs" to "have recourse to forced or compulsory labour") *id.* art. 10
     (permitting forced labor "exacted as a tax"); *id.* art. 18 (permitting forced labor "for the transport
26   of persons or goods, such as the labor of porters or boatmen").  In fact, as abhorrent as it is to
     some, forced prison labor is constitutional in the United States.  *See Pollock v. Williams*, 322 U.S.
27   4, 17-18 (1944) ("Forced labor in some special circumstances may be consistent with the general
     basic system of free labor.  For example, forced labor has been sustained as a means of punishing
28   crime, and there are duties such as work on highways which society may compel.").

1    Netherlands has held that the ILO's definition of "forced and compulsory labour" did not

2    "contain[] norms that are so precisely defined as to be eligible by virtue of their content for direct

3    application and hence to be capable of being binding on all persons." *E.O. v. Openbaar*

4    *Ministerie*, HR 18 Apr. 1995, NJ 1995, 619, *reproduced in* 28 NETH. Y.B. INT'L L. 336-38

5    (1997).  Even if the ILO Convention's definitions were precise enough, *Sosa* held that such

6    conventions are not "self-executing" and do not "create obligations enforceable in the federal

7    courts."  *Sosa*, 542 U.S. at 735.

8        To be actionable under the ATS, an alleged tort *cannot* involve the violation of any norm

9    with "less . . . acceptance among civilized nations than the historical paradigms."  *Sosa*, 542 U.S.

10   at 732.  Blackstone, writing in the era the ATS was enacted, *see id.* at 714-15, concluded that the

11   only international law violations recognized were those "in which *all* the learned of *every* nation

12   agree."  4 W. BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND 67 (1769) at 67.  The

13   ILO Convention on which plaintiffs rely does not reflect universal consensus: the United States

14   has not ratified it; nor have China, South Korea, or several other nations.[21]

15                  **4.  Defendants Cannot Be Held Liable On Plaintiffs' ATS Theories**

16       Even recognizing the norms plaintiffs assert: (a) these norms (torture, *etc.*) apply only to

17   *states*, not private actors like defendants; and (b) defendants cannot be held liable on aiding-and-

18   abetting theory.  As *Sosa* makes clear, in evaluating whether to permit ATS liability, courts must

19   ask "whether international law extends the scope of liability for a violation of a given norm *to the*

20

21   _____
     [21] *See* "Ratifications Of The Fundamental Human Rights Conventions By Country,"
     http://www.ilo.org/ilolex/english/docs/declworld.htm.  The absence of a universal norm

22   prohibiting forced labor is only underscored by its absence among international law violations in
     the *Restatement (Third) of Foreign Relations Law of the United States*.  In *Sosa*, 542 U.S. at 737,

23   the Court looked to Section 702 of the *Restatement* to determine whether the arbitrary arrest at
     issue in the case was actionable.  *Sosa* rejected plaintiffs' claim even though prolonged arbitrary

24   detention is included in Section 702, reasoning that that claim "expresse[d] an aspiration that
     exceeds any binding customary rule having the specificity we require."  *Id.* at 738.  Section 702

25   contains no mention of forced labor; and in 1993, it was practiced in more than 40 countries,
     including Brazil, China, India, Pakistan, and Bulgaria.  *See* 1993 Country Reports on Human

26   Rights Practices, Bureau of Democracy, Human Rights, and Labor, U.S. Department of State
     (Jan. 31, 1994), http://dosfan.lib.uic.edu/ERC/democracy/1993_hrp_report/93hrp_report_toc.html  That a rule

27   of international law "as stated is . . . far from full realization . . . is evidence against its status as
     binding law; and an even clearer point against the creation by judges of a private cause of action

28   to enforce the aspiration behind the rule claimed."  *Sosa* 542 U.S. at 738 n.29.

1   *perpetrator being sued, if the defendant is a private actor such as a corporation.*"  *Id.*  at 732

2   n.20.

3          a.  State Action.  International law generally applies only to nations, not to private parties.

4   *See* RESTATEMENT, *supra*, Part I, ch. 1, intro. note; *In re Estate of Marcos Human Rights Litig.*,

5   978 F.2d 493, 501-02 (9th Cir. 1992).  Although some courts have expanded international law to

6   cover *private* violations of an extremely narrow list of norms, there is little dispute that the four

7   norms alleged by plaintiffs apply *only* to states:

8       •   The *Restatement* lists "piracy, slave trade, attacks on or hijacking of aircraft, genocide,

9           war crimes, and perhaps certain acts of terrorism" as the only offenses for which

10          individuals may be held liable under international law.  RESTATEMENT, *supra*, § 404.

11      •   Several courts have held that *private* actors may *not* be held liable for torture.[22]

12      •   Courts have rejected arbitrary imprisonment claims against non-state actors.[23]

13      •   Courts do not, and should not, recognize international law claims against private

14          corporations for cruel punishment, violations of free speech rights, or forced labor.

15         b.  Aiding and Abetting.  As the Executive Branch and courts and scholars who read *Sosa*

16  correctly have rightly concluded, there is no civil aiding-and-abetting liability under the ATS.[24]

17  Even accepting such a theory, defendants' conduct does not qualify—plaintiffs do not allege that

18  defendants *intended* to harm plaintiffs.

19  ───────────────
    [22] *See, e.g.*, *Kadic v.Karadzic*, 70 F.3d 232, 243 (2d Cir. 1995); *Tel-Oren v. Lybian Arab*
20  *Republic*, 726 F.2d 774, 795 (D.C. Cir. 1984) (Edwards, J., concurring); *Ibrahim v. Titan Corp.*,
    391 F. Supp. 2d 10, 14-15 (D.C. D.C. 2005); *Abdullahi v. Pfizer, Inc.*, 2002 WL 31082956, at *5
21  (S.D.N.Y. Sept. 17, 2002).
    [23] *See Wiwa v. Royal Dutch Petroleum*, 2002 U.S. Dist. LEXIS 3293 at *37-40 (S.D.N.Y. 2002).
22  [24] *See* U.S. Talisman Br. at 12-28; Curtis A. Bradley et al., Sosa, *Customary International Law*
    *and the Continuing Relevance of* Erie, 120 HARV. L. REV. 870, 924-29 (2007); *Exxon*, 393 F.
23  Supp. 2d at 24; *In re South Af. Apartheid Litig.*, 346 F. Supp. 2d 538, 549-51 (S.D.N.Y. 2004).
           Some courts have held to the contrary, *see, e.g.*, *Presbyterian Church of Sudan v.*
24  *Talisman*, 453 F. Supp. 2d 633 (S.D.N.Y. 2006), but whether such a norm exists is an open
    question in the Ninth Circuit.  In *Rio Tinto*, a panel majority initially concluded that "post-*Sosa*,
25  claims for *vicarious liability* for violations of *jus cogens* norms *are actionable* under the [ATS]."
    *Sarei v. Rio Tinto*, 456 F.3d 1069, 1078 (9th Cir. 2006) (underline added).  But on rehearing, the
26  panel modified its opinion and expressly declined to resolve the question.  *See Sarei v. Rio Tinto*,
    487 F.3d 1193, 1203 (9th Cir. 2007).  On August 20, 2007, the Ninth Circuit granted petition for
27  rehearing en banc and vacated the panel majority's opinion.  *See* Ex. H (Order).  It is unclear
    whether the Ninth Circuit will address vicarious liability issues, the "exhaustion" issue that was
28  the subject of a lengthy dissent, or something else.

1    The text of the ATS, principles of statutory construction, practical considerations, and

2    international law all militate against finding aiding-and-abetting liability under the ATS.  The text

3    of the ATS contains no express provision for aiding and abetting liability.  *See* 28 U.S.C. § 1350.

4    But the Congress that enacted the ATS knew how to create secondary liability.  The year after it

5    enacted the ATS, "Congress enacted a criminal statute containing specific provisions for indirect

6    liability—for example, for aiding or assisting piracy."  Bradley, *supra*, at 926 & n.296 (citing Act

7    of Apr. 30, 1790, ch. 9, § 10, 1 Stat. 112, 114.  The ATS is bereft of such language.

