Xiaoning et al v. Yahoo! Inc, et al

Case 4:07-cv-02151-CW    Document 65-4    Filed 08/27/2007    Page 1 of 114

Doc. 65 Att. 3

# EXHIBIT B

Dockets.Justia.com

## Beijing Municipal First Intermediate People's Court

# Criminal Verdict

(2003) One Intermediate Criminal Division First Trial Case No. 2226

The public prosecuting organ is the First Branch of Beijing Municipal People's Procuratorate.

Defendant Wang Xiaoning (Pseudonyms: Shi Cheng, Chen Ping, Tiandi Shuping, Shi'er Yue Dangren, etc.), male, 53 years old (born on January 7, 1950), Han ethnicity, place of birth: Shenyang, Liaoning Province, university graduate, unemployed, resided at No. 30 Baiwanzhuang Shen Qu, Xicheng District, Beijing; because he was suspected of committing the crime of inciting subversion of the state power, he was taken into custody on September 1, 2002, arrested on September 30, 2002; he is currently being held in custody at the Beijing National Security Detention Center.

Defense Attorney Bai Yu is a lawyer from Beijing Yi Feng Law Office

Defense Attorney Hao Jun is a lawyer from Beijing Yi Feng Law Office

In the First Branch of Beijing Municipal People's Procuratorate's Criminal Indictment (2003) No. 64, the First Branch of Beijing Municipal People's Procuratorate charged Defendant Wang Xiaoning with committing the crime of inciting subversion of the state power, and on July 9, 2003 it sent the case to this court for public prosecution. This court formed a collegiate panel according to law and proceeded to conduct a public trial. The First Branch of Beijing People's Procuratorate sent Deputy Procurator Zhao Changping and Tang Ruiqing to court to support the public prosecution. Defendant Wang Xiaoning and his defense attorneys Bai Yu and Hao Jun were also in court and participated in the proceedings. This trial has now been concluded.

The First Branch of Beijing People's Procuratorate charged that, from October, 2000 to March, 2001, Defendant Wang Xiaoning compiled 11 editions of an Internet publication—*Free Forum for Political Reform*. In articles published in this Internet publication—"11 Essays on Democratic Politics," "Wang Xiaoning's 123 Emails" and others, he publicly proclaimed opposition to the leadership of the Communist Party of China and

rejection of the "Four Fundamental Principles," and advocated the establishment of a multiparty system. He also delivered the 10th and the 11th edition of this publication to email addresses that he had been collecting over time.

From August, 2001 to May, 2002, Defendant Wang Xiaoning wrote many articles, such as "The Chinese Constitution" (Wang Xiaoning's Draft) and "Understand Correctly the Current Constitution and Use the Constitution to Advance the Establishment of a Democratic Political Body in China," with his real name and pseudonyms like "Chen Ping" and "Shi Cheng." With other articles that he had collected, he compiled 31 editions of *Commentaries on Current Affairs and Politics*. In these articles, he advocated his own democratic thoughts and attacked the current political and social systems. He widely distributed and disseminated these thoughts by using Yahoo China's online group and email, which he had registered under his pseudonyms. During this period, Wang Xiaoning kept a close and long-term contact with Liu Guokai—the ringleader of an overseas hostile organization, chairman of the Social Democratic Party of China. In the mission statement of the publication *Commentaries on Current Affairs and Politics*, he explicitly suggested: "To conduct promotion for the realization of a democratic political system in China as well as for the Social Democratic Party of China to participate in the governing of China."

From June to July, 2002, Defendant Wang Xiaoning actively conducted promotion work to prepare for the organization of the Third Road Party of China. He wrote articles in the name of the "Third Road Party of China" to propagate the Third Road Party of China's lines and ideological tenets. He advocated the establishment of a political party that could replace the Communist Party of China. He also distributed articles *en masse* by email, such as "Take the Third Road, Establish a Third Party" and "The Principal of the Third Road Party of China Gives a Speech, Appeals to the Left Wing of the Communist Party of China to Comply with Democracy and Supports the Left Wing of the Communist Party of China to Establish its Own Party."

From April, 2002 to May, 2002, Defendant Wang Xiaoning also sent the articles he had written, such as "The Four Fundamental Principles Are the Biggest Obstacle to Progress in China," to overseas publications or websites, such as *Democracy Forum,* to advocate his political opinions.

The First Branch of Beijing Municipal People's Procuratorate sent the evidence that incriminated Defendant Wang Xiaoning, including testimonies from witnesses, documentary

evidence, the process of capture, and the defendant's confession. This procuratorate maintains that Defendant Wang Xiaoning's actions violated the "Criminal Law of the People's Republic of China" Paragraph 2 of Article 105 and Article 106, and that his actions constituted the crime of inciting subversion of the state power. It has requested this court to punish defendant Wang Xiaoning according to law.

During the court session, Defendant Wang Xiaoning did not deny the facts as charged in the indictment. However, he argued that his actions did not constitute the crime of inciting subversion of the state power. The opinions from his defense attorneys Bai Yu and Hao Jun during the court session were: Defendant Wang Xiaoning's actions did not constitute a crime.

Through investigation and adjudication, this court concludes:

1.      Defendant Wang Xiaoning, from October, 2000 to March, 2001, compiled 11 editions of the Internet publication, *Free Forum for Political Reform,* with his own writing and reproductions of other articles. In the articles published in this publication, such as "11 Essays on Democratic Politics," "Wang Xiaoning's 123 Emails," and "Gu Zhun's Direct Democracy and Congressional Political Thoughts are an Important Development of Marxism-Leninism and Mao Zedong Thoughts—Three Arguments on the Road of Political Reform in China," he publicly declared his opposition to the leadership of the Communist Party of China and the "Four Fundamental Principles," attacked and smeared the Socialist system in China as an "autocratic and dictatorial political system," and advocated the establishment of a multiparty system. He also sent out respectively the 10th and the 11th edition of the publication containing the above-mentioned content to a large number of email addresses that he had been collecting over time.

The above-mentioned facts are corroborated by the evidence of the court's proofs and cross-examinations listed below, and are confirmed by this court.

a)      Defendant Wang Xiaoning's confession proves: from October, 2000 to March, 2001, he compiled *Free Forum for Political Reform* in a total of 11 editions. This Internet publication was distributed in a few hundred copies for each edition. The distribution method was through logging onto the Internet by telephone and sending out emails. The email addresses to which he delivered the publication were all collected from the Internet. Some articles in this Internet publication were written by himself; others were downloaded by him from the web. All these 11 editions were saved on his computer.

b)      The work record of the Beijing National Security Bureau confirms:

Defendant Wang Xiaoning was detained and interrogated at 10 a.m. on September 1, 2002. Meanwhile, his house (No. 30 Baiwanzhuang Shen Qu, Xicheng District, Beijing) was being searched according to law. In the search, the 1st to the 11th edition of the electronic publication *Free Forum for Political Reform* saved in "Wang Xiaoning's Computer\Wang Xiaoning's Data 2\E:\Wang's Internet publication\Free Forum for Political Reform" folder (time created: 17:29, December 29, 2001) on his computer (hard drive model number: 90650U2, serial number: C20E6AMC) was obtained.

        c)      The work record of the Beijing National Security Bureau confirms: it has searched and obtained the first page (the 10th and the 11th edition) of some of the *Free Forum for Political Reform* sent out by Wang Xiaoning from his email address ggf-ihps@21cn.com.

        d)      Some articles written by Defendant Wang Xiaoning, such as "11 Essays on Democratic Politics," "Wang Xiaoning's 123 Emails," and "Gu Zhun's Direct Democracy and Congressional Political Thoughts Are an Important Development to Marxism-Leninism and Mao Zedong Thoughts—Three Arguments on the Road of Political Reform in China," contain contents that oppose the leadership of the Communist Party of China and the "Four Fundamental Principles," and attack and smear the Socialist system of China, such as "The Four Fundamental Principles are the biggest obstacle to the establishment of a democratic political system in China," "The Four Fundamental Principles are essentially one fundamental principle: the leadership of the Communist Party or so-called autocratic dictatorship," "What the Four Fundamental Principles have brought the Chinese people is a massive disaster," "Don't forget that China is still an autocratic and dictatorial state," "Without a multiparty system, free election, and separation of powers, any reform of the political system is fake," "The National People's Congress and multiparty cooperation is a fake democratic system and a true dictatorship," and "The so-called Chinese style political system—the political system under the Four Fundamental Principles—is a fake democratic system and a true dictatorship."

        2.      From August, 2001 to May, 2002, Defendant Wang Xiaoning compiled 31 editions of the Internet publication *Commentaries on Current Affairs and Politics* with his own writings and reproductions of other articles. In this Internet publication, he published many articles, such as "Foreword to 'Commentaries on Current Affairs and Politics', "The Chinese Constitution" (Wang Xiaoning's Draft), "Understand Correctly the Current Constitution, Use the Constitution to Advance the Establishment of a Democratic Political Body in China," "Hold High the Great Flag of the Current Constitution, Fight Hard against

Any Violation of the Constitution," "Gu Zhun's Socialist Dual Party System Marks the Direction for the Reform of the Political System in China," and "Revolt of the Left Wing in the Communist Party of China Increases the Possibility of a Military Coup," under his real name and the pseudonyms "Chen Ping", "Shi Cheng", "Tiandi Shuping," etc.

In these articles, he advocated his own so-called "democratic thoughts" and attacked the current political and social systems. He widely distributed and disseminated these thoughts by using Yahoo China's online group and email, which were registered under his pseudonyms. During this period, Wang Xiaoning kept a close and long-term contact with Liu Guokai, the ringleader of an overseas hostile organization, chairman of the Social Democratic Party of China. In the mission statement of *Commentaries on Current Affairs and Politics*, he explicitly proposed "to conduct promotion work for the establishment of a democratic political system in China, as well as for the Social Democratic Party of China to participate in the governing of China." In the Internet publication, he also published and reposted a large number of articles written by Liu Guokai for the purpose of attacking and smearing the Chinese government.

The above-mentioned facts are corroborated by the evidence of the court's proofs and cross-examinations listed below, and are confirmed by this court.

a)       Defendant Wang Xiaoning's confession proves: Between August, 2001 and March or April, 2002, he compiled *Commentaries on Current Affairs and Politics* in a total number of 31 editions. He registered this Internet publication on Yahoo China, then sent it out through Yahoo China's online group. This online group distributed a total number of 25 editions. From August to October, 2001, each edition was distributed in five to six hundred copies, and they were all sent in groups. These five to six hundred email addresses were collected by him over time and then provided to Yahoo China. The originator's address was bxoguh@yahoo.com.cn, and the sender's email address was ahgq@yahoo.com.cn. Later, "Yahoo China" online group believed that there were political problems with his articles and refused to distribute them. He then sent out the 26th to 31st editions of the publication to each email box individually by himself. The email addresses he used to distribute the publication are ggf-ihps@21cn.com and 50-wopc@21cn.com. Some articles in this Internet publication were written by himself, some were downloaded by him from the Web, and some were sent to him by Liu Guokai, including those originally published in *Free Forum for Political Reform*. His purpose of compiling this Internet publication is to advocate political democratic thinking,

advance political reform in China, and concurrently help Liu Guokai advocate his Social Democratic Party of China. There is an agreement between him and Liu Guokai to help each other in their advocacy.

b)      The work record of the Beijing National Security Bureau confirms: Defendant Wang Xiaoning was detained and interrogated at 10 a.m. on September 1, 2002. In the meantime, his house (No. 30 Baiwanzhuang Shen Qu, Xicheng District, Beijing) was being searched according to law. In the search, the 1st to 25th editions of the electronic publication *Free Forum for Political Reform* saved in "Wang Xiaoning's Computer\Wang Xiaoning's Data 2\E:\Wang's Internet publication\Free Forum for Political Reform" folder (time created: 17:29, December 29, 2001) and the 26th, 27th, 28th, 30th and 31st edition of *Free Forum for Political Reform* saved in the "E Drive\Wang Xiaoning Data 2\Wang's Internet publication\Free Forum for Political Reform unfinished" folder (time created: 17:29, December 29, 2001) were obtained from his computer (hard drive model number: 90650U2, serial number: C20E6AMC)

c)      The work record of the Beijing National Security Bureau confirms: the "*Free Forum for Political Reform* Work Guidelines and Plan" written by Wang Xiaoning was found on Wang Xiaoning's computer (E Drive:\Wang's Internet publication\Free Forum for Political Reform 1st to 25th edition" folder).

d)      The work record of the Beijing National Security Bureau confirms: it has searched and obtained the first page of *Free Forum for Political Reform* (the 9th, 10th, 11th, 13th, 14th, 17th, 18th, 19th, 20th, 21st, 22nd, 23rd, 24th, 25th, 26th, 27th, 28th and 30th edition), which were sent out by Wang Xiaoning through the email address bxoguh@yahoo.com.cn.

e)      The user information from Yahoo Holdings (Hong Kong) Ltd. proves and confirms: the Yahoo China website is authorized by Yahoo Holdings (Hong Kong) Ltd. to operate in mainland China. Online group is a service similar to a bulletin board provided by the Yahoo China website. Its members may upload materials to the online group through the Internet. The originator of the online group "aaabbbccc" is bxoguh@yahoo.com.cn. This user is a registered user of the Yahoo China website.

f)      The user information from Yahoo Holdings (Hong Kong) Ltd. proves and confirms: ahgq@yahoo.com.cn is a registered user of the Yahoo China website.

g)      The Ministry of National Security of the People's Republic of China proves and confirms: the Social Democratic Party of China is a hostile organization. Its ringleader

Liu Guokai is a hostile element.

      h)     The work record of the Beijing National Security Bureau confirms: from July, 2001 to February, 2002, it searched and obtained Wang Xiaoning's email correspondence with Liu Guokai, chairman of the overseas hostile organization "Social Democratic Party of China," in a total number of 46 pages.

      i)     The work record of the Beijing National Security Bureau confirms: in September, 2002, on the personal computer of the then arrested Wang Xiaoning, it found email correspondence with Liu Guokai, chairman of the overseas hostile organization "Social Democratic Party of China," in a total of 30 pages.

      j)     Articles written by Wang Xiaoning, such as "Foreword to '*Commentaries on Current Affairs and Politics'*", "The Chinese Constitution" (Wang Xiaoning's Draft), "Understand Correctly the Current Constitution, Use the Constitution to Advance the Establishment of a Democratic Political Body in China," "Hold High the Great Flag of the Current Constitution, Fight Hard against Any Violation of the Constitution," and "Gu Zhun's Socialist Dual Party System Marks the Direction for the Reform of the Political System in China," "Revolt of the Left Wing in the Communist Party of China Increases the Possibility of a Military Coup," contain contents that oppose the leadership of the Communist Party of China and the "Four Fundamental Principles," attack and smear the Socialist system in China, such as "China has entered the 21st century, but it is still an autocratic and dictatorial state," "The Communist Party has ruled China and established up to now 52 years of autocratic and dictatorial rule,", "The Communist Party of China is bound to lose power, even become abandoned by people and history, and will never ever rise again," "Just look at China now, workers and peasants are oppressed at the bottom of the society, hundreds millions of workers have lost their jobs, many peasant migrant workers are brutally exploited and oppressed, they have no right to strike, no right to organize unions, and their basic rights cannot be guaranteed," "In fact, China's political system is a 'party state system.' It is an autocratic and dictatorial system," "the Chinese people are completely deprived of democratic rights, political rights, and rights to manage state affairs," "China is one of the few countries in the world that still reinforce an autocratic and dictatorial political system. China will eventually become a democratic polity. China's extreme corruption, its half-dead half-alive economy, the sharp social conflicts, the repeated hardship suffered by peasants, workers and other laborers, and the reality that China is moving towards crony capitalism, all these prove that China

needs political reform that will establish a democratic system."

3.     From June to July, 2002, Defendant Wang Xiaoning actively conducted "promotion work" to prepare for the organization of the "Third Road Party of China." In articles written in the name of the "Third Road Party of China," such as "Take the Third Road, Establish a Third Party" and "The Principal of the Third Road Party of China Gives a Speech, Calls on the Left Wing of the Communist Party of China to Comply with Democracy, and Supports the Left Wing of the Communist Party of China to Establish its Own Party," he slandered the leadership of the Communist Party of China, attacked and smeared the current political and social system in China, advocated the Third Road Party of China's "ideological lines and political tenets," preached the establishment of a political party that can replace the Communist Party of China and practice a "multiparty system" and "separation of powers" in China. Defendant Wang Xiaoning distributed the above-mentioned articles in large quantity by email.

The above-mentioned facts are corroborated by the evidence of the court's proofs and cross-examinations listed below, and are confirmed by this court.

a)     Defendant Wang Xiaoning's confession proves: in May, 2002, he had the idea of establishing the Third Road Party of China. He planned to organize a new political party and establish a new democratic polity in China. Thus, he wrote the article "Take the Third Road, Establish a Third Party" in order to elaborate his idea. Later, he wrote four successive articles in order to advocate this party of his, and sent them out in the name of the "Third Road Party of China." At the time, the email addresses he used were cn01edul@hotmail.com, cn02edul@hotmail.com, and cn01edul@yahoo.com.cn. The time was approximately between June and August, 2002. Each article was sent in five to six hundred copies. After these five articles were sent out, some people supported, some thought that the time was not ripe, and some expressed desire to join his Party.

b)     The work record of the Beijing National Security Bureau confirms: on Wang Xiaoning's computer (Desktop\ "The Third Road Party of China." folder) it found 10 "Third Road Party of China" articles written by Wang Xiaoning (such as "Take the Third Road, Establish the Third Party," "The Third Road Party of China's 10 Points Concerning the Great Unification of China", "The Principal of the Third Road Party of China Gives a Speech, Calls on the Left Wing of the Communist Party of China to Comply with Democracy, and Supports the Left Wing of the Communist Party of China to Establish its Own Party," "The Third Road

Party of China's 22 Points Concerning Resolving the Extremely Severe Problem of the Three 'Nongs' (i.e. Peasants, Rural Areas, and Agriculture) in China," etc.)

c)    The testimony of witness Xiao Yong proves: around July, 2002, he and his friends were surfing on the web in an Internet café. He read about the statutes of the Third Road Party of China in his friend's email. At the end of this email, there was a line that read like this: "Anyone who agrees with our party's political ideas, please contact us." In the middle of July, he sent an email to the Third Road Party of China for the first time. Basically, he said that he agreed with its political ideas and hoped to stay in touch on a long term basis. The Third Road Party of China soon replied to his email and welcomed him to join the party. Concurrently, in consideration of safety issues, they asked him to provide an alias and asked him to promote the Third Road Party of China's opinions to the public and expand the organization while protecting his own safety. Later, they would also send party documents to him. Xiao Yong provided them with the alias "Wang Zuozhi." The Third Road Party of China sent him an email again and asked him whether he had any good suggestions for the party. He proposed to "build the party slowly, focus on promotion, and expand the organization." Later, he also suggested two ways to establish the Third Road Party of Chinas—"the lightning way" and "the gradual way." He once sent an email to the Third Road Party of China to inquire whether he could use the name of the Third Road Party of China to publish articles in overseas democratic movement publications. The Third Road Party of China replied "yes" to him and made it clear that he should not publish any articles contradicting the Third Road Party of China's principles. The documents that he received from the Third Road Party of China were mainly "The Third Road Party of China's 22 Points Concerning Resolving the Extremely Severe Problem of Three 'Nongs' (i.e. Peasants, Rural Areas, and Agriculture) in China,", "The Third Road Party of China's 10 Points Concerning the Great Unification of China," "The Third Road Party of China Recommends an Important Article—Beware of the Chinese Communist Party's Fake Reform of the Political System in China," and "The Principal of the Third Road Party of China Gives a Speech, Calls on the Left Wing of the Communist Party of China to Comply with Democracy, and Supports the Left Wing of the Communist Party of China to Establish its Own Party."

d)    A search of Xiao Yong's email mailbox (adamsyong@hotmail.com) obtained five articles from the Third Road Party of China—("Take the Third Road, Establish a Third Party," "The Principal of the Third Road Party of China Gives a Speech, Calls on the Left

Wing of the Communist Party of China to Comply with Democracy, and Supports the Left Wing of the Communist Party of China to Establish its Own Party," "The Third Road Party of China's 22 Points Concerning Resolving the Extremely Severe Problem of the Three 'Nongs' (i.e. Peasants, Rural Areas, and Agriculture) in China," "The Third Road Party of China's 10 Points Concerning the Great Unification of China," and "The Third Road Party of China Recommends an Important Article—Beware of the Chinese Communist Party's Fake Reform of the Political System in China.") Correspondence between Xiao Yong and the Third Road Party of China was also found.

e)      The testimony of the witness Xie Yimin proves: in July, 2002, when he was browsing an overseas website called "the Big Reference," he read the article "The Principal of the Third Road Party of China Gives a Speech, Calls on the Left Wing of the Communist Party of China to Comply with Democracy, and Supports the Left Wing of the Communist Party of China to Establish its Own Party." At the bottom of the article, there was the Third Road Party of China's email address. About two days later, he sent his first email to the Third Road Party of China. The content of that email was in support of their opinions, and the email was signed "Shi Qiao." After about two days, he found a reply email sent by the Third Road Party of China. The main content was to welcome his correspondence and to inform him that the Third Road Party of China had already published three documents. If needed, they could be sent to him. Xie Yimin then sent out his second email to the Third Road Party of China and asked them to send the three documents to his other email address zaphie2004@hotmail.com, and said that he would ally with more people. The last email that the Third Road Party of China sent to him was an article about "the Three 'Nongs'."

f)      A search of Xie Yimin's email mailbox (junshimi2003@yahoo.com.cn) obtained the article "The Third Road Party of China's 22 Points Concerning Resolving the Extremely Severe Problem of the Three 'Nongs' (i.e. Peasants, Rural Areas, and Agriculture) in China" from the Third Road Party of China and the correspondence between Xie Yimin and the Third Road Party of China.

g)      The work record of the Beijing National Security Bureau confirms: many emails in which Wang Xiaoning contacted other people about issues regarding the Third Road Party of China were found in Wang Xiaoning's computer (Desktop\"The Third Road Party of China." folder).

h)      Articles such as "Take the Third Road, Establish a Third Party" which

Defendant Wang Xiaoning wrote in the name of the Third Road Party of China contain words such as "It has been thirteen years since the 'June Fourth event' in 1989. Very few countries in the world have not achieved a democratic polity. Yet China still has an autocratic and dictatorial political system," "China hasn't achieved a democratic polity for thirteen years. The main reason for this is that a political party capable of replacing the Communist Party of China was never formed," "Since the Communist Party of China gained power, it established a dictatorial political system—the people's democratic dictatorship. The system of the people's democratic dictatorship is a politically oppressive polity. In the past 52 years, the politically oppressive polity in China has not changed. This political oppressive polity is reactionary. China must change this political oppressive polity," "China must take the third road—the road of democracy + new socialism," "A vast change in Chinese history is imminent. We urgently need to establish a third political party," "Why has the Communist Party of China, which is so corrupt, still not yet fallen from power? The main reason is that China does not have any political party capable of replacing the Communist Party of China," "The Third Road Party welcomes all improvements and gradual advances beneficial to the democratic movement, but shall never give up people's revolution. We believe in the power of people and pin our hope on people's revolution." With these words, he slandered the leadership of the Communist Party of China, attacked and smeared the current political and social system in China. He advocated the ideological lines and political tenets of the "Third Road Party of China." He preached the establishment of a political party capable of replacing the Communist Party of China and the implementation of a "multiparty system" and "separation of the three powers" in China.

4.      Between April, 2001 and May, 2002, Defendant Wang Xiaoning published a number of articles under his real name and his pseudonym "Chen Ping," such as "Regulations and the Government's Red Documents Are Not Law," "The Four Fundamental Principles are the Biggest Obstacle to Progress in China," "Analysis of the Possibility of a Military Coup in China," and "Why is the Communist Party of China Afraid of Western Democratic Politics," in domestic and overseas electronic publications: *China Research, Democracy Forum, Big Reference,* and *Small Reference.* In these articles, he publicly opposed the "Four Fundamental Principles," slandered the leadership of the Communist Party of China, attacked and smeared the current political and social system in China, and advocated his so-called "political opinions."

The above-mentioned facts are corroborated by the evidence of the court's proofs and cross-examinations listed below, and are confirmed by this court.

a)     Defendant Wang Xiaoning's confession proves: in *China Research*, he has published articles which include "Regulation and Control of the Internet Cannot Violate the Constitution and Laws," "Bring Down Corruption in Using Government Vehicles," "The Current Condition of Science and Technology in China's National Defense Industry Is Worrisome,", "Regulations and the Government's Red Documents Are Not Law," "Discussing the Road to China's Unification On October 1." These articles were signed with his real name "Wang Xiaoning." The time of the publication of these articles was successively from April, 2001 to May, 2002. He submitted them to *China Research* by email from his computer at home. The email address he used was ggf-ihps@263.net. *Democracy Forum* reposted some the articles he wrote including "11 Essays on Democratic Politics," "Don't Give a Hand to People Who Oppose Political Reform." *Big Reference* reposted a large number of articles from his Internet publication *Commentaries on Current Affairs and Politics*. As all the Internet publications he compiled were sent to *Big Reference*, *Big Reference* then selected some of them to publish. *Big Reference* used to solicit his submissions. In *Big Reference*, he published "Analysis of the Possibility of a Military Coup in China," and "Whether Arresting Lü Jiaping's Son Is Aimed at the Chinese Communist Party's Military Authority." These articles were signed with his pseudonym "Chen Ping." *Small Reference* published his article "Why Is the Communist Party of China Afraid of Western Democratic Politics" signed with his real name "Wang Xiaoning." *Small Reference* asked him for submissions after reading his articles published in *Democracy Forum*.

b)     The work record of the Beijing National Security Bureau confirms: from April, 2001 to May, 2002, a search obtained 20 articles which he had published in the domestic electronic publication *China Research*, such as "Regulation and Control of the Internet Cannot Violate the Constitution and Laws," "Bring Down Corruption in Using Government Vehicles," "The Current Condition of Science and Technology in China's National Defense Industry Is Worrisome," "Regulations and the Government's Red Documents Are Not Law," and "Discussing the Road to China's Unification On October 1."

c)     The work record of the Beijing National Security Bureau confirms: On April 21st, 2001, a search obtained articles published in the Asia Democracy Foundation's *Democracy Forum*, including "11 Essays on Democratic Politics": "The Four Fundamental

Principles Are the Biggest Obstacle to Progress in China," "Malicious Attack on the Communist Party of China Is Not Subversion of the State Power," "China Does Not Have a Publishing Law, But It Has a Unique Labor Reform System," etc.

    d)    The work record of the Beijing National Security Bureau attests: on March 23rd, 2001, a search obtained the article "Why Is the Communist Party of China Afraid of Western Democratic Politics," which was published in the overseas publication *Small Reference*. On May 31st, 2001, a search obtained two articles "Analysis of the Possibility of a Military Coup in China" and "Whether Arresting Lü Jiaping's Son Is Aimed at the Chinese Communist Party's Military Authority," which were published in the domestic publication *Big Reference*.

    This court finds that, Defendant Wang Xiaoning smeared and incited the subversion of state power and the Socialist system and endangered national security through writing and reposting articles, compiling electronic publications, and distributing them in large numbers by email. His actions constitute the crime of inciting the subversion of the state power and the crime is severe. He should be punished according to law. Defendant Wang Xiaoning also colluded with overseas hostile organizations and individuals and committed the crime of inciting subversion of the state power. He should be severely punished according to law. The First Branch of the Beijing Municipal People's Procuratorate charged Defendant Wang Xiaoning with committing the crime of inciting subversion of the state power. Facts and evidence are clear, indisputable, and sufficient. Therefore, this court accepts the prosecution's charges. Through many of the articles written or edited by him, Defendant Wang Xiaoning incited subversion of the state power and the overthrow of the Socialist system, thus endangering national security, by fabricating facts or malicious denigrating and smearing in disregard of the truth. His actions are consistent with the constitution of the crime of inciting subversion of the state power. Hence, this court does not accept the pleas and opinions of the defendant and his defense team, who state that Wang Xiaoning's actions do not constitute a crime. Hereby, according to the "Criminal Law of the People's Republic of China" Paragraph 2 of Article 105, Article 106, Paragraph 1 of Article 56, Paragraph 1 of Article 55, and Article 64, the following verdict is rendered:

    1.    Defendant Wang Xiaoning is sentenced to 10 years' imprisonment with two years' deprivation of political rights for committing the crime of inciting subversion of the state power.

    (The prison term is to be calculated starting on the day the verdict is executed, with

13

each day spent in detention prior to the execution of the verdict to count as one day of the prison term; therefore, the term will run from September 1, 2002 to August 31, 2012).

2.    Objects sent with the case which were used by Defendant Wang Xiaoning to commit his crimes, including 2 computers, 2 receipts, 1 Internet dial-up card, and 6 floppy disks, are confiscated.

If this verdict is not accepted, an appeal may be filed between two and ten days from the receipt of this verdict, either through this court or directly to the Beijing Municipal Higher People's Court. In case of a written appeal, the original appellate petition must be submitted together with one photocopy.

Presiding Judge: Wang Jian

Judicial Judge: An Ruihua

Deputy Judicial Judge: Zhao Jian

Date: ***2003 [illegible]

Beijing Municipal First Intermediate People's Court [seal]

This document has been checked against the original source. No difference is found [stamp]

Court Clerks: Yang Benhui

Pan Mengmeng

# 北京市第一中级人民法院
# 刑事判决书

(2003) 一中刑初字第 2226 号

公诉机关北京市人民检察院第一分院.

被告人王小宁（笔名：石城、陈平、天地述评、十二月党人等），男，53 岁(1950 年 1 月 7 日出生)，汉族，出生地辽宁省沈阳市，大学文化，无业，住北京市西城区百万庄甲区 30 号；因涉嫌犯煽动颠覆国家政权罪于 2002 年 9 月 1 日被羁押，同年 9 月 30 日被逮捕；现羁押在北京市国家安全局看守所.

辩护人白宇，北京市怡丰律师事务所律师.

辩护人郝军，北京市怡丰律师事务所律师.

北京市人民检察院第一分院以京检一分刑诉字（2003）第 64 号起诉书指控被告人王小宁犯煽动颠覆国家政权罪，于 2003 年 7 月 9 日向本院提起公诉. 本院依法组成合议庭，公开开庭进行了审理. 北京市人民检察院第一分院指派代理检察员赵长平、唐瑞清出庭支持公诉，被告人王小宁及其辩护人白宇、郝军到庭参加诉讼. 现已审理终结.

北京市人民检察院第一分院指控：被告人王小宁于 2000 年 10 月至 2001 年 3 月间，编辑了 11 期《政治改革自由论坛》网刊，在该网刊发表的《民主政治随感十一篇》、《王小宁的 123 封电子邮件》等文章中公开宣称反对中国共产党的领导，推翻"四项基本原则"，鼓吹建立多党制. 并以电子邮件的方式将该刊第 10 期、第 11 期分别向平时搜集的电子邮箱地址投递.

被告人王小宁于 2001 年 8 月至 2002 年 5 月间，以真实姓名及 "陈平"、"石城" 等笔名撰写了《中国宪法》(王小宁方案)、《正确地认识现行宪法，利用宪法推进中国民主政体的实现》等多篇文章，连同其收集的其他文章编辑了 31 期《时事政治评论》，宣传自己的民主思想，攻击现行政治制度和社会制度。并分别通过其用假名注册的 "雅虎中国" 网站的电子部落及电子邮箱的形式广泛发送、传播。在此期间，王小宁与境外敌对组织头目中国社会民主党主席刘国凯长期密切联系，在《时事政治评论》办刊宗旨中明确提出："为在中国实现民主政治体制，为中国社会民主党在中国上台执政进行宣传工作。"

被告人王小宁于 2002 年 6、7 月间，为筹建 "中国第三道路党" 积极做宣传工作，以 "中国第三道路党" 的名义撰写文章宣扬 "中国第三道路党" 的路线和思想纲领，鼓吹要建立一个可以替代中国共产党的执政党。并将《走第三条道路，建立第三政党》、《中国第三道路党负责人发表谈话，呼吁中共左派遵从民主，支持中共左派独立成党》等文章以电子邮件的方式大量发送。

被告人王小宁于 2001 年 4 月至 2002 年 5 月间，还将自己撰写的《四项基本原则是中国进步的最大障碍》等文章投寄给《民主论坛》等境内外刊物或网站发表，宣传自己的政治主张。

北京市人民检察院第一分院向本院移送了指控被告人王小宁犯罪的证人证言、书证、抓获经过及被告人供述等证据，认为被告人王小宁的行为触犯了《中华人民共和国刑法》第一百零五条第二款、第一百零六条的规定，已构成煽动颠覆国家政权罪。提请本院对被告人王小宁依法惩处。

被告人王小宁在开庭审理中对起诉书指控的事实没有异议，但辩称其行为不构成煽动颠覆国家政权罪。其辩护人白宇、郝军在开庭审理中提出的辩护意见是：被告人王小宁的行为不构成犯罪。

经审理查明：

一、被告人王小宁于 2000 年 10 月至 2001 年 3 月间，通过自己撰写及转载其他文章编辑了 11 期《政治改革自由论坛》网刊。在该网刊发表的由其撰写的《民主政治随感十一篇》、《王小宁的 123 封电子邮件》、《顾准的直接民主和议会政治思想是对马列主义、毛泽东思想的重大发展——三论中国政治改革之路》等文章中公开宣称反对中国共产党的领导，反对"四项基本原则"，攻击、诽谤中国的社会主义制度是"专制独裁的政治制度"，鼓吹建立多党制。被告人王小宁将载有上述内容的该刊第 10 期、第 11 期以电子邮件的方式分别向其平时搜集的电子邮箱地址大量投递。

上述事实，有下列经法庭举证、质证的证据在案证实，本院予以确认。

1、被告人王小宁的供述证实：他在 2000 年 10 月份到 2001 年 3 月份办了《政治改革自由论坛》一共 11 期，这个网刊每期发送几百份。发送方式是拨号上网，通过电子邮件的方式，他发送的地址都是在网上积累的。这个网刊上的文章有一部分是他写的，还有一部分是他从网上下载的。这 11 期都存在他的电脑中了。

2、北京市国家安全局的工作说明证实：2002 年 9 月 1 日上午 10 时对被告人王小宁实施拘留审查，同时依法对其住所（西城区百万庄申区 30 号）进行搜查。搜查获取其电脑（硬盘型号：90650U2，序列号：C20E6AMC）"王小宁电脑\

3

王小宁资料 2\E:\王网刊\政治改革自由论坛"文件夹（创建时间：2001 年 12 月 29 日 17：29）中所存的电子刊物《政治改革自由论坛》第 1 至 11 期。

3、北京市国家安全局的工作说明证实：查获王小宁用其电子邮箱 ggf-ihps@21cn.com 发送的部分刊物《政治改革自由论坛》的首页（第 10 期、第 11 期）。

4、在被告人王小宁撰写的《民主政治随感十一篇》、《王小宁的 123 封电子邮件》、《顾准的直接民主和议会政治思想是对马列主义、毛泽东思想的重大发展——三论中国政治改革之路》等文章中，均有"四项基本原则是中国民主政体建立的最大障碍"、"四项基本原则实质就是一项基本原则：共产党的领导或者叫专制独裁"、"四项基本原则给中国人民带来的是巨大灾难"、"不要忘记中国还是一个专制独裁的国家"、"没有多党制、自由大选、三权分立，任何政治体制改革都是假的"、"人大和多党合作是假民主真专制独裁的政治制度"、"所谓中国式的政治制度，在四项基本原则下的政治制度、是假民主真专制的政治制度"等反对中国共产党的领导，反对"四项基本原则"，攻击、诽谤中国的社会主义制度的内容。

二、被告人王小宁于 2001 年 8 月至 2002 年 5 月间，通过自己撰写及转载其他文章编辑了 31 期《时事政治评论》网刊。在该网刊发表的其以王小宁及"陈平"、"石城"" 天地述评"等笔名撰写的《<时事政治评论>发刊词》、《中国宪法》（王小宁方案）、《正确地认识现行宪法，利用宪法推进中国民主政体的实现》、《高举现行宪法的伟大旗帜，与一切违宪行为做坚决的斗争》、《顾准的社会主义两党制的思想为中国政治体制改革指明了方向》、《中共左派的反叛使军事政

4

变可能性增大》等多篇文章中，宣传其所谓的"民主思想"，攻击、诽谤现行的政治制度和社会制度。被告人王小宁将上述网刊通过其用假名注册的"雅虎中国"网站的电子部落及电子邮箱的方式广泛发送、传播。在此期间，被告人王小宁与境外敌对组织头目"中国社会民主党"主席刘国凯密切联系，在《时事政治评论》办刊宗旨中明确提出："为在中国实现民主政治体制，为中国社会民主党在中国上台执政进行宣传工作。"并在该网刊上大量转载、发表刘国凯攻击、诽谤中国政府的文章。

上述事实，有下列经法庭举证、质证的证据在案证实，本院予以确认。

1、被告人王小宁的供述证实：《时事政治评论》是他在 2001 年 8 月到 2002 年 3、4 月份办的，一共办了 31 期。他在"雅虎中国"注册了这个网刊，然后通过"雅虎中国"电子部落发送。这个电子部落一共给发送了 25 期，从 2001 年 8 月到 10 月每期发送五六百份，都是群发的。这五六百份的邮箱地址是他平时积累的，然后提供给"雅虎中国"。发起人的邮箱地址是 bxoguh@yahoo.com.cn，发件人的邮箱地址是 ahgq@yahoo.com.cn。后来"雅虎中国" 电子部落认为他的文章有政治问题，不给发送了，他就自己一个信箱一个信箱地发送，发送了第 26 期到第 31 期。他自己发送刊物用的邮箱地址是 ggf-ihps@21cn.com 和 50-wopc@21cn.com。这份网刊中的文章，有一部分是他写的，有一部分是他从网上下载的，还有一部分是刘国凯给他发送过来的，也包括原来在《政治改革自由论坛》上发表过的。他办这个网刊的目的是宣传政治民主思想，推动中国政治改革，同时也是为了帮助刘国凯宣传"中国社会民主党"，他和刘国凯之间有一个互相帮助对方

做宣传的协议。

2、北京市国家安全局的工作说明证实：2002 年 9 月 1 日上午 10 时对被告人王小宁实施拘留审查，同时依法对其住所（西城区百万庄申区 30 号）进行搜查。搜查获取其电脑（硬盘型号：90650U2，序列号：C20E6AMC）"王小宁电脑\E: \ 王小宁资料 2\王网刊\《时事政治评论》"文件夹（创建时间：2001 年 12 月 29 日 17: 29）中所存的电子刊物《时事政治评论》第 1 至 25 期，"E 盘\王小宁资料 2\王网刊\《时事政治评论》未完"文件夹（创建时间：2001 年 12 月 29 日 17: 29）中《时事政治评论》26、27、28、30、31 期。

3、北京市国家安全局的工作说明证实：在王小宁的电脑（"E: / 王网刊/《时事政治评论》1 期到 25 期" 文件夹）中发现王小宁撰写的 "《时事政治评论》工作方针和计划"。

4、北京市国家安全局的工作说明证实：查获王小宁用其电子邮箱 bxoguh@yahoo.com.cn 发送的《时事政治评论》的首页（第 9、10、11、13、14、17、18、19、20、21、22、23、24、25、26、27、28、30 期）。

5、雅虎香港控股有限公司关于用户资料的证明证实：雅虎中国网站是由雅虎香港控股有限公司授权在国内经营的网站。电子部落是雅虎中国网站提供的一种类似于公告栏的服务。其成员可以通过互联网在电子部落里上传资料。电子部落 aaabbbccc 的发起人是 bxoguh@yahoo.com.cn。该用户是雅虎中国网站的一个注册用户。

6、雅虎香港控股有限公司关于用户资料的证明证实：ahgq@yahoo.com.cn 是雅虎中国网站的注册用户。

7、中华人民共和国国家安全部的证明证实："中国社会民主党"为敌对组织，该组织头目刘国凯为敌对分子。

8、北京市国家安全局的工作说明证实：查获王小宁在2001年7月至2002年2月期间，与境外敌对组织"中国社会民主党"主席刘国凯的来往电子邮件材料共46页。

9、北京市国家安全局的工作说明证实：2002年9月，在扣押的王小宁个人电脑中发现其与境外敌对组织"中国社会民主党"主席刘国凯的来往电子邮件材料共30页。

10、在被告人王小宁撰写的《<时事政治评论>发刊词》、《中国宪法》（王小宁方案）、《正确地认识现行宪法，利用宪法推进中国民主政体的实现》、《高举现行宪法的伟大旗帜，与一切违宪行为做坚决的斗争》、《顺准的社会主义两党制的思想为中国政治体制改革指明了方向》、《中共左派的反叛使军事政变可能性增大》等多篇文章中，均有"进入了二十一世纪的中国，仍然是一个专制独裁的国家"、"共产党统治了中国，在中国建立了至今五十二年的专制独裁统治"、中共肯定要下台，甚至被人民、被历史所抛弃，永远不会再上台"、"看一看现在中国，工人和农民被压在社会的最底层，几千万工人失业，很多民工受到残酷的剥削和压迫，没有权利罢工，没有权利组织工会，其基本权利得不到保证"、"中国的事实上的政治制度就是'党国制'，这是一种专制独裁的政治制度"、"中国人民的民主权利、政治权利、管理国家事务的权利完全被剥夺了"、"中国是世界上少数仍然实行专制独裁政治制度的国家之一，中国总是要走向民主政体，中国的极端腐败，中国经济的半死不活，社会矛盾的尖锐，工人、农民等劳动人民受二遍苦，中国走向特权资本主义的现实，都说明中国需要建立民主政体的政治改革"等反对中国共产党的领导，反对"四项基本原则"，攻击、诽谤中国的社会主义制度的内容。

7

三、被告人王小宁于 2002 年 6、7 月间，为筹建"中国第三道路党"进行积极的"宣传工作"。在其以"中国第三道路党"的名义撰写的《走第三条道路，建立第三政党》、《中国第三道路党负责人发表谈话，呼吁中共左派遵从民主，支持中共左派独立成党》等文章中，诬蔑中国共产党的领导，攻击、诽谤中国现行的政治制度和社会制度，宣扬"中国第三道路党"的"路线思想和政治纲领"，鼓吹要建立一个可以替代中国共产党的执政党，在中国实行"多党制"和"三权分立"。被告人王小宁将上述文章以电子邮件的方式大量发送。

上述事实，有下列经法庭举证、质证的证据在案证实，本院予以确认。

1、被告人王小宁的供述证实：2002 年 5 月他有了成立"中国第三道路党"的想法，打算成立一个新的政党，建立中国新的民主政体。于是他写了《走第三条道路，建立第三政党》来阐述他的观点，后来又陆续写了四篇文章来宣传他的这个党，并且以"中国第三道路党"的名义发送出去。当时使用的邮箱是 cn01edul@hotmail.com、cn02edul@hotmail.com、和 cn01edul@yahoo.com.cn。时间大概在 2002 年 6 月到 8 月，每篇文章发送五六百份。这五篇文章发送出去以后，有人支持，有人认为时机不成熟，也有人表示希望加入。

2、北京市国家安全局的工作说明证实：在王小宁的电脑（桌面/"中国第三道路党文件"文件夹）中发现王小宁撰写的"中国第三道路党"十篇文章。（《走第三条道路，建立第三政党》、《中国第三道路党关于实现中国统一大业的十点主张》、《中国第三道路党推荐一篇重要文章》、《中国第三道路党负责人发表谈话，呼吁中共左派遵从民主，支持中

共左派独立成党》、《中国第三道路党关于解决中国极为严重的三农（农民、农村、农业）问题的二十二点主张》等）

　　3、证人肖勇的证言证实：大概在 2002 年 7 月份，他和朋友在网吧上网，在朋友的电子邮件里看到了有关"第三道路党"章程的内容，这个电子邮件的最后留有一句话："凡赞同我党政治主张的，请与我们联系。" 7 月中旬，他第一次给"第三道路党"发了电子邮件，大致意思是对"第三道路党"的政治主张表示赞同，希望保持长期联系。不久，"第三道路党"就给他回信了，对他参加"第三道路党"表示欢迎。同时从安全方面考虑要求他提供一个代名，并要求他在保证安全的情况下向外宣传"第三道路党"的主张，发展组织，以后还会给他寄党的文件。他提供了化名"王佐之"。"第三道路党"又给他发来邮件，问他对该党有什么好的建议。他提出了"缓建党、重宣传、扩组织"的建议，后来还建议"第三道路党"的成立要采取"突发式"和"渐进式"两种方式。他曾经发电子邮件向"第三道路党"询问，是否可以以"第三道路党" 党员的名义在国外的民运刊物上发表文章。"第三道路党"回复他可以，并交待他所发表的文章不要跟"第三道路党"党的原则相违背。他主要收到的"第三道路党"的文件有：《中国第三道路党关于解决中国极为严重的三农（农民、农村、农业）问题的二十二点主张》、《中国第三道路党关于实现中国统一大业的十点主张》、《中国第三道路党推荐一篇重要文章——警惕中共假的政治体制改革》、《中国第三道路党负责人发表谈话，呼吁中共左派遵从民主，支持中共左派独立成党》等文章。

　　4、在肖勇的电子信箱（adamsyong@hotmail.com）中查获"中国第三道路党"的五篇文章（《走第三条道路，建立第三政

党》、《中国第三道路党负责人发表谈话，呼吁中共左派遵从民主，支持中共左派独立成党》、《中国第三道路党关于解决中国极为严重的三农（农民、农村、农业）问题的二十二点主张》、《中国第三道路党关于实现中国统一大业的十点主张》、《中国第三道路党推荐一篇重要文章——警惕中共假的政治体制改革》》及肖勇与"中国第三道路党"的来往信件。

5、证人谢毅民的证言证实：2002 年 7 月份他在上海外《大参考》网站时，看到一篇《中国第三道路党负责人发表谈话，呼吁中共左派遵从民主，支持中共左派独立成党》的文章，文章的末尾留下了"中国第三道路党"的电子邮箱的地址。大约两天后，他向"中国第三道路党"发送了第一封电子邮件，内容是支持他们的意见，落款为"石桥"。 大约两天后，发现"中国第三道路党"给他回复，主要内容是欢迎联系，"第三道路党"已发表三个文件，如需要可发给他。他又发了第二封电子邮件给"中国第三道路党"，要求把三个文件发到他的另一个邮箱 zaphie2004@hotmail.com，并说要联合更多的人。"中国第三道路党"最后发给他的是一篇有关"三农"的文章。

6、在谢毅民的电子信箱（junshimi2003@yahoo.com.cn）中查获"中国第三道路党"的文章《中国第三道路党关于解决中国极为严重的三农（农民、农村、农业）问题的二十二点主张》及谢毅民与"中国第三道路党"的来往信件。

7、北京市国家安全局的工作说明证实：在王小宁的电脑（桌面/"中国第三道路党文件"文件夹）中发现多封王小宁与他人针对"中国第三道路党"的有关问题进行联系的"来往信件"。

8、在被告人王小宁以"中国第三道路党"名义撰写的

《走第三条道路，建立第三政党》等文章中，均有"1989 年
'六四事件'发生已经十三年了，世界上只剩少数国家没有
实现民主政体了，而中国还是专制独裁政治制度"、"中国十
三年没有实现民主政体，主要是由于中国一直没有出现和形
成一个足以取代中共的政党"、"中共执政以后，建立了专政
政治制度——人民民主专政。专政制度就是政治压迫政体，
五十二年了，中国政治压迫政体一直没有改变。这种政治压
迫制度都是反动的，中国一定要改变政治压迫制度"、"中国
必须走第三条道路——民主+新社会主义的道路"、"中国历
史巨变在即，急需建立第三政党""为什么中共那么腐败而
不倒台，最主要原因就是中国还没有一个可以取代中共的政
党"、 "第三道路党欢迎一切有利民主运动的改良、渐进，
但决不放弃人民革命。我们相信人民的力量，寄希望于人民
革命"等诬蔑中国共产党的领导，攻击、诽谤中国现行的政
治制度和社会制度，宣扬"中国第三道路党"的"路线思想
和政治纲领"，鼓吹要建立一个可以替代中国共产党的执政
党，在中国实行"多党制"和"三权分立"的内容。

　　四、被告人王小宁于 2001 年 4 月至 2002 年 5 月间，在
境内外电子刊物《中国研究》、《民主论坛》、《大参考》、《小
参考》上，发表了其以王小宁及笔名"陈平"撰写的《法规
和政府的红头文件不是法律》、《四项基本原则是中国进步的
最大障碍》、《中国军事政变的可行性分析》、《中共为什么害
怕西方式的民主政治》等多篇文章。在文章中公开反对"四
项基本原则"，诬蔑中国共产党的领导，攻击、诽谤中国现
行的政治制度和社会制度，宣传其所谓的"政治主张"。

　　上述事实，有下列经法庭举证、质证的证据在案证实，
本院予以确认。

1、被告人王小宁的供述证实：他在《中国研究》上发表过《对网络进行管制不能违反宪法和法律》、《打倒公车腐败》、《中国的国防工业科技现状令人担忧》、《法规和政府的红头文件不是法律》、《十一论中国统一之路》等文章，都是署的"王小宁"这个真实名字。发表这些文章陆续是在2001年4月到2002年5月间，他是在家里的电脑上通过电子邮件的形式向《中国研究》投稿的，他使用的邮箱是 gcf-ihps@263.net。《民主论坛》转载过他写的《民主政治随感十一篇》、《不要给反对政治改革的人以口实》等文章。他编辑的网刊《时事政治评论》中相当一部分文章，《大参考》上都转载了，因为他编的网刊都给《大参考》发送，《大参考》就会挑一部分发表。《大参考》曾经向他约过稿，他在《大参考》上发表过《中国军事政变的可行性分析》、《逮捕吕加平的儿子，是否针对中共军方》，署名是"陈平"。《小参考》上刊登过他写的《中共为什么害怕西方式的民主政治》，署名"王小宁"，《小参考》是在看了他在《民主论坛》上发表的文章以后才找他约稿的。

2、北京市国家安全局的工作说明证实：2001年4月至2002年5月，查获王小宁在境内电子刊物《中国研究》上发表了《对网络进行管制不能违反宪法和法律》、《打倒公车腐败》、《中国的国防工业科技现状令人担忧》、《法规和政府的红头文件不是法律》及《十一论中国统一》等二十余篇文章。

3、北京市国家安全局的工作说明证实：2001年4月21日，查获王小宁在"民主亚洲基金会"的《民主论坛》上发表了《四项基本原则是中国进步的最大障碍》、《恶毒攻击中共不是颠覆国家政权》、《中国没有出版法，却独有劳改制》等《民主政治随录十一篇》。

4、北京市国家安全局的工作说明证实：2001年3月23日，查获王小宁在境外刊物《小参考》上发表了《中共为什么害怕西方式的民主政治》一文。2001年5月30日，查获王小宁化名"陈平"在境外电子刊物《大参考》上发表了《中国军事政变的可行性分析》和《新闻分析：逮捕吕加平的儿子，是否针对中共军方》两篇文章。

本院认为，被告人王小宁通过撰写、转载文章编辑电子网刊并以电子邮件大量发送的方式，诽谤、煽动颠覆国家政权和社会主义制度，危害国家安全，其行为已构成煽动颠覆国家政权罪，且罪行重大，依法应予惩处。被告人王小宁还与境外敌对组织和个人相勾结，实施煽动颠覆国家政权的犯罪，依法应予从重惩处。北京市人民检察院第一分院指控被告人王小宁犯煽动颠覆国家政权罪的事实清楚，证据确实、充分，指控的罪名成立。被告人王小宁在其撰写或编辑的大量文章中，采取捏造事实或不顾事实真相恶意抵毁、污蔑的方式，煽动颠覆国家政权、推翻社会主义制度，危害了国家安全，其行为符合煽动颠覆国家政权罪的犯罪构成，故对于被告人王小宁及其辩护人关于王小宁的行为不构成犯罪的辩解和辩护意见，本院不予采信和采纳。据此，依照《中华人民共和国刑法》第一百零五条第二款、第一百零六条、第五十六条第一款、第五十五条第一款、第六十四条的规定，判决如下：

一、被告人王小宁犯煽动颠覆国家政权罪，判处有期徒刑十年，剥夺政治权利二年。

（刑期从判决执行之日起计算，判决执行以前先行羁押的，羁押一日折抵刑期一日，即自2002年9月1日起至2012年8月31日止）

　　二、随案移送的供被告人王小宁犯罪所用的物品：电脑主机二台、发票二页、上网卡一张、软盘六张，予以没收。

　　如不服本判决，可在接到本判决书的第二日起十日内，通过本院或直接向北京市高级人民法院提出上诉，书面上诉的应当提交上诉状正本一份，副本一份。

审　判　长　　王　坚

审　判　员　　安端华

代理审判员　　赵　建

　　　　　　二〇〇三　　　　　　　　日

**本件与原本核对无误**

书　记　员　　杨奔卉

潘萌萌

**NetworkOmni**®
*Multilingual Communications*



los angeles

portland

miami

toronto

lima

zürich

london

santo domingo

## Translation Certificate of Accuracy

| | |
|---|---|
| [Job Number] | 58411 |
| [Client Name] | O'Melveny & Myers LLP (Los Angeles). |
| [Document Name] | Shi Tao_Final.doc |
| | Wang Xiaoning_Final.doc |

The above referenced document has been translated accurately, completely and reliably, and reviewed for cultural appropriateness by two qualified translators—one to translate and one to edit. No additions or deletions have occurred that would change the context of the source language message; content has not been altered or misrepresented; specific industry terminology has been used throughout; the reading level (linguistic register) of the original document has been maintained; and if adaptation of the reading level has been requested, target text has been adapted following Client's instructions.

The translators translating the materials have professional translation experience, full fluency in the target language of the materials, the ability to read and understand the source language, knowledge and experience with the culture(s) of the intended audience, and adequate knowledge of the subject matter.

This Certificate of Accuracy is hereby issued within the limits set forth by NetworkOmni's Terms and Conditions. The signing representative acknowledges that the information related to the above referenced document is privileged and confidential communication, and that reproduction of said materials is strictly prohibited without written authorization.

Alejandro Moreda

_____
Printed Name of Certifying Representative

Sr. Project Manager

_____
Title

_____
Signature

August 27, 2007

_____
Date

State of California
County of Los Angeles

On August 27, 2007, before me, Janice Parvin, Notary Public, personally appeared Alejandro Moreda, personally known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that she executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

WITNESS my hand and official seal.

_____
Notary Public

> JANICE S. PARVIN
> Commission # 1742963
> Notary Public - California
> Ventura County
> My Comm. Expires May 27, 2011

4353 Park Terrace Drive • Westlake Village, CA 91361 • 800-543-4244 • www.networkomni.com

# EXHIBIT C

## Changsha Intermediate People's Court of Hunan Province
# Criminal Verdict

(2005) Changsha Intermediate Criminal Division One First Trial Case No. 29

The public prosecuting organ is the Changsha People's Procuratorate of Hunan Province.

Defendant Shi Tao, a.k.a. "198964," male, born on July 25, 1968 in Yanchi County in Ningxia Hui Autonomous Region, Han ethnicity, university graduate, unemployed, resided at Room 102, West Unit, Building 3, Jun'anli Housing Development in Taiyuan, Shanxi Province. Because he was suspected of committing the crime of illegally providing state secrets to foreign entities, he was taken into custody on November 24, 2004, placed under criminal detention on the following day, and arrested on December 14 of the same year. He is currently being held in custody at the Changsha Detention Center.

Authorized Defense Attorney Tong Wenzhong is a lawyer with the Tianyi Law Firm in Shanghai.

In Changsha Procuratorate Criminal Indictment No. 13 (2005), the Changsha People's Procuratorate charged Defendant Shi Tao with committing the crime of illegally providing state secrets to foreign entities, and on January 31, 2005, it sent the case to this court for public prosecution. This court formed a collegiate panel according to law and held a closed trial to hear this case. The Changsha People's Procuratorate sent procurator Su Shuangji to court to support the prosecution. Defendant Shi Tao and his defense attorney Tong Wenzhong were also in court to participate in the proceedings. This trial has now been concluded.

The Changsha People's Procuratorate charged that, from February 11 to April 22, 2004, Defendant Shi Tao was employed by Hunan's *Contemporary Business News* as head of the Editorial Department. At around 5:00 pm on April 20, after a routine newspaper review meeting and a pre-editorial meeting, assistant editors-in-chief of *Contemporary Business News* Wang XX and Yang XX convened a special meeting of the heads of the newspaper's Front Page News Department, the Mobile Hotline Department, and the Editorial Department.

During this special meeting, Wang XX verbally communicated the main content of a top-secret document entitled "A Notice Regarding Current Stabilization Work" (CPC General Office Document No. 11 [2004]) issued by the General Office of the Central Committee of the Communist Party of China (CPC) and the General Office of the State Council. He also emphasized that this was a top-secret document that could not be recorded or disseminated. However, Defendant Shi Tao secretly took notes on the document's main content. Between approximately 7:00 pm on that day and approximately 2:00 am the following morning, Defendant Shi Tao used his personal email account (huoyan-1989@yahoo.com.cn) in his office to send the notes he had secretly taken on the above-mentioned main content of CPC General Office Document No. 11 [2004] to the email account of Hong Zhesheng (caryhung@aol.com), one of the founders of the "Asia Democracy Foundation" located in New York, USA, and editor-in-chief of the overseas web site "Democracy Forum" and the electronic publication "Democracy News." He gave "198964" as the informer's alias and asked Hong Zhesheng to find a way to distribute it as quickly as possible without using Shi Tao's name. That day, the above-mentioned main content of CPC General Office Document No. 11 [2004] was posted on the "Democracy Forum" under the name of "198964." It was later reposted on other overseas web sites such as "Boxun News" and the "China Democracy & Justice Party."

Regarding the above-mentioned facts as charged, the prosecuting organ provided such corroborating evidence as oral testimonies of witnesses, a verification certificate of the level of confidentiality, related material and written evidence, process records of capturing Shi Tao, photos of the crime scene and photos of material evidence, proof of the defendant's identity, and the defendant's confession. The procuratorate maintains that Defendant Shi Tao's actions violated Article 110 of the "Criminal Law of the People's Republic of China" and that his actions constitute the crime of illegally providing state secrets abroad. It has sent the case to this court for prosecution, requesting that a verdict be rendered according to law.

Neither Defendant Shi Tao nor his defense attorney raised any objections to the criminal facts as charged in the indictment or to the characterization of this case. Defendant Shi Tao argued in his defense: "My criminal act of providing state secrets to foreign entities did not involve especially serious circumstances." His defense attorney stated: "Considering

that Defendant Shi Tao's actions did not cause extremely serious damage to state security or interests and that his attitude in admitting his crimes was good, we request penalty to be lenient."

In the course of the trial it was determined that: In April 2001, Defendant Shi Tao made the acquaintance of Hong Zhesheng (from China's Taiwan Province, resident of New York, USA, and one of the founders of the Asia Democracy Foundation), editor-in-chief of the overseas web site "Democracy Forum" and the electronic publication "Democracy News." At approximately 5:00 pm on April 20, 2004, after a routine newspaper review meeting and a pre-editorial meeting, assistant editors-in-chief of *Contemporary Business News* Wang XX and Yang XX convened a meeting of senior staff of the newspaper's Front Page News Department, the Mobile Hotline Department, and the Editorial Department. Shi Tao, then head of the newspaper's News Center and Editorial Center, attended the meeting. During the meeting, Wang XX verbally communicated main excerpts of a top-secret document entitled "A Notice Regarding Current Stabilization Work" (No. 11 [2004] issued by the CPC General Office) issued by the General Office of the Central Committee of the Communist Party of China (CPC) and the General Office of the State Council. He emphasized that this was a top-secret document that could not be recorded or disseminated. Defendant Shi Tao took notes on the document's main content. When Wang XX discovered that Shi Tao was taking notes, he reminded Shi Tao that he was not allowed to take notes. However, Shi Tao still took detailed notes in his notebook. That night at approximately 11:32 pm, Defendant Shi Tao leaked this information to an overseas hostile element. Taking advantage of the fact that he was working overtime alone in his office, he connected to the Internet through his phone line and used his personal email account (huoyan-1989@yahoo.com.cn) to send his notes on the above-mentioned main content of CPC General Office Document No. 11 [2004]. He also used the alias "198964" as the name of the informer and asked Hong Zhesheng to find a way to distribute the information as quickly as possible without using Shi Tao's name. That day, the above-mentioned main content of CPC General Office Document No. 11 [2004] was posted on the "Democracy Forum" under the name of "198964." It was later reposted on other foreign web sites such as "Boxun News" and the "China Democracy & Justice Party."

The evidence demonstrating the above criminal facts is as follows: 1. A verification

certificate of level of confidentiality issued by the State Secret Protection Bureau, which confirms that the content of the state secret materials illegally provided by Defendant Shi Tao to foreign entities basically match the sub-headings in CPC General Office Document No. 11 [2004] (top-secret level), and that the basic content of CPC General Office Document No. 11 [2004] that was leaked should be classified as top-secret level state secrets. 2. Material evidence: (i) An email sent by Shi Tao at 11:00 p.m. on April 20, 2004, using his personal email account (huoyan-1989@yahoo.com.cn), in which he sent a summary of CPC General Office Document No. 11 [2004] to the email account of the overseas hostile element Hong Zhesheng (caryhung@aol.com). The general idea of the email was that Shi Tao wanted Hong Zhesheng to find a way to distribute CPC General Office Document No. 11 [2004] as quickly as possible but that he should use "198964", rather than the name "Shi Tao", to identify the informer; a summary of the document was attached at the end. (ii) The summary of CPC General Office Document No. 11 [2004] downloaded from the Internet that was posted on foreign web sites and electronic publications such as "Democracy Forum," "Boxun News," and "China Democracy & Justice Party" under the name of "198964." Defendant Shi Tao identified these materials, confirming that they were the same as the state secrets that he had provided. (iii) Materials downloaded from the Internet that identify hostile element Hong Zhesheng and confirm that Hong Zhesheng is from China's Taiwan Province, currently residing in New York, USA. He is a founder of the Asia Democracy Foundation and editor-in-chief of the overseas web site "Democracy Forum" and the electronic publication "Democracy News." 3. Record of evidence-taking and the material evidence of a notebook, confirming the fact that on December 6, 2004, Defendant Shi Tao's wife Wang Yuan provided the state [stamp for correction] security agency with a notebook found in their home containing Shi Tao's notes on the summary of CPC General Office Document No. 11. There was also a note in Shi Tao's notebook reading "Meeting on April 20 to relay Propaganda Department document (top-secret) (CPC General Office Document No. 11), notice from the CPC General Office regarding current stabilization work," with a summary of the document appended at the end. This notebook was identified by Defendant Shi Tao, confirming that he was the person who made the notes. 4. Account holder information furnished by Yahoo Holdings (Hong Kong) Ltd., which confirms that for IP address 218.76.8.201 at 11:32:17 p.m.

on April 20, 2004, the corresponding user information is as follows: user telephone number: 0731-4376362 located at the *Contemporary Business News* office in Hunan; address: 2F, Building 88, Jianxiang New Village, Kaifu District, Changsha. 5. Photos taken at the scene and photos of related material evidence and written evidence. 6. Material evidence: (i) One envelope and one check sent by the overseas hostile element Hong Zhesheng to Defendant Shi Tao as payment for his submission. (ii) Another notebook belonging to Defendant Shi Tao, which recorded the email address of the overseas hostile element Hong Zhesheng. (iii) The notebooks of witnesses Wang XX and Peng Zhiguo, both of which contained information on CPC General Office Document No. 11. 7. Testimonies of witnesses Wang XX, Yang XX, and Peng Zhiguo, confirming that at approximately 5:00 on the afternoon of April 20, during a meeting especially convened by Wang XX of the newspaper's department heads, he verbally communicated the main content of CPC General Office Document No. 11 [2004] and emphasized that it was a top-secret document that should not be disseminated; that Defendant Shi Tao attended the meeting and took notes; that when Wang XX discovered that Shi Tao was taking notes, he especially reminded Shi Tao of the fact that he was not supposed to take notes; and that Defendant Shi Tao was on duty that night. 8. Testimonies of witnesses Yi Sufen, He Ping, Hu Youde, and Hong Yu, confirming that, when the department heads of the newspaper relay a document of important messages from the Provincial Party Committee's Propaganda Department, if it is emphasized that it is a top-secret document not to be circulated, as newspaper employees they will all regard that document as state secret. 9. Process record of capturing Shi Tao. 10. Defendant Shi Tao's identity papers. 11. A *Contemporary Business News* employee registration form, confirming that Defendant Shi Tao was employed by Hunan's *Contemporary Business News* from February 11, 2004 to April 22, 2004. 12. Shi Tao's written statements and confession, confirming that he completely admitted the fact that he had intentionally and illegally provided state secrets to foreign entities. The above items of evidence corroborate each other and are sufficient to establish the facts of this case.

This court finds that, in order to inform overseas hostile elements, Defendant Shi Tao intentionally and illegally provided information that he knew to be top-secret level state secrets to an entity outside of the country. Having endangered state security involving

especially serious circumstances, his actions constitute the crime of illegally providing state secrets to foreign entities. Therefore, the court accepts the prosecution's charge that Shi Tao's actions constitute the crime of illegally providing state secrets to foreign entities. Defendant Shi Tao argued in his defense: "My criminal act of providing state secrets to foreign entities did not involve especially serious circumstances." This was investigated and it was found that, according to Item 1 of Article 2 of the Supreme People's Court's "Explanation on Certain Questions Regarding Specific Applications of Law when Trying Cases of Stealing, Gathering, Procuring, or Illegally Providing State Secrets or Intelligence for Foreign Entities," stealing, gathering, procuring, or illegally providing state secrets are crimes with "especially serious circumstances." The state secrets that Defendant Shi Tao illegally provided to foreign entities were verified by the State Secret Protection Bureau as top-secret level state secrets, so his actions should be considered to involve especially serious circumstances. Therefore, the defense argument cannot be accepted by this court. Shi Tao's defense attorney stated: "Considering that Defendant Shi Tao's actions did not cause extremely serious harm to state security or interests and that his attitude in admitting his crimes was good, we request penalty to be lenient." This was investigated and found to conform with the facts; therefore, the opinion of the defense can be accepted by this court. In view of the above, and in accordance with Article 111, Paragraph 1 of Article 55, and Paragraph 1 of Article 56 of the "Criminal Law of the People's Republic of China," the following verdict is rendered:

Defendant Shi Tao is sentenced to 10 years' imprisonment with two years' deprivation of political rights for committing the crime of illegally providing state secrets to foreign entities.

(The prison term is to be calculated starting on the day the verdict is implemented, with each day spent in detention prior to the implementation of the verdict to count as one day of the prison term; therefore, the term will run from November 24, 2004 to November 23, 2014).

If this verdict is not accepted, an appeal may be filed between two and ten days from the receipt of this verdict, either through this court or directly to the Hunan Province Higher People's Court. In case of written appeal, the original appellate petition must be submitted with two photocopies.

Presiding Judge: Ouyang Hua

Judicial Judge: Liu Zhigan

Deputy Judicial Judge: Xie Shaoping


***[illegible] 27, 200* [illegible]

Changsha Intermediate People's Court of Hunan Province [seal]


This document has been checked against the original source. No difference is found [stamp]


Court Clerk: Huang Shizhi

---

**Case No. 19-10**

---

Name:        师涛
             Shi Tao


Location:    湖南省
             Hunan Province


Source:      湖南省长沙市中级人民法院刑事判决书（2005）
             Changsha Intermediate People's Court of Hunan Province
             Criminal Verdict (2003)

---

# 湖南省长沙市中级人民法院

# 刑事判决书

（2005）长中刑一初字第 29 号

公诉机关湖南省长沙市人民检察院。

被告人师涛，化名"198964"，男，1968 年 7 月 25 日出生于宁夏回族自治区盐池县，汉族，大学文化，无业，住山西省太原市军安里小区 3 号楼西单元 102 室。因涉嫌犯为境外非法提供国家秘密罪，于 2004 年 11 月 24 日被抓获，次日被刑事拘留，同年 12 月 14 日被逮捕。现押长沙市看守所。

委托辩护人佟文忠，上海市天易律师事务所律师。

长沙市人民检察院以长检刑诉字（2005）第 13 号起诉书指控被告人师涛犯为境外非法提供国家秘密罪一案，于 2005 年 1 月 31 日向本院提起公诉。本院依法组成合议庭，不公开开庭审理了本案，长沙市人民检察院指派代理检察员苏双技出庭支持公诉，被告人师涛及其辩护人佟文忠等到庭参加诉讼。现已审理终结。

长沙市人民检察院指控，2004 年 2 月 11 日至同年 4 月 22 日期间，被告人师涛受聘湖南省当代商报社，任编辑部主任。同年 4 月 20 日下午 5 时许，湖南省当代商报社副总编王某某、杨

1

22

某某在例行评报会和编前会后，又召集该报社要闻部、热线机动部、编辑部等部门负责人参加了一个专门会议。在该专门会上，王某某口头传达了属于绝密级国家秘密的中共中央办公厅、国务院办公厅《关于当前稳定工作的通知》（中办发 [2004] 11 号）的重要内容摘要，并强调该文件属于绝密文件，不能记录、传播，但被告人师涛私自将此重要内容摘要作了记录。同日下午 19 时许至凌晨 2 时许，被告人师涛在其办公室，通过其个人的电子邮箱 huoyan-1989@yahoo.com.cn, 向位于美国纽约的 "民主亚洲基金会" 筹设人之一、境外网站 "民主论坛" 及电子刊物《民主通讯》主编洪哲胜的电子邮箱 caryhung@aol.com 发送了其私自记录的上述中办发 [2004] 11 号文件的重要内容摘要，并将提供者化名为 "198964"，同时要求洪哲胜尽快想办法发出去，但不要用师涛的名字。当日，署名 "198964" 提供的上述中办发 [2004] 11 号文件的重要内容摘要在《民主论坛》刊登发表，此后又被 "博讯"、"中国民主正义党" 等境外网站转载发表。

对指控的上述事实，公诉机关提供了证人证言、密级鉴定书、相关物证、书证、抓获经过材料、现场照片及物证照片、被告人的身份证明材料、被告人的供述等证据证实，该院认为，被告人师涛的行为已触犯《中华人民共和国刑法》第一百一十一条之规定，构成为境外非法提供国家秘密罪，向本院提起公诉，要求依法判处。

被告人师涛及其辩护人对起诉书指控的犯罪事实及本案的

2

23

定性不持异议。被告人师涛辩解："其为境外非法提供国家秘密的犯罪行为不属于情节特别严重。"其辩护人辩称："鉴于被告人师涛的行为并未给国家安全和利益造成极其严重的危害后果和认罪态度好，请求对其从轻处罚。"

经审理查明：被告人师涛于 2001 年 4 月与境外网站"民主论坛"及电子刊物《民主通讯》的主编洪哲胜（中国台湾省人，居住美国纽约，系"民主亚洲基金会"的筹设人之一）相识。2004年 4 月 20 日下午 5 时许，湖南省当代商报社副总编王某某、杨某某在例行评报会和编前会后，又召集该报社要闻部、热线机动部、编辑部等部门负责人开会，时任该报社新闻中心和编辑中心主任的师涛参加了会议。王某某在会上口头传达了属于绝密级国家秘密的中共中央办公厅、国务院办公厅《关于当前稳定工作的通知》（中办发[2004]11 号）的重要内容摘要，并强调该文件属于绝密文件，不能记录，不要传播。被告人师涛将此重要内容摘要作了记录。王某某发现师涛在作记录，就提醒师涛不能作记录，但师涛仍在记录本上作了详细记录。当日晚 23 时 32 分许，被告人师涛为向境外敌对分子通风报信，利用其独自在办公室值班之机电话上网，通过其个人的电子邮箱 huoyan-1989@yahoo.com.cn 向境外敌对分子洪哲胜的电子邮箱 caryhung@ao1.com 发送了其记录的上述中办发[2004]11 号文件的重要内容摘要，并将提供者化名为"198964"，同时要洪哲胜尽快想办法发出去，但不要用师涛的名字。当日，署名为"198964"提供的上述中办发

3

传达宣传部文件（绝密文件）（中办11号文件），中办关于当前稳定工作的通知。"等文字，后附有文件摘要内容。该笔记本经被告人师涛的辨认，确认系其所作的记录；4、雅虎香港控股有限公司出具的关于用户资料的证明材料，证实 IP 地址：218.76.8.201,时间：2004 年 4 月 20 日 23 时 32 分 17 秒的对应用户资料如下：用户电话：0731-4376362，湖南《当代商报》社。地址：长沙市开福区建湘新村88栋2楼；5、现场照片及相关物证、书证照片；6、物证：①、境外敌对分子洪哲胜作为稿费寄给被告人师涛的支票一张及信封一件；②、被告人师涛的另一本笔记本，上记载有境外敌对分子洪哲胜的电子邮箱号码；③证人王某某、彭治国的笔记本，上均记载有中办11号文件的摘要内容；7、证人王某某、杨某某、彭治国的证言，证实 2004 年 4 月 20 日下午 5 时许，王某某在专门召集报社部门负责人开会的会议上，口头传达了中办发[2004]11 号文件的重要内容摘要，并强调该文件属于绝密文件，不要传播。被告人师涛参加会议并作了记录，王某某发现师涛在作记录，就专门提醒师涛不要作记录的事实以及被告人师涛在当晚值班的事实；8、证人易素芬、何平、胡有德、洪宇的证言，证实报社负责人在传达省委宣传部的重要精神的文件时，如强调不能传播，是绝密文件，作为一名新闻工作者均会将该文件视为国家秘密的事实；9、抓获经过材料；10、被告人师涛的身份证明材料；11、当代商报社招聘人员登记表，证实被告人师涛于 2004 年 2 月 11 日至 2004 年 4 月 22

[2004]11 号文件的重要内容摘要在《民主通讯》上刊登发表，此后又被"博讯"、"中国民主正义党"等境外网站转载发表。

证明上述事实的证据有：1、国家保密局作出的密级鉴定书，证实被告人师涛为境外非法提供的国家秘密的材料内容与"中办发[2004]11 号文件（绝密级）中的小标题内容基本一致，泄露了中办发[2004]11 号文件的基本内容，应当属于绝密级国家秘密；2、书证：①、被告人师涛于 2004 年 4 月 20 日 23 时使用其个人的电子邮箱 huoyan-1989@yahoo.com.cn通过互联网将中办发[2004]11 号文件内容摘要发送给境外敌对分子洪哲胜的电子邮箱 caryhung@aol.com 的电子邮件一封，内容大意为师涛要洪哲胜尽快想办法将中办发[2004]11 号文件发出去，但提供者不要用师涛的名字，而是化名为"198964"，后附有文件摘要内容；②、通过互联网下载的在《民主通讯》、"博讯"、"中国民主正义党"等境外网站和电子刊物刊登发表的署名为"198964"者提供的中办 11 号文件摘要的资料，该资料经被告人师涛辨认，确认与其所提供的国家秘密的内容一致；③、从互联网上下载的敌对分子洪哲胜的身份资料，证实洪哲胜是中国台湾人，居住在美国纽约，系"民主亚洲基金会"的筹设人之一，系境外网站"民主论坛"及电子刊物《民主通讯》的主编；3、取证笔录、物证笔记本，证实 2004 年 12 月 6 日，被告人师涛的妻子王媛将从其家中找到的师涛记录有中办 11 号文件摘要内容的笔记本交给公安机关的事实，及被告人师涛的笔记本上记载有"4 月 20 日开会

4

日受聘于湖南当代商报社的事实；12、被告人师涛的手写自诉材料及供述，均对其故意为境外非法提供国家秘密的犯罪事实供认不讳。上述证据相互印证，足以认定本案事实。

本院认为，被告人师涛为向境外敌对分子通风报信，故意非法将其所知悉的属于绝密级的国家秘密提供给境外的机构，危害国家安全，属情节特别严重，其行为已构成为境外非法提供国家秘密罪。故公诉机关指控被告人师涛的行为构成为境外非法提供国家秘密罪的罪名成立。被告人师涛辩解："其为境外非法提供国家秘密的犯罪行为不属于情节特别严重。"经查，最高人民法院《关于审理为境外窃取、刺探、收买、非法提供国家秘密具体应用法律若干问题的解释》第二条第（一）项中规定，为境外窃取、刺探、收买、非法提供绝密级国家秘密的，属于"情节特别严重"，被告人师涛为境外非法提供的国家秘密已经国家保密局鉴定为绝密级国家秘密，其行为应认定为情节特别严重，故此辩解本院不予采纳。其辩护人辩称："鉴于被告人师涛的行为并未给国家安全和利益造成极其严重的危害后果和认罪态度好，请求对其从轻处罚。"经查，与事实相符，故此辩护意见本院予以采纳。据此，依照《中华人民共和国刑法》第一百一十一条、第五十五条第一款、第五十六条第一款之规定，判决如下：

被告人师涛犯为境外非法提供国家秘密罪，判处有期徒刑十年，剥夺政治权利二年。

（刑期从判决执行之日起计算，判决执行以前先行羁押的，

6

羁押一日折抵刑期一日，即自 2004 年 11 月 24 日起至 2014 年 11 月 23 日止）

　　如不服本判决，可在收到本判决书后的第二日起十日内，通过本院或直接向湖南省高级人民法院提出上诉，书面上诉的，应提交上诉状正本一份，副本两份。



审　判　长　　欧　阳　华

审　判　员　　柳　志　敢

代理审判员　　谢　绍　平

本件与原本核对无异

书　记　员　　黄　实　之

**Changsha Intermediate People's Court of Hunan Province
Criminal Verdict**

Changsha Intermediate Criminal Division One First Trial Case No. 29 (2005)

Prosecuting organ is the Changsha People's Procuratorate of Hunan Province.

Defendant Shi Tao, a.k.a. "198964," male, born on July 25, 1968 in Yanchi County in Ningxia Hui Autonomous Region, Han ethnicity, university graduate, unemployed, resided at Room 102, West Unit, Building 3, Jun'anli Housing Development in Taiyuan, Shanxi Province. Because he was suspected of committing the crime of illegally providing state secrets to foreign entities, he was taken into custody on November 24, 2004, placed under criminal detention on the following day, and arrested on December 14 of the same year. He is currently being held in custody at the Changsha Detention Center.

Authorized defense attorney is Tong Wenzhong, a lawyer with the Tianyi Law Firm in Shanghai.

In Changsha Procuratorate Criminal Indictment No. 13 (2005), the Changsha People's Procuratorate charged defendant Shi Tao with committing the crime of illegally providing state secrets to foreign entities, and on January 31, 2005 it sent the case to this court for prosecution. This court formed a collegiate bench according to law and held a closed trial to hear this case. The Changsha People's Procuratorate sent procurator Su Shuangji to court to support the prosecution. Defendant Shi Tao and his defense attorney Tong Wenzhong were also in court to participate in the proceedings. This trial has now been concluded.

The Changsha People's Procuratorate charged that, from February 11 to April 22, 2004, defendant Shi Tao was employed by Hunan's *Contemporary Business News*, where he held the position of head of the Editorial Department. At around 5:00 on the afternoon of April 20, after a routine newspaper review meeting and a pre-editorial meeting, assistant editors-in-chief of *Contemporary Business News* Wang XX and Yang XX convened a special meeting of the heads of the newspaper's Front Page News Department, the Mobile Hotline Department, and the Editorial Department. During this special meeting, Wang XX verbally communicated a summary of the main contents of a top-secret document issued by the General Office of the Central Committee of the Communist Party of China (CPC) and the General Office of the State Council entitled "A Notice Regarding Current Stabilizing Work" (CPC General Office Document No. 11 [2004]). He also emphasized that this was a top-secret document and that notes must not be taken on it and that it should not be disseminated. However, defendant Shi Tao secretly did take notes on the summary of the document's main content. Between approximately 7:00 pm on that day and approximately 2:00 am the following morning, defendant Shi Tao used his personal email account (huoyan-1989@yahoo.com.cn) in his office to send the notes he had secretly taken on the above-mentioned summary of the main contents of CPC General Office Document No. 11 (2004) to the email account of Hong Zhesheng (caryhung@aol.com), one of the founders of the "Asia Democracy Foundation" located in New York, USA and editor-in-chief of the foreign web site "Democracy Forum" and the electronic publication "Democracy News." He gave "198964" as the alias of the person who provided the document and asked Hong Zhesheng to find a way to distribute it as quickly as possible without using Shi Tao's name. That day, the above-mentioned summary of the main contents of CPC General Office Document No. 11 (2004) was posted for publication on the "Democracy Forum" under the name of "198964." It was later reposted for publication on other foreign web sites such as "Boxun News" and the "China Democracy & Justice Party."

Regarding the above-mentioned facts as charged, the prosecuting organ provided such corroborating evidence as the oral testimony of witnesses, a secrecy-degree verification certificate, related material and written evidence, materials on the process of taking Shi Tao into custody, photos of the crime scene and photos of material evidence, information proving the defendant's identity, and the defendant's confession. The procuratorate maintains that defendant Shi Tao's actions violated Article 110 of the "Criminal Law of the PRC" and that his actions constitute the crime of illegally providing state secrets outside of the country. It has sent the case to this court for prosecution, requesting that a verdict be passed according to law.

Neither defendant Shi Tao nor his defense attorney raised any objections to the criminal facts as charged in the indictment or to the characterization of this case. Defendant Shi Tao argued in his defense: "My criminal act of providing state secrets to foreign entities did not involve especially serious circumstances." His defense attorney stated: "Considering that defendant Shi Tao's actions did not cause extremely serious damage to state security or interests and that his attitude in admitting his crimes was good, please punish him leniently."

In the course of the trial it was determined that: In April 2001, defendant Shi Tao made the acquaintance of Hong Zhesheng (from China's Taiwan Province, resident of New York in the USA, and one of the founders of the Asia Democracy Foundation), editor-in-chief of the foreign web site "Democracy Forum" and the electronic publication "Democracy News." At approximately 5:00 on the afternoon of April 20, 2004, after a routine newspaper review meeting and a pre-editorial meeting, assistant editors-in-chief of *Contemporary Business News* Wang XX and Yang XX convened a meeting of senior staff of the newspaper's Front Page News Department, the Mobile Hotline Department, and the Editorial Department. Shi Tao, then head of the newspaper's News Center and Editorial Center, attended the meeting. During the meeting, Wang XX verbally communicated a summary of the main contents of a top-secret document issued by the General Office of the Central Committee of the Communist Party of China (CPC) and the General Office of the State Council entitled "A Notice Regarding Current Stabilizing Work" (No. 11 [2004] issued by the CPC General Office). He emphasized that this was a top-secret document and that notes must not be taken on it and that it should not be disseminated. Defendant Shi Tao took notes on this summary of the document's main contents. When Wang XX discovered that Shi Tao was taking notes, he reminded Shi Tao that he was not allowed to take notes. However, Shi Tao still made detailed notes in his notebook. That night at approximately 11:32 pm, defendant Shi Tao leaked this information to an overseas hostile element, taking advantage of the fact that he was working overtime alone in his office to connect to the internet through his phone line and use his personal email account (huoyan-1989@yahoo.com.cn) to send his notes on the above-mentioned summary of the main contents of CPC General Office Document No. 11 (2004). He also used the alias "198964" as the name of the provider and asked Hong Zhesheng to find a way to distribute the information as quickly as possible without using Shi Tao's name. That day, the above-mentioned summary of the main contents of CPC General Office Document No. 11 (2004) was posted for publication on the "Democracy Forum" under the name of "198964." It was later reposted for publication on other foreign web sites such as "Boxun News" and the "China Democracy & Justice Party."

The evidence demonstrating the above criminal facts is as follows: 1. A secrecy-degree verification certificate issued by the State Secrecy Bureau, which confirms that the sub-headings of the state secret materials illegally provided by defendant Shi Tao to foreign entities were basically the same as those in CPC General Office Document No. 11 (2004) (top-secret level) and that the basic content of CPC General Office Document No. 11 (2004) that was leaked should be classified as top-secret level state secrets. 2. Material evidence: (i) An email sent by Shi Tao at 11:00 p.m. on April 20, 2004 using his personal email account (huoyan-1989@yahoo.com.cn), in which he sent the summary of the contents of CPC General Office Document No. 11 (2004) to the email account of overseas hostile element Hong Zhesheng (caryhung@aol.com). The general idea of the email was that Shi Tao

wanted Hong Zhesheng to find a way to distribute CPC General Office Document No. 11 (2004) as quickly as possible but that he should use "198964", rather than [the name] Shi Tao, as the name of the document's provider; the summary of the document was attached at the end. (ii) The summary of CPC General Office Document No. 11 (2004), downloaded from the Internet, where it was posted on foreign web sites and electronic publications such as "Democracy Forum," "Boxun News," and "China Democracy & Justice Party" under the name of "198964." These materials were identified by defendant Shi Tao, confirming that these materials were the same as the state secrets that he provided. (iii) Materials downloaded from the Internet that identify hostile element Hong Zhesheng and confirm that Hong Zhesheng is from China's Taiwan Province, resides in New York in the USA, is a founder of the Asia Democracy Foundation, and is editor-in-chief of the foreign web site "Democracy Forum" and the electronic publication "Democracy News." 3. Notes on evidence-taking and the material evidence of a notebook, confirming the fact that on December 6, 2004, defendant Shi Tao's wife Wang Ai provided the state security organ with a notebook found in their home containing Shi Tao's notes on the summary of CPC General Office Document No. 11 (2004). There was also a note recorded in Shi Tao's notebook reading"Meeting on April 20 to relay Propaganda Department document (top-secret) (CPC General Office Document No. 11 [2004]), notice from the CPC General Office regarding current stabilizing work," with a summary of the document appended at the end. This notebook was identified by defendant Shi Tao, confirming that he was the person who made the notes. 4. Account holder information furnished by Yahoo Holdings (Hong Kong) Ltd., which confirms that for IP address 218.76.8.201 at 11:32:17 p.m. on April 20, 2004, the corresponding user information was as follows: user telephone number: 0731-4376362 located at the *Contemporary Business News* office in Hunan; address: 2F, Building 88, Jianxiang New Village, Kaifu District, Changsha. 5. Photos taken at the scene and photos of related material evidence and written evidence. 6. Material evidence: (i) One envelope and one check sent by overseas hostile element Hong Zhesheng to defendant Shi Tao as payment for a manuscript. (ii) Another notebook of defendant Shi Tao's, in which was written the email address of overseas hostile element Hong Zhesheng. (iii) The notebooks of witnesses Wang XX and Peng Zhiguo, in both of which was written information on CPC General Office Document No. 11 (2004). 7. The testimony of witnesses Wang XX, Yang XX, and Peng Zhiguo, confirming that at approximately 5:00 on the afternoon of April 20, during a meeting especially convened by Wang XX of the newspaper's department heads, he verbally communicated a summary of the main contents of CPC General Office Document No. 11 (2004) and emphasized that it was a top-secret document that should not be disseminated; that defendant Shi Tao attended the meeting and took notes; that when Wang XX discovered that Shi Tao was taking notes, he especially reminded Shi Tao of the fact that he was not supposed to take notes; and that defendant Shi Tao worked the night shift that night. 8. The testimony of witnesses Yi Sufen, He Ping, Hu Youde, and Hong Yu, confirming that, when the department heads of the newspaper passed on the main points of a document issued by the Provincial Committee's Propaganda Department, if it had been emphasized not to circulate it and that it was a top-secret document, as newspaper employees they would all have regarded that document as a state secret. 9. Materials on the process of taking Shi Tao into custody. 10. Defendant Shi Tao's identity papers. 11. A *Contemporary Business News* employee registration form*, confirming that defendant Shi Tao was employed by Hunan's *Contemporary Business News* from February 11, 2004 to April 22, 2004. 12. Written statements given by Shi Tao, and his confession, confirming that he confessed completely to the fact

that he intentionally and illegally provided state secrets to foreign entities. The above items of evidence corroborate with each other and are sufficient to establish the facts of this case.

This court finds that, in order leak information to hostile elements outside of the country, defendant Shi Tao intentionally and illegally provided information that he knew to be top-secret level state secrets to an entity outside of the country. Having endangered state security and involving especially serious circumstances, his actions constitute the crime of illegally providing state secrets to foreign entities. Therefore, the court accepts the prosecution's charge that Shi Tao's actions constitute the crime of illegally providing state secrets to foreign entities. Defendant Shi Tao argued in his defense: "My criminal act of providing state secrets to foreign entities did not involve especially serious circumstances." This was investigated and it was found that, according to Item 1 of Article 2 of the Supreme People's Court's "Explanation on Certain Questions Regarding the Specific Application of the Law when Trying Cases of Stealing, Gathering, Procuring, or Illegally Providing State Secrets or Intelligence Outside of the Country," stealing, gathering, procuring, or illegally providing state secrets are crimes with "especially serious circumstances." The state secrets that defendant Shi Tao illegally provided outside of the country were verified by the State Secrecy Bureau as being top-secret level state secrets, and his actions should be considered to involve especially serious circumstances. Therefore, the defense argument cannot be accepted by this court. Shi Tao's defense attorney stated: "Considering that defendant Shi Tao's actions did not result in causing extremely serious harm to state security or interests and that his attitude in admitting his crimes was good, please punish him leniently." This was investigated and found to conform with the facts; therefore, the opinion of the defense can be accepted by this court. In view of the above, and in accordance with Article 111, Paragraph 1 of Article 55, and Paragraph 1 of Article 56 of the "Criminal Law of the PRC," the following verdict is passed:

Defendant Shi Tao is sentenced to 10 years' imprisonment with two years' subsequent deprivation of political rights for committing the crime of illegally providing state secrets to foreign entities.

(The prison term is to be calculated starting on the day the verdict is implemented, with each day spent in detention prior to the implementation of the verdict to count as one day of the prison term; therefore, the term will run from November 24, 2004 to November 23, 2014).

If this verdict is not accepted, an appeal may be filed between two and ten days from the receipt of this verdict, either to this court or directly to the Hunan Province Higher People's Court. In case of a written appeal, the original appellate petition must be submitted together with one copy.

Presiding judge: Ouyang Hua
Judicial officer: Liu Zhigan
Deputy judicial officer: Xie Shaoping

April 27, 2005

Secretary: Huang Shizhi



**NetworkOmni**®
*Multilingual Communications*

los angeles

portland

miami

toronto

lima

zürich

london

santo domingo

## Translation Certificate of Accuracy

| | |
|---|---|
| [Job Number] | 58411 |
| [Client Name] | O'Melveny & Myers LLP (Los Angeles). |
| [Document Name] | Shi Tao_Final.doc |
| | Wang Xiaoning_Final.doc |

The above referenced document has been translated accurately, completely and reliably, and reviewed for cultural appropriateness by two qualified translators—one to translate and one to edit. No additions or deletions have occurred that would change the context of the source language message; content has not been altered or misrepresented; specific industry terminology has been used throughout; the reading level (linguistic register) of the original document has been maintained; and if adaptation of the reading level has been requested, target text has been adapted following Client's instructions.

The translators translating the materials have professional translation experience, full fluency in the target language of the materials, the ability to read and understand the source language, knowledge and experience with the culture(s) of the intended audience, and adequate knowledge of the subject matter.

This Certificate of Accuracy is hereby issued within the limits set forth by NetworkOmni's Terms and Conditions. The signing representative acknowledges that the information related to the above referenced document is privileged and confidential communication, and that reproduction of said materials is strictly prohibited without written authorization.

Alejandro Moreda

_____
Printed Name of Certifying Representative

Signature
_____

Sr. Project Manager

August 27, 2007
_____

Title

Date
_____

State of California
County of Los Angeles

On August 27, 2007, before me, Janice Parvin, Notary Public, personally appeared Alejandro Moreda, personally known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that she executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

WITNESS my hand and official seal.

Notary Public

> JANICE S. PARVIN
> Commission # 1742963
> Notary Public - California
> Ventura County
> My Comm. Expires May 27, 2011

# EXHIBIT D

Nos. 00-56603, 00-56628

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

JOHN DOE I, ET AL.,

Plaintiffs-Appellees,

v.

UNOCAL CORPORATION, ET AL.,

Defendants-Appellants.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA

SUPPLEMENTAL BRIEF FOR THE UNITED STATES OF AMERICA,
AS AMICUS CURIAE

WILLIAM HOWARD TAFT, IV
Legal Adviser
Department of State
Washington D.C. 20510

DANIEL MERON
Acting Assistant Attorney General

DOUGLAS N. LETTER
(202) 514-3602
ROBERT M. LOEB
(202) 514-4332
Attorneys, Appellate Staff
Civil Division, Room 7268
Department of Justice
950 Pennsylvania Ave., N.W.
Washington, D.C.  20530-0001

## *TABLE OF CONTENTS*

*Page*

ARGUMENT ................................................................................................ 1

    A.    The Court Should Be Very Hesitant To Apply Its
            Federal Common Law Powers To Resolve A Claim
            Centering On The Mistreatment of Foreign Nationals
            By Their Own Government ............................................................. 4

    B.    The Significant Policy Decision To Impose Aiding And
            Abetting Liability For ATS Claims Should Be Made
            By Congress, Not The Courts ........................................................ 7

    C.    Practical Consequences Counsel Against The Adoption
            Of Aiding And Abetting Liability Under The ATS ........................ 10

    D.    Aiding And Abetting Liability Does Not In Any Event
            Satisfy Sosa's Threshold Requirements That An International
            Law Norm Be Both Firmly Established And Well Defined .............. 17

CONCLUSION ........................................................................................... 28

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

i

## TABLE OF AUTHORITIES

*Cases:*                                                                 *Page*

American Ins. Ass'n v. Garamendi, 123 S. Ct. 2374 (2003) ................................ 15

Argentine Republic v. Amerada Hess Shipping Corp.,
    488 U.S. 428 (1989) ................................................................. 15

Boim v. Quranic Literacy Institute, 291 F.3d 1000 (7th Cir. 2002) ...................... 9

Central Bank of Denver v. First Interstate Bank, 511 U.S. 164
    (1994) .......................................................................... 8-10, 19, 20

Crosby v. National Foreign Trade Council, 530 U.S. 363 (2000) ................. 13, 14

Doe v. Unocal, 923 F. Supp. 880 (C.D. Cal. 1997) ........................................... 15

Fong Yue Ting v. United States, 149 U.S. 698 (1893) ....................................... 15

Rose v. Himely, 8 U.S. (4 Cranch) 241 (1807) ..................................................... 5

EEOC v. Arabian Am. Oil Co., 499 U.S. 244 (1991) ........................................... 5

Sosa v. Alvarez-Machain, 124 S. Ct. 2739 (2004) .............. 1, 2, 3, 6, 8-11, 17, 25

Tel-Oren v. Libyan Arab Republic, 726 F.2d 774 (D.C. Cir. 1984) ................. 3, 6

The Apollon, 22 U.S. (9 Wheat.) 362 (1824) ....................................................... 5

United States v. Curtiss-Wright Export Corp., 299 U.S. 304 (1936) .................. 15

United States v. La Eugenie, 26 F. Cas. 832 (D. Mass. 1822) .............................. 5

United States v. Palmer, 16 U.S. 610 (1818) ....................................................... 5

*Statutes:*

28 U.S.C. § 1350 ............................................................................................... 2, 7

28 U.S.C. § 1605(a)(5) ..................................................................... 15

18 U.S.C. § 2333 ............................................................................. 8

## *Regulations:*

67 Fed. Reg. 35423 (May 16, 2002) ................................................ 14

## *Legislative Materials:*

Cong. Rec. 1440 (July 22, 1998) ..................................................... 13

Congressional Research Service, Issue Brief for Congress: China-U.S.
   Relations, 13 (January 31, 2003) ............................................... 13

## *Miscellaneous:*

American Foreign Policy and the International Criminal Court,
   Marc Grossman, Under Secretary for Political Affairs,
   Remarks to the Center for Strategic and International Studies,
   Washington, DC, May 6, 2002 (http://www.state.gov/p/9949pf.htm) ....... 19

Charter of the International Military Tribunal at Nuremberg ............................ 21

Congressional Research Service, Issue Brief for Congress:
   China-U.S. Relations, 13 (January 31, 2003) ............................................. 13

CNN All Politics, Clinton Defends China Trip, Engagement Policy,
   http://www.cnn.com/ALLPOLITICS/1998/06/11/clinton.china
   (June 11, 1998) ...................................................................... 13

"Element of Crimes," Article 8(2)(b)(xxii)-2 (2002) .......................................... 25

"Enforcing International Labor Standards: The Potential of the
Alien Tort Claims Act," 37 Vand. J. Transnat'l L. 203, 229
(Jan. 2004) ...................................................................................... 22

J. Tamayo, Canada Reviewing "Constructive Engagement"
Policy Over Cuba's Crackdown on Dissent, Miami Herald
(June 30, 1999) ............................................................................. 12

Military Commission Instruction No. 2, Art. 6(c)(1) (April 30, 2004)
(available at http://www.defenselink.mil/news/May2003/
d20030430milcominstno2.pdf) .................................................. 19

National Security Decision Directive 187 (Sept. 7, 1985);
Peter D. Fever., The Clinton Administration's China
Engagement Policy in Perspective (presented at Duke
University "War and Peace Conference," February 26, 1999)
(http://www.duke.edu/web/cis/pass/pdf/warpeaceconf/p-feaver.pdf) ......... 12

Nuremberg International Military Tribunal Control Council
Order No. 10; Statute of the International Criminal
Tribunal for the Former Yugoslavia (1993, updated 2004) ................... 18, 22

OECD Convention on Combating Bribery of Foreign Public
Officials in International Business Transactions,
37 ILM 1, art. 1(2) .................................................................... 18

Prosecutor v. Furundzija, IT-95-17/1 .................................................. 24

Prosecutor v. Kajelijeli, ICTR-98-44A-T ........................................... 25

Prosecutor v. Tadic, ICTY-94-1-A ...................................................... 24

Prosecutor v. Vasiljevic, ICTY-98-32-A ............................................. 24

Rome Statute of the International Criminal Court (1998) ..................... 18

Statute of the International Criminal Tribunal for the
Former Yugoslavia (1993, updated 2004) .................................... 18

iv

Statute of the International Criminal Tribunal for Rwanda (1994) ...................... 18

In re Tesch, 13 Int'l L. Rep. 250 (1947) ........................................................... 24

TRIALS OF WAR CRIMINALS BEFORE THE NUERNBERG MILITARY
    TRIBUNAL UNDER CONTROL COUNCIL LAW NO. 10 (1946-1949) ........... 22-24

TRIAL OF MAJOR WAR CRIMINALS BEFORE THE INTERNATIONAL
    MILITARY TRIBUNAL ................................................................................ 21

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

———————————

Nos. 00-56603, 00-56628

———————————

JOHN DOE I, ET AL.,

Plaintiffs-Appellees,

v.

UNOCAL CORPORATION, ET AL.,

Defendants-Appellants.

———————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA

———————————

SUPPLEMENTAL BRIEF FOR THE UNITED STATES OF AMERICA,
AS AMICUS CURIAE

———————————

## ARGUMENT

The en banc panel asked the parties to submit supplemental briefs addressing the effect of Sosa v. Alvarez-Machain, 124 S.Ct. 2739 (2004), on the present case. In submitting this brief, the United States wishes to make clear that it in no way endorses or approves of the human rights record of the Burmese military government. As we have previously noted to this Court, the United States unequivocally deplores and strongly condemns the anti-democratic policies and blatant human rights abuses

of the Burmese government. The United States has specifically condemned the use of forced labor by the Burmese government, and forced labor more generally. The legal issues presented in this appeal, however, have broader implications for overall United States policy that necessitate the filing of this brief.

In <u>Sosa</u>, the Supreme Court held that the Alien Tort Statute ("ATS"), 28 U.S.C. § 1350, is a jurisdictional statute and does not establish a cause of action. The Court, however, held that the ATS permits federal courts in limited circumstances to recognize a federal common law claim of an alien alleging a violation of the law of nations. The Court found that the claim there failed on the ground that it did not satisfy a necessary, but not in itself sufficient, requirement for such a federal common law cause of action under the ATS: that it must "rest on a norm of international character accepted by the civilized world and defined with a specificity comparable to the features of the 18th-century paradigms[, <u>i.e.</u>,violations of safe conducts, infringement of the rights of ambassadors, and piracy]." <u>Sosa</u>, 124 S.Ct. at 2761.

Significantly, the <u>Sosa</u> Court rejected the notion that the ATS grants federal courts unencumbered common law powers to recognize and remedy international law violations. Rather, the Court went out of its way to chronicle reasons why a court must act very cautiously and with "a restrained conception of the discretion" in both recognizing ATS claims and in extending liability. <u>Sosa</u>, 124 S.Ct. at 2761-2764, 2766 n.20. The Supreme Court instructed the federal courts to refrain from an

-2-

"aggressive role in exercising a jurisdiction that remained largely in shadow for much of the prior two centuries." Id. at 2762-2763. The Court discussed at length the reasons for approaching this federal common law power with "great caution," id. at 2764: in general, courts must rely upon legislative guidance before exercising substantive law-making authority, and there is a heightened need for such guidance when the issues could impinge upon the "discretion of the Legislative and Executive Branches in managing foreign affairs." Id. at 2763.

The Supreme Court's strongest cautionary note pertained to claims relating to a foreign government's treatment of its own citizens in its own territory: "It is one thing for American courts to enforce constitutional limits on our own State and Federal Governments' power, but quite another to consider suits under rules that would go so far as to claim a limit on the power of foreign governments over their own citizens, and to hold that a foreign government or its agent has transgressed those limits." Ibid. The Court left open whether it would ever be appropriate to project the common law of the United States to resolve such extraterritorial claims. Citing to "Tel-Oren v. Libyan Arab Republic, 726 F.2d 774, 813 (C.A.D.C.1984) (Bork, J., concurring) (expressing doubt that § 1350 should be read to require 'our courts [to] sit in judgment of the conduct of foreign officials in their own countries with respect to their own')," Sosa, 124 S.Ct. at 1263, the Court concluded that recognition of such claims "should be undertaken, if at all, with great caution." Ibid (emphasis added).

-3-

Thus, under <u>Sosa</u>, there would have to be a clear basis and justification for a court to recognize a common law cause of action under U.S. law to govern such extraterritorial conduct.  Far from there being such a basis and justification here, a number of considerations weigh strongly against doing so.  As we detail below, all of the cautionary admonitions articulated by the <u>Sosa</u> Court apply with full force to the claims in this case, and should lead the Court to affirm the district court's dismissal of the aiding and abetting counts of the complaint.

**A.    The Court Should Be Very Hesitant To Apply Its Federal Common Law Powers To Resolve A Claim Centering On The Treatment of Foreign Nationals By Their Own Government.**

Under the ATS, although the substantive norm to be applied is drawn from international law or treaty, any cause of action recognized by a federal court is one devised as a matter of federal common law -- <u>i.e.</u>, the law of the United States.  The question, thus, becomes whether the challenged conduct should be subject to a cause of action under -- and thus governed by -- <u>U.S. law</u>.  In this case, the aiding and abetting claim asserted against defendants turns upon the abusive treatment of the Burmese people by their military government.  It would be extraordinary to give U.S. law an extraterritorial effect to regulate conduct by a foreign country vis-avis its own citizens in its own territory, and all the more so for a federal court to do so as a matter of common law-making power.

-4-

Even when construing a federal statute, there is a strong presumption against projecting U.S. law to resolve disputes that arise in foreign nations, especially disputes between such nations and their own citizens. See EEOC v. Arabian Am. Oil Co., 499 U.S. 244, 248 (1991). This presumption "serves to protect against unintended clashes between our laws and those of other nations which could result in international discord." Ibid.

Notably, the same strong presumption existed in the early years of this nation, and, significantly, applied even to the federal statute that defined and punished as a matter of U.S. law one of the principal law of nations offenses -- piracy. See United States v. Palmer, 16 U.S. 610, 630-631 (1818). See also The Apollon, 22 U.S. (9 Wheat.) 362, 370 (1824) ("The laws of no nation can justly extend beyond its own territories, except so far as its own citizens."); Rose v. Himely, 8 U.S. (4 Cranch) 241, 279 (1807) (general statutory language should not be construed to apply to the conduct of foreign citizens outside the United States). The view of that time is reflected by Justice Story:

> No one [nation] has a right to sit in judgment generally upon the actions of another; at least to the extent of compelling its adherence to all the principles of justice and humanity in its domestic concerns * * *. It would be inconsistent with the equality and sovereignty of nations, which admit no common superior. No nation has ever yet pretended to be the custos morum of the whole world; and though abstractedly a particular regulation may violate the

> law of nations, it may sometimes, in the case of nations, be
> a wrong without a remedy.

United States v. La Eugenie, 26 F. Cas. 832, 847 (D. Mass. 1822) (emphasis added).

While the Supreme Court in Sosa concluded that Congress, through the ATS, intended the federal courts to have a limited federal common law power to adjudicate well established and defined international law claims such as piracy and attacks on ambassadors, as noted above, the Court expressly questioned whether this federal common law power could properly be employed "at all" in regard to disputes between a foreign nation and its own citizens. Sosa, 124 S.Ct. at 2763. Indeed, it is difficult to imagine that the drafters of the ATS intended to grant the newly created federal courts the unchecked power to apply their federal common law powers to decide extraterritorial disputes regarding a foreign nation's treatment of its own citizens. Nothing in the ATS, or in its contemporary history, suggests that Congress intended it to apply to conduct in foreign lands. To the contrary, the ambassador assaults that preceded and motivated the enactment of the ATS involved purely domestic conduct. See id. at 2756-2657.

Moreover, "those who drafted the Constitution and the Judiciary Act of 1789 wanted to open federal courts to aliens for the purpose of avoiding, not provoking, conflicts with other nations." Tel-Oren, 726 F.2d at 812 (Bork, J., concurring). The point of the ATS and the Constitution's Law of Nations Clause was to ensure that the

National Government would be able to afford a forum for punishment or redress of violations for which the nation offended by conduct against it or its nationals might hold the United States accountable. A foreign government's treatment of its own nationals is a matter entirely distinct and removed from these types of concerns.

Against this backdrop, reinforced by caution mandated by the Supreme Court in <u>Sosa</u>, courts should be very hesitant ever to apply their federal common law powers to resolve a claim, such as the one here, centering on the mistreatment of foreign nationals by their own government.

**B.    The Significant Policy Decision To Impose Aiding And Abetting Liability For ATS Claims Should Be Made By Congress, Not The Courts**

As the Supreme Court has held, the creation of civil aiding and abetting liability is a legislative act that the courts should not undertake without a conclusion that Congress so intended, and there is no indication in either the language or history of the ATS that Congress intended such a vast expansion of suits in this sensitive foreign policy area.

The ATS speaks to a "civil action by an alien for a tort only, committed in violation of the law of nations." 28 U.S.C. § 1350. An aiding and abetting claim is not brought against a party charged as having "committed" a tort in violation of the law of nations. Rather, allowing aiding and abetting liability for ATS common law claims would extend liability not only to violators of international norms, but also

-7-

against all those who allegedly gave aid and assistance to the tortfeasor. The ATS simply does not by its terms suggest such third-party liability.

Even where Congress expressly establishes domestic criminal aiding and abetting liability, the question whether to impose such liability for civil claims as well is still deemed a separate legislative policy that typically requires legislative action. The Supreme Court's ruling in <u>Central Bank of Denver</u> v. <u>First Interstate Bank</u>, 511 U.S. 164 (1994), is key to this case; there, the Court explained that there is no "general presumption" that a federal statute should be read as extending aiding and abetting liability to the civil context. In the criminal law context "aiding and abetting is an ancient * * * doctrine," <u>id</u>. at 181, but its extension to permit civil redress is not well established: "the doctrine has been at best uncertain in application." <u>Ibid</u>. While in the criminal context the government's prosecutorial judgment serves as a substantial check on the imposition of criminal aiding and abetting liability, there is no similar check on civil aiding and abetting liability claims. <u>Cf.</u> <u>Sosa</u>, 124 S.Ct. at 2763.

Significantly, the <u>Central Bank of Denver</u> Court noted that "Congress has not enacted a general civil aiding and abetting statute -- either for suits by the Government (when the Government sues for civil penalties or injunctive relief) or for suits by private parties." 511 U.S. at 182. The Court concluded, "when Congress enacts a statute under which a person may sue and recover damages from a private defendant

-8-

for the defendant's violation of some statutory norm, <u>there is no general presumption that the plaintiff may also sue aiders and abettors</u>." <u>Ibid</u>. (emphasis added).[1] Thus, under <u>Central Bank of Denver</u>, a court must presume that there is no right to assert an aiding and abetting claim under the ATS.

Moreover, in <u>Central Bank of Denver</u>, the Court explained that adoption of aiding and abetting liability for civil claims would be "a vast expansion of federal law." 511 U.S. at 183. Such an expansion of the law, the Court held, required legislative action, and could not be carried out through the exercise of federal common law. <u>Ibid</u>. So, too, under the ATS. Reading this statute to permit aiding and abetting claim would vastly increase its scope and range. That vast increase should not be undertaken without clear guidance from Congress. Notably, the Supreme Court described the ATS as an "implicit sanction to entertain the <u>handful</u> of international law <u>cum</u> common law claims." <u>Sosa</u>, 124 S.Ct. at 2754 (emphasis added).

The <u>Sosa</u> Court cautioned that federal courts should be wary of "exercising innovative authority over substantive law" without "legislative guidance." <u>Sosa</u>, 124 S.Ct. at 2762. The Court also warned against assuming a legislative function in

---

[1] This general presumption against implying aiding and abetting liability can be overcome in our domestic law. For example, the United States recently successfully argued in favor of aiding and abetting liability under a statute providing a civil cause of action for those injured by an act of international terrorism, 18 U.S.C. § 2333. <u>See</u> Boim v. <u>Quranic Literacy Institute</u>, 291 F.3d 1000 (7th Cir. 2002). That argument was based, however, on the particular context, language, and purposes of that statute.

-9-

"crafting remedies" where resolution of the legal issue could adversely implicate foreign policy and foreign relations. Id. at 2763. The caution mandated by Sosa in deciding whether to recognize and enforce an international law norm under the ATS, when coupled with the teaching of Central Bank of Denver that the decision of whether to adopt aiding and abetting liability for a civil claim is typically a legislative policy judgment, lead to the unmistakable conclusion that aiding and abetting liability should not be recognized under the ATS, absent further congressional action. Ultimately, the questions of whether and, if so, how to expand the reach of civil liability under international law beyond the tortfeasor would present difficult policy and foreign relations considerations that should be determined by Congress, not the courts.

**C.      Practical Consequences Counsel Against The Adoption Of Aiding And Abetting Liability Under The ATS.**

Under Sosa, a court deciding whether to adopt a rule extending aiding and abetting liability under the ATS must also consider the potential practical consequences, including the foreign policy effects of such a ruling. See 124 S.Ct. at 2766 ("the determination whether a norm is sufficiently definite to support a cause of action should (and, indeed, inevitably must) involve an element of judgment about the practical consequences of making that cause available to litigants in the federal courts"); id. at 2766 n.21 (in discussing other possible limiting principles, the Court

-10-

stated, "there is a strong argument that federal courts should give serious weight to the Executive Branch's view of the case's impact on foreign policy"). Those consequences strongly counsel against the creation of aiding and abetting liability for ATS claims.

1. One of the "practical consequences" of embracing "aiding and abetting" liability for ATS claims would be to create uncertainty that could interfere with the ability of the U.S. government to employ the full range of foreign policy options when interacting with regimes with oppressive human rights practices. One of these options is to promote active economic engagement as a method of encouraging reform and gaining leverage. Judicial development of aiding and abetting liability under the ATS for aiding oppressive regimes would generate significant uncertainty concerning private liability that could deter many businesses from such economic engagement because of fear of potential liability. Even when companies are not party to or directly responsible for the abuses of an oppressive regime, they would likely become targets of ATS aiding and abetting suits, and the fact-specific nature of an aiding and abetting inquiry would expose them to protracted and uncertain proceedings in U.S. courts. Cf. Central Bank of Denver, 511 U.S. at 188-189.

Constructive engagement strategies have been employed by the United States in the past, such as with regard to South Africa and China.[2] Constructive economic engagement policies have been adopted by other countries, as well.[3]  In other situations, the United States has adopted a policy of limiting or prohibiting economic engagement.  Even in these situations, however, the possibility of adopting an engagement policy is an important foreign policy tool.

In the case of South Africa, the policy of economic constructive engagement included use of "U.S. influence to promote peaceful change away from apartheid." National Security Decision Directive 187 at 1.  Methods used to achieve that goal included increased funding of educational, labor, and business programs.  Id. at 2. Also, U.S. businesses were urged to "assist black-owned companies."  Ibid.[4]

In the case of China, constructive engagement has been advocated as a means of advancing human rights over the long term and serving important U.S. national interests:

---

[2] See National Security Decision Directive 187 (Sept. 7, 1985); Peter D. Fever., The Clinton Administration's China Engagement Policy in Perspective (presented at Duke University "War and Peace Conference," February 26, 1999) (http://www.duke.edu/web/cis/pass/pdf/warpeaceconf/p-feaver.pdf).

[3]  See, e.g., J. Tamayo, Canada Reviewing "Constructive Engagement" Policy Over Cuba's Crackdown on Dissent, Miami Herald (June 30, 1999).

[4]  As the Sosa Court noted, corporations that did business in South Africa under this policy are now being subject to ATS claims under an aiding and abetting theory.  See Sosa, 124 S.Ct. at 2766 n.21.

-12-

> Underlying th[e economic engagement] approach, for some, is a belief that trends in China are moving inexorably in the "right" direction. That is, the PRC is becoming increasingly interdependent economically with its neighbors and the developed countries of the West and therefore will be increasingly unlikely to take disruptive action that would upset these advantageous international economic relationships. They contrast this behavior favorably with that of disruptive states * * * – those who are not part of the international system and who may support the kind of global terrorism that struck the United States on September 11, 2001. Some also believe that greater wealth in the PRC will push Chinese society in directions that will develop a materially better-off, more educated, and cosmopolitan populace that will, over time, press its government for greater political pluralism and democracy.

Congressional Research Service, Issue Brief for Congress: China-U.S. Relations, 13 (January 31, 2003).[5]

While the United States has no current policy of promoting investment in Burma, the complexity and sensitivity of policy decisions about Burma illustrate why the courts should not embark on a new category of ATS liability that could constrain

---

[5] See also CNN All Politics, Clinton Defends China Trip, Engagement Policy, http://www.cnn.com/ALLPOLITICS/1998/06/11/clinton.china (June 11, 1998) (quoting President Clinton: "Choosing isolation over engagement * * *would make it more dangerous. It would undermine, rather than strengthen, our efforts to foster stability in Asia. It will eliminate, not facilitate, cooperation on issues relating to weapons of mass destruction."); 144 Cong. Rec. E1440 (1998) (remarks of Rep. Roemer) ("I support constructive engagement with China as a method of improving our critically important bilateral relationship and pursuing our foreign policy goals to advance human rights and religious freedom * * *. Our policy of constructive engagement has also helped expand cooperation with China in critical areas important to our national security * * *.").

policy options for the future. As the Supreme Court recognized in <u>Crosby</u> v. <u>National</u> <u>Foreign Trade Council</u>, 530 U.S. 363, 374 (2000), Congress, when enacting sanctions against Burma, "clearly intended the federal Act to provide the President with flexible and effective authority over economic sanctions against Burma. Although Congress immediately put in place a set of initial sanctions * * *, it authorized the President to terminate any and all of those measures upon determining and certifying that there had been progress in human rights and democracy in Burma * * *. And, most significantly, Congress empowered the President 'to waive, temporarily or permanently, any sanction [under the federal Act] * * * if he determines and certifies to Congress that the application of such sanction would be contrary to the national security interests of the United States.'"

Importantly, the adoption of an aiding and abetting rule for ATS cases would not be limited to the case of Burma, but potentially could affect policy options for the United States around the world. Hence, this Court must look to the "practical consequences" beyond its application to the facts of this case. Adopting aiding and abetting liability under the ATS would, in essence, be depriving the Executive of an important tactic of diplomacy and available tools for the political branches in attempting to induce improvements in foreign human rights practices. The selection of the appropriate tools, and the proper balance between rewards and sanctions,

-14-

requires policymaking judgment properly left to the federal political branches. See Crosby, 530 U.S. at 375-385.

The Supreme Court's admonitions in Sosa counsel that such a significant judicial infringement upon the Executive's foreign policy powers should be in accord with the constitutional commitment of "the entire control of international relations" to the political branches. Fong Yue Ting v. United States, 149 U.S. 698, 705 (1893). See also United States v. Curtiss-Wright Export Corp., 299 U.S. 304, 319, 320 (1936); American Ins. Ass'n v. Garamendi, 123 S. Ct. 2374, 2386 (2003).

2.    Another important practical consideration is that allowing for the proliferation of ATS suits, by adopting an aiding and abetting liability standard, would inevitably lead to greater diplomatic friction. Adopting aiding and abetting liability under the ATS would trigger a wide range of ATS actions where plaintiffs seek to challenge the conduct of foreign nations -- conduct that would otherwise be immune from suit under the  Foreign Sovereign Immunities Act ("FSIA").[6]   Aiding and abetting liability would afford plaintiffs the ability to, in effect, challenge the foreign

---

[6]  Under the FSIA, foreign governments are immune from suit, subject to certain specified exceptions. For tort claims, foreign governments generally cannot be sued unless the tort occurs within the United States. See 28 U.S.C. § 1605(a)(5); Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 439-41 (1989). In the present case, the Burmese governmental entities alleged to have been involved in perpetrating the forced labor were found by the district court to be immune under the FSIA. See Doe v. Unocal, 923 F. Supp. 880 (C.D. Cal. 1997).

government's conduct by asserting claims against those alleged to have aided and abetted the government.

Experience has shown that aiding and abetting ATS suits often trigger foreign government protests, both from the nations where the alleged abuses occurred, and, in cases against foreign corporations, from the nations where the corporations are based or incorporated (and therefore regulated). This can and already has led to a lack of cooperation on important foreign policy objectives.

3. Aiding and abetting liability can also have a deterrent effect on the free flow of trade and investment more generally, because of the uncertainty it creates for those operating in countries where abuses might occur. The United States has a general interest in promoting the free flow of trade and investment, both into and out of the United States, in order to increase jobs and the standard of living. Apart from this national economic interest, the U.S. has broader foreign policy interests in using trade and investment to promote economic development in other countries as a way of promoting stability, democracy and security.[7]

---

[7] Adopting aiding and abetting liability for ATS claims could also have a potential deterrent effect on investments within the United States because of the concern of ATS aiding and abetting liability based on contacts here and the exposure of such investments to attachment to satisfy adverse judgments.

Thus, serious foreign policy and other consequences relating to U.S. national interests strongly counsel against the judicial common law adoption of a rule extending civil aiding and abetting liability to ATS claims.

**D.    Aiding And Abetting Liability Does Not In Any Event Satisfy <u>Sosa</u>'s Threshold Requirements That An International Law Norm Be Both Firmly Established And Well Defined.**

Under <u>Sosa</u>, whatever other considerations are relevant in determining whether an international law norm should be recognized and enforced as part of an ATS federal common law cause of action, a necessary requirement is that the international law principle must be both sufficiently established and well defined. The Court did not provide any definitive methodology for assessing when international law norms meet these standards. The Court explained, however, that the principle must be <u>both</u> "accepted by the civilized world" and "defined with a specificity," and in both respects the norms must be "comparable to the features of the 18th-century paradigms" – <u>i.e.</u>, violation of safe conducts, infringement of the rights of ambassadors, and piracy." <u>Sosa</u>, 124 S.Ct. at 2761. Thus, in resolving whether the necessary conditions are met, this Court should examine: 1) whether aiding and abetting liability is broadly, if not universally accepted, by the international community in a manner comparable to the "18th-century paradigms," and 2) whether the principle, as accepted by the international community, is defined with "specificity."

-17-

The application of those inquiries to aiding and abetting liability demonstrates that a court should not exercise its common law powers to adopt such liability for ATS claims.

1.   a. The charters of the modern international criminal tribunals embrace the concept of criminal aiding and abetting liability.   See Nuremberg International Military Tribunal Control Council Order No. 10; Statute of the International Criminal Tribunal for the Former Yugoslavia (1993, updated 2004) ("ICTY Statute"), art. 7(1); Statute of the International Criminal Tribunal for Rwanda (1994) ("ICTR Statute"), art. 6(1); Rome Statute of the International Criminal Court (1998).[8]   Aiding and abetting liability has also been adopted by the United States when defining acts of international terrorism subject to prosecution before military commissions.[9]

b.   Although there is a substantial international consensus on the general concept of extending aiding and abetting criminal liability to offenses punishable by

---

[8]  A number of criminal multilateral treaties to which the United States is a party have some form of provision asking the signatory nations to criminalize the acts of those who aid or abet or are otherwise accomplices to the criminal acts covered by the treaty.  See, e.g., OECD:  Convention on Combating Bribery of Foreign Public Officials in International Business Transactions, 37 ILM 1, art. 1(2); Convention for the Suppression of the Traffic in Persons and of the Exploitation of the Prostitution of Others, art. 2.  These treaties generally do not create international law crimes. Rather, they are agreements to domestically enforce a particular crime.  For example, a treaty agreeing that all countries should enact domestic laws criminalizing murder does not transform all murders into violations of international law.

[9]  Military Commission Instruction No. 2, Art. 6(C)(1) (April 30, 2003) (available at http://www.defenselink.mil/news/May2003/d20030430milcominstno2.pdf).

-18-

international tribunals, this fact does not translate to an established principle of extending criminal aiding and abetting liability concepts to the civil context. As discussed above, there is no "general presumption" that criminal aiding and abetting liability should be read to extend aiding and abetting liability to the civil context. Rather, the general presumption under our domestic law is that such an extension requires an independent legislative policy choice. <u>Central Bank of Denver</u>, 511 U.S. at 182.

Moreover, the decision to charge a person before an international criminal tribunal is a grave matter requiring careful exercise of prosecutorial judgment. As noted earlier, that prosecutorial judgment serves as a substantial check on the application of the criminal aiding and abetting standard.[10] Opening the doors to civil aiding and abetting claims in U.S. courts through the ATS could not be more different. Any aggrieved alien, anywhere in the world, could potentially bring such an ATS civil suit in the United States and claim that a private party aided or abetted abuses committed abroad. Such a "vast expansion" of civil liability by adoption of an aiding

---

[10] One of the reasons the United States refused to join the Rome Statute is the lack of sufficient checks on prosecutorial discretion. <u>See</u> American Foreign Policy and the International Criminal Court, Marc Grossman, Under Secretary for Political Affairs, Remarks to the Center for Strategic and International Studies, Washington, DC, May 6, 2002 (http://www.state.gov/p/9949pf.htm) (objecting to ICC because "placing this kind of unchecked power in the hands of the prosecutor would lead to controversy, politicized prosecutions, and confusion. Instead, the U.S. argued that the Security Council should maintain its responsibility to check any possible excesses of the ICC prosecutor.").

and abetting rule, <u>Central Bank of Denver</u>, 511 U.S. at 183, is not authorized by any international law document or international tribunal decision.[11]

Under <u>Sosa</u>, before creating aiding and abetting liability for civil ATS claims, a court should examine whether there is an international consensus that criminal aiding and abetting liability should necessarily translate into a right to sue the aider/abettor for money damages. Given <u>Central Bank of Denver</u>'s statement that the extension of criminal aiding and abetting concepts to the civil context is "at best uncertain," 511 U.S. at 181, it is not possible to make that claim.

2. Even if the general concept of aiding and abetting liability were deemed sufficiently established under international law to satisfy the first <u>Sosa</u> threshold limitation, there remains the second threshold question of whether the principle, as accepted by the international community, is defined with "specificity." In <u>Sosa</u>, the Court found that the claim of arbitrary detention, previously deemed by this Court to have achieved universal acceptance, had not achieved the status of a well-defined and broadly embraced international law principle such that it could enforced under the ATS. The Supreme Court explained that any consensus concerning this norm was "at

---

[11] Notably, some instruments allow for the possibility of an award of reparations to victims. <u>See</u> Article 75(2) of the Rome Statute. However, this is a new development in international criminal law, it is not uniform (it is not reflected, for example, in the ICTY or ICTR statutes), it concerns only the award of reparations in the criminal context rather than a stand-alone civil action, it simply allows for the possibility of reparations rather than requires it, and it provides for an award by the international tribunal itself, rather than through the domestic courts of any nation in the world.

-20-

a high level of generality." <u>Sosa</u>, 124 S.Ct. at 2768 n.27. The same is true here. A survey of the available international law materials confirms that the general principle of aiding and abetting liability for international law violations has not achieved a universally recognized specific definition. There is simply no established international law standard as to civil aiding and abetting, and even as to a criminal law standard, there is no one universally accepted, well-defined standard established by the international community.

a. The post-WWII Nuremberg tribunals did not establish a specific, well-defined aiding and abetting standard. Article 6 of the Charter of the International Military Tribunal at Nuremberg did not address aiding and abetting liability. Two defendants, Fritz Sauckel and Albert Speer, who had principal responsibility for the Nazi forced labor policy, were found guilty of war crimes and crimes against humanity, but not for Crimes against peace because of their lack of personal participation in planning a "war of aggression."[12]

The Nuremberg International Military Tribunal gave way to subsequent proceedings under Control Council Order No. 10, which provided the legal basis for the four major World War II allies to prosecute war crimes. This provided that a person "is deemed to have committed a crime * * * if he was * * * an accessory to

---

[12] <u>See</u> 22 TRIAL OF MAJOR WAR CRIMINALS BEFORE THE INTERNATIONAL MILITARY TRIBUNAL, 566-568, 576-579.

the commission of any such crime or ordered or abetted the same." Control Council Law No. 10, Article II (2). The Order did not, however, define an aiding and abetting standard.

The aiding and abetting standard applied by the U.S. tribunals convened under Control Council Law No. 10 has been described by some as establishing a standard of "knowing practical assistance or encouragement that has a substantial effect on the perpetration of the crime."[13] The actual decisions of the U.S. tribunal, however, never specify that standard. In holding individuals liable, the tribunal held guilty those in positions of responsibility or command who planned, oversaw, and provided for the executions and other atrocities, as well as those who carried out these acts. 4 TRIALS OF WAR CRIMINALS BEFORE THE NUERNBERG MILITARY TRIBUNAL UNDER CONTROL COUNCIL LAW NO. 10 (1946-1949), 51, 568-586. Regarding those associated with the Einsatzgruppen, the tribunal explained that "more than mere knowledge of illegality or crime is required," id. at 585, and found not guilty those who did not participate in executions and whose ranks did not automatically place the person in "a position where his lack of objection in any way contributed to the success of any execution operation," id. at 581; see also id. 52 ("the rank and position of these defendants carried with it the power and duty to control their subordinates. This power, coupled

---

[13] Marisa Anne Pagnattaro, "Enforcing International Labor Standards: The Potential of the Alien Tort Claims Act," 37 Vand. J. Transnat'l L. 203, 229 (Jan. 2004).

-22-

with the knowledge of intended crime and the subsequent commission of crime during their time of command imposes clear criminal responsibility.").

The U.S. Tribunal in <u>United States</u> v. <u>Flick</u> refused to hold some of the executives of steel companies guilty for aiding and abetting Nazi forced labor programs. Even though all of the charged steel company executives employed forced laborers, only those executives who actively solicited and sought to increase the number of forced laborers were deemed criminally guilty. 4 TRIALS OF WAR CRIMINALS BEFORE THE NUERNBERG MILITARY TRIBUNAL UNDER CONTROL COUNCIL LAW NO. 10 at 1181-1206. Other tribunal cases similarly held guilty corporate executives who sought out forced laborers or otherwise acted with greater complicity with Nazi forced labor operations.[14]

---

[14]    <u>See</u> <u>United States</u> v. <u>Krauch</u>, 8 TRIALS OF WAR CRIMINALS BEFORE THE NUERNBERG MILITARY TRIBUNAL UNDER CONTROL COUNCIL LAW NO. 10 at Nuremberg Military Tribunal, 1187-1188 (holding high ranking industrialists guilty where they affirmatively sought out the employment of forced laborers); <u>United States</u> v. <u>Krupp</u>, 9 TRIALS OF WAR CRIMINALS BEFORE THE NUERNBERG MILITARY TRIBUNAL UNDER CONTROL COUNCIL LAW NO. 10 at 1187-1188 (holding guilty Krupp corporation executives who actively sought the employment of forced laborers and assisted German officials in securing the return of escaped workers). <u>See</u> <u>also</u> <u>In re Tesch</u>, 13 Int'l L. Rep. 250 (1947) (British tribunal decision holding the manufacturer of the poison gas Zyklon B guilty because he knew the purpose of the gas produced was to kill people and he also undertook to train S.S. officers on how to use the new gas to kill people).

At bottom, the U.S. tribunal decisions were very contextual in nature and cannot fairly be read as themselves establishing a clear generally applicable definition of aiding and abetting liability.

b.  More recently, the ad hoc International Criminal Tribunal for the Former Yugoslavia and the International Criminal Tribunal for Rwanda articulated definitions for criminal aiding and abetting.[15]  See Prosecutor v. Tadic, ICTY-94-1-A, ¶ 194 (July 15, 1999); Prosecutor v. Vasiljevic, ICTY-98-32-A (Feb. 25, 2004); Prosecutor v. Kajelijeli, ICTR-98-44A-T (2003).  These tribunals, are, however, of limited scope and authority.  United Nations Security Council resolution 827 of May 25, 1993, established the ICTY to address the violations of international humanitarian law committed in the territory of the former Yugoslavia since 1991.  See ICTY Statute, art. 1.  The ICTR's jurisdiction is likewise limited to the prosecution of persons responsible for genocide and other serious violations of international humanitarian law committed in the territory of Rwanda between January 1, 1994 and December 31, 1994.  See ICTR Statute, art. 1.  Though of great significance in their own contexts, the statutes and rulings of the ICTY and the ICTR are specific to their limited jurisdictions and do not create general international law.

---

[15]  The ICTY trial court looked to the Nuremberg cases when attempting to define the ICTY Statute, which provides for, but does not define, criminal aiding and abetting liability.  See ICTY Statute, art. 7(1).  The ICTY trial court noted, however, that the Nuremberg charter and related documents provided little guidance.  See Prosecutor v. Furundzija, IT-95-17/1 T (1998).

c.  A distinct criminal aiding and abetting standard was included in the Rome Statute of the International Criminal Court.  The Rome Statute is a multilateral statute that establishes a court to enforce a limited international criminal code for those nations that are party to the Statute.[16]  Article 25(3)(c) of the Rome Statute provides that:

> A person shall be criminally responsible * * * if that person * * *[f]or the purpose of facilitating the commission of such a crime, aids, abets or otherwise assists in its commission or its attempted commission, including providing the means for its commission.

Because the United States has declined to become a party to the Rome Statute, however, it would not be appropriate for a U.S. court to directly embrace the precepts of that Statute as governing international law regarding aiding and abetting liability.[17]  See Sosa, 124 S.Ct. at 2767 (rejecting plaintiff's invocation of nonbinding and non-self-executing treaties in his effort to "establish the relevant and applicable rule of international law").

---

[16]  The Statute was adopted on July 17, 1998, and went into effect July 1, 2002.  The Statute currently has 94 parties.  The United States is not a party.

[17]  Moreover, reliance upon the Statute's aiding and abetting standard is further undermined by the fact that the Statute does not criminalize forced labor generally, but, rather, limits its application to forced labor in the context of armed conflict or circumstances involving "enslavement," which it defines as "the exercise of any or all of the powers attaching to the right of ownership over a person and includes the exercise of such power in the course of trafficking in persons, in particular women and children."  See Rome Statute, Article 7(2); ICC, "Element of Crimes," Article 8(2)(b)(xxii)-2 (2002).

-25-

It is notable, however, that the Rome Statute differs in a very significant respect from the ICTY and ICTR tribunal jurisprudence on the question of <u>mens rea</u>. Where the ICTY and ICTR tribunals require an aider/abettor to have "knowledge that the acts performed by the aider and abettor assist the commission of a specific crime by the principal," <u>see</u> <u>Vasiljevic</u>, <u>supra</u>, at ¶ 102, the Rome Statute requires more -- the purpose to facilitate the crime.

\* \* \* \* \*

In sum, there simply is no established international law standard as to civil aiding and abetting, and, even as to the criminal law standard, there is no one well-defined universally accepted standard established by the international community. The concept is still developing and has not achieved international consensus. Accordingly, the adoption of aiding abetting liability for civil claims under the ATS does not meet the "high bar" established by the <u>Sosa</u> Court for recognizing a cause of action under U.S. common law, especially with respect to a claim where the primary conduct involves a foreign government's treatment of its own nationals in its own territory.

## CONCLUSION

For the foregoing reasons, this Court should affirm the dismissal of the aiding and abetting claims.

Respectfully submitted,

WILLIAM HOWARD TAFT, IV
  Legal Adviser
  Department of State
  Washington D.C. 20510

DANIEL MERON
  Acting Assistant Attorney General

DOUGLAS N. LETTER
  (202) 514-3602
ROBERT M. LOEB
  (202) 514-4332
  Attorneys, Appellate Staff
  Civil Division, Room 7268
  Department of Justice
  950 Pennsylvania Ave., N.W.
  Washington, D.C.  20530-0001

AUGUST 2004

-27-

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a)(7)(C) of the Federal Rules of Appellate Procedure, I hereby certify that this brief complies with the type-volume limitation in Rule 32(a)(7)(B). The foregoing brief is presented in Time New Roman 14 point font. The word count for the brief (as calculated by the WordPerfect 9.0 word-processing program, excluding exempt material) is 6,528, and is under the 7,000 word limitation. The 7,000 word limit is derived from Ninth Circuit Rule 32-3, which expressly permits the conversion of a page limitation set by order (here 25 pages) into a word-count limit (of 280 words per page).

ROBERT M. LOEB
Attorney for the United States

## CERTIFICATE OF SERVICE

I hereby certify that on August 25, 2004, I served copies of the foregoing

"Supplemental Brief For the United States of America as <u>Amicus Curiae</u>," upon the

Court and the following opposing counsel of record by FedEx overnight delivery:

Daniel Stormer, Esq.
Anne Richardson, Esq.
Hadsell & Stormer, Inc.
128 North Fair Oaks Avenue, Suite 204
Pasadena, CA 91103
(626) 585-9600

Paul Hoffman, Esq.
Schonbrun Desimone Seplow
 Harris & Hoffman LLP
723 Ocean Front Walk
Venice, CA 90291
(310) 396-0731

Judith Brown Chomsky, Esq.          (by overnight U.S. mail)
Law Offices of Judith Brown Chomsky
P.O. Box 29726
Elkins Park, PA 19027
(215) 782-8367

Jennifer M. Green, Esq.
Beth Stephens, Esq.
Center for Constitutional Rights
666 Broadway, Seventh Floor
New York, NY 10012
(212) 614-6464

Richard Herz, Esq.
Katharine J. Redford, Esq.
EarthRights International
1612 "K" Street, N.W., Suite 401
Washington, D.C. 20006
(202) 466-5188

Daniel M. Petrocelli
M. Randall Oppenheimer
Wallace M. Allan
O'Melveny & Myers, LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA 90067-6035

Howrey Simon Arnold & White, LLP
Edwin V. Woodsome, Jr.
550 S. Hope Street, Suite 1400
Los Angeles, CA 90071

Terry Collingsworth, Esq.
Natacha Thys, Esq.
David Grunwald, Esq.
International Labor Rights Fund
733 15th Street, N.W., Suite 920
Washington, D.C. 20005
(202) 347-4100

Joseph C. Kohn, Esq.
Martin J. D'urso, Esq.
Kohn, Swift & Graft, P.C.
One South Broad Street, Suite 2100
Philadelphia, PA 19107
(215) 238-1700

Christopher E. Krafchak, Esq.
Kenderton S. Lynch, Esq.
Krafchak & Associates
2029 Century Park East, Ninth Floor
Los Angeles, CA 90067
(310) 772-0034

Cristobal Bonifaz, Esq.
John C. Bonifaz, Esq.
Law Offices of Cristobal Bonifaz
48 North Pleasant Street
P.O. Box 2488
Amherst, MA 01004-2488

Carter G. Phillips
Daniel M. Price
Joseph R. Guerra
Marinn F. Carlson
Maria T. DiGiulian
Sidley Austin Brown & Wood LLP
1501 K Street, NW
Washington, D.C. 20005
(202) 736-8000

Jan S. Amundson
Quentin Riegel
National Association of
Manufacturers
1331 Pennsylvania Avenue, NW
Washington, DC 20004-1790
(202) 637-3000

Stephen A. Bokat
Robin S. Conrad
Ellen Dunham Bryant
National Chamber Litigation
Center, Inc.
1615 H Street
Washington, D.C. 20062
(202) 463-5337

ROBERT M. LOEB

# EXHIBIT E

# EXHIBIT E

1   DANIEL MERON
    Acting Assistant Attorney General
2   KEVIN V. RYAN
    United States Attorney
3   VINCENT M. GARVEY
    Deputy Branch Director
4   ALEXANDER K. HAAS
    Trial Attorney, Civil Division
5   Federal Programs Branch
    U.S. Department of Justice
6   Post Office Box 883, Room 1030
    Washington, D.C.  20044
7   Telephone:  (202) 307-3937
    Facsimile:  (202) 616-8470
8
    Attorneys for the United States
9

10              UNITED STATES DISTRICT COURT

11         FOR THE NORTHERN DISTRICT OF CALIFORNIA

12  _____
                            )
13  JANE DOE I, et al.,     )      No. C 02 0672 CW (EMC)
                            )      No. C 02 0695 CW (EMC)
14       Plaintiffs,        )
                            )      STATEMENT OF INTEREST
15            v.            )
                            )      OF THE UNITED STATES
16  LIU QI, et al.,         )
                            )
17       Defendants.        )
    _____)
18                          )
    PLAINTIFF A, et al.,    )
19                          )
         Plaintiffs,        )
20                          )
              v.            )
21                          )
    XIA DEREN, et al.,      )
22                          )
         Defendants.        )
23  _____)

24       By letter dated November 7, 2003, this Court solicited

25  "the State Department's position regarding Magistrate Judge

26  Chen's Report and Recommendation and Plaintiffs' objections"

27  related to the above-captioned cases.  See Letter from U.S.

28  STATEMENT OF INTEREST OF THE UNITED STATES, C 02 0672 CW (EMC) &
    C 02 0695    CW (EMC)

1  District Judge Claudia Wilken to William Howard Taft, IV of

2  November 7, 2003.  Pursuant to 28 U.S.C. §§ 516-517, the

3  Attorney General, on behalf of the Department of State,

4  hereby submits the following.

5      Attached hereto as Exhibit A is a letter, dated January

6  14, 2004, from William H. Taft, IV, Legal Adviser, U.S.

7  Department of State, to Peter D. Keisler, Assistant Attorney

8  General, in response to the Court's request for the

9  Department of State's position.¹/

10

11                                Respectfully submitted,

12                                DANIEL MERON
                                  Acting Assistant Attorney General
13                                KEVIN V. RYAN
                                  United States Attorney
14

15                                _Alexander K. Haas_
                                  VINCENT M. GARVEY
16                                Deputy Branch Director
                                  ALEXANDER K. HAAS
17                                Trial Attorney, Civil Division
                                  Federal Programs Branch
18                                U.S. Department of Justice
                                  20 Massachusetts Ave., NW, 7221
19                                Washington, D.C.  20001
                                  Telephone:  (202) 307-3937
20                                Facsimile:  (202) 616-8470
                                  Attorneys for the United States
21

22  Dated:  January 16, 2004

23  _____

24      ¹ The brief for the United States in support of the petition
    for certiorari in Sosa v. Alvarez-Machain, a case referenced in the
25  attached letter from the Legal Adviser, was filed on September 25,
    2003.  It can be found at the Solicitor General's website. See
26  website of the Office of Solicitor General, at
    http://www.usdoj.gov/osg/briefs/2003/0responses/
27  2003-0339.resp.html (last visited Jan.16, 2004).

28  STATEMENT OF INTEREST OF THE UNITED STATES, C 02 0672 CW (EMC) &
    C 02 0695    CW (EMC)              - 2 -

# EXHIBIT A

THE LEGAL ADVISER

DEPARTMENT OF STATE

WASHINGTON

January 14, 2004

Honorable Peter D. Keisler
Assistant Attorney General
Civil Division
United States Department of Justice
Washington, D.C. 20530

Re:  *Jane Doe I, et al. v. Liu Qi, et al.*, C-02-0672
     CW; *Plaintiff A, et al. v. Xia Deren, et al.*, C-
     01-0695 CW

Dear Mr. Keisler:

By letter dated November 7, U.S. District Court Judge
Claudia Wilken invited the Department of State to submit
its views, by January 16, 2004, regarding the June 11
Report and Recommendation of U.S. Magistrate Judge Edward
Chen and the July 24/25 objections of plaintiffs thereto in
the above-captioned cases.  (By way of background, I am
enclosing a copy of the United States' statement of
interest filed by your predecessor with Judge Chen on
September 27, 2002 that attached a copy of my September 25,
2002 letter in response to Judge Chen.)  I am writing now
to ask that you please file a copy of this letter with
Judge Wilken, in response to her November 7 letter, in
whatever manner you deem most appropriate.

As you know, the United States Supreme Court has
recently granted certiorari in *Sosa v. Alvarez-Machain*,
2003 WL 22070605 (Dec. 1, 2003), which implicates issues
that would appear to be central to the District Court's
disposition of the above-captioned cases.  On December 9,
the U.S. Court of Appeals for the Ninth Circuit in *Doe v.
Unocal*, Nos. 00-56603 and 00-57197 (copy attached) ordered
a suspension of further proceedings in that case pending
the Supreme Court's decision in *Sosa*.

2

In light of the above, it would seem appropriate for Judge Wilken similarly to postpone the *Liu* and *Xia* litigation.  If, however, Judge Wilken intends to dispose of the above-captioned cases before the Supreme Court decides, we would appreciate an opportunity to submit additional substantive comments in response to her November 7 request.

Thank you for your assistance.

Sincerely,

William H. Taft, IV

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

**FILED**

DEC - 9 2003

CATHY A. CATTERSON
CLERK, U.S. COURT OF APPEALS

JOHN DOE I, individually & as
Administrator of the Estate of his deceased
child Baby Doe I, & on behalf of all others
similarly situated; JANE DOE, I, on behalf of
herself, as Administratrix of the Estate of her
deceased child Baby Doe I & on behalf of all
others similarly situated; JOHN DOE II;
JOHN DOE III; JOHN DOE IV; JOHN DOE
V; JANE DOE II; JANE DOE III; JOHN
DOE VI; JOHN DOE VII; JOHN DOE VIII;
JOHN DOE IX; JOHN DOE X; JOHN DOE
XI, on behalf of themselves & all others
similarly situated & Louisa Benson on behalf
of herself & the general public,

            Plaintiffs - Appellants,

    v.

UNOCAL CORPORATION, a California
Corporation; TOTAL S.A., a Foreign
Corporation; JOHN IMLE, an individual;
ROGER C. BEACH, an individual,

            Defendants - Appellees.

Nos. 00-56603
    00-57197

D.C. No. CV-96-06959-RSWL



SERVED ON US BY MAIL
    POSTMARKED 12.9.03

JOHN ROE III; JOHN ROE vII; JOHN ROE VIII; JOHN ROE X,

  Plaintiffs - Appellants,

v.

UNOCAL CORPORATION; UNION OIL COMPANY OF CALIFORNIA,

  Defendants - Appellees.

Nos. 00-56628
  00-57195

D.C. No. CV-96-06112-RSWL

**ORDER**

SCHROEDER, Chief Judge:

This case is withdrawn from submission pending issuance of the Supreme

Court's decision in *Sosa v. Alvarez-Machain*, 2003 WL 22070605 (Dec. 1, 2003).

2

```
 1 │ ROBERT D. McCALLUM, JR.
   │ Assistant Attorney General
 2 │ VINCENT M. GARVEY
   │ Deputy Branch Director
 3 │ ALISON N. BARKOFF
   │ Trial Attorney, Civil Division
 4 │ Federal Programs Branch
   │ U.S. Department of Justice
 5 │ Post Office Box 883, Room 1020
   │ Washington, D.C.  20044
 6 │ Telephone:  (202) 514-5751
   │ Facsimile:  (202) 616-8470
 7 │
   │ Attorneys for the United States
 8 │
 9 │            UNITED STATES DISTRICT COURT
10 │        FOR THE NORTHERN DISTRICT OF CALIFORNIA
11 │
12 │ JANE DOE I, et al.,              No. C 02 0672 CW (EMC)
                                      No. C 02 0695 CW (EMC)
13 │     Plaintiffs,
                                      STATEMENT OF INTEREST
14 │        v.                        OF THE UNITED STATES
15 │ LIU QI, et al.,
16 │     Defendants.
17 │
   │ PLAINTIFF A, et al.,
18 │
   │     Plaintiffs,
19 │
20 │        v.
   │ XIA DEREN, et al.,
21 │
   │     Defendants.
22 │
23 │      By letter dated May 3, 2002, and by order dated August 5,
24 │ 2002, this Court "solicit[ed] the Department of State's opinion
25 │ on a number of issues" related to the above-captioned cases,
26 │ including whether the cases are barred by the Foreign Sovereign
27 │ Immunities Act, 28 U.S.C. §§ 1330, 1605-07, or are nonjusticiable
28 │
```

STATEMENT OF INTEREST OF THE UNITED STATES, C 02 0672 CW(EMC), C 02 0695 CW(EMC)

1  under the act of state doctrine. <u>See</u> Letter from U.S. Magistrate

2  Judge Edward M. Chen to William Howard Taft, IV of May 3, 2002;

3  Court's Aug. 5, 2002 Order.  Pursuant to 28 U.S.C. §§ 516-617,

4  the Attorney General, on behalf of the Department of State,

5  hereby submits the following.

6      Attached hereto as Exhibit A is a letter, dated September

7  25, 2002, from William H. Taft, IV, Legal Advisor, U.S.

8  Department of State, to Robert D. McCallum, Jr., Assistant

9  Attorney General, which explains the Department of State's views

10  on the issues raised by the Court.

11

12                          Respectfully submitted,

13                          ROBERT D. McCALLUM, JR.
                            Assistant Attorney General
14

15                          <i>Alison N. Barkoff</i>
                            _____
16                          VINCENT M. GARVEY
                            Deputy Branch Director
17                          ALISON N. BARKOFF
                            Trial Attorney, Civil Division
18                          Federal Programs Branch
                            U.S. Department of Justice
19                          Post Office Box 883, Room 1020
                            Washington, D.C.  20044
20                          Telephone:  (202) 514-5751
                            Facsimile:  (202) 616-8470
21                          Attorneys for the United States

    Dated:   September 26, 2002
22  ///

23  ///

24  ///

25  ///

26  ///

27  ///

28

    STATEMENT OF INTEREST OF THE UNITED STATES, C 02 0672 CW(EMC), C 02 0695 CW(EMC)

CERTIFICATE OF SERVICE

I am over the age of 18 years and not a party to the within action.  I am employed by the United States Department of Justice, Civil Division, Federal Programs Branch.  My business address is 901 E Street, N.W., Washington, D.C. 20004.

On September 26, 2002, I served STATEMENT OF INTEREST OF THE UNITED STATES on the persons named below, by enclosing a copy in an envelope addressed as shown below and placing the envelope for collection and mailing on the date and at the place shown below following our ordinary business practices.  I am readily familiar with the practice of this office for collection and processing correspondence for mailing.  On the same day that correspondence in placed for collection and mailing, it is deposited in the ordinary course of business within the United States Postal Service in a sealed envelope with postage fully prepaid.

Date of mailing: September 26, 2002.  Place of mailing: Washington, D.C.  Persons to whom mailed:

Joshua Sondheimer
The Center for Justice & Accountability
870 Market Street, Suite 684
San Francisco, CA  94102
Attorney for plaintiffs in Doe v. Liu Qi

Terri E. Marsh
1333 Connecticut Ave., N.W.
Suite 608
Washington, D.C.  20008
Attorney for plaintiffs in Doe v. Liu Qi

Paul Hoffman
Schonbrun DeSimone Seplow Harris & Hoffman LLP
723 Ocean Front Walk
Venice, CA  90291
Attorney for plaintiffs in Doe v. Liu Qi

///

STATEMENT OF INTEREST OF THE UNITED STATES, C 02 0672 CW(EMC), C 02 0695 CW(EMC)

1   Karen Parker
    154 5th Avenue
2   San Francisco, CA 94118
    Attorney for plaintiffs in <u>Plaintiff A v. Xia Deren</u>
3
    Morton Sklar
4   World Organization Against Torture USA
    1725 K St., N.W., Suite 610
5   Washington, D.C. 20006
    Attorneys for plaintiffs in <u>Plaintiff A v. Xia Deren</u>
6
    I declare under penalty of perjury under the laws of the
7
United States of America that the foregoing is true and correct.
8
Executed on <u>September 26, 2002</u>, at Washington, D.C.
9

10                        Alison N. Barkoff
                          ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾
11                        Alison N. Barkoff

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

STATEMENT OF INTEREST OF THE UNITED STATES, C 02 0672 CW(EMC), C 02 0695 CW(EMC)

# TAB A

THE LEGAL ADVISER

DEPARTMENT OF STATE

WASHINGTON

September 25, 2002

Honorable Robert D. McCallum
Assistant Attorney General
Civil Division
United States Department of Justice
10th Street & Constitution Avenue, N.W.
Washington, D.C. 20530

> Re:  *Doe, et al. v. Liu Qi, et al.*, and *Plaintiff A,
>      et al. v. Xia Deren*, Civil Nos. C 02-0672 CW
>      (EMC) and C 02-0695 CW (EMC) (N.D. Cal.)

Dear Mr. McCallum:

By letter dated May 3, U.S. Magistrate Judge Edward M.
Chen of the Northern District of California solicited the
Department of State's views on several issues in connection
with the above-captioned case.  Encl 1.  Magistrate Chen
asked that we respond before July 5, either by letter or
statement of interest pursuant to 28 U.S.C. § 517.  On June
25, the Department of Justice sought and received an
extension of time to August 9.  On July 25, the District
Court consolidated proceedings in the *Plaintiff A v. Xia
Deren* case with *Liu*, and referred that case also to
Magistrate Judge Chen.  On August 5, Magistrate Chen
vacated the previous briefing schedule, and invited the
State Department to provide its views on either or both of
these cases by September 27.  We ask that you please file a
copy of this response to these requests with Magistrate
Chen in whatever manner you deem most appropriate under the
circumstances.

In *Liu*, the gravamen of plaintiffs' complaint is that
the defendant, as Mayor of Beijing, People's Republic of
China ("PRC"), either knew or should have known about
various human rights abuses that were allegedly perpetrated
against adherents to the Falun Gong movement in Beijing,
and that he was under a duty under both Chinese and

- 2 -

international law to prevent such actions.[1]  The complaint
alleges that Defendant Liu "planned, instigated, ordered,
authorized, or incited police and other [PRC] security
forces to commit the abuses suffered by Plaintiffs, and had
command or superior responsibility over, controlled, or
aided and abetted such forces in their commission of such
abuses.  The acts alleged herein...were carried out in the
context of a nationwide crackdown against Falun Gong
practitioners." Compl., ¶ 2.

     In *Liu*, all but one of the plaintiffs are aliens; four
apparently reside in the United States.  Federal subject
matter jurisdiction is alleged to lie under customary
international law, the Torture Victims Protection Act
(TVPA), 28 U.S.C. § 1350, note, the Alien Tort Statute
(ATS), 28 U.S.C. § 1350, and 28 U.S.C. § 1331.  Id., ¶ 3.

     As noted in Magistrate Chen's May 3 letter, a default
was entered in favor of the plaintiffs on March 12.
Plaintiffs subsequently moved for judgment by default.  In
reviewing that motion, the Court has asked for the
Department's views on two questions: (1) whether the case
is barred under the Foreign Sovereign Immunities Act
("FSIA"), and (2) whether the Court should find the case
"nonjusticiable" under the Act of State doctrine.  We
address these issues in turn.

     Before turning to the questions posed by the Court, we
would note Magistrate Chen's subsequent invitation to
provide the Department's views in the *Xia* case.  From our
review of that complaint, we conclude, as did Magistrate
Chen in his August 5 order, that the relevant issues
involved in both cases are "similar, if not identical."  In
these circumstances, we see no need to comment separately
on the *Xia* case; the views as expressed below regarding *Liu*
may be taken to apply *mutatis mutandis* to *Xia*.  At the same
time, we note that the complaint in *Xia* is unambiguous in
asserting that the defendant was acting in his official
capacity.

     We also stress our deep concern about the human rights
abuses that have been alleged in these complaints.  The
United States has repeatedly made these concerns known to
the Government of the PRC and has called upon it to respect

---

[1] We note that the Complaint caption refers to "Liu Qi, and Does 1-5,
inclusive," but we have not found specific reference in the complaint
to any defendants other than Mr. Liu.

- 3 -

the rights of all its citizens, including Falun Gong
practitioners. Our critical views regarding the PRC
Government's abuse and mistreatment of practitioners of the
Falun Gong movement are a matter of public record and are
clearly set forth in the Department's annual human rights
reports, the most recent version of which may be found at
http://www.state.gov/drl/rls/hrrpt/2001/eap/8289.htm.

With respect to the FSIA, Magistrate Chen asked
specifically whether the exception to immunity under 28
U.S.C. § 1605(a)(7) applies to the case against *Liu*. In
our considered opinion, the exception under 28 U.S.C. §
1605(a)(7) does not apply by its terms, since the Peoples'
Republic of China has never been designated as a state
sponsor of terrorism within the meaning of subsection (A)
of that provision. Nor, in our view, does the "tort"
exception under 28 U.S.C. § 1605(a)(5) apply since none of
the acts in question occurred in the United States. It
does not appear to us that any other exception of the FSIA
would be relevant to the facts alleged in the complaint.
Therefore, if the FSIA is the appropriate legal framework
for determining the issue, the action would have to be
dismissed. See 28 U.S.C. §§ 1330, 1604 (immunity unless
there is exception under 28 U.S.C. §§ 1605-1607).

Whether the FSIA applies to this case presents a
number of issues for the Court to determine. We understand
that, since *Chuidian v. Philippine National Bank*, 912 F.2d
1095 (9th Cir. 1990), the practice in the 9th Circuit has
been to evaluate claims brought against individual foreign
government officials in United States federal courts
according to whether the allegations giving rise to the
suit were performed in an official capacity. Where the
conduct is found to be official, the courts have deemed the
action to be, in effect, a claim against the foreign state,
and have applied the analytical framework of the FSIA.
Other jurisdictions have also adopted this approach. See,
e.g., *Byrd v. Corporacion Forestal Y Industrial de Olancho
S.A.*, 182 F.3d 380, 388-89 (5th Cir. 1999); *El-Fadl v.
Central Bank of Jordan*, 75 F.3d 668, 671 (D.C. Cir. 1996).[2]

The following considerations may be relevant given
this framework. As noted above, the only named defendant
in *Liu* is Beijing's Mayor, Mr. Liu Qi. The allegations of

_____

[2] The Executive Branch has not specifically endorsed the approach of
*Chuidian*, but recognizes that it is controlling law in the 9th Circuit
in which these cases arise.

- 4 -

the complaint are directed solely towards actions he
allegedly took, or failed to take, as a senior official of
the Chinese Government, in implementation of official
policy.  What is at issue, in the words of the complaint,
is the "Chinese government's crackdown on Falun Gong," and
more particularly the "[a]buses being committed by police
and security forces in Beijing against the Falun Gong."
Compl., ¶¶ 31, 32.  The acts and omissions attributed to
Mayor Liu are characterized as part of this "widespread
governmental crackdown"; the duties he is said to have
violated derived from his official position.  The complaint
specifically alleges that "[a]s the Mayor of the City of
Beijing, Defendant Liu held and holds the power not only to
formulate all important provincial policies and policy
decisions, but also to supervise, direct and lead the
executive branch of the city government, which includes the
operation of the Public Security Bureau of Beijing, under
which the police operate, and other security forces."  Id.,
¶ 34.[3]

It is noteworthy in this regard that the 9th Circuit
has previously held that the FSIA is not rendered
inapplicable because of alleged violations of customary
international law by the officials of a foreign state
defendant.  *Siderman de Blake v. Argentina*, 965 F.2d 699
(9th Cir. 1992), *cert. denied*, 507 U.S. 1017 (1993).  See
also *Argentine Republic v. Amerada Hess*, 488 U.S. 428
(1989)(FSIA is exclusive basis for suit against foreign
state notwithstanding alleged violations of international
law by its officials).  Because suits against current
officials may well constitute the "practical equivalent" of
suits against the sovereign, and because denial of immunity
in such circumstances would allow "litigants to accomplish
indirectly what the [FSIA] barred them from doing
directly," *Chuidian*, *supra* at 1101-02, we believe the
courts should be especially careful before concluding that
the FSIA is inapplicable to a suit against a current
official relating to the implementation of government
programs.  Cf., *Saudi Arabia v. Nelson*, 507 U.S. 349, 361
(1993)("the intentional conduct alleged here (the Saudi
Government's wrongful arrest, imprisonment and torture of

---

[3] As is described more fully below, this is one of a series of suits in
U.S. courts against Chinese officials for actions allegedly taken
against Falun Gong practitioners.  This pattern may reinforce the
inference from the complaint that, at bottom, this suit is directed at
PRC government policies rather than past conduct of a specific
official.

- 5 -

Nelson) ... boils down to abuse of the power of its police
by the Saudi Government, and however monstrous such abuse
undoubtedly may be, a foreign state's exercise of the power
of its police has long been understood ... as peculiarly
sovereign in nature").  Otherwise, plaintiffs could evade
the FSIA altogether by the simple expedient of naming a
high level foreign official as a defendant rather than a
foreign state.

    We acknowledge the expanding body of judicial
decisions under the TVPA holding _former_ foreign government
officials liable for acts of torture and extrajudicial
killing despite (or indeed because of) the fact that the
defendants abused their governmental positions.  See, e.g.,
_Xuncax v. Gramajo_, 886 F. Supp. 162 (D.Mass. 1995); _Hilao
v. Estate of Marcos_, 103 F.3d 767 (9th Cir. 1996); _Cabello
Barreuto v. Fernández Larios_, 205 F.Supp.2d 1325 (N.D.Fla.
2002).  The principal aim of the TVPA was to codify the
decision of the Second Circuit in _Filartiga v. Pena-Irala_,
630 F.2d 876 (2d Cir. 1980), by providing an explicit
statutory basis for suits against former officials of
foreign governments over whom U.S. courts have obtained
personal jurisdiction, for acts of torture and
extrajudicial killing committed in an official capacity.
The Senate Report on the TVPA states that "[b]ecause all
states are officially opposed to torture and extrajudicial
killing … the FSIA should normally provide no defense to an
action taken under the TVPA against a _former_ official"
(emphasis supplied).[4]

    At the same time, the TVPA was not intended to
override otherwise existing immunities from U.S.
jurisdiction, as courts have recognized in suits brought
under these statutes against _current_ or _sitting_ foreign
governmental officials.[5]  See, e.g., _Saltany v. Reagan_, 702

[4] As this sentence indicates, Congress anticipated that, although it
would not normally be so, in some cases involving officials who had
left office, exercise of jurisdiction under the TVPA would still be
inappropriate.  See, e.g., S. Rep. No. 102-249, at *8 ("To avoid
liability by invoking the FSIA, a former official would have to prove
an agency relationship to the state, which would require that the state
admit some knowledge or authorization of relevant acts.")(internal
quotation marks omitted).  The cases before Magistrate Chen do not pose
the question of how _Chiudian_ should be applied to such former
officials.

[5] Dealing with sitting officials is a component of the President's power
over the nation's foreign relations.  See, e.g., _United States v.
Curtiss-Wright Corp._, 299 U.S. 304, 320 (1936) (describing "the very
delicate, plenary and exclusive power of the President as the sole

- 6 -

F. Supp. 319 (D.D.C. 1988); *Lafontant v. Aristide*, 844 F.
Supp. 128 (E.D.N.Y. 1994); *Tachiona v. Mugabe*, 169
F.Supp.2d 259 (S.D.N.Y. 2001). These cases are consistent
with relevant international authority, such as the
decisions of the International Court of Justice in the
*Yerodia* case (*Case Concerning the Arrest Warrant of 11
April 2000 - Democratic Republic of the Congo v. Belgium*,
Judgment of Feb. 14, 2002) and the European Court of Human
Rights in *Al-Adsani v. The United Kingdom* (No. 35763/97,
Judgment of Nov. 21, 2001).

     In response to Magistrate Chen's second set of
questions ("Should the Court find the case nonjusticiable
under the Act of State doctrine? What effect will
adjudication of this suit have in the foreign policy of the
United States?"), we respectfully offer the following
observations for the Court's consideration.

     Litigation in U.S. courts challenging the legality of
a foreign government's actions, or inactions, taken within
its own territory, can present sensitive dimensions, as
recognized in a number of decisions of the U.S. Supreme
Court. See, e.g., *Underhill v. Hernandez*, 168 U.S. 250,
252 (1897); *Banco Nacional de Cuba v. Sabbatino*, 376 U.S.
398, 428 (1964); *W.S. Kirkpatrick & Co., Inc. v.
Environmental Tectonics Corporation, Int'l*, 493 U.S. 400,
405 (1990)). Cf., *Baker v. Carr*, 362 U.S. 186 (1962). The
Court has recognized that the judiciary should approach
such litigation with the utmost care and circumspection.

     We note that *Liu* is only one of several recent cases
brought in U.S. federal courts by Falun Gong adherents
against high-level PRC officials--typically, under the ATS
and the TVPA. The case just added to these proceedings,
*Plaintiff A et al. v. Xia Deren*, is but the most recent
example. See also, e.g., *Peng, et al. v. Zhao*, No. 01
Civil 6535 (DLC) (SDNY) (default judgment in nominal amount
of $1 entered, December 26, 2001; defendant Zhao Zhifei was
said to be the Department Head of the Public Security

organ of the federal government in the field of international
relations"). If Congress intended to alter the balance of power
between the Executive and Legislative Branches in the area of foreign
policy, Congress would be required to adopt a clear statement of that
intent. "[T]he 'clear statement' rule," which "was originally
articulated to guide interpretation of statutes that significantly
alter the federal-state balance," should also be applied to "statutes
that significantly alter the balance between Congress and the
President." *Armstrong v. Bush*, 924 F.2d 282, 289 (D.C.Cir. 1991).

- 7 -

Bureau of Hubei Province); *Jin, et al. v. Ministry of State Security*, et al., No. 02-CV-627 (DDC)(case pending); *Petit, et al. v. Ding*, No. CV 02-00295 (D. HI)(case pending) (defendant Ding Guangen is said to be the Deputy Chief, Falun Gong Control Office, and Minister for Media and Propaganda, Central Committee of the Chinese Communist Party of the PRC). In our judgment, adjudication of these multiple lawsuits, including the cases before Magistrate Chen, is not the best way for the United States to advance the cause of human rights in China.

The United States Government has emphasized many times to the Chinese Government, publicly and privately, our strong opposition to violations of the basic human rights of Falun Gong practitioners in China. We have made clear, on repeated occasions, our absolute and uncompromising abhorrence of human rights violations such as those alleged in the complaint, in particular torture, arbitrary detention, interference with religious freedom, and repression of freedom of opinion and expression. The Executive Branch has many tools at its disposal to promote adherence to human rights in China, and it will continue to apply those tools within the context of our broader foreign policy interests.

We believe, however, that U.S. *courts* should be cautious when asked to sit in judgment on the acts of foreign officials taken within their own countries pursuant to their government's policy.[6] This is especially true when (as in the instant cases) the defendants continue to occupy governmental positions, none of the operative acts are alleged to have taken place in the United States, personal jurisdiction over the defendants has been obtained only by alleged service of process during an official visit, and the substantive jurisdiction of the court is asserted to

---

[6] As the Department of State testified before the Senate Committee on the Judiciary during its consideration of the TVPA, "From a foreign policy perspective, we are particularly concerned over the prospect of nuisance or harassment suits brought by political opponents or for publicity purposes, where allegations may be made against foreign governments or officials who are not torturers but who will be required to defend against expensive and drawn-out legal proceedings. Even when the foreign government decl nes to defend and a default judgment results, such suits have the potential of creating significant problems for the Executive's management of foreign affairs. ... We believe that inquiry by a U.S. court into the legitimacy of foreign government sanctions is likely to be viewed as highly intrusive and offensive." S. Hrg. 101-1284 on S. 1629 and H.R. 1662 (June 22, 1990) at 28 (Prepared Statement of David P. Stewart).

- 8 -

rest on generalized allegations of violations of norms of customary international law by virtue of the defendants' governmental positions.  Such litigation can serve to detract from, or interfere with, the Executive Branch's conduct of foreign policy.

We ask the Court in particular to take into account the potential for reciprocal treatment of United States officials by foreign courts in efforts to challenge U.S. government policy.  In addressing these cases, the Court should bear in mind a potential future suit by individuals (including foreign nationals) in a foreign court against U.S. officials for alleged violations of customary international law in carrying out their official functions under the Constitution, laws and programs of the United States (e.g., with respect to capital punishment, or for complicity in human rights abuses by conducting foreign relations with foreign regimes accused of those abuses). The Court should bear in mind the potential that the United States Government will intervene on behalf of its interests in such cases.

If the Court finds that the FSIA is not itself a bar to these suits, such practical considerations, when coupled with the potentially serious adverse foreign policy consequences that such litigation can generate, would in our view argue in favor of finding the suits non-justiciable.  However, if the Court were to determine that dismissal is not appropriate, we would respectfully urge the Court to fashion its final orders in a manner that would minimize the potential injury to the foreign relations of the United States.

Sincerely,

William H. Taft, IV

Enclosures:
        As stated.

# TAB 1

**UNITED STATES DISTRICT COURT**
NORTHERN DISTRICT OF CALIFORNIA
UNITED STATES COURTHOUSE
450 GOLDEN GATE AVENUE
SAN FRANCISCO, CA 94102



CHAMBERS OF
EDWARD M. CHEN
UNITED STATES MAGISTRATE JUDGE

MAY 16 2002

May 3, 2002

The Honorable William Howard Taft, IV
Office of the Legal Adviser
United States Department of State
2201 C Street N.W.
Washington, DC 20520

  Re: *Jane Doe I, et al. v. Liu Qi, et al.*, C-02-0672 CW (EMC) (Northern District of
    California)

Dear Mr. Taft:

On February 2, 2002, six individual plaintiffs, each of whom is a Falun Gong practitioner,
brought suit against Liu Qi, who has served as the mayor of Beijing of the People's Republic of
China since February, 1999. The plaintiffs are citizens of various countries, including the
People's Republic of China, France, Sweden, Israel, and the United States. Four currently reside
in the United States. The suit contends that each of the plaintiffs was subject to arrest and
detention under harsh conditions, including the use of unreasonable force and torture, in
connection with China's crackdown on the Falun Gong practitioners. The suit contends that the
City of Beijing has been a focal point of the repression and persecution against the Falun Gong
and that the defendant Liu knew or should have known that Beijing police and other security
forces were engaged in a pattern and practice of severe human rights abuses against Falun Gong
practitioners. The complaint asserts that defendant Liu had a duty both under customary
international law and Chinese law to prevent police and other security forces under his authority
from engaging in abuses. The complaint asserts five causes of action under the Torture Victim
Protection Act and Alien Tort Claims Act. Enclosed is a copy of the complaint filed herein.

Defendant Liu was served while passing through San Francisco International Airport, apparently
on his way to the Winter Olympics. Having failed to respond to the complaint, the Court entered
a default on March 12, 2002. Plaintiffs now move for judgment by default. This motion has
been assigned to me by the District Judge in this case for a Report and Recommendation.
Enclosed is a copy of the plaintiffs' motion for judgment by default.

Having reviewed the complaint and plaintiffs' motion, the Court has determined that it would be appropriate to solicit the Department of State's opinion on a number of issues. In particular, the Court would appreciate the Department of State's views on the following issues:

1.      Is this case barred under the Foreign Sovereign Immunities Act ("FSIA")? Please address, *inter alia*:

      a.      Whether the exception from immunity under 28 U.S.C. § 1605(a)(7) applies.

      b.      In determining both whether the FSIA applies and whether 28 U.S.C. § 1605(a)(7) applies, what law and facts must be demonstrated to establish defendant Liu was acting within or outside the scope of his authority? Must the court determine defendant's scope of his authority under Chinese law; if so the Court requests translated version of all applicable law material to this determination.

2.      Should the Court find the case nonjusticiable under the Act of State doctrine? What effect will adjudication of this suit have in the foreign policy of the United States?

If the Department of State believes a response to some or all of the above questions from the People's Republic of China is appropriate, it may invite the appropriate representative thereof to submit its written views to the Court as well.

The Court would appreciate your consideration of this matter and your communication of the State Department's position regarding these issues. The Court leaves to your discretion whether your response is best submitted in the form of a letter or a Statement of Interest filed pursuant to 28 U.S.C. § 517. A copy should be sent to plaintiffs' counsel. The Court would appreciate a response by July 5, 2002.

Thank you for attention and cooperation.

Yours very truly,

Edward M. Chen
U.S. Magistrate Judge

EMC/ld
Enc.
cc:     Joshua Sondheimer, Esq., The Center for Justice & Accountability, 870 Market Street, Suite 684, San Francisco, CA 94102 (*Plaintiffs' counsel*)
Michael S. Sorgen, Esq., Law Offices of Michael Sorgen, 240 Stockton Street, 9th Floor, San Francisco, CA 94108(*Plaintiffs' counsel*)
Terri Marsh, Esq., Law Offices of Terri Marsh, 3133 Connecticut Avenue, NW, Suite 608, Washington, DC 20008 (*Plaintiffs' counsel*)