Xiaoning et al v. Yahoo! Inc, et al

Case 4:07-cv-02151-CW    Document 65-5    Filed 08/27/2007    Page 1 of 90

Doc. 65 Att. 4

# EXHIBIT F

Dockets.Justia.com

THE LEGAL ADVISER

DEPARTMENT OF STATE

WASHINGTON

July 24, 2006

Hon. Peter D. Keisler
Assistant Attorney General
Civil Division
United States Department of Justice
Washington, D.C. 20530

Re: *Li Weixum, et al. v. Bo Xilai,* No. 1:04CV00649 (DDC)

Dear Mr. Keisler:

By letter dated February 24, 2006, U.S. District Court Judge Richard J. Leon solicited the Department of State's views in connection with the above-referenced suit, which was brought under the Alien Tort Statute (ATS) and the Torture Victim Protection Act (TVPA). Specifically, Judge Leon asked for the Department of State position on: (1) what effect, if any, adjudication of this case will have on the foreign policy of the United States; (2 the applicability of the act of state doctrine; and (3) if the court finds that the case is justiciable, the application of the Foreign Sovereign Immunities Act (FSIA). Judge Leon asked that we respond either directly or by statement of interest pursuant to 28 U.S.C. §517. A copy of his letter is enclosed (Enclosure A). We here provide our views on the foreign policy consequences of this litigation and request that this letter be submitted to the court as an attachment to a Suggestion of Immunity and Statement of Interest addressing the legal issues.

*Background*

The plaintiffs allege that Chinese Minister of Commerce Bo Xilai planned and carried out serious human rights abuses against practitioners of the Falun Gong spiritual movement (FLG) in Liaoning Province. All plaintiffs appear to be Chinese nationals who reside in the People's Republic of China or in countries other than the United States. They assert that Minister Bo, acting "under color of law" in his former position as Governor of Liaoning, is responsible for these violations. All of the acts alleged in the complaint are said to have occurred within China, at the direction of the Chinese government, against Chinese nationals. We are unaware of any connection between the underlying suit and the United States.

As Minister of Commerce, Bo Xilai is now responsible for China's commerce and international trade, including international trade policy and negotiation. The attempt to serve process on Minister Bo was made at a time when he was Minister of Commerce (no longer Governor of Liaoning Province) and while he was on official diplomatic travel to the United States as an active member of the delegation of Chinese Vice Premier Wu Yi to the U.S.-China Joint Commission on Commerce and Trade (JCCT) – a bilateral, governmental consultative forum that addresses significant bilateral trade concerns and promotes commercial opportunities between the United States and China. We understand from the Government of China that the summons and complaint were physically thrust upon Minister Bo while he was attending a U.S. - China Business Council reception in honor of Vice Premier Wu Yi and her delegation (see Enclosure B).

Without reference to the specific allegations in this suit, the Department of State has informed China, both publicly and privately, of its strong opposition to violations of the basic human rights of FLG practitioners in China. We have repeatedly called on China to respect the rights of all its citizens, including FLG adherents. The Department of State's critical views of China's treatment of the FLG practitioners are a matter of public record. *See, e.g.*, Department of State Annual Human Rights Report for 2005, www.state.gov/g/drl/rls/hrrpt/2005/61065.htm (especially pages 22-23).

### Discussion

Although we oppose the Chinese government's anti-FLG policies, we believe that this suit should be dismissed. For U.S. courts to exercise jurisdiction over Minister Bo in the circumstances of this case would be inconsistent with international law and expectations relating to the immunities of states and their official representatives and would seriously interfere with the United States' ability to conduct foreign relations. Moreover, it will undercut the U.S. government's efforts to engage China on human rights issues, including its treatment of the FLG. It could also adversely affect U.S. engagement with China on a broad range of other issues, including counter-terrorism, law enforcement, economics and trade, trafficking in persons, adoption, narcotics suppression, and nuclear nonproliferation. Indeed, the instant lawsuit has already had a chilling effect on U.S.-China relations; I enclose a series of diplomatic notes and letters that China has sent the United States expressing its deep concern about it (Enclosures B – D).

1. The Department of State regards the April 2004 visit of Minister Bo to have been a special diplomatic mission and considers Minister Bo to have been an official diplomatic envoy while present in the United States on that special mission. Consistent with the rules of customary international law recognized and applied in the United States and in furtherance of the President's authority under Article II of the Constitution, it is appropriate to recognize the immunity of a high-level official on a special diplomatic mission from the jurisdiction of United States federal and state courts in a case such as this. In light of these considerations, the Department recognizes and allows the immunity of Minister Bo Xilai from the jurisdiction of the United States District Court, including from service of process, during the period of his visit to the United States.

The practical wisdom underlying this immunity is apparent. Diplomatic relations often turn on the ability of officials from different states to communicate and meet with each other without harassment or distraction. Indeed, the need for unhampered communication between governments is often most critical when the disagreements between them are the greatest. If suits of this kind can be commenced in U.S. courts against a senior foreign government official present in the United States for government-to-government business, the President will be deprived of an essential foreign policy tool and our ability to pursue our foreign policy objectives effectively will be significantly undermined. The United States must be able to host foreign officials without the prospect that they may be served with process in a civil suit.

Permitting suits like this would also be inconsistent with U.S. views on the assertion of jurisdiction over U.S. government officials by foreign governments and courts. The United States has made clear to foreign governments that it objects to service of process on senior U.S. officials traveling overseas; we have insisted, for example, that requests for documents and information about official acts of U.S. representatives for use in criminal investigations should be made government-to-government through diplomatic or law enforcement channels, not by attempting to serve or obtain jurisdiction over the officials themselves, particularly when they are on temporary visits. Permitting this suit against Minister Bo would be inconsistent with our representations to other governments, and could expose U.S. officials visiting other countries to suits arising from their performance of official U.S. government functions.

2. The attempted assertion of jurisdiction over Minister Bo while he was in the United States on official, bilateral business at the invitation of the United States has had immediate adverse foreign policy consequences and has directly interfered with the President's authority to conduct foreign relations, including his authority to receive "Ambassadors and other public ministers" (U.S. Const. Art. II, Section 3). The Executive originally invited Vice Premier Wu Yi to head a delegation to the United States for bilateral consultations in an effort to further U.S. - China trade relations. The attempt to serve Minister Bo while he was here on that delegation undercut that effort and elicited strong objections from China, which characterized the purported service as an assault and questioned the good faith of the United States in hosting the visit. Indeed, China's Legal Adviser has made clear to me that, because of this litigation, he has recommended that Minister Bo not travel to the United States unless his immunities from jurisdiction will be respected.

3. The foreign policy problems created by this case are exacerbated by the fact that it is, in effect, a suit against China about acts taken in China against Chinese nationals. Any lawsuit that challenges the policies and actions of foreign authorities in their own territory concerning their own citizens has an inherent potential to cause friction in foreign relations. A review of the complaint in this case makes clear its ambition to challenge not only acts attributed to Minister Bo, but also the Chinese Government's anti-FLG policy in general. (See, for example, Compl. ¶ 1, alleging that Minister Bo's actions were taken "in concert with other officials at the highest levels of the national government of the People's Republic of China (PRC) and its ruling Central

3

Committee of the Chinese Communist Party.") The fact that the lawsuit is effectively directed against the Chinese Government and its official policies is confirmed when it is seen in the context of the large number of suits the FLG have initiated against high-level Chinese officials in the United States and other countries. The FLG website (flgjustice.org) lists over sixty actions against Chinese entities and officials. Lawsuits have been filed in South America, Africa, Asia and Europe (in over ten different European countries), in addition to Canada, where multiple suits have been filed, and the United States, where the website reports fifteen suits.

In view of the Department of State's recognition of Minister Bo's immunity from the Court's jurisdiction and the significant adverse foreign policy implications of the further conduct of this suit, the Department of State asks that you submit to the Court an appropriate Suggestion of Immunity and Statement of Interest to obtain the prompt dismissal of the proceedings against Minister Bo.

                                        Sincerely,

                                        John B. Bellinger, III

Enclosures:

    A.  Letter from Hon. Richard J. Leon, U.S. District Court for the District of
           Columbia, to Hon. John B. Bellinger, III , dated February 28, 2006.
    B.  Diplomatic Note from the Embassy of the People's Republic of China to the U.S.
           Department of State, dated April 26, 2004.
    C.  Letter from Liu Zhenmin, Director General of the Department of Treaty and Law
           to Hon. William Taft, dated August 23, 2004.
    D.  Letter from Li Zhaoxing, Minister of Foreign Affairs, to Hon. Condoleezza Rice,
           dated March 30, 2006.

# Enclosure A

United States District Court for the District of Columbia
Washington, DC 20001

Chambers of
Richard J. Leon
United States District Judge

February 24, 2006

Honorable John B. Bellinger III
Legal Adviser, Office of the Legal Adviser
United States Department of State
2201 C Street, N.W.
Washington, DC 20520

      Re:   *Li Weixum, et al. v. Bo Xilai*, Civil Action No. 04-0649 (RJL) (District of
            Columbia)

Dear Mr. Bellinger:

On April 22, 2004, Li Weixum and 3 other individual plaintiffs, each of whom is a Falun
Gong practitioner, brought suit against Bo Xilai, current Minister of Commerce of the
People's Republic of China ("PRC"), under the Alien Tort Claims Act ("ATCA") and the
Torture Victims Protection Act ("TVPA"). A copy of the complaint is enclosed. The
plaintiffs each have resided in or are currently residing in the Liao Ning Province of the
People's Republic of China ("PRC") and claim that they have been subjected to various
forms of persecution and abuse because of their support for Falun Gong practitioners.
According to the plaintiffs, the alleged beatings and torture took place while the plaintiffs
were being held in detention centers located in Liao Ning Province. The defendant, Bo
Xilai, previously served as governor of the Liao Ning Province, and plaintiffs claim that
Xilai supervised the detention centers and prison camps located in the province where the
plaintiffs were allegedly abused and "planned and carried out a sustained and deliberate
set of policies and actions that resulted in the arbitrary and unlawful arrest, detention,
persecution, and in some cases execution, of the [p]laintiffs." Xilai is currently the PRC's
Minister of Commerce.

Plaintiffs have brought the following causes of action under ACTA and TVPA: (1)
Torture; (2) Genocide; (3) Deprivation of the Right to Live; (4) Right to Liberty and

Honorable John B. Bellinger III
February 24, 2006
Page 2

Security of Person and to be Free of Arbitrary Arrest and Imprisonment, (5) Freedom of
Thought, Conscience and Religion, and the Freedom to Hold Opinions Without
Interference and to Associate Freely; and (6) Violations of the above-cited rights and
protections as embodied in customary international law. While Xilai was served on April
22, 2004, in front of the Fairmont Hotel, 2401 M Street, N.W., Washington, DC, he has
not responded in any capacity to the complaint in this action. Having failed to respond to
the complaint, the Court entered a default on July 28, 2004. Plaintiffs moved for Default
Judgment and Declaratory Judgment on February 4, 2005. This Court denied the motions
on September 27, 2005 by minute order. The motion for Default Judgment and
Declaratory Judgment is enclosed.

Having reviewed the complaint, plaintiff's motion and the relevant law, the Court has
determined that it would be appropriate to solicit the Department of State's opinion on a
number of issues relevant to the resolution of the action. In particular, the Court would
appreciate the Department of State's views on the following issues:

1.    What effect, if any, will adjudication of this suit have in the foreign policy
      of the United States, specifically with the PRC?

2.    What is the Department of State's position on the applicability of the Act of
      State Doctrine in this action?

3.    If the Court finds that the case is justiciable, what is the Department of
      State's position on the application of the Foreign Sovereign Immunities Act
      ("FSIA") in this action?

If the Department of State believes a response to some or all of the above questions from
the People's Republic of China is appropriate, it may invite the appropriate representative
thereof to submit its written views to the Court as well.

The Court would greatly appreciate the Department of State's consideration of this matter
and a communication from the Department of State outlaying the Department of State's
views and/or positions regarding these issues. The Court leaves to your discretion
whether your response is best submitted in the form of a letter or a Statement of Interest
filed pursuant to 28 U.S.C. § 517. A copy of any such response should be sent to
plaintiff's counsel as well. This letter in no way invites the Department of State to litigate
this case on behalf of Xilai. The Court would appreciate a response by April 23, 2006.

Honorable John B. Bellinger III
February 24, 2006
Page 3

Thank you for your consideration of this matter and your cooperation.

Very truly yours,

Richard J. Leon
United States District Judge

Enclosures

cc:    Morton Sklar, Esq., w/o enc.

# Enclosure B

# 中华人民共和国大使馆

## THE EMBASSY OF THE PEOPLE'S REPUBLIC OF CHINA

2300 Connecticut Avenue, N.W.

Washington, D.C. 20008

CE 057/04

The Embassy of the People's Republic of China presents its compliments to the Department of State of the United States of America and has the honor to make a statement on the following matter.

At about 6:30 on the evening of April 22, when Chinese Minister of Commerce Bo Xilai and other members of the entourage of Vice Premier Wu Yi were walking into the lobby of the Fairmont Hotel in Washington, D.C. on their way to the dinner hosted by the U.S.-China Business Council, the National Committee on U.S.-China Relations and the American Chamber of Commerce in honor of the Vice Premier who came to the United States for the 15th Session of the China-U.S. Joint Commission on Commerce and Trade (JCCT), an unidentified man suddenly rushed toward Minister Bo and other members of the Chinese entourage, and attempted to throw an object at them. Minister Bo and other members of the Chinese entourage swiftly dodged this physical attack. This man's act constituted a criminal assault, a grave threat to the personal safety of Minister Bo and other members of the Chinese entourage. Thereafter, the man attempted to escape from the site, but was intercepted by U.S. police officer, Sergeant Regina A. Randolph. After taking his deposition, the man was allowed to leave.

It was following the consensus reached by Premier Wen Jiabao and President George W. Bush and at the express invitation of the U.S. Government that Minister Bo and other members of the Chinese delegation came to the United States with Vice Premier Wu Yi to attend the 15th Session of the JCCT. The U.S. Government had the full responsibility to ensure security and safety of Minister Bo and other delegation members during their stay in the United States. The Chinese side had repeatedly requested the U.S. side to take necessary measures, including providing security details and safe and unobstructed passage for Minister Bo. However, the U.S. side had asserted that Minister Bo had no security risks in the United States and refused to do so, which has resulted in this criminal assault and the extremely unpleasant situation. The Chinese Government hereby expresses its strong dissatisfaction with the U.S. Government, and has made solemn representations with it.

This year's JCCT meeting is the first session since the level of officials attending it having been raised, and it is of important significance for promoting China-U.S. economic relations and trade as well as overall bilateral relations.  The fact that the Chinese delegation was headed by Vice Premier Wu Yi and was composed of officials from over 10 departments of the Chinese Government, including 12 senior officials at ministerial and vice-ministerial levels, fully demonstrates the high importance the Chinese Government has attached to this JCCT session.  It should be stressed that Minister Bo, as the head of the Ministry of Commerce which is the Chinese organizer of the JCCT session, has played an important and active role in making the meeting a success.  Regrettably however, due to the reasons of the U.S. side, the assault incident which should not have happened took place anyway.  This has not only done harm to the personal safety and dignity of Minister Bo, but has also cast a shadow over the exchanges and cooperation between China and the United States and between the relevant governmental organizations of the two countries.  The Chinese Government strongly urges the U.S. Government to recognize the gravity of this assault incident, charge the police with the responsibility to investigate this matter, punish the attacker in accordance with the law, and ensure that similar events will not reoccur in the future.

The Embassy of the People's Republic of China avails itself of this opportunity to renew to the Department of State of the United States of America the assurances of its highest consideration.

Washington, D.C., April 26, 2004

Department of State
United States of America
Washington, D.C.

Cc:   The National Security Council
      The Department of Justice
      The Department of Commerce
      The Office of the United States Trade Representative

# Enclosure C

(Translation)

Mr. William Taft

Legal Advisor to US State Department

Washington D.C.    20520-6310

Beijing, 23 August 2004

Dear Mr. Taft,

I am writing to you on the attempted "lawsuit" by the "Falun Gong" against Chinese Commerce Minister Bo Xilai at the US District Court for the District of Columbia. As Director General of the Department of Treaty and Law of China's Ministry of Foreign Affairs, I would like to inform you, officially, that the Chinese Government has decided to present its position to the US side on this matter, presenting the truth of the April 22nd incident and explaining its position on the issue of sovereign immunity. I would be much appreciative if you could help convey the position attached herewith to the above-mentioned court in

good time.

With best wishes.

Your Sincerely,

Liu Zhenmin

Director General, Department of Treaty and Law

Ministry of Foreign Affairs

(Translation)

# Position of the Chinese Government on the Assault and Attempted Frame-up by "Falun Gong" Against Minister Bo Xilai

The Government of China wishes to state its position on the assault and attempted frame-up by "Falun Gong" against Chinese Commerce Minister Bo Xilai:

I. The April 22nd incident was an assault perpetrated by "Falun Gong" element, and Minister Bo Xilai was not "served" any US court summons

In April 2004, acting on the agreement reached by Chinese Premier Wen Jiabao and US President George W. Bush and at the invitation of the US Government, Chinese Commerce Minister Bo Xilai accompanied Vice Premier Wu Yi to attend the 15th Session of the China-US Joint Commission on Commerce and Trade (JCCT). At about 6:30pm on April 22nd, Minister Bo Xilai and his Chinese entourage walked into the lobby of the Fairmont Hotel in Washington D.C. on their way to the dinner held by the US-China Business Council, the National Committee on US-China Relations and the American

Chamber of Commerce. An unidentified adult male, with an object in his hand, made a sudden and violent charge toward Minister Bo and his Chinese entourage, posing a serious threat to the Minister's personal safety. The man's act could only be described as a criminal assault. As he tried to flee the scene, a US police officer by the name of Regina A. Randolph stopped and apprehended him. Neither Minister Bo nor any one of the Chinese entourage touched the object the assaultant once held in his hand or knew anything about it and how it was later disposed of.

Owing to the failure of the US Government to live up to the responsibility for security and safety of Minister Bo during his stay in the US, which resulted in the above-mentioned assault, the Chinese Government has made solemn representations to it accordingly.

## II. US courts have no jurisdiction over the so-called "lawsuit" by "Falun Gong"

1. The principle of sovereign immunity is derived from one of sovereign equality, which forms the cornerstone of modern international law and is enshrined in clear-cut terms in many important international legal documents including the UN Charter. Based on the

principle of *par in parem non habet juridictionem* (between equals there is no jurisdiction), the court of one State shall not accept a lawsuit in which a foreign State is the defendant without the explicit consent of its government to give up jurisdictional immunity. Only when a foreign State institutes a proceeding before a court of another State, or only when there is a counter-claim arising out of the same legal relationship or facts as the principal claim, the foreign State cannot invoke jurisdictional immunity. Even if a foreign State has lost the case in the court of another State, it is not subject to measures of constraint. Such are the basic contents of the principle of sovereign immunity.

2. The principle of sovereign immunity was universally accepted by countries in their judicial practices as early as in the 19th century. The US was among the first countries to follow such principle. The Case of Schooner Exchange heard by the US Supreme Court in 1982 and many other cases before US courts thereafter all upheld this principle. In international relations of the modern times, the principle of sovereign immunity, as a universally recognized norm of international law, is widely supported by legislative and judicial practices of countries as well as by international legislation.

3. It is China's act of state when the Chinese Government, acting in compliance with the Constitution and laws of the land, outlawed the "Falun Gong" cult, and when its government officials perform their duty in accordance with the power entrusted to them by China's Constitution and laws.  Under the principle of sovereign immunity, China's act of state is entitled to jurisdictional immunity in the US courts.  And the US courts, therefore, have no jurisdiction to hear the so-called "lawsuit" by "Falun Gong" against Minister Bo Xilai.

III. The negative impact of "Falun Gong" "lawsuit" on China-US relations

Since the establishment of their diplomatic relations in 1979, China and the US have enjoyed increasingly broad and close exchanges and cooperation in the political, economic, trade, science and technology, culture, narcotics control, counter-terrorism and other fields, which greatly promoted the well-being of the two peoples and effectively contributed to peace and stability in the Asia-Pacific region and the world at large.

China and the US are both major countries of global influences. They have had extensive and important common interests though not

without some differences.   China-US relationship has always been a two-way and mutually beneficial one.   Such relationship can move ahead along a sound and steady course only when the two countries observe such basic norms governing international relations as mutual respect for sovereignty and territorial integrity, mutual non-interference in the internal affairs, equality and mutual benefit.   As an important official of the Chinese Government, Minister Bo Xilai has made a huge contribution to the development of China-US relations.   The frame-up "lawsuit" by the "Falun Gong" cult against Minister Bo Xilai, who was attending a JCCT session as a guest of the US Government, was aimed not only at attacking the Chinese Government but also obstructing the normal contact and the friendly cooperation between China and the US. The political motive behind the "Falun Gong" scheme cannot be more sinister.

Should the US court adjudicate this trumped-up "lawsuit", it would send out a deadly wrong signal to the "Falun Gong" cult, cause immeasurable disruption to the normal bilateral exchanges and cooperation in the various fields, and severely undermine the common interests of the two countries.   Therefore, the Chinese Government calls for the immediate dismissal of the "Falun Gong" "lawsuit" against Minister Bo Xilai.

# Enclosure D

(Translation)

Beijing, 30 March 2006

The Honorable Condoleezza Rice
Secretary of State
The US Department of State
Washington, DC
USA

Dear Dr. Rice,

I am writing to you concerning the unwarranted lawsuit filed by Falun Gong against Chinese Commerce Minister Bo Xilai at the District Court for the District of Columbia, and I wish to draw your attention to the following:

1. On 22 April 2004, Minister Bo Xilai, who was visiting the United States as guest of the US Government, was assaulted by an individual sent by Falun Gong, which put the Minister's personal safety in great jeopardy. Neither Minister Bo himself nor his aids touched the object the Falun Gong personnel held. They have not received any document from the US court.

2. Both the banning of the Falun Gong cult by the Chinese Government in accordance with China's Constitution and other laws and the discharging of their duties by Chinese government officials in accordance with law are acts of China exercising its sovereign rights. According to international law and universally recognized basic norms governing international relations, these acts are not subject to the jurisdiction of US courts. The same conclusion can be drawn from the *Foreign Sovereign Immunities Act* of 1976 of the United States.

3. Falun Gong is a cult and an anti-China political organization. In filing this frame-up case, Falun Gong attempts to disrupt the growth of China-US relations and normal personnel exchange between the two countries. China and the United States are working to develop a constructive and cooperative relationship in all fields. If Falun Gong should succeed in its frame-up lawsuit, China-US relations, especially our economic and trade ties as well as cooperation between the relevant government departments and personnel exchange, will be adversely

affected. The interest of the United States will also be undermined. This is something neither of us wants to see.

I have learnt that the US District Judge has recently sent a letter on this case to Mr. John Bellinger, Legal Advisor of the US State Department, and expressed the hope that the State Department would give its opinion on the case before 23 April. Legal opinions produced by the US Government have shown to be helpful in resolving such cases. In the interest of proper settlement of this issue that adversely affects our bilateral ties, I hope that you will give your personal attention to this matter and instruct the relevant office of the State Department to promptly provide legal opinion to the court. The legal opinion may include the following: The unwarranted lawsuit filed by Falun Gong undermines China-US relations and interests of the US side. The banning of Falun Gong by the Chinese Government according to law is an "act of state". Minister Bo Xilai enjoys immunity from the jurisdiction of US courts. The US State Department urges the court concerned to immediately stop adjudicating the case and dismiss it. The Chinese side requests that in providing the document of the State Department, the US side should include the diplomatic note of the Chinese side on the case and the *Position of the Government on the Assault and Attempted Frame-up by Falun Gong Against Minister Bo Xilai*.

With best regards,



(Signed)    Li Zhaoxing

Minister of Foreign Affairs
People's Republic of China

康多莉扎·赖斯女士

国务卿

美国国务院

哥伦比亚特区 华盛顿

亲爱的赖斯博士：

　　我谨就"法轮功"在美国哥伦比亚特区联邦地区法院诬告中国商务部薄熙来部长案事向你致函，并愿说明：

　　一、二〇〇四年四月二十二日，"法轮功"派人袭击作为美国政府客人访美的薄熙来部长，这是一起严重威胁薄部长人身安全的恶性事件。薄部长本人及其随行人员从未接触"法轮功"人员所持物品，也未接到任何美国法院的文书。

　　二、中国政府根据中国宪法和法律取缔"法轮功"邪教，中国政府公职人员依法履行其职责，是中国行使国家主权的行为。根据国际法和公认的国际关系基本准则，上述行为不受美国法院的司法管辖。即使仅考虑美国一九七六年《外国主权豁免法》的规定，也应当得出同样的结论。

　　三、"法轮功"是邪教，也是反华政治组织。"法轮功"策划诬告案，目的是干扰中美关系发展和两国正常人员往

来。当前，中美两国致力于全面发展建设性合作关系，如果"法轮功"诬告图谋得逞，将对中美关系，特别是两国经贸关系，包括双方有关机构的合作和人员交流造成严重负面影响，也将损害美方的利益。这是我们双方都不愿看到的。

我注意到，近期美主办法官已就此案致函美国务院法律顾问贝林格，希望美国务院在四月二十三日前对"法轮功"诬告薄熙来部长案提出意见。从以往实践看，美政府就有关案件出具法律意见书，有利于推动案件解决。为妥善解决这一干扰双边关系的问题，希望你关注此事，责成美国务院有关部门尽快向美法院提交法律意见书。意见书内容包括："法轮功"诬告案影响中美关系，损害美方切实利益；中国政府依法取缔"法轮功"属于"国家行为"；薄熙来部长享有不受美国法院司法管辖的豁免权；美国务院敦促有关法院立即停止审理并撤销此案。中方要求美方在提交国务院文件时，一并提交中方关于此案的外交照会和政府立场。

顺致敬意。

中华人民共和国外交部长

二〇〇六年三月 三十 日于北京

# EXHIBIT G

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

RA'ED MOHAMAD IBRAHIM MATAR,                       :
On behalf of himself and his deceased wife Eman Ibrahim   :
Hassan Matar, and their deceased children Ayman, Mohamad  :
and Dalia; MAHMOUD SUBHAI AL HUWETI, on behalf of   :
himself and his deceased wife Muna Fahmi Al Huweti, their   :
deceased sons Subhai and Mohammed, and their injured   :
children, Jihad, Tariq, Khamis, and Eman; and MARWAN   :
ZEINO on his own behalf,                        :        05 Civ. 10270 (WHP)
                                               :
            Plaintiffs,                         :        **ECF CASE**
                                               :
       v.                                      :
                                               :
AVRAHAM DICHTER, former Director of Israel's General   :
Security Service,                               :
                                               :
            Defendants.                        :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


## STATEMENT OF INTEREST
## OF THE UNITED STATES OF AMERICA


JOHN B. BELLINGER, III                MICHAEL J. GARCIA
Legal Adviser,                        United States Attorney for the
Department of State                   Southern District of New York

JEFFREY S. BUCHOLTZ                   SERRIN TURNER (ST-0646)
Acting Assistant Attorney General     DAVID S. JONES (DJ-5276)
                                      Assistant United States Attorneys
ORI LEV                               86 Chambers Street, 3rd Floor
Senior Trial Counsel                  New York, New York 10007
Department of Justice, Civil Division Tel No. (212) 637-2701
Federal Programs Branch               Fax No. (212) 637-2686

# TABLE OF CONTENTS

Preliminary Statement.................................................................................................................. 1

Argument ...................................................................................................................................... 4

Point I: Dichter Is Entitled to Immunity ....................................................................................... 4

A.    Foreign Officials Enjoy Immunity at Common Law for Their Official Acts,
      Which Was Not Displaced by the FSIA ................................................................................ 4

      1.    Immunity for Foreign Officials Acting in an Official Capacity Was
            Well-Established at Common Law prior to the Enactment of the FSIA ....................... 4

            a.    Official Immunity before the Issuance of the Tate Letter in 1952 ................... 4

            b.    Official Immunity after the Tate Letter.............................................................. 7

      2.    The FSIA Did Not Displace Common-Law Immunity for the Official Acts
            of Foreign Officials ..................................................................................................... 10

            a.    Statutory Text and Legislative History ............................................................ 10

            b.    Post-FSIA Case Law ........................................................................................ 13

            c.    International Law .............................................................................................. 19

B.    Dichter's Participation in Planning a Military Strike Constitutes an Official Act ............. 23

      1.    Whether an Act Is Performed in an Official Capacity Turns on Whether
            the Act Is Attributable to the State, Not on Whether It Was Lawful ........................... 23

      2.    There Is No Exception to the Immunity of Individual Officials for
            Alleged Jus Cogens Violations ................................................................................... 27

C.    The TVPA Does Not Trump the Immunity of Foreign Officials for Their Official Acts ... 33

Point II: The Courts Should Not Recognize a Civil Cause of Action for the
Disproportionate Use of Military Force....................................................................................... 35

A.    The Courts Have No Authority to Create a Federal Common Law Cause of Action under
      the ATS for the Disproportionate Use of Military Force.................................................... 37

B.    The TVPA Provides a Narrow Cause of Action That Does Not Encompass Claims for
      Civilian Casualties Resulting from the Disproportionate Use of Military Force ............... 47

Conclusion ................................................................................................................................... 52

## TABLE OF AUTHORITIES

Cases

*Aktepe v. United States*, 105 F. 3d 1400 (11th Cir. 1997) .............................................................. 43

*Alfred Dunhill of London v. Republic of Cuba*, 425 U.S. 682 (1976) ............................................ 8

*Arcaya v. Paez*, 145 F. Supp. 464 (S.D.N.Y. 1956) ...................................................................... 7

*Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428 (1989). ......................... 19, 25

*Baker v. Carr*, 369 U.S. 186 (1962)..................................................................................... 45, 51

*Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398 (1964) ....................................................... 7

*Barr v. Matteo*, 360 U.S. 564 (1959) ......................................................................................... 13

*Boos v. Barry*, 485 U.S. 312 (1988).......................................................................................... 23

*Bryks v. Canadian Broad. Corp.*, 906 F. Supp. 204 (S.D.N.Y. 1995).......................................... 14

*Byrd v. Corporacion Forestal*, 182 F.3d 380 (5th Cir. 1999)...................................................... 13

*Cabiri v. Assasie-Gyimah*, 921 F. Supp. 1189 (S.D.N.Y. 1996) ............................................ 14, 32

*Chaser Shipping Corp. v. United States*, 649 F. Supp. 736 (S.D.N.Y. 1986) ............................... 43

*Chuidian v. Philippine National Bank*, 912 F.2d 1095 (9th Cir. 1990)................................. passim

*Church of Scientology v. Commissioner of the Metropolitan Police*,
   65 ILR 193 (Federal Republic of Germany, Federal Supreme Court 1978)........................... 21

*Columbia Marine Services, Inc. v. Reffet Ltd.*, 861 F.2d 18 (2d Cir. 1988) ................................. 36

*Corrie v. Caterpillar, Inc.*, 403 F. Supp. 2d 1019 (W.D. Wash. 2005) ................................. 41, 45

*Crosby v. National Foreign Trade Council*, 530 U.S. 363 (2000) ............................................... 45

*Deal v. United States*, 508 U.S. 129 (1993)................................................................................. 48

*Doe I v. Israel*, 400 F. Supp. 2d 86 (D.D.C. 2005)............................................................... passim

*Doe v. Liu Qi*, 349 F. Supp. 2d 1258 (N.D. Cal. 2004) ........................................................ 31, 32

*EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244 (1991) .................................................................. 38

*El-Fadl v. Cent. Bank of Jordan*, 75 F.3d 668 (D.C. Cir. 1996)....................................... 13, 15, 24

*El-Shifa Pharm. Indus. v. United States*, 402 F. Supp. 2d 267 (D.D.C. 2005)............................ 43

*Enahoro v. Abubakar*, 408 F.3d 877 (7th Cir. 2005) ..................................................... 13

*Ex Parte Peru*, 318 U.S. 578 (1943) ............................................................................... 5

*Filartiga v. Pena-Irala*, 630 F.2d 876 (2d Cir. 1980) ......................................... 31, 34, 48

*First Am. Corp. v. Al-Nahyan*, 948 F. Supp. 1107 (D.D.C. 1996) ......................... 15, 16

*Garb v. Republic of Poland*, 440 F.3d 579 (2d Cir. 2006) ............................................ 22

*Goldstar (Panama) S.A. v. United States*, 967 F.2d 965 (4th Cir. 1992) ....................... 32

*Greenspan v. Crosbie*, No. 74 Civ. 4734 (JCM), 1976 WL 841
    (S.D.N.Y. Nov. 23, 1976) ............................................................... 8, 9, 10, 17

*Gregoire v. Biddle*, 177 F.2d 579 (2d Cir. 1949) ......................................................... 23

*Guaylupo-Moya v. Gonzales*, 423 F.3d 121 (2d Cir. 2005) ........................................ 20

*Hamdan v. Rumsfeld*, 415 F.3d 33 (D.C. Cir. 2005) .................................................... 36

*Head Money Cases*, 112 U.S. 580 (1884) .................................................................... 36

*Heaney v. Government of Spain*, 445 F.2d 501 (2d Cir. 1971) ........................................ 8

*Herbage v. Meese*, 747 F. Supp. 60 (D.D.C. 1990) ............................... 14, 15, 24, 28

*Hilao v. Estate of Marcos*, 25 F.3d 1467 (9th Cir. 1994) .............................................. 31

*Hilton v. Guyot*, 159 U.S. 113 (1895) ........................................................................ 22

*Holtzman v. Schlesinger*, 484 F.2d 1307 (2d Cir. 1973) ......................................... 43, 44

*Imbler v. Pachtman*, 424 U.S. 409 (1976) .................................................................. 33

*In re Agent Orange*, 373 F. Supp. 2d 7 (E.D.N.Y. 2005) ............................................ 43

*In re Doe*, 860 F.2d 40 (2d Cir. 1988) ........................................................................ 31

*In re Grand Jury Proceedings*, 613 F.2d 501 (5th Cir. 1980) ....................................... 30

*In re Terrorist Attacks*, 392 F. Supp. 2d 539 (S.D.N.Y. 2005) .............................. 14, 26

*Jaffe v. Miller,* 95 ILR 446 (Ontario Court of Appeal, Canada 1993) ............................ 21

*John Hancock Mut. Life Ins. Co. v. Harris Trust and Sav. Bank*, 510 U.S. 86 (1993) ............... 48

*Johnson v. Eisentrager*, 339 U.S. 763 (1950) .............................................................. 36

*Jones v. Ministry of Interior*, UKHL 26 (House of Lords, United Kingdom 2006)......... 20, 24, 29

*Kadic v. Karadzic*, 70 F.3d 232 (2d Cir. 1995)....................................................... 31, 34

*Keller v. Cent. Bank of Nigeria*, 277 F.3d 811 (6th Cir. 2002).................................. 13, 15

*Kline v. Kaneko*, 685 F. Supp. 386 (S.D.N.Y. 1988)................................................ 14, 24

*Koohi v. United States*, 976 F.2d 1328 (9th Cir. 1992) ................................................. 43

*Lafontant v. Aristide*, 844 F. Supp. 128 (E.D.N.Y. 1994) ................................. 11, 16, 35

*Letelier v. Republic of Chile*, 748 F.2d 790 (2d Cir. 1984) ......................................... 18

*Leutwyler v. Office of Her Majesty Queen Rania Al-Abdullah*,
    184 F. Supp. 2d 277 (S.D.N.Y. 2001)................................................................ 14, 26

*Linder v. Portocarrero*, 747 F. Supp. 1452 (S.D. Fla. 1992) ...................................... 51

*Linder v. Portocarrero*, 963 F.2d 332 (11th Cir. 1992)........................................... 43, 44

*Lyders v. Lund*, 32 F.2d 308 (N.D. Cal. 1929) ............................................................ 7

*Magness v. Russian Federation*, 247 F.3d 609 (5th Cir. 2001) .................................... 18

*Malley v. Briggs*, 475 U.S. 335 (1986) ...................................................................... 33

*Mujica v. Occidental Petroleum Corp.*, 381 F. Supp. 2d 1164 (C.D. Cal. 2005)........................ 51

*Murray v. The Schooner Charming Betsy*, 6 U.S. (2 Cranch) 64 (1804)....................................... 20

*National City Bank of New York v. Republic of China*, 348 U.S. 356 (1955) ................................ 5

*Nejad v. United States*, 724 F. Supp. 753 (C.D. Cal. 1989)........................................... 43

*Park v. Shin*, 313 F.3d 1138 (9th Cir. 2002)............................................................. 25

*Planned Parenthood Fed'n of Am., Inc. v. Agency for Int'l Dev.*,
    838 F.2d 649 (2d Cir. 1988)......................................................................... 51

*Princz v. Fed. Republic of Germany*, 26 F.3d 1166 (D.C. Cir. 1994) .......................... 28

*Prosecutor v. Blaskic* 110 I.L.R. 607 (1997) ............................................................ 20

*Rappenecker v. United States*, 509 F. Supp. 1024 (N.D. Cal. 1981)............................ 43

*Republic of Mexico v. Hoffman*, 324 U.S. 30 (1945)..................................................... 5

*Rios v. Marshall*, 530 F. Supp. 351 (S.D.N.Y. 1981). ............................................... 14

*Rose v. Himely*, 8 U.S. (4 Cranch) 241 (1807) ........................................................... 38

*Saudi Arabia v. Nelson*, 507 U.S. 349 (1993) .............................................................. 28

*Schneider v. Kissinger*, 412 F.3d 190 (D.C. Cir. 2005) ................................................ 45

*Smith v. Socialist People's Libyan Arab Jamahiriya*, 101 F.3d 239 (2d Cir. 1997) .................... 28

*Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004) .................................................... passim

*Tachiona v. Mugabe*, 169 F. Supp. 2d 259 (S.D.N.Y. 2001) ........................... 12, 19, 22

*Tachiona v. United States*, 386 F.3d 205 (2d Cir. 2004 ) ...................................... 12, 16

*Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774 (D.C. Cir. 1984) ............................. 39

*The Apollon*, 22 U.S. (9 Wheat.) 362 (1824) ............................................................... 38

*Trajano v. Marcos*, 978 F.2d 493 (9th Cir. 1992) ........................................................ 32

*Underhill v. Hernandez*, 168 U.S. 250 (1897) .......................................................... 6, 7

*United States ex rel. Lujan v. Gengler*, 510 F.2d 62 (2d Cir. 1975) ............................. 36

*United States v. De La Pava*, 268 F.3d 157 (2d Cir. 2001) ......................................... 36

*United States v. Lee*, 106 U.S. 196 (1882) ..................................................................... 5

*United States v. Noriega*, 117 F.3d 1206 (11th Cir.1997) ............................................ 16

*United States v. Palmer*, 16 U.S. 610 (1818) .............................................................. 38

*Velasco v. Gov't of Indonesia*, 370 F.3d 392 (4th Cir. 2004) ........................... 13, 14, 15

*Velasquez-Rodriguez Case*, Inter-Am. Ct. H.R. (Ser. C) No. 4
    (Inter-American Court of Human Rights 1989) ....................................................... 25

*Verlinden v. B.V. Central Bank of Nigeria*, 461 U.S. 480 (1983) .................................. 5

*Waltier v. Thomson*, 189 F. Supp. 319 (S.D.N.Y. 1960) .................................... 8, 23, 27

*Whiteman v. Austria*, 431 F.3d 57 (2d Cir. 2005) ....................................................... 45

*Xuncax v. Gramajo*, 886 F. Supp. 162 (D. Mass. 1995) .............................................. 32

Statutes

Alien Tort Statute, 28 U.S.C. § 1350 ............................................................... passim

Federal Tort Claims Act, Pub. L. No. 601,
    *codified as amended at* 28 U.S.C. §§ 2671-2680 (1946) .................................... 10, 13

Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1602-1611 ............................... passim

Military Commissions Act of 2006, Pub. L. No. 109-366, § 5, 120 Stat. 2600, 2631 (2006) ... 36

Torture Victim Protection Act, Pub. L. 102-256 (1992),
    *codified at* 28 U.S.C. § 50 note ..................................................................... passim

War Crimes Act of 1996, Pub. L. 104-492 (1996),
    *codified as amended at* 18 U.S.C. § 2441 ............................................................ 45

28 U.S.C. § 517 ............................................................................................... 1

Legislative History

133 Cong. Rec. S3900 (daily ed. Mar. 25, 1987) (statement of Sen. Leahy) .............................. 49

134 Cong. Rec. H9692 (daily ed. Oct. 5, 1988) (statement of Rep. Leach) ................................ 49

135 Cong. Rec. H6423, H6424 (daily ed. Oct. 2, 1989) (statement of Rep. Bereuter) ............... 50

135 Cong. Rec. H6423, H6424 (daily ed. Oct. 2, 1989) (statement of Rep. Fascell).................. 49

137 Cong. Rec. S1369, S1378 (daily ed. Sep. 25, 1991) (statement of Sen. Specter) ................ 50

H.R. Rep. 100-700 (1988), 1988 U.S.C.C.A.N. 5945 ................................................ 13

H.R. Rep. 102-367(I) (1991), 1992 U.S.C.C.A.N. 84 .................................... 34, 48, 49

H.R. Rep. 104-698 (1996), 1996 U.S.C.C.A.N. 2166 .............................................. 46

H.R. Rep. No. 94-1487 (1976), 1976 U.S.C.C.A.N. 6604 ........................ 11, 12, 16, 18

S. Rep. 102-249 (1991).............................................................................. 34, 48, 49, 50

Statement by President George Bush upon Signing H.R. 2092 (Mar. 12, 1992), 1992
    U.S.C.C.A.N. 91 ......................................................................................... 51

International Materials

Draft Articles on the Responsibility of States for Internationally Wrongful Acts,
U.N. GAOR, 56th Sess., Supp. No. 10, U.N. Doc. A/56/10, Art. 4 (2001) *available at*
http://untreaty.un.org/ilc/texts/instruments/english/commentaries/9_6_2001.pdf.................. 25

Final Report to the Prosecutor by the Committee Established to Review the
NATO Bombing Campaign Against the Federal Republic of Yugoslavia,
*available at* http://www.un.org/icty/pressreal/nato061300.htm........................................ 41, 42

Fourth Hague Convention of 1907, 36 Stat. 2306, Art. 3 ............................................................ 32

International Law Commission Draft Articles on the Law of Treaties with Commentaries,
Art. 50, cmt. 3 (1966) .................................................................................................................. 27

Protocol Additional to the Geneva Conventions of 12 August 1949
(adopted Jun. 8, 1977), *reprinted in* 16 I.L.M. 1391 (1977) ........................................ 40, 41, 46

Report of the International Law Commission to the General Assembly on the Work
of Its Fifty-First Session, U.N. Doc. A/54/10 (1999)................................................................ 29

Report of the International Law Commission to the General Assembly on the Work
of Its Forty-Third Session, U.N. Doc. A/46/10 (Jul. 19, 1991)................................................ 22

United Nations Convention on Jurisdictional Immunities of States and their Property,
U.N. Doc. A/RES/59/38 (Dec. 16, 2004), *available at*
http://untreaty.un.org/English/notpubl/English_3_13.pdf................................................ 21, 29

Vienna Convention on the Law of Treaties, 1155 U.N.T.S. 331, Art. 53 (May 23, 1969) .......... 27

Miscellaneous Authorities

Hazel Fox QC, THE LAW OF STATE IMMUNITY 525 (2004) ..................................................... 27, 32

Jean Pictet, COMMENTARY ON THE ADDITIONAL PROTOCOLS 1053-54 (1987)............................ 32

OPPENHEIM'S INTERNATIONAL LAW 8 (Robert Jennings & Arthur Watts, eds.) (9th ed. 1992)... 27

Restatement (Second) of Foreign Relations Law of the United States (1965) ............................... 8

Restatement (Third) of Foreign Relations Law of the United States (1986) ................................ 36

S.V. George, *Head of State Immunity in the United States Courts:*
*Still Confused After All These Years*, 64 FORDHAM L. REV. 1051, 1058-59 (Dec. 1995).......... 6

Sean D. Murphy, PRINCIPLES OF INTERNATIONAL LAW 82 (2006) ............................................... 27

U.S. Department of State, Daily Press Briefing, Jul. 23, 2002, *available at*
http://www.state.gov/r/pa/prs/dpb/2002/12098.htm................................................................. 2

## PRELIMINARY STATEMENT

Plaintiffs in this case sue Avraham Dichter, former Director of the Israeli General Security Service, for his role in an Israeli military attack carried out in the Gaza Strip in July 2002. The attack struck a residential apartment building where Saleh Mustafa Shehadeh, a leader of the armed wing of the Hamas terrorist organization, had been determined by Israeli intelligence to be at the time. Shehadeh was killed in the attack, but a substantial number of civilians were killed or wounded as well. Plaintiffs, surviving victims of the attack, claim that the attack was unlawful under international law by virtue of targeting a building where civilians were known to be located. Their principal claims are brought under the Alien Tort Statute ("ATS"), 28 U.S.C. § 1350, for alleged "war crimes," "crimes against humanity," "cruel, inhuman, or degrading treatment or punishment," and "extrajudicial killing" within the meaning of the Torture Victim Protection Act ("TVPA"), Pub. L. 102-256 (1992), *codified at* 28 U.S.C. § 1350 note. After Dichter moved to dismiss plaintiffs' complaint on grounds of the Foreign Sovereign Immunities Act ("FSIA"), the political question doctrine, and the act of state doctrine, the Court issued an order on July 20, 2006, inviting the United States to "state its views, if any, on these issues or on any other issues it considers relevant to the case." Pursuant to 28 U.S.C. § 517,[1] the United States respectfully submits this Statement of Interest in response to the Court's order.

At the outset, it should be made clear that the United States has voiced serious objections to the Shehadeh attack, which are a matter a public record. As the State Department said at the

---

[1] Section 517 provides that the "Solicitor General, or any officer of the Department of Justice, may be sent by the Attorney General to any State or district in the United States to attend to the interests of the United States in a suit pending in a court of the United States, or in a court of a State, or to attend to any other interest of the United States." 28 U.S.C. § 517.

time: "We have repeatedly criticized the use of heavy weaponry in densely populated areas because of these kind[s] of dangers of large numbers of innocent civilians being killed."[2] In filing this Statement of Interest, the United States does not seek to revisit these issues and takes no position herein as to the lawfulness of the Shehadeh attack. Rather, the United States makes this submission in order to clarify its views on two issues with broad-reaching ramifications for U.S. interests: (1) whether foreign officials are immune from civil suit for their official acts; and (2) whether federal law recognizes a private cause of action for the disproportionate use of military force in armed combat.

As explained below, foreign officials such as Dichter do enjoy immunity from suit for their official acts. This immunity is not codified in the FSIA but instead is rooted in longstanding common law that the FSIA did not displace. Plaintiffs' apparent position that the FSIA eliminated this immunity runs contrary to the statute's text and legislative history, post-FSIA case law, and customary international law. Moreover, any refusal by U.S. courts to grant immunity to foreign officials for their official acts could seriously harm U.S. interests, by straining diplomatic relations and possibly leading foreign nations to refuse to recognize the same immunity for American officials.

Given that Dichter's alleged participation in the Shehadeh attack was clearly undertaken in his official capacity, Dichter is entitled to invoke immunity here. The fact that plaintiffs allege that Dichter's conduct was unlawful or violated *jus cogens* norms does not change the analysis; what matters is that the conduct was performed on Israel's behalf and is properly attributed to the State of Israel rather than to Dichter personally. Nor is Dichter's immunity trumped by the

---

[2] *See* U.S. Department of State, Daily Press Briefing, Jul. 23, 2002, *available at* http://www.state.gov/r/pa/prs/dpb/2002/12098.htm.

TVPA, which was intended to be construed in harmony with existing immunity rules, not in derogation of them. Accordingly, this suit should be dismissed on immunity grounds.

The issue of Dichter's immunity, though, is not the only issue in this case of concern to the United States. In essence, plaintiffs seek for this Court to recognize a private cause of action for the disproportionate use of military force in armed conflict – either by creating such a cause of action as a matter of federal common law under the ATS, or by reading such a cause of action into the TVPA. Following either course would lead to bad law and bad policy.

As the Supreme Court stressed in *Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004), the federal courts' power to create common-law causes of action for violations of international law is extremely narrow. It would be an improper exercise of this power to create a cause of action based on a norm – proportionality in the use of military force – that, however well accepted, is subjective, open-ended, and susceptible to considerable controversy in its application. Moreover, the practical consequences of creating such a cause of action would be wholly untenable. Opening the federal courthouse doors to such claims would threaten to enmesh the courts in policing armed conflicts across the globe – a charge that would exceed judicial competence and intrude on the Executive's control over foreign affairs.

For related reasons, nor should the TVPA be read to supply a vehicle for plaintiffs' claims. The TVPA was intended to supply a narrow cause of action for summary executions by foreign governments – a severely grave violation of international law that Congress viewed as on par with torture. Construing the statute to encompass military operations causing harm to untargeted civilians would dilute the meaning of the statute and extend its reach far beyond the bounds Congress intended, thereby engendering the very same problems that would attend the judicial creation of such a cause of action under the ATS.

## ARGUMENT

### POINT I

### DICHTER IS ENTITLED TO IMMUNITY

**A.    Foreign Officials Enjoy Immunity at Common Law for Their Official Acts, Which Was Not Displaced by the FSIA**

The parties' immunity arguments in this case center on the FSIA: Dichter claims that he

is entitled to the statute's protection, Def.'s Br. at 6-8, while plaintiffs argue that "[t]he FSIA

does not extend sovereign immunity to individuals," Pls.' Br. at 3. This emphasis on the FSIA is

understandable given that, following the Ninth Circuit's decision in *Chuidian v. Philippine

National Bank*, 912 F.2d 1095 (9th Cir. 1990), a number of courts have analyzed the immunity of

individual foreign officials under the statute's rubric. *See infra* at 13-19.

In the Government's view, however, this emphasis is misplaced. The Government agrees

with Dichter that he is entitled to immunity, but that immunity resides in common law rather

than the FSIA. As explained below, individual foreign officials have long been recognized to

hold immunity from suit with respect to their official acts. Contrary to plaintiffs' argument, this

immunity was not displaced by the enactment of the FSIA. Rather, common-law immunity for

foreign officials endures as a vital complement to the FSIA's grant of immunity to foreign states

– for, absent the former, litigants could easily circumvent the latter, frustrating the important

purposes served by the statute.

    *1.    Immunity for Foreign Officials Acting in an Official Capacity Was Well-
       Established at Common Law prior to the Enactment of the FSIA*

       *a.    Official Immunity before the Issuance of the Tate Letter in 1952*

The doctrine of foreign sovereign immunity, broadly construed, extends deep into

American jurisprudence, having been established as a matter of common law well before

Congress enacted the FSIA in 1976. As the Supreme Court stated two decades prior to the

FSIA's enactment: "Very early in our history this immunity was recognized, and it has since become part of the fabric of our law. It has become such solely through adjudications of this Court." *National City Bank of New York v. Republic of China*, 348 U.S. 356, 358-59 (1955) (citations omitted).

The seminal expression of the sovereign immunity doctrine was set forth nearly 200 years ago by Chief Justice Marshall in *The Schooner Exchange v. McFaddon*, 11 U.S. (7 Cranch) 116 (1812), which "came to be regarded as extending virtually absolute immunity to foreign sovereigns." *Verlinden v. B.V. Central Bank of Nigeria*, 461 U.S. 480, 486 (1983). *The Schooner Exchange* also introduced the practice of deferring to "suggestions of immunity" by the Department of State wherever made in individual cases, or, in the absence of such determinations, deferring to State Department policies concerning foreign immunity generally. *See Republic of Mexico v. Hoffman*, 324 U.S. 30, 34-36 (1945); *Ex Parte Peru*, 318 U.S. 578, 587-89 (1943). This deference reflected a basic function of foreign sovereign immunity – the avoidance of cases that might fray relations with foreign sovereigns – and the corresponding need to follow the lead of the Executive as the branch of government responsible for foreign affairs. *See Hoffman*, 324 U.S. at 35 ("'In such cases the judicial department of this government follows the action of the political branch, and will not embarrass the latter by assuming an antagonistic jurisdiction.' It is therefore not for the courts to deny an immunity which our government has seen fit to allow, or to allow an immunity on new grounds which the government has not seen fit to recognize.") (quoting *United States v. Lee*, 106 U.S. 196, 209 (1882)).

The "absolute" immunity of the sovereign was, early on, generally understood to encompass not only the state and the head of state,[3] but also other individual officials insofar as they acted on the sovereign's behalf. Thus, even prior to the *Schooner Exchange* case, statements recognizing immunity for the official acts of foreign officials appear in the opinions of the Attorney General. *See* 1 Op. Att'y Gen. 45, 46 (1797) (concerning civil suit brought against governor of French island for seizure of a ship: "I am inclined to think, if the seizure of the vessel is admitted to have been an official act, done by the defendant by virtue, or under color, of the powers vested in him as governor, that it will of itself be a sufficient answer to the plaintiff's action; that the defendant ought not to answer in our courts for any mere irregularity in the exercise of his powers; and that the extent of his authority can, with propriety or convenience, be determined only by the constituted authorities of his own nation."); 1 Op. Att'y Gen. 81 (1797) (concerning suit brought against British official: "[I]t is as well settled in the United States as in Great Britain, that a person acting under a commission from the sovereign of a foreign nation is not amenable for what he does in pursuance of his commission, to any judiciary tribunal in the United States.").

Expressions of official-act immunity likewise appear in subsequent federal case law. Thus, in *Underhill v. Hernandez*, 168 U.S. 250 (1897), the Supreme Court rejected a suit brought against a Venezuelan general for acts undertaken in his official capacity in Venezuela, holding that the defendant was protected by "[t]he immunity of individuals from suits brought in foreign tribunals for acts done within their own states, in the exercise of governmental authority, whether

---

[3] *See* S.V. George, *Head of State Immunity in the United States Courts: Still Confused After All These Years*, 64 FORDHAM L. REV. 1051, 1058-59 (Dec. 1995) ("Historically, sovereign immunity for states and head-of-state immunity were considered one and the same because the head-of-state was considered to be the equivalent of the state.").

as civil officers or as military commanders." *Id.* at 252.[4] The more common fact pattern,

though, involved suits against consular officials, who by virtue of their position had a regular

presence within the United States.  Unlike diplomatic officials, whose immunity extended even

to acts of a personal nature, consular officials were viewed as possessing the same immunity as a

state's non-diplomatic officers generally – *i.e.*, immunity from suit only for acts within the scope

of their official duties.  *See Arcaya v. Paez*, 145 F. Supp. 464, 466-467 (S.D.N.Y. 1956)

(collecting pre-1952 cases for the proposition that "a consul is not immune from suit except

when the action is based upon acts which he has committed within the scope of his duties"); *see

also Lyders v. Lund*, 32 F.2d 308, 309 (N.D. Cal. 1929) ("[I]n actions against the officials of a

foreign state not clothed with diplomatic immunity, it can be said that suits based upon official,

authorized acts, performed within the scope of their duties on behalf of the foreign state, and for

which the foreign state will have to respond directly or indirectly in the event of a judgment, are

actions against the foreign state.").  Thus, prior to 1952, which marks the beginning of modern

sovereign immunity jurisprudence in the United States, foreign officials were already understood

to enjoy immunity for their official acts.

       *b.*    *Official Immunity after the Tate Letter*

      In 1952, the State Department issued the Tate Letter, which announced that the

Department would no longer follow the absolute theory of sovereign immunity set forth in *The

Schooner Exchange*.  Instead, the letter explained that the Department would follow the so-called

"restrictive theory" of sovereign immunity, according to which a foreign state enjoys immunity

---

[4] Although the holding in *Underhill* is more widely cited as an expression of the "act of state"
doctrine, the Supreme Court has recognized that "sovereign immunity provided an independent
ground" for the holding. *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 430 (1964).

as to its "public," *i.e.*, sovereign, activities, but not for its "private," *i.e.*, commercial, activities. *See generally Alfred Dunhill of London v. Republic of Cuba*, 425 U.S. 682, 697-706 (1976); *see also id.* 712-15 (appended text of Tate Letter). This evolution in policy reflected similar developments in foreign jurisdictions, driven by "the widespread and increasing practice on the part of governments of engaging in commercial activities." *Id.* at 714.

The adoption of the restrictive theory did not change the rule applicable to individual officials, however. As before the Tate Letter, the State Department continued to recognize the immunity of foreign officials for their official acts in suggestions of immunity made to the federal courts. *See* Sovereign Immunity Decisions of the Department of State from May 1952 to January 1977 (M. Sandler, D. Vagts, & B. Ristau, eds.) ("Immunity Decisions Report"), *in* 1977 Dig. U.S. Prac. Int'l L. 1017, at 1020, 1037 (No. 19), 1075-77 (Nos. 96 & 97) (reporting suggestions of immunity for individual officials). Likewise, the federal courts continued to defer to such suggestions when they were presented. *See Greenspan v. Crosbie*, No. 74 Civ. 4734 (JCM), 1976 WL 841, at *2 (S.D.N.Y. Nov. 23, 1976); *Waltier v. Thomson*, 189 F. Supp. 319, 320-21 (S.D.N.Y. 1960). And where no suggestion was made, courts applied the same general rule of decision. *See Heaney v. Government of Spain*, 445 F.2d 501, 504 (2d Cir. 1971) (noting in *dicta* that the immunity of a foreign state extends to any official or agent of the state with respect to their official acts). Thus, the Restatement (Second) of Foreign Relations Law of the United States (1965), published during this time period, includes official-act immunity among the various dimensions of immunity belonging to foreign sovereigns.[5]

---

[5] The Second Restatement states that the immunity of a foreign state extends to:

    (a) the state itself;
(continued...)

Notably, in at least one of the post-Tate Letter cases, *Greenspan v. Crosbie*, *supra*, the immunity of individual foreign officials was recognized to be unlimited by the restrictive theory's exceptions to immunity for commercial activity – and thus broader than the immunity of the state itself. In the case, plaintiffs sued the Province of Newfoundland and three of its individual officials for alleged violations of U.S. securities laws. 1976 WL 841, at *1. Pursuant to the restrictive theory, the Department of State determined that the Province was *not* immune from claims for compensatory damages with respect to the securities sales at issue, given that the sales constituted commercial activity. *Id.*; *see also* Immunity Decisions Report at 1076. The Department nevertheless filed a suggestion of immunity recognizing the individual officials to be fully immune for their participation in this same activity, reasoning: "although it is alleged that the defendant officials of the Province of Newfoundland acted in excess of their authority, it is not alleged that these officials acted other than in their official capacities and on behalf of the Province." Immunity Decisions Report at 1076. Accordingly, this Court declined to exercise jurisdiction as to these individual defendants, finding that "[t]he Suggestion of Immunity removes the individual defendants from this case" – even while the court went on to exercise

---

> (b) its head of state and any person designated by him as a member of his official party;
> (c) its government or any governmental agency;
> (d) its head of government and any person designated by him as a member of his official party;
> (e) its foreign minister and any person designated by him as a member of his official party;
> (f) *any other public minister, official, or agent of the state with respect to acts performed in his official capacity if the effect of exercising jurisdiction would be to enforce a rule of law against the state;*
> (g) a corporation created under its laws and exercising functions comparable to those of an agency of the state.

*Id.* § 66(f) (emphasis added).

jurisdiction as to the Province itself. *Greenspan*, 1976 WL 841, at *2. Hence, the State

Department recognized, and this Court accepted, that insofar as the individual defendants had

acted on behalf of the state, their actions were not attributable to them in their personal capacity;

they were instead attributable only to the state, and accordingly the state was the only proper

defendant in the case.[6] Decided in late 1976, *Greenspan* reflects the scope of common-law

immunity for individual foreign officials as it existed when the FSIA was enacted that same

year.[7]

> 2.    *The FSIA Did Not Displace Common-Law Immunity for the Official Acts of Foreign Officials*
>
>     a.    *Statutory Text and Legislative History*

Contrary to plaintiffs' apparent position that the enactment of the FSIA in effect

"eliminated" sovereign immunity for "individuals acting in their official capacity," *see* Pls.' Br.

at 4, there is no suggestion anywhere in the FSIA's text or legislative history that the statute was

intended to effect any change whatsoever in the immunity previously recognized for individual

foreign officials. The text of the statute makes no mention of the immunity belonging to

---

[6] This application of immunity resembles the way in which immunity for federal employees
works under the Federal Tort Claims Act ("FTCA"). Under the so-called "Westfall
Amendment" to the Act, in any tort action filed against a federal employee, the United States is
substituted as party defendant upon certification by the Attorney General that the acts at issue
were performed in the employee's official capacity. *See* 28 U.S.C. § 2679(d).

[7] The Immunity Decisions Report also describes an unpublished 1968 case in which the State
Department declined to suggest immunity for a "non-profit organization funded by the Caribbean
governments" *or* its liaison officer, after concluding that the organization's function was
commercial in nature, being analogous to that of a labor union or private employment agency.
*Id.* at 1062-63 (No. 62). The Report does not explain why the Department did not suggest
immunity for the official involved, but an official of a non-profit organization providing
employment services to a number of governments is clearly distinguishable from the provincial
government officials involved in *Greenspan*.

individual foreign officials, but rather speaks only to the immunity of "foreign states" and any

"agency or instrumentality of a foreign state." 28 U.S.C. §§ 1605, 1610. Likewise, the

legislative history's only reference to any type of individual official – diplomatic or consular

representatives – clarifies that the FSIA does not govern their immunity since the statute "deals

only with the immunity of foreign states." H.R. Rep. No. 94-1487, at 21 (1976), 1976

U.S.C.C.A.N. 6604, 6620 ("FSIA House Report").

The statute's exclusive focus on states and their agencies and instrumentalities is

explained by the history leading up to its enactment. The fundamental problem Congress sought

to address at the time was an ongoing explosion in commercial litigation against foreign states

and state enterprises engaged in commerce with the United States, and the concomitant need to

regularize such litigation under a system of clear and predictable rules. *See* FSIA House Report

at 7, 1976 U.S.C.C.A.N. at 6605 ("In a modern world where foreign state enterprises are every

day participants in commercial activities, [the FSIA] is urgently needed legislation."); *see also*

*Lafontant v. Aristide*, 844 F. Supp. 128, 137 (E.D.N.Y. 1994) ("[The FSIA] was crafted

primarily to allow state-owned companies, which had proliferated in the communist world and in

the developing countries, to be sued in United States courts in connection with their commercial

activities."). The regime ushered in by the Tate Letter had proven unworkable: the State

Department lacked significant fact-finding machinery by which to guide application of the

restrictive theory in cases allegedly concerning commercial activity, and moreover, foreign

governments seeking determinations of immunity were prone to exert diplomatic influence.

FSIA House Report at 8-9, 1976 U.S.C.C.A.N. at 6607. As a result, these determinations were

characterized by a lack of uniformity and transparency and became a burden on the State

Department. *Id.* Thus, at the urging of the Executive Branch, Congress enacted the FSIA in

order to "codify the so-called 'restrictive' principle of sovereign immunity, as presently recognized in international law," so as to render it susceptible to application directly by the courts, without the need for State Department involvement.  *Id.* at 7, 44-46, 1976 U.S.C.C.A.N. at 6605, 6634-35.  By contrast, cases particularly concerning individual foreign officials had posed no significant problems in the past and were not the impetus for the new legislation.  *Cf. Tachiona v. Mugabe*, 169 F. Supp. 2d 259, 290 (S.D.N.Y. 2001) (concluding that issues regarding head-of-state immunity "were not yet 'in the air' as part of the underlying concerns that prompted the FSIA nor in the debate and deliberations that accompanied the enactment"), *rev'd in part on other grounds sub nom. Tachiona v. United States*, 386 F.3d 205 (2d Cir. 2004).

Accordingly, there is no reason to believe that in enacting the FSIA, Congress intended, *sub silentio*, to alter or eliminate the pre-existing common-law immunity for individual foreign officials.  Indeed, the FSIA was not intended to effect *any* major change from the *status quo ante* with respect to substantive rules of immunity.  It was instead intended to "codify" the restrictive theory, "as presently recognized."  FSIA House Report at 7, 1976 U.S.C.C.A.N. at 6605.  Given that Congress expressly sought to preserve the pre-existing immunity rule for foreign states, it would be incongruous to believe that Congress simultaneously abrogated the long-standing immunity of individual foreign officials.  *See Chuidian*, 912 F.2d at 1101-02 ("It would be illogical to conclude that Congress would have enacted such a sweeping alteration of existing law implicitly and without comment."); *see also Tachiona*, 169 F. Supp. 2d at 276 (rejecting argument that the FSIA was "intended to enunciate a substantive redirection of United States international relations policy").

Indeed, in the compilation of the State Department's pre-FSIA immunity decisions published immediately after the FSIA's enactment, the editors – officials of the State Department

-12-

and Department of Justice who had been involved in the statute's drafting – specifically noted

that the FSIA was not intended to eliminate the precedential effect of past "decisions concerning

the immunity of heads of state and of other nondiplomatic and nonconsular officials." Immunity

Decisions Report at 1020. As the editors noted: "These decisions may be of some future

significance, because the [FSIA] does not deal with the immunity of individual officials, but only

that of foreign states and their political subdivisions, agencies and instrumentalities." *Id.*[8]

        b.    *Post-FSIA Case Law*

      Reading the FSIA to eliminate immunity for individual foreign officials would conflict

not only with the statute's text and legislative history, but also with post-FSIA case law. Since

the statute's enactment, numerous circuit courts have continued to recognize the existence of

immunity for individual foreign officials with respect to their official acts,[9] as have numerous

---

[8] The continuation of common law immunities post-FSIA finds an analogy in the federal tort context. In 1946, the enactment of the FTCA comprehensively codified the sovereign immunity of the United States as to common law tort claims. *See* Pub. L. No. 601 (1946). Yet, the immunity of individual federal officials from such claims was unaffected by the statute's enactment and continued to evolve separately at common law, *see, e.g., Barr v. Matteo*, 360 U.S. 564 (1959), until Congress, in response to the Supreme Court's decision in *Westfall v. Erwin*, 484 U.S. 292 (1988), amended the FTCA so as to afford individual federal officials immunity by statute. *See* H.R. Rep. 100-700, at 2-3 (1988), 1988 U.S.C.C.A.N. 5945, 5945-46 (discussing background of amendment).

[9] *See Velasco v. Gov't of Indonesia*, 370 F.3d 392, 402 (4th Cir. 2004); *Keller v. Cent. Bank of Nigeria*, 277 F.3d 811, 815 (6th Cir. 2002); *Byrd v. Corporacion Forestal*, 182 F.3d 380, 388 (5th Cir. 1999); *El-Fadl v. Cent. Bank of Jordan*, 75 F.3d 668, 671 (D.C. Cir. 1996); *Chuidian v. Philippine Nat'l Bank*, 912 F.2d 1095, 1101 (9th Cir. 1990). In the one exception cited by the plaintiffs – *Enahoro v. Abubakar*, 408 F.3d 877 (7th Cir. 2005) – the court found only that such immunity was not provided *by the FSIA*. *Id.* at 882 ("[W]e conclude, based on the language of the FSIA, that the FSIA does not apply to General Abubakar . . . ."). The court was not presented with, and thus had no occasion to consider, the Government's argument here, *viz.*, that such immunity is rooted in common law that was unaffected by the FSIA's enactment.

judges in this district.[10]  In so holding, courts have broadly agreed on the functional rationale for

this immunity – *viz.*, that "a suit against an individual acting in his official capacity is the

practical equivalent of a suit against the sovereign directly." *Chuidian*, 912 F.2d at 1101;

*accord, e.g., Velasco*, 370 F.3d at 399; *In re Terrorist Attacks*, 349 F. Supp. 2d at 788; *Doe I v.*

*Israel*, 400 F. Supp. 2d 86, 104 (D.D.C. 2005); *see also Herbage v. Meese*, 747 F. Supp. 60, 66

(D.D.C. 1990) (finding sovereign immunity to protect individual officers on the ground that "a

government does not act but through its agents").  Hence, courts have recognized, rightly, that

unless sovereign immunity extends to individual foreign officials, litigants could easily

circumvent the immunity provided to foreign states by the FSIA.  *See Chuidian*, 912 F.2d at

1102 ("Such a result would amount to a blanket abrogation of foreign sovereign immunity by

allowing litigants to accomplish indirectly what the Act barred them from doing directly.").

However, while the rationale for the immunity recognized in these cases has thus been

cogently identified, the source of the immunity has not been.  In *Chuidian*, the leading circuit

case, the Ninth Circuit identified the FSIA as the source; specifically, the court held that

individual officials fall within the statute's definition of an "agency or instrumentality of a

foreign state" and so possess the same immunity afforded to such entities under the statute.  912

F.2d at 1103.  In reaching this holding, the court unnecessarily and erroneously rejected the

Government's position – which was the same as the position asserted here – that immunity for

foreign officials is instead rooted in the common law.  *Id.* at 1102-03.  A number of other courts

---

[10] *See, e.g., In re Terrorist Attacks*, 392 F. Supp. 2d 539, 551 (S.D.N.Y. 2005); *Leutwyler v.*
*Office of Her Majesty Queen Rania Al-Abdullah*, 184 F. Supp. 2d 277, 286-87 (S.D.N.Y. 2001);
*Cabiri v. Assasie-Gyimah*, 921 F. Supp. 1189, 1197 (S.D.N.Y. 1996); *Bryks v. Canadian Broad.*
*Corp.*, 906 F. Supp. 204, 210 (S.D.N.Y. 1995); *Kline v. Kaneko*, 685 F. Supp. 386, 389
(S.D.N.Y. 1988); *Rios v. Marshall*, 530 F. Supp. 351, 371 (S.D.N.Y. 1981).

have followed *Chuidian* in this respect, though without significant analysis, and without the

benefit of briefing by the Government. *See, e.g., El-Fadl*, 75 F.3d at 671; *Keller*, 277 F.3d at

815.[11] Other courts, however, have declined to read the FSIA's "agency or instrumentality"

definition as encompassing natural persons, but nonetheless have recognized a "judicially

created" extension of the statute's protection to individual officials. *Velasco*, 370 F.3d at 398-99

("Although the statute is silent on the subject, courts have construed foreign sovereign immunity

to extend to an individual acting in his official capacity on behalf of a foreign state."); *Herbage*,

747 F. Supp. at 66 ("Nowhere does the FSIA discuss the liability or role of natural persons . . . .

Nonetheless, decisions in other federal courts, as well as reason, indicate -- even if only indirectly

-- that the sovereign immunity granted in the FSIA does extend to natural persons acting as

agents of the sovereign."); *First Am. Corp. v. Al-Nahyan*, 948 F. Supp. 1107, 1120 (D.D.C.

1996) (same).

        The latter line of cases is closer to (though still wide of) the mark; for, while *Chuidian*'s

result was correct, its statutory interpretation is unpersuasive. The *Chuidian* court based its

holding on the flawed premise that "a bifurcated approach to sovereign immunity was not

intended by the Act" -- *i.e.*, that Congress intended the FSIA to be a "comprehensive" statute

governing all sovereign immunity determinations, regardless of the nature of the defendant. *See*

*Chuidian*, 912 F.2d at 1102. As indicated above, such a reading of the statute is inconsistent

with its text and legislative history. *See supra* at 10-13. Moreover, courts have in fact followed

such "a bifurcated approach to sovereign immunity" in cases involving heads of state. As

---

[11] Although the Government agreed with the result in *Chuidian*, it has never endorsed the
*Chuidian* approach to foreign official immunity and has not filed any brief revisiting the source
of foreign official immunity since *Chuidian* was decided.

numerous courts have held, because the FSIA does not address the immunity of heads of state,

their immunity continues to be governed by common law as it was pre-FSIA.[12]  The Second

Circuit recently expressed this view in *dicta* in *Tachiona v. United States*, 386 F. 3d 205 (2d Cir.

2004):

> We have some doubt as to whether the FSIA was meant to supplant the "common
> law" of head-of-state immunity, which generally entailed deference to the
> executive branch's suggestions of immunity.  For one thing, the FSIA applies
> only to foreign states, which are defined as including "political subdivision[s],"
> and "agenc[ies] or instrumentalit[ies]" thereof.  "[A]genc[ies] [and]
> instrumentalit[ies]" in turn are defined in terms not usually used to describe
> natural persons.  Moreover, the only references to heads of state or other foreign
> officials in the FSIA's legislative history suggest that their immunity is not
> governed by the Act.

*Id.* at 220-21 (citations omitted).  The same reasoning applies to the immunity of individual

officials *other* than heads of state: the FSIA did not address their immunity, and so did not

supplant it as it previously existed at common law.[13]

---

[12] *See, e.g., United States v. Noriega*, 117 F.3d 1206, 1212 (11th Cir.1997) ("Because the FSIA
[does not address] head-of-state immunity, . . . head-of-state immunity could attach in cases,
such as this one, only pursuant to the principles and procedures outlined in *The Schooner
Exchange* and its progeny."); *Tachiona*, 169 F. Supp. 2d at 276 (rejecting the proposition that the
FSIA was intended to set forth "a uniform rule of law to govern all assertions of foreign
immunity, including head-of state immunity"); *First Am. Corp.*, 948 F. Supp. at 1119 ("[T]he
enactment of the FSIA was not intended to affect the power of the State Department . . . to assert
immunity for heads of state or for diplomatic and consular personnel."); *Aristide*, 844 F. Supp. at
137 ("The language and legislative history of the FSIA, as well as case law, support the
proposition that the pre-1976 suggestion of immunity procedure survives the FSIA with respect
to heads-of-state.").  Cases involving diplomats and consular officials have likewise been
decided outside the confines of the FSIA, as courts have instead looked to specific treaties
governing diplomatic and consular relations, *see, e.g., Tachiona*, 169 F. Supp. 2d at 215-220, as
envisioned in the FSIA's legislative history, FSIA House Report at 21, 1976 U.S.C.C.A.N. at
6620.

[13] Thus, while plaintiffs prominently rely on the above passage from *Tachiona* for the
proposition that "the FSIA does not apply to individuals," Pls.' Br. at 5, the passage cuts against
their argument in the end.  The view expressed in the passage is not merely that the FSIA does
not extend immunity to individuals, but that the statute does not *rescind* such immunity either.

Further, *Chuidian*'s attempt to stretch the FSIA's "agency or instrumentality" definition to cover individual officials leads to problematic results. For example, this reading implies that individual officials are subject to the same *exceptions* to immunity laid out in the FSIA for states and their agencies and instrumentalities – such that if an individual foreign official were sued, for example, over commercial transactions undertaken in an official capacity, the official would not be immune from suit and could be held personally liable for the conduct at issue. *See Chuidian*, 912 F.2d at 1103-06 (considering, after finding individual official's immunity to be governed by the FSIA, whether any of the FSIA's exceptions were met). This result diverges from the common law as it existed at the time of the FSIA's enactment. As reflected in *Greenspan v. Crosbie, supra*, the immunity then recognized for foreign officials acting in their official capacity did not merely match, but rather exceeded, that of the state: even if the state could be sued for an official's acts under the restrictive theory, the official himself could not be. *See supra at* 9-10. Thus, by subjecting the immunity of individual officials to the same limits applicable to the immunity of states and their agencies or instrumentalities, the *Chuidian* court's construction leaves foreign officials with less immunity than they enjoyed before the FSIA's enactment. This change in substantive law was unanticipated not only by Congress, but apparently by the *Chuidian* court itself – which thought its reading of the FSIA's "agency or instrumentality" definition would *preserve* the immunity previously afforded to individual officials under common law. *See Chuidian*, 912 F.2d at 1101 ("If in fact the Act does not include such officials, the Act contains a substantial unannounced departure from prior common law.").[14]

---

[14] Notably, a rule allowing suit against an individual official if the state itself is not immune (continued...)

Along similarly problematic lines, *Chuidian* would also seem to imply that an individual official's *personal* property qualifies as property of a state agency or instrumentality, making it subject to attachment according to the rules set forth in § 1610 – even though § 1610 was clearly intended to apply only to state-owned assets. *See* FSIA House Report at 27-30, 1976 U.S.C.C.A.N. at 6626-29. Notably, § 1610 affords litigants broader attachment rights with respect to property of state agencies or instrumentalities compared to property of the state itself: so long as an agency or instrumentality is "engaged in commercial activity in the United States," any of its property can be attached to satisfy any claim as to which it lacks immunity from suit. *See* 28 U.S.C. § 1610(b); *see also Letelier v. Republic of Chile*, 748 F.2d 790, 798-99 (2d Cir. 1984).[15] Thus, were "agency or instrumentality" read to encompass individual officials, litigants in any action brought under the FSIA would have an obvious incentive to name as many individual foreign officials as possible as defendants, in order to maximize the potential for recovery and to circumvent the FSIA's limitations on attachment of property of the state itself. It defies common sense to believe that Congress intended these consequences.[16]

Accordingly, this Court should find Dichter to be immune from suit for his official acts and should rest this holding on common law rather than any provision of the FSIA. While

---

would diverge from the approach endorsed by Congress in the federal tort context – where federal employees are completely immunized from suit for their official-capacity acts, even if the federal government has waived its own sovereign immunity as to those acts. *See supra* n.6.

[15] By contrast, property of the state itself can be attached only if the property sought for attachment is used for commercial activity and various other conditions are met. *See* 28 U.S.C. § 1610(a).

[16] Yet another problem concerns service of process. The FSIA imposes stricter requirements for service of process on a foreign state as opposed to its agencies or instrumentalities. *See* 28 U.S.C. § 1608; *see also, e.g., Magness v. Russian Federation*, 247 F.3d 609, 614-617 (5th Cir. 2001). Under the *Chuidian* approach, litigants in any FSIA case might circumvent those stricter requirements by suing, and, accordingly, serving, an individual official rather than the state itself.

official immunity serves, importantly, to prevent circumvention of the FSIA, it is not itself

codified in the FSIA, but instead is afforded by common law that the FSIA did not displace.

This holding would be consistent with the results reached in the accumulated post-FSIA case law

on point, yet at the same time would avoid the conceptual difficulties and troublesome

implications entailed by the *Chuidian* approach.[17]

        *c.    International Law*

     A final reason to reject the idea that the FSIA eliminated immunity for individual foreign

officials is that any such holding would bring U.S. sovereign immunity law into conflict with

customary international law. The FSIA was enacted partly in order to bring U.S. foreign

immunity law into line with prevailing international practice, *see* FSIA House Report at 7-8,

1976 U.S.C.C.A.N at 6605-06, and should be construed compatibly with customary international

law absent a specific reason to the contrary. As stated by the district court in *Tachiona*:

> Authorities recognize that the growth of international law is evolutionary. It
> expands by accretion as consensus develops among nations around widely
> recognized customs, practices and principles, and not by patchwork elevation of
> any one country's *ad hoc* pronouncements. Thus, any dramatic deviation from
> accepted international norms legislated by any single state without reference to
> widely accepted customary rules would be inconsistent with this principle.

---

[17] Even if the FSIA did govern the immunity of a foreign official, however, Dichter would be
entitled to immunity, and plaintiffs' claims brought under the ATS and the TVPA would be
subject to dismissal. As the Supreme Court held in *Argentine Republic v. Amerada Hess
Shipping Corp.*, 488 U.S. 428 (1989), the ATS does not supply a jurisdictional basis for claims
against a foreign state since the FSIA is "the sole basis for obtaining jurisdiction of a foreign
state in our courts." *Id.* at 434. Moreover, the FSIA does not recognize an exception to
immunity for torts committed outside the territory of the United States. *Id.* at 439-43. The FSIA
thus bars plaintiffs from bringing their ATS and TVPA claims against Israel and, accordingly,
would bar such claims against Dichter were his immunity governed by the statute as well.

169 F. Supp. 2d at 276-77; *cf. Guaylupo-Moya v. Gonzales*, 423 F.3d 121, 135 (2d Cir. 2005)

("[W]here legislation is ambiguous, it should be interpreted to conform to international law.")

(citing *Murray v. The Schooner Charming Betsy*, 6 U.S. (2 Cranch) 64, 118 (1804)).

Like U.S. law, customary international law has long recognized that foreign officials

enjoy civil immunity for their official acts. As explained by the Appeals Chamber of the

International Criminal Tribunal for the Former Yugoslavia:

> Such officials are mere instruments of a State and their official function can only
> be attributed to the State. They cannot be the subject of sanctions or penalties for
> conduct that is not private but undertaken on behalf of a State. In other words,
> State officials cannot suffer the consequences of wrongful acts which are not
> attributable to them personally but to the State on whose behalf they act: they
> enjoy so-called 'functional immunity.' This is a well-established rule of
> customary international law going back to the eighteenth and nineteenth centuries,
> restated many times since.

*Prosecutor v. Blaskic (Issue of subpoena duces tecum)*, 110 I.L.R. 607, 707 (1997) (citing

cases).[18]

These principles have been applied in several significant foreign jurisdictions, some with

immunity statutes that, like the FSIA, make no mention of individual officials. Thus, most

recently, the House of Lords recognized immunity from civil suit for official-capacity acts even

though the United Kingdom's immunity statute did not "expressly provide[] for the case where

suit is brought against the servants or agents, officials or functionaries of a foreign state"; the

court reasoned that "[t]he foreign state's right to immunity cannot be circumvented by suing its

servants or agents." *Jones v. Ministry of Interior*, UKHL 26, ¶ 10 (House of Lords, United

Kingdom 2006). Likewise, a Canadian appellate court has held that "[t]he fact that [Canada's

---

[18] Although this holding was rendered by a criminal tribunal, it specifically concerned an issue of
civil process – specifically, the tribunal's power to enforce a subpoena to state officials acting in
their official capacity.

immunity statute] is silent on its application to employees of the foreign state can only mean that Parliament is content to have the determination of which employees are entitled to immunity determined at common law. . . . There is nothing in the State Immunity Act which derogates from the common law principle that, when acting in pursuit of their duties, officials or employees of foreign states enjoy the benefits of sovereign immunity." *Jaffe v. Miller,* 95 ILR 446, 459-60 (Ontario Court of Appeal, Canada 1993). Germany's national court has reached the same result. *Church of Scientology v. Commissioner of the Metropolitan Police,* 65 ILR 193 (Federal Republic of Germany, Federal Supreme Court 1978) (recognizing immunity for head of Scotland Yard: "The acts of such agents constitute direct State conduct and cannot be attributed as private activities to the person authorized to perform them in a given case.").

The United Nations Convention on Jurisdictional Immunities of States and their Property ("UN Immunity Convention") embodies the most current effort to codify international law concerning foreign sovereign immunity. U.N. Doc. A/RES/59/38 (Dec. 16, 2004), *available at* http://untreaty.un.org/English/notpubl/English_3_13.pdf. While the United States has not signed the Convention and does not necessarily agree that the Convention accurately reflects customary international law in every particular, it does view the Convention's treatment of individual officials as consistent with customary international law to the extent that it clothes individual officials with the immunity of the state. The Convention generally grants immunity to states, and defines the term "State" to include "representatives of the State acting in that capacity." *See id.* Art. 2, ¶ 1(b)(4). As explained in the drafting committee's commentary, this provision reflects the understanding that official capacity acts are properly attributed to the state itself rather than the individual whom the state acts through:

> It is to be observed that, in actual practice, proceedings may be instituted, not only against the government departments or offices concerned, but also against their

> directors or permanent representatives in their official capacities. Actions against
> such representatives or agents of a foreign Government in respect of their official
> acts are essentially proceedings against the State they represent. The foreign
> State, acting through its representatives, is immune *ratione materiae*. Such
> immunities characterized as *ratione materiae* are accorded for the benefit of the
> State and are not in any way affected by the change or termination of the official
> functions of the representatives concerned. Thus, no action will be successfully
> brought against a former representative of a foreign State in respect of an act
> performed by him in his official capacity.

Report of the International Law Commission to the General Assembly on the Work of Its Forty-

Third Session, ¶ 18, p. 25, U.N. Doc. A/46/10 (Jul. 19, 1991).

In light of all of the foregoing authorities, any reading of the FSIA that would eliminate

the immunity historically recognized for individual foreign officials would constitute a "dramatic

deviation from accepted international norms," and should be rejected. *Tachiona*, 169 F. Supp.

2d at 276-77. Indeed, parting with this international consensus would threaten serious harm to

U.S. interests, by inviting reciprocation in foreign jurisdictions.[19] Given the global leadership

responsibilities of the United States, its officials are at special risk of being made the targets of

politically driven lawsuits abroad – including damages suits arising from alleged war crimes.[20]

The immunity defense is a vital means of deflecting these suits and averting the nuisance and

diplomatic tensions that would ensue were they to proceed. It is therefore of critical importance

that American courts recognize the same immunity defense for foreign officials, as any refusal to

do so could easily lead foreign jurisdictions to refuse such protection for American officials in

turn. As the Supreme Court has stated in a related context:

---

[19] *See Hilton v. Guyot*, 159 U.S. 113, 228 (1895) ("[I]nternational law is founded upon mutuality
and reciprocity."); *see also Garb v. Republic of Poland*, 440 F.3d 579, 585 (2d Cir. 2006)
(describing the concept of reciprocity as a "touchstone[] of international law").

[20] Even more worrisome, foreign *criminal* courts might look to U.S. civil immunity rules in an
effort to justify assertions of jurisdiction over U.S. officials.

> In light of the concept of reciprocity that governs much of international law in this area, we have a more parochial reason to protect foreign diplomats in this country. Doing so ensures that similar protections will be accorded those that we send abroad to represent the United States, and thus serves our national interest in protecting our own citizens. Recent history is replete with attempts, some unfortunately successful, to harass and harm our ambassadors and other diplomatic officials. These underlying purposes combine to make our national interest in protecting diplomatic personnel powerful indeed.

*Boos v. Barry*, 485 U.S. 312, 323-24 (1988). Thus, this Court should adhere to prevailing

international norms, which are reflected in our own common law, and afford Dichter immunity

for his official acts.

**B.     Dichter's Participation in Planning a Military Strike Constitutes an Official Act**

     *1.     Whether an Act Is Performed in an Official Capacity Turns on Whether the Act Is Attributable to the State, Not on Whether It Was Lawful*

As a fallback position, plaintiffs argue that the defendant's acts, as alleged in the

complaint, were not "lawfully within the scope of his authority," so they cannot be deemed

official acts protected by official immunity, Pls.' Br. at 6. There is no merit in this argument.

Plaintiffs do not claim that the defendant's acts were actually unauthorized by the State of

Israel. Rather, plaintiffs argue that the acts were not *validly* authorized because, according to

plaintiffs, the acts were unlawful under international and Israeli law. *See* Pls.' Br. at 6-12. The

flaws in this logic are obvious. By definition, a civil lawsuit against a foreign official will

challenge the lawfulness of the official's acts. Hence, the official's immunity would be rendered

meaningless if it could be overcome by such allegations alone. *See Waltier*, 189 F. Supp. at 321

n.6 (rejecting argument that foreign official's allegedly false statements could not be considered

within the scope of his duties based simply on the premise that "wrongdoing is never

authorized") (citing *Gregoire v. Biddle*, 177 F.2d 579, 581 (2d Cir. 1949) (L. Hand, C.J.) ("[I]t

can be argued that official powers, since they exist only for the public good, never cover

occasions where the public good is not their aim, and hence that to exercise a power dishonestly

is necessarily to overstep its bounds. A moment's reflection shows, however, that that cannot be the meaning of the limitation without defeating the whole doctrine.")); *see also Herbage*, 747 F. Supp. at 67 (rejecting argument that officials lost immunity by virtue of "acting illegally," finding that conduct was within the scope of their official capacities); *Kline*, 685 F. Supp. at 390 (holding that plaintiff's claim that Mexican immigration official expelled her without due process "is in no way inconsistent with [the official] having acted in his official capacity"); *Jones*, UKHL 26, ¶ 12 ("The fact that conduct is unlawful or objectionable is not, of itself, a ground for refusing immunity.").

Rather, the official-capacity test properly turns on whether the acts in question were performed on the state's behalf, such that they are attributable to the state itself – as opposed to constituting private conduct. This test flows directly from the principle underlying immunity for foreign officials, which is that an official acting in an official capacity is a manifestation of the state, and as such the official's acts are attributable to the state rather than to the official personally. *See supra* at 9-10, 19-22. Because an individual official cannot be sued for conduct of the state, the relevant inquiry is simply whether the official's actions constitute state conduct. *See Doe I*, 400 F. Supp. at 104 ("[S]uits against officers in their personal capacities must pertain to private action – that is, to actions that exceed the scope of authority vested in that official so that the official cannot be said to have acted on behalf of the state."); *see also El-Fadl*, 75 F.3d at 671 (dismissing on immunity grounds where defendant's activities "were neither personal nor private, but were undertaken only on behalf of the Central Bank [of Jordan]").[21]

---

[21] This view conforms to international law regarding when individual conduct is attributable to states. *See* Draft Articles on the Responsibility of States for Internationally Wrongful Acts, U.N. GAOR, 56th Sess., Supp. No. 10, U.N. Doc. A/56/10, Art. 4 (2001) *available at* (continued...)

Moreover, any contrary rule would create an easy end-run around the immunity of the

state. The immunity of a foreign state is not subject to any roving "unlawfulness" exception but

rather is subject only to those immunity exceptions specifically set forth in the FSIA. *See*

*Amerada Hess*, 488 U.S. at 433-35. Given that a foreign state's immunity under the FSIA does

not dissipate upon mere allegations that its acts were unlawful, the immunity of the officials

through whom the state acts must be similarly resilient. Any gap in the officials' immunity

would simply "allow[] litigants to accomplish indirectly what the Act barred them from doing

directly." *Chuidian*, 912 F.2d at 1102; *see also Park v. Shin*, 313 F.3d 1138, 1144 (9th Cir.

2002) (in determining whether acts at issue were performed in an official capacity, courts should

consider "whether [the] action against the foreign official is merely a disguised action against the

nation that he or she represents" and "whether [the] action against the official would have the

effect of interfering with the sovereignty of the foreign state that employs the official"). Indeed,

in *Amerada Hess*, which involved the bombing of a neutral ship by the Argentine military, the

Supreme Court specifically held that a foreign state's immunity was not subject to any general

exception for alleged violations of international law brought under the Alien Tort Statute. *Id.* at

435-43. By plaintiffs' logic, the litigants in *Amerada Hess* could have avoided this result simply

---

http://untreaty.un.org/ilc/texts/instruments/english/commentaries/9_6_2001.pdf. Draft Article 7
specifies that the conduct of any person empowered to exercise governmental authority is
considered conduct of the state under international law if the person acts in that capacity, even if
the person exceeds his authority or contravenes his instructions. As the commentary of the
International Law Commission further makes clear: "Cases where officials acted in their capacity
as such, *albeit unlawfully or contrary to instructions*, must be distinguished from cases where the
conduct is so removed from the scope of their official functions that it should be assimilated to
that of private individuals, not attributable to the State." *Id.* commentary ¶ 7 (emphasis added);
*see also, e.g.*, *Velasquez-Rodriguez Case*, Inter-Am. Ct. H.R. (Ser. C) No. 4 (Inter-American
Court of Human Rights 1989), ¶ 170 ("Under international law a State is responsible for the acts
of its agents undertaken in their official capacity and for their omissions, even when those agents
act outside the sphere of authority or violate internal law.").

through the contrivance of naming the bomber pilot or defense minister as defendant rather than the Argentine government itself. Such a glaring loophole in the immunity afforded to state conduct would render the Supreme Court's holding in the case a practical nullity.

Here, plaintiffs' complaint clearly concerns state conduct. The complaint alleges that "since at least November 2000, *the State of Israel* has systematically engaged in so-called 'targeted killings' . . . of 'suspected terrorists' in [occupied Palestinian territory] and elsewhere outside of Israel," and that "[t]hese 'targeted' executions have been carried out with knowledge that non-targeted civilians would also be killed or injured, or with utter disregard for that probability." Compl. ¶ 17 (emphasis added). Dichter is named as defendant only by virtue of his alleged involvement in planning and authorizing such an operation as the Director of Israel's General Security Service. *See* Compl. ¶¶ 36-45 (alleging that "Defendant participated in the specific decision to authorize the 'targeted assassination' of Shehadeh" and approved the use of military aircraft in the attack). Thus, the complaint itself makes plain that the challenged conduct was performed on Israel's behalf – as Israel itself has confirmed in a letter to the State Department from its ambassador, *see* Kalicki Decl. Ex. A (stating that Dichter's actions were performed in the course of his "official duties, and in furtherance of official policies of the State of Israel").[22]

Accordingly, the actions alleged were clearly undertaken in Dichter's official capacity and cannot form the basis for a suit against Dichter personally. *See Doe I*, 400 F. Supp. 2d at 105 ("Plaintiffs do not present legitimate claims against the individual Israeli defendants in their

---

[22] Courts in this district have accorded "'great weight' to any extrinsic submissions made by . . . foreign defendants regarding the scope of their official responsibilities." *See In re Terrorist Attacks*, 392 F. Supp. 2d at 551 (quoting *Leutwyler*, 184 F. Supp. 2d at 287).

personal capacities. . . . All allegations stem from actions taken on behalf of the state and, in

essence, the personal capacity suits amount to suits against the officers for being Israeli

government officials.").

     2.     *There Is No Exception to the Immunity of Individual Officials for Alleged* Jus
           Cogens *Violations*

     Contrary to plaintiffs' contentions, *see* Pls.' Br. at 9-12, nothing in the foregoing analysis

is changed by the fact that plaintiffs allege that defendant's conduct violated *jus cogens* norms.[23]

Plaintiffs argue that because a *jus cogens* norm "by definition permits of no derogation . . . .

Israel could not authorize the acts alleged." Pls.' Br. at 10 (internal quotation marks and citation

omitted). But this is simply another variation of the argument that "wrongdoing is never

authorized." *Waltier*, 189 F. Supp. at 321 n.6. The principle that a *jus cogens* norm permits of

no derogation merely implies that any derogation from the norm will be unlawful; it does not

imply anything about the identity of the actor responsible for the derogation. Here, assuming

*arguendo* that the specific conduct plaintiffs allege constituted violation of a norm that the

United States would recognize as a *jus cogens* violation, the violation would remain attributable

to the state itself rather than to Dichter personally – because the conduct at issue was not private

---

[23] The concept of *jus cogens* is of relatively recent origin and remains unsettled. *See* International Law Commission Draft Articles on the Law of Treaties with Commentaries, Art. 50, cmt. 3 (1966) ("The emergence of rules having the character of jus cogens is comparatively recent . . . ."). The Vienna Convention on the Law of Treaties introduced the concept that treaties are invalid if they conflict with a *jus cogens* norm, which it defines as "a norm accepted and recognized by the international community of States as a whole as a norm from which no derogation is permitted and which can be modified only by a subsequent norm of general international law having the same character." 1155 U.N.T.S. 331, Art. 53 (May 23, 1969) . Not only are the consequences of a norm qualifying as *jus cogens* unclear outside of the treaty context, *see, e.g.*, I OPPENHEIM'S INTERNATIONAL LAW 8 (Robert Jennings & Arthur Watts, eds.) (9th ed. 1992); Fox, *infra*, at 523-25, but controversy surrounds the question of which norms – if any – qualify as *jus cogens*. *See* Sean D. Murphy, PRINCIPLES OF INTERNATIONAL LAW 82 (2006); OPPENHEIM'S INTERNATIONAL LAW, *supra*, at 8.

in nature but rather was officially authorized by the state. *See Herbage*, 747 F. Supp. at 67

(holding that individuals acting in their official capacities as agents of a foreign government are

entitled to immunity "no matter how heinous the alleged illegalities"). As the Supreme Court

held in finding that alleged police torture was "sovereign" rather than commercial activity, and

thus protected by sovereign immunity:

> [H]owever monstrous such abuse undoubtedly may be, a foreign state's exercise
> of the power of its police has long been understood for purposes of the restrictive
> theory as peculiarly sovereign in nature. Exercise of the powers of police and
> penal officers is not the sort of action by which private parties can engage in
> commerce. Such acts as legislation, or the expulsion of an alien, or a denial of
> justice, cannot be performed by an individual acting in his own name. They can
> be performed only by the state acting as such.

*Saudi Arabia v. Nelson*, 507 U.S. 349, 361-62 (1993) (citations and internal quotation marks

omitted). Certainly the same holds true for a foreign state's exercise of its military powers.

Further, any rule denying civil immunity to individual officials for alleged *jus cogens*

violations would allow circumvention of the state's immunity for the same conduct. A foreign

state's immunity is not subject to any general exception for *jus cogens* violations under the FSIA.

*See Smith v. Socialist People's Libyan Arab Jamahiriya*, 101 F.3d 239, 242-45 (2d Cir. 1997);

*accord Princz v. Fed. Republic of Germany*, 26 F.3d 1166, 1173-75 (D.C. Cir. 1994); *cf. Saudi

Arabia, supra.* Indeed, while plaintiffs consider "extrajudicial killing" to be a *jus cogens*

violation, the one exception of the FSIA encompassing such conduct is narrow in scope, aimed

specifically at eliminating sovereign immunity as a defense to acts of state-sponsored terrorism.

*See* 28 U.S.C. § 1605(a)(7).[24] Were plaintiffs' position accepted, however, litigants could easily

---

[24] As the D.C. Circuit has noted: "[T]he passage of § 1605(a)(7) involved a delicate legislative
compromise. While Congress sought to create a judicial forum for the compensation of victims
and the punishment of terrorist states, it proceeded with caution, in part due to executive branch
(continued...)

bypass these tight restraints by suing individual officials for alleged *jus cogens* violations without limitation. *See Doe I*, 400 F. Supp. 2d at 105 (rejecting *jus cogens* exception given that no such exception is found in the FSIA: "[E]ven assuming that the Israeli defendants have engaged in *jus cogens* violations, . . . *[j]us cogens* violations, without more, do not constitute an implied waiver of FSIA immunity.").

Not only would a *jus cogens* exception to official-act immunity be at odds with the FSIA, it would also be out of step with customary international law. No such exception is included in the UN Immunity Convention, having been specifically rejected for lack of support within the current international consensus. *See* Report of the International Law Commission to the General Assembly on the Work of Its Fifty-First Session, U.N. Doc. A/54/10 (1999), at 171-72. Recently, the House of Lords likewise rejected such an exception in the *Jones* case, in which individual foreign officials were held to be immune from civil suit, notwithstanding that they were alleged to have engaged in torture. *See Jones*, UKHL 26, ¶¶ 12-35. As the court stated:

> [T]here is no evidence that states have recognised or given effect to an international law obligation to exercise universal jurisdiction over claims arising from alleged breaches of peremptory [*i.e.*, *jus cogens*] norms of international law, nor is there any consensus of judicial and learned opinion that they should. . . . But this lack of evidence is not neutral: since the rule on immunity is well-understood and established, and no relevant exception is generally accepted, the rule prevails.

*Id.* ¶ 27.

Plaintiffs' citation to the International Military Tribunal's rejection of an immunity defense in the Nuremburg trials, *see* Pls.' Br. at 11-12, is off point for a number of reasons. This

---

officials' concern that other nations would respond by subjecting the American government to suits in foreign countries." *Cicippio-Puleo v. Islamic Republic of Iran*, 353 F.3d 1024, 1035 (D.C. Cir. 2004).

is a civil suit, in what, for the defendant, is a foreign court. The Nuremburg trials, by contrast, were criminal proceedings, which were, as a legal matter, under the authority of the defendants' own sovereign. In such different circumstances, immunity considerations can play out differently. As an initial matter, international law clearly distinguishes between the civil and criminal immunity of officials. On the civil side, officials are accorded immunity in part because states themselves are responsible for their officials' acts. On the criminal side, in contrast, international law holds individuals personally responsible for their international crimes, and does not recognize the concept of state criminal responsibility. *See Jones*, UKHL 26, ¶ 31; *see also id.* ¶ 19 (distinguishing criminal proceedings as "categorically different" for immunity purposes). Moreover, critically, there is the check of prosecutorial discretion in the criminal context: the Nuremburg proceedings were instituted by sovereign governments, and criminal prosecutions in this country are likewise controlled by the Executive branch. *See In re Grand Jury Proceedings*, 613 F.2d 501, 505 (5th Cir. 1980). Thus, while Congress has provided limited authority for the criminal prosecution of war crimes in the federal courts, *see infra* at 45-46, any decision to bring such grave charges against a foreign official would be made by the Executive – and only after exceedingly careful consideration of the potential diplomatic consequences. By contrast, civil lawsuits like the one at bar are brought by private plaintiffs and consequently present an uncontrolled risk of interference with the Executive's conduct of foreign affairs. *Cf. Sosa*, 542 U.S. at 727 ("The creation of a private right of action raises issues beyond the mere consideration whether underlying conduct should be allowed or not, entailing, for example, a decision to permit enforcement without the check imposed by prosecutorial discretion.").

Significantly, the lack of an immunity exception for civil suits alleging *jus cogens* violations does not mean that such violations, when they actually occur, will necessarily be

beyond the reach of the courts. The immunity protecting foreign officials for their official acts

ultimately belongs to the sovereign and can be waived by the sovereign – as has happened, for

example, where former officials have been removed from power and the ascendant government

has distanced itself from past abuses. *See In re Doe*, 860 F.2d 40, 45 (2d Cir. 1988) ("Because it

is the state that gives the power to lead and the ensuing trappings of power – including immunity

– the state may therefore take back that which it bestowed upon its erstwhile leaders. . . . [B]y

issuing the waiver, the Philippine government has declared its decision to revoke an attribute of

[the Marcoses'] former political positions; namely, head-of-state immunity."). Similarly, the

circumstances of a case may create a question whether the conduct was performed on behalf of

the state or was instead performed in the official's private capacity, in which case immunity

would not attach in the first place. *See Kadic v. Karadzic*, 70 F.3d 232, 250 (2d Cir. 1995)

("[W]e doubt that the acts of even a state official, taken in violation of a nation's fundamental

law *and wholly unratified by that nation's government*, could properly be characterized as an act

of state.") (emphasis added); *Filartiga v. Pena-Irala*, 630 F.2d 876, 884 (2d Cir. 1980) ("Where

reports of torture elicit some credence, a state usually responds by denial or, less frequently, by

asserting that the conduct was unauthorized or constituted rough treatment short of torture.")

(quoting United States *amicus* brief). Indeed, in none of the cases cited by plaintiffs finding that

individual defendants had overstepped the bounds of their lawful authority, *see* Pls.' Br. at 6, did

the foreign state publicly ratify the conduct of the official being sued.[25]

---

[25] *See Hilao v. Estate of Marcos*, 25 F.3d 1467, 1472 (9th Cir. 1994) (finding that "the
Philippine government's agreement that the suit against Marcos proceed" negated any sovereign
immunity concern); *Doe v. Liu Qi*, 349 F. Supp. 2d 1258, 1287 (N.D. Cal. 2004) (finding that
"Defendants cannot claim to have acted under a valid grant of authority" where the government
of China had "publicly disclaimed" any policy of torture and denied the misconduct alleged,
(continued...)

Moreover, even where sovereign immunity is validly invoked by a foreign official for an alleged *jus cogens* violation, and not waived in any manner by the parent government, remedies may still exist outside the civil setting. Beyond the possibility of criminal proceedings, the Executive may pursue sanctions or apply other forms of pressure in the diplomatic sphere – which is, of course, the usual forum for addressing objectionable conduct by foreign states. *See* Hazel Fox QC, THE LAW OF STATE IMMUNITY 525 (2002) ("State immunity . . . does not contradict a prohibition contained in a *jus cogens* norm but merely diverts any breach of it to a different method of settlement."). The Fourth Hague Convention of 1907, for example, provides that a "belligerent party" – *i.e.*, the *state* – is "responsible for all acts committed by persons forming part of its armed forces" and "shall, if the case demands, be liable to pay compensation." Fourth Hague Convention of 1907, 36 Stat. 2306, Art. 3. This obligation is generally understood to be enforceable by states through diplomatic means rather than by individuals through private litigation. *See* Jean Pictet, COMMENTARY ON THE ADDITIONAL PROTOCOLS 1053-54 (1987) (explaining that Article 3 of the Fourth Hague Convention envisions claims brought by the government of those wronged against the government responsible for the violations); *see also Goldstar (Panama) S.A. v. United States*, 967 F.2d 965, 968-69 (4th Cir. 1992) (refusing to

---

even if it allegedly had "covertly authorized" that conduct); *Xuncax v. Gramajo*, 886 F. Supp. 162, 176 n.10 (D. Mass. 1995) ("There is no suggestion that either the past or present government of Guatemala characterizes the actions alleged here as 'officially' authorized."). In the other two cases cited, the defendant officials themselves waived the argument. *See Trajano v. Marcos*, 978 F.2d 493, 498 (9th Cir. 1992) ("Marcos-Manotoc's default makes the application of both cases easy in this case, for she has admitted acting on her own authority, not on the authority of the Republic of the Philippines."); *Cabiri v. Assasie-Gyimah*, 921 F. Supp. 1189, 1198 (S.D.N.Y. 1996) ("Assasie-Gyimah does not claim that the acts of torture he is alleged to have committed fall within the scope of his authority."). To the extent that these cases contain language to the effect that actions contravening an official's statutory mandate *categorically* cannot be deemed to fall within his official capacity, *see, e.g., Liu Qi*, 349 F. Supp. 2d at 1282, this argument should be rejected for the reasons explained above.

recognize private cause of action under Article 3 of the Fourth Hague Convention).  To permit

plaintiffs here to seek such compensation by suing an individual official would thus run contrary

to the accepted international-law model, which contemplates addressing such issues through

state-to-state negotiations.

**C.    The TVPA Does Not Trump the Immunity of Foreign Officials for Their Official Acts**

Finally, plaintiffs argue that, even if foreign officials are protected by immunity for their

official acts, and even if the defendant's conduct was within his scope of authority, the TVPA

trumps the defendant's claim to immunity.  This argument, too, should be rejected.

Contrary to plaintiffs' contentions, *see* Pls.' Br. at 12, the TVPA is not unambiguous, but

is instead silent as to whether its provisions take precedence over the immunity of a foreign

official where that immunity is validly asserted.  Given that the statute does not directly address

the question, it should be read in harmony, rather than in conflict, with relevant immunity rules --

as the Supreme Court has instructed in the parallel context of § 1983.  *See Malley v. Briggs*, 475

U.S. 335, 339 (1986) ("Although the statute on its face admits of no immunities, we have read it

'in harmony with general principles of tort immunities and defenses rather than in derogation of

them.'") (quoting *Imbler v. Pachtman*, 424 U.S. 409, 418 (1976)).[26]

---

[26] The TVPA and § 1983 both apply, on their face, to official acts.  *Compare* TVPA § 2, *codified at* 28 U.S.C. § 1350 note ("An individual who, under actual or apparent authority, or color of law, of any foreign nation . . . subjects an individual to extrajudicial killing shall, in a civil action, be liable . . . .") *with* 42 U.S.C. § 1983 ("Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable . . . .").

The TVPA's legislative history confirms that this was the intent of Congress. In addition to making clear that "nothing in the TVPA overrides the doctrines of diplomatic and head of state immunity," H.R. Rep. 102-367(I), at 5 (1991), 1992 U.S.C.C.A.N. 84, 88 ("TVPA House Report") , the legislative history also indicates that the statute was intended to be compatible with the immunity an individual official might claim "by invoking the FSIA," S. Rep. 102-249, at 8 (1991) ("TVPA Senate Report"); *see also* TVPA House Report at 5, 1992 U.S.C.C.A.N. at 88 ("The TVPA is subject to restrictions in the [FSIA]."). Although it was believed that such immunity would typically be unavailable in a TVPA case (at least for former officials), this belief was based not on the idea that the TVPA would trump the individual defendant's immunity, but rather on the idea that the defendant would have difficulty establishing immunity in the first place because the state would disown the conduct at issue. The Senate report offered the following explanation:

> To avoid liability by invoking the FSIA, a former official would have to prove an agency relationship to a state, which would require that the state "admit some knowledge or authorization of relevant acts." 28 U.S.C. 1603(b) [FSIA's "agency or instrumentality" definition]. Because all states are officially opposed to torture and extrajudicial killing, however, the FSIA should *normally* provide no defense to an action taken under the TVPA against a former official.

TVPA Senate Report at 8 (emphasis added).

In essence, Congress expected that where an individual official is accused of conduct truly covered by the TVPA , foreign states would not normally assert that the conduct was within the scope of the official's authority. *See Kadic, supra*; *Filartiga, supra.* But the converse implication is that where, as here, there is no doubt that the official's conduct was performed on the state's behalf, Congress understood that the official could validly assert an immunity defense. Although the legislative history apparently followed *Chuidian* in tracing that immunity to the FSIA's "agency and instrumentality" definition, nothing suggests that Congress would have

-34-

intended a different result if this immunity had correctly been traced back to common law instead. Rather, the thrust of the legislative history is that the statute was not intended to conflict with any form of immunity for foreign officials. *See Aristide*, 844 F. Supp. at 138-39 (holding that the TVPA "was not intended to trump diplomatic and head-of-state immunities," nor does it conflict with the FSIA since "the TVPA will only apply to state actors when they act in their individual capacity").

## POINT II

## THE COURTS SHOULD NOT RECOGNIZE A CIVIL CAUSE OF ACTION FOR THE DISPROPORTIONATE USE OF MILITARY FORCE

Given Dichter's immunity from suit, the Court has no occasion to reach the merits of the case. However, even if Dichter were found to lack immunity, plaintiffs' complaint should still be dismissed for failure to state a valid cause of action under federal law.

Plaintiffs' complaint, at its core, asks this Court to adjudicate the proportionality of a military targeting decision by a foreign nation, in order to determine whether the degree of force used was unjustified by any legitimate military objective. While plaintiffs acknowledge that the target of the attack in question was a Hamas military leader, Saleh Mustafa Shehadeh, Compl. ¶ 23, they do not purport to bring any claims on Shehadeh's behalf. Instead, plaintiffs are survivors of the attack who bring claims on behalf of non-targeted civilians injured or killed in the operation. *See* Compl. ¶¶ 5-7; *see also id.* ¶ 17 ("These 'targeted' executions have been carried out with knowledge that non-targeted civilians would also be killed or injured, or with utter disregard for that probability."). The crux of these claims is the allegation that Dichter violated international law in planning and authorizing the strike by, as plaintiffs put it, failing to "take all feasible precautions in the choice of means and methods of attack, with a view to avoiding or minimizing loss of civilian life and injury to civilians." Compl. ¶ 50.

-35-

No such civil cause of action exists within federal law, nor should this Court recognize

one. While plaintiffs rely heavily on customary international law and the Geneva Conventions

as the basis for their claims, these sources do not by themselves supply a federal private cause of

action.[27] Thus, plaintiffs' claims are cognizable only if they may be brought under federal

common law pursuant to the Supreme Court's decision in *Sosa v. Alvarez-Machain* or if they

may be brought under the TVPA. As explained below, however, neither federal common law

nor the TVPA provides a basis for plaintiffs' claims. Indeed, the creation of such a cause of

---

[27] It is well settled that international treaties do not generally provide private litigants with enforceable rights. *See Head Money Cases*, 112 U.S. 580, 598 (1884); *see also* Restatement (Third) of Foreign Relations Law of the United States (1986), § 907 cmt. a ("International agreements, even those directly benefit[t]ing private persons, generally do not create private rights or provide for a private cause of action in domestic courts"); *United States v. De La Pava*, 268 F.3d 157, 164 (2d Cir. 2001) ("[T]here is a strong presumption against inferring individual rights from international treaties."); *Columbia Marine Services, Inc. v. Reffet Ltd.*, 861 F.2d 18, 21 (2d Cir. 1988) ("An action arises under a treaty only when the treaty expressly or by implication provides for a private right of action."); *United States ex rel. Lujan v. Gengler*, 510 F.2d 62, 67 (2d Cir. 1975). In particular, the Geneva Conventions do not themselves create a private right of action. *See Hamdan v. Rumsfeld*, 415 F.3d 33, 40 (D.C. Cir. 2005), *rev'd on other grounds*, 126 S. Ct. 2749 (2006); *cf. Johnson v. Eisentrager*, 339 U.S. 763, 789 n. 14 (1950) (explaining that, with the 1929 Geneva Conventions, "the obvious scheme of the Agreement [is] that responsibility for observance and enforcement of these rights is upon political and military authorities."). Indeed, the recent Military Commissions Act of 2006, Pub. L. No. 109-366, § 5, 120 Stat. 2600, 2631 (2006)("MCA"), provides that no person may invoke the Geneva Conventions and its protocols in any civil action against members of the U.S. armed forces for whom the United States bears international responsibility. This reflects Congressional intent not to use the federal courts as a venue for adjudicating private claims for violations of the Geneva Conventions, even in instances where there is a strong connection with the United States. Implying such an action under the ATS, where there is no such connection, would be anomalous. See Section 5 of MCA ("No person may invoke the Geneva Conventions or any protocols thereto in any habeas corpus proceeding or other civil action or proceeding to which the United States, or a current or former officer, employee, member of the Armed Forces, or other agent of the United States, is a party as a source of rights in any court of the United States or its states or territories.") Nor does customary international law supply a federal cause of action, except to the extent permitted by the Supreme Court's decision in *Sosa v. Alvarez-Machain*. *See infra* at 37-47.

action would raise serious concerns about the respective roles of the judiciary and the political branches in addressing sensitive disputes regarding armed conflicts abroad.

## A.   The Courts Have No Authority to Create a Federal Common Law Cause of Action under the ATS for the Disproportionate Use of Military Force

In *Sosa v. Alvarez-Machain*, *supra*, the Supreme Court clarified the conditions under which claims for alleged violations of international law can be brought under the ATS. As the Court explained, while the ATS is itself a jurisdictional statute that does not establish a private cause of action, Congress understood, in enacting the statute in 1789, that courts exercising jurisdiction under the statute would recognize private causes of action for certain international law violations as a matter of federal common law. 542 U.S. at 712. The *Sosa* Court affirmed that courts continue to retain such authority, but took pains to emphasize that this authority must be exercised with "great caution." *Id.* at 728, 730. Given that "[t]he creation of a private right of action raises issues beyond the mere consideration whether the underlying primary conduct should be allowed or not, entailing, for example, a decision to permit enforcement without the check imposed by prosecutorial discretion," the creation of such a right is generally "better left to legislative judgment." *Id.* at 727. Moreover, "the potential implications for the foreign relations of the United States of recognizing such cases should make courts particularly wary of impinging on the discretion of the Legislative and Executive Branches in managing foreign affairs." *Id.*

Accordingly, the *Sosa* Court left the door of federal common law open only to a "very limited category" of international law claims, *id.* at 728, "subject to vigilant doorkeeping," *id.* at 729. Specifically, the Court instructed that "federal courts should not recognize private claims under federal common law for violations of any international law norm with less definite content and acceptance among civilized nations than the historical paradigms familiar when [the statute] was enacted" in 1789 – namely, violation of safe conducts, infringement of the rights of

-37-

ambassadors, and piracy. *Id.* at 715, 732. "And," the Court stressed, "the determination whether

a norm is sufficiently definite to support a cause of action should (and, indeed, inevitably must)

involve an element of judgment about the practical consequences of making that cause available

to litigants in the federal courts." *Id.* at 732-33 (footnotes omitted).

All of these considerations counsel strongly against recognizing a private cause of action

under federal common law for the international law violations alleged here. As a preliminary

matter, the courts should be very hesitant to recognize a federal common law cause of action for

*any* claim centering on a foreign government's treatment of foreign nationals in foreign territory.

There is a strong presumption generally against projecting U.S. law onto disputes arising in

foreign territories – a presumption which "serves to protect against unintended clashes between

our laws and those of other nations which could result in international discord." *See EEOC v.*

*Arabian Am. Oil Co.*, 499 U.S. 244, 248 (1991). Notably, the same strong presumption existed

in the early years of the nation; even the federal statute that punished, as a matter of U.S. law,

one of the principal offenses under the law of nations – piracy – was held not to apply where a

foreign state had jurisdiction. *See United States v. Palmer*, 16 U.S. 610, 630-31 (1818) (the

federal piracy statute should not be read to apply to foreign nationals on a foreign ship); *see also*

*The Apollon*, 22 U.S. (9 Wheat.) 362, 370 (1824); *Rose v. Himely*, 8 U.S. (4 Cranch) 241, 279

(1807).

In light of this presumption, which is strongly reinforced by the judicial restraint

mandated by the Supreme Court in *Sosa*, courts should be very hesitant ever to apply their

federal common law power under the ATS to entertain such extraterritorial claims. Indeed, the

*Sosa* Court expressly questioned whether this federal common law power could properly be

employed "at all" in regard to a foreign nation's actions taken abroad. *Sosa*, 542 U.S. at 727-28.

-38-

Moreover, nothing in the ATS, or in its contemporary history, suggests that Congress intended

the statute to apply to conduct in foreign lands. To the contrary, the assaults on ambassadors that

preceded and motivated the enactment of the ATS involved conduct purely within the United

States. The point of the ATS was to ensure that the United States would be able to provide a

forum for redressing such violations, thereby *preventing* diplomatic conflicts with the nations

offended by such conduct. *See id.* at 715, 720, 723-24 & n.15; *see also Tel-Oren v. Libyan Arab

Republic*, 726 F.2d 774, 812 (D.C. Cir. 1984) (Bork, J., concurring) ("[T]hose who drafted the

Constitution and the Judiciary Act of 1789 wanted to open federal courts to aliens for the

purpose of avoiding, not provoking, conflicts with other nations."). Suits against a foreign

government for conduct occurring in foreign territory are entirely removed from these types of

concerns.

 In any event, whatever limited discretion the courts might have to extend the ATS to

certain claims involving extraterritorial conduct, they certainly should not exercise that discretion

to recognize a federal cause of action for the disproportionate use of military force in the context

of a foreign armed conflict. Such a cause of action would not, as *Sosa* requires, "rest on a norm

of international character . . . defined with a specificity comparable to the features of the 18th-

century paradigms" recognized at the time the ATS was enacted. *Sosa*, 542 U.S. at 725.

 Indeed, a comparable norm was rejected in *Sosa* itself, where the Court found that the

international law norm against "arbitrary" detention was not sufficiently well defined to merit

recognition as the basis for a federal common law cause of action. As the Supreme Court

explained, although many nations recognize this norm, this consensus exists only "at a high level

of generality." *Id.* at 737 n.27. Accordingly, the norm could not be taken as the predicate for a

federal lawsuit, for by itself it fails to specify what qualifies as "arbitrary" in any particular case.

*Id.* at 737-38.  As the Court concluded, "[w]hatever may be said for the broad principle

[plaintiffs] advance[], in the present, imperfect world, it expresses an aspiration that exceeds any

binding customary rule having the specificity we require."  *Id.* at 738.

    Likewise, while all agree in the abstract that military force should not be

"disproportionate" to military objectives, this moral clarity tends to dissipate in the application of

principle to practice.  The provisions of the Geneva Conventions cited in plaintiffs' complaint

serve to illustrate.  For example, plaintiffs cite Article 52 of Additional Protocol I, which forbids

attacks on "civilian objects" – meaning "objects which are not military objectives."  *See* Protocol

Additional to the Geneva Conventions of 12 August 1949 (adopted Jun. 8, 1977), *reprinted in* 16

I.L.M. 1391 (1977) ("Additional Protocol I"), Art. 52, cl. 1.  The term "military objectives" is

defined in turn as "objects which by their nature, location, purpose or use make an effective

contribution to military action and whose total or partial destruction, capture or neutralization, in

the circumstances ruling at the time, offers a definite military advantage."  *Id.*, Art. 52, cl. 2.

Yet, putting aside for the moment that the United States has never ratified Additional Protocol I

of the Geneva Conventions, the problem is that the cited Article fails to specify what constitutes

"an effective contribution to military action" or "a definite military advantage" – nor can such

specificity be expected, since these determinations are highly value-laden and context-specific.

Along similar lines, plaintiffs cite Article 57 of Additional Protocol I, which provides, *inter alia*,

that "[t]hose who plan or decide upon an attack shall . . . [r]efrain from deciding to launch any

attack which may be expected to cause incidental loss of civilian life, injury to civilians, damage

to civilian objects, or a combination thereof, which would be excessive in relation to the concrete

and direct military advantage anticipated."  Additional Protocol I, Art. 57, cl. 2(a)(iii).  Again,

the rub lies in determining what counts as "excessive."  Any number of intangibles must be

-40-

considered: How important is the military objective sought to be achieved?  What are the pros

and cons of each option available to achieve that objective?  For each option, what is the

probability of success?  What are the costs of failure?  What are the risks of civilian casualties

involved in each option?  What are the risks of military casualties involved in each option?  How

are casualties of either kind to be weighed against the benefits of the operation?[28]

In short, questions of proportionality are highly open-ended, and the answers to them

tend to be subjective and imprecise.  *See Corrie v. Caterpillar, Inc.*, 403 F. Supp. 2d 1019, 1025

(W.D. Wash. 2005) (rejecting ATS claim based on Geneva Conventions provision prohibiting

destruction of personal property "except where such destruction is rendered absolutely necessary

by military operations" as a "subjective" norm that "is not sufficient under *Sosa*").  As stated in a

recent report by a committee established to review the NATO bombing campaign in Yugoslavia:

> The main problem with the principle of proportionality is not whether or not it
> exists but what it means and how it is to be applied.  It is relatively simple to state
> that there must be an acceptable relation between the legitimate destructive effect
> and undesirable collateral effects.  For example, bombing a refugee camp is
> obviously prohibited if its only military significance is that people in the camp are
> knitting socks for soldiers.  Conversely, an air strike on an ammunition dump
> should not be prohibited merely because a farmer is plowing a field in the area.
> Unfortunately, most applications of the principle of proportionality are not quite
> so clear cut.  It is much easier to formulate the principle of proportionality in
> general terms than it is to apply it to a particular set of circumstances because the
> comparison is often between unlike quantities and values.  One cannot easily
> assess the value of innocent human lives as opposed to capturing a particular
> military objective.

---

[28] As the commentary to Article 57 itself acknowledges, its terms "are relatively imprecise and
are open to a fairly broad margin of judgment."  Additional Protocol I, Art. 57, cmt. 2187,
*available at* http://www.icrc.org/ihl.nsf/COM/470-750073?OpenDocument.  Indeed, the
ambiguity of the provision, coupled with the possibility of prosecutions for grave breaches of the
Article, led several delegations to object to it as "dangerously imprecise" and imposing a "very
heavy burden of responsibility . . . on military commanders."  *Id.*

Final Report to the Prosecutor by the Committee Established to Review the NATO Bombing

Campaign Against the Federal Republic of Yugoslavia ¶ 48, *available at*

http://www.un.org/icty/pressreal/nato061300.htm. Thus, while there are certainly clear-cut cases

on the extremes, the proportionality principle fails to provide a serviceable rule of decision in the

large run of cases; accordingly, it does not possess the specificity required under *Sosa* to afford a

federal common law cause of action. *See Sosa*, 542 U.S. at 737 ("[A]lthough it is easy to say

that some policies of prolonged arbitrary detentions are so bad that those who enforce them

become enemies of the human race, it may be harder to say which policies cross that line with

the certainty afforded by Blackstone's three common law offenses.").

This conclusion is bolstered by the "practical consequences" of recognizing such a civil

cause of action. *Id.* at 738. As in *Sosa*, the implications of transforming the international norms

on which plaintiffs rely into a springboard for federal litigation would be "breathtaking." *Id.* at

736 (finding that allowing ATS suits for "arbitrary" detention "would support a cause of action

in federal court for any arrest, anywhere in the world"). Civilian casualties frequently occur in

armed conflict. Were lawsuits such as this one cognizable under the ATS, the federal courts

could quickly become embroiled as referees of such conflicts around the world, called upon

whenever civilian casualties occur to adjudge the legitimacy of the military action that caused

them.

The assumption of such a far-reaching role would plainly strain the competence of the

judiciary. Initially, discovery into the knowledge, planning, and motives behind a foreign

military attack would tend to be impracticable: most, if not all, of the relevant evidence would be

in the exclusive control of governments and officials beyond the jurisdiction of the federal

courts; and the information at issue would presumably be mostly classified or otherwise

privileged. *See Holtzman v. Schlesinger*, 484 F.2d 1307, 1310 (2d Cir. 1973) (questions

regarding propriety of military action are beyond judicial management given that, *inter alia*, the

relevant evidence is often "in the hands of foreign governments"). But more fundamentally,

given the lack of a specific, objective standard of decision, even if the relevant information were

discoverable, its "digestion" would in any event often be "beyond judicial management." *Id.* at

1312. Indeed, in non-ATS cases raising issues of military proportionality, courts have generally

abstained on political question grounds, in large part due to a lack of judicially manageable

standards.[29] As the Eleventh Circuit stated in one such case:

> [W]e read the allegations of the complaint . . . as [requiring the court] to discern
> between military, quasi-military, industrial, economic and other strategic targets,

---

[29] *See Linder v. Portocarrero*, 963 F.2d 332, 335 (11th Cir. 1992) (finding no judicially
manageable standards for evaluating decision by Nicaraguan rebels to attack allegedly civilian
targets); *Tiffany v. United States*, 931 F.2d 271, 279 (4th Cir. 1991) ("Judges have no 'judicially
discoverable and manageable standards' for resolving whether necessities of national defense
outweigh risks to civilian aircraft."); *El-Shifa Pharm. Indus. v. United States*, 402 F. Supp. 2d
267, 274 (D.D.C. 2005) (finding no judicially manageable standards for evaluating President's
decision to target pharmaceutical plant based on intelligence that it was a chemical weapons
facility); *Chaser Shipping Corp. v. United States*, 649 F. Supp. 736, 738 (S.D.N.Y. 1986)
(finding no judicially manageable standards in case involving damage to civilian ship from mine
accident); *Nejad v. United States*, 724 F. Supp. 753, 755 (C.D. Cal. 1989) (dismissing claim
against United States for downing Iranian civilian plane during combat with hostile forces);
*Rappenecker v. United States*, 509 F. Supp. 1024, 1025 (N.D. Cal. 1981) (holding claims arising
out of military operations to recover ship from hostile Cambodian forces were nonjusticiable);
*see also Aktepe v. United States*, 105 F. 3d 1400, 1404 (11th Cir. 1997) ("[C]ourts lack standards
with which to assess whether reasonable care was taken to achieve military objectives while
minimizing injury and loss of life."); *but see Koohi v. United States*, 976 F.2d 1328, 1331 (9th
Cir. 1992) (finding suit concerning accidental military shooting of civilian aircraft justiciable).
In *In re Agent Orange*, 373 F. Supp. 2d 7 (E.D.N.Y. 2005), *appeal filed*, No. 05-1953 (2d Cir.
2005), a case challenging the use of Agent Orange in the Vietnam War which *did* include an
ATS claim, the district court found that the political question doctrine did not bar adjudication of
the case, *see id.* at 69; but, given "the inherently subjective judgments necessary to determine
whether the concept [of proportionality] applies," the court refused to recognize a private cause
of action for plaintiffs' proportionality claims under the ATS. *See id.* at 138.

and rule upon the legitimacy of targeting such sites as hydroelectric plants on
Nicaraguan soil in the course of a civil war. We would be called upon to inquire
into whether, and under what circumstances, defendants [Nicaraguan anti-
government leaders and organizations] were justified in targeting such sites, with
knowledge that civilians or paramilitary or military personnel would be present at
these sites. Indeed, we would be called upon to discern between military or
paramilitary personnel guarding a strategic dam and engineers building or
maintaining such a site during time of war. In short, we would necessarily be
required to measure and carefully assess the use of the tools of violence and
warfare in the midst of a foreign civil war . . . .

*Linder*, 963 F.2d at 335. Judges – being "'deficient in military knowledge, lacking vital
information upon which to assess the nature of battlefield decisions, and sitting thousands of
miles from the field of action,'" *Holtzman v. Schlesinger*, 484 F.2d 1307, 1310 (2d Cir. 1973)
(quoting *Da Costa v. Laird*, 471 F.2d 1146, 1155 (2d Cir. 1973)) – are generally in a poor
position to resolve such questions, yet they could be frequently put in this position were claims
such as plaintiffs' deemed cognizable under the ATS.

Moreover, not only do the courts lack a sufficiently reliable compass to become regular
travelers in this subject matter area, but were they to do so, they would inevitably cross paths
with the Executive in its management of foreign affairs. It is an unfortunate fact that violent
conflict remains a virtual constant in human affairs and exists today in numerous parts of the
world – not only in Israel and the occupied territories, but also in Iraq, Afghanistan, Chechnya,
Sudan, Kashmir, and elsewhere. Civilian casualties arising from these hostilities can generate
considerable political and diplomatic controversy, as this case offers but one illustration. When
such controversy arises, it is important for the Executive to be able to speak for the government
with one voice – or, for that matter, to keep silent; given the global leadership role of the United
States, its pronouncements can draw intense international scrutiny and carry significant political
and diplomatic consequences. To allow overseas hostilities to become fodder for federal
lawsuits would invite a stream of unpredictable commentary from the courts, creating "the

-44-

potentiality of embarrassment from multifarious pronouncements by various departments on one question." *Baker v. Carr*, 369 U.S. 186, 217 (1962).[30] Moreover, such suits would subject the foreign states and officials involved to the burdens and embarrassments of litigation, leading to strains in U.S. relations. In both respects, such litigation would undermine the Executive's ability to manage the conflict at issue through diplomatic means, or to avoid becoming entangled in it at all. *See Sosa*, 542 U.S. at 727-28 (warning that "many attempts by federal courts to craft remedies for the violation of new norms of international law would raise risks of adverse foreign policy consequences"); *see also Crosby v. National Foreign Trade Council*, 530 U.S. 363, 386 (2000) ("We have . . . consistently acknowledged that the 'nuances' of 'the foreign policy of the United States . . . are much more the province of the Executive Branch and Congress than of this Court.'") (quoting *Container Corp. of Am. v. Franchise Tax Bd.*, 463 U.S. 159, 196 (1983)).[31]

Of significant interest, Congress specifically paid heed to such foreign policy concerns in drafting the War Crimes Act of 1996, Pub. L. 104-492 (1996), *codified as amended at* 18 U.S.C. § 2441. The statute, as enacted, criminalizes grave breaches of the Geneva Conventions

---

[30] Such pronouncements as to what constitutes a disproportionate use of military force could cause embarrassment to the Executive not only to the extent that those pronouncements might conflict with positions taken by the Executive in its conduct of foreign affairs, but also to the extent that they might conflict with actions taken by the Executive in its conduct of military operations.

[31] As with justiciability concerns, concerns over the potential for judicial intrusion into sensitive areas of foreign policy have led courts to dismiss specific cases on political question grounds. *See, e.g., Schneider v. Kissinger*, 412 F.3d 190, 198 (D.C. Cir. 2005), *cert. denied*, 126 S. Ct. (Apr. 17, 2006) (dismissing FTCA claims against U.S. government official for involvement in coup in Chile); *Whiteman v. Austria*, 431 F.3d 57, 73 (2d Cir. 2005) (dismissing FSIA claims against Austria arising from Nazi confiscation of property in light of U.S. efforts to resolve claims through diplomatic channels); *Corrie*, 403 F. Supp. 2d at 1032 (E.D. Wash. 2005) (dismissing ATS claims against U.S. manufacturers for sale of bulldozers to Israel); *Doe I*, 400 F. Supp. 2d at 111-13 (D.D.C. 2005) (dismissing ATS claims against Israeli government officials regarding lawfulness of Israeli settlement policy).

committed by or against members of the U.S. military or U.S. nationals. *Id.* However, when the

bill was under consideration by Congress, the Executive Branch proposed expanding the scope

of coverage to include grave breaches committed by any individual who was subsequently found

in the United States – regardless of whether that perpetrator, or the victim of the breach, was a

member of the U.S. military or a U.S. national. As explained in the report of the House Judiciary

Committee, this proposal was rejected:

> The Committee decided that the expansion . . . to include universal jurisdiction
> would be . . . unwise at present. *Domestic prosecution based on universal
> jurisdiction could draw the United States into conflicts in which this country has
> no place and where our national interests are slight.* In addition, problems
> involving witnesses and evidence would likely be daunting. This does not mean
> that war criminals should go unpunished. There are ample alternative venues
> available which are more appropriate. Prosecutions can be handled by the nations
> involved or by international tribunal. If a war criminal is discovered in the United
> States, the federal government can extradite the individual upon request in order
> to facilitate prosecution overseas. The Committee is not presently aware that
> these alternative venues are inadequate to meet the task.

H.R. Rep. 104-698, at 8 (1996), 1996 U.S.C.C.A.N. 2166, 2173 (emphasis added). Thus, even in

the *criminal* context, with the check of prosecutorial discretion, Congress was unwilling to

bestow the federal courts with universal jurisdiction to adjudicate even "grave" breaches of the

Geneva Conventions, for fear of the possible foreign policy ramifications. Plainly, then, the

courts have no license to devise, on their own initiative, a *civil* cause of action under federal

common law for breaches of the Geneva Conventions – "grave" or not – as alleged by plaintiffs

here. The fact that Congress has not even ratified the particular provisions of Additional

Protocol I on which plaintiffs rely further underlines the impropriety of courts jumping ahead of

Congress on these issues. *See Sosa*, 542 U.S. at 726 ("[A]lthough we have even assumed

competence to make judicial rules of decision of particular importance to foreign relations, . . .

the general practice has been to look for legislative guidance before exercising innovative

authority over substantive law. It would be remarkable to take a more aggressive role in

exercising a jurisdiction that remained largely in shadow for much of the prior two centuries.")
(citations omitted).

In sum, because any consensus regarding the principle of proportionality exists only "at a
high level of generality," *Sosa* at 736 n.27, and because the transformation of that principle into
the basis for a private cause of action would entail troublesome practical (and potentially
constitutional) problems as between the courts and the Executive, this Court should not
recognize a federal common law cause of action for plaintiffs' claims.

**B.    The TVPA Provides a Narrow Cause of Action That Does Not Encompass Claims
for Civilian Casualties Resulting from the Disproportionate Use of Military Force**

Just as the Court should not create a cause of action for the disproportionate use of
military force under federal common law, nor should it read such a cause of action into the
TVPA. As the *Sosa* Court noted, the TVPA "is confined to specific subject matter" – namely,
torture and "extrajudicial killing." 542 U.S. at 728. While plaintiffs construe the statute's
prohibition of "extrajudicial killing" to cover the deaths of non-targeted civilians in armed
conflict, the statute was not intended to sweep so broadly.[32]

The statutory text indicates that Congress understood "extrajudicial killing" to be an
especially grave offense, entailing more than unintentional civilian deaths. Thus, the term
"extrajudicial killing" is defined in the statute as "a *deliberated* killing not authorized by a
previous judgment pronounced by a regularly constituted court . . . ." TVPA § 3(a) (emphasis
added). The term "deliberated," while to some extent ambiguous, suggests that Congress
intended only to reach killings that are specifically intended, and not the collateral consequence

---

[32] This case does not involve whether the TVPA would create a cause of action for the targeted
killing of Shehadeh himself, and the United States therefore is not addressing that question in
this brief.

of action taken for some other purpose. *See* TVPA House Report at 5, 1992 U.S.C.C.A.N. at 87

("The inclusion of the word 'deliberated' is sufficient . . . to [exclude] killings that lack the

requisite extrajudicial intent, such as those caused by a police officer's authorized use of deadly

force.").[33]  Moreover, the statute's prohibition on "extrajudicial killing" cannot be read in

isolation, but rather must be read in the context of the statute as a whole. *See John Hancock Mut.*

*Life Ins. Co. v. Harris Trust and Sav. Bank*, 510 U.S. 86, 94-95 (1993) (stating that a court's

examination of statutory language is "guided not by a single sentence or member of a sentence,

but look[s] to the provisions of the whole law, and to its object and policy") (internal quotation

marks omitted); *Deal v. United States*, 508 U.S. 129, 132 (1993) (stating as a "fundamental

principle of statutory construction" that the meaning of statutory language "cannot be determined

in isolation, but must be drawn from the context in which it is used").  The fact that the TVPA

pairs "extrajudicial killing" with torture indicates that the conduct Congress sought to reach was

on a moral par with torture, and that both offenses involve unlawful conduct purposefully

undertaken to cause harm to  a specific victim – death in the case of extrajudicial killing, and

physical and mental pain or suffering in the case of torture.  *See* TVPA § 3(b) (defining torture to

involve such harm of an individual where the harm is "intentionally inflicted on that

individual").

The legislative history squarely confirms these conclusions.  Both the House and Senate

reports repeatedly use the term "extrajudicial killings" interchangeably with "summary

---

[33] While the Report says "include" rather than "exclude," the context in which the statement
occurs makes clear that this is a typographical error.

executions." *See* TVPA House Report at 3-4; TVPA Senate Report at 3-5.[34]  The term

"summary execution" plainly implies a specific intent to kill, as the examples given in the

legislative history illustrate.  Thus, the House Report explains that the statute was intended to

codify the holding of *Filartiga v. Pena-Irala, supra,* in which the Second Circuit allowed an

alien to bring suit under the ATS over the death of a family member who had been "tortured to

death" by an official of a foreign government.  TVPA House Report at 3-4, 1992 U.S.C.C.A.N.

at 86.  The Senate Report likewise explains that the statute is targeted at acts of such depravity,

citing a report that in the year preceding the statute's enactment there were "100 deaths attributed

to torture in over 40 countries and 29 extrajudicial killings by death squads."  TVPA Senate

Report at 3.  These acts are of a different order compared to unintended civilian deaths resulting

from military operations, which the term "summary execution" simply does not fit.

    As further made clear in the legislative history, the statute singles out "summary

executions" along with torture because Congress viewed both as uniquely incontrovertible

human rights violations.  *See* TVPA House Report at 2, 1992 U.S.C.C.A.N. at 85 ("Official

torture and summary execution violate standards accepted by virtually every nation."); TVPA

Senate Report at 8 ("[N]o state officially condones torture or extrajudicial killings."); 135 Cong.

Rec. H6423, H6424 (daily ed. Oct. 2, 1989) (statement of Rep. Fascell) ("We cannot allow

individuals to get away with conduct that violates the most basic human rights."); 134 Cong.

Rec. H9692 (daily ed. Oct. 5, 1988) (statement of Rep. Leach) ("We are dealing with one of the

most awful crimes imaginable to the human mind, that of torture."); 133 Cong. Rec. S3900

---

[34] *See also* TVPA Senate Report at 4 (explaining that the statute accords with a revised draft of
the Restatement of Foreign Relations Law of the United States, described as providing that
"there should be a cause of action where a state practices '[summary] murder'").

(daily ed. Mar. 25, 1987) (statement of Sen. Leahy) ("Torture and extrajudicial killing are the most insidious forms of human rights violations . . . ."). Yet, again, there is no such categorical consensus concerning what acts are prohibited by the principle of proportionality. Thus, interpreting the TVPA to cover non-purposeful civilian casualties caused by the use of military force would transform a statute intended to supply an "unambiguous" cause of action, TVPA House Report at 3, into one requiring highly debatable applications of international law. Congress did not intend to authorize such a judicial venture into unknown territory. *See Sosa*, 542 U.S. at 728 ("We have no congressional mandate to seek out and define new and debatable violations of the law of nations, and modern indications of congressional understanding of the judicial role in the field [including the TVPA] have not affirmatively encouraged greater judicial creativity.").

Indeed, allowing plaintiffs to bring their claims under the auspices of the TVPA would give rise to the same undesirable "practical consequences" that would follow were plaintiffs' claims recognized under federal common law: it would invite a flood of cases seeking for the federal courts to regulate the proportionality of military operations in armed conflicts worldwide. There is no reason to believe that Congress intended to so burden the courts, or to create such potential for conflict with the Executive's management of foreign affairs. Indeed, at the time the TVPA was enacted, the Executive expressed serious concern that cases brought under the statue could complicate diplomatic relations with other nations. *See* TVPA Senate Report at 14-15. In response, the proponents of the statute stressed that it was intended to be of narrow scope and was not anticipated to give rise to a large number of cases. *See* 137 Cong. Rec. S1369, S1378 (daily ed. Sep. 25, 1991) (statement of Sen. Specter) ("Let me emphasize that the bill is a limited measure. It is estimated that only a few of these lawsuits will ever be brought."); 135 Cong. Rec.

H6423, H6424 (daily ed. Oct. 2, 1989) (statement of Rep. Bereuter) ("The Torture Victim

Protection Act is very specific and narrowly drawn legislation, and as such is unlikely to result in

an inappropriately large number of lawsuits.").[35] Yet plaintiffs' reading of the statute would put

the courts in the position of having to field all manner of disputes arising from foreign armed

conflicts – disputes that generally lie beyond the competence of the judiciary to resolve and that

are rife with potential for foreign-policy conflicts of precisely the kind the Executive forewarned

against. Congress plainly had no such far-reaching agenda in enacting the statute. Accordingly,

the Court should not construe the TVPA to provide a cause of action for plaintiffs' claims.[36]

––––––––––––––––––

[35] Along similar lines, President George H.W. Bush emphasized that courts should take care not
to exceed the narrowly drawn bounds of the statute:

> There is . . . a danger that U.S. courts may become embroiled in difficult and
> sensitive disputes in other countries, and possibly ill-founded or politically
> motivated suits, which have nothing to do with the United States and which offer
> little prospect of successful recovery. Such potential abuse of this statute
> undoubtedly would give rise to serious frictions in international relations and
> would also be a waste of our own limited and already overburdened judicial
> resources. . . . It is to be hoped that U.S. courts will be able to avoid these
> dangers by sound construction of the statute and the wise application of relevant
> legal procedures and principles.

Statement by President George Bush upon Signing H.R. 2092 (Mar. 12, 1992), 1992
U.S.C.C.A.N. 91 (paragraph structure altered).

[36] These same concerns – over judicial competence and interference with the Executive's
conduct of foreign affairs – sound as well under the political question doctrine, *see supra* nn. 29
& 31; and if plaintiffs had a valid cause of action by which to bring their claims, there would be
a serious issue whether this *particular* case should be dismissed on political question grounds, as
Dichter argues. *See Planned Parenthood Fed'n of Am., Inc. v. Agency for Int'l Dev.*, 838 F.2d
649, 655 (2d Cir. 1988) ("In determining whether a case presents a non-justiciable political
question, the court must first make a 'discriminating inquiry into the precise facts and posture of
the particular case.'") (quoting *Baker*, 369 U.S. at 217). Other courts have dismissed cases
arising out of foreign hostilities on political question grounds precisely to protect the
prerogatives of the Executive Branch. *E.g., Doe I*, 400 F. Supp. 2d at 111-13 (dismissing claims
arising from Israeli-Palestinian conflict found to interfere with Executive's foreign-policy
prerogatives); *Mujica v. Occidental Petroleum Corp.*, 381 F. Supp.2d 1164, 1195 (C.D. Cal.
2005) (dismissing claim arising from bombing campaign in Colombia found to interfere with
(continued...)

## CONCLUSION

For the reasons above, the United States takes the view that the defendant is immune

from suit for the official acts alleged in this lawsuit and that plaintiffs' complaint fails in any

event to state a valid federal cause of action.

Dated: New York, New York
       November 17, 2006

JOHN B. BELLINGER, III            MICHAEL J. GARCIA
Legal Adviser,                    United States Attorney for the
Department of State               Southern District of New York

JEFFREY S. BUCHOLTZ          By:  _____/s/ Serrin Turner_____
Acting Assistant Attorney General SERRIN TURNER (ST-0646)
                                  DAVID S. JONES (DJ-5276)
ORI LEV                           Assistant United States Attorneys
Senior Trial Counsel              86 Chambers Street, 3rd Floor
Department of Justice, Civil Division  New York, New York 10007
Federal Programs Branch           Tel No. (212) 637-2701
                                  Fax No. (212) 637-2686

---

Executive's right to respond to human rights violations); *Linder v. Portocarrero*, 747 F. Supp.
1452, 1468-69 (S.D. Fla. 1992) (dismissing claims arising from Contras' operations in Nicaragua
found to interfere with Executive's ability to conduct foreign policy in a civil war). However,
the Court need not reach this issue. The problem with the plaintiffs' case – and the United
States' interest in its dismissal – is generic: recognition of a private cause of action for the
disproportionate use of military force would create a systemic and continuing source of
justiciability problems for the courts and conflicts with the Executive's conduct of foreign
policy. Because there is no reason for the courts to recognize such a cause of action, whether
under federal common law or the TVPA, these difficulties can and should be *categorically*
avoided.

# EXHIBIT H

**FILED**

**FOR PUBLICATION**

AUG 20 2007

UNITED STATES COURT OF APPEALS

CATHY A. CATTERSON, CLERK
U.S. COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| ALEXIS HOLYWEEK SAREI; PAUL E. NERAU; THOMAS TAMAUSI; PHILLIP MIRIORI; GREGORY KOPA; METHODIUS NESIKO; ALOYSIUS MOSES; RAPHEAL NINIKU; GABRIEL TAREASI; LINUS TAKINU, LEO WUIS; MICHAEL AKOPE; BENEDICT PISI; THOMAS KOBUKO; JOHN TAMUASI; NORMAN MOUVO; JOHN OSANI; BEN KORUS; NAMIRA KAWONA; JOANNE BOSCO; JOHN PIGOLO; MAGDALENE PIGOLO, individually and on behalf of themselves and all others similarly situated, | No. 02-56256<br><br>D.C. No. CV-00-11695-MMM |
| Plaintiffs - Appellants, | |
| V. | |
| RIO TINTO, PLC; RIO TINTED LIMITED, | |
| Defendants - Appellees. | |

| | |
|---|---|
| ALEXIS HOLYWEEK SAREI; PAUL E. NERAU; THOMAS TAMAUSI; PHILLIP MIRIORI; GREGORY KOPA; METHODIUS NESIKO; ALOYSIUS MOSES; RAPHEAL NINIKU; GABRIEL TAREASI; LINUS TAKINU, LEO WUIS; | No. 02-56390<br><br>D.C. No. CV-00-11695-MMM<br><br>ORDER |

MICHAEL AKOPE; BENEDICT PISI;
THOMAS KOBUKO; JOHN TAMUASI;
NORMAN MOUVO; JOHN OSANI;
BEN KORUS; NAMIRA KAWONA;
JOANNE BOSCO; JOHN PIGOLO;
MAGDALENE PIGOLO, individually and
on behalf of themselves and all others
similarly situated,

      Plaintiffs - Appellees,

 V.

RIO TINTO, PLC; RIO TINTED
LIMITED,

      Defendants - Appellants.

Before: SCHROEDER, Chief Judge.

Upon the vote of a majority of nonrecused regular active judges of this court,[*] it is ordered that this case be reheard by the en banc court pursuant to Circuit Rule 35-3.  The three-judge panel opinion shall not be cited as precedent by or to this court or any district court of the Ninth Circuit, except to the extent adopted by the en banc court.

_____

[*]Judges Hawkins and Wardlaw are recused.

2