8    And courts may not read secondary liability into federal statutes, *see Central Bank of*

9    *Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994), especially in ATS

10   cases.  In *Central Bank*, the Supreme Court refused to read civil aiding-and-abetting liability into

11   the federal securities statute.  In doing so, the Court reasoned that while Congress has passed a

12   general *criminal* aiding and abetting statute, 18 U.S.C. § 2, it "has *not* enacted a general civil

13   aiding and abetting statute—either for suits by the Government . . . or for suits by private parties."

14   *Central Bank*, 511 U.S. at 176, 182.  While in *criminal* law, "aiding and abetting is an ancient . . .

15   doctrine," in civil cases, "the doctrine has been at best uncertain in application" and its

16   recognition would be "a vast expansion of federal law."  *Id.* at 181, 183.  Moreover, *Sosa*

17   repeatedly emphasized that only a "modest number" of claims could be brought under the ATS

18   without legislative authorization and made clear that any "innovative" interpretations of the Act

19   must be left to the legislative process.  *See* 542 U.S. at 730-731.  Thus, to endorse civil aiding-

20   and-abetting liability in ATS cases would violate both the command of *Sosa* and of *Central*

21   *Bank*.[25]

22   Recognizing such claims would also harm U.S. policy interests.  The Executive Branch

23   has rejected the aiding-and-abetting theory plaintiffs advance, *see* U.S. Talisman Br. at 12-28, in

24

25   [25] *See, e.g.*, *In re S. Afr. Apartheid Litig.*, 346 F. Supp. 2d 538, 550-51 (S.D.N.Y. 2004), *appeal pending sub nom. Khulumani et al. v. Barclay Nat'l Bank Ltd., et al.*, No. 05-2141 (2nd Cir.
26   2005) (*Central Bank* applies "with special force" in the ATS context; recognizing aiding-and-abetting liability "without congressional mandate, in an area that is so ripe for non-meritorious
27   and blunderbuss suits would be an abdication of this Court's duty to engage in 'vigilant door keeping'" and would be inconsistent with the "'restrained conception' of new international law
28   violations that the Supreme Court has mandated for the lower federal courts").

C07-02151 CW
YAHOO!'S MOT. TO DISMISS SEC. AM.          - 21 -
COMPL.

1    part, because it poses such significant policy concerns:

2        [C]ivil aiding and abetting . . . liability would inevitably lead to greater diplomatic
         friction for the United States.  Such liability would trigger a wide range of ATS suits
3        with plaintiffs challenging the conduct of foreign nations—conduct that would
         otherwise be immune from suit under the Foreign Sovereign Immunities Act. . . .
4

5    *Id.* at 19-22.  The Court has said such policy views must be given "serious weight."  Order at 7.

6        Civil aiding-and-abetting liability is equally disfavored under international law.  Notably,

7    none of the international law sources on which plaintiffs rely mentions the theory.  *See* Compl.

8    ¶ 69.  That is also not surprising.  As one group of scholars recently and rightly observed:

9        The Court in *Sosa* rejected an arbitrary detention claim under the ATS [even
         though it was a norm expressed in several treaties and other documents]. . . *There
10       is no relevant treaty that embraces aiding and abetting liability for corporations,
         the* Restatement *says nothing about such liability, and there is no widespread state
11       practice of imposing liability on corporations for violations of international
         human rights law.*  To paraphrase *Sosa*, that a rule of corporate liability is so far
12       from full realization is evidence against its status as binding law and even stronger
         evidence against the creation by judges of a private cause of action to enforce the
13       aspiration behind the rule.

14   Bradley et al., *supra*, at 927-28.[26]

15       Even if, in theory, corporate actors could be held liable for aiding and abetting under the

16   ATS, defendants may not be held liable here.  Under any ATS theory, plaintiffs must establish

17   that defendants' conduct violated "norm[s] of international character accepted by the civilized

18   world."  *Sosa*, 542 U.S. at 725.  As explained in Section V.E, *infra*, defendants' alleged acts of

19   aiding and abetting are privileged by U.S. federal, U.S. state, and a wide variety of international

20   [26] Plaintiffs will no doubt cite statutes establishing international *criminal* tribunals that recognize
     aiding-and-abetting liability.  *See* Rome Statute of the International Criminal Court ("ICC") art.
21   25(1), July 17, 1998, 2187 U.N.T.S. 90; Statute of the International Criminal Tribunal for the
     Former Yugoslavia ("ICTFY"), S.C. Res. 827, arts. 2-5, U.N. Doc. S/RES/827 (May 25, 1993);
22   Statute of the International Criminal Tribunal for Rwanda, S.C. Res. 955, arts. 2-4, U.N. Doc.
     S/RES/955 (Nov. 8, 1994).  But as *Central Bank* explains, these tribunals' recognition of the
23   "ancient doctrine" of *criminal* aiding-and-abetting liability is a far cry from recognizing *civil*
     liability.  Moreover, even if these criminal law sources were valid evidence of *civil* liability, they are
24   too unspecific to be actionable under *Sosa*.  Some tribunals permit aiding-and-abetting liability if
     defendant had knowledge of the principal's violation; others require defendant to have intended to
25   further the violation.  *See* Bradley, *supra*, at 927 (comparing ICTFY with ICC).  Further, "none of
     the modern international criminal tribunals extends criminal liability *to corporations*," and "the
26   state parties to the relatively recent [ICC] negotiations *considered and rejected* international
     criminal liability for *corporations*."  *Id*. at 925 n.292; *see id*. at 927.  These conflicting standards,
27   which only undercut plaintiffs' efforts to hold defendants liable, come nowhere close to the
     "settled and determinate" definitions on which the Supreme Court said one must rely to conclude
28   that "all nations" and "all persons" recognize a particular norm.  *Smith*, 5 Wheat. at 161-62.

1    law.  Because there is no allegation that defendants *intended* harm to plaintiffs, plaintiffs' aiding-

2    and-abetting theory fails.  Even those courts that wrongly recognize the theory hold that it *only*

3    applies if "the defendant knew of the [principal's] specific violation," and "acted with the *intent*

4    to assist that violation."  *The Presbyterian Church of Sudan, v. Talisman Energy, Inc.*, 453 F.

5    Supp. 2d 633, 668 (S.D.N.Y. 2006).  Courts have refused to find such intent even where the

6    defendant is accused of actively working with a local, repressive, military government to protect

7    defendants' oil extraction business.  *See id.*  Here, the allegations come nowhere close.

8              **B.       Plaintiffs Have Failed to State a Claim Under the TVPA**

9         Plaintiffs' TVPA claims fail for similar reasons.  First, plaintiffs' Third and Fourth Claims

10   for Relief—for arbitrary arrest and forced labor, which plaintiffs bring, in part, under the TVPA,

11   *see* Compl. at 25-26—may not be brought under the statute.  By its plain terms, the TVPA

12   provides a remedy for "torture," *not* arbitrary arrest or forced labor.[27]

13        Second, all of plaintiffs' TVPA claims fail because the TVPA applies only to individuals,

14   *not* corporations.  The statutory text imposes liability on an "*individual* who, under actual or

15   apparent authority, or color of law, of any foreign nation . . . subjects an *individual* to torture."  28

16   USC 1350, note.  Because a corporation cannot be subjected to "torture," and because the same

17   word used in the same statute must be given the same meaning, "individual" in section 1350 does

18   not include "corporations," as numerous courts have recognized.  *See, e.g.*, *Mujica v. Occidental*

19   *Petroleum Corp.*, 381 F. Supp. 2d 1164, 1175-76 (C.D. Cal. 2005); *Doe I v. Exxon Mobil Corp.*,

20   393 F. Supp. 2d 20, 28 (D.D.C. 2005); *Arndt v. UBS AG*, 342 F. Supp. 2d 132, 141 (S.D.N.Y.

21   2004); *but see Aldana*, 416 F.3d at 1249-50.

22        Third, properly construed, the TVPA does not impose aiding-and-abetting liability.  By its

23   plain terms, the TVPA applies only to individuals who "subject[]" others to torture, 28 U.S.C.

24

---

25   [27] *See* P.L. 102-256, 106 Stat. 73 at § 2(a) (codified at 28 U.S.C. § 1350, note) (creating liability
     for "[a]n individual who, under actual or apparent authority, or color of law, of any foreign
26   nation" subjects "an individual to torture" or "extrajudicial killing"); *id.* § 3(b)(1) (defining
     "torture" as "any act . . . by which severe pain or suffering . . . is intentionally inflicted on [an]
27   individual for such purposes as obtaining . . . information or a confession," punishment,
     intimidation, coercion, or discrimination); *Qi*, 349 F. Supp. 2d at 1278 (TVPA "provides a cause
28   of action for the . . . specific tort of torture").

1  § 1350, note.  Civil aiding-and-abetting liability may not be read into the statute.

2          Fourth, even if the TVPA could be construed to impose aiding-and-abetting liability, only

3  individuals acting under the color of law, not private actors, may be held liable.[28]

4          Fifth, even if aiding-and-abetting liability were available, defendants' alleged acts of

5  aiding and abetment—communicating with the PRC—are privileged (see *infra*, V.E), and

6  defendants are not alleged to have acted with the requisite intent.

7          Finally, plaintiffs Wang and Shi have failed to allege facts sufficient to establish they were

8  tortured and not merely subject to "police brutality," which is not actionable under the TVPA.

9  *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 93 (D.C. Cir. 2002); *see also*

10  defendants' alternative Mot. for a More Definite Statement. (elaborating on this argument).

11          **C.          Plaintiffs Have Failed To State A Claim Under ECPA**

12          In their Eleventh Claim for Relief, *see* Compl. ¶¶ 128-36, Shi and Wang allege defendants

13  improperly intercepted their emails, 18 U.S.C. § 2511, accessed their communications, 18 U.S.C.

14  § 2701, and disclosed contents of their communications and user information, 18 U.S.C. § 2702.

15  Plaintiffs' ECPA claims must be dismissed because (1) the statute does not apply

16  extraterritorially; and (2) sections 2701 and 2702 do not apply to defendants' alleged disclosures.

17          "Congress ordinarily intends its statutes to have domestic, not extraterritorial,

18

---

19  [28] *See In re S. Af, Apartheid Litig.*, 346 F. Supp. at 555 ("Since a prerequisite to TVPA liability
   is that the individual be acting under color of law, this Court finds that creating aider and abettor
20  liability for private actors not acting under color of law would be inconsistent with the statute and
   precluded by *Central Bank*."); *Mujica*, 381 F. Supp. 2d at 1174; *Exxon*, 393 F. Supp. 2d at 28;
21  *Corrie*, 403 F. Supp. 2d at 1027 (same); S. Rep. No. 249 at 9 ("[A] higher official need not have
   personally performed or ordered the abuses in order to be held liable.  Responsibility for torture,
22  summary execution, or disappearances extends beyond the person who actually committed those
   acts—anyone with higher authority who authorize, tolerated or knowingly ignored those acts is
23  liable for them.").

24          While some courts have wrongly concluded or suggested that the TVPA permits
   secondary liability, they have done so largely based on statements in committee reports.  *See, e.g.*,
25  *Cabello v. Fernandez-Larios*, 402 F.3d 1148, 1157–58 (11th Cir. 2005); *Doe v. Saravia*, 348 F.
   Supp. 2d 1112, 1148–49 (E.D. Cal. 2004).  These decisions, including this Court's dicta in *Qi*, *see*
26  349 F. Supp. 2d at 1332, are incorrect, as "[l]egislative history cannot trump the statute,"
   *Bonneville Power Admin. v. FERC*, 422 F.3d 908, 920 (9th Cir. 2005); *Ratzlaf v. United States*,
27  510 U.S. 135, 147-48 (1994), and the Supreme Court's decision in *Central Bank* makes clear that
   Congress must speak clearly when, and if, it seeks to impose civil aiding-and-abetting liability.
28  In any event, this Court's dicta in *Qi* does not control here, because in *Qi*—unlike here—the
   defendants were state actors.  *See Qi*, 349 F. Supp. 2d at 1314.

1    application." *Small v. United States*, 544 U.S. 385, 388-89 (2005). Foreign policy concerns

2    justify this presumption, *see Sale v. Haitian Ctrs. Council*, 509 U.S. 155, 173-74 (1993), as does

3    the fact that, if Congress wishes to, it may rebut the presumption. *Argentine Republic v. Amerada*

4    *Hess Shipping Corp.*, 488 U.S. 428, 440 (1989) ("[w]hen it desires to do so, Congress knows how

5    to place the high seas within the jurisdictional reach of a statute") "Absent clear evidence of

6    congressional intent to apply a statute beyond our borders [a] statute will apply only to the

7    territorial United States." *United States v. Gatlin*, 216 F.3d 207, 211-12 (2d Cir. 2000).

8           Neither the text of ECPA nor its legislative history gives any indication that Congress

9    intended the statute to apply extraterritorially. ECPA contains no extraterritorial provision, *cf.* 18

10   U.S.C. § 1513(d) (statute prohibiting retaliating against a witnesses: "There is extraterritorial

11   Federal jurisdiction over an offense under this section."), and ECPA's legislative history

12   explicitly states the Act's definition of "wire communication," applicable under both § 2702 and

13   § 2511, "is not meant to suggest that the Electronic Communications Privacy Act applies to

14   interceptions made outside the territorial United States." S. Rep. No. 99-541, 1986 U.S.C.C.A.N.

15   at 3566.

16          The Ninth Circuit has ruled that ECPA's wiretap provisions have no extraterritorial

17   application. *See United States v. Peterson*, 812 F.2d 486, 492 (9th Cir. 1987) (holding that "Title

18   III has no extraterritorial force"). Similarly, the Second Circuit has held that the term "wire

19   communication" in ECPA is intended only to refer to communications "through our Nation's

20   communications network." *United States v. Toscanino*, 500 F.2d 267, 279 (2d Cir. 1974); *United*

21   *States v. Cotroni*, 527 F.2d 708, 711 (2d Cir. 1975); *see also United States v. Angulo-Hurtado*,

22   165 F. Supp. 2d 1363, 1369 (N.D. Ga. 2001); *Berlin Democratic Club v. Rumsfeld*, 410 F. Supp.

23   144, 153 (D.C. D.C. 1976) (denying Austrian citizen standing to sue U.S. military officials in

24   Germany for violations of ECPA's wiretap provisions).

25          The complaint alleges plaintiffs Shi and Wang reside in China, used Chinese email

26   accounts, and that Yahoo!, YHKL, or Yahoo! China disclosed information regarding their

27   internet usage to Chinese authorities. *See Compl.* ¶¶ 10, 12, 40, 54, 60, 62. For purposes of

28   determining where an alleged interception takes place, the Ninth Circuit has held that telephone

1   conversations are intercepted "where the tapped phone is located *and* where law enforcement

2   officers first overhear the call." *United States v. Luong*, 471 F.3d 1107, 1109 (9th Cir. 2006); *see*

3   *also United States v. Denman*, 100 F.3d 399, 403 (5th Cir. 1996). Plaintiffs' computers—the

4   email equivalent of the "tapped phone"—were located in China, and Chinese officials allegedly

5   read their emails in China. Therefore, any alleged interceptions—even if defendants facilitated

6   them in Hong Kong or the United States, as plaintiffs allege—occurred outside the United States

7   and ECPA's reach. In *Cotroni*, the court rightly rejected the argument that Canadian wiretaps, set

8   in Canada and authorized by Canadian authorities, violated ECPA's wiretap provisions because

9   some conversations traveled over U.S. communications systems. *Cotroni* reasoned, "it is not the

10  route followed by foreign communications which determines the application of [the wiretap

11  statute]; it is where the interception took place." 527 F.2d at 711.[29]

12      Even if ECPA applied extraterritorially, plaintiffs fail to state a claim under 18 U.S.C.

13  § 2702. While section 2702(a) generally prohibits an electronic-communication-services provider

14  from divulging records or information pertaining to subscribers, the statute permits disclosure "to

15  any person other than a governmental entity." 18 U.S.C. § 2702(c)(6); *Freedman v. America*

16  *Online, Inc.*, 412 F. Supp. 2d 174, 183 (D. Conn. 2005) (ECPA "permits an ISP to voluntarily

17  divulge a subscriber's customer information to any person other than a governmental entity");

18  *United States v. Hambrick*, 55 F. Supp. 2d 504, 507 (W.D. Va. 1999) ("ISPs are free to turn

19  stored data and transactional records over to nongovernmental entities"). The PRC is not a

20  "governmental entity" for purposes of ECPA, because ECPA defines the term as "a department or

21  agency of the United States or any State or political subdivision thereof." 18 U.S.C. § 2711(4).[30]

22  _____

23  [29] To be clear, the ATS does not provide plaintiffs a vehicle by which to bring ECPA claims based on foreign conduct. The ATS allows aliens to bring "civil action[s] . . . for a *tort only*, committed in violation of *the law of nations* or a *treaty of the United States*." 28 U.S.C. § 1350.

24  The Ninth Circuit has made clear that "garden variety violations of statutes, . . . regulations, and common law" "are not appropriately considered breaches of the 'law of nations' for purposes of

25  jurisdiction under the Alien Tort Statute." *Hamid v. Price Waterhouse*, 51 F.3d 1411, 1418 (9th Cir. 1995). Plaintiffs do not allege, nor could they ever prove, that the protections afforded by

26  ECPA on which they rely are part of the "law of nations" or part of "a treaty of the United States." 28 U.S.C. § 1350.

27  [30] The definition of "governmental entity" was added to § 2711 as part of a clarifying amendment in the USA PATRIOT Improvement and Reauthorization Act of 2005. PL 109-177. Before the

28  definition was codified, courts recognized that "governmental entity" meant federal, state, and

1    Finally, plaintiffs cannot state a claim under 18 U.S.C. § 2701. They assert defendants

2    violated this provision by exceeding "their authorization to access and control private information

3    concerning Plaintiffs' electronic communications." Compl. ¶ 130. However, section 2701(a)

4    does not apply "to conduct authorized . . . by the person or entity providing a wire or electronic

5    communications service." 18 U.S.C. § 2701(c)(1) . As the alleged provider of the plaintiffs'

6    email services, defendants cannot violate this section. *See Bohach v. City of Reno*, 932 F. Supp.

7    1232, 1236 (D. Nev. 1996) ("§ 2701(c)(1) allows providers to do as they wish when it comes to

8    accessing communications in electronic storage").[31]

9         **D.    Plaintiffs Have Failed to State a Claim Under California Law**

10    Plaintiffs' California claims are for battery, assault, false imprisonment, intentional

11    infliction of emotional distress, negligence, and unfair competition. Each claim is barred by

12    Section §47(b) of the California Civil Code, which privileges defendants' alleged

13    communications. *See infra* Section V.E.2. Each is also preempted by the foreign affairs doctrine

14    and suffers from various defects specific to California law.

15         **1.    The Foreign Affairs Doctrine Preempts Plaintiffs' California Claims**

16    The federal foreign affairs doctrine limits "state involvement in foreign affairs and

17    international relations—matters which the Constitution entrusts solely to the Federal

18    Government." *Zschernig v. Miller*, 389 U.S. 429, 436 (1968). Where a proposed application of

19    state law falls outside areas of "traditional state responsibility," the foreign affairs doctrine

20    mandates the dismissal of plaintiffs' claims even if there is no direct conflict between the state's

21    policy and that of the federal government. *American Ins. Ass'n v. Garamendi*, 539 U.S. 396, 419

22    n.11, 425 (2003). The regulation of an American business's conduct in China falls well outside

23    any area of "traditional state responsibility." *Id.* For this reason alone, the Court should either

24

25    local governments. *See Ameritech Corp. v. McCann*, 403 F.3d 908, 912-13 (7th Cir. 2005).

26    [31] If plaintiffs' claims proceed past the motion to dismiss stage, defendants will also demonstrate
     that plaintiffs' ECPA claims are barred by the statute of limitations, vitiated by plaintiffs' consent
     to terms of services agreements, and precluded by provisions of ECPA allowing disclosure of

27    contents of communications and subscriber records where "necessarily incident to the rendition of
     the service or to the protection of the rights or property of the provider of that service." 18 U.S.C.

28    §§ 2702(b)(5) , 2702(c)(3).

1   refuse to hear or dismiss plaintiffs' six California claims with prejudice.

2         Even if regulating how companies conduct business in China were within California's

3   "traditional competence," *id.* at 419 n.11, the same outcome is required. California has only the

4   weakest interest in the claims plaintiffs assert because plaintiffs do not reside here, and all the

5   allegedly tortious activity took place in China. To the extent California has any interest in

6   proscribing defendants' alleged conduct, the foreign policy conflict that such regulation would far

7   outweigh California's interest. *See Mujica*, 381 F. Supp. 2d at 1190.

8               **2.  Plaintiffs Cannot Establish Their Intentional Tort Claims**

9         Aiding-and-Abetting Liability.  Plaintiffs' intentional tort claims, their Fifth through

10  Eighth Claims for Relief, all hinge on an aiding-and-abetting theory. These claims—for battery,

11  assault, false imprisonment, and intentional infliction of emotional distress, *see* Compl. at 26-

12  28—must be dismissed. Plaintiffs cannot establish that defendants possessed the intent necessary

13  for aiding-and-abetting liability.

14        Under California law, aiding and abetting "necessarily requires a defendant to reach a

15  *conscious decision* to participate in tortious activity for the purpose of assisting another in

16  performing a wrongful act." *Howard v. Superior Court*, 2 Cal. App. 4th 745, 749 (Cal. Ct. App.

17  1992) (emphasis in original). Put another way, aiding-and-abetting liability may only be imposed

18  if the defendant "knew that a tort had been, or was to be committed, and *acted with the intent of*

19  *facilitating the commission of that tort*." *Gerard v. Ross*, 204 Cal. App. 3d 968, 983 (Cal. Ct.

20  App. 1988).

21        Plaintiffs do not allege that defendants intended to cause them harm or "facilitate" the

22  PRC's alleged torts. They merely allege defendants' conduct was "voluntary" and "willing."

23  Compl. ¶ 2.  Neither claim is sufficient to establish that defendants acted "with the intent of

24  facilitating the commission of" their alleged abuse. *Gerard*, 204 Cal. App. 3d at 983. Nor are

25  these conclusory allegations consistent with documents identified in plaintiffs' complaint. *See*

26  Compl. ¶ 64 (citing ruling of Hong Kong Commissioner, which states at ¶ 8.25: "the disclosure of

27  Information in the circumstances of the case was not a voluntary act initiated by [YHKL] but was

28

1   compelled under the force of PRC law").[32]

2        <u>Direct Liability.</u>  To the extent plaintiffs seek to hold defendants *directly* liable on their

3   false imprisonment and intentional infliction claims, *see* Compl. ¶¶ 106, 110, those claims must

4   be rejected as well.  Plaintiffs' false imprisonment claim is easily dispensed with, as the

5   complaint is devoid of allegations that defendants directly engaged in any "nonconsensual

6   intentional confinement of a person."  *Fermino v. Fedco, Inc.*, 7 Cal. 4th 701, 715 (Cal. 1994).

7        Plaintiffs' intentional infliction claim has no basis either.  Given California privilege law,

8   *see infra* Section V.E.2, providing law enforcement officials with information regarding criminal

9   activity cannot possibly be "extreme and outrageous conduct . . . so extreme as to exceed all

10  bounds of that usually tolerated in a civilized community."  *Conroy v. Regents of University of

11  California*, 151 Cal. App. 4th 132, 146 (Cal. Ct. App. 2007).  Moreover, to be held liable,

12  defendants' conduct must have been "directed at the plaintiff, or occur in the presence of a

13  plaintiff of whom the defendant is aware."  *Id*.  Defendants lacked this knowledge, particularly as

14  to plaintiff Yu.[33]

15              **3.   Plaintiffs Do Not State a Claim for Negligence**

16       Plaintiffs' negligence claims, Compl. at 28, may not proceed on an aiding-and-abetting

17  theory, which only applies to intentional torts, *see Fiol v. Doellstedt*, 50 Cal. App. 4th 1318, 1325

18  (Cal. Ct. App. 1996).  Plaintiff Yu cannot state a direct claim for negligence because her injuries

19  were not reasonably foreseeable and, thus, defendants owed her no duty of care.  Duty is a

20  "question of law to be resolved by the court," *Artiglio v. Corning Inc.*, 18 Cal. 4th 604, 614 (Cal.

21  _____

22  [32] To the extent plaintiffs claim defendants "ratified" the PRC's intentional torts and are liable on that theory, *see, e.g.*, Compl. ¶ 74, there can be no "ratification" under California law absent an agency relationship.  *See Estate of Stephens*, 28 Cal. 4th 665, 673 (Cal. 2002) ("Ratification is the voluntary election by a person to adopt in some manner as his own act an act which was purportedly done *on his behalf* by another person . . . .").  Plaintiffs do not allege, nor could they, that PRC officials acted on behalf of defendants or that defendants exercised control over the PRC.

25  [33] *Cf. Davidson v. City of Westminster*, 32 Cal. 3d 197, 210 (Cal. 1982) (dismissing intentional infliction claim against police officers who failed to prevent assault they knew was likely to occur; "Absent an intent to injure, such inaction is not the kind of extreme and outrageous conduct" that gives rise to liability under the tort); *Christensen v. Superior Ct.*, 54 Cal. 3d 868, 879, 906 (Cal. 1991) (rejecting intentional infliction claims brought against funeral home that desecrated remains of plaintiffs' loved ones; plaintiffs had "not alleged that the conduct of any of the defendants was directed primarily at them").

1998), based on:

> the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved.

*Friedman v. Merck & Co.*, 107 Cal. App. 4th 454, 465 (Cal. Ct. App. 2003).

Yu seeks to hold defendants liable for emotional and other harms suffered on account of her husband's mistreatment. *Ileto v. Glock*, 194 F. Supp. 2d 1040, 1053 (C.D. Cal. 2002), disposes of her claim. In *Ileto*, plaintiffs were injured by guns defendant manufactured and sued for negligence. Applying California law, the court held, "While it may be foreseeable that some criminals might obtain Glock firearms and use them to harm others, there was no way of foreseeing that this *particular individual* . . . would obtain a Glock firearm and use it to injure *these Plaintiffs*." *Id.* at 1053. Yu's claims are similarly too remote.

Wang and Shi's negligence claims must be dismissed because they assumed the risk of harm when they chose to use Yahoo! China email and group list services to engage in activity they knew violated Chinese law. Primary assumption of the risk "operate[s] as a complete bar to the plaintiff's recovery" in negligence cases, and applies where "by virtue of the nature of the activity and the parties' relationship to the activity, the defendant owes no legal duty to protect the plaintiff from the particular risk of harm that caused the injury." *Knight v. Jewett*, 3 Cal. 4th 296, 314-15 (Cal. 1992); *Saffro v. Elite Racing, Inc.*, 98 Cal. App. 4th 173, 178 (Cal. Ct. App. 2002).

Although the doctrine is most commonly applied to active sports, *see Moser v. Ratinoff*, 105 Cal. App. 4th 1211, 1220-21 (Cal. Ct. App. 2003), it has also been applied to other dangerous, non-sporting activities.[34] In *Cohen v. McIntyre*, 16 Cal. App. 4th 650, 655 (Cal. Ct.

---

[34] *See, e.g.*, *Herrle v. Estate of Marshall*, 45 Cal. App. 4th 1761 (Cal. Ct. App. 1996) (patient's estate not liable to nurse's aid struck by patient suffering from senile dementia); *Rosenbloom v. Hanour Corp.*, 66 Cal. App. 4th 1477 (Cal. Ct. App. 1998) (employer not liable to employee hired to handle sharks who was bitten by a shark); *Hamilton v. Martinelli & Associates*, 110 Cal. App. 4th 1012, 1021 (Cal. Ct. App. 2003) (training officer not liable to probation officer injured while performing required training maneuver).

1  App. 1993), for example, the court rejected a negligence claim a veterinarian brought against the

2  owner of a dog that had bit him.  "Cohen, a licensed veterinarian, was injured during the course of

3  treating an animal under his control, an activity for which he was employed and compensated and

4  one in which the risk of being attacked and bitten is well known."  *Id.*

5      Wang and Shi both made journalistic careers criticizing the PRC's repressive policies.

6  *See* Compl. ¶¶ 32-45, 52-56.  They were no doubt fully aware of the risk of engaging in political

7  speech.  *See, e.g.*, *id.* ¶ 25 (dissidents "face a well-documented pattern of" abuses).  According to

8  the complaint, Wang's writings included the warning: "We should never forget that China is still

9  a totalitarian and despotic country."  *Id.* ¶¶ 33, 43.  Shi, like Wang, wrote about the suppression of

10 free expression in China and, indeed, he was prosecuted for publicizing a "state secret" document

11 that related to previous crackdowns on political speech.  *See id.* ¶¶ 52-54.  Moreover, according to

12 Shi's criminal judgment cited in the complaint, *see id.* ¶ 62, Shi's editors warned him he would be

13 prosecuted if he published the document, *see* Ex. C at 5.  Defendants cannot be held liable for a

14 knowing and obvious risk that plaintiffs assumed—however righteous their cause.  *Cf. Baker v.*

15 *Superior Ct.*, 129 Cal. App. 3d 710 (Cal. Ct. App. 1982) (firefighter cannot sue for injuries

16 sustained while fighting blaze).

17               **4.  Plaintiffs Do Not State a Claim For Unfair Competition**

18     Plaintiffs' complaint does not state a claim within the meaning of section 17200.  It does

19 allege unlawful, unfair, or fraudulent business practices.  To the contrary, the gist of the

20 complaint is that defendants *obeyed laws and procedures* that plaintiffs allege led to their

21 imprisonment.

22     Moreover, plaintiffs lack standing to bring the Tenth Claim for Relief under California

23 Business and Professions Code section 17204.  *See* Compl. at 29-31.  Proposition 64 recently

24 amended section 17204 to limit private suits to those brought by plaintiffs who have "suffered

25 injury *and* lost money or property '*as a result* of such unfair competition.'"  *Daro v. Superior*

26 *Court*, 151 Cal. App. 4th 1079, 1098 (2007) (emphasis in original).  The new language in section

27 17204 is similar to existing language in section 17203, which courts have read to permit

28 restitution only.  *See Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1150 (Cal.

2003).  Thus, under Proposition 64, to bring a UCL action a plaintiff must now allege a valid

claim to restitution.  *See Walker v. USAA Casualty Ins. Co.*, 474 F. Supp. 2d 1168, 1172 (E.D.

Cal. 2007).  *See also Center for Biological Diversity v. FPL Group, Inc.*, 2006 WL 2987634 at

*4-6 (Cal. Superior Ct., Oct. 13, 2006) (Sabraw, J.).[35]

Restitution claims under section 17204 are limited to the recovery of money or property

"that defendants took *directly* from plaintiff" or that can "be traced" to "*particular funds*" in a

defendant's possession.  *Korea Supply*, 29 Cal. 4th at 1149-50; *see also Colgan v. Leatherman

Tool Group, Inc.*, 135 Cal. App. 4th 663, 699 (Cal. Ct. App. 2006) (restitution limited to "money

or property identified as belonging in good conscience to the plaintiff [that] *could clearly be

traced to particular funds or property in the defendant's possession*").  Plaintiffs do not allege

defendants took or have their property.  They claim the PRC seized it.  *See* Compl. ¶¶ 10-12, 37,

47, 57.  Plaintiffs have no restitution claim against defendants.  *See Walker*, 474 F. Supp. 2d at

1172.[36]

**E.**    **Defendants' Communications With The PRC Are Protected From Liability**

Finally, the complaint must be dismissed because the only actions defendants are alleged

to have taken—communications with law enforcement concerning suspected criminal activity—

are privileged and immunized from liability under federal, California, and international law.

**1.    The Communications Are Protected Under Federal Law**

Federal law privileges communications with law enforcement officials.  In *In re Quarles*,

158 U.S. 532, 535-36 (1895), the Supreme Court explained that principles of sovereignty require

privileging such communications from liability.  "It is the right, as well as the duty, of every

citizen . . . to communicate to the executive officers any information which he has of the

commission of an offense against those laws; and such information, given by a private citizen, is

a privileged and confidential communication, for which no action of libel or slander will lie . . .

---

[35] Plaintiffs might cite two cases that they would argue are contrary.  *See White v. Trans Union LLC*, 462 F. Supp. 2d 1079 (C.D. Cal 2006); *Southern California Housing Rights Center v. Los Feliz Towers Homeowners Assoc.*, 426 F. Supp. 2d 1061 (C.D. Cal. 2005).  Not so.  Neither case is apt on these facts, analyzes the issues closely, or is in keeping with the logic of *Korea Supply* or the purpose of Proposition 64.  *Walker* and its ilk control.

[36] Plaintiffs' California claims, like their ECPA claims, are also time barred.

1   The right of a citizen informing of a violation of law . . . *arises out of the creation and*

2   *establishment by the Constitution itself of a national government, paramount and supreme within*

3   *its sphere of action.*"

4           Relying on *Quarles*, *Vogel v. Gruaz*, 110 U.S. 311 (1884), and their progeny, federal

5   courts have consistently upheld these privileges.  The Ninth Circuit, for example, has explained

6   that "the information given to a prosecutor by a private person for the purpose of initiating a

7   prosecution is protected by [a] cloak of immunity . . . so that all persons might freely disclose

8   their suspicions and deductions" without fear of being sued.  *Borg v. Boas*, 231 F.2d 788, 794-95

9   (9th Cir. 1956).[37]  While some courts say the privilege is absolute, *see Vogel*, 110 U.S. at 314;

10  *Holmes v. Eddy,* 341 F.2d 477, 480-481 (4th Cir. 1965), others say it is qualified, *see McDonald*

11  *v. Smith*, 472 U.S. 479, 485 (1985); *Foltz v. Moore McCormack Lines, Inc*., 189 F.2d 537, 540

12  (2d Cir. 1951).  Plaintiffs' federal claims fail either way.  Even under the qualified privilege,

13  defendants' communications with the PRC are immunized unless they were (1) false; *and* (2)

14  made with malice.  *See Foltz*, 189 F.2d at 540; *Swaaley v. U. S*., 376 F.2d 857, 862 (Ct. Cl. 1967).

15  Plaintiffs do not allege the information defendants provided was false; far from it, they complain

16  it was all too accurate.  Nor do they assert that defendants acted with ill will.

17          Plaintiffs' federal claims are also barred by the foreign sovereign compulsion and *Noerr-*

18  *Pennington* doctrines.  The foreign sovereign compulsion doctrine, which finds its roots in

19  antitrust law, applies here to bar plaintiffs' claims.[38]  It provides that courts may not require a

20  _____

21  [37] *See also U.S. v. New York Tel. Co.*, 434 U.S. 159, 175 (1977) (government could compel private phone company to install pen registers on telephones; citing *In re Quarles* approvingly);

22  *Brown v. Edwards*, 721 F.2d 1442, 1454 n.17 (5th Cir. 1984) (citing *Vogel* and *Borg* in support of "an absolute privilege for statements made in the institution of criminal charges"); *Holmes v.*

23  *Eddy*, 341 F.2d 477, 480-481 (4th Cir. 1965) (granting stockbroker immunity for statements made to the SEC about a suspicion that a company was attempting to bilk the public); *Foltz v. Moore*

24  *McCormack Lines, Inc.*, 189 F.2d 537, 540 (2d Cir. 1951) (defendant who provided information to FBI was immune from suit unless statement was false and made with malice); *Swaaley v. U. S*.,

25  376 F.2d 857, 862-63 (Ct. Cl. 1967) (statements made to government concerning suspected criminal activity privileged); RESTATEMENT (SECOND) OF TORTS § 598 cmt. d (1977) (statement

26  privileged "when any recognized interest of the public is in danger, including the interest in the prevention of crime and the apprehension of criminals").

     [38] *See Societe Internationale Pour Participations Industrielles et Commerciales, S.A. v. Rogers*,

27  357 U.S. 197 (1958) (excusing Swiss company's failure to comply with American discovery order that required it to violate Swiss law); *United States v. Brodie*, 174 F. Supp. 2d 294, 299-304

28  (E.D. Pa. 2001) (recognizing potential applicability of doctrine outside antitrust law).

1   person to engage in acts prohibited by a foreign state or refrain from acts compelled by the state.

2   *See Timberland Lumber Co. v. Bank of America*, 549 F.2d 597, 606 (9th Cir. 1977). One leading

3   case, *Interamerican Refining Corp. v. Texaco Maracaibo, Inc.*, 307 F. Supp. 1291, 1296 (D. Del.

4   1970), holds that because "defendants were compelled by regulatory authorities in Venezuela to

5   boycott plaintiff," they had "a complete defense to [plaintiff's] action under the antitrust laws

6   based on that boycott." As the court elaborated:

7   
8   
9   
> When a nation compels a trade practice firms there have no choice but to obey.
> Acts of business become effectively acts of the sovereign. The Sherman Act does
> not confer jurisdiction on United States courts over acts of foreign sovereigns. . . .
> *Were compulsion not a defense, American firms abroad faced with a government
> order would have to choose one country or the other in which to do business. Id.*

10  Under the doctrine, defendants must show their communications were (a) "basic and

11  fundamental'" to plaintiffs' case and "not just [of] peripheral" concern, and (b) compelled.

12  *Brodie*, 174 F. Supp. 2d at 300. Both requirements are met here. Defendants' communications

13  with the PRC are at the core of plaintiffs' case; and, as documents cited in the complaint make

14  clear, *see* Compl. ¶ 64, defendants' disclosure of information was compelled by Chinese law. In

15  its report, the Hong Kong Privacy Commissioner concluded:

16  "[T]he disclosure of Information in the circumstances of the case was not a voluntary act initiated
    by [YHKL] but was compelled under the force of PRC law," Ex. A¶ 8.25;

17  "the Order was a legal obligation imposed on [YHKL]," and "refusal to comply [with the order]
    might result in both criminal and administrative sanctions," *id.* ¶ 7.12; and

18  "Yahoo! China and [YHKL] did in the circumstances of this case genuine penal
    apprehension of possible violation of Article 45 or Article 277 if refused to comply with the
    [PRC's] order," *id.* ¶ 7.8.[39]

19  
20  As the Supreme Court has said: "It is hardly debatable that fear of criminal prosecution

21  constitutes a weighty excuse for" acting, "and this excuse is not weakened because the laws

22  ─────────────────────

23  [39] Article 45 of the Criminal Procedure Law provides the PRC the authority to gather evidence
    requires the government to investigate those who "falsif[y], conceal[], or destroy[]" it. Article 277

24  of the Criminal Law provides "[w]hoever intentionally obstruct officers of a State security organ
    or a public security organ from maintaining State security in accordance with law" is to be
    punished "to fixed-term imprisonment of not more than three years, criminal detention, or public

25  surveillance or be fined." Article 18 of the State Security Law provides that "when a State
    security organ investigates and finds out any circumstances endangering State security and

26  gathers related evidence, citizens and organizations concerned shall faithfully furnish it with
    relevant information and may not refuse to do so." *Id.* ¶¶ 7.1-7.11; *see also* Article 57 of PRC

27  Regulations on Telecommunications; Article 18 of Measures for the Administration of Internet E-
    mail Services; Articles 9, 13, 14 and 15 of Administrative Measures on Internet Bulletin Services.

28  *See* Appendix B, Tabs 2, 3, 4, 7, 10, and 11.

1  [engendering this fear] are those of a foreign sovereign." *Societe Internationale*, 357 U.S. at 211.

2      The *Noerr-Pennington* doctrine also originated in antitrust law and shields firms from

3  liability for communications with government officials. *See United Mine Workers of Am. v.*

4  *Pennington*, 381 U.S. 657 (1965); *Eastern R.R. Presidents Conference v. Noerr Motor Freight,*

5  *Inc.*, 365 U.S. 127 (1961). The doctrine has been extended to non-antitrust cases,[40] shields

6  defendants from claims based on communications with law enforcement,[41] and applies unless

7  plaintiffs can show that defendants' communications were a *sham* designed to injure plaintiffs

8  through *false* accusations, *see Oregon Natural Res.*, 944 F.2d at 534. Again, plaintiffs make no

9  such allegations.

10      **2. Plaintiffs' Claims Are Barred By California's Statutory Privilege[42]**

11      California Civil Code Section 47(b) "bars" civil actions based on communications with

12  law enforcement. *Hagberg v. Calif. Fed. Bank FSB*, 32 Cal. 4th 350, 360 (2004). "[C]ourts have

13  given [§ 47(b)] an expansive reach," "held that the privilege is absolute, even if the result is

14  inequitable," and ruled that "any doubt as to whether the privilege applies is resolved in favor of

15  applying it." *Morales v. Coop. of Am. Physicians, Inc*, 180 F.3d 1060, 1062 (9th Cir. 1999). Like

16  its federal counterparts, section 47(b) is designed to "encourage[e] freedom of communication

17  between citizens and public authorities charged with investigating wrongdoing." *Forro*

18  *Precision, Inc. v. Int'l Bus. Machs.*, 673 F.2d 1045, 1053 (9th Cir. 1982). The privilege is based

19  on the recognition that "it [is] the duty of every citizen to cooperate with the police in their

20
21  [40] *See, e.g., Boulware v. State of Nev. Dept. of Human Res.*, 960 F.2d 793, 800 (9th Cir. 1992)
    (civil rights); *Evers v. Custer County*, 745 F.2d 1196, 1204 (9th Cir. 1984) (civil conspiracy);
    *Oregon Natural Res. Council v. Mohla*, 944 F.2d 531, 533-34 (9th Cir. 1991) (tort); *Video Int'l*
22  *Prod. v. Warner-Amex Cable Commc'n*, 858 F.2d 1075, 1084 (5th Cir. 1988) (*Noerr-Pennington*
    doctrine applies to "claims brought under federal and state law," and to "common-law tort"
23  claims as well as statutory claims).

    [41] *See Forro Precision, Inc. v. Inter. Bus. Machines*, 673 F.2d 1045, 1059-1060 (9th Cir. 1982);
24  *Palmer v. Roosevelt Lake Log Owners Ass'n.*, 551 F. Supp. 486, 493-494 (D. Wash. 1982).

    [42] Defendants believes Chinese law should control and disposes of plaintiffs' "state law" claims.
25  However, for the purposes of this motion, defendants assume *arguendo*, as plaintiffs' complaint
    alleges, that California law applies. *Cf. Panama Processes, S.A. v. Cities Services Co.*, 650 F.2d
26  408, 413 n.6 (2d Cir. 1981) (noting party had reserved right to argue Brazilian law applied,
    though it was presently arguing under New York law); *Radiation Sterilizers, Inc. v. U.S.*, 867 F.
27  Supp. 1465, 1476 (E.D. Wash. 1994) (in ruling on motions to dismiss, court did not decide
    whether Washington or Georgia law applied, but merely determined whether plaintiffs' causes of
28  action, brought under Washington law, stated cognizable claims under Washington law).

1    investigation of crime and to provide information to investigating officers"; it thus, "shields"

2    those who give "testimony or statements to officials conducting criminal investigations."

3    *Hagberg,* 32 Cal. 4th at 373.

4        Both federal and California courts have held that the section 47(b) privilege applies to

5    communications made in foreign countries to foreign officials. *See Beroiz v. Wahl*, 84 Cal. App.

6    4th 485 494-95 (Cal. Ct. App. 2000) (Mexico); *E. & J. Gallo Winery v. Andina Licores, S.A.*,

7    Case No. CV F 05-0101, 2006 U.S. DIST. LEXIS 47206, at *24 (E.D. Cal. June 30, 2006)

8    (Ecuador). The *Beroiz* court surveyed case law from other jurisdictions and observed that,

9    throughout the United States, courts "have uniformly held that similar privileges apply to foreign

10   proceedings and communications." 84 Cal. App. 4th at 494.[43]

11             **3.  Plaintiffs' International Law Claims Are Similarly Barred**

12       Finally, plaintiffs assert defendants violated "universal" standards of international law by

13   providing the PRC with evidence of plaintiffs' unlawful internet usage. *See* Compl. ¶¶ 3, 5, 70-

14   96. Not so. Numerous countries,[44] like our country and like virtually every State in the Union,[45]

15   have long *privileged* such communications.

16   **V.    PLAINTIFFS FAILED TO JOIN AN INDISPENSABLE PARTY**

17       Plaintiffs' complaint must be dismissed pursuant to Rule 12(b)(7), because the PRC is a

18   "necessary" party and the case cannot proceed without it. *Wilbur v. Locke*, 423 F.3d 1101, 1111

19   (9th Cir. 2005).

20   _____

21   [43] While *Beroiz*, 84 Cal. App. 4th at 494-96, and *E. & J. Gallo Winery*, 2006 U.S. DIST. LEXIS
     47206, at *24-26, observed that a qualified, rather than absolute, privilege  might apply if

22   defendant initiated foreign legal proceedings and the foreign legal system did not provide
     adequate safeguards, that circumstance is not presented here. The complaint does not allege that

23   defendants initiated contact with the PRC, nor did they. Plaintiffs also have not alleged
     defendants acted with "hatred or ill will" or recklessly published false information. *Noel v. River*

24   *Hills Wilsons, Inc*., 113 Cal. App. 4th 1363, 1370 (Cal. Ct. App. 2003) ("The malice necessary to
     defeat a qualified privilege is 'actual malice' which is established by a showing [1] that the

25   publication was motivated by hatred or ill will towards the plaintiff or [2] by a showing that the
     defendant lacked reasonable grounds for belief in the truth of the publication and therefore acted

26   in reckless disregard of the plaintiff's rights."); see also *Dorn v. Mendelzon*, 196 Cal. App. 3d

27   933, 945 (Cal. Ct. App. 1987).
     [44] *See* Yahoo!'s concurrently filed Anti-SLAPP Motion at 8, n.5.

28   [45] *See* Yahoo!'s concurrently filed Anti-SLAPP Motion at 8, n.6.

1

## A.    The PRC is a Necessary Party

2    A party is "necessary" if (1) complete relief cannot be afforded plaintiffs in its absence; *or*

3   (2) a decision on the merits will either (a) impair its ability to protect its interests or (b) subject

4   defendants in this case to "multiple or inconsistent obligations." *Dawavendewa v. Salt River*

5   *Project Agr. Imp. & Power Dist.*, 276 F.3d 1150, 1155 (9th Cir. 2002). Both of these alternative

6   tests are satisfied; satisfying *either* test is sufficient. *See* FED. R. CIV. P. 19(a).

7    Plaintiffs complain they are being wrongly incarcerated and abused by the PRC. Their

8   complaint seeks "affirmative action by the Defendants to secure the[ir] release." Compl. at 34

9   ¶ (d). That relief is not possible in the PRC's absence. No money judgment or declaration of

10   rights would be enough: plaintiffs' harm continues so long as they remain incarcerated.

11    The PRC has a strong interest in this action and its absence will impair its interests and

12   impose conflicting obligations. Plaintiffs seek both an injunction preventing defendants from

13   providing the PRC with evidence in criminal cases, *see* Compl. at 34 ¶ (e), and a declaration that

14   disclosure of such evidence violates international law, *see id.* at 34 ¶ (d). Those requests are a

15   direct attack on the PRC's sovereignty and ability to "govern [its own] territory." *Dawavendewa*,

16   276 F.3d at 1157.[46] Moreover, there can be no question the case "subject[s] [defendants] to a

17   substantial risk of incurring . . . inconsistent obligations." FED. R. CIV. P. 19(a)(2)(ii). Unless the

18   Court can also bind the PRC, the requested relief will put defendants squarely "between the

19   proverbial rock and hard place." *Dawavendewa*, 276 F.3d at 1156. Rule 19(a)(2) is designed to

20   prevent such results. *See id.*

21

## B.    The PRC Cannot be Joined

22    American courts do not have jurisdiction over foreign states unless the state waives

23   immunity or the plaintiffs' claims fall under one of the statutory exceptions to the Foreign

24   Sovereign Immunity Act, 28 U.S.C. §§1604, 1605, *see In re Republic of the Phil.*, 309 F.3d 1143,

25   1149 (9th Cir. 2002). The PRC does not fall into any of the exceptions in this case,. *See id.*

26

27   ───────────────

[46] *See also Davis v. United States*, 192 F.3d 951, 959 (10th Cir. 1999) (Seminole Tribe necessary party where judgment would overrule Tribe's ordinance); *Ricci v. State Bd. of Law Examiners*, 569 F.2d 782 (3d Cir. 1978) (State Supreme Court was necessary and indispensable party to

28   action seeking to invalidate Court's rule governing bar admission).

C07-02151 CW
YAHOO!'S MOT. TO DISMISS SEC. AM.        - 37 -
COMPL.

1

### C.    The PRC is Indispensable

2    If a necessary party cannot be joined, the Court must consider whether in "equity and

3    good conscience" the suit should proceed without it.  FED. R. CIV. P. 19(b); *EEOC v. Peabody*

4    *Western Coal Co.*, 400 F.3d 774, 780 (9th Cir. 2005).  Court must balance four factors in making

5    this determination.  *See Dawavendewa*, 276 F.3d at 1161.  All four factors favor dismissal.

6    The first three factors are closely related:  (1) prejudice to the PRC and defendants; (2) the

7    ability to mitigate prejudice by shaping the relief; and (3) the adequacy of a judgment that does

8    not bind the PRC.  To award any relief to plaintiffs, the Court must rule that providing evidence

9    to the PRC in a criminal case was a violation of international law.   Plaintiffs seek a declaration to

10    such effect, an injunction preventing such disclosures, and damages.  Any judgment for plaintiffs

11    in this case—no matter how broad or narrow the relief—will intrude on the PRC's sovereignty,

12    and put defendants in an untenable conflict, *Dawavendewa*, 276 F.3d at 1156.[47]   Moreover, were

13    the Court to award plaintiffs relief without joinder of the PRC, such relief will be inadequate.

14    Political speech will still be criminal in China, plaintiffs will still be in prison, and companies will

15    still be required by Chinese law to furnish evidence.

16    The fourth factor—whether an alternative forum exists—also favors dismissal.  Shi

17    instituted legal proceedings before the Hong Kong Privacy Commissioner; his case is pending on

18    appeal; the Commissioner issued a detailed ruling showing Shi's claims were taken seriously; and

19    Hong Kong is an adequate, alternative forum.[48]  But even if no alternative forum existed, that

20    does *not* prevent dismissal when the other Rule 19(b) factors are satisfied.[49]

21    ---

22    [47] *See Saudi Arabia v. Nelson*, 507 U.S. 349, 361 (1993) ("however monstrous such abuse
undoubtedly may be, a foreign state's exercise of the power of its police has long been
understood" as sovereign in nature),

23    [48] *See e.g., Capri Trading Corp. v. Bank Bumiputra Malaysia Berhad*, 812 F. Supp. 1041, 1043-
44 (N.D. Cal. 1993) (Hong Kong is an adequate forum to adjudicate alleged RICO violations,

24    common law fraud and breach of fiduciary duty claim); *Dragon Capital Partners L.P. v. Merrill
Lynch Capital Servs. Inc.*, 949 F. Supp. 1123, 1130-31 (S.D.N.Y. 1997) (rejecting claim that

25    impending Chinese takeover of Hong Kong will render it an inadequate forum and finding that
Hong Kong is an adequate forum to try securities fraud claims).

26    [49] *See Dawavendewa*, 276 F.3d at 1162 (collecting cases); *Wilbur*, 423 F.3d at 1115 ("even
assuming [plaintiffs] have no other forum in which to pursue a remedy, we have 'regularly held

27    that the [absent party's] interest in [sovereign] immunity overcomes the lack of an alternative
remedy or forum for the plaintiffs.'").  Indeed, outside the Ninth Circuit, the fact that the PRC is

28    entitled to sovereign immunity would, by itself, require that this case be dismissed.  *See*

1   **VI.    PLAINTIFFS' COUNSEL MAY LACK AUTHORITY TO BRING THIS SUIT**

2           In the unique circumstances of this case, there is a serious question about the authority and

3   ability of plaintiffs' counsel to prosecute this case on behalf of Shi and Wang. As the complaint

4   suggests, counsel have no direct contact with Shi and Wang and can only allege the facts of Shi

5   and Wang's case based on information and belief. *See* Compl. ¶¶ 45, 65, 145. A "suit instituted

6   without authority from the party named as plaintiff is a nullity," "any judgment obtained in such a

7   suit is void," and the complaint in such a case must be dismissed. *Meredith v. Ionian Trader*, 279

8   F. 2d 471, 474 (2d Cir. 1960); *see also Pueblo of Santa Rosa v. Fall*, 273 U.S. 315, 319 (1927).

9   Under federal and California law, every action must be prosecuted by the real party in interest or

10  a representative of that party authorized by law. *See* FED. R. CIV. P. 17; CAL. CIV. PROC. CODE

11  § 367. Representative suits are allowed *only* where appropriate documented authority exists.[50]

12          This Court has the power to "require an attorney, one of its officers, to show his authority

13  to appear," and to dismiss a case if that authority is not shown. *Pueblo* 273 U.S. at 319; *see also*

14  *United States v. Wolf*, 352 F. Supp. 2d 1195, 1199 (W.D. Okla. 2004); *In re Retail Chemists*

15  *Corp*, 66 F. 2d 605, 608 (2d Cir. 1933). We submit it is important and prudent to address this

16  issue at the threshold of this case.[51]

17  _____
    *Dawavendewa*, 276 F.3d at 1162. Defendants believe this rule is correct and hereby preserve the
18  issue.

    [50] In California, plaintiffs may grant general powers of attorney to sue on their behalf, *see* CAL.
19  PROB. CODE §§ 4263(a)(1), 4459, but the documents must be (a) dated; (b) signed "either (1) by
    the principal or (2) in the principal's name by another adult in the principal's presence and at the
20  principal's direction"; and (c) "acknowledged before a notary public or . . . signed by at least two
    witnesses." *Id.* §§ 4121, 4122; *Estate of Rabinowitz*, 114 Cal. App. 4th 635, 638 (2003).

21      In China, a party must submit to the People's Court a power of attorney bearing her signature
    or seal that specifies the subject matter and the limits of authority granted. An agent must have
22  special authority to recognize, withdraw, or modify claims; to become involved in mediation; and
    to file a counterclaim or to lodge an appeal on behalf of the principal. *See* 1991Civil Procedure
23  Law (P.R.C.), Art. 59. (Appx. B, Tab 5). A carte blanche power of attorney, which fails to name
    the powers granted, precludes an agent from doing any of the above. *See* Opinions of the
24  Supreme People's Court on Certain Issues Concerning Application of PRC Civil Procedure Law
    2002, SUP. PEOPLE'S CT. GAZ., Art. 69. (Appx. B, Tab 8).

25  [51] Defendants are aware of one prominent ATS case prosecuted for six years, in which certain
    plaintiffs alleged that they had not authorized counsel to act in settling the case. The judgment
26  and settlement were only upheld, in large part, because plaintiffs had signed powers of attorney,
    shared them with defendants, and defendants relied on them pursuant to California Probate Code
27  section 4303, which provides: "A third person who acts in good faith reliance on a power of
    attorney is not liable to the principal . . . if . . . (1) The power of attorney is presented to the third
28  person by the attorney-in-fact designated in the power of attorney. (2) The power of attorney

    C07-02151 CW
    YAHOO!'S MOT. TO DISMISS SEC. AM.          - 39 -
    COMPL.

1    Defendants have met and conferred with plaintiffs' counsel regarding this issue.

2    Plaintiffs' counsel have represented they have written powers of attorney granting full authority,

3    but decline to provide them to defendants at this stage of the proceedings.  The need for such

4    assurances are especially important here, because it will be impossible to depose plaintiffs or

5    witnesses in China,[52] attempts to gather evidence may violate Chinese law,[53] and plaintiffs have

6    little or no ability to provide *any* evidence to support their claims.[54]

7    **VII.    CONCLUSION**

8    Plaintiffs' Second Amended Complaint should be dismissed with prejudice.

9    Dated: August 27, 2007                          DANIEL M. PETROCELLI
                                                     MATTHEW T. KLINE
10                                                   O'MELVENY & MYERS LLP

11

12   By: _____
                                                     Daniel M. Petrocelli
13                                                   Attorneys for Defendant Yahoo! Inc and for
                                                     specially appearing defendant Yahoo! Hong
14                                                   Kong, Ltd.

---

appears on its face to be valid.  (3) The power of attorney includes a notary public's certificate of acknowledgment or is signed by two witnesses."  CAL. PROB. CODE § 4303.

[52] *See* U.S. Department of State, China Judicial Assistance, http://travel.state.gov/law/info/judicial/judicial_694.html ("it does **not** appear possible to take the deposition of a witness located in China") (emphasis in original).

[53] *See* Hong Kong Commissioner's Report ¶¶ 7.17-7.18; *see also id.* ¶¶ 7.3-7.20.

[54] *See id.* ¶ 3.2 ("No supporting evidence was attached to [Shi's] complaint.  Despite repeated requests, no further information or evidence was produced by [Shi] or his authorized representative to the Commissioner for consideration."); *see also id.* ¶¶ 3.3, 8.52.

C07-02151 CW
YAHOO!'S MOT. TO DISMISS SEC. AM.          - 40 -
COMPL.