1   DANIEL M. PETROCELLI (S.B. #97802)
    dpetrocelli@omm.com
2   MATTHEW T. KLINE (S.B. #211640)
    mkline@omm.com
3   O'MELVENY & MYERS LLP
    1999 Avenue Of The Stars
4   Los Angeles, California 90067-6035
    Main Number: (310) 553-6700
5   Facsimile: (310) 246-6779

6   Attorneys for Defendant YAHOO!, INC. and
    Specially Appearing Defendant YAHOO!
7   HOLDINGS (HONG KONG), LTD.

8
                    UNITED STATES DISTRICT COURT
9               NORTHERN DISTRICT OF CALIFORNIA
                        OAKLAND DIVISION
10

11  WANG XIAONING, YU LING, SHI TAO,       Case No. C07-02151 CW
    and ADDITIONAL PRESENTLY
12  UNNAMED AND TO BE IDENTIFIED           DECLARATION OF MATTHEW T.
    INDIVIDUALS,                           KLINE IN SUPPORT OF DEFENDANT
13                                         YAHOO!, INC.'S OPPOSITION TO
                        Plaintiff,         PLAINTIFFS' MOTION TO ENLARGE
14                                         TIME
            v.
15                                         Judge:  Hon. Claudia Wilken
    YAHOO!, INC., a Delaware Corporation,
16  YAHOO! HONG KONG, LTD., a Foreign
    Subsidiary of Yahoo!, AND OTHER
17  PRESENTLY UNNAMED AND TO BE
    IDENTIFIED INDIVIDUAL EMPLOYEES
18  OF SAID CORPORATIONS,

19                      Defendant.

20

21  I, MATTHEW T. KLINE, declare:

22      1.      I am an attorney in the law firm of O'Melveny & Myers, LLP, attorney of record

23  for defendant Yahoo!, Inc. ("Yahoo!") and specially appearing for defendant Yahoo! Holdings

24  (Hong Kong), Ltd. ("YHKL").  Pursuant to Civil Local Rule 6-3(c), I submit this declaration in

25  support of Defendants' Opposition to Plaintiffs' Motion to Enlarge Time.  Except where

26  otherwise indicated, I have personal knowledge of the facts stated herein and, if called as a

27  witness, I could and would testify competently thereto.

28      2.      A true and correct copy of Defendant Yahoo!, Inc's Motion to Dismiss is attached

C07-02151 CW
DECL. OF M. KLINE

1    hereto as Exhibit A.

2        3.    A true and correct copy of Defendant Yahoo!, Inc's Special Motion to Strike

3    Plaintiffs' State Law Causes of Action Pursuant to the California Anti-SLAPP Statute is attached

4    hereto as Exhibit B.

5        4.    I participated in the meet-and-confer telephone conferences and other

6    communications with Plaintiffs' counsel on September 7, 10, 12 and 13 referenced by Morton

7    Sklar in his Declaration Supporting Plaintiffs' Motion to Enlarge Time.  Mr. Sklar is correct that

8    Defendants' counsel repeatedly asked for a more specific description of the jurisdictional

9    discovery Plaintiffs seek to take in this case.  However, Mr. Sklar's statement that he "provided

10   Defense Counsel with a detailed description of the limited discovery" Plaintiffs are requesting is

11   incorrect.  (Sklar Decl. ¶ 7.)  During the telephone conference on September 10, Mr. Sklar

12   provided Defendants' counsel only high-level generalities concerning the broad topics of

13   discovery Plaintiffs were seeking.  During this call, I requested that Plaintiffs provide a copy of

14   their written discovery proposal before filing their motion with the Court to allow Defendants to

15   consider Plaintiffs' specific discovery requests and meaningfully respond.  Plaintiffs never did so

16   before filing these Motions on September 14.

17       5.    During the telephone conferences on September 7 and 10, I also requested that

18   Plaintiffs provide specific citations to case law or other authority that Plaintiffs contended

19   supported their entitlement to discovery into the claims in Yahoo!'s Motion to Dismiss.  In

20   response, Mr. Sklar provided two case citations taken from the annotated version of the Federal

21   Rules of Civil Procedure, which nowhere appear in Plaintiffs' Discovery Motion, and never

22   provided Defendants with citations to any of the cases actually cited in Plaintiffs' Discovery

23   Motion before it was filed on September 14.

24       6.    I drafted the email from which Mr. Sklar selectively quotes in paragraph 11 of his

25   Declaration.  I told Mr. Sklar that this email was being sent in an effort to avoid confusion and to

26   clearly outline our position on his proposed motions.  I asked that he attach the email to his

27   motion to inform the Court of Defendants' positions, but Mr. Sklar declined to place the entire

28   email before the Court.  A true and correct copy of that email is attached hereto as Exhibit C and

1    reproduced below.

2        Morton,
         Following up on our various conversations, you have informed us in general terms
3    about motions you intend to file concerning the three motions we filed on August
     27.  We thought it would be useful to send you a short summary of our response to
4    your assertions:

5
     1)    You have told us you will file a motion to "hold in abeyance" Yahoo, Inc.!'s
6    Motion to Dismiss and SLAPP Motion, in order to take limited discovery related to
     these motions.  We will oppose this motion for at least the following reasons:
7        First, neither motion turns on disputed facts; both accept as true the facts
     alleged in the second amended complaint.  There is no need for discovery to
8    oppose these motions.  Despite our invitation, you have not provided us with case
     authority demonstrating your right to indefinitely postpone the resolution of our
9    motions in order to obtain discovery.
         Second, the federal rules permit the filing of motions to dismiss at the threshold
10   of a case in order to test plaintiffs' legal claims and theories before costly litigation
     ensues.  As we have explained in our motions, we think your complaint fails to state
11   a cognizable legal claim, much less one that is justiciable.  We seek a ruling from
     the court on these arguments.
12       Third, to the extent you believe you need discovery on certain factual issues in
     order to oppose all or parts of our motion, you have refused to identify the specific
13   discovery you need or the issues in our motion to which such discovery relates.
         Fourth, the motion to initiate discovery is unnecessary.  The Court has not
14   stayed discovery in the case; nor have you initiated any discovery; nor have we
     indicated we will take the position there should be no discovery.
15       Fifth, your perceived need for certain limited—though unspecified—discovery
     is not cause to file no response at all to our motions.  Certainly, there are many
16   arguments and issues in our motions to which you can respond without any
     professed need for discovery.  You should oppose our motions and specifically
17   identify those arguments to which you believe you cannot respond absent
     discovery.  Once you've made your arguments and explained where a factual
18   disputes remain, we and the Court can then evaluate your position, and we can
     either agree to your request, or failing that, litigate the issue.
19       Sixth, as to YHKL's motion to dismiss for lack of personal jurisdiction, you
     have not identified the discovery you need to oppose the motion.  If and when you
20   do, we will be in a position to evaluate our response.  As of now, you've given us
     no specifics.
21
     2)    You have told us you will file a motion seeking a three-week continuance of
22   the September 26 deadline for opposing defendants' three pending motions.
     Because, as you have explained, you seek this extension in order to file and
23   accelerate your first motion—which seeks to indefinitely postpone your response to
     defendants' motions—we anticipate opposing this motion.
24       This, of course, is not a complete statement of our views on these issues--just
     our reactions based on the conversations we've had.  But we wanted you to have our
25   basic position before you filed your motions.

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Thanks,
Matt

7.      A true and correct copy of Defendants' Motion for an Early Case Management Conference and Order, filed June 21, 2007, is attached hereto as Exhibit D.

8.      A true and correct copy of the parties' Joint Stipulation Re: Withdrawal of the Plaintiffs' Motion for Leave to File Second Amended Complaint, Re: Filing of Second Amended Complaint, and Re: Extending Time Deadlines Accordingly, filed July 19, 2007, is attached hereto as Exhibit E.  This Stipulation was jointly negotiated and agreed to by Plaintiffs' counsel.

9.      I participated in several telephone conversations with Mr. Sklar regarding scheduling issues prior to the filing of the July 19 Stipulation.  During these and prior calls, Mr. Sklar expressed a desire to avoid delays in the case, arguing that delay would prejudice Plaintiffs due to their current incarceration in Chinese prisons.  Defendants requested that more time be built into the schedule than is reflected in the July 19 Stipulation, but Plaintiffs refused, and the parties ultimately agreed to the current briefing schedule as described in the July 19 Stipulation.

10.      A true and correct copy of the Declaration of Morton Sklar in Support of Plaintiffs' Opposition to Defendants' Motion for an Early Case Management Conference and Order is attached hereto as Exhibit F.

11.      A true and correct copy of Plaintiffs' Opposition to Defendants' Motion for an Early Case Management Conference and Order is attached hereto as Exhibit G.


I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.  Executed in Los Angeles, California on this 19th day of September 2007.


        /s/  Matthew T. Kline
              Matthew T. Kline

# EXHIBIT A

1  DANIEL M. PETROCELLI (S.B. #97802)
   dpetrocelli@omm.com
2  MATTHEW T. KLINE (S.B. #211640)
   mkline@omm.com
3  O'MELVENY & MYERS LLP
   1999 Avenue of the Stars, 7th Floor
4  Los Angeles, CA  90067-6035
   Telephone:    (310) 553-6700
5  Facsimile:    (310) 246-6779
   Attorneys for Defendant YAHOO!, INC and
6  Specially Appearing Defendant YAHOO! HONG
   KONG, LTD.
7

8                    UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF CALIFORNIA
9                        OAKLAND DIVISION

10 WANG XIAONING, YU LING, SHI          Case No.  C07-02151 CW
   TAO, and ADDITIONAL PRESENTLY
11 UNNAMED AND TO BE IDENTIFIED         CORRECTED VERSION: DEFENDANT
   INDIVIDUALS,                         YAHOO!, INC.'S MOTION TO DISMISS
12                                      PLAINTIFFS' SECOND AMENDED
                  Plaintiffs,           COMPLAINT; PROPOSED ORDER
13
        v.
14                                      Date:      November 1, 2007
                                        Time:      2 p.m.
15 YAHOO! INC., a Delaware Corporation, Location:  Courtroom 2
   YAHOO! HONG KONG, LTD., a Foreign
16 Subsidiary of Yahoo!, AND OTHER      Judge:     Hon. Claudia Wilken
   PRESENTLY UNNAMED AND TO BE
17 IDENTIFIED INDIVIDUAL
   EMPLOYEES OF SAID
18 CORPORATIONS,

19                Defendants.

20 TO PLAINTIFFS AND THEIR COUNSEL OF RECORD:

21         PLEASE TAKE NOTICE THAT ON November 1, 2007, at 2 p.m., defendant Yahoo!,

22 Inc. ("Yahoo!") will and hereby does move to dismiss, with prejudice, plaintiffs' second amended

23 complaint ("complaint"), which was filed July 30, 2007.  Yahoo! brings this motion pursuant to

24 Rules 12(b)(1), (6), and (7) of the Federal Rules of Civil Procedure.  This motion is based on this

25 notice of motion and motion, the following memorandum of points and authorities, the pleadings

26 on file in this matter, the reply memorandum Yahoo! intends to file, and any further argument the

27 Court might allow.

28
   C07-02151 CW
   YAHOO!'S MOT. TO DISMISS SEC. AM.
   COMPL

1      Without waiving its objection to the exercise of personal jurisdiction in this case, specially

2  appearing defendant Yahoo! Hong Kong, Ltd. ("YHKL") joins this motion.

3      Dated: August 30, 2007                 DANIEL M. PETROCELLI
                                              MATTHEW T. KLINE
4                                             O'MELVENY & MYERS LLP

5

6                                             By: _____
7                                                     Daniel M. Petrocelli
                                              Attorneys for Defendant Yahoo! Inc and for
8                                             specially appearing defendant Yahoo! Hong
                                              Kong, Ltd.
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

C07-02151 CW
YAHOO!'S MOT. TO DISMISS SEC. AM.              - 2 -
COMPL.

# TABLE OF CONTENTS

I.  Introduction ........................................................................................................... 1

II.  Summary Of Plaintiffs' Allegations ..................................................................... 2

III.  Plaintiffs Claims Are Not Justiciable. ................................................................. 4

    A.  This Case Should Be Dismissed Under The Act Of State Doctrine. ................. 5

        1.  This Case Directly Challenges Sovereign Acts Of The PRC. ...................... 5

          a.  Judging PRC Speech Laws. ..................................................................... 5

          b.  Judging The PRC's Treatment Of Plaintiffs. ......................................... 7

          c.  Judging The PRC's Ability To Gather Evidence. ................................... 7

        2.  The *Sabbatino* Factors All Favor Dismissal. ............................................. 8

    B.  This Case Should Be Dismissed Under Principles Of International Comity.................... 12

    C.  This Case Should Be Dismissed Under The Political Question Doctrine. ........................ 14

IV.  Plaintiffs Have Failed To State A Cognizable Claim. ....................................... 15

    A.  Plaintiffs Have Failed To State A Claim Under The ATS. .............................. 15

        1.  Plaintiffs' Allegations Do Not Meet *Sosa*'s "High Bar." ......................... 15

        2.  The ATS Does Not Apply Extraterritorially. ............................................. 16

        3.  The Norms Plaintiffs Invoke Are Not Actionable Under The ATS............. 16

          a.  Preemption. ........................................................................................... 16

          b.  Free Speech. .......................................................................................... 17

          c.  Forced Labor ......................................................................................... 18

        4.  Defendants Cannot Be Held Liable On Plaintiffs' ATS Theories. .............. 19

          a.  State Action. .......................................................................................... 20

          b.  Aiding and Abetting. ............................................................................. 20

    B.  Plaintiffs Have Failed to State a Claim Under The TVPA. .............................. 23

    C.  Plaintiffs Have Failed To State A Claim Under ECPA. ................................... 24

    D.  Plaintiffs Have Failed to State a Claim Under California Law.......................... 27

        1.  The Foreign Affairs Doctrine Preempts Plaintiffs' California Claims. .......... 27

        2.  Plaintiffs Cannot Establish Their Intentional Tort Claims.......................... 28

          a.  Aiding-and-Abetting Liability................................................................ 28

**TABLE OF CONTENTS**
**(Continued)**

       b.  Direct Liability. .......................................................................................... 29

   3.    Plaintiffs Do Not State a Claim for Negligence. .......................................... 29

   4.    Plaintiffs Do Not State a Claim For Unfair Competition. ............................. 31

  E.    Defendants' Communications With The PRC Are Protected From Liability. ................. 32

   1.    The Communications Are Protected Under Federal Law. ............................. 32

   2.    Plaintiffs' Claims Are Barred By California's Statutory Privilege ................. 35

   3.    Plaintiffs' International Law Claims Are Similarly Barred. .......................... 36

V.    Plaintiffs Failed To Join An Indispensible Party ................................................. 37

 A.    The PRC Is A Necessary Party. ......................................................................... 37

 B.    The PRC Cannot Be Joined. ............................................................................. 38

 C.    The PRC Is Indispensable. ................................................................................ 38

VI.    Plaintiffs' Counsel May Lack Authority To Bring This Suit. ............................... 39

VII.    Conclusion ............................................................................................................ 40

# TABLE OF AUTHORITIES

**Page**

## CASES

*Abdullahi v. Pfizer, Inc.*, 2002 WL 31082956 (S.D.N.Y. Sept. 17, 2002)..................................20

*Aldana v. Del Monte Fresh Produce, N.A., Inc.*, 416 F.3d 1242 (11th Cir. 2005) ..............17, 24

*American Ins. Ass'n v. Garamendi*, 539 U.S. 396 (2003)................................................14, 27, 28

*Ameritech Corp. v. McCann*, 403 F.3d 908 (7th Cir. 2005) ........................................................27

*Anderman v. Fed. Rep. of Austria*, 256 F. Supp. 2d 1098 (C.D. Cal. 2003)...............................15

*Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428 (1989) ............................25

*Arndt v. UBS AG*, 342 F. Supp. 2d 132 (S.D.N.Y. 2004) ............................................................24

*Artiglio v. Corning Inc.*, 18 Cal. 4th 604 (Cal. 1998) .................................................................30

*Baker v. Carr*, 369 U.S. 186 (1962)...........................................................................................14

*Baker v. Superior Ct.*, 129 Cal. App. 3d 710 (Cal. Ct. App. 1982) ...........................................31

*Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398 (1964).............................................*passim*

*Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955 (2007) ........................................................2, 15, 18

*Berlin Democratic Club v. Rumsfeld*, 410 F. Supp. 144 (D.C. D.C. 1976) ...............................25

*Beroiz v. Wahl*, 84 Cal. App. 4th 485 (Cal. Ct. App. 2000)........................................................36

*Bigio v. Coca-Cola Co.*, 239 F.3d 440 (2d Cir. 2000) ...............................................................12

*Bohach v. City of Reno*, 932 F. Supp. 1232 (D. Nev. 1996) .......................................................27

*Bonneville Power Admin. v. FERC*, 422 F.3d 908 (9th Cir. 2005).............................................24

*Borg v. Boas*, 231 F.2d 788 (9th Cir. 1956)...............................................................................33

*Boulware v. State of Nev. Dept. of Human Res.*, 960 F.2d 793 (9th Cir. 1992)........................35

*Branch v. Tunnell*, 14 F.3d 449 (9th Cir. 1994)..........................................................................3

*Brown v. Edwards,* 721 F.2d 1442 (5th Cir. 1984) ....................................................................33

*Cabello v. Fernandez-Larios*, 402 F.3d 1148 (11th Cir. 2005) ................................................24

*Capri Trading Corp. v. Bank Bumiputra Malaysia Berhad*, 812 F. Supp. 1041
    (N.D. Cal. 1993)......................................................................................................................38

*Center for Biological Diversity v. FPL Group, Inc.*, 2006 WL 2987634 (Cal.
    Superior Ct., Oct. 13, 2006)....................................................................................................32

*Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S.
    164 (1994)...............................................................................................................21, 22, 24

*Christensen v. Superior Ct.*, 54 Cal. 3d 868 (Cal. 1991) ...........................................................29

*Cohen v. McIntyre*, 16 Cal. App. 4th 650 (Cal. Ct. App. 1993) ................................................31

*Colgan v. Leatherman Tool Group, Inc.*, 135 Cal. App. 4th 663
    (Cal. Ct. App. 2006)................................................................................................................32

*Conroy v. Regents of Univ. of Calif.*, 151 Cal. App. 4th 132
    (Cal. Ct. App. 2007)................................................................................................................29

*Consol. Rendering Co. v. Vermont*, 207 U.S. 541 (1908)............................................................7

**TABLE OF AUTHORITIES**
(Continued)

*Corrie v. Caterpillar, Inc.*, 403 F. Supp. 2d 1019 (W.D. Wa. 2005) .................................. *passim*

*Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363 (2000) .................................................. 14

*Daro v. Superior Court*, 151 Cal. App. 4th 1079 (2007) .......................................................... 32

*Davidson v. City of Westminster*, 32 Cal. 3d 197 (Cal. 1982) .................................................. 29

*Davis v. United States*, 192 F.3d 951 (10th Cir. 1999) ............................................................. 37

*Dawavendewa v. Salt River Project Agr. Imp. & Power Dist.*, 276 F.3d 1150
    (9th Cir. 2002) ................................................................................................. 37, 38, 39

*Dayton Coal & Iron Co. v. Barton*, 183 U.S. 23 (1901) ............................................................. 7

*Doe I v. Exxon Mobil Corp.*, 393 F. Supp. 2d 20 (D.D.C. 2005) .................................... 20, 23, 24

*Doe v. Qi*, 349 F. Supp. 2d 1258 (N.D. Cal. 2004) ................................................................ *passim*

*Doe v. Saravia*, 348 F. Supp. 2d 1112 (E.D. Cal. 2004) ...................................................... 17, 24

*Dorn v. Mendelzon*, 196 Cal. App. 3d 933 (Cal. Ct. App. 1987) .............................................. 36

*Dragon Capital Partners L.P. v. Merrill Lynch Capital Servs. Inc.*, 949 F. Supp.
    1123 (S.D.N.Y. 1997) ..................................................................................................... 39

*E. & J. Gallo Winery v. Andina Licores, S.A.*, Case No. CV F 05-0101, 2006 U.S.
    DIST. LEXIS 47206 (E.D. Cal. June 30, 2006) ................................................................... 36

*Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*,
    365 U.S. 127 (1961) ........................................................................................................ 35

*EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244 (1991) ................................................................ 16

*EEOC v. Peabody Western Coal Co.*, 400 F.3d 774 (9th Cir. 2005) .......................................... 38

*Enahoro v. Abubakar*, 408 F.3d 877 (7th Cir. 2005) ............................................................... 17

*Estate of Rabinowitz*, 114 Cal. App. 4th 635 (2003) ............................................................... 39

*Estate of Stephens*, 28 Cal. 4th 665 (Cal. 2002) ..................................................................... 29

*Evers v. Custer County*, 745 F.2d 1196 (9th Cir. 1984) ........................................................... 35

*Fermino v. Fedco, Inc.*, 7 Cal. 4th 701 (Cal. 1994) ................................................................. 29

*Fiol v. Doellstedt*, 50 Cal. App. 4th 1318 (Cal. Ct. App. 1996) ............................................... 29

*Foltz v. Moore McCormack Lines, Inc.*, 189 F.2d 537 (2d Cir. 1951) ...................................... 33

*Forro Precision, Inc. v. Int'l Bus. Machs.*, 673 F.2d 1045 (9th Cir. 1982) ......................... 35, 36

*Freedman v. America Online, Inc.*, 412 F. Supp. 2d 174 (D. Conn. 2005) ............................... 26

*Friedman v. Merck & Co.*, 107 Cal. App. 4th 454 (Cal. Ct. App. 2003) ................................... 30

*Gerard v. Ross*, 204 Cal. App. 3d 968 (Cal. Ct. App. 1988) ................................................... 28

*Guinto v. Marcos*, 654 F. Supp. 276 (S.D. Cal. 1986) ......................................................... 6, 17

*Hagberg v. Calif. Fed. Bank FSB*, 32 Cal. 4th 350 (Cal. 2004) .......................................... 35, 36

*Hamid v. Price Waterhouse*, 51 F.3d 1411 (9th Cir. 1995) ..................................................... 26

*Hamilton v. Martinelli & Associates*, 110 Cal. App. 4th 1012 (Cal. Ct. App. 2003) ................. 31

*Herrle v. Estate of Marshall*, 45 Cal. App. 4th 1761 (Cal. Ct. App. 1996) .............................. 30

*Holmes v. Eddy*, 341 F.2d 477 (4th Cir. 1965) ....................................................................... 33

*Howard v. Superior Ct.*, 2 Cal. App. 4th 745 (Cal. Ct. App. 1992) .......................................... 28

**TABLE OF AUTHORITIES**
(Continued)

*Ibrahim v. Titan Corp.*, 391 F. Supp. 2d 10 (D.D.C. 2005)..........................................20

*Ileto v. Glock*, 194 F. Supp. 2d 1040 (C.D. Cal. 2002)................................................30

*In re Calpine Corp. Sec. Litig.*, 288 F. Supp. 2d 1054 (N.D. Cal. 2003)........................3

*In re Estate of Ferdinand Marcos*, 25 F.3d 1467 (9th Cir. 1994).................................6

*In re Estate of Marcos Human Rights Litig.*, 978 F.2d 493 (9th Cir. 1992) ................20

*In re Quarles*, 158 U.S. 532 (1895) .............................................................12, 32, 33

*In re Republic of the Phil.*, 309 F.3d 1143 (9th Cir. 2002)........................................38

*In re Retail Chemists Corp,* 66 F. 2d 605 (2d Cir. 1933)...........................................40

*In re South Afr. Apartheid Litig.*, 346 F. Supp. 2d 538 (S.D.N.Y. 2004) ............20, 21, 24

*Interamerican Refining Corp. v. Texaco Maracaibo, Inc.*, 307 F. Supp. 1291
(D. Del. 1970) ......................................................................................................34

*Joo v. Japan*, 413 F.3d 45 (D.C. Cir. 2005).............................................................14

*Kadic v.Karadzic*, 70 F.3d 232 (2d Cir. 1995).........................................................20

*Khulumani et al. v. Barclay Nat'l Bank Ltd., et al.*, No. 05-2141 (2nd Cir. 2005)....................21

*Knight v. Jewett*, 3 Cal. 4th 296 (Cal. 1992) ...........................................................30

*Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134 (Cal. 2003)...........................32

*Liu v. Republic of China*, 892 F.2d 1419 (9th Cir. 1989) .........................................8, 12

*McDonald v. Smith*, 472 U.S. 479 (1985)................................................................33

*Meredith v. Ionian Trader*, 279 F. 2d 471 (2d Cir. 1960)........................................2, 39

*Morales v. Coop. of Am. Physicians, Inc*, 180 F.3d 1060 (9th Cir. 1999)................................35

*Moser v. Ratinoff*, 105 Cal. App. 4th 1211 (Cal. Ct. App. 2003) ...........................................30

*Mujica v. Occidental Petroleum Corp.*, 381 F. Supp. 2d 1164 (C.D. Cal. 2005)...........23, 24, 28

*Noel v. River Hills Wilsons, Inc.*, 113 Cal. App. 4th 1363 (Cal. Ct. App. 2003).......................36

*Oregon Natural Res. Council v. Mohla*, 944 F.2d 531 (9th Cir. 1991)  ...............................35

*Palmer v. Roosevelt Lake Log Owners Ass'n.*, 551 F. Supp. 486 (D. Wash. 1982) .................35

*Panama Processes, S.A. v. Cities Services Co.*, 650 F.2d 408 (2d Cir. 1981)..........................35

*Pollock v. Williams*, 322 U.S. 4 (1944).....................................................................19

*Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82 (D.C. Cir. 2002)...........18, 24

*Pueblo of Santa Rosa v. Fall*, 273 U.S. 315 (1927)..............................................2, 39

*Quarles*, Vogel v. Gruaz, 110 U.S. 311 (1884) .......................................................33

*Radiation Sterilizers, Inc. v. U.S.*, 867 F. Supp. 1465 (E.D. Wash. 1994) ..............................35

*Ratzlaf v. United States*, 510 U.S. 135 (1994) ........................................................24

*Ricci v. State Bd. of Law Examiners*, 569 F.2d 782 (3d Cir. 1978) ......................................37

*Rivendell Forest Prods., Ltd. v. Canadian Forest Prods.*, 810 F. Supp. 1116
(D. Colo. 1993) ....................................................................................................14

*Rosenbloom v. Hanour Corp.*, 66 Cal. App. 4th 1477 (Cal. Ct. App. 1998).........................30

*Saffro v. Elite Racing, Inc.*, 98 Cal. App. 4th 173 (Cal. Ct. App. 2002)..................................30

**TABLE OF AUTHORITIES**
(Continued)

*Sale v. Haitian Ctrs. Council*, 509 U.S. 155 (1993) ................................ 25

*Sarei v. Rio Tinto*, 456 F.3d 1069 (9th Cir. 2006) ................................ 20

*Saudi Arabia v. Nelson*, 507 U.S. 349 (1993) ................................ 38

*Shipping Ltd. v. Flota Mercante Grancocolombiana, S.A.*, 830 F.2d 449
   (2d Cir. 1987) ................................ 15

*Small v. United States*, 544 U.S. 385 (2005) ................................ 25

*Societe Internationale Pour Participations Industrielles et Commerciales,
   S.A. v. Rogers*, 357 U.S. 197 (1958) ................................ 34, 35

*Societe Nationale Industrielle Aerospatiele v. United States Dist. Court for the
   Dist. of Iowa*, 482 U.S. 522 (1987) ................................ 12

*Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004) ................................ *passim*

*Southern California Housing Rights Center v. Los Feliz Towers Homeowners
   Assoc.*, 426 F. Supp. 2d 1061 (C.D. Cal. 2005) ................................ 32

*Swaaley v. U. S.*, 376 F.2d 857 (Ct. Cl. 1967) ................................ 33

*Tel-Oren v. Lybian Arab Republic*, 726 F.2d 774 (D.C. Cir. 1984) ................................ 20

*The Presbyterian Church of Sudan v. Talisman Energy, Inc.*, Case No. 07-0016,
   (2d Cir. May 15, 2007) ................................ *passim*

*Timberland Lumber Co. v. Bank of America*, 549 F.2d 597 (9th Cir. 1977) ................................ 34

*U.S. v. New York Tel. Co.*, 434 U.S. 159 (1977) ................................ 33

*Underhill v. Hernandez*, 168 U.S. 250 (1897) ................................ 5

*United Mine Workers of Am. v. Pennington*, 381 U.S. 657 (1965) ................................ 35

*United States v. Angulo-Hurtado*, 165 F. Supp. 2d 1363 (N.D. Ga. 2001) ................................ 25

*United States v. Brodie*, 174 F. Supp. 2d 294 (E.D. Pa. 2001) ................................ 34

*United States v. Cotroni*, 527 F.2d 708 (2d Cir. 1975) ................................ 25, 26

*United States v. Denman*, 100 F.3d 399 (5th Cir. 1996) ................................ 26

*United States v. Gatlin*, 216 F.3d 207 (2d Cir. 2000) ................................ 25

*United States v. Hambrick*, 55 F. Supp. 2d 504 (W.D. Va. 1999) ................................ 26

*United States v. Luong*, 471 F.3d 1107 (9th Cir. 2006) ................................ 26

*United States v. Peterson*, 812 F.2d 486 (9th Cir. 1987) ................................ 25

*United States v. Smith*, 5 Wheat. 153 (1820) ................................ 18, 22

*United States v. Toscanino*, 500 F.2d 267 (2d Cir. 1974) ................................ 25

*United States v. Wolf*, 352 F. Supp. 2d 1195 (W.D. Okla. 2004) ................................ 39

*Video Int'l Prod. v. Warner-Amex Cable Commc'n*, 858 F.2d 1075 (5th Cir. 1988) ................................ 35

*Vieth v. Jubelirer*, 514 U.S. 267 (2004) ................................ 14

*Walker v. USAA Casualty Ins. Co.*, 474 F. Supp. 2d 1168 (E.D. Cal. 2007) ................................ 32

*Wang v. Yahoo!, Inc.*, Order Denying Def. Yahoo!'s Mot. for Early Case Mgt.
   Conf. & Order (filed July 31, 2007) ................................ 4, 5

*White v. Trans Union LLC*, 462 F. Supp. 2d 1079 (C.D. Cal 2006) ................................ 32

*Wilbur v. Locke*, 423 F.3d 1101 (9th Cir. 2005) ................................ 37, 39

# TABLE OF AUTHORITIES
### (Continued)

*Wiwa v. Royal Dutch Petroleum*, 2002 U.S. Dist. LEXIS 3293 (S.D.N.Y. 2002) .................... 20

*Yahoo!, Inc. v. La Ligue Contre Le Racisme et L'Antisemitisme*, 169 F. Supp. 2d
   1181 (N.D. Cal. 2001), *rev'd on other grounds*, 433 F.3 1199 (9th Cir. 2006)........... 6, 7, 12

*Zschernig v. Miller*, 389 U.S. 429 (1968) ....................................................... 27

## STATUTES

18 U.S.C. § 2 ................................................................................. 21

18 U.S.C. § 1513 ............................................................................. 25

18 U.S.C. § 2511 ......................................................................... 24, 25

18 U.S.C. § 2701 ......................................................................... 25, 27

18 U.S.C. § 2702 ..................................................................... 25, 26, 27

18 U.S.C. § 2711 ............................................................................. 27

28 U.S.C. § 1350 ......................................................................... *passim*

28 U.S.C. § 1350, note ................................................................... *passim*

28 U.S.C. § 1604 ............................................................................. 38

28 U.S.C. § 1605 ............................................................................. 38

Cal. Civ. Code §47(b) ....................................................................... 27

Cal. Civ. Proc. Code § 367 ................................................................. 39

Cal. Prob. Code § 4303 ..................................................................... 40

Cal. Prob. Code § 4121 ..................................................................... 39

Cal. Prob. Code § 4122 ..................................................................... 39

Cal. Prob. Code § 4263(a)(1) ............................................................... 39

Cal. Prob. Code § 4459 ..................................................................... 39

Cal. Bus. & Prof. Code § 17204 ....................................................... 31, 32

## OTHER AUTHORITIES

1993 Country Reports on Human Rights Practices, Bureau of Democracy, Human
   Rights, and Labor, U.S. Department of State (Jan. 31, 1994)................................ 19

4 W. Blackstone, Commentaries on the Laws of England 67 (1769) ............................ 19

Administrative Measures on Internet Bulletin Services (P.R.C.) ............................... 35

Br. of the U.S. as Amicus Curiae, *The Presbyterian Church of Sudan v. Talisman
   Energy, Inc.*, Case No. 07-0016, at 5-12 (2d Cir. May 15, 2007) ............................ 16, 20, 22

Bureau of Economic and Business Affairs, OECD Guidelines for
   Multinational Enterprises 5 (2002) ..................................................... 13

Caroline Uyttendaele & Joseph Dumortier, *Free Speech on the Information
   Superhighway*, 16 J. Marshall J. Computer & Info. L. 905 (1998) ................................ 6

Civil Procedure Law (P.R.C.) ............................................................... 39

Criminal Law (P.R.C.) ..................................................................... 34

Criminal Procedure Law (P.R.C.) ........................................................... 34

Curtis A. Bradley et al., Sosa, *Customary International Law and the Continuing
   Relevance of* Erie, 120 Harv. L. Rev. 870 (2007) ..................................... 20, 21, 22

**TABLE OF AUTHORITIES**
(Continued)

Daria Vaisman, *Turkey's Restriction, Europe's Problem* ...........................................6

Evans J.R. Revere, Acting Assistant Sec'y for East Asian and Pacific Affairs, *The Bush Administration's Second-Term Foreign Policy Toward East Asia*, Remarks to Center for Strategic Int'l Studies Conference (May 17, 2005)..........................9

Judgment of Huang Qi, Huang Qi, Prisoner of conscience, Sichuan Province, http://web.amnesty.org/apro/aproweb.nsf/pages/asa170012004_appealtwo ......................6

Letter from Hon. John B. Bellinger III to Hon. Peter D. Keisler re: *Li Weixum, et al. v. Bo Xilai*, No. 1:04CV00649 (D.D.C.) (July 24, 2006)......................................9

Measures for the Administration of Internet E-mail Services (P.R.C.) ......................................35

*Morton Sklar on Yahoo! human rights lawsuit* (Apr. 21, 2007) (webcast) ......................6

Office of the Privacy Comm'r for Personal Data, Hong Kong, Report Published under § 48(2) of the Personal Data (Privacy) Ordinance (Cap. 486), Report No.: R07-3619 (Mar. 14, 2007), http://www.pcpd.org.hk/english/publications/files/Yahoo_e.pdf ...........................................3

Opinions of the Supreme People's Court on Certain Issues Concerning Application of PRC Civil Procedure Law 2002 (P.R.C.) ......................................39

Ratifications Of The Fundamental Human Rights Conventions By Country," http://www.ilo.org/ilolex/english/docs/declworld.htm ......................19

Regulations on Telecommunications (P.R.C.)......................................35

Reporters Without Borders Briefs for July 2007, *Spain: Gara and Deia Journalists Now Face Charges of "Insulting King* ......................................6

RESTATEMENT (SECOND) OF TORTS (1977)......................................33

RESTATEMENT (THIRD) OF FOREIGN RELATIONS (1987) ......................................*passim*

Robert B. Zoellick, Deputy Sec'y of State, *Whither China: From Membership to Responsibility?*, Remarks to National Committee on U.S.-China Relations (Sept. 21, 2005) ......................................9

Ronald J. Krotoszynski, *A Comparative Perspective on the First Amendment*, 78 TUL. L. REV. 1549 (2004) ......................................6

Scott Shane, *Suit Over C.I.A. Program*, N.Y. TIMES, May 31, 2007......................................11

Sionaidh Douglas-Scott, *The Hatefulness of Protected Speech*, 7 WM. & MARY BILL OF RTS. J. 305 (1999) ......................................6, 17

S. Rep. No. 99-541 (1986), *as reprinted in* 1986 U.S.C.C.A.N. 3555, 3566 ......................25

S. Rep. No. 102-249 (1991), 1991 WL 258662 ......................................24

State Security Law (P.R.C.) ......................................34

Statement of Interest of the United States, *Doe v. Qi*, Case No. C02 0672 CW (EMC) (filed Jan. 16, 2004) ......................................9, 11

Thomas J. Christensen, Deputy Assistant Sec'y for East Asian and Pacific Affairs, U.S.-China Relations, Statement Before the House Committee on Foreign Affairs, Subcommittee on Asia, the Pacific and the Global Environment (Mar. 27, 2007) ......................................9

U.S. Dep't of State, Bureau of East Asian and Pacific Affairs, *Background Note: China* (Jan. 2007)......................................9

William J. Clinton, Remarks by the President at Signing of China Permanent

**TABLE OF AUTHORITIES**
**(Continued)**

1

Normal Trade Relations (Oct. 10, 2000)...................................................................9

2

World Organization for Human Rights USA, "Major lawsuit filed by Human
    Rights USA against Yahoo! highlights the internet company's complicity in
    human rights abuses in China (Apr. 18, 2007) ....................................................10

3

**RULES**

4

Fed. R. Civ. P. 12 ............................................................................................*passim*

5

Fed. R. Civ. P. 17 .......................................................................................................39

6

Fed. R. Civ. P. 19 ...........................................................................................2, 37, 38, 39

7

8

CC1:769592.6

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    **I.    <u>INTRODUCTION</u>**

2          This is a lawsuit by citizens of China imprisoned for using the internet in China to express

3    political views in violation of China law. It is a political case challenging the laws and actions of

4    the Chinese government.  It has no place in the American courts.  Yahoo! deeply sympathizes

5    with the plaintiffs and their families and does not condone the suppression of their rights and

6    liberty by their government.  But Yahoo! has no control over the sovereign government of the

7    People's Republic of China ("PRC"), the laws it passes, and the manner in which it enforces its

8    laws.  Neither Yahoo! Inc. or YHKL, therefore, can be held liable for the independent acts of the

9    PRC just because a former Yahoo! subsidiary in China obeyed a lawful government request for

10   the collection of evidence relevant to a pending investigation.

11         There are numerous legal grounds why plaintiffs' complaint cannot proceed:

12         *First*, plaintiffs' claims are not justiciable under *Sosa v. Alvarez-Machain*, 542 U.S. 692

13   (2004), the act of state doctrine, principles of international comity, and the political question

14   doctrine.  The complaint challenges the actions of the PRC in enacting and enforcing laws

15   proscribing certain types of speech deemed inimical to its government.  Litigating this case thus

16   risks violating international law principles of sovereignty, interfering with U.S. foreign policy,

17   and jeopardizing the U.S. law enforcement interests.

18         *Second*, plaintiffs have failed to state a claim under the Alien Tort Statute ("ATS"), the

19   Torture Victim Protection Act ("TVPA"), the Electronic Communications Privacy Act ("ECPA"),

20   and the California laws on which they rely.  Among other infirmities, plaintiffs' ATS and TVPA

21   theories are not actionable against corporate actors, ECPA does not apply extraterritorially, and

22   plaintiffs' California claims are preempted.

23         *Third*, plaintiffs' claims contravene federal, California, and international law—each of

24   which expressly protects defendants from civil liability for communicating with law enforcement

25   officials regarding investigations.  Whether they responded to the PRC's requests voluntarily or

26   under compulsion of PRC law (the complaint seeks to obscure that it was plainly the latter),

27   defendants' conduct was plainly privileged.

28         *Fourth*, the complaint fails to join the PRC or PRC officials who allegedly harmed

C07-02151 CW
YAHOO!'S MOT. TO DISMISS SEC. AM.
COMPL.

1  plaintiffs, and who are "necessary" and "indispensable" parties under Rule 19 of the Federal

2  Rules of Civil Procedure.

3       *Fifth*, this case should not proceed unless counsel of record for plaintiffs establish their

4  authority to represent plaintiffs in this case.  *See Pueblo of Santa Rosa v. Fall*, 273 U.S. 315, 319

5  (1927); *Meredith v. Ionian Trader*, 279 F. 2d 471, 474 (2d Cir. 1960).

6  ## II.    SUMMARY OF PLAINTIFFS' ALLEGATIONS[1]

7       **Plaintiff Wang Xiaoning.**  From 2000 to 2002, Wang worked in mainland China as a

8  author and editor of pro-democracy publications.  Compl. ¶¶ 32-35.  PRC authorities arrested

9  Wang and charged, tried, and convicted him of "incitement to subvert state power," advocating

10  the establishment of an alternative political party, and communicating with an overseas enemy

11  organization.  *Id*. ¶¶ 37-40.  Wang was taken into custody on September 1, 2002, charged on

12  September 30, 2002, tried and convicted in July 2003, and sentenced to a 10-year prison term on

13  September 12, 2003.  *See id*. ¶¶ 37-41.  While in prison, Wang suffered brutal treatment at the

14  hands of the PRC as punishment for his political activities.  *See id*. ¶¶ 39, 43-44.  Wang is

15  allowed only limited contact with outsiders; it is unclear whether he has any contact with his

16  counsel or authorized this lawsuit.  *See id*. ¶ 45.

17       **Plaintiff Shi Tao.**  Shi Tao worked as a reporter and editor at the *Contemporary Business*

18  *News* in mainland China and wrote articles advocating political reform.  *See id*. ¶¶ 52-55.  On

19  April 20, 2004, from his place of employment, Shi published anonymously a document the PRC

20  considered to be a "state secret."  *See id*. ¶¶ 55-56, 62-63.  PRC authorities arrested Shi on

21  November 23, 2004 and charged him on December 14; he pled guilty on March 11, 2005.  *See id*.

22  ¶¶ 57-61.  On April 30, 2005, Shi was sentenced to 10 years in prison and is currently

23  incarcerated at a Chinese prison known for abusive treatment of prisoners.  *See id*. ¶¶ 62-66.

24  Given the vague allegations about his specific circumstances, it is unclear whether Shi's counsel

25  have contact with him or the authority to represent him.  *See id*. ¶¶ 59, 65-66.  Before filing this

26  suit, Shi brought an action against YHKL before the Hong Kong Privacy Commissioner.  *See id*.

27

28  [1] Solely for purposes of this motion, the facts alleged in plaintiffs' complaint ("compl.", filed July 30, 2007, are all assumed true.  *See Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1985 (2007).

1   ¶ 64.  The Commissioner rejected Shi's claim.  *See id.*

2          *Yu Ling.*  Yu Ling is Wang's wife.  *See id.* ¶ 11.  She and "her family have endured

3   severe psychological and emotional suffering as a direct result of [Wang's] arbitrary detention."

4   *Id.* ¶ 46.  She has been "subjected to continued police surveillance," including seizure of her

5   computer.  *Id.* ¶¶ 47-48.  Yu's "emotional injuries have caused [her] physical injury," and

6   devoting time to Wang's legal defense has cost her time and money.  *Id.* ¶¶ 50-51.

7          *Yahoo! and YHKL.*  Plaintiffs have sued Yahoo! and YHKL.  Yahoo! is a Delaware

8   corporation and its primary place of business is Sunnyvale, California.  Yahoo! is an internet

9   portal and provides email and other internet-based services.  YHKL, which is based in Hong

10  Kong, is Yahoo!'s indirect subsidiary and has a portal business in Hong Kong.  *See id.* ¶¶ 14-15.

11         Plaintiffs allege Yahoo! and YHKL controlled the operations of Yahoo! China, an internet

12  portal serving mainland China.  *See id.* ¶¶ 15-17.  Having used Yahoo! China email accounts and

13  group lists to publish political literature, *see id.* ¶¶ 33-34, 55, plaintiffs rest their claims on two

14  pivotal allegations:  defendants "willingly" provided information regarding plaintiffs' online

15  activities to the PRC and were "instrumental" to "causing the Plaintiff[s'] arrest and criminal

16  prosecution," *id.* ¶¶ 2, 42, 44, 62.

17         Although the success of this motion in no way turns on refuting these two assertions, the

18  very documents cited in the complaint undermine both claims.[2]  As the Hong Kong Privacy

19  Commissioner concluded in Shi's case, *see* Compl. ¶ 64 (citing ruling), "the disclosure of

20  Information in the circumstances of the case *was not a voluntary act initiated by [YHKL] but was

21  compelled under the force of PRC law*."[3]  (All emphases added unless otherwise indicated.)  And,

22  plaintiffs' criminal judgments do not show that defendants divulged plaintiffs' identities, caused

23  _____

24  [2] On a motion to dismiss, the court may consider documents described in, but not attached to, a
    complaint.  *See Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994); *In re Calpine Corp. Sec.
    Litig.*, 288 F. Supp. 2d 1054, 1076 (N.D. Cal. 2003).

25  [3] Exhibits are attached in Appendix A.  *See* Ex. A (Office of the Privacy Comm'r for Personal
    Data, Hong Kong, Report Published under § 48(2) of the Personal Data (Privacy) Ordinance
26  (Cap. 486), Report No.: R07-3619, at ¶ 8.25 (Mar. 14, 2007),
    http://www.pcpd.org.hk/english/publications/files/Yahoo_e.pdf ("Hong Kong Commissioner's
27  Report")).  The Report also explains that Yahoo! China's Privacy Policy and Terms of Service
    clearly informed users that their information would be disclosed in response to law enforcement
28  requests.  *Id.* at 8.37-8.39.

1  them to be investigated, or provided proof essential to their convictions.[4]

2      ***Claims and Relief Sought.***  The complaint contains claims under the ATS, TVPA, and

3  ECPA; a variety of international law sources; and six California law theories.  *See* Compl. ¶¶ 3-6.

4  Shi asserts 11 causes of action.  Wang asserts 10; unlike Shi, he does not make a forced labor

5  claim.  *See id.* at ¶¶ 69-136.  Yu asserts three California law claims—for intentional infliction of

6  emotional distress, negligence, and unfair business practices.  *See id.* at ¶¶ 109-27.  Plaintiffs seek

7  compensatory and punitive damages, as well as declaratory relief determining defendants violated

8  international law, injunctive relief to prevent defendants from complying with future requests for

9  information, and "affirmative action by the Defendants to secure the release of the detainees."

10  **III.    PLAINTIFFS CLAIMS ARE NOT JUSTICIABLE.**

11      *Sosa v. Alvarez-Machain*, 542 U.S. 692, 728 (2004), instructs courts to proceed in ATS

12  cases with "great caution."  Trial courts have a duty of "vigilant door keeping," obligating them

13  to consider a variety of prudential concerns before exercising jurisdiction.  *Id.* at 729; *see also*

14  *Wang v. Yahoo!, Inc.*, Order Denying Def. Yahoo!'s Mot. for Early Case Mgt. Conf. & Order at

15  4:19-5:19 (filed July 31, 2007) ("Order").  As this Court has recognized, "[a]lthough it is one

16  thing for American courts to enforce limits on their own government's power, . . . it is 'quite

17  another to consider suits under rules that would go so far as to claim a limit on the power of

18  foreign governments over their own citizens, and to hold that a foreign government or its agents

19  has transgressed those limits.'"  *Id.* at 5:1-6 (quoting *Sosa*).  Three justiciability doctrines that

20  reflect these constitutional and prudential concerns—the act of state doctrine, the doctrine of

21  international comity, and the political question doctrine—compel dismissal here.

22

23  ─────────────
   [4] Wang's and Shi's judgments—both in the original Chinese and translated into English—are
   attached in Appendix A, as Exhibits B and C, respectively.  Both judgments cite various sources

24  of evidence—including physical evidence, witnesses, and plaintiffs' confessions—on which
   plaintiffs' convictions rested.  With regard to defendants, all Wang's judgment states is that

25  YHKL provided records that showed that two Yahoo! China email accounts had been set up by
   users in China.  *See* Appx. A, Ex. B at 6 ¶ e, f.  And in Shi's case, the judgment shows that the

26  information YHKL provided merely helped confirm that an email in the case was sent from Shi's
   place of employment—not that Shi sent it. *See* Appx. A, Ex. C at 4-5, Compl. ¶ 62.  *Indeed,*

27  *contrary to the suggestion that the PRC learned about Wang's identity from defendants, the*
   *judgment discloses that Wang published articles using his real name.*  See Appx. A, Ex. B at 11,

28  ¶ 4 and 21, ¶ a.

   C07-02151 CW
   YAHOO!'S MOT. TO DISMISS SEC. AM.        - 4 -
   COMPL.

A.      **This Case Should Be Dismissed Under The Act Of State Doctrine.**

The act of state doctrine provides that "[e]very sovereign State is bound to respect the independence of every other sovereign State, *and the courts of one country will not sit in judgment on the acts of the government of another done within its own territory.*" *Underhill v. Hernandez*, 168 U.S. 250, 252 (1897). This doctrine is rooted in the recognition that "[t]he conduct of the foreign relations . . . is committed by the Constitution to the Executive and Legislative . . . departments." *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 423 (1964).

**1.  This Case Directly Challenges Sovereign Acts Of The PRC.**

As this Court recently observed, "[t]he claims in this case directly implicate the propriety of actions taken by the Chinese government." Order at 6:22-27. Indeed, the case "require[s] the court to sit in judgment" of at least three sovereign acts of the PRC. *Corrie v. Caterpillar, Inc.*, 403 F. Supp. 2d 1019, 1032 (W.D. Wa. 2005). Each is addressed in turn.

a. Judging PRC Speech Laws. By its express terms, plaintiffs' complaint is a facial attack on criminal laws in China banning political speech. One of the complaint's recurring and critical allegations is that the PRC had no right to detain plaintiffs for publishing political literature.[5] However, "free speech" rights as we understand them in the United States are not the law in China.[6] As one Chinese court has summarized the law:

---

[5] *See, e.g.*, Compl. ¶ 23 ("*As a result of the expression of their views*, these 'dissidents' are subjected to arbitrary arrest, criminal prosecution, and persecution *in violation of numerous protections for fundamental rights involving the exercise of freedom of expression, association, press and assembly under the Chinese Constitution and international law.*"); ¶ 27 ("by helping the censors, and by identifying people who could be accused of anti-government speech or communication, the Defendants would be placing many *innocent individuals, who were merely expressing their views or communicating with others*, at risk of arbitrary arrest, prolonged arbitrary detention, forced labor, and torture *as a result of their lawful exercise of free speech and free association rights*"); ¶ 85 ("These acts of arbitrary arrest and long-term detention suffered by the Plaintiffs designated in this Third Claim for Relief, including arrest and detention *for an unlawful purpose in violation of the rights to freedom of speech, association, and assembly*").

[6] Article 35 of the Chinese Constitution recognizes "freedom of speech" as a right citizens enjoy, but other parts of the Constitution and PRC law limit this right and prohibit various forms of speech. Translations of these and other Chinese law sources cited in this motion are included in Appendix B accompanying this motion. See Appendix B, ex. 1, Constitution of the PRC, Articles 1, 28, 51, and 53; ex. 2, State Security Law (P.R.C), Article 4; ex. 4 Criminal Law (P.R.C.), Article 105; ex 6, Law on Protecting State Secrets (P.R.C.), Article 24; ex. 10, Management Provisions on Electronic Bulletin Services in Internet (P.R.C.), Article 9.

This court believes that freedom of speech is a political right of the citizens of China, but when exercising this right, no one may harm the interests or security of the nation, and may not use rumor mongering or defamation to incite subversion of the national regime. Therefore, the court takes note that the defense counsel takes a standpoint that only stresses the right of the accused, and ignores his duties.[7]

No matter how strenuous our disagreement, every sovereign nation has a right to regulate speech within it borders. *See Yahoo!, Inc. v. La Ligue Contre Le Racisme et L'Antisemitisme*, 169 F. Supp. 2d 1181, 1186 (N.D. Cal. 2001), *rev'd on other grounds*, 433 F.3d 1199 (9th Cir. 2006) (en banc). Because American law is unique in the protections it affords to free speech—even among Western democracies—courts have recognized that our First Amendment does not reflect customary international law. *See Guinto v. Marcos*, 654 F. Supp. 276, 280 (S.D. Cal. 1986) (cited favorably by *In re Estate of Ferdinand Marcos*, 25 F.3d 1467, 1475 (9th Cir. 1994)).[8]

Despite all this, plaintiffs' claims all proceed from the premise that international law is violated not only when the PRC acts to enforce its laws prohibiting political speech, but when companies assist the PRC in enforcing these laws.[9] Endorsement of this theory of liability requires the Court to consider and declare unlawful the Chinese government's prohibitions on

---

[7] Judgment of Huang Qi, Congressional-Executive Committee on China Virtual Academy http://www.cecc.gov/pages/virtualAcad/exp/expsecurity.php

[8] *See also, e.g.*, Sionaidh Douglas-Scott, *The Hatefulness of Protected Speech*, 7 WM. & MARY BILL OF RTS. J. 305, 309 (1999) (As "Ronald Dworkin recently commented: 'The United States stands alone even among democracies, in the extraordinary degree to which its [C]onstitution protects freedom of speech and of the press.'"); Ronald J. Krotoszynski, *A Comparative Perspective on the First Amendment*, 78 TUL. L. REV. 1549 (2004) (German speech protections more limited than those in the U.S.); Caroline Uyttendaele & Joseph Dumortier, *Free Speech on the Information Superhighway*, 16 J. MARSHALL J. COMPUTER & INFO. L. 905 (1998) (free speech more limited in Europe; speech subject to restrictions when it harms the public order); Daria Vaisman, *Turkey's Restriction, Europe's Problem* ¶¶ 2-3, http://www.opendemocracy.net/democracy-turkey/free_speech_3952.jsp (French law makes it a crime to insult foreign heads of state); Reporters Without Borders Briefs for July 2007, *Spain: Gara and Deia Journalists Now Face Charges of "Insulting King,"* http://www.rsf.org/article.php3?id_article=23090 (journalists who published satire of king "face[d] charges of 'insulting the king' under article 491 of the criminal code").

[9] *See, e.g., supra* n.5; Compl. ¶ 124 ("Defendants have also acted contrary to public policy by infringing upon the freedom of speech and expression of the general public."); *Morton Sklar on Yahoo! human rights lawsuit* (Apr. 21, 2007), http://www.brightcove.com/title.jsp?title=769385554&channel=27638673 (webcast at 06:23-8:16) ("The U.S. Government outlaws these kinds of behaviors [against people] who are in *favor of free press and free speech. So when Yahoo! says that the people involved are just abiding by Chinese law, that may be the case, but the laws are unlawful in terms of U.S. and international law and U.S. law requires just the opposite.* . . . Foreign governments have the right to request information from Yahoo! pursuant to court orders . . . . China is using it to persecute people for the communication of ideas. And that's not something the United States government or a United States corporation should go along with.").

1   speech.  This would be a direct affront to the PRC's sovereignty.  *See Yahoo!*, 169 F. Supp. 2d at

2   1186 ("A basic function of a sovereign state is to determine by law what forms of speech and

3   conduct are acceptable within its borders").

4          b.  Judging The PRC's Treatment Of Plaintiffs**.**  The complaint also requires the Court to

5   question the PRC's criminal cases against Wang and Shi—from the lawfulness of their arrest, to

6   the fairness of their trials and appeals, to their treatment in prison.  *See* Compl. ¶¶ 37-45, 57-63.

7   Plaintiffs allege that the PRC violated their rights at every turn: "[h]igh level officials of the PRC

8   are involved in the abuses"; the PRC is "falsely imprison[ing]" plaintiffs.  *Id*. ¶¶ 45, 141, 105-08.

9   Plaintiffs even ask this Court to order defendants to take "affirmative action . . . to secure

10  [plaintiffs'] release."  *Id*. at 34 ¶ (d).  Adjudicating the legitimacy of plaintiffs' prosecution,

11  conviction, and incarceration—much less granting quasi-habeas corpus relief—openly and

12  directly challenges the PRC's sovereignty.

13         c.  Judging the PRC's Ability to Gather Evidence.  Plaintiffs also seek an order that would

14  require defendants to selectively violate China's laws, including orders compelling disclosure of

15  evidence.  *See* Compl. ¶ 6 (plaintiffs seek "injunctive relief to stop any further disclosures of user

16  information in order to prevent such . . . abuses from taking place in the future").

17         Defendants cannot be expected, let alone ordered, to violate another nation's laws.  Like

18  any sovereign state, China requires companies operating within its jurisdiction to comply with its

19  laws.  *Cf. Dayton Coal & Iron Co. v. Barton*, 183 U.S. 23, 24 (1901).  This sovereign power, as

20  has long been recognized, includes the right to compel the production of evidence.  *See Consol.*

21  *Rendering Co. v. Vermont*, 207 U.S. 541, 552 (1908).  Article 45 of the PRC Criminal Procedure

22  Law provides that "the public security organs shall have the authority to collect or obtain

23  evidence" in connection with investigations. [10]  Anyone who receives such a request "shall

24  provide truthful evidence," and may not "falsif[y], conceal[], or destroy[]" evidence.  Compliance

25  with these requests is mandatory and may not be challenged in the Chinese courts.[11]  It would be

---

26  [10] Appendix B, Tab 4.

27  [11] Section 2 of Article 1 of the People's Supreme Court's Judicial Interpretations on the People's
    Republic of China Administrative Procedure Law (Appendix B, Tab 9) specifically provides that
28  the courts shall not accept cases initiated by citizens, legal persons, or other organizations

1    a serious affront to the PRC's sovereignty even to entertain the issue of whether companies can

2    disregard such requests.

3                        **2.   The *Sabbatino* Factors All Favor Dismissal.**

4    Courts consider four factors in determining whether to dismiss on "act of state" grounds:

5    • *First*, courts examine the "degree of codification or consensus concerning [the]

6        particular area of international law." *Sabbatino*, 376 U.S. at 428.  The less consensus,

7        the stronger the argument is for declining jurisdiction.

8    • *Second*, courts consider the case's impact on "foreign relations"; the greater the

9        impact, the greater the "justification" for dismissing the case. *Id*.

10   • *Third*, a court has greater authority to hear a case if "the government which

11       perpetrated the challenged act of state is no longer in existence." *Id*.

12   • *Fourth*, courts in the Ninth Circuit consider "whether the foreign state was acting in

13       the public interest." *Liu v. Republic of China*, 892 F.2d 1419, 1432 (9th Cir. 1989).  If

14       the state was so acting, the court has less leeway to proceed with the case.[12]

15   *The First Factor*.  There is nothing remotely close to "codification or consensus" under

16   international law to support plaintiffs' claims. *Sabbatino*, 376 U.S. at 428.  As explained in

17   Section IV.E, *infra*, U.S., California, and international law all treat communications with law

18   enforcement officials as privileged acts that cannot give rise to liability.  It is likewise an axiom

19   of international law that "a state may not require a person . . . to refrain from doing an act in

20   another state that is required by the law of that state."  RESTATEMENT (THIRD) OF FOREIGN

21   RELATIONS § 441 (1987).  The first *Sabbatino* strongly favors dismissal.

22   *The Second Factor*.  The implications of this case for foreign relations—the most

23   important *Sabbatino* factor, *see Doe v. Qi*, 349 F. Supp. 2d 1258, 1296 (N.D. Cal. 2004)—can

24   ────────────────────────

25   concerning the acts of state public security agencies and state security bureaus that are authorized
     by the PRC Criminal Procedure Law.  Article 28 of Provisions on the Procedures for the
     Handling of Administrative Review Cases by Public Security Bodies states that certain cases,

26   including "objections concerning criminal judicial acts such as compulsory measures and criminal
     investigation measures carried out in accordance with laws in criminal cases" may not be heard.

27   [12] Although it militates in favor of dismissal, defendants disagree that this fourth factor is an
     appropriate consideration under *Sabbatino*.  Because Ninth Circuit law included it, defendants

28   simply note their objection to preserve it.

1    hardly be overstated.  A cornerstone of U.S. foreign policy is maintaining strong and carefully

2    managed relations with the PRC.[13]  Unlike rogue or smaller states, often implicated in ATS cases,

3    China is a world power, a significant trading partner, and a fellow permanent member of the U.N.

4    Security Council.[14]  It can be expected to act decisively in protecting its sovereignty and guarding

5    against perceived encroachments on its authority.[15]  Both the Executive Branch and China have

6    expressed the strong view that the United States must manage its relations with the PRC without

7    interference from the courts.[16]

8         Though openly critical of China's human rights record, the United States has made the

9    policy judgment to actively engage China, promote investment there by American companies,

10   and take a "carrot" rather than "stick" approach to urging reform.[17]  As the Executive Branch has

11   consistently urged, ATS cases can threaten U.S. foreign policy toward countries like China,

---

[13] *See, e.g.*, Robert B. Zoellick, Deputy Sec'y of State, *Whither China: From Membership to Responsibility?*, Remarks to National Committee on U.S.-China Relations (Sept. 21, 2005), *available at* http://www.state.gov/s/d/former/zoellick/rem/53682.htm.

[14] *See, e.g.*, Thomas J. Christensen, Deputy Assistant Sec'y for East Asian and Pacific Affairs, U.S.-China Relations, Statement Before the House Committee on Foreign Affairs, Subcommittee on Asia, the Pacific and the Global Environment (Mar. 27, 2007), http://www.state.gov/p/eap/rls/rm/2007/82276.htm; Evans J.R. Revere, Acting Assistant Sec'y for East Asian and Pacific Affairs, *The Bush Administration's Second-Term Foreign Policy Toward East Asia*, Remarks to Center for Strategic Int'l Studies Conference (May 17, 2005), http://www.state.gov/p/eap/rls/rm/2005/46420.htm; UN Security Council, Membership in 2007, http://www.un.org/sc/members.asp.

[15] *See, e.g.*, U.S. Dep't of State, Bureau of East Asian and Pacific Affairs, *Background Note: China* (Jan. 2007), http://www.state.gov/r/pa/ei/bgn/18902.htm.

[16] *See, e.g.*, Ex. E (Statement of Interest of the United States, *Doe v. Qi*, Case No. C02 0672 CW (EMC), Tab A at 2-3, 7 (filed Jan. 16, 2004) (condemning human rights abuses by PRC, but urging that diplomatic means are far more effective than litigation)); Ex. F (Letter from Hon. John B. Bellinger III to Hon. Peter D. Keisler re: *Li Weixum, et al. v. Bo Xilai*, No. 1:04CV00649 (D.D.C.) at 2-3 (July 24, 2006) (same)).

[17] *See, e.g.*, *id.*; William J. Clinton, Remarks by the President at Signing of China Permanent Normal Trade Relations (Oct. 10, 2000), http://www.clintonfoundation.org/legacy/101000-speech-by-president-at-signing-of-china-pntr.htm ("the more China opens its markets, the more it unleashes the power of economic freedom, the more likely it [will] be to more fully liberate the human potential of its people"); U.S. Dep't of State, Bureau of East Asian and Pacific Affairs, Background Note: China (Jan. 2007), http://www.state.gov/r/pa/ei/bgn/18902.htm ("*For seven consecutive administrations, U.S. policy has been to encourage China's opening and integration into the global system.*  As a result, China has moved from being a relatively isolated and poor country to one that is a key participant in international institutions . . . .  The State Department's annual China human rights and religious freedom reports have noted China's well-documented abuses of human rights . . . . .  At the same time, *China's economic growth and reform since 1978 has improved dramatically the lives of hundreds of millions of Chinese, increased social mobility, and expanded the scope of personal freedom.*").

1    where "constructive [economic] engagement has been advocated as a means of advancing human

2    rights."  Appx. A, Ex. D (*Doe v. Unocal*, Supp. Br. for the U.S. as Amicus Curiae, Case No. 00-

3    56603 at 12-13 (9th Cir. Aug. 25, 2004).

4        This case is a prime example.  It is an admitted effort by plaintiffs and their counsel to

5    "convince other U.S. companies to think twice before doing business with the Chinese

6    government."[18]  Indeed, the very purpose of this lawsuit is to attack specific laws in China and the

7    PRC's ability and authority to enforce them.

8        This Court's opinion and analysis in *Doe v. Qi* are instructive.  In *Qi*, 349 F. Supp. 2d at

9    1264, plaintiffs sued two PRC officials, accusing them of commanding the torture of proponents

10   of Falun Gong.  After considering the views of the U.S. and Chinese governments regarding the

11   policy impact of the case, the Court declined to dismiss the case in its entirety, choosing instead

12   to craft a narrow default judgment affording limited declaratory relief.  *See id.* at 1266.  The

13   Court reasoned that the PRC officials' acts of torture so clearly violated Chinese and international

14   law, as well as U.S. policy statements condemning such torture, that it would not contradict U.S.

15   foreign policy to declare that the two officials had deviated from these  norms.  *See id.* at 1266-

16   67.

17       Here, based on plaintiffs' strategic framing of their complaint, no such compromise is

18   available.  Plaintiffs have chosen not to name the PRC, PRC prison guards, or PRC law

19   enforcement personnel as defendants.  But considering a declaration on whether defendants did

20   anything wrong—let alone the monetary and injunctive relief plaintiffs seek—does not obviate

21   litigating the legitimacy of Chinese laws regulating speech and the PRC's ability to enforce them.

22   Undertaking such litigation might well be viewed as a profound rebuke of the PRC and risk

23   poisoning U.S. relations with a significant world power.  It might also provoke the PRC into

24   precipitously reacting to the perceived encroachment by cracking down more harshly on political

25   speech or even harming plaintiffs.  *Cf. Sabbatino*, 376 U.S. at 423 (act-of-state doctrine rests on

26

---

27   [18] World Organization for Human Rights USA, "Major lawsuit filed by Human Rights USA
     against Yahoo! highlights the internet company's complicity in human rights abuses in China,
28   (Apr. 18, 2007), http://humanrightsusa.blogspot.com/search/label/human%20rights.

1    the "strong sense of the Judicial Branch that its engagement in the task of passing on the validity

2    of foreign acts of state may hinder rather than further this country's pursuit of goals both for itself

3    and for the community of nations").

4          In contrast to *Qi*, the policy implications of this case extend well beyond a mere

5    reaffirmation that the United States condemns torturing political dissidents.  Entertaining this

6    lawsuit may invite challenges to U.S. policy and threaten American law enforcement efforts.  For

7    example, were this Court to rule, as plaintiffs request, that defendants acted wrongfully in

8    respecting the PRC's official requests for evidence, nothing would stop courts in other countries

9    from issuing similar rulings about American processes and laws.  A court in France could issue an

10   injunction mandating that French companies doing business in America refuse to provide

11   evidence in cases where the defendant might be subject to the death penalty.  The Executive

12   Branch is clearly opposed to inviting such responses and has recognized this as a real threat.  *See*

13   Appx. A, Ex. E (Statement of Interest of U.S., *Doe v. Qi* at 8 (death penalty example)); Ex. G

14   (*Matar v. Dicther*, Case No. 05 Civ. 10270 (WHP), Statement of Interest of the U.S. at 22

15   (S.D.N.Y. Nov. 29, 2006).  Similarly, corporations doing business in the United States could

16   reasonably fear that complying with American requests for information might subject them to

17   civil liability in the United States or abroad.  Suits under the ATS challenging the U.S. "War on

18   Terror," *see* Scott Shane, *Suit Over C.I.A. Program*, N.Y. TIMES, May 31, 2007, are one recent

19   example.  To follow the path plaintiffs urge would seriously risk undermining U.S. law

20   enforcement efforts.

21         These policy concerns dramatically distinguish this case from *Qi*, where the defendants

22   were accused of engaging in and commanding acts of universally condemned violence, or the

23   more typical ATS case where a corporate defendant is accused of hiring rogue military forces to

24   commit abuses on its behalf to protect a major infrastructure project.  Here, the issue is whether

25   defendants violated international, U.S., and California law by complying with Chinese law in

26   connection with a criminal investigation.  American courts cannot be placed in the position of

27   deciding whether law enforcement activities carried out by a foreign state are illegitimate—at

28

C07-02151 CW
YAHOO!'S MOT. TO DISMISS SEC. AM.          - 11 -
COMPL.

1   least not without significantly jeopardizing U.S. foreign relations and law enforcement interests.

2   For these reasons, the second and "central" *Sabbatino* factor mandates dismissal.

3       *The Third Factor.*  As this Court held in *Qi*, 349 F. Supp. 2d at 1303, the third *Sabbatino*

4   factor "clearly weighs in favor of applying the act of state doctrine," because "the PRC still

5   exist[s]."  Nor is there any evidence that the PRC has retreated from or repudiated its position that

6   plaintiffs should be incarcerated or that it has a right to enforce its own criminal laws.  *Cf. Bigio*

7   *v. Coca-Cola Co.*, 239 F.3d 440, 453 (2d Cir. 2000) (declining to dismiss under act-of-state

8   doctrine where government  "ha[d] apparently repudiated the acts in question").

9       *The Fourth Factor.*  This final factor—"whether the foreign state was acting in the public

10  interest," *Liu*, 892 F.2d at 1432—also favors dismissal.  The creation and enforcement of laws

11  regulating speech within a sovereign's borders are quintessentially acts of a sovereign serving the

12  public's interest.  *See Yahoo!*, 169 F. Supp. 2d at 1186.  That the government is China and the

13  laws are inimical to our beliefs does not change the analysis or conclusion.  *Cf. In re Quarles*, 158

14  U.S. 532, 535-36 (1895) (It is the duty and the right . . . of every citizen to assist in prosecuting,

15  and in securing the punishment of, any breach of the peace of the United States.").

16      Again, *Qi* is instructive.  This Court rejected the argument that torture and arbitrary

17  detention of Falun Gong members were actions in the public interest, even though the PRC had

18  argued they posed a threat to public health and safety.  *See Qi*, 349 F. Supp. 2d at 1306.  Unlike

19  *Qi*, this case implicates not only the PRC's treatment of political dissidents, but also the propriety

20  of China's laws regulating speech, the right of the PRC to compel assistance to enforce its laws,

21  and ultimately the independence of the sovereign government of China.  *Cf. Quarles*, 158 U.S. at

22  537.

23      **B.    This Case Should Be Dismissed Under Principles Of International Comity.**

24      Comity counsels courts to decline jurisdiction in cases that call into question executive,

25  legislative, or judicial acts of foreign states.  *See Societe Nationale Industrielle Aerospatiele v.*

26  *United States Dist. Court for the Dist. of Iowa*, 482 U.S. 522, 544 n.27 (1987).  The *Restatement*

27  *(Third) of Foreign Relations Law* ("RESTATEMENT") sets forth eight factors to determine

28

1    "[w]hether exercise of jurisdiction over a person or activity is unreasonable."  RESTATEMENT,

2    *supra*, § 403.[19]  All eight factors militate against exercising jurisdiction in this case:

3    •    The first two factors are satisfied because the indisputable locus of this case is China.

4        *See id.* at § 403(a), (b).

5    •    The third, fifth, and sixth factors are satisfied because evidence-gathering laws are

6        "traditional" and important parts of law enforcement efforts the world over.  *See id.* at

7        § 403(c), (e), (f).  The PRC's prohibitions on speech, while misguided, are not

8        uncommon, and a sovereign's ability to legislate and enforce its own laws is both

9        "generally accepted" and an important part of the "international political, legal, [and]

10        economic system."  *Id.* at § 403(c), (e).

11    •    The fourth factor is satisfied because companies doing business abroad have a

12        "justified expectation" that they should comply with local law.  *Id.* at § 403(d).

13        Plaintiffs' own authorities recognize companies are "obliged" to do so.  Human Rights

14        Watch Letter at 2 ¶ 3 (quoted in Compl. ¶ 27).  The U.S. government mandates

15        compliance as well.  *See* BUREAU OF ECONOMIC AND BUSINESS AFFAIRS, OECD

16        GUIDELINES FOR MULTINATIONAL ENTERPRISES 5 (2002).

17    •    The seventh and eighth factors are satisfied because the PRC has an exceedingly

18        strong interest in compliance with its sovereign orders.  See RESTATEMENT, *supra*, §

19        403(g), (h).  Other sovereign states would no doubt object to an American court

20        prescribing which laws American companies (*e.g.*, Yahoo!), and foreign companies

---

[19] (a) the link of the activity to the territory of the regulating state, *i.e.,* the extent to which the activity takes place within the territory, or has substantial, direct, and foreseeable effect upon or in the territory;

(b) the connections, such as nationality, residence, or economic activity, between the regulating state and the person principally responsible for the activity to be regulated, or between that state and those whom the regulation is designed to protect;

(c) the character of the activity to be regulated, the importance of regulation to the regulating state, the extent to which other states regulate such activities, and the degree to which the desirability of such regulation is generally accepted;

(d) the existence of justified expectations that might be protected or hurt by the regulation;

(e) the importance of the regulation to the international political, legal, or economic system;

(f) the extent to which the regulation is consistent with the traditions of the international system;

(g) the extent to which another state may have an interest in regulating the activity; and

(h) the likelihood of conflict with regulation by another state.

1    (*e.g.*, YHKL) must obey when doing business in countries other than the U.S.  *See id.*

2    §§ 403(g), (h); *Rivendell Forest Prods., Ltd. v. Canadian Forest Prods.*, 810 F. Supp.

3    1116, 1119 (D. Colo. 1993).

4    **C.    This Case Should Be Dismissed Under The Political Question Doctrine.**

5    This case presents a nonjusticiable "political question," *Vieth v. Jubelirer*, 514 U.S. 267,

6    277-78 (2004), and should be dismissed because it "challenges the official acts of an existing

7    government in a region where diplomacy is delicate and U.S. interests are great."  *Corrie*, 403 F.

8    Supp. 2d at 1032.  In cases that "touch on foreign relations," the political question doctrine

9    requires the Court to undertake a "discriminating analysis of the particular question posed, in

10   terms of the history of its management by the political branches, of its susceptibility to judicial

11   handling in light of its nature and posture."  *Baker v. Carr*, 369 U.S. 186, 211-12 (1962).

12   Consideration of the traditional "political question" factors set forth in *Baker v. Carr*,

13   confirm that this case should be dismissed.  First, management of foreign relations is plainly

14   "commit[ed]" to the coordinate "political branches."  *Id.*  at 217; *American Ins. Ass'n v.*

15   *Garamendi*, 539 U.S. 396, 414 (2003); *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363,

16   383-86 (2000).  Second, this Court could not entertain plaintiffs' complaint without expressing a

17   "lack of respect" for Executive Branch policy toward China, *Baker*, 369 U.S. at 217, which

18   disfavors lawsuits such as this one, encourages investment, encourages compliance with local

19   law, and elects to use diplomatic pressure to improve human rights.  *Cf. Corrie*, 403 F. Supp. 2d

20   at 1032 ("For this court to preclude sales of Caterpillar products to Israel would be to make a

21   foreign policy decision and to impinge directly upon the prerogatives of the executive branch of

22   government.").  Third, were it allowed to proceed, this lawsuit would represent "multifarious

23   pronouncements by various departments on one question."  *Baker*, 369 U.S. at 217.

24   "Dismissal is appropriate if *any one* of these . . . factors is 'inextricable' from the case."

25   *Corrie*, 403 F. Supp. 2d at 1032 (quoting *Alperin*, 410 F.3d at 544); *Joo v. Japan*, 413 F.3d 45,

26   49-53 (D.C. Cir. 2005).  Here, all three factors are present.  Practical concerns, which help guide

27   the political question analysis, also counsel in favor of dismissal.  Given Shi's and Wang's

28   unavailability to give testimony in this case, the parties' inability to depose PRC officials

1   regarding plaintiffs' allegations, and the unavailability of other witnesses and documents in

2   China, *see* Def. Yahoo!, Inc.'s Mot. For An Early Case Mgmt. Conf. & Order at 6-7, 10-11 (filed

3   June 21, 2007), "there is a very real possibility that the parties might not be able to compile all the

4   relevant data, thus making any adjudication of this case both difficult and imprudent." *Anderman*

5   *v. Fed. Rep. of Austria*, 256 F. Supp. 2d 1098, 1112 (C.D. Cal. 2003); *see also O.N.E. Shipping*

6   *Ltd. v. Flota Mercante Grancocolombiana, S.A.*, 830 F.2d 449, 453 (2d Cir. 1987) (act of state

7   doctrine requires dismissal "[w]hen the causal chain between a defendant's alleged conduct and

8   plaintiff's injury cannot be determined without an inquiry into the motives of the foreign

9   government").

10  **IV.     PLAINTIFFS HAVE FAILED TO STATE A COGNIZABLE CLAIM.**

11          Even if justiciable, plaintiffs' complaint  must be dismissed because it fails to state a claim

12  upon which relief can be granted.  *See* FED. R. CIV. P. 12(b)(6); *Bell Atl. Corp. v. Twombly*, 127

13  S. Ct. 1955, 1964-65 (2007).  Plaintiffs' claims under the ATS, TVPA, ECPA, and California law

14  all fail as a matter of law.  Moreover, defendants' conduct is privileged and not actionable.

15          **A.      Plaintiffs Have Failed To State A Claim Under The ATS.**

16          On their face, plaintiffs' four ATS claims—the First through Fourth Claims for Relief—

17  have no basis in law.

18                  **1.  Plaintiffs' Allegations Do Not Meet *Sosa*'s "High Bar."**

19          In *Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004), the Supreme Court established a

20  framework for addressing ATS claims.  *Sosa* held that, while the ATS grants district courts

21  jurisdiction over "any civil action by an alien for a tort only, committed in violation of the law of

22  nations," 28 U.S.C. § 1350, the statute itself does not create a cause of action, *see Sosa*, 542 U.S.

23  at 713-14.  If any cause of action exists under the ATS, the law of nations must provide it.  *Sosa*

24  set a "high bar" for recognizing such claims, holding that "the ATS [may] furnish jurisdiction"

25  for only a "relatively modest set of actions."  *Id.*  at 720, 727.  As *Sosa* observed, courts "have no

26  congressional mandate to seek out and define new and debatable violations of the law of nations,"

27  such claims may have "collateral consequences" on the "foreign relations of the United States,"

28  and widespread recognition of ATS claims would permit civil suits to proliferate "without the

1    check imposed by prosecutorial discretion." *Id.* at 727-28.

2         To overcome *Sosa*'s high bar, plaintiffs face three burdens.  They must establish that the

3    specific facts of their case amount to a violation of "definable, universal and obligatory"

4    international norm that is "accepted by the civilized world and defined with . . .  specificity." *Id.*

5    at 720, 725.  They must show that "international law extends the scope of liability for a violation

6    of a given norm *to the perpetrator being sued*." *Id.* at 732 & n.20.  And they must overcome the

7    many prudential reasons to dismiss an ATS case, including objections from the "political

8    branches." *See id.* at 728 n.23.  Plaintiffs meet none of these burdens.

9              **2.  The ATS Does Not Apply Extraterritorially.**

10        The text of the ATS says nothing about the statute's extraterritorial application to aliens

11   not harmed on American soil.  Absent such a "clear express[ion]" from Congress in the "language

12   of" the ATS, the statute cannot be read to apply beyond outside our nation's boundaries.  *EEOC*

13   *v. Arabian Am. Oil Co.*, 499 U.S. 244, 248 (1991).  In the wake of *Sosa*, the United States has

14   argued forcefully that the ATS should not apply where plaintiffs alleged they were harmed abroad

15   by their own governments.  *See, e.g.*, Br. of the U.S. as Amicus Curiae, *The Presbyterian Church*

16   *of Sudan v. Talisman Energy, Inc.*, Case No. 07-0016, at 5-12 (2d Cir. May 15, 2007) ("U.S.

17   Talisman Br.").  Not only does the text of the ATS *not* mention extraterritorial claims, *see id.* at

18   8-9, a review of the legislative history in 1789—when Congress enacted the ATS—shows the

19   statute was enacted to do nothing more than provide foreigners with a forum to bring suit in the

20   United States if they were injured here, *see id.* at 6-8.  Although several courts in this circuit,

21   including this one, have assumed that the ATS may apply extraterritorially, *cf. id.* at 6 n.2,

22   federal statutes should presumptively *not* be so construed, *see id.* at 9-10.

23            **3.  The Norms Plaintiffs Invoke Are Not Actionable Under The ATS.**

24        Even if the ATS applies, plaintiffs' claims for torture and cruel and inhuman punishment

25   are preempted, and their claims for free speech and forced labor cannot be recognized under *Sosa*.

26        a. Preemption.  Plaintiffs Shi and Wang's "First and Second Claims for Relief" are for

27   "Torture" and "Cruel, Inhuman, or Degrading Treatment or Punishment" in violation of the ATS

28   and TVPA.  Compl. ¶¶ 70-83.  In enacting the TVPA, Congress occupied the field and precluded

1    enforcement of these international law norms under the ATS.  *See Enahoro v. Abubakar*, 408

2    F.3d 877, 886 (7th Cir. 2005); *Corrie v. Caterpillar, Inc*., 403 F. Supp. 2d 1019, 1025 (W.D. Wa.

3    2005).  Although some courts have disagreed with this conclusion, *see, e.g.*, *Doe v. Saravia*, 348

4    F. Supp. 2d 1112, 1145 (E.D. Cal. 2004); *Aldana v. Del Monte Fresh Produce, N.A., Inc.*, 416

5    F.3d 1242, 1251 (11th Cir. 2005), no post-*Sosa* opinion to the contrary binds this Court, and the

6    reasoning in *Enahoro* is most persuasive.  As *Enahoro* explained, and *Sosa* made clear:

7        "Since many attempts by federal courts to craft remedies for the violation of new
         norms of international law would raise risks of adverse foreign policy
8        consequences, they should be undertaken, if at all, with great caution." [*Sosa*, 542
         U.S. at 727-28.]  It is [thus] hard to imagine that the *Sosa* Court would approve of
9        common law claims based on torture and extrajudicial killing when Congress has
         specifically provided a cause of action for those violations and has set out how
10       those claims must proceed.

11   408 F.3d at 885-86.  Shi and Wang's First and Second Claims for Relief stand or fall on whether

12   they can meet the standards Congress set forth in TVPA.  Plaintiffs' failure to state a claim under

13   the TVPA, and their torture claims specifically, are addressed in Section IV.B, *infra*, and in defs.'

14   Alternative Mot. for a More Definite Statement (filed herewith).

15       b.  Free Speech.  Shi and Wang's "Third Claim for Relief" is for "Arbitrary Arrest and

16   Prolonged Detention."  Compl. at 24-25.  The complaint alleges plaintiffs were wrongly arrested

17   and detained "for an unlawful purpose in violation of the rights to freedom of speech, association,

18   and assembly" and because of their "participation in, and support of, the peaceful exercise of their

19   rights of free speech and free association."  *Id*. ¶¶ 85-86.  As explained above, the right to free

20   expression is not guaranteed in China, *supra* at 5-6, many parts of the Western world, *see, e.g.*,

21   Douglas-Scott, *supra*, at 309, or by the law of nations, *see Guinto v. Marcos*, 654 F. Supp. 276,

22   280 (S.D. Cal. 1986).

23       *Sosa* instructs that "federal courts should not recognize private claims under federal

24   common law for violations of any international law norm with less definite content and

25   acceptance among civilized nations than the historical paradigms familiar when [the ATS] was

26   enacted."  542 U.S. at 732.  Plaintiffs' arbitrary detention claim, which rests on the premise that

27   plaintiffs may not be incarcerated for engaging in political speech, comes nowhere close.

28

1    *Sosa*, 542 U.S. at 730-31, pointed to the Supreme Court's definition of the law of piracy in

2    *United States v. Smith*, 5 Wheat. 153 (1820), as an example of the "specificity with which the law

3    of nations" must be defined before courts recognize a claim under the ATS.  In *Smith*, the Court,

4    listing 20 pages of citations dating back centuries, noted that  "[t]here is scarcely a writer on the

5    law of nations who does not allude to piracy as a crime of *settled and determinate* nature; and

6    whatever may be the diversity of definitions, in other respects, *all* writers concur in holding that

7    robbery, or forcible depredations upon sea, *animo furandi*, is piracy." *Id*. at 161.  There is no

8    such international consensus either *protecting* the right to engage in political speech or

9    *prohibiting* nations from criminalizing it.

10    c. Forced Labor.  Plaintiff Shi's "Fourth Claim for Relief" is for "Forced Labor."  Compl.

11    ¶¶ 91-96.  However, the complaint fails to describe what labor Shi was forced to do and instead

12    describes the conditions at his prison generally.  *See id*. ¶ 66.  As this Court and others have

13    recognized, "whether a claim under the [ATS] lies . . . turns on whether the specific facts (not the

14    general characterization of the claim) violates international norms."  *Qi*, 349 F. Supp. 2d at 1278;

15    *Sosa*, 542 U.S. at 737-38 (while "some policies of arbitrary detentions" might be actionable,

16    plaintiffs' detention was not); *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82,

17    93-94 (D.C. Cir. 2002); *see also Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1964-65 (2007) ([a]

18    formulaic recitation of the elements of a cause of action will not do.").

19    Shi's claim must also be rejected because forced labor in prison, however offensive, is far

20    from universally condemned.  There is no "settled and determinate" definition of forced labor on

21    which "all writers concur."  *Smith*, 5 Wheat. at 161.  Plaintiffs rely on the definition found in the

22    1930 Forced Labor Convention of the International Labor Organization, *see* Compl. ¶69 (f), but

23    the Convention's broad definition ("all work or service which is extracted from any person under

24    the menace of penalty and for which said person has not offered himself voluntarily," Convention

25    art. 2), is riddled with exceptions, including one for prison labor.[20]  The Supreme Court of the

---

[20] *See, e.g.*, *id.* art. 2 (excluding from definition "[a]ny work or service exacted from any person as a consequence of a conviction in a court of law, provided that the said work or service is carried out under the supervision and control of a public authority and that the said person is not hired to or placed at the disposal of private individuals, companies or associations"); *see also id.* art. 7 (permitting local "chiefs" to "have recourse to forced or compulsory labor") *id.* art. 10

1   Netherlands has held that the ILO's definition of "forced and compulsory labour" did not

2   "contain[] norms that are so precisely defined as to be eligible by virtue of their content for direct

3   application and hence to be capable of being binding on all persons." *E.O. v. Openbaar*

4   *Ministerie*, HR 18 Apr. 1995, NJ 1995, 619, *reproduced in* 28 NETH. Y.B. INT'L L. 336-38

5   (1997). Even if the ILO Convention's definitions were precise enough, *Sosa* held that such

6   conventions are not "self-executing" and do not "create obligations enforceable in the federal

7   courts." *Sosa*, 542 U.S. at 735.

8          To be actionable under the ATS, an alleged tort *cannot* involve the violation of any norm

9   with "less . . . acceptance among civilized nations than the historical paradigms." *Sosa*, 542 U.S.

10  at 732. Blackstone, writing in the era the ATS was enacted, *see id.* at 714-15, concluded that the

11  only international law violations recognized were those "in which *all* the learned of *every* nation

12  agree." 4 W. BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND 67 (1769) at 67. The

13  ILO Convention on which plaintiffs rely does not reflect universal consensus: the United States

14  has not ratified it; nor have China, South Korea, or several other nations.[21]

15                    **4.  Defendants Cannot Be Held Liable On Plaintiffs' ATS Theories.**

16         Even recognizing the norms plaintiffs assert: (a) these norms (torture, *etc.*) apply only to

17

---

18  (permitting forced labor "exacted as a tax"); *id.* art. 18 (permitting forced labor "for the transport
    of persons or goods, such as the labor of porters or boatmen"). In fact, as abhorrent as it is to

19  some, forced prison labor is constitutional in the United States. *See Pollock v. Williams*, 322 U.S.
    4, 17-18 (1944) ("Forced labor in some special circumstances may be consistent with the general

20  basic system of free labor. For example, forced labor has been sustained as a means of punishing
    crime, and there are duties such as work on highways which society may compel.").

21  [21] *See* "Ratifications Of The Fundamental Human Rights Conventions By Country,"
    http://www.ilo.org/ilolex/english/docs/declworld.htm. The absence of a universal norm

22  prohibiting forced labor is only underscored by its absence among international law violations in
    the *Restatement (Third) of Foreign Relations Law of the United States*. In *Sosa*, 542 U.S. at 737,

23  the Court looked to Section 702 of the *Restatement* to determine whether the arbitrary arrest at
    issue in the case was actionable. *Sosa* rejected plaintiffs' claim even though prolonged arbitrary

24  detention is included in Section 702, reasoning that that claim "expresse[d] an aspiration that
    exceeds any binding customary rule having the specificity we require." *Id.* at 738. Section 702

25  contains no mention of forced labor; and in 1993, it was practiced in more than 40 countries,
    including Brazil, China, India, Pakistan, and Bulgaria. *See* 1993 Country Reports on Human

26  Rights Practices, Bureau of Democracy, Human Rights, and Labor, U.S. Department of State
    (Jan. 31, 1994), http://dosfan.lib.uic.edu/ERC/democracy/1993_hrp_report/93hrp_report_toc.html

27  That a rule of international law "as stated is . . . far from full realization . . . is evidence against its
    status as binding law; and an even clearer point against the creation by judges of a private cause

28  of action to enforce the aspiration behind the rule claimed." *Sosa* 542 U.S. at 738 n.29.

1    *states*, not private actors like defendants; and (b) defendants cannot be held liable on an aiding-

2    and-abetting theory.  As *Sosa* makes clear, in evaluating whether to permit ATS liability, courts

3    must ask "whether international law extends the scope of liability for a violation of a given norm

4    *to the perpetrator being sued, if the defendant is a private actor such as a corporation.*"  *Sosa*,

5    542 U.S. at 732 n.20.

6        a.  State Action.  International law generally applies only to nations, not to private parties.

7    *See* RESTATEMENT, *supra*, Part I, ch. 1, intro. note; *In re Estate of Marcos Human Rights Litig.*,

8    978 F.2d 493, 501-02 (9th Cir. 1992).  Although some courts have expanded international law to

9    cover *private* violations of an extremely narrow list of norms, there is little dispute that the four

10   norms alleged by plaintiffs apply *only* to states:

11   • The *Restatement* lists "piracy, slave trade, attacks on or hijacking of aircraft, genocide,

12      war crimes, and perhaps certain acts of terrorism" as the only offenses for which

13      individuals may be held liable under international law.  RESTATEMENT, *supra*, § 404.

14   • Several courts have held that *private* actors may *not* be held liable for torture.[22]

15   • Courts have rejected arbitrary imprisonment claims against non-state actors.[23]

16   • Courts do not, and should not, recognize international law claims against private

17      corporations for cruel punishment, violations of free speech rights, or forced labor.

18       b.  Aiding and Abetting.  As the Executive Branch and courts and scholars who read *Sosa*

19   correctly have rightly concluded, there is no civil aiding-and-abetting liability under the ATS.[24]

---

[22] *See, e.g.*, *Kadic v. Karadzic*, 70 F.3d 232, 243 (2d Cir. 1995); *Tel-Oren v. Lybian Arab Republic*, 726 F.2d 774, 795 (D.C. Cir. 1984) (Edwards, J., concurring); *Ibrahim v. Titan Corp.*, 391 F. Supp. 2d 10, 14-15 (D.D.C. 2005); *Abdullahi v. Pfizer, Inc.*, 2002 WL 31082956, at *5 (S.D.N.Y. Sept. 17, 2002).

[23] *See Wiwa v. Royal Dutch Petroleum*, 2002 U.S. Dist. LEXIS 3293 at *37-40 (S.D.N.Y. 2002).

[24] *See* U.S. Talisman Br. at 12-28; Curtis A. Bradley et al., Sosa, *Customary International Law and the Continuing Relevance of* Erie, 120 HARV. L. REV. 870, 924-29 (2007); *Exxon*, 393 F. Supp. 2d at 24; *In re South Af. Apartheid Litig.*, 346 F. Supp. 2d 538, 549-51 (S.D.N.Y. 2004).
    Some courts have held to the contrary, *see, e.g.*, *Presbyterian Church of Sudan v. Talisman*, 453 F. Supp. 2d 633 (S.D.N.Y. 2006), but whether such a norm exists is an open question in the Ninth Circuit.  In *Rio Tinto*, a panel majority initially concluded that "post-*Sosa*, claims for *vicarious liability* for violations of *jus cogens* norms *are actionable* under the [ATS]."  *Sarei v. Rio Tinto*, 456 F.3d 1069, 1078 (9th Cir. 2006) (underline added).  But on rehearing, the panel modified its opinion and expressly declined to resolve the question.  *See Sarei v. Rio Tinto*, 487 F.3d 1193, 1203 (9th Cir. 2007).  On August 20, 2007, the Ninth Circuit granted petition for rehearing en banc and vacated the panel majority's opinion.  *See* Ex. H (Order).  It is unclear

1   Even accepting such a theory, defendants' conduct does not qualify—plaintiffs do not allege that

2   defendants *intended* to harm plaintiffs.

3       The text of the ATS, principles of statutory construction, practical considerations, and

4   international law all militate against finding aiding-and-abetting liability under the ATS. The text

5   of the ATS contains no express provision for aiding and abetting liability. *See* 28 U.S.C. § 1350.

6   But the Congress that enacted the ATS knew how to create secondary liability. The year after it

7   enacted the ATS, "Congress enacted a criminal statute containing specific provisions for indirect

8   liability—for example, for aiding or assisting piracy." Bradley, *supra*, at 926 & n.296 (citing Act

9   of Apr. 30, 1790, ch. 9, § 10, 1 Stat. 112, 114. The ATS is bereft of such language.

10      And courts may not read secondary liability into federal statutes, *see Central Bank of*

11  *Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994), especially in ATS

12  cases. In *Central Bank*, the Supreme Court refused to read civil aiding-and-abetting liability into

13  the federal securities statute. In doing so, the Court reasoned that while Congress has passed a

14  general *criminal* aiding and abetting statute, 18 U.S.C. § 2, it "has *not* enacted a general civil

15  aiding and abetting statute—either for suits by the Government . . . or for suits by private parties."

16  *Central Bank*, 511 U.S. at 176, 182. While in *criminal* law, "aiding and abetting is an ancient . . .

17  doctrine," in civil cases, "the doctrine has been at best uncertain in application" and its

18  recognition would be "a vast expansion of federal law." *Id.* at 181, 183. Moreover, *Sosa*

19  repeatedly emphasized that only a "modest number" of claims could be brought under the ATS

20  without legislative authorization and made clear that any "innovative" interpretations of the Act

21  must be left to the legislative process. *See* 542 U.S. at 730-731. Thus, to endorse civil aiding-

22  and-abetting liability in ATS cases would violate both the command of *Sosa* and of *Central*

23  *Bank*.[25]

24  _____

25  whether the Ninth Circuit will address vicarious liability issues, the "exhaustion" issue that was
    the subject of a lengthy dissent, or something else.

26  [25] *See, e.g., In re S. Afr. Apartheid Litig.*, 346 F. Supp. 2d 538, 550-51 (S.D.N.Y. 2004), *appeal pending sub nom. Khulumani et al. v. Barclay Nat'l Bank Ltd., et al.*, No. 05-2141 (2nd Cir.

27  2005) (*Central Bank* applies "with special force" in the ATS context; recognizing aiding-and-
    abetting liability "without congressional mandate, in an area that is so ripe for non-meritorious

28  and blunderbuss suits would be an abdication of this Court's duty to engage in 'vigilant door
    keeping'" and would be inconsistent with the "'restrained conception' of new international law

1    Recognizing such claims would also harm U.S. policy interests.  The Executive Branch

2    has rejected the aiding-and-abetting theory plaintiffs advance, *see* U.S. Talisman Br. at 12-28, in

3    part, because it poses such significant policy concerns:

> [C]ivil aiding and abetting . . . liability would inevitably lead to greater diplomatic
> friction for the United States.  Such liability would trigger a wide range of ATS suits
> with plaintiffs challenging the conduct of foreign nations—conduct that would
> otherwise be immune from suit under the Foreign Sovereign Immunities Act. . . .

7    *Id*. at 19-22.  The Court has said such policy views must be given "serious weight."  Order at 7.

8    Civil aiding-and-abetting liability is equally disfavored under international law.  Notably,

9    none of the international law sources on which plaintiffs rely mentions the theory.  *See* Compl.

10    ¶ 69.  That is also not surprising.  As one group of scholars recently and rightly observed:

> The Court in *Sosa* rejected an arbitrary detention claim under the ATS [even
> though it was a norm expressed in several treaties and other documents]. . . *There
> is no relevant treaty that embraces aiding and abetting liability for corporations,
> the* Restatement *says nothing about such liability, and there is no widespread state
> practice of imposing liability on corporations for violations of international
> human rights law.*  To paraphrase *Sosa*, that a rule of corporate liability is so far
> from full realization is evidence against its status as binding law and even stronger
> evidence against the creation by judges of a private cause of action to enforce the
> aspiration behind the rule.

16    Bradley et al., *supra*, at 927-28.[26]

17    Even if, in theory, corporate actors could be held liable for aiding and abetting under the

18    ATS, defendants may not be held liable here.  Under any ATS theory, plaintiffs must establish

_____

violations that the Supreme Court has mandated for the lower federal courts").

[26] Plaintiffs will no doubt cite statutes establishing international *criminal* tribunals that recognize aiding-and-abetting liability.  *See* Rome Statute of the International Criminal Court ("ICC") art. 25(1), July 17, 1998, 2187 U.N.T.S. 90; Statute of the International Criminal Tribunal for the Former Yugoslavia ("ICTFY"), S.C. Res. 827, arts. 2-5, U.N. Doc. S/RES/827 (May 25, 1993); Statute of the International Criminal Tribunal for Rwanda, S.C. Res. 955, arts. 2-4, U.N. Doc. S/RES/955 (Nov. 8, 1994).  But as *Central Bank* explains, these tribunals' recognition of the "ancient doctrine" of *criminal* aiding-and-abetting liability is a far cry from recognizing *civil* liability.  Moreover, even if these criminal law sources were valid evidence of *civil* law, they are too unspecific to be actionable under *Sosa*.  Some tribunals permit aiding-and-abetting liability if defendant had knowledge of the principal's violation; others require defendant to have intended to further the violation.  *See* Bradley, *supra*, at 927 (comparing ICTFY with ICC).  Further, "none of the modern international criminal tribunals extends criminal liability *to corporations*," and "the state parties to the relatively recent [ICC] negotiations *considered and rejected* international criminal liability for *corporations*."  *Id*. at 925 n.292; *see id*. at 927.  These conflicting standards, which only undercut plaintiffs' efforts to hold defendants liable, come nowhere close to the "settled and determinate" definitions on which the Supreme Court said one must rely to conclude that "all nations" and "all persons" recognize a particular norm.  *Smith*, 5 Wheat. at 161-62.

1   that defendants' conduct violated "norm[s] of international character accepted by the civilized

2   world." *Sosa*, 542 U.S. at 725. As explained in Section IV.E, *infra*, defendants' alleged acts of

3   aiding and abetting are privileged by U.S. federal, U.S. state, and a wide variety of international

4   law. Because there is no allegation that defendants *intended* harm to plaintiffs, plaintiffs' aiding-

5   and-abetting theory also fails. Even those courts that wrongly recognize the theory hold that it

6   *only* applies if "the defendant knew of the [principal's] specific violation," and "acted with the

7   *intent* to assist that violation." *The Presbyterian Church of Sudan, v. Talisman Energy, Inc.*, 453

8   F. Supp. 2d 633, 668 (S.D.N.Y. 2006). Courts have refused to find such intent even where the

9   defendant is accused of actively working with a local, repressive, military government to protect

10  defendants' oil extraction business. *See id.* Here, the allegations come nowhere close.

11          **B.       Plaintiffs Have Failed to State a Claim Under the TVPA.**

12          Plaintiffs' TVPA claims fail for similar reasons. First, plaintiffs' Third and Fourth Claims

13  for Relief—for arbitrary arrest and forced labor, which plaintiffs bring, in part, under the TVPA,

14  *see* Compl. at 25-26—may not be brought under the statute. By its plain terms, the TVPA

15  provides a remedy for "torture," *not* arbitrary arrest or forced labor.[27]

16          Second, all of plaintiffs' TVPA claims fail because the TVPA applies only to individuals,

17  *not* corporations. The statutory text imposes liability on an "*individual* who, under actual or

18  apparent authority, or color of law, of any foreign nation . . . subjects an *individual* to torture." 28

19  USC 1350, note. Because a corporation cannot be subjected to "torture," and because the same

20  word used in the same statute must be given the same meaning, "individual" in section 1350 does

21  not include "corporations," as numerous courts have recognized. *See, e.g.*, *Mujica v. Occidental*

22  *Petroleum Corp.*, 381 F. Supp. 2d 1164, 1175-76 (C.D. Cal. 2005); *Doe I v. Exxon Mobil Corp.*,

23  393 F. Supp. 2d 20, 28 (D.D.C. 2005); *Arndt v. UBS AG*, 342 F. Supp. 2d 132, 141 (S.D.N.Y.

24

---

25  [27] *See* P.L. 102-256, 106 Stat. 73 at § 2(a) (codified at 28 U.S.C. § 1350, note) (creating liability
    for "[a]n individual who, under actual or apparent authority, or color of law, of any foreign
26  nation" subjects "an individual to torture" or "extrajudicial killing"); *id.* § 3(b)(1) (defining
    "torture" as "any act . . . by which severe pain or suffering . . . is intentionally inflicted on [an]
27  individual for such purposes as obtaining . . . information or a confession," punishment,
    intimidation, coercion, or discrimination); *Qi*, 349 F. Supp. 2d at 1278 (TVPA "provides a cause
28  of action for the . . . specific tort of torture").

1    2004); *but see Aldana*, 416 F.3d at 1249-50.

2         Third, properly construed, the TVPA does not impose aiding-and-abetting liability.  By its

3    plain terms, the TVPA applies only to individuals who "subject[]" others to torture, 28 U.S.C.

4    § 1350, note.  Civil aiding-and-abetting liability may not be read into the statute.

5         Fourth, even if the TVPA could be construed to impose aiding-and-abetting liability, only

6    individuals acting under the color of law, not private actors, may be held liable.[28]

7         Fifth, even if aiding-and-abetting liability were available, defendants' alleged acts of

8    aiding and abetment—communicating with the PRC—are privileged (see *infra*, IV.E), and

9    defendants are not alleged to have acted with the requisite intent.

10        Finally, plaintiffs Wang and Shi have failed to allege facts sufficient to establish they were

11   tortured and not merely subject to "police brutality," which is not actionable under the TVPA.

12   *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 93 (D.C. Cir. 2002); *see also*

13   Defs.' Alternative Mot. for a More Definite Statement (filed herewith) (elaborating on this

14   argument).

15        **C.    Plaintiffs Have Failed To State A Claim Under ECPA.**

16        In their Eleventh Claim for Relief, *see* Compl. ¶¶ 128-36, Shi and Wang allege defendants

17   improperly intercepted their emails, 18 U.S.C. § 2511, accessed their communications, 18 U.S.C.

18

19   ───────────────────
     [28] *See In re S. Afr. Apartheid Litig.*, 346 F. Supp. 2d at 555 ("Since a prerequisite to TVPA
     liability is that the individual be acting under color of law, this Court finds that creating aider and

20   abettor liability for private actors not acting under color of law would be inconsistent with the
     statute and precluded by *Central Bank*."); *Mujica*, 381 F. Supp. 2d at 1174; *Exxon*, 393 F. Supp.

21   2d at 28; *Corrie*, 403 F. Supp. 2d at 1027 (same); S. Rep. No. 102-249, at 9 (1991), 1991 WL
     258662 ("[A] higher official need not have personally performed or ordered the abuses in order to

22   be held liable.  Responsibility for torture, summary execution, or disappearances extends beyond
     the person who actually committed those acts—anyone with higher authority who authorize,

23   tolerated or knowingly ignored those acts is liable for them.").
          While some courts have wrongly concluded or suggested that the TVPA permits

24   secondary liability, they have done so largely based on statements in committee reports.  *See, e.g.,*
     *Cabello v. Fernandez-Larios*, 402 F.3d 1148, 1157–58 (11th Cir. 2005); *Doe v. Saravia*, 348 F.

25   Supp. 2d 1112, 1148–49 (E.D. Cal. 2004).  These decisions, including this Court's dicta in *Qi, see*
     349 F. Supp. 2d at 1332, are incorrect, as "[l]egislative history cannot trump the statute,"

26   *Bonneville Power Admin. v. FERC*, 422 F.3d 908, 920 (9th Cir. 2005); *Ratzlaf v. United States*,
     510 U.S. 135, 147-48 (1994), and the Supreme Court's decision in *Central Bank* makes clear that

27   Congress must speak clearly when, and if, it seeks to impose civil aiding-and-abetting liability.
     In any event, this Court's dicta in *Qi* does not control here, because in *Qi*—unlike here—the

28   defendants were state actors.  *See Qi*, 349 F. Supp. 2d at 1314.

1  § 2701, and disclosed contents of their communications and user information, 18 U.S.C. § 2702.

2  Plaintiffs' ECPA claims must be dismissed because (1) the statute does not apply

3  extraterritorially; and (2) sections 2701 and 2702 do not apply to defendants' alleged disclosures.

4      "Congress ordinarily intends its statutes to have domestic, not extraterritorial,

5  application." *Small v. United States*, 544 U.S. 385, 388-89 (2005).  Foreign policy concerns

6  justify this presumption, *see Sale v. Haitian Ctrs. Council*, 509 U.S. 155, 173-74 (1993), as does

7  the fact that, if Congress wishes to, it may rebut the presumption. *Argentine Republic v. Amerada

8  Hess Shipping Corp.*, 488 U.S. 428, 440 (1989) ("[w]hen it desires to do so, Congress knows how

9  to place the high seas within the jurisdictional reach of a statute").  "Absent clear evidence of

10  congressional intent to apply a statute beyond our borders [a] statute will apply only to the

11  territorial United States." *United States v. Gatlin*, 216 F.3d 207, 211-12 (2d Cir. 2000).

12      Neither the text of ECPA nor its legislative history gives any indication that Congress

13  intended the statute to apply extraterritorially.  ECPA contains no extraterritorial provision, *cf.* 18

14  U.S.C. § 1513(d) (statute prohibiting retaliating against a witnesses: "There is extraterritorial

15  Federal jurisdiction over an offense under this section."), and ECPA's legislative history

16  explicitly states the Act's definition of "wire communication," applicable under both § 2702 and

17  § 2511, "is not meant to suggest that the Electronic Communications Privacy Act applies to

18  interceptions made outside the territorial United States." S. Rep. No. 99-541, at 12 (1986), *as

19  reprinted in* 1986 U.S.C.C.A.N. 3555, 3566.

20      The Ninth Circuit has ruled that ECPA's wiretap provisions have no extraterritorial

21  application. *See United States v. Peterson*, 812 F.2d 486, 492 (9th Cir. 1987) (holding that "Title

22  III has no extraterritorial force").  Similarly, the Second Circuit has held that the term "wire

23  communication" in ECPA is intended only to refer to communications "through our Nation's

24  communications network." *United States v. Toscanino*, 500 F.2d 267, 279 (2d Cir. 1974); *United

25  States v. Cotroni*, 527 F.2d 708, 711 (2d Cir. 1975); *see also United States v. Angulo-Hurtado*,

26  165 F. Supp. 2d 1363, 1369 (N.D. Ga. 2001); *Berlin Democratic Club v. Rumsfeld*, 410 F. Supp.

27  144, 153 (D.C. D.C. 1976) (denying Austrian citizen standing to sue U.S. military officials in

28  Germany for violations of ECPA's wiretap provisions).

1  The complaint alleges plaintiffs Shi and Wang reside in China, used Chinese email

2  accounts, and that Yahoo!, YHKL, or Yahoo! China disclosed information regarding their

3  internet usage to Chinese authorities.  *See* Compl. ¶¶ 10, 12, 40, 54, 60, 62.  For purposes of

4  determining where an alleged interception takes place, the Ninth Circuit has held that telephone

5  conversations are intercepted "where the tapped phone is located *and* where law enforcement

6  officers first overhear the call."  *United States v. Luong*, 471 F.3d 1107, 1109 (9th Cir. 2006); *see*

7  *also United States v. Denman*, 100 F.3d 399, 403 (5th Cir. 1996).  Plaintiffs' computers—the

8  email equivalent of the "tapped phone"—were located in China, and Chinese officials allegedly

9  read their emails in China.  Therefore, any alleged interceptions—even if defendants facilitated

10  them in Hong Kong or the United States, as plaintiffs allege—occurred outside the United States

11  and ECPA's reach.  In *Cotroni*, the court rightly rejected the argument that Canadian wiretaps, set

12  in Canada and authorized by Canadian authorities, violated ECPA's wiretap provisions because

13  some conversations traveled over U.S. communications systems.  *Cotroni* reasoned, "it is not the

14  route followed by foreign communications which determines the application of [the wiretap

15  statute]; it is where the interception took place."  527 F.2d at 711.[29]

16  Even if ECPA applied extraterritorially, plaintiffs fail to state a claim under 18 U.S.C.

17  § 2702.  While section 2702(a) generally prohibits an electronic-communication-services provider

18  from divulging records or information pertaining to subscribers, the statute permits disclosure "to

19  any person other than a governmental entity."  18 U.S.C. § 2702(c)(6); *Freedman v. America*

20  *Online, Inc.*, 412 F. Supp. 2d 174, 183 (D. Conn. 2005) (ECPA "permits an ISP to voluntarily

21  divulge a subscriber's customer information to any person other than a governmental entity");

22  *United States v. Hambrick*, 55 F. Supp. 2d 504, 507 (W.D. Va. 1999) ("ISPs are free to turn

23

---

24  [29] To be clear, the ATS does not provide plaintiffs a vehicle by which to bring ECPA claims
based on foreign conduct.  The ATS allows aliens to bring "civil action[s] . . . for a *tort only*,

25  committed in violation of *the law of nations* or a *treaty of the United States*."  28 U.S.C. § 1350.
The Ninth Circuit has made clear that "garden variety violations of statutes, . . . regulations, and

26  common law" "are not appropriately considered breaches of the 'law of nations' for purposes of
jurisdiction under the Alien Tort Statute."  *Hamid v. Price Waterhouse*, 51 F.3d 1411, 1418 (9th

27  Cir. 1995).  Plaintiffs do not allege, nor could they ever prove, that the protections afforded by
ECPA on which they rely are part of the "law of nations" or part of "a treaty of the United

28  States."  28 U.S.C. § 1350.

1    stored data and transactional records over to nongovernmental entities").  The PRC is not a

2    "governmental entity" for purposes of ECPA, because ECPA defines the term as "a department or

3    agency of the United States or any State or political subdivision thereof."  18 U.S.C. § 2711(4).[30]

4         Finally, plaintiffs cannot state a claim under 18 U.S.C. § 2701.  They assert defendants

5    violated this provision by exceeding "their authorization to access and control private information

6    concerning Plaintiffs' electronic communications."  Compl. ¶ 130.  However, section 2701(a)

7    does not apply "to conduct authorized . . . by the person or entity providing a wire or electronic

8    communications service."  18 U.S.C. § 2701(c)(1) .  As the alleged provider of the plaintiffs'

9    email services, defendants cannot violate this section.  *See Bohach v. City of Reno*, 932 F. Supp.

10   1232, 1236 (D. Nev. 1996) ("§ 2701(c)(1) allows providers to do as they wish when it comes to

11   accessing communications in electronic storage").[31]

12        **D.    Plaintiffs Have Failed to State a Claim Under California Law.**

13        Plaintiffs' California claims are for battery, assault, false imprisonment, intentional

14   infliction of emotional distress, negligence, and unfair competition.  Each claim is barred by

15   Section 47(b) of the California Civil Code, which privileges defendants' alleged communications.

16   *See infra* Section IV.E.2.  Each is also preempted by the foreign affairs doctrine and suffers from

17   various defects specific to California law.

18        **1.    The Foreign Affairs Doctrine Preempts Plaintiffs' California Claims.**

19        The federal foreign affairs doctrine limits "state involvement in foreign affairs and

20   international relations—matters which the Constitution entrusts solely to the Federal

21   Government."  *Zschernig v. Miller*, 389 U.S. 429, 436 (1968).  Where a proposed application of

22   state law falls outside areas of "traditional state responsibility," the foreign affairs doctrine

23   _____

24   [30] The definition of "governmental entity" was added to § 2711 as part of a clarifying amendment
     in the USA PATRIOT Improvement and Reauthorization Act of 2005.  PL 109-177.  Before the
     definition was codified, courts recognized that "governmental entity" meant federal, state, and

25   local governments.  *See Ameritech Corp. v. McCann*, 403 F.3d 908, 912-13 (7th Cir. 2005).

26   [31] If plaintiffs' claims proceed past the motion to dismiss stage, defendants will also demonstrate
     that plaintiffs' ECPA claims are barred by the statute of limitations, vitiated by plaintiffs' consent
     to terms of services agreements, and precluded by provisions of ECPA allowing disclosure of

27   contents of communications and subscriber records where "necessarily incident to the rendition of
     the service or to the protection of the rights or property of the provider of that service."  18 U.S.C.

28   §§ 2702(b)(5) , 2702(c)(3).

1  mandates the dismissal of plaintiffs' claims even if there is no direct conflict between the state's

2  policy and that of the federal government.  *American Ins. Ass'n v. Garamendi*, 539 U.S. 396, 419

3  n.11, 425 (2003).  The regulation of an American business's conduct in China falls well outside

4  any area of "traditional state responsibility."  *Id*.  For this reason alone, the Court should either

5  refuse to hear or dismiss plaintiffs' six California claims with prejudice.

6      Even if regulating how companies conduct business in China were within California's

7  "traditional competence," *id*. at 419 n.11, the same outcome is required.  California has only the

8  weakest interest in the claims plaintiffs assert because plaintiffs do not reside here, and all the

9  allegedly tortious activity took place in China.  To the extent California has any interest in

10 proscribing defendants' alleged conduct, the foreign policy conflict that such regulation would

11 create far outweighs California's interest.  *See Mujica*, 381 F. Supp. 2d at 1190.

12              **2.  Plaintiffs Cannot Establish Their Intentional Tort Claims.**

13      a.  Aiding-and-Abetting Liability.  Plaintiffs' intentional tort claims, their Fifth through

14 Eighth Claims for Relief, all hinge on an aiding-and-abetting theory.  These claims—for battery,

15 assault, false imprisonment, and intentional infliction of emotional distress, *see* Compl. at 26-

16 28—must be dismissed.  Plaintiffs cannot establish that defendants possessed the intent necessary

17 for aiding-and-abetting liability.

18      Under California law, aiding and abetting "necessarily requires a defendant to reach a

19 *conscious decision* to participate in tortious activity for the purpose of assisting another in

20 performing a wrongful act."  *Howard v. Superior Court*, 2 Cal. App. 4th 745, 749 (Cal. Ct. App.

21 1992) (emphasis in original).  Put another way, aiding-and-abetting liability may only be imposed

22 if the defendant "knew that a tort had been, or was to be committed, and *acted with the intent of*

23 *facilitating the commission of that tort*."  *Gerard v. Ross*, 204 Cal. App. 3d 968, 983 (Cal. Ct.

24 App. 1988).

25      Plaintiffs do not allege that defendants intended to cause them harm or "facilitate" the

26 PRC's alleged torts.  They merely allege defendants' conduct was "voluntary" and "willing."

27 Compl. ¶ 2.  Neither claim is sufficient to establish that defendants acted "with the intent of

28 facilitating the commission of" their alleged abuse.  *Gerard*, 204 Cal. App. 3d at 983.  Nor are

1    these conclusory allegations consistent with documents identified in plaintiffs' complaint.  *See*

2    Compl. ¶ 64 (citing ruling of Hong Kong Commissioner, which states at ¶ 8.25:  "the disclosure

3    of Information in the circumstances of the case was not a voluntary act initiated by [YHKL] but

4    was compelled under the force of PRC law").[32]

5         b.  Direct Liability.  To the extent plaintiffs seek to hold defendants *directly* liable on their

6    false imprisonment and intentional infliction claims, *see* Compl. ¶¶ 106, 110, those claims must

7    be rejected as well.  Plaintiffs' false imprisonment claim is easily dispensed with, as the

8    complaint is devoid of allegations that defendants directly engaged in any "nonconsensual

9    intentional confinement of a person."  *Fermino v. Fedco, Inc.*, 7 Cal. 4th 701, 715 (Cal. 1994).

10        Plaintiffs' intentional infliction claim has no basis either.  Given California privilege law,

11   *see infra* Section IV.E.2, providing law enforcement officials with information regarding criminal

12   activity cannot possibly be "extreme and outrageous conduct . . . so extreme as to exceed all

13   bounds of that usually tolerated in a civilized community."  *Conroy v. Regents of Univ. of Calif.*,

14   151 Cal. App. 4th 132, 146 (Cal. Ct. App. 2007).  Moreover, to be held liable, defendants'

15   conduct must have been "directed at the plaintiff, or occur in the presence of a plaintiff of whom

16   the defendant is aware."  *Id.*  Defendants lacked this knowledge, particularly as to plaintiff Yu.[33]

17        **3.  Plaintiffs Do Not State a Claim for Negligence.**

18        Plaintiffs' negligence claims, Compl. ¶¶ 114-17, may not proceed on an aiding-and-

19   abetting theory, which only applies to intentional torts, *see Fiol v. Doellstedt*, 50 Cal. App. 4th

20   1318, 1325 (Cal. Ct. App. 1996).  Plaintiff Yu cannot state a direct claim for negligence because

---

[32] To the extent plaintiffs claim defendants "ratified" the PRC's intentional torts and are liable on that theory, *see, e.g.*, Compl. ¶ 74, there can be no "ratification" under California law absent an agency relationship.  *See Estate of Stephens*, 28 Cal. 4th 665, 673 (Cal. 2002) ("Ratification is the voluntary election by a person to adopt in some manner as his own act an act which was purportedly done *on his behalf* by another person . . . .").  Plaintiffs do not allege, nor could they, that PRC officials acted on behalf of defendants or that defendants exercised control over the PRC.

[33] *Cf. Davidson v. City of Westminster*, 32 Cal. 3d 197, 210 (Cal. 1982) (dismissing intentional infliction claim against police officers who failed to prevent assault they knew was likely to occur; "Absent an intent to injure, such inaction is not the kind of extreme and outrageous conduct" that gives rise to liability under the tort); *Christensen v. Superior Ct.*, 54 Cal. 3d 868, 879, 906 (Cal. 1991) (rejecting intentional infliction claims brought against funeral home that desecrated remains of plaintiffs' loved ones; plaintiffs had "not alleged that the conduct of any of the defendants was directed primarily at them").

1  her injuries were not reasonably foreseeable and, thus, defendants owed her no duty of care.  Duty

2  is a "question of law to be resolved by the court," *Artiglio v. Corning Inc.*, 18 Cal. 4th 604, 614

3  (Cal. 1998), based on:

> the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff
> suffered injury, the closeness of the connection between the defendant's conduct
> and the injury suffered, the moral blame attached to the defendant's conduct, the
> policy of preventing future harm, the extent of the burden to the defendant and
> consequences to the community of imposing a duty to exercise care with resulting
> liability for breach, and the availability, cost, and prevalence of insurance for the
> risk involved.

8  *Friedman v. Merck & Co.*, 107 Cal. App. 4th 454, 465 (Cal. Ct. App. 2003).

9      Yu seeks to hold defendants liable for emotional and other harms suffered on account of

10  her husband's mistreatment.  *Ileto v. Glock*, 194 F. Supp. 2d 1040, 1053 (C.D. Cal. 2002),

11  disposes of her claim.  In *Ileto*, plaintiffs were injured by guns defendant manufactured and sued

12  for negligence.  Applying California law, the court held, "While it may be foreseeable that some

13  criminals might obtain Glock firearms and use them to harm others, there was no way of

14  foreseeing that this *particular individual* . . . would obtain a Glock firearm and use it to injure

15  *these Plaintiffs*."  *Id.* at 1053.  Yu's claims are similarly too remote.

16      Wang and Shi's negligence claims must be dismissed because they assumed the risk of

17  harm when they chose to use Yahoo! China email and group list services to engage in activity

18  they knew violated Chinese law.  Primary assumption of the risk "operate[s] as a complete bar to

19  the plaintiff's recovery" in negligence cases, and applies where "by virtue of the nature of the

20  activity and the parties' relationship to the activity, the defendant owes no legal duty to protect

21  the plaintiff from the particular risk of harm that caused the injury."  *Knight v. Jewett*, 3 Cal. 4th

22  296, 314-15 (Cal. 1992); *Saffro v. Elite Racing, Inc.*, 98 Cal. App. 4th 173, 178 (Cal. Ct. App.

23  2002).

24      Although the doctrine is most commonly applied to active sports, *see Moser v. Ratinoff*,

25  105 Cal. App. 4th 1211, 1220-21 (Cal. Ct. App. 2003), it has also been applied to other

26  dangerous, non-sporting activities.[34]  In *Cohen v. McIntyre*, 16 Cal. App. 4th 650, 655 (Cal. Ct.

---

[34] *See, e.g.*, *Herrle v. Estate of Marshall*, 45 Cal. App. 4th 1761 (Cal. Ct. App. 1996) (patient's estate not liable to nurse's aid struck by patient suffering from senile dementia); *Rosenbloom v. Hanour Corp.*, 66 Cal. App. 4th 1477 (Cal. Ct. App. 1998) (employer not liable to employee

1    App. 1993), for example, the court rejected a negligence claim a veterinarian brought against the

2    owner of a dog that had bit him. "Cohen, a licensed veterinarian, was injured during the course of

3    treating an animal under his control, an activity for which he was employed and compensated and

4    one in which the risk of being attacked and bitten is well known." *Id*.

5         Wang and Shi both made journalistic careers criticizing the PRC's repressive policies.

6    *See* Compl. ¶¶ 32-45, 52-56. They were no doubt fully aware of the risk of engaging in political

7    speech. *See, e.g.*, *id.* ¶ 25 (dissidents "face a well-documented pattern of" abuses). According to

8    the complaint, Wang's writings included the warning: "We should never forget that China is still

9    a totalitarian and despotic country." *Id*. ¶¶ 33, 43. Shi, like Wang, wrote about the suppression of

10   free expression in China and, indeed, he was prosecuted for publicizing a "state secret" document

11   that related to previous crackdowns on political speech. *See id*. ¶¶ 52-54. Moreover, according to

12   Shi's criminal judgment cited in the complaint, *see id.* ¶ 62, Shi's editors warned him he would be

13   prosecuted if he published the document, *see* Appx. A, Ex. C at 5. Defendants cannot be held

14   liable for a knowing and obvious risk that plaintiffs assumed—however righteous their cause. *Cf*.

15   *Baker v. Superior Ct.*, 129 Cal. App. 3d 710 (Cal. Ct. App. 1982) (firefighter cannot sue for

16   injuries sustained while fighting blaze).

17            **4.   Plaintiffs Do Not State a Claim For Unfair Competition.**

18        Plaintiffs' complaint does not state a claim within the meaning of section 17200. It does

19   not allege unlawful, unfair, or fraudulent business practices. To the contrary, the gist of the

20   complaint is that defendants *obeyed laws and procedures* that plaintiffs allege led to their

21   imprisonment.

22        Moreover, plaintiffs lack standing to bring the Tenth Claim for Relief under California

23   Business and Professions Code section 17204. *See* Compl. ¶¶ 118-27. Proposition 64 recently

24   amended section 17204 to limit private suits to those brought by plaintiffs who have "suffered

25   injury *and* lost money or property '*as a result* of such unfair competition.'" *Daro v. Superior*

26

27   hired to handle sharks who was bitten by a shark); *Hamilton v. Martinelli & Associates*, 110 Cal.
     App. 4th 1012, 1021 (Cal. Ct. App. 2003) (training officer not liable to probation officer injured
28   while performing required training maneuver).

1    *Court*, 151 Cal. App. 4th 1079, 1098 (2007) (emphasis in original).  The new language in section

2    17204 is similar to existing language in section 17203, which courts have read to permit

3    restitution only.  *See Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1150 (Cal.

4    2003).  Thus, under Proposition 64, to bring a UCL action a plaintiff must now allege a valid

5    claim to restitution.  *See Walker v. USAA Casualty Ins. Co.*, 474 F. Supp. 2d 1168, 1172 (E.D.

6    Cal. 2007).  *See also Center for Biological Diversity v. FPL Group, Inc.*, 2006 WL 2987634 at

7    *4-6 (Cal. Superior Ct., Oct. 13, 2006) (Sabraw, J.).[35]

8        Restitution claims under section 17204 are limited to the recovery of money or property

9    "that defendants took *directly* from plaintiff" or that can "be traced" to "*particular funds*" in a

10   defendant's possession.  *Korea Supply*, 29 Cal. 4th at 1149-50; *see also Colgan v. Leatherman*

11   *Tool Group, Inc.*, 135 Cal. App. 4th 663, 699 (Cal. Ct. App. 2006) (restitution limited to "money

12   or property identified as belonging in good conscience to the plaintiff [that] *could clearly be*

13   *traced to particular funds or property in the defendant's possession*").  Plaintiffs do not allege

14   defendants took or have their property.  They claim the PRC seized it.  *See* Compl. ¶¶ 10-12, 37,

15   47, 57.  Plaintiffs have no restitution claim against defendants.  *See Walker*, 474 F. Supp. 2d at

16   1172.[36]

17        **E.    Defendants' Communications With The PRC Are Protected From Liability.**

18        Finally, the complaint must be dismissed because the only actions defendants are alleged

19   to have taken—communications with law enforcement concerning suspected criminal activity—

20   are privileged and immunized from liability under federal, California, and international law.

21        **1.   The Communications Are Protected Under Federal Law.**

22        Federal law privileges communications with law enforcement officials.  In *In re Quarles*,

23   158 U.S. 532, 535-36 (1895), the Supreme Court explained that principles of sovereignty require

24   privileging such communications from liability.  "It is the right, as well as the duty, of every

25   ───────────────────────

26   [35] Plaintiffs might cite two cases that they would argue are contrary.  *See White v. Trans Union*
     *LLC*, 462 F. Supp. 2d 1079 (C.D. Cal 2006); *Southern California Housing Rights Center v. Los*

27   *Feliz Towers Homeowners Assoc.*, 426 F. Supp. 2d 1061 (C.D. Cal. 2005).  Not so.  Neither case
     is apt on these facts, analyzes the issues closely, or is in keeping with the logic of *Korea Supply* or
     the purpose of Proposition 64.  *Walker* and its ilk control.

28   [36] Plaintiffs' California claims, like their ECPA claims, are also time barred.

1  citizen . . . to communicate to the executive officers any information which he has of the

2  commission of an offense against those laws; and such information, given by a private citizen, is

3  a privileged and confidential communication, for which no action of libel or slander will lie . . .

4  The right of a citizen informing of a violation of law . . . *arises out of the creation and*

5  *establishment by the Constitution itself of a national government, paramount and supreme within*

6  *its sphere of action.*"

7      Relying on *Quarles*, *Vogel v. Gruaz*, 110 U.S. 311 (1884), and their progeny, federal

8  courts have consistently upheld these privileges.  The Ninth Circuit, for example, has explained

9  that "the information given to a prosecutor by a private person for the purpose of initiating a

10  prosecution is protected by [a] cloak of immunity . . . so that all persons might freely disclose

11  their suspicions and deductions" without fear of being sued.  *Borg v. Boas*, 231 F.2d 788, 794-95

12  (9th Cir. 1956).[37]  While some courts say the privilege is absolute, *see Vogel*, 110 U.S. at 314;

13  *Holmes v. Eddy,* 341 F.2d 477, 480-481 (4th Cir. 1965), others say it is qualified, *see McDonald*

14  *v. Smith*, 472 U.S. 479, 485 (1985); *Foltz v. Moore McCormack Lines, Inc*., 189 F.2d 537, 540

15  (2d Cir. 1951).  Plaintiffs' federal claims fail either way.  Even under the qualified privilege,

16  defendants' communications with the PRC are immunized unless they were (1) false; *and* (2)

17  made with malice.  *See Foltz*, 189 F.2d at 540; *Swaaley v. U.S*., 376 F.2d 857, 862 (Ct. Cl. 1967).

18  Plaintiffs do not allege the information defendants provided was false; far from it, they complain

19  it was all too accurate.  Nor do they assert that defendants acted with ill will.

20      Plaintiffs' federal claims are also barred by the foreign sovereign compulsion and *Noerr-*

21  *Pennington* doctrines.  The foreign sovereign compulsion doctrine, which finds its roots in

22  _____

23  [37] *See also U.S. v. New York Tel. Co.*, 434 U.S. 159, 175 (1977) (government could compel private phone company to install pen registers on telephones; citing *In re Quarles* approvingly);

24  *Brown v. Edwards,* 721 F.2d 1442, 1454 n.17 (5th Cir. 1984) (citing *Vogel* and *Borg* in support of "an absolute privilege for statements made in the institution of criminal charges"); *Holmes v.*

25  *Eddy*, 341 F.2d 477, 480-481 (4th Cir. 1965) (granting stockbroker immunity for statements made to the SEC about a suspicion that a company was attempting to bilk the public); *Foltz v. Moore*

26  *McCormack Lines, Inc.*, 189 F.2d 537, 540 (2d Cir. 1951) (defendant who provided information to FBI was immune from suit unless statement was false and made with malice); *Swaaley v. U. S.*,

27  376 F.2d 857, 862-63 (Ct. Cl. 1967) (statements made to government concerning suspected criminal activity privileged); RESTATEMENT (SECOND) OF TORTS § 598 cmt. d (1977) (statement

28  privileged "when any recognized interest of the public is in danger, including the interest in the prevention of crime and the apprehension of criminals").

1  antitrust law, applies here to bar plaintiffs' claims.[38]  It provides that courts may not require a

2  person to engage in acts prohibited by a foreign state or refrain from acts compelled by the state.

3  *See Timberland Lumber Co. v. Bank of America*, 549 F.2d 597, 606 (9th Cir. 1977).  One leading

4  case, *Interamerican Refining Corp. v. Texaco Maracaibo, Inc.*, 307 F. Supp. 1291, 1296 (D. Del.

5  1970), holds that because "defendants were compelled by regulatory authorities in Venezuela to

6  boycott plaintiff," they had "a complete defense to [plaintiff's] action under the antitrust laws

7  based on that boycott."  As the court elaborated:

8      When a nation compels a trade practice firms there have no choice but to obey.
       Acts of business become effectively acts of the sovereign.  The Sherman Act does
9      not confer jurisdiction on United States courts over acts of foreign sovereigns. . . .
       *Were compulsion not a defense, American firms abroad faced with a government
10     order would have to choose one country or the other in which to do business.  Id.*

11         Under the doctrine, defendants must show their communications were (a) "basic and

12  fundamental'" to plaintiffs' case and "not just [of] peripheral" concern, and (b) compelled.

13  *Brodie*, 174 F. Supp. 2d at 300.  Both requirements are met here.  Defendants' communications

14  with the PRC are at the core of plaintiffs' case; and, as documents cited in the complaint make

15  clear, *see* Compl. ¶ 64, defendants' disclosure of information was compelled by Chinese law.  In

16  its report, the Hong Kong Privacy Commissioner concluded:

17     • "[T]he disclosure of Information in the circumstances of the case was not a
         voluntary act initiated by [YHKL] but was compelled under the force of PRC
18       law," Appx. A, Ex. A¶ 8.25;
       • "the Order was a legal obligation imposed on [YHKL]," and "refusal to
19       comply [with the order] might result in both criminal and administrative
         sanctions," *id*. ¶ 7.12; and
20     • "Yahoo! China and [YHKL] did in the circumstances of this case have
         genuine penal apprehension of possible violation of Article 45 or Article 277
21       if refused to comply with the [PRC's] order," *id*. ¶ 7.8.[39]

22  ────────────────
[38] *See Societe Internationale Pour Participations Industrielles et Commerciales, S.A. v. Rogers*,
23  357 U.S. 197 (1958) (excusing Swiss company's failure to comply with American discovery
    order that required it to violate Swiss law); *United States v. Brodie*, 174 F. Supp. 2d 294, 299-304
24  (E.D. Pa. 2001) (recognizing potential applicability of doctrine outside antitrust law).

    [39] Article 45 of the Criminal Procedure Law provides the PRC the authority to gather evidence
25  requires the government to investigate those who "falsif[y], conceal[], or destroy[]" it. Article 277
    of the Criminal Law provides "[w]hoever intentionally obstruct officers of a State security organ
26  or a public security organ from maintaining State security in accordance with law" is to be
    punished "to fixed-term imprisonment of not more than three years, criminal detention, or public
27  surveillance or be fined."  Article 18 of the State Security Law provides that "when a State
    security organ investigates and finds out any circumstances endangering State security and
28  gathers related evidence, citizens and organizations concerned shall faithfully furnish it with
    relevant information and may not refuse to do so."  *Id*. ¶¶ 7.1-7.11; *see also* Article 57 of PRC

1    As the Supreme Court has said:  "It is hardly debatable that fear of criminal prosecution

2    constitutes a weighty excuse for" acting, "and this excuse is not weakened because the laws

3    [engendering this fear] are those of a foreign sovereign."  *Societe Internationale*, 357 U.S. at 211.

4         The *Noerr-Pennington* doctrine also originated in antitrust law and shields firms from

5    liability for communications with government officials.  *See United Mine Workers of Am. v.*

6    *Pennington*, 381 U.S. 657 (1965); *Eastern R.R. Presidents Conference v. Noerr Motor Freight,*

7    *Inc.*, 365 U.S. 127 (1961).  The doctrine has been extended to non-antitrust cases,[40] shields

8    defendants from claims based on communications with law enforcement,[41] and applies unless

9    plaintiffs can show that defendants' communications were a *sham* designed to injure plaintiffs

10   through *false* accusations, *see Oregon Natural Res.*, 944 F.2d at 534.  Again, plaintiffs make no

11   such allegations.

12        **2.  Plaintiffs' Claims Are Barred By California's Statutory Privilege.[42]**

13        California Civil Code Section 47(b) "bars" civil actions based on communications with

14   law enforcement.  *Hagberg v. Calif. Fed. Bank FSB*, 32 Cal. 4th 350, 360 (Cal. 2004).  "[C]ourts

15   have given [47(b)] an expansive reach," "held that the privilege is absolute, even if the result is

16   inequitable," and ruled that "any doubt as to whether the privilege applies is resolved in favor of

17   applying it."  *Morales v. Coop. of Am. Physicians, Inc*, 180 F.3d 1060, 1062 (9th Cir. 1999).  Like

---

19   Regulations on Telecommunications; Article 18 of Measures for the Administration of Internet E-
     mail Services; Articles 9, 13, 14 and 15 of Administrative Measures on Internet Bulletin Services.

20   *See* Appendix B, Tabs 2, 3, 4, 7, 10, and 11.

[40] *See, e.g., Boulware v. State of Nev. Dept. of Human Res.*, 960 F.2d 793, 800 (9th Cir. 1992)
21   (civil rights); *Evers v. Custer County*, 745 F.2d 1196, 1204 (9th Cir. 1984) (civil conspiracy);
     *Oregon Natural Res. Council v. Mohla*, 944 F.2d 531, 533-34 (9th Cir. 1991) (tort); *Video Int'l*
22   *Prod. v. Warner-Amex Cable Commc'n*, 858 F.2d 1075, 1084 (5th Cir. 1988) (*Noerr-Pennington*
     doctrine applies to "claims brought under federal and state law," and to "common-law tort"
23   claims as well as statutory claims).

[41] *See Forro Precision, Inc. v. Inter. Bus. Machines*, 673 F.2d 1045, 1059-1060 (9th Cir. 1982);
24   *Palmer v. Roosevelt Lake Log Owners Ass'n.*, 551 F. Supp. 486, 493-494 (D. Wash. 1982).

[42] Defendants believe Chinese law should control and disposes of plaintiffs' "state law" claims.
25   However, for the purposes of this motion, defendants assume *arguendo*, as plaintiffs' complaint
     alleges, that California law applies.  *Cf. Panama Processes, S.A. v. Cities Services Co.*, 650 F.2d
26   408, 413 n.6 (2d Cir. 1981) (noting party had reserved right to argue Brazilian law applied,
     though it was presently arguing under New York law); *Radiation Sterilizers, Inc. v. U.S.*, 867 F.
27   Supp. 1465, 1476 (E.D. Wash. 1994) (in ruling on motions to dismiss, court did not decide
     whether Washington or Georgia law applied, but merely determined whether plaintiffs' causes of
28   action, brought under Washington law, stated cognizable claims under Washington law).

1    its federal counterparts, section 47(b) is designed to "encourage[e] freedom of communication

2    between citizens and public authorities charged with investigating wrongdoing." *Forro*

3    *Precision, Inc. v. Int'l Bus. Machs.*, 673 F.2d 1045, 1053 (9th Cir. 1982). The privilege is based

4    on the recognition that "it [is] the duty of every citizen to cooperate with the police in their

5    investigation of crime and to provide information to investigating officers"; it thus "shields" those

6    who give "testimony or statements to officials conducting criminal investigations." *Hagberg,* 32

7    Cal. 4th at 373.

8        Both federal and California courts have held that the section 47(b) privilege applies to

9    communications made in foreign countries to foreign officials. *See Beroiz v. Wahl*, 84 Cal. App.

10   4th 485 494-95 (Cal. Ct. App. 2000) (Mexico); *E. & J. Gallo Winery v. Andina Licores, S.A.*,

11   Case No. CV F 05-0101, 2006 U.S. DIST. LEXIS 47206, at *24 (E.D. Cal. June 30, 2006)

12   (Ecuador). The *Beroiz* court surveyed case law from other jurisdictions and observed that,

13   throughout the United States, courts "have uniformly held that similar privileges apply to foreign

14   proceedings and communications." 84 Cal. App. 4th at 494.[43]

15                    **3.  Plaintiffs' International Law Claims Are Similarly Barred.**

16       Finally, plaintiffs assert defendants violated "universal" standards of international law by

17   providing the PRC with evidence of plaintiffs' unlawful internet usage. *See* Compl. ¶¶ 3, 5, 70-

18   96. Not so. Numerous countries,[44] like our country and like virtually every State in the Union,[45]

19   have long *privileged* such communications.

20   _____

21   [43] While *Beroiz*, 84 Cal. App. 4th at 494-96, and *E. & J. Gallo Winery*, 2006 U.S. DIST. LEXIS
     47206, at *24-26, observed that a qualified, rather than absolute, privilege might apply if

22   defendant initiated foreign legal proceedings and the foreign legal system did not provide
     adequate safeguards, that circumstance is not presented here. The complaint does not allege that

23   defendants initiated contact with the PRC, nor did they. Plaintiffs also have not alleged
     defendants acted with "hatred or ill will" or recklessly published false information. *Noel v. River*

24   *Hills Wilsons, Inc*., 113 Cal. App. 4th 1363, 1370 (Cal. Ct. App. 2003) ("The malice necessary to
     defeat a qualified privilege is 'actual malice' which is established by a showing [1] that the

25   publication was motivated by hatred or ill will towards the plaintiff or [2] by a showing that the
     defendant lacked reasonable grounds for belief in the truth of the publication and therefore acted

26   in reckless disregard of the plaintiff's rights."); see also *Dorn v. Mendelzon*, 196 Cal. App. 3d
     933, 945 (Cal. Ct. App. 1987).

27   [44] *See* Yahoo!'s concurrently filed Anti-SLAPP Motion at 8, n.5.

28   [45] *See* Yahoo!'s concurrently filed Anti-SLAPP Motion at 8, n.6.

1    **V.    PLAINTIFFS FAILED TO JOIN AN INDISPENSABLE PARTY.**

2        Plaintiffs' complaint must be dismissed pursuant to Rule 12(b)(7), because the PRC is a

3    "necessary" party and the case cannot proceed without it.  *Wilbur v. Locke*, 423 F.3d 1101, 1111

4    (9th Cir. 2005).

5        **A.    The PRC Is A Necessary Party.**

6        A party is "necessary" if (1) complete relief cannot be afforded plaintiffs in its absence; *or*

7    (2) a decision on the merits will either (a) impair its ability to protect its interests or (b) subject

8    defendants in this case to "multiple or inconsistent obligations."  *Dawavendewa v. Salt River*

9    *Project Agr. Imp. & Power Dist.*, 276 F.3d 1150, 1155 (9th Cir. 2002).  Both of these alternative

10   tests are satisfied; satisfying *either* test is sufficient.  *See* FED. R. CIV. P. 19(a).

11       Plaintiffs complain they are being wrongly incarcerated and abused by the PRC.  Their

12   complaint seeks "affirmative action by the Defendants to secure the[ir] release."  Compl. at 34

13   ¶ (d).  That relief is not possible in the PRC's absence.  No money judgment or declaration of

14   rights would be enough:  plaintiffs' harm continues so long as they remain incarcerated.

15       The PRC has a strong interest in this action and its absence will impair its interests and

16   impose conflicting obligations.  Plaintiffs seek both an injunction preventing defendants from

17   providing the PRC with evidence in criminal cases, *see* Compl. at 34 ¶ (e), and a declaration that

18   disclosure of such evidence violates international law, *see id.* at 34 ¶ (d).  Those requests are a

19   direct attack on the PRC's sovereignty and ability to "govern [its own] territory."  *Dawavendewa*,

20   276 F.3d at 1157.[46]  Moreover, there can be no question the case "subject[s] [defendants] to a

21   substantial risk of incurring . . . inconsistent obligations."  FED. R. CIV. P. 19(a)(2)(ii).  Unless the

22   Court can also bind the PRC, the requested relief will put defendants squarely "between the

23   proverbial rock and hard place."  *Dawavendewa*, 276 F.3d at 1156.  Rule 19(a)(2)  is designed to

24   prevent such results.  *See id*.

25

26

27   [46] *See also Davis v. United States*, 192 F.3d 951, 959 (10th Cir. 1999) (Seminole Tribe necessary party where judgment would overrule Tribe's ordance); *Ricci v. State Bd. of Law Examiners*, 569 F.2d 782 (3d Cir. 1978) (State Supreme Court was necessary and indispensable party to

28   action seeking to invalidate court's rule governing bar admission).

1    **B.    The PRC Cannot Be Joined.**

2        American courts do not have jurisdiction over foreign states unless the state waives

3    immunity or the plaintiffs' claims fall under one of the statutory exceptions to the Foreign

4    Sovereign Immunity Act, 28 U.S.C. §§ 1604, 1605, *see In re Republic of the Phil.*, 309 F.3d

5    1143, 1149 (9th Cir. 2002).  The PRC does not fall into any of the exceptions in this case.  *See id.*

6    **C.    The PRC Is Indispensable.**

7        If a necessary party cannot be joined, the Court must consider whether in "equity and

8    good conscience" the suit should proceed without it. FED. R. CIV. P. 19(b); *EEOC v. Peabody*

9    *Western Coal Co.*, 400 F.3d 774, 780 (9th Cir. 2005).  Courts must balance four factors in making

10   this determination.  *See Dawavendewa*, 276 F.3d at 1161.  All four factors favor dismissal.

11       The first three factors are closely related:  (1) prejudice to the PRC and defendants; (2) the

12   ability to mitigate prejudice by shaping the relief; and (3) the adequacy of a judgment that does

13   not bind the PRC.  To award any relief to plaintiffs, the Court must rule that providing evidence

14   to the PRC in a criminal case was a violation of international law.   Plaintiffs seek a declaration to

15   such effect, an injunction preventing such disclosures, and damages.  Any judgment for plaintiffs

16   in this case—no matter how broad or narrow the relief—will intrude on the PRC's sovereignty,

17   and put defendants in an untenable conflict, *Dawavendewa*, 276 F.3d at 1156. [47]  Moreover, were

18   the Court to award plaintiffs relief without joinder of the PRC, such relief will be inadequate.

19   Political speech will still be criminal in China, plaintiffs will still be in prison, and companies will

20   still be required by Chinese law to furnish evidence.

21       The fourth factor—whether an alternative forum exists—also favors dismissal.  Shi

22   instituted legal proceedings before the Hong Kong Privacy Commissioner; his case is pending on

23   appeal; the Commissioner issued a detailed ruling showing Shi's claims were taken seriously; and

24   Hong Kong is an adequate, alternative forum. [48]  But even if no alternative forum existed, that

25   _____

26   [47] *See Saudi Arabia v. Nelson*, 507 U.S. 349, 361 (1993) ("however monstrous such abuse undoubtedly may be, a foreign state's exercise of the power of its police has long been understood" as sovereign in nature).

27   [48] *See e.g., Capri Trading Corp. v. Bank Bumiputra Malaysia Berhad*, 812 F. Supp. 1041, 1043-
28   44 (N.D. Cal. 1993) (Hong Kong is an adequate forum to adjudicate alleged RICO violations, common law fraud and breach of fiduciary duty claim); *Dragon Capital Partners L.P. v. Merrill*

1  does *not* prevent dismissal when the other Rule 19(b) factors are satisfied.[49]

2  ## VI.    PLAINTIFFS' COUNSEL MAY LACK AUTHORITY TO BRING THIS SUIT.

3          In the unique circumstances of this case, there is a serious question about the authority and

4  ability of plaintiffs' counsel to prosecute this case on behalf of Shi and Wang.  As the complaint

5  suggests, counsel have no direct contact with Shi and Wang and can only allege the facts of Shi

6  and Wang's case based on information and belief.  *See* Compl. ¶¶ 45, 65, 145.  A "suit instituted

7  without authority from the party named as plaintiff is a nullity," "any judgment obtained in such a

8  suit is void," and the complaint in such a case must be dismissed. *Meredith v. Ionian Trader*, 279

9  F. 2d 471, 474 (2d Cir. 1960); *see also Pueblo of Santa Rosa v. Fall*, 273 U.S. 315, 319 (1927).

10  Under federal and California law, every action must be prosecuted by the real party in interest or

11  a representative of that party authorized by law.  *See* FED. R. CIV. P. 17; CAL. CIV. PROC. CODE

12  § 367.  Representative suits are allowed *only* where appropriate documented authority exists.[50]

13          This Court has the power to "require an attorney, one of its officers, to show his authority

14  to appear," and to dismiss a case if that authority is not shown.  *Pueblo* 273 U.S. at 319; *see also*

15  *United States v. Wolf*, 352 F. Supp. 2d 1195, 1199 (W.D. Okla. 2004); *In re Retail Chemists*

16  _____

17  *Lynch Capital Servs. Inc.*, 949 F. Supp. 1123, 1130-31 (S.D.N.Y. 1997) (rejecting claim that impending Chinese takeover of Hong Kong will render it an inadequate forum and finding that Hong Kong is an adequate forum to try securities fraud claims).

18  [49] *See Dawavendewa*, 276 F.3d at 1162 (collecting cases); *Wilbur*, 423 F.3d at 1115 ("even assuming [plaintiffs] have no other forum in which to pursue a remedy, we have 'regularly held that the [absent party's] interest in [sovereign] immunity overcomes the lack of an alternative

19  remedy or forum for the plaintiffs.'").  Indeed, outside the Ninth Circuit, the fact that the PRC is entitled to sovereign immunity would, by itself, require that this case be dismissed. *See*

20  *Dawavendewa*, 276 F.3d at 1162.  Defendants believe this rule is correct and hereby preserve the issue.

21  [50] In California, plaintiffs may grant general powers of attorney to sue on their behalf, *see* CAL.

22  PROB. CODE §§ 4263(a)(1), 4459, but the documents must be (a) dated; (b) signed "either (1) by the principal or (2) in the principal's name by another adult in the principal's presence and at the

23  principal's direction"; and (c) "acknowledged before a notary public or . . . signed by at least two witnesses."  *Id.* §§ 4121, 4122; *Estate of Rabinowitz*, 114 Cal. App. 4th 635, 638 (2003).

24  In China, a party must submit to the People's Court a power of attorney bearing her signature

25  or seal that specifies the subject matter and the limits of authority granted.  An agent must have special authority to recognize, withdraw, or modify claims; to become involved in mediation; and

26  to file a counterclaim or to lodge an appeal on behalf of the principal.  *See* 1991 Civil Procedure Law (P.R.C.), Art. 59.  (Appx. B, Tab 5).  A carte blanche power of attorney, which fails to name

27  the powers granted, precludes an agent from doing any of the above.  *See* Opinions of the Supreme People's Court on Certain Issues Concerning Application of PRC Civil Procedure Law

28  2002, SUP. PEOPLE'S CT. GAZ., Art. 69. (Appx. B, Tab 8).

1    *Corp*, 66 F. 2d 605, 608 (2d Cir. 1933).  We submit it is important and prudent to address this

2    issue at the threshold of this case.[51]

3          Defendants have met and conferred with plaintiffs' counsel regarding this issue.

4    Plaintiffs' counsel have represented they have written powers of attorney granting full authority,

5    but decline to provide them to defendants at this stage of the proceedings.  The need for such

6    assurances are especially important here, because it will be impossible to depose plaintiffs or

7    witnesses in China,[52] attempts to gather evidence may violate Chinese law,[53] and plaintiffs have

8    little or no ability to provide *any* evidence to support their claims.[54]

9    **VII.    CONCLUSION**

10         Plaintiffs' Second Amended Complaint should be dismissed with prejudice.

11   Dated: August 30, 2007                    DANIEL M. PETROCELLI
                                               MATTHEW T. KLINE
12                                             O'MELVENY & MYERS LLP

13                                             By:_____
14                                                    Daniel M. Petrocelli
                                               Attorneys for Defendant Yahoo! Inc and for
15                                             specially appearing defendant Yahoo! Hong
                                               Kong, Ltd.

16

17

18

19

20   [51] Defendants are aware of one prominent ATS case prosecuted for six years, in which certain
     plaintiffs alleged that they had not authorized counsel to act in settling the case.  The judgment
21   and settlement were only upheld, in large part, because plaintiffs had signed powers of attorney,
     shared them with defendants, and defendants relied on them pursuant to California Probate Code
22   section 4303, which provides: "A third person who acts in good faith reliance on a power of
     attorney is not liable to the principal . . . if . . . (1) The power of attorney is presented to the third
23   person by the attorney-in-fact designated in the power of attorney.  (2) The power of attorney
     appears on its face to be valid.  (3) The power of attorney includes a notary public's certificate of
24   acknowledgment or is signed by two witnesses."  CAL. PROB. CODE § 4303.
     [52] *See* U.S. Department of State, China Judicial Assistance,
25   http://travel.state.gov/law/info/judicial/judicial_694.html ("it does **not** appear possible to take the
     deposition of a witness located in China") (emphasis in original).
26   [53] *See* Hong Kong Commissioner's Report ¶¶ 7.17-7.18; *see also id.* ¶¶ 7.3-7.20.
27   [54] *See id.* ¶ 3.2 ("No supporting evidence was attached to [Shi's] complaint.  Despite repeated
     requests, no further information or evidence was produced by [Shi] or his authorized
28   representative to the Commissioner for consideration."); *see also id.* ¶¶ 3.3, 8.52.

C07-02151 CW
YAHOO!'S MOT. TO DISMISS SEC. AM.          - 40 -
COMPL.

# EXHIBIT B

1  DANIEL M. PETROCELLI (S.B. #97802)
   dpetrocelli@omm.com
2  MATTHEW T. KLINE (S.B. #211640)
   mkline@omm.com
3  O'MELVENY & MYERS LLP
   1999 Avenue Of The Stars
4  Los Angeles, California 90067-6035
   Main Number: (310) 553-6700
5  Facsimile: (310) 246-6779

6  Attorneys for Defendant YAHOO!, INC.

7

8                    UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF CALIFORNIA
                          OAKLAND DIVISION
9

10 WANG XIAONING, YU LING, SHI TAO,        Case No. C07-02151 CW
   and ADDITIONAL PRESENTLY
11 UNNAMED AND TO BE IDENTIFIED            **DEFENDANT YAHOO!, INC.'S NOTICE**
   INDIVIDUALS,                            **OF MOTION AND SPECIAL MOTION TO**
                                           **STRIKE PLAINTIFFS' STATE LAW**
12                Plaintiff,               **CAUSES OF ACTION PURSUANT TO**
                                           **THE CALIFORNIA ANTI-SLAPP**
13         v.                              **STATUTE**

14 YAHOO!, INC., a Delaware Corporation,   Date:      November 1, 2007
   YAHOO! HONG KONG LTD., a Foreign        Time:      2 p.m.
15 Subsidiary of Yahoo!, AND OTHER         Location:  Courtroom 2
   PRESENTLY UNNAMED AND TO BE
16 IDENTIFIED INDIVIDUAL EMPLOYEES         Judge:     Hon. Claudia Wilken
   OF SAID CORPORATIONS,
17
                  Defendant.
18

19

20 TO PLAINTIFFS AND THEIR COUNSEL OF RECORD:

21         PLEASE TAKE NOTICE THAT ON October 4, 2007, at 2 p.m. in Courtroom 2, 4th

22 Floor, United States Courthouse, 1301 Clay Street, Oakland, California, defendant Yahoo!, Inc.

23 ("Yahoo!") will and hereby does move to strike plaintiffs' six causes of action brought under

24 California law—*i.e.*, plaintiffs' Fifth through Tenth Claims for Relief in their Second Amended

25 Complaint ("complaint"). This special motion to strike is brought on the grounds that (1)

26 plaintiffs' California causes of action are subject to the California anti-SLAPP statute, California

27 Code of Civil Procedure § 425.16; and (2) are barred by California Civil Code § 47, which

28 privileges the communications at issue in this case.

C07-02151 CW
YAHOO!'S ANTI-SLAPP MOTION AND
[PROPOSED] ORDER

1        This motion is based on this notice of motion and motion, the following Memorandum of

2    Points and Authorities, Yahoo!'s concurrently filed Motion to Dismiss Plaintiffs' Second

3    Amended Complaint, the pleadings on file in this matter, the reply memorandum Yahoo! intends

4    to file, and any further argument the Court might allow.

5        Dated: August 27, 2007       DANIEL M. PETROCELLI
                                      MATTHEW T. KLINE

6                                           O'MELVENY & MYERS LLP

7

8                                    By: _____

9                                         Daniel M. Petrocelli
                                    Attorneys for Defendant

10                                         YAHOO!, INC.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ................................................................................................ 1

II.     STATEMENT OF FACTS ................................................................................. 1

III.    PLAINTIFFS' CALIFORNIA LAW CLAIMS MUST BE STRICKEN BECAUSE
        YAHOO!'S ALLEGED COMMUNICATIONS WERE PRIVILEGED. .......................... 2

        A.      The Anti-SLAPP Statute Applies. ........................................................... 3

                1.      Plaintiffs' Claims Target Protected Acts of Communication. .................... 3

                2.      No Good Reason Exists to Exempt Plaintiffs' Claims from the
                        Statute ......................................................................................... 5

        B.      Plaintiffs Claims Are Barred by Civil Code Section 47(b). .................................. 10

IV.     CONCLUSION ................................................................................................ 10

CC1:766379.7
8/24/07

- i -

1  I.    **INTRODUCTION**

2          Plaintiffs' six causes of action brought under California law—their Fifth through Tenth

3  Claims for Relief—each must be stricken pursuant to California's anti-SLAPP statute and

4  California Civil Code section 47, because the claims are based on alleged acts of communications

5  with Chinese law enforcement officials concerning, what is by definition, a matter of public

6  concern—*i.e.*, alleged criminal activity.  The anti-SLAPP statute, which is designed to protect

7  participation in matters of public concern, allows defendants an expedited means to challenge

8  lawsuits arising out of such communications.  *See* CAL. CODE CIV. PROC. § 425.16.  The anti-

9  SLAPP statute applies to supplemental state law claims brought in federal court, *see Globetrotter*

10 *Software, Inc. v. Elan Computer Group, Inc.*, 63 F. Supp. 2d 1127, 1129-30 (N.D. Cal. 1999), and

11 affords Yahoo! substantive and procedural protections, including the right to file this special

12 motion to strike.  Civil Code section 47(b) is similar to the SLAPP statute and privileges

13 communications with law enforcement officials—even those that occur abroad—and shields

14 Yahoo! from liability arising out of such acts.  Plaintiffs' claims in this case challenge

15 quintessential acts of communication protected by California law.  Plaintiffs' Fifth through Tenth

16 Claims for Relief must be stricken.

17 II.   **STATEMENT OF FACTS**

18         Plaintiffs allege they published pro-democracy literature in China, using Yahoo! China

19 email accounts and group lists.  *See* Compl., ¶¶ 10, 12, 33-35, 53-54, 56.  They allege the Chinese

20 government sought to prosecute plaintiffs under Chinese laws prohibiting such speech; and

21 Yahoo!, defendant Yahoo! Hong Kong, Ltd., and/or Yahoo! China (plaintiffs' allegations are

22 unclear) "provided Chinese officials with access to [plaintiffs'] private e-mail records, copies of

23 email messages, e-mail addresses, user ID numbers, and other identifying information . . . ."

24 *Id.* ¶¶ 2, 42, 62.  Plaintiffs assert that "[t]hese disclosures served . . . as the basis" for their

25 prosecution and detention and that, once incarcerated, government officials abused them and

26 engaged in "acts of persecution." *Id.* ¶ 2.  Plaintiffs are deliberately vague as to whether

27 defendants provided information to the Chinese government on their own accord or in response to

28 an official request from the Chinese government.  All the complaint says is that defendants acted

1   "voluntarily." *Id.* ¶ 2.

2       Plaintiffs contend that defendants' disclosure of information aided and abetted the

3   misconduct of the Chinese government and violated federal, international, and California law.  In

4   paragraph 4 of their complaint, plaintiffs describe their California claims.  They say defendants

5   "violate[d] California state laws, including prohibitions against battery, false imprisonment,

6   assault, intentional infliction of emotional distress, negligence, negligent supervision, and the

7   California Business & Professions Code § 17200." Compl. ¶ 4.  Plaintiffs elaborate on their

8   California law claims in the "Causes of Action" section of their complaint and their Fifth through

9   Tenth Claims for Relief. *See id.* ¶¶ 69, 97-127.[1]

10      For purposes of this motion, Yahoo! assumes the facts alleged in the complaint are true

11  and should be read most favorably to plaintiffs—*i.e.*, that Yahoo! played some role in the

12  transmittal of information regarding plaintiffs to the Chinese authorities.  Even on these assumed

13  facts, the veracity of which Yahoo! does not concede, plaintiffs have failed to state a claim.

14  **III.    PLAINTIFFS' CALIFORNIA LAW CLAIMS MUST BE STRICKEN BECAUSE**

15  **YAHOO!'S ALLEGED COMMUNICATIONS WERE PRIVILEGED.**

16      Plaintiffs' complaint could not more directly challenge Yahoo!'s right to engage in

17  communicative acts protected by California law.  As both California state and federal courts have

18  recognized, California Civil Code § 47(b) privileges communications made to both domestic and

19  foreign law enforcement officials. *See Beroiz v. Wahl*, 84 Cal. App. 4th 485, 494-95 (Cal. Ct.

20  App. 2000)  (§ 47(b) privilege applies to communications made to Mexican law enforcement); *E.*

21

22  [1] At times, plaintiffs suggest that their tort claims (*e.g.*, for battery) are brought under both "the
    laws of California *and the United States.*" *Id.* ¶¶ 98-100 (emphasis added); *see also id.* ¶¶ 112,

23  116.  Of course, "[t]here is no federal general common law" and, as the Supreme Court explained
    70 years ago, "[e]xcept in matters governed by the Federal Constitution or Acts of Congress, the

24  law to be applied in any case *is the law of the State.*" *Erie Railroad Co v. Tompkins*, 304 U.S. 64,
    78 (1938) (emphasis added).  Because plaintiffs' complaint directly invokes the law of the State

25  of California, Yahoo! assumes, for purposes of bringing this motion, that California law applies.
    However, Yahoo! reserves the right to assert that California law does not apply to this case.

26  *Cf. Radiation Sterilizers, Inc. v. U.S.*, 867 F. Supp. 1465, 1476 (E.D. Wash. 1994) (in ruling on
    motions to dismiss, court did not decide whether Washington or Georgia law applied, but merely

27  determined whether plaintiffs' causes of action, brought under Washington law, stated cognizable
    claims under Washington law); *Panama Processes, S.A. v. Cities Services Co.*, 650 F.2d 408, 413

28  n.6 (2d Cir. 1981) (party reserved right to argue that Brazilian law applied, though it presently
    argued under New York law).

1   &  J. Gallo Winery v. Andina Licores, S.A., Case No. CV F 05-0101, 2006 U.S. DIST. LEXIS

2   47206, at *24 (E.D. Cal. June 30, 2006) (privilege applies to communications made in Ecuador);

3   Johnson v. Symantec Corp., 58 F. Supp. 2d 1107, 1110 (N.D. Cal. 1999) ("undisputed" that

4   privilege applies to communications "made in the context of ongoing governmental

5   investigations"). Given this rule, plaintiffs' California law claims should either be dismissed

6   pursuant to Yahoo!'s concurrently filed motion to dismiss, or stricken pursuant to the anti-SLAPP

7   statute.

8        Adjudicating a SLAPP motion is a two-step process. First, the Court must determine

9   whether the defendant has met its burden of demonstrating that the anti-SLAPP statute applies.

10  See Navellier v. Sletten, 29 Cal. 4th 82, 88 (Cal. 2002). Second, if defendant meets that burden,

11  the plaintiffs must demonstrate they have stated a legally cognizable claim. See id.

12       In federal court, a plaintiff's burden in response to an anti-SLAPP motion depends on the

13  nature of defendant's challenge. If the challenge is based on legal defects on the face of the

14  pleadings, then plaintiffs' burden is "analogous to [that of] a Rule 12(b)(6) motion to dismiss."

15  Rogers v. Home Shopping Network, Inc., 57 F. Supp. 2d 973, 982 (C.D. Cal. 1999). If, instead, a

16  defendant's challenge is based on a lack of evidence to substantiate plaintiff's claims, then the

17  plaintiff's burden is analogous to a motion for summary judgment pursuant to Rule 56. See id. at

18  982-83. Here, Yahoo! challenges deficiencies on the face of the pleadings. Thus, plaintiffs'

19  allegations should be assumed true and their California law claims stricken only if they failed to

20  plead a "cognizable legal theory" or pled insufficient facts "under a cognizable legal theory."

21  Balistreri v. Pacifica Police Dept., 901 F.2d 696, 699 (9th Cir. 1988) (applying Rule 12(b)(6)).

22  Yahoo! contends plaintiffs' claims are barred by California privilege law.

23       **A.    The Anti-SLAPP Statute Applies.**

24            1.    **Plaintiffs' Claims Target Protected Acts of Communication.**

25       The SLAPP statute applies to any "cause of action against a person arising from any act of

26  that person in furtherance of that person's right of petition or free speech under the United States

27  or California Constitution in connection with a public issue," CAL. CODE CIV. PROC.

28  § 425.16(b)(1), including "any written or oral statement or writing made before a legislative,

C07-02151 CW
YAHOO!'S ANTI-SLAPP MOTION AND        - 3 -
[PROPOSED] ORDER

1  executive, or judicial proceeding, or any other official proceeding authorized by law" and "any

2  written or oral statement or writing made in connection with an issue under consideration or

3  review by a legislative, executive, or judicial body, or any other official proceeding authorized by

4  law," *id.* §§ 425.16(e)(1)-(2). Plaintiffs' California claims fall within the scope of the SLAPP

5  statute because they arise from communications with government officials concerning an official

6  investigation.

7       California courts have uniformly held that such communications are protected:

8      • In *Briggs v. Eden Council for Hope & Opportunity*, 19 Cal. 4th 1106, 1115 (Cal.

9         1999), the California Supreme Court held that statements made to investigators for the

10         Department of Housing and Urban Development fell within the ambit of the statute.

11      • In *Dickens v. Provident Life & Accident Ins. Co.*, 117 Cal. App. 4th 705, 713-717

12         (Cal. Ct. App. 2004), the California court of appeal held that the statute protected

13         statements made to federal prosecutors that resulted in plaintiffs' prosecution.

14      • In *Siam v. Kizilbash*, 130 Cal. App. 4th 1563, 1569-1570 (Cal. Ct. App. 2005), the

15         Court of Appeal held that defendant's reports of child abuse to police qualified.

16      • And in *Computerxpress, Inc. v. Jackson*, 93 Cal. App. 4th 993, 1009-10 (Cal. Ct. App.

17         2001), the court held that SLAPP applied to complaints filed with the SEC.

18  None of these results is surprising. As the California Supreme Court has recognized: "it [is] the

19  duty of every citizen to cooperate with the police in their investigation of crime and to provide

20  information to investigating officers," and defendants cannot be held liable for "fulfill[ing] this

21  duty." *Hagberg v. Calif. Fed. Bank FSB*, 32 Cal. 4th 350, 373 (Cal. 2004).

22       Under any reading of the complaint, defendants' alleged communications are protected.

23  Even assuming Yahoo! *volunteered* information to the PRC—which it did not—its actions, like

24  those in *Briggs*, *Dickens*, *Siam*, and *Computer Express*, are fully protected. *See Dickens*, 117 Cal.

25  App. 4th 705 at 707-08 (lawsuit is subject to SLAPP because "Dickens's cause of action . . .

26  challenges the actions of [defendants] in allegedly playing an instrumental role in procuring the

27  criminal prosecution against him.")

28

1    If Yahoo!'s communications were made in response to a formal legal request, then those

2    communications deserve even greater protection. Testimony given before public bodies,

3    evidence produced in response to subpoenas or legal process, and reports made in response to

4    official requests for information are all "protected activities" under the SLAPP statute. *Greka*

5    *Integrated, Inc. v. Lowrey*, 133 Cal. App. 4th 1572, 1580 (Cal. Ct. App. 2005) ("Lowrey

6    disclosed information about Greka to his counsel, to authorities and in deposition and trial

7    testimony *in response to subpoenas. These are all protected activities.* Accordingly, Lowrey met

8    his burden to show the complaint arose from protected speech.") (citing CAL. CODE CIV. PROC. §

9    425.16(e)(1) (statements made "before a legislative, executive, or judicial proceeding, or any

10    other official proceeding authorized by law" are protected activity)) (emphasis added); *Gallanis-

11    Politis v. Medina*, 152 Cal. App. 4th 600, 611 (Cal. Ct. App. 2007) (holding that "investigation

12    and report . . . conducted and written in response to a request for information from" County

13    official were "acts in furtherance of [defendants'] right of petition or free speech," and, thus,

14    protected by the SLAPP statute).

15         2.    **No Good Reason Exists to Exempt Plaintiffs' Claims from the Statute.**

16    Plaintiffs have not indicated whether they believe the SLAPP statute applies in this case.

17    If they argue against its application, such arguments should be rejected.

18    First, plaintiffs may argue that because they filed this lawsuit to protect their free speech

19    rights—and not to interfere with defendants' rights and duties to speak—the SLAPP statute

20    should not apply. Such an argument would be misguided. The SLAPP statute applies even when

21    plaintiff's lawsuit is not motivated by a desire to chill defendant's speech. *See Dickens*, 117 Cal.

22    App. 4th 705 at 716-17. Even if that were not the rule, plaintiffs clearly intend to silence

23    defendants: they seek "injunctive relief to stop any further disclosures of user information" to the

24    PRC. Compl. at 34.

25    Second, plaintiffs might argue that SLAPP should not apply to communications with

26    foreign law enforcement officials. However, plaintiffs assert claims based on *California* law

27    against a *California* defendant and are, therefore, subject to *California* defenses. Moreover,

28

1   identical language in California's related litigation privilege statute, *see* CAL. CIV. CODE § 47(b),

2   has been held to apply to communications with foreign law enforcement officials.

3        The Ninth Circuit has held that the anti-SLAPP statute furthers "important, substantive

4   state interests," and should be applied to California claims absent a direct conflict with other laws.

5   *United States ex rel. Newsham v. Lockheed Missiles & Space Co.*, 190 F.3d 963, 973 (9th Cir.

6   1999) (extending SLAPP statute's protection to California claims in federal diversity actions).

7   Although a court in this district has recently concluded that the SLAPP statute may not apply to

8   claims *filed* in another jurisdiction and *governed by the substantive law* of that jurisdiction, it

9   recognized that the SLAPP statute does govern "cases where California substantive law was

10  being applied." *Schering Corp. v. First DataBank*, Inc., 2007 U.S. Dist. LEXIS 50164 at *8

11  (N.D. Cal. Apr 20, 2007).  "California has a great interest in determining how much protection to

12  give California speakers" who are sued for California torts.  *Id.* at *17.  Plaintiffs cannot claim the

13  protections of California law but avoid its burdens.[2]

14       Moreover, in determining the scope of the SLAPP statute's protections, California courts

15  have often looked to California Civil Code section 47(b), which contains identical language.

16  Though the conduct protected by the two statutes is not identical, courts often examine "the scope

17  of the litigation privilege to determine whether a given communication falls within the ambit of

18  subdivision (e)(1) and (2) [of the SLAPP statute]." *Flatley v. Mauro*, 39 Cal. 4th 299, 322 (Cal.

19  2006); *see also Dickens*, 117 Cal. App. 4th at 715 ("because the defendants' conduct would have

20  been privileged under Civil Code section 47 subsection (b), *it would have necessarily been*

21  *protected activity under section 425.16*") (emphasis added); *Sylmar Air Conditioning v. Pueblo*

22  *Contracting Servs.*, 122 Cal. App. 4th 1049, 1058 (Cal Ct. App. 2004) ("Communications within

23

---

24  [2] Indeed, one Illinois federal court held that, "because California has a great interest in
    determining how much protection to give California speakers," the SLAPP statute may apply to
25  protect California defendants even where another state's substantive law does govern the
    underlying action.  *See Global Relief Found. v. New York Times Co.*, 2002 U.S. Dist. LEXIS
26  17081 at *32-33 (N.D. Ill 2002) (holding that California defenses to defamation, including
    SLAPP, applied even though defamation claim was otherwise governed by Illinois law) (citing
27  RESTATEMENT (SECOND) OF CONFLICTS § 145, cmt. d (1971) ("[T]he local law of the state where
    the parties are domiciled, rather than the local law of the state of conflict and injury, may be
28  applied to determine whether one party is immune from tort liability to the other.")).

1   the protection of the litigation privilege of Civil Code section 47, subdivision (b) are equally

2   entitled to the benefits of section 425.16."); *Contemporary Services Corp. v. Staff Pro Inc.*, 152

3   Cal. App. 4th 1043, 1055 (Cal. App. 2007) ("Both section 425.16 and Civil Code section 47 are

4   construed broadly, to protect the right of litigants to the utmost freedom of access to the courts

5   without [the] fear of being harassed subsequently by derivative tort actions.  Thus, it has been

6   established for well over a century that a communication is absolutely immune from any tort

7   liability if it has 'some relation' to judicial proceedings."); *but see Flatley*, 39 Cal. 4th at 322-23

8   (finding an instance where the protections did not overlap because the purpose of the SLAPP

9   statute was not served by protecting activities conclusively established to be crimes).

10      Section 47(b) has been held to apply to communications abroad.  *See Beroiz v. Wahl*, 84

11   Cal. App. 4th 485 494-95 (Cal. Ct. App. 2000), *E. & J. Gallo Winery v. Andina Licores, S.A.*,

12   Case No. CV F 05-0101, 2006 U.S. DIST. LEXIS 47206, at *24 (E.D. Cal. June 30, 2006).  In

13   *Beroiz*, 84 Ca. App. 4th at 490-91, for example, the defendant was an American citizen living in

14   Mexico who filed criminal charges against American members of a Mexican homeowners'

15   association.  The members of the homeowners' association sued the defendant in California court

16   for defamation based on statements made to a Mexican district attorney.  *See id.*  In ruling that

17   section 47(b) applied, the court noted that the question was an issue of first impression in

18   California, but both out-of-state precedents and the public policy rationales supporting

19   section 47(b) argued strongly in favor of applying it broadly to shield defendants from suit.  *See*

20   *id.* at 909-12.

21      Similarly, in *E. & J. Gallo*, Andina sued Gallo in Ecuador for breach of contract.  *See*

22   2006 U.S. Dist. LEXIS at *1-9.  Gallo then sued Andina in California for declaratory relief,

23   breach of contract, unfair competition, and abuse of process.  *See id.*  Relying on *Beroiz*,

24   *E. & J. Gallo* held that statements made in connection with foreign legal proceedings were

25   protected under section 47(b).  *See id.* at *26-28.[3]

26   _____

[3] Both courts said that if the foreign legal system was "devoid of adequate procedural
safeguards," and defendants used the foreign legal process as a means and with the intent to harm
27   plaintiffs, then the absolute privilege afforded by § 47(b) might not apply.  *See id.*; *see Beroiz*, 84
Cal. App. 4th at 494-96.  But where, as here, there is no claim that defendants acted with malice,
28   the privilege applies to communications outside the state.

1    Indeed, American courts generally have refused to allow plaintiffs to hold defendants

2    liable for engaging in conduct abroad that would be protected speech here. *See, e.g., Bachchan v.*

3    *India Abroad Publ'ns, Inc.*, 585 N.Y.S. 2d 661, 664-65 (N.Y. Sup. Ct. 1992) (where plaintiff filed

4    suit in U.S. to enforce foreign libel judgment, court refused to enforce judgment because foreign

5    tribunal had not provided defendant with various substantive and procedural free speech

6    defenses).[4] And courts in numerous countries[5] and virtually every state[6] privilege

7    _____

8    [4] *See also Beroiz*, 84 Cal. App. 4th at 494:

9        In *Vanderkam v. Clarke* (S.D.Tex. 1998) 993 F. Supp. 1031, 1031-1032, the
       executive director of a scandal-ridden Irish corporation brought an action against a
       lawyer appointed by the High Court of Ireland to investigate the corporation, alleging

10       that the lawyer's communication of his official findings had defamed the director. The
       district court in Vanderkam held that the lawyer's conduct was absolutely privileged,
       reasoning that the lawyer had published his findings as ordered by the Irish court, and

11       that under Texas law, lawyers are privileged to publish otherwise defamatory material in
       connection with a judicial proceeding. (*Id.* at p. 1032.)

12        Similarly, in *Sorge v. City of New York* (1968) 56 Misc.2d 414, 415 [288 N.Y.S.2d

13       787, 790-791], two police officers in New York City testified, at the request of the State
       Department of the United States, at a hearing before an Italian judge regarding criminal

14       activity in Italy. When the officers were sued for defamation, the court in Sorge held
       that their testimony during the Italian judicial proceeding was absolutely privileged

15       under New York law. (288 N.Y.S.2d at pp. 798-799.)
        Finally, in *Bakhshandeh v. American Cyanamid Company* (S.D.N.Y. 1962) 211 F.

16       Supp. 803, 804, an Iranian citizen sued an American corporation for defamation,
       alleging, inter alia, that the corporation's employees had made defamatory remarks to an

17       Iranian governmental official in Tehran. Citing primarily New York law, the district
       court in Bakhshandeh determined that these remarks to the Iranian official were subject

18       to a qualified privilege, and thus they were not actionable absent proof of malice. ( *Id.* at
       pp. 808-809.).

19    [5] *See, e.g., Mann v. O'Neill* (1997) 191 C.L.R. 204 at 216 (Austl.) ("Complaints to prosecuting
    authorities—'statements in aid of justice', as they are sometimes called— enjoy qualified

20    privilege.")); *Pleau v. Simpsons-Sears Ltd.*, (1976) 15 O.R. 2d 436 (Ont. C.A.) at ¶16 (Qualified
    privilege applied to defendant's publication of a notice to employees regarding possible forged

21    checks bearing plaintiff's name; reasoning that published statement was privileged because
    defendant "acted at the request of the local police"); *Lupee v. Hogan*, (1920) 47 N.B.R. 492 (N.B.

22    C.A.) at ¶9 ("universally recognized" rule that "all material statements made by persons interested
    in the detection of a crime during their investigations, and material thereto, are privileged");

23    *Padmore v. Lawrence*, 11 Ad. & El. 380, 382 (K.B. 1840) (Coleridge, J.) (Great Britain: "For the
    sake of public justice, charges and communications, which would otherwise be slanderous, are

24    protected if bona fide made in the prosecution of inquiry into suspected crime."); *Martin v.
    Watson*, [1994] Q.B. 425 at p. 437 (Great Britain: "[Q]ualified privilege . . . applies to a statement

25    made to a police officer by way of reporting a complaint."); Susanna Frederick Fischer,
    *Rethinking* Sullivan, 34 Geo. Wash Int'l L. Rev. 101, 118-26 (2002) (English law privileges

26    "statement[s] made to the police concerning the commission of a crime"; noting that the laws of
    Australia, New Zealand, and England are similar; showing that statutory developments in all three

27    countries have not changed the common law privilege for communications to police); *Hardaker
    v. Phillips*, 2005 (4) SA 515 (S. Afr.) (discussing qualified privilege that attaches to witness

28    statements in ongoing prosecutorial proceedings).

1    communications to law enforcement.  In short, the SLAPP statute—like section 47(b)—should be

2    read broadly to apply in this case.

3            3.  Finally, plaintiffs may not argue that their claims under Business & Profession

4    Code section 17204 are exempt from the SLAPP statute.  California Code of Civil Procedure

5    section 425.17 exempts claims "brought *solely* in the public interest" when the "plaintiff does *not*

6    seek any relief greater than or different from the relief sought for the general public."  CAL. CODE

7    CIV. PROC. § 425.17(b), (b)(1) (emphasis added.)  Although plaintiffs advert to the "public

8    interest" in describing their section 17204 claims, Compl. ¶ 119, they concede that they "bring

9    this cause of action on behalf of *themselves*" and "seek compensation for the loss of *their*

10   *property and the personal financial impacts they have suffered,*" *id.* (emphasis added).  As a

11   result, section 425.17 does not exempt their claims.  *See, e.g., Ingels v. Westwood One Broad.*

12   *Servs., Inc.*, 129 Cal. App. 4th 1050, 1067 (Cal. Ct. App. 2005) ("[b]ecause appellant alleges and

13   seeks recovery of damages personal to himself, his claim fails to meet the first requirement set out

14

15   [6] *See General Elec. Co. v. Sargent & Lundy*, 916 F.2d 1119, 1125-27 (6th Cir. 1990) (Kentucky);
     *Borg v. Boas*, 231 F.2d 788, 794 (9th Cir. 1956) (Idaho); *Kahermanes v. Marchese*, 361 F. Supp.
16   168, 172 (E.D. Pa. 1973); *Marsh v. Commercial & Sav. Bank of Winchester, Va.*, 265 F. Supp.
     614, 621 (W.D. Va. 1967); *Cutts v. Am.United Life Ins. Co.*, 505 So. 2d 1211, 1215 (Ala. 1987);
17   *Miller v. Nuckolls*, 91 S.W. 759, 761, 762 (Ark. 1905); *Kress v. Self*, 526 P.2d 754, 756 (Ariz. Ct.
     Appl. 1974); *Burke v. Greene*, 963 P.2d 1119, 1122 (Colo. 1998); *Flanagan v. McLane*, 87 Conn.
18   220, 87 A. 727, 728 (1913); *Newark Trust Co. v. Bruwer*, 141 A.2d 615, 617 (Del. 1958);
     *Fridovich v. Fridovich*, 598 So. 2d 65, 67, 68 (Fla. 1992); *Hardaway v. Sherman Enters., Inc.*,
19   210 S.E.2d 363, 364 (Ga. 1974); *Starnes v. Int'l Harvester Co.*, 539 N.E.2d 1372-75 (Ill. 4th Dist.
     1989); *Indiana Nat. Bank v. Chapman*, 482 N.E.2d 474, 479 (Ind. Ct. App. 4th Dist. 1985);
20   *Winckel v. Von Maur Inc.*, 652 N.W.2d 453 (Iowa 2002); *Faber v. Byrle*, 229 P.2d 718 (Kan.
     1951); *Cormier v. Blake*, 198 So. 2d 139, 144 (La. Ct. App. 3d Cir. 1967); *Robinson v. Van*
21   *Auken*, 76 N.E. 601, 602 (Mass. 1906); *Packard v. Central Maine Power Co.*, 477 A.2d 264, 268
     (Me. 1984); *Kefgen v. Davidson*, 617 N.W.2d 351 (Mich. Ct. App. 2000); *Smits v. Wal-Mart*
22   *Stores*, Inc., 525 N.W.2d 554, 557 (Minn. Ct. App. 1994); *Arnold v. Quillian*, 262 So. 2d 414,
     415 (Miss. 1972); *Hancock v. Blackwell*, 41 S.W. 205, 207 (Mo. 1897); *Pierce v. Oard*, 37 N.W.
23   677, 679 (Neb. 1888); *Hampe v. Foote*, 47 P.3d 438, 440 (Nev. 2002); *Dijkstra v. Westerink*, 401
     A.2d 1118-21 (N.J. App. Div. 1979); *Grossman v. Fieland*, 483 N.Y.S.2d 735, 736 (2d Dep't
24   1985); *Averitt v. Rozier*, 458 S.E.2d 26 (N.C. 1995); *Richmond v. Nodland*, 552 N.W.2d 586
     (N.D. 1996); *Paramount Supply Co. v. Sherlin Corp.*, 16 Ohio App. 3d 176 (8th Dist. Cuyahoga
25   County 1984); *Magness v. Pledger*, 334 P.2d 792, 795 (Okla. 1959); *Ducosin v. Mott*, 642 P.2d
     1168, 1169-70 (Or. 1982); *Sylvester v. D'Ambra*, 54 A.2d 418, 420 (R.I. 1947); *Moore v. Bailey*,
26   628 S.W.2d 431, 436 (Tenn. Ct. App. 1981); *Hott v. Yarbrough*, 245 S.W. 676, 678, 679 (Tex.
     Comm'n App. 1922); *Schnupp v. Smith*, 457 S.E.2d 42 (Vt. 1995); *Story v. Shelter Bay Co.*, 760
27   P.2d 368, 372-73 (Wash App. Div. 1 1988); *Otten v. Schutt*, 113 N.W.2d 152, 156 (Wis. 1962);
     *Lever v. Cmty. First Banestates*, 989 P.2d 634 (Wyo. 1999); *Columbia First Bank v. Ferguson*,
28   665 A.2d 650 (D.C. 1995).

C07-02151 CW
YAHOO!'S ANTI-SLAPP MOTION AND          - 9 -
[PROPOSED] ORDER

1  in section 425.17, subdivision (b)").

2  **B.    Plaintiffs Claims Are Barred by Civil Code Section 47(b).**

3      Because Yahoo! has shown the SLAPP statute applies, plaintiffs bear the burden to show

4  each of their six California claims is cognizable. *See Navellier*, 29 Cal. 4th at 88. Plaintiffs'

5  California claims fail as a matter of law, as fully addressed in Yahoo!'s concurrently filed motion

6  to dismiss. *See* Mot. at 27-31, 35-36.

7      One infirmity that pervades each of plaintiffs' California claims—and the one most

8  closely tied to the anti-SLAPP statute—is the privilege afforded by Civil Code section 47(b). *See*

9  *id.* at 18-19. The privilege, as noted above, is read broadly by Californian courts to shield

10 defendants from liability for communicating with law enforcement officials. *See Johnson*, 58 F.

11 Supp. 2d at 1110. That privilege applies to communications in the United States and abroad. *See*

12 *Beroiz*, 84 Cal. App. at 494-95; *E. & J. Gallo Winery*, 2006 U.S. DIST. LEXIS 47206, at *24.

13 And that privilege is an absolute bar to plaintiffs' six California claims. *See Moore v. Conliffe*, 7

14 Cal. 4th 634, 638 n.1 (Cal. 1994) ("Although the protection afforded by the statute is commonly

15 denominated a 'privilege,' which creates a 'privileged communication,' section 47(b) does not

16 create an evidentiary privilege that protects a communication from compelled disclosure. Instead,

17 the section 47(b) privilege operates as a limitation on liability, precluding use of the protected

18 communications and statements as the basis for a tort action other than for malicious prosecution.

19 Thus, section 47(b) creates what in many other contexts is termed an 'immunity' from suit.").

20 **IV.    CONCLUSION**

21     For the foregoing reasons, Yahoo!'s anti-SLAPP motion should be granted and plaintiffs'

22 six causes of action brought under California law—their Fifth through Tenth Claims for Relief—

23 should be immediately stricken from plaintiffs' Second Amended Complaint.

24 Dated:  July 27, 2007                          DANIEL M. PETROCELLI
                                                   MATTHEW T. KLINE
25                                                 O'MELVENY & MYERS LLP

26                                          By:_____
                                                   Daniel M. Petrocelli
27                                                 Attorneys for Defendant
                                                   YAHOO!, INC.

28

# EXHIBIT C

| From: | Kline, Matthew |
|---|---|
| Sent: | Thursday, September 13, 2007 5:43 PM |
| To: | 'Morton Sklar'; mortonandsara03@verizon.net; tharris@humanrightsusa.org; Roger Myers |
| Cc: | Petrocelli, Daniel |
| Subject: | Wang v. Yahoo!: Motion Practice |

Morton,

Following up on our various conversations, you have informed us in general terms about motions you intend to file concerning the three motions we filed on August 27. We thought it would be useful to send you a short summary of our response to your assertions:

1) You have told us you will file a motion to "hold in abeyance" Yahoo, Inc.!'s Motion to Dismiss and SLAPP Motion, in order to take limited discovery related to these motions. We will oppose this motion for at least the following reasons:

   *First*, neither motion turns on disputed facts; both accept as true the facts alleged in the second amended complaint. There is no need for discovery to oppose these motions. Despite our invitation, you have not provided us with case authority demonstrating your right to indefinitely postpone the resolution of our motions in order to obtain discovery.

   *Second*, the federal rules permit the filing of motions to dismiss at the threshold of a case in order to test plaintiffs' legal claims and theories before costly litigation ensues. As we have explained in our motions, we think your complaint fails to state a cognizable legal claim, much less one that is justiciable. We seek a ruling from the court on these arguments.

   *Third*, to the extent you believe you need discovery on certain factual issues in order to oppose all or parts of our motion, you have refused to identify the specific discovery you need or the issues in our motion to which such discovery relates.

   *Fourth*, the motion to initiate discovery is unnecessary. The Court has not stayed discovery in the case; nor have you initiated any discovery; nor have we indicated we will take the position there should be no discovery.

   *Fifth*, your perceived need for certain limited--though unspecified--discovery is not cause to file no response at all to our motions. Certainly, there are many arguments and issues in our motions to which you can respond without any professed need for discovery. You should oppose our motions and specifically identify those arguments to which you believe you cannot respond absent discovery. Once you've made your arguments and explained where a factual disputes remain, we and the Court can then evaluate your position, and we can either agree to your request, or failing that, litigate the issue.

   *Sixth*, as to YHKL's motion to dismiss for lack of personal jurisdiction, you have not identified the discovery you need to oppose the motion. If and when you do, we will be in a position to evaluate our response. As of now, you've given us no specifics.

2) You have told us you will file a motion seeking a three-week continuance of the September 26 deadline for opposing defendants' three pending motions. Because, as you have explained, you seek this extension in order to file and accelerate your first motion--which seeks to indefinitely postpone your response to defendants' motions--we anticipate opposing this motion.

1

This, of course, is not a complete statement of our views on these issues--just our reactions based on the conversations we've had. But we wanted you to have our basic position before you filed your motions.

Thanks,

Matt

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
**Matthew T. Kline**
O'Melveny & Myers LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA 90067
Phone: (310) 246-6840
Fax: (310) 246-6779
mkline@omm.com
www.omm.com

*This message and any attached documents contain information from the law firm*
*of O'Melveny & Myers LLP that may be confidential and/or privileged. If you are*
*not the intended recipient, you may not read, copy, distribute, or use this*
*information. If you have received this transmission in error, please notify the*
*sender immediately by reply e-mail and then delete this message.*

# EXHIBIT D

1  DANIEL M. PETROCELLI (S.B. #97802)
   dpetrocelli@omm.com
2  MATTHEW T. KLINE (S.B. #211640)
   mkline@omm.com
3  O'MELVENY & MYERS LLP
   1999 Avenue Of The Stars
4  Los Angeles, California 90067-6035
   Main Number: (310) 553-6700
5  Facsimile: (310) 246-6779

6  Attorneys for Defendant YAHOO!, INC. and
   Specially Appearing Defendant YAHOO!
7  HOLDINGS (HONG KONG), LTD.

8

         UNITED STATES DISTRICT COURT
9        NORTHERN DISTRICT OF CALIFORNIA
                OAKLAND DIVISION
10

11 | WANG XIAONING, YU LING, SHI TAO,      | Case No. C07-02151 CW
   | and ADDITIONAL PRESENTLY             |
   | UNNAMED AND TO BE IDENTIFIED         | **DEFENDANT YAHOO!, INC.'S MOTION**
12 | INDIVIDUALS,                         | **FOR AN EARLY CASE MANAGEMENT**
   |                                      | **CONFERENCE AND ORDER;**
13 |                    Plaintiff,        | **PROPOSED ORDER**

14 |            v.                        | Date:      July 2 or 26, 2007[*]
                                           | Time:      TBD
15 | YAHOO!, INC., a Delaware Corporation, | Location:  Courtroom 2
   | YAHOO! HOLDINGS (HONG KONG),         |
16 | LTD., a Foreign Subsidiary of Yahoo!,| Judge:     Hon. Claudia Wilken
   | ALIBABA.COM, INC. a Delaware         |
17 | Corporation, AND OTHER PRESENTLY     |
   | UNNAMED AND TO BE IDENTIFIED         |
18 | INDIVIDUAL EMPLOYEES OF SAID         |
   | CORPORATIONS,                        |
19 |                                      |
   |                    Defendant.        |
20

21  TO PLAINTIFFS; DEFENDANT ALIBABA.COM, INC.; AND THEIR COUNSEL OF

22  RECORD:

23        PLEASE TAKE NOTICE THAT ON Monday, July 2, 2007, at a time to be determined by

24  the Court or on Thursday, July 26, 2007, at 2:00 p.m.—depending on whether the Court grants

25  defendant Yahoo!, Inc.'s ("Yahoo!'s") motion to shorten time being filed concurrently

26

27  _____

    [*] Defendant Yahoo!, Inc. is filing concurrently herewith a motion to shorten time for the hearing
28  on this motion from July 26, 2007 to July 2, 2007. Defendant Alibaba.com, Inc. joins this case
    management motion and the motion to shorten time.

    C07-02151 CW
    YAHOO!'S MOT. FOR AN EARLY CASE
    MANAGEMENT CONF. AND ORDER

1  herewith—in Courtroom 2, 4th Floor, United States Courthouse, 1301 Clay Street, Oakland,

2  California, defendant Yahoo!, Inc. ("Yahoo!") will and hereby does move for an early Case

3  Management Order, pursuant to Civil Local Rule 16-2(d). This Case Management Order, which

4  proposes bifurcating certain issues and soliciting statements of interest from the political branches

5  to address others, is sought consistent with the procedures contemplated in *Sosa v. Alvarez-*

6  *Machain*, 542 U.S. 629, 728 n.23 (2004); other Alien Tort Statute cases that similarly pose

7  foreign policy concerns, *see, e.g.*, *Doe v. Qi*, 349 F. Supp. 2d 1258 (N.D. Cal. 2004); and the

8  Standing Order for All Judges of the N.D. Cal., Contents of Joint Case Mgmt. Statement

9  (effective Mar. 1, 2007), which encourage parties to propose case management procedures that

10  "facilitate the just, speedy, and inexpensive disposition" of matters by "narrowing,"

11  "bifurcat[ing]," and "streamlin[ing]" procedures.

12      This motion, which Alibaba.com, Inc. joins, is based on this Notice of Motion and

13  Motion, the pleadings on file in this matter, the following Memorandum of Points and

14  Authorities, the Exhibits filed with this Motion, and any further argument the Court might allow.

15      Dated: June 21, 2007          DANIEL M. PETROCELLI
16                                     MATTHEW T. KLINE
                                   O'MELVENY & MYERS LLP

17

18                                   By:_____

19                                       Daniel M. Petrocelli
                                 Attorneys for Defendant
20                                     YAHOO!, INC.

21

22

23

24

25

26

27

28

# I.    **INTRODUCTION**

Pursuant to Standing Order of this Court and Civil Local Rule 16-2(d), Yahoo! seeks an early Case Management Conference and the adoption of a tailored Case Management Order to facilitate a reasoned approach to this litigation, promote efficiency, and narrow and focus the issues, while at the same time respecting the seriousness of plaintiffs' claims and defendants' defenses. *See* Standing Order for All Judges of the N.D. Cal., Contents of Joint Case Mgmt. Statement ¶¶ 15, 16, 20 (effective Mar. 1, 2007).  Plaintiffs seek to hold Yahoo! and the other defendants liable under the Alien Tort Statute for alleged acts of torture and violations of human rights committed by officials of the People's Republic of China.  The complaint acknowledges that none of the defendants committed the alleged abuses; the allegation is that defendants aided and abetted the Chinese government by providing it with information about plaintiffs, in response to law enforcement requests.

The Supreme Court has cautioned that cases of this sort raise foreign policy concerns and must be handled with "great caution" and in consultation with the political branches of government.  *Sosa v. Alvarez-Machain*, 542 U.S. 629, 728 n.23 (2004).  Cases seeking to hold corporations liable for the acts of foreign government officials pose particular concern, because they expand the number of ATS suits that may be brought and provide more direct financial incentives to bring such suits.[1]  Because this case challenges several decades of U.S. foreign policy toward China, seeks to adjudge the actions of the Chinese government, and seeks to impose new rules for responding to law enforcement requests for information, we believe the Court should secure a Statement of Interest from the United States before proceeding.  The proposed Case Management Order reflects the time it will take to solicit the views of the United States, while at the same time setting a schedule to address other issues in the interim.

Yahoo! proposes that this case be managed in phases, with a hold on discovery unless and until the Court determines the case may proceed.  The proposed Order initially divides the case

---

[1] *See, e.g.*, *Sosa*, 524 U.S. at 732-33 nn.20 & 21; Brief of the United States as Amicus Curiae, *The Presbyterian Church of Sudan v. Talisman*, United States Court of Appeal for the Second Circuit, Case No. 07-0016, at 19-22 (filed May 15, 2007) ("U.S. Amicus Br.") (attached as Ex. A).

C07-02151 CW
YAHOO!'S MOT. FOR AN EARLY CASE
MANAGEMENT CONF. AND ORDER

1   into two phases:

2       • <u>Phase I</u>:  The Court immediately resolves whether plaintiffs have named the

3       correct corporate parties, whether the Court has jurisdiction over the Yahoo! Hong

4       Kong defendant, and whether plaintiffs can prosecute this case, in light of the

5       unique circumstances that they cannot give testimony or communicate with their

6       counsel;

7       • <u>Phase II</u>:  After the Court obtains a Statement of Interest by the appropriate

8       branches of government, and after jurisdiction and party issues are resolved, the

9       Court can address the varied legal issues presented by plaintiffs' claims asserted

10      under federal, international, and California law.

11  As described below, Yahoo! proposes a briefing schedule for Phases I and II.

12      Yahoo! requests this motion be heard on shortened time, on July 2, 2007, so that these

13  case management issues may be considered and the case streamlined before a great deal of work

14  is done in the coming month.  Also, a hearing on this date would make possible the attendance of

15  Yahoo!'s lead counsel, who thereafter will be on a long-scheduled vacation until July 23.

16  Defendant Alibaba.com, Inc. joins in these motions.

17  **II.   PLAINTIFFS' ALLEGATIONS**

18      Plaintiffs Wang Xiaoning and Shi Tao are Chinese citizens.  *See* Amended Complaint for

19  Tort Damages ¶¶ 10, 12 (filed May 29, 2007) ("Am. Compl.").  Both men are currently serving

20  prison terms in China.  *See id.*  Wang's wife, Yu Ling, is also named as a plaintiff in this suit; she

21  alleges she was harmed by her husband's mistreatment at the hands of the Chinese authorities.

22  *See id.* ¶ 11.  The named defendants are Yahoo!, Inc.; Yahoo Holdings (Hong Kong) Ltd.

23  ("YHKL"); and Alibaba.com, Inc.  The essence of the complaint is that plaintiffs published pro-

24  democracy and other literature using Yahoo! China group lists or email accounts, and that the

25  Chinese government requested information from YHKL to identify, charge, and try plaintiffs for

26  violations of Chinese law.  The complaint alleges that Chinese officials tortured and violated

27  plaintiffs' human rights and seeks to hold defendants liable for the acts of the Chinese

28  government.  *See id.* ¶¶ 30-43.

1    Plaintiffs seek to hold defendants liable under three federal statutes (the Alien Tort

2    Statute, 28 U.S.C. § 1350 ("ATS"); the Torture Victim Protection Act, 28 U.S.C. § 1350

3    ("TVPA"); and the Electronic Communications Privacy Act, 18 U.S.C. §§ 2701, 2702, 2511

4    ("ECPA")), a variety of international law sources, and on a number of California statutory and

5    common law theories (including battery, assault, false imprisonment, intentional infliction of

6    emotional distress, negligence, and unfair business practices).  *See* Am. Compl. at 17:5-28:5.

7    Plaintiffs seek to hold defendants liable on aiding and abetting and other theories of vicarious

8    liability.  *See, e.g., id.* at ¶¶ 2, 60, 90.  Plaintiffs seek, *inter alia*, compensatory and punitive

9    damages, as well as declaratory and injunctive relief.  *See id.* at 29:22-30:8.

10   **III.    THE COURT SHOULD SEEK THE VIEWS OF THE POLITICAL BRANCHES**

11   **GIVEN THE SERIOUS POLICY QUESTIONS PRESENTED BY THIS CASE.**

12   As this Court and United States Supreme Court both have observed, ATS cases of this sort

13   are "unusual" and must be approached with "great caution."  *Doe v. Qi*, 349 F. Supp. 2d 1258,

14   1273 (N.D. Cal. 2004); *Sosa v. Alvarez-Machain*, 542 U.S. 629, 728 (2004).  Caution is essential

15   because such cases seek to compel the courts to pass judgment on the acts of government officials

16   of foreign sovereign nations, thereby raising foreign policy and justiciability concerns.  *See Sosa*,

17   524 U.S. at 727.  Consequently, there is a "high bar" to asserting such claims, and courts are

18   charged with the duty of "vigilant doorkeeping" to make sure ATS claims fall within the "narrow

19   class" of claims allowed.  *Id.* at 728; *Qi*, 349 F. Supp. 2d at 1291.  Such doorkeeping, of

20   necessity, must take into account the "policy of case-specific deference to the political branches"

21   and includes seeking the political braches and other governments' views before allowing such a

22   case to proceed.  *Sosa*, 524 U.S. at 733 n. 21; *Qi*, 349 F. Supp. 2d at 1291, 1296-1303.

23   This particular ATS case has unique potential to affecting "impact foreign relations."  *Qi*,

24   349 F. Supp. 2d at 1266.  It challenges several decades of U.S. foreign policy toward China, in

25   that one of its stated aims is to curtail American investment in China.[2]  Moreover, the gist of

26   ─────────────────────

27   [2] *Compare* World Organization for Human Rights USA, "Major lawsuit filed by Human Rights
     USA against Yahoo! highlights the internet company's complicity in human rights abuses in
     China, (Apr. 18, 2007), http://humanrightsusa.blogspot.com/search/label/human%20rights

28   (Website of Plaintiffs' Lead Counsel: "*[T]his lawsuit ought to convince other U.S. companies to*

C07-02151 CW
YAHOO!'S MOT. FOR AN EARLY CASE          - 3 -
MANAGEMENT CONF. AND ORDER

1    plaintiffs' claim is that when Chinese law enforcement officials requested information from

2    defendants, defendants should have refused the request on the ground the information provided

3    could potentially be used to violate plaintiffs' human rights.[3]  Forcing Internet companies, or any

4    company, into this quasi-judicial role of evaluating the merits of law enforcement requests, not

5    only puts companies into an impossible position (requiring them either to break the law and

6    refuse the request or risk liability in a case of this sort), but would impermissibly delay and

7    hamper legitimate law enforcement efforts.  The U.S. government, foreign governments, law

8    enforcement agencies, and the international business community no doubt would have serious and

9    justifiable concerns about the creation of such a rule.

10          It is well settled that the views of the appropriate branches of government should be

11   sought in ATS cases, where, as here, plaintiffs' case potentially violates the "act of state"

12   doctrine, poses nonjusticiable "political questions," or should be dismissed under the doctrine of

13   "international comity."[4]  The Case Management Order, as described below, affords the Court

14   time to solicit and consider these views and the parties the opportunity to brief them.

15   *think twice before doing business with the Chinese government . . . .*"), *with* U.S. Dep't of State,
     Bureau of East Asian and Pacific Affairs, Background Note: China (January, 2007),
16   http://www.state.gov/r/pa/ei/bgn/18902.htm ("*U.S. China policy has been remarkably consistent.*
     *For seven consecutive administrations, U.S. policy has been to encourage China's opening and*
17   *integration into the global system.*  As a result, China has moved from being a relatively isolated
     and poor country to one that is a key participant in international institutions . . . .  The State
18   Department's annual China human rights and religious freedom reports have noted China's well-
     documented abuses of human rights . . . . .  At the same time, *China's economic growth and*
19   *reform since 1978 has improved dramatically the lives of hundreds of millions of Chinese,*
     *increased social mobility, and expanded the scope of personal freedom.*") (emphases added).
20
     [3] *See* "Some people think the Internet is a bad thing," (June 6, 2007), http://www.gginternet1.co.
21   uk/amnesty/irrepressible01/ (video webcast at 1:02:05 to 1:02:33) (Plaintiffs' Lead Counsel:
     "The bottom line for Yahoo and the other internet companies that we're concerned about is that
22   they must be held accountable for their complicity in these abuses, *they must ask themselves,*
     *before any new requests for information are responded to, whether it would result in the arbitrary*
23   *arrest and torture of internet users who have committed no real crimes, and they must not allow*
     *themselves to become complicit in major human rights abuses.*") (emphasis added).
24
     [4] *See, e.g., Sosa*, 524 U.S. at 733 n. 21; *Sarei v. Rio Tinto*, __ F.3d __, 2007 WL 1079901, at *7-
25   14 (9th Cir. Apr. 12, 2007); *Qi*, 349 F. Supp. 2d at 1291, 1296-1303; *see also Banco Nacional de*
     *Cuba v. Sabbatino*, 376 U.S. 398 (1964); *Vieth v. Jubelirer*, 514 U.S. 267, 277-78 (2004);
26   *American Ins. Ass'n v. Garamendi*, 539 U.S. 396, 414 (2003); *Societe Nationale Industrielle*
     *Aerospatiele v. United States Dist. Court for the Dist. of Iowa*, 482 U.S. 522, 544 n.27 (1987).

27

28

## IV. **THIS COMPLICATED LEGAL ISSUES IN THIS CASE SHOULD BE RESOLVED IN A LOGICAL, SEQUENTIAL FASHION.**

This case should be divided into two initial Phases.  In Phase I, which would commence immediately, the parties and Court would address three threshold issues:  (1) whether this Court has personal jurisdiction over YHKL; (2) whether plaintiffs have any basis for bringing suit against the named Alibaba defendant; and (3) the complicated issue of how Wang and Shi intend to prove their case, given the fact of their incarceration and presumed inability to give testimony or communicate with the parties or the Court.

In Phase II, and with the anticipated benefit of the political branches' views regarding this case, the parties and Court would address merits issues, such as whether (1) this case is justiciable or violates the "act of state" doctrine; (2) plaintiffs have stated a claim under the ATS, TVPA, ECPA, and other sources of law on which they rely; and (3) whether plaintiffs' California state law claims are subject to a special motion to strike under the so-called "Anti-SLAPP" statute.

### A. **Phase I:  Threshold, Procedural Issues.**

(1)  Personal Jurisdiction.  Before the parties' and judicial resources are unnecessarily expended, the Court should determine whether it has personal jurisdiction over YHKL.  YHKL is a foreign company that has never purposefully availed itself of California, and its contacts with California are minimal.  The fact that YHKL is a wholly owned subsidiary of Yahoo!, a California company, does not confer personal jurisdiction over YHKL.  *See, e.g.*, *Doe I v. Unocal* 248 F.3d 915, 925-26 (9th Cir. 2001).  YHKL is an independent Hong Kong business, focused on serving a Hong Kong clientele.  It employs over 100 employees in Hong Kong, is well capitalized, and observes corporate formalities.  It is not an alter ego or mere agent.  Plaintiffs' complaint lacks any allegations to the contrary.  Whether YHKL belongs in this case should be addressed at the outset, in Phase I.

(2)  Alibaba.  Plaintiffs conclusorily plead that the information concerning them allegedly disclosed to the Chinese government was provided by "Defendants Yahoo! Inc., its agents, wholly-owned subsidiaries Yahoo! HK and Yahoo! China, *and its strategic partner Alibaba.com, Inc.*"  Am. Compl. ¶ 2 (emphasis added).  Alibaba.com, Inc. does not, and never

C07-02151 CW
YAHOO!'S MOT. FOR AN EARLY CASE                     - 5 -
MANAGEMENT CONF. AND ORDER

did, maintain any information about Yahoo! China users and so could not possibly have participated in any way in the disclosures upon which plaintiffs' claims are based. Moreover, the complaint makes clear that it was not until 2005—well after the alleged wrongful disclosures were made in 2002 and 2004—that any Alibaba entity even had a connection with the operation of Yahoo! China. *Id.* ¶ 18. Alibaba.com, Inc. should be dismissed from this case immediately. This threshold issue should be litigated in Phase I before Alibaba, Inc. is forced to expend resources litigating the many other issues raised by this case.

(3)  Plaintiffs' Proffer. A key threshold issue to be discussed at the first Case Management Conference and, if need be, litigated, is how plaintiffs will be able to prove their case and defendants defend it. Wang and Shi are currently serving lengthy prison terms in China. *See* Am. Compl. ¶¶ 10, 12, 39, 42, 60, 63. According to the complaint, Wang and Shi are allowed very little contact with the outside world. Indeed, the complaint alleges that Wang's access to visitors is "strictly limited" and that "[p]rison officials scrutinize all written correspondence to and from Wang, severely limiting his ability to communicate with anyone outside the prison, including his wife." *Id.* ¶ 43. Similarly, Shi is said to be housed at a high-security prison, at which his written communications are monitored, and it is alleged "[h]e has very little contact with people outside the prison." *Id.* ¶ 62.

There is no reason to believe that Wang or Shi will be allowed any contact with foreign attorneys (their named counsel in this case or defendants' lawyers), especially for purposes of prosecuting this case. Plaintiffs' counsel will not be able to take their deposition; and neither will defendants' counsel. According to the U.S. Department of State, "it does **not** appear possible to take the deposition of a witness located in China. . . . China does not recognize the right of persons to take depositions, *and any effort to do so could result in the detention and/or arrest of U.S. citizen participants.*"[5]

The majority of plaintiffs' causes of action, if not all of them, depend on admissible proof that defendants caused plaintiffs to suffer abuse at the hands of the Chinese government.

---

[5] U.S. Dep't of State, China Judicial Assistance, http://travel.state.gov/law/ info/judicial/judicial_694.html (bolding in original) (last accessed on June 11, 2007).

Although we have raised the issue, plaintiffs have not explained to date how they will provide such proof. Any attempt by Yu or other parties to testify as to what Wang and Shi told them, or mere reliance on generalized reports about abuses in China, is inadmissible hearsay that does not fall within any recognized exception to the rule. *See Qi*, 349 F. Supp. at 1310 n.39. Under these circumstances, we believe it is prudent and reasonable to require plaintiffs' to make a factual proffer identifying the witnesses and other proof available of their claims.

(4) A Phase I Briefing Schedule. Defendants propose the following Phase I briefing schedule: opening briefs addressing these three issues should be due July 27, 2007; oppositions should be due August 27, 2007; and replies should be due September 14, 2007.

### B.    Phase II: Dispositive Motions Informed by Governments' Views

We request that the Court solicit the views of the U.S. government regarding this case. The Court should also ask the U.S. government to solicit the views of other nations regarding the foreign policy and law enforcement issues this case raises. The Court should request responses from the government by the beginning of September, if possible. With these statements in hand, the parties will be able to brief a number of legal issues this case poses:

(1) Is this Case Justiciable?   Given the foreign policy and impact this case could have on law enforcement, this Court will need to determine if the case violates the "act of state" doctrine, poses nonjusticiable "political questions," or should be dismissed under the doctrine of "international comity." *See supra* n. 4. Waiting for the government's views on these issues is essential to the analysis. *See id.*

(2) Can Claims Be Stated Under the ATS?   This statute is the source of great controversy. ATS issues to be litigated, include:

- whether aiding and abetting theory of liability exists under the ATS;[6]

---

[6] *See, e.g.*, *Sarei v. Rio Tinto*, __ F.3d __, 2007 WL 1079901, at *5 (9th Cir. Apr. 12, 2007) (concluding that such a claim was not frivolous, but stopping short of recognizing such a claim); U.S. Amicus Br. at 12-27 (arguing against aiding and abetting liability); Curtis A. Bradley et al., Sosa, *Customary International Law and the Continuing Relevance of* Erie, 120 HARV. L. REV. 870, 924-29 (2007) (discussing debate; concluding, that in light of *Sosa*, only Congress and the President through legislation, and not the courts, can impose such liability).

- assuming such a theory exists, whether *corporate* defendants may be held liable, given that international-law norms are applicable only to *states*;[7]

- assuming corporations may be held liable, whether *these* defendants may be liable, given there is no allegation they *intended* for plaintiffs to suffer any harm;[8]

- whether plaintiffs' torture claims under the ATS are preempted by the TVPA;[9]

- whether plaintiffs' remaining ATS claims, based on norms against arbitrary arrest and forced labor, are of sufficiently "definite content and acceptance" to be actionable under the ATS;[10]

- whether the international-law sources on which plaintiffs rely support ATS claims;[11]

- and whether plaintiffs' factual allegations are specific enough even to state a claim, particularly as to plaintiff Shi, for whom no specific allegations are made and it is merely assumed he was tortured because he is incarcerated at a notoriously abusive prison, *see, e.g.*, Am. Compl. ¶¶ 57, 64.

Litigating all these issues will take time and is costly, and their resolution is best informed after giving the government an opportunity to express its views. YHKL and Alibaba.com, Inc., moreover, should not be forced to brief these issues if they do not belong in this case.

(3) Can Claims Be Stated Under the TVPA? Plaintiffs' TVPA claims raise similar questions and equally call out for the government's views. The questions include:

- whether the TVPA applies only to individuals, not corporations;[12]

---

[7] *See, e.g.*, RESTATEMENT (THIRD) OF THE FOREIGN RELATIONS LAW OF THE UNITED STATES, Part I, ch. 1, introductory note (1987) (noting that international law generally applies to states).

[8] *See, e.g.*, Rome Statute of the Int'l Criminal Court, art. 25(3), U.N. Doc. A/CONF.183/9 (1998) (recognizing intent requirement); *Presbyterian Church of Sudan v. Talisman Energy*, 453 F. Supp. 2d 633, 668 (S.D.N.Y. 2006) (same).

[9] *See Enahoro v. Abubakar*, 408 F.3d 877, 886 (7th Cir. 2005) (concluding the TVPA preempts torture claims under the ATS).

[10] *Sosa*, 542 U.S. at 732.

[11] *See id.* at 734 (noting that the International Covenant on Civil and Political Rights and the Universal Declaration of Human Rights, on which plaintiffs rely here, have "little utility" in establishing norms enforceable under the ATS).

1
- whether defendants can be held liable when they did not engage in the acts of

2
    torture;[13]

3
- whether even if the TVPA could be construed to impose some form of aiding and

4
    abetting liability, it would not impose such liability on individuals who were not

5
    themselves acting under the color of law;[14]

6
- and whether plaintiffs have alleged sufficient facts to make out their claims.

7
(4)  <u>Will the Remaining Claims Survive?</u>   Plaintiffs' claims under California common

8
law, the California Unfair Competition Law ("UCL"), and ECPA raise similarly complex

9
questions.  For example, the Court will need to decide whether these sources of law can be

10
applied extraterritorially.[15]  The Court will also need to decide whether plaintiffs' claims suffer

11
from other defects, including whether some are time-barred.[16]

12
Finally, plaintiffs' California state law claims are subject to a special motion to strike.

13
Invoking California law, plaintiffs seek to hold Yahoo! liable for communications allegedly made

14
by its agent, YHKL, to the Chinese government. *See, e.g.*, Am. Compl. ¶¶ 40, 54, 60.  Such

15
communicative acts with government officials cannot give rise to claims for civil liability. *See*

16
CAL. CIV. CODE § 47(b); *Beroiz v. Wahl*, 100 Cal. Rprt. 2d 905, 909-12 (Cal. Ct. App. 2000).

17
California law provides Yahoo! immediate means to assert this defense, pursuant to CAL. CIV.

18

19
[12] *See, e.g.*, *Mujica v. Occidental Petroleum Corp.*, 381 F. Supp. 2d 1164, 1175-76 (C.D. Cal. 2005) (TVPA does not apply to corporations).

20
[13] *Cf.* 28 U.S.C. § 1350, *Note*.

21
[14] *See In re South African Apartheid Litig.*, 346 F. Supp. 2d 538, 555 (S.D.N.Y. 2004) ("Since a

22
prerequisite to TVPA liability is that the individual be acting under color of law, this Court finds that creating aider and abettor liability for private actors not acting under color of law would be

23
inconsistent with the statute and precluded by *Central Bank*.").

24
[15] *See, e.g.*, *United States v. Toscanino*, 500 F.2d 267, 279 (2nd Cir. 1974) (refusing to apply ECPA extraterritorially); *Norwest Mortgage, Inc. v. Superior Court*, 72 Cal. App. 4th 214, 223

25
(1999) (refusing to apply UCL extraterritorially); *Arno v. Club Med, Inc.*, 22 F.3d 1464 (9th Cir. 1994) (Californian's claim against foreign employer for injury suffered in France governed by

26
French law); Amicus Br. at 5-12 (arguing the ATS does not apply extraterritorially).

27
[16] To take just one example, Yu's intentional infliction of emotional distress claim fails because she was not the target of any of the conduct alleged—her husband allegedly was. *See, e.g.*,

28
*Christensen v. Superior Court*, 54 Cal.3d 868, 905-06 (1991).

1  PROC. § 425.16, the so-called "Anti-SLAPP" statute. *See Vess v. Ciba-Geigy Corp. USA*, 317

2  F.3d 1097, 1109 (9th Cir. 2003) (affirming granting of SLAPP motion).

3      The Anti-SLAPP statute provides that a SLAPP motion should be filed within 60 days of

4  service of the operative complaint and the hearing on a SLAPP motion should be held "not more

5  than 30 days after the service of the motion." CAL. CIV. PROC. § 425.16(f). If the Court agrees to

6  the phased approach Yahoo! proposes, and if plaintiffs consent to the hearing on the SLAPP

7  motion occurring more than 30 days after the motion is filed, then Yahoo! could file its SLAPP

8  motion and the Court could hear it pursuant to the Phase II briefing schedule below. *See Greka*

9  *Integrated, Inc. v. Lowrey*, 35 Cal. Rptr. 3d 684, 689 (Cal. Ct. App. 2005). If not, Yahoo! will

10  need to file this motion sooner, and it will need to be heard sooner.

11      (5)    A Phase II Briefing Schedule.    These issues are complex and no doubt disputed.

12  They require extensive briefing, but may not need to be briefed at all after Phase I. To allow time

13  for Phase I and to solicit and receive Statement of Interest letters, opening briefs on Phase II

14  issues should be due October 8, oppositions due October 29, and replies due November 7.

15  **V.    STAYING DISCOVERY**

16      Only if plaintiffs' case survives Phases I and II, should merits discovery begin. A serious

17  issue and impediment in this case is whether defendants may produce documents or interview

18  witnesses related to the requests for information made by the Chinese government without

19  violating Chinese law and subjecting defendants, their employees, and counsel to criminal

20  sanctions. A Hong Kong Privacy Commissioner has already ruled in a parallel case that he would

21  *not* compel the production of such written materials, because producing such materials could

22  violate Chinese "State Secret Laws" and expose defendants to "serious penal consequences."[17]

23  Similarly, China counsel have advised us that merely interviewing witnesses about these events

24  could subject the witnesses and our lawyers to prosecution.

25

26  [17] Office of the Privacy Commissioner for Personal Data, Hong Kong, *Report Published under*

27  *Section 48(2) of the Personal Data (Privacy) Ordinance (Cap. 486), Report No.: R07-3619*, at
¶¶ 7.17-7.18 (issued Mar. 14, 2007); *see also id.* ¶¶ 7.3-7.20 (attached as Exhibit C),

28  http://www.pcpd.org.hk/english/publications/files/Yahoo_e.pdf.

1    Before this Court grapples with such extraordinary issues, which directly raise foreign

2    policy concerns, it should first determine whether this case is justiciable, whether plaintiffs can

3    prosecute it, and whether the case should be dismissed for a variety of reasons. This can likely be

4    accomplished by November. Thereafter, the Court will be able to determine whether this case

5    should be allowed to proceed. If the Court answers this question in the negative, the case will be

6    dismissed, foreign policy and justiciability concerns will have been respected, and plaintiffs will

7    be entitled to appeal. If the Court answers the question in the affirmative, the parties can set a

8    schedule to address discovery and move the case toward summary judgment and trial, if need be.

## VI.    MEET AND CONFER—PLAINTIFFS' POSITION

10    We have explored these and other difficult threshold issues with plaintiffs' counsel.

11   Plaintiffs' counsel have indicated they would like this case to proceed on the more traditional

12   track. Plaintiffs also object that this motion is contrary to the Court's June 19, 2007 scheduling

13   order and is premature, given the parties have not gone through the regular ADR process.[18]

14    To respond briefly, the stipulation and accompanying declaration that gave rise to the

15   Court's June 19 order *explicitly* mentioned that Yahoo! would file this motion "promptly."[19] As

16   for ADR, Yahoo!'s Proposed Order accompanying this motion provides:

17       the phased approach and briefing schedule set forth in Yahoo!'s Motion shall be
         followed. *By no later than August 17, 2007, the parties shall "meet and discuss"*

18

---

19   [18] Plaintiffs' precise position, which they asked us to reproduce in this motion, is:

20       Plaintiffs have indicated that they object to both the Defendants' Motion seeking a
         special case management conference, and to the Defendants' request for an early (July 2)
21       date for a hearing on that Motion, on the grounds that, first, these requests are at variance
         with the new timetable ordered by the Court, and more specifically with the justification
22       given by the Defendants for requesting changes in that timetable, and second, because it
         is premature to raise the matters the Defendants seek to address before the Court before
23       the regular ADR and case management process takes place.

24   Email from M. Sklar to M. Kline (June 20, 2007).

25   [19] *See* Joint Stip. Request For Order Enlarging Time To Respond To Compl. & Extending Initial
     Deadlines ¶ 3 (filed June 18, 2007) (defendants "reserve[ing] their right to seek further
26   enlargement of time and propose a modified case management plan consistent with the Standing
     Order for All Judges of the Northern District of California, Contents of Joint Case Management
27   Statement (effective Mar. 1, 2007)"); Decl. Of Daniel Petrocelli ¶ 9 (filed June 18, 2007)
     ("Defendants anticipate promptly filing a motion to address case management issues.").
28

C07-02151 CW
YAHOO!'S MOT. FOR AN EARLY CASE          - 11 -
MANAGEMENT CONF. AND ORDER

1   *"early settlement"* and *"ADR."*  Otherwise, all deadlines set forth in this Court's
2   June 19, 2007 order are hereby superseded by this Order.  (Emphasis added.)

3   **VII.    CONCLUSION**

4       For the foregoing reasons, Yahoo!'s motion should be granted.

5       Dated: June 21, 2007                    DANIEL M. PETROCELLI
                                                MATTHEW T. KLINE
6                                               O'MELVENY & MYERS LLP

7

8                                               By: _____
9                                                       Daniel M. Petrocelli
                                                Attorneys for Defendant
10                                              YAHOO!, INC.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT E

MORTON H. SKLAR (admitted *pro hac vice*)
msklar@humanrightsusa.org
WORLD ORGANIZATION FOR HUMAN RIGHTS USA
2029 P Street NW, Suite 301
Washington, DC  20036
Telephone:     (202) 296-5702
Facsimile:     (202) 296-5704
[Local Counsel, Roger R. Myers of Holme Roberts &
Owen LLP, Listed on the Signature Page]
Attorneys for Plaintiffs

DANIEL M. PETROCELLI (S.B. #97802)
dpetrocelli@omm.com
O'MELVENY & MYERS LLP
1999 Avenue Of The Stars
Los Angeles, California 90067-6035
Telephone: (310) 553-6700
Facsimile: (310) 246-6779
Attorneys for Defendant YAHOO!, INC.

JOSEPH P. CYR (*pro hac vice* application forthcoming)
joe.cyr@lovells.com
SCOTT REYNOLDS (*pro hac vice* application forthcoming)
scott.reynolds@lovells.com
LOVELLS LLP
590 Madison Ave.
New York, New York 10022
Telephone: (212) 909-0600
Facsimile: (212) 909-0660
Attorneys for Defendant ALIBABA.COM, INC.

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

| | |
|---|---|
| WANG XIAONING, YU LING, SHI TAO, and ADDITIONAL PRESENTLY UNNAMED AND TO BE IDENTIFIED INDIVIDUALS,<br><br>               Plaintiffs,<br><br>      v.<br><br>YAHOO! INC., a Delaware Corporation, YAHOO! HONG KONG, LTD., a Foreign Subsidiary of Yahoo!, ALIBABA.COM INC., a Delaware Corporation AND OTHER PRESENTLY UNNAMED AND TO BE IDENTIFIED CORPORATE DEFENDANTS AND UNNAMED AND TO BE IDENTIFIED INDIVIDUAL EMPLOYEES OF SAID CORPORATIONS,<br><br>               Defendants. | CASE NO. C07-02151 CW<br><br>**JOINT STIPULATION RE: WITHDRAWAL OF THE PLAINTIFFS' MOTION FOR LEAVE TO FILE SECOND AMENDED COMPLAINT, RE: FILING OF SECOND AMENDED COMPLAINT, AND RE: EXTENDING TIME DEADLINES ACCORDINGLY; PROPOSED ORDER**<br><br>**[JOINT DECLARATION OF MORTON SKLAR, MATTHEW KLINE, AND SCOTT REYNOLDS]** |

1

## RECITALS

2      **WHEREAS,** the original Complaint in the above-captioned case was filed on April 18, 2007

3  and a First Amended Complaint was filed on May 29, 2007;

4      **WHEREAS,** Plaintiffs filed a Motion for Leave to File Second Amended Complaint, along

5  with the text of a Second Amended Complaint, without the consent of the Defendants on July 13,

6  2007, and this motion has not yet been opposed by Defendants or heard by the Court;

7      **WHEREAS,** the Court issued an initial Case Schedule Order on April 18, 2007, and a

8  second Case Schedule Order on June 19, 2007 pursuant to a Joint Stipulated Request to Enlarge

9  Time;

10      **WHEREAS**, Defendant Yahoo!, Inc. submitted a Motion For An Early Case Management

11  Conference And Order, which is fully briefed and currently being considered by the Court;

12      **WHEREAS,** Plaintiffs and Defendants have been engaged in discussions regarding

13  Plaintiffs' Second Amended Complaint; Plaintiffs' Motion for Leave to File a Second Amended

14  Complaint; how to reach a stipulated agreement on the filing of a Second Amended Complaint; and

15  the effect of the filing of the Second Amended Complaint on both the existing Court-ordered

16  schedule, and Yahoo!, Inc.'s proposal to modify that schedule;

17

18

## STIPULATION

19  **WHEREAS, NOW THEREFORE,** the Parties hereby jointly stipulate and request as follows:

20      (1)  Plaintiffs hereby withdraw their Motion for Leave to File a Second Amended Complaint;

21      (2)  Defendants consent to Plaintiffs' filing the Second Amended Complaint, which has

22  dropped Alibaba.com, Inc. as a Defendant;

23      (3)  Defendants hereby reserve any and all objections that they have to the Second Amended

24  Complaint, including but not limited to their ability to move to dismiss the complaint for failure to

25  state a claim, move to strike it pursuant to the anti-SLAPP statute, move for a more definite

26  statement, or move to dismiss for lack of personal jurisdiction;

27          (a) Plaintiffs, for their part, do not by this Stipulation consent to, or accept the validity

28      of, any such Motions;

(4)  Defendants' respective Answers or Responsive Motions to the Second Amended Complaint will not be due until 30 days following the date on which this Court adopts and issues the accompanying [Proposed] Order;

(5)  Plaintiffs' Opposition to Defendants' Responsive Motions will not be due until 30 days after Defendants file their Responsive Motions;

(6)  Defendants' respective Replies to Plaintiffs' Opposition will not be due until 21 days following the filing of Plaintiffs' Opposition.

(7)   The additional time deadlines set forth in the Court's June 19, 2007 Scheduling Order will be extended as follows:

(a)  the last day to meet and discuss initial disclosures, early settlement, ADR and discovery matters will be extended from August 17, 2007 to September 7, 2007;

(b)  the last day to file a Rule 26(f) Report, complete initial disclosures or state objections in a Rule 26(f) report, and file a Case Management Statement or other Civil Local Rule 16-9(a) Joint or Separate Case Management Statements will be extended from September 7, 2007 to September 28, 2007;

(c)  the Initial Case Management Conference with the Court will be moved from September 18, 2007 to October 9, 2007 at 2 p.m.;

(8) This Stipulation and revisions to the schedule do not moot Yahoo!, Inc.'s Motion For An Early Case Management Conference And Order, and if the Court grants Yahoo!'s Motion and Yahoo!'s proposed case schedule is adopted, then:

(a) only defendants' "Phase I" briefs would be due 30 days following the date on which this Court adopts and issues the accompanying Order; and

(b) all of the obligations set forth in paragraph 7, above, except the obligation to meet and confer regarding ADR would be suspended until after "Phase II" is resolved;

(c) it should be noted, however, that plaintiffs have filed a written opposition to Yahoo!' Motion For An Early Case Management Conference And Order and they oppose both Yahoo!'s Motion and the proposed case schedule in the subparagraphs 8(b) and 8(c) above;

1

(9)  The parties will continue to meet and confer regarding case management issues and

2

Defendants' objections to Plaintiffs' Second Amended Complaint;

3

(10)  The Parties reserve their right to seek further enlargements of time as may be required;

4

(11)  Plaintiffs reserve their right to seek further amendments to the Second Amended

5

Complaint; and

6

(12)  This Stipulation does not a constitute an appearance or waiver of any defenses

7

including but not limited to those contesting jurisdiction.

8

Respectfully submitted this 19th day of July, 2007,

9

MORTON H. SKLAR
THERESA HARRIS

10

WORLD ORGANIZATION FOR HUMAN

11

RIGHTS USA

12

By: */s/ Morton Sklar*

13

Morton Sklar
Attorney for Plaintiffs

14

15

Local Counsel for Plaintiffs
ROGER MYERS (S.B.#146164)

16

HOLME ROBERTS & OWEN LLP
560 Mission St., 25th Floor

17

San Francisco, CA 94105
Telephone: (415) 268-2000

18

DANIEL PETROCELLI, ESQ.

19

O'MELVENY & MYERS LLP

20

By:  */s/ Daniel Petrocelli*

21

Daniel M. Petrocelli, Esq.
Attorney for Defendant YAHOO!, INC.

22

JOSEPH P. CYR, ESQ.

23

SCOTT REYNOLDS, ESQ.
LOVELLS LLP

24

25

By:  */s/ Scott Reynolds*

Scott Reynolds, Esq.

26

Attorneys for Defendant ALIBABA.COM,
INC.

27

28

4

**ORDER [Proposed]**

PURSUANT TO THE ABOVE JOINT STIPULATION and the accompanying Notice Of Withdrawal Of Plaintiffs' Motion For Leave To File A Second Amended Complaint: (a) Plaintiffs' Motion For Leave To File A Second Amended Complaint is withdrawn; (b) Plaintiffs' Second Amended Complaint (filed with this Stipulation) is deemed filed; and (c) the case management schedule set forth in the parties Joint Stipulation is approved and hereby amended accordingly.  It is hereby ORDERED.

SIGNED on the _____ day of _____, 2007.


_____

The Honorable Claudia Wilken
Judge, United States District Court
for the Northern District of California

CC1:767278.1
7/19/07

Joint Stipulated Request                                                                                    Case No. C07-02151 CW

#29504 v1

# EXHIBIT F

1　Morton, H. Sklar, Executive Director
　　msklar@humanrightsusa.org
2　World Organization for Human Rights USA
　　2029 P Street NW, Suite 301
3　Washington, DC 20036
　　Telephone: (202) 296-5702
4　Facsimile: (202) 296-5704
　　[Admitted *Pro Hac Vice*]
5
　　Roger Myers (CA State Bar No. 146164)
6　roger.myers@hro.com
　　HOLME ROBERTS & OWEN LLP
7　560 Mission Street, 25th Floor
　　San Francisco, CA 94105-2994
8　Telephone:　　(415) 268-2000
　　Facsimile:　　(415) 268-1999
9
　　Attorneys for Plaintiffs
10　WANG XIAONING, YU LING, SHI TAO

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## OAKLAND DIVISION

| | |
|---|---|
| WANG XIAONING, YU LING, SHI TAO, and ADDITIONAL PRESENTLY UNNAMED AND TO BE IDENTIFIED INDIVIDUALS,<br><br>　　　　　　　　Plaintiffs,<br><br>　　v.<br><br>YAHOO, INC., a Delaware Corporation, YAHOO! HOLDINGS (HONG KONG), LTD., a Foreign Subsidiary of Yahoo!, ALIBABA.COM, INC. a Delaware Corporation, AND OTHER PRESENTLY UNNAMED AND TO BE IDENTIFIED INDIVIDUAL EMPLOYEES OF SAID CORPORATIONS,<br><br>　　　　　　　　Defendants. | **Case No. C07-02151 CW**<br><br>**TORT DAMAGES CLAIM**<br><br><br>**DECLARATION OF MORTON SKLAR IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR AN EARLY CASE MANAGEMENT CONFERENCE AND ORDER**<br><br>Date: July 2 or 26, 2007 (Proposed)<br>Time: TBD<br>Location: Courtroom 2<br><br>Judge: Hon. Claudia Wilken |

I, MORTON SKLAR, declare:

1.　　I am the Executive Director of the World Organization for Human Rights USA,

attorney of record and lead counsel for the Plaintiffs in the above-captioned case, and a former

Judge (for nine years) with one of the two international courts operated by the Organization of

American States. This declaration is being submitted pursuant to Civil Local Rule 7-3 in support of Plaintiffs' Opposition To Defendants' Motion To For An Early Case Management Conference. Except where otherwise indicated, I have personal knowledge of the facts stated herein and, if called as a witness, I could and would testify competently thereto.

2.     In an opposition filed today titled Plaintiffs' Opposition To Defendants' Motion For An Early Case Management Conference, Plaintiffs are requesting the Court to dismiss Defendant Yahoo!'s Motion For An Early Case Management Conference, and to adhere to the newly revised schedule for ADR and case management activities ordered by the Court on June 19, with the Initial Case Management Conference scheduled for September 18, 2007.

3.     As previously indicated in my Declaration accompanying our Opposition to the Defendants' Motion to Shorten Time for an early, July 2 Motions Hearing date on the request for an early case management conference, Defendants' counsel prevailed upon me, as a matter of professional courtesy, to enter into a Joint Stipulation with them to postpone the original case management schedule initially set by the court, based on their vacation and travel plans. This new schedule set a date for the initial case management conference with the Court for September 18. Had I known then that this request for a delay in the case management process was part of a broader strategy by the Defendants seeking to bypass and undercut that process by proposing an alternative approach that is not consistent with the regular case management procedures, I would not have acceded to their request and agreed to the Joint Stipulation, since it is not in the Plaintiffs' interests to delay the litigation process. Moreover, the representations made to me regarding the difficulty of changing Mr. Petrocelli's travel plans were not entirely consistent with the subsequent statements made to me suggesting that minor alterations could be made to accommodate the revised schedule they later proposed, including a July 2 hearing date.

1

2          I declare under penalty of perjury under the laws of the United States that the foregoing is

3    true and correct.  Executed in Washington, D.C. on this 29th day of June 2007.

4

5

6                                                              */s/ Morton Sklar*
                                                              Morton Sklar

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT G

1   Morton, H. Sklar, Executive Director
    msklar@humanrightsusa.org
2   World Organization for Human Rights USA
    2029 P Street NW, Suite 301
3   Washington, DC 20036
    Telephone: (202) 296-5702
4   Facsimile:  (202) 296-5704
    [Admitted *Pro Hac Vice*]
5
    Roger Myers (CA State Bar No. 146164)
6   roger.myers@hro.com
    HOLME ROBERTS & OWEN LLP
7   560 Mission Street, 25th Floor
    San Francisco, CA 94105-2994
8   Telephone:     (415) 268-2000
    Facsimile:     (415) 268-1999
9
    [Additional Attorneys Appear on Signature Page]
10
    Attorneys for Plaintiffs
11  WANG XIAONING, YU LING, SHI TAO

12                  **UNITED STATES DISTRICT COURT**
13               **NORTHERN DISTRICT OF CALIFORNIA**
                        **OAKLAND DIVISION**
14
15  WANG XIAONING, YU LING, SHI TAO,          **Case No. C07-02151 CW**
    and ADDITIONAL PRESENTLY
16  UNNAMED AND TO BE IDENTIFIED              **TORT DAMAGES CLAIM**
    INDIVIDUALS,
17                                            **PLAINTIFFS' OPPOSITION TO**
                         Plaintiffs,          **DEFENDANTS' MOTION FOR AN EARLY**
18                                            **CASE MANAGEMENT CONFERENCE AND**
            v.                                **ORDER**
19
    YAHOO, INC., a Delaware Corporation,
20  YAHOO! HOLDINGS (HONG KONG),              Date: July 2 or 26, 2007 (Proposed)
    LTD., a Foreign Subsidiary of Yahoo!,     Time: TBD
21  ALIBABA.COM, INC. a Delaware              Location: Courtroom 2
    Corporation, AND OTHER PRESENTLY
22  UNNAMED AND TO BE IDENTIFIED
    INDIVIDUAL EMPLOYEES OF SAID              Judge: Hon. Claudia Wilken
23  CORPORATIONS,

                         Defendants.
24

25

26

27

28

    PLAINTIFFS' OPPOSITION TO
    DEFENDANTS' MOTION FOR AN EARLY                         Case No. C07-02151 CW
    CASE MANAGEMENT CONFERENCE

# TABLE OF CONTENTS

TABLE OF CONTENTS .............................................................................................. i

TABLE OF AUTHORITIES ..................................................................................... iii

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR AN
     EARLY CASE MANAGEMENT CONFERENCE ........................................ 1

I.    Introduction – The Second Rescheduling of the Case Management
       Conference As Requested by Defendants Is Inappropriate and
       Unnecessary ................................................................................................ 1

II.    Many Of The Underlying Arguments Upon Which The Defendants
       Base Their Request For An Alternative Case Management Process
       Are Based Upon Incorrect Assumptions or Mischaracterizations ................. 3

    A.    Defendants Incorrectly Assume that Plaintiffs Will Be Inaccessible
    for Evidentiary Purposes ............................................................................. 4

    B.    Defendants' Motion Mischaracterizes the Standing Order as
    Describing the Case Management Process Itself, When in Fact It Only
    Describes the Contents of the Parties' Reports Subsequent to Those
    Procedures .................................................................................................. 5

    C.    Defendants' Motion Misinterprets the *Sosa* Vigilant Doorkeeping
    Requirement by Incorrectly Implying that Plaintiffs' Claims Fall Outside
    of the Narrow Class of Claims Suitable for ATCA Cases ............................. 5

III.   The Issues Raised by the Defendants Require the Further Factual and
       Issue Development that the Regular Case Management Process Is
       Designed To Provide .................................................................................... 8

    A.    The Defendants' Personal Jurisdiction Challenges Are Not
    Conclusive, and   Require Further Factual Development and Legal
    Analysis Through the Regular Case Management Process and/or
    Preliminary Discovery ................................................................................. 9

    B.    The Regular Case Management Process Will Best Facilitate the
    Fact Finding Process Necessary to Demonstrate the Impropriety of the
    Defendants Disclosing Internet User Information to Chinese Authorities ............... 10

IV.   Solicitation of the Views of the Political Branches of the U.S.
       Government On This Case Would Not Be Appropriate and Would
       Not Justify The Requested "Suspension" of the Case Management
       Process ...................................................................................................... 11

    A.    Since Immunity and Act of State Doctrine Issues Are Not Relevant
    to This Case, Soliciting a Statement of Interest From the Political
    Branches Would Be Inappropriate ............................................................... 12

    B.    Even if a Statement of Interest Were Submitted, It Would Not Be
    Dispositive with Respect to Any Determinations of the Final Outcome
    of the Case ................................................................................................. 14

PLAINTIFFS' OPPOSITION TO             i
DEFENDANTS' MOTION FOR AN EARLY
CASE MANAGEMENT CONFERENCE         Case No. C07-02151 CW

C.    Because Determining the Justiciability of Claims Requires a Comprehensive Record of the Pleadings and Facts, the Regular Discovery and Case Management Process Should Not Be Delayed Pending Receipt of a Statement of Interest ................................................................. 19

V.    Conclusion ............................................................................................................ 21

Certificate of Compliance

# TABLE OF AUTHORITIES

## CASES

*Alexis Holyweek Sarei v. Rio Tinto, PLC*, Nos. 02-56256, 02-56390, 2007 WL 1079901 (9th Cir. Apr. 12, 2007)....................................................................15

*Baker v. Carr*, 369 U.S. 186 (1962)........................................................................12, 15

*Data Disc, Inc. v. Systems Technology Associates, Inc.*, 557 F.2d 1280, 1285 n.1 (9th Cir. 1977)..............................................................................................................9

*Doe v. Qi*, 349 F. Supp.2d 1258 (N.D. Cal. 2004)..............................................6, 7, 18

*Estados Unidos Mexicanos v. DeCoster*, 229 F.3d 332, 342 (1st Cir. 2000) .......13, 14

*In re Estate of Marcos Human Rights Litig.*, 978 F.2d 493, 500 (9th Cir. 1992).......14

*In re Nazi Era Cases Against German Defendants Litigation*, 129 F. Supp.2d 370, 375 (D.N.J. 2001)...................................................................................................20

*In re South African Apartheid Litigation*, 238 F. Supp.2d 1379 (JPML 2002) ...........7

*Insurance Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694 (1982)...............................................................................................................9

*Kadic v. Karadzic*, 70 F.3d 232, 249 (2nd Cir. 1995)..............................................16

*National Coalition Government of Union of Burma v. Unocal, Inc*, 176 F.R.D. 329, 339 (C.D.Cal. 1997)....................................................................................13

*Pfizer, Inc. v. Government of India*, 434 U.S. 308, 319 (1978) .................................14

*Renee v. Geary*, 501 U.S.312, 316 (1991) ................................................................20

*Sabbatino v. Banco Nationale de Cuba*, 376 U.S. 398 (1964)...................................12

*Siderman de Blake v. Republic of Argentina*, 965 F.2d 699, 714-15 (9th Cir. 1992)............7, 14

*Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004).......................................6, 7, 12, 15

*Wells Fargo & Co. v. Wells Fargo Express Co.*, 556 F.2d 406, 430 n.24 (9th Cir. 1977) ..................................................................................................................9

## OTHER AUTHORITIES

135 Cong. Rec. H. 6423, October 2, 1989 ...........................................................17, 18

138 Cong. Rec. S. 2667, March 3, 1992. ..............................................................17, 18

Country Reports on Human Rights Practices, (Mar. 6, 2007) *available at* http://www.state.gov/g/drl/rls/hrrpt/2006/78771.htm. ....................................19, 20

Derek Baxter, *Protecting the Power of the Judiciary: Why the Use of State Department "Statements of Interest" in Alien Tort Statute Litigation Runs Afoul of Separation of Power Concerns*, 37 Rutgers L.J. 807, 825 n.103 (2006) ...............15

Standing Order for All Judges of the N.D. Cal., Contents of Joint Case Mgmt. Statement (effective Mar. 1, 2007). ......................................................................5

*The Internet in China: A Tool for Freedom or Suppression?, p. 156, available at* http://commdocs.house.gov/committees/intlrel/hfa26075.000/hfa26075_0f.htm ..................................................................................................................11

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR AN EARLY CASE MANAGEMENT CONFERENCE**

I.     **Introduction – The Second Rescheduling of the Case Management Conference As Requested by Defendants Is Inappropriate and Unnecessary**

This submission is being filed in opposition to the Defendants' Motion for an Early Case Management Conference.  Plaintiffs previously filed an Opposition to Defendants' Motion to have an early hearing on their request on July 2.  The present Opposition rejects the Defendants' suggestion that an Early Case Management Conference be held at all, on grounds that such an early conference is unnecessary and inappropriate, that the matters and issues that the Defendant would like to raise in the proposed earlier Conference can all be more effectively dealt with as part of the regular case management process, and that the Court should not be placed in the position of altering for a second time the scheduling for the case management process, especially given that the Defendants successfully sought and obtained an amendment of the Scheduling Order just a few days ago.  Plaintiffs believe that the regular case management conference, just rescheduled at the Defendants' request for September 18, and the regular case management process leading up to that conference, are the more appropriate mechanisms for the Parties and the Court to consider and decide how best to deal with these matters.

In their Motion, Defendants point to a number of issues and concerns they cite as reasons why an early conference should be scheduled, and as matters that they propose to address at that special court hearing.  Plaintiffs agree that these issues, and several others that are important to the Plaintiffs, are relevant to these proceedings and must be raised and addressed at the appropriate time, but not at this stage of the proceedings, nor in the manner that the Defendants propose to deal with them.  Instead, their proper consideration, even for preliminary planning purposes, requires exactly the kind of fact gathering and development, and information sharing, that the regular case management process is designed to produce.  These regularly scheduled

procedures should be allowed to proceed and to accomplish their purposes before alternative, extraordinary methods of the type the Defendants propose are applied.

Plaintiffs note, at the outset, that the July 26 date being proposed for the special Conference is just one day earlier than the date (July 27) originally set for the Initial Case Management Conference by the Court.  The Defendants successfully sought a change in this July 27 date just a few days ago on the basis of the Defendants' attorneys' vacation and travel plans. Why, if the underlying goal of the defendants was anything other than to unnecessarily delay and add to the complexity of the case management process, are the Defendants now seeking an additional case management conference on July 26, instead of using the originally scheduled conference of July 27 to deal with these matters?  Why a change in that date was required in the first place given the present Motion for the second change, has not been adequately or logically explained or justified.

With respect to the merits of the issues and concerns that the Defendants cite, Plaintiffs note initially that all (or certainly the vast majority) of these matters would and should be raised as part of the regular case management and ADR process.  The purpose of the ADR and case management procedures is precisely to provide an efficacious means for the Parties to share and discuss the information and issues that advance the litigation process, to identify the issues in contention, and to provide the Court with a summary of the information and arguments that are needed to decide how the case should best be handled, and hopefully, resolved.  Plaintiffs believe that the true motivation of the Defendants, first in seeking a postponement in the case management schedule generally, and now in asking for a fractured (or bifurcated as the Defendants describe it) approach to the case management process is, pure and simple, to unnecessarily delay the progress of the litigation.  This underlying goal is indicated most directly by their request to have discovery and the regular case management process "suspended" until the

1   views of the United States government on the case can be solicited and obtained.

2       Rather than adopt the Defendants' piecemeal approach, whose primary purpose appears to be

3   to delay the effective completion of the case management process, Plaintiffs urge the Court to

4   reject the Defendants' Motion in its entirety, and to maintain the newly rescheduled case

5   management schedule as ordered by the Court on June 19, with the September 18 Initial Case

6   Management Conference used to consider any issues that have been (and will be) raised, and to

7   decide how they best should be handled, after the full benefits of the ADR and case management

8   process have been brought to bear on these matters, as intended by the Court's regular Rules and

9   procedures.

10

11  **II.     Many Of The Underlying Arguments Upon Which The Defendants Base Their
             Request For An Alternative Case Management Process Are Based Upon Incorrect
12           Assumptions or Mischaracterizations**

13

14      Defendants request an alternative approach to the case management process that features

15  "bifurcating certain issues," "soliciting statements of interest from the political branches" of the

16  U.S. Government, and placing "a hold on discovery" and other elements of the regular pre-trial

17  and case management process while these initial procedures are completed.  Def. Yahoo! Inc.'s

18  Mot. for an Early Case Mgmt. Conference and Order 1:4, 1:24 (filed June 21, 2007). (hereinafter

19  "Def. Mot.").  Plaintiffs are unalterably opposed to this proposed approach, the substantial delays

20  in the litigation process that it inherently is designed to produce, and its effect of undercutting and

21  bypassing the regular case management process that has already been approved and scheduled by

22  the Court and previously changed at the Defendants' behest.  Plaintiffs point out that many of the

23  proposals are based upon incorrect assumptions and mischaracterizations, placing into serious

24  question the need and justification for the highly unusual procedures and variations from

25  established court practice that the Defendants request.

26

27

28

PLAINTIFFS' OPPOSITION TO                          3
DEFENDANTS' MOTION FOR AN EARLY                                    Case No. C07-02151 CW
CASE MANAGEMENT CONFERENCE

1

2

**A. Defendants Incorrectly Assume that Plaintiffs Will Be Inaccessible for Evidentiary Purposes**

3

To provide just a few examples of the incorrect assumptions and mischaracterizations that

4

form the foundation for the Defendants' Motion, they suggest on page 2, lines 2-6 of their Motion

5

that the Plaintiffs cannot "prosecute this case…in light of the circumstances that they cannot give

6

testimony or communicate with their counsel." Def. Mot. 2:4-6. Neither of these assumptions is

7

correct. One of the Plaintiffs in the case, Yu Ling, came to the United States from China when

8

9

the complaint was filed. Another potential Plaintiff, the mother and legally designated

representative of Plaintiff Shi Tao, also traveled to South Africa and then to the U.S. from China

10

in the past few weeks to accept the Committee to Protect Journalists' Golden Pen International

11

Press Freedom Award on behalf of her son, and to check on the status of the present case by

12

stopping in the U.S. on her trip back to China. While communication with and access to those

13

14

Plaintiffs being detained in China most certainly is restricted and heavily monitored and censored,

15

they do communicate with their family members, and through them with their counsel, including

16

their Chinese lawyers who have been representing them (to little avail) in that country. Nor do

17

we believe that it is appropriate for the Defendants to seek to cite the unlawful detention and

18

19

communications restrictions imposed on Shi Tao and Wang Xiaoning as a basis for claiming that

20

their lawsuit cannot be carried out in U.S. courts, and for seeking dismissal of their claims.

21

As with so many of the other issues the Defendants seek to cite as justification for the

22

"alternative" forms of case management they are proposing, the question of how problems

23

24

associated with limited access to some of the Plaintiffs impacts the litigation is not one that can or

should be handled summarily. This question requires exactly the kind of detailed information

25

disclosure and discussion between the Parties that the regular case management system is

26

designed to produce, so that the Court will have the information, documentation and legal

27

28

PLAINTIFFS' OPPOSITION TO
DEFENDANTS' MOTION FOR AN EARLY
CASE MANAGEMENT CONFERENCE

4

Case No. C07-02151 CW

1   analyses necessary to properly evaluate and make decisions on these matters for case

2   management purposes.

3   **B. Defendants' Motion Mischaracterizes the Standing Order as Describing the Case Management Process Itself, When in Fact It Only Describes the Contents of the Parties' Reports Subsequent to Those Procedures**

4

5

6   A second example of the incorrect and inaccurate assumptions underlying the Defendants'

7   Motion is their citation to sections 15, 16, and 20 of the Standing Order for All Judges of the

8   Northern District of California on the Contents of the Joint Case Management Statement. *See*

9   Def. Mot., Standing Order for All Judges of the N.D. Cal., Contents of Joint Case Mgmt.

10  Statement (effective Mar. 1, 2007). That Standing Order refers to the information that the Parties

11  must include in the Case Management Statement to be submitted to the Court (due on September

12  7th in the present case under the Jointly Stipulated Schedule approved by the Court on June 19th).

13  These are not guidelines on how the case management system should be handled, as the

14  Defendants imply, but rather on what the contents of the Parties' reports (joint or separate) to the

15  Court on the Case Management Process must cover. By definition, that report cannot be filed

16  until after the case management process has (at least partially) taken place, initial disclosures and

17  discussions have occurred, and issues in dispute identified and addressed (at least initially) by the

18  parties. Those are exactly the steps, mandated by the Court's Standing Order and regular case

19  management procedures, that the Defendants are seeking to bypass, undercut, and substantially

20  delay through the proposals they have made. Their proposals therefore must be recognized as

21  being inconsistent with the Standing Order and the case management process, not in furtherance

22  of these procedures.

23  **C. Defendants' Motion Misinterprets the *Sosa* Vigilant Doorkeeping Requirement by Incorrectly Implying that Plaintiffs' Claims Fall Outside of the Narrow Class of Claims Suitable for ATCA Cases**

24

25

26

27  The vigilant door-keeping "cautions" expressed in *Sosa* do not apply to cases such as this

28

PLAINTIFFS' OPPOSITION TO                    5
DEFENDANTS' MOTION FOR AN EARLY                          Case No. C07-02151 CW
CASE MANAGEMENT CONFERENCE

where the human rights violations cited as the bases for the claims, such as torture and long-term arbitrary detention, have been fully recognized and accepted by Congress and by the courts as appropriate foundations for ATCA and TVPA lawsuits. The Supreme Court in its *Sosa* decision made crystal clear that the weighing of political and foreign policy concerns was not appropriate in the special category of cases, such as those arising under the TVPA, where a very explicit determination had been made by Congress that U.S. courts were authorized to exercise jurisdiction and make determinations in cases involving torture abuses.

Defendants incorrectly suggest that an early Case Management Conference and the adoption of a "tailored" or "bifurcated" Case Management Order will fulfill the "duty of 'vigilant doorkeeping' to make sure ATS claims fall within the 'narrow class' of claims allowed," that the Supreme Court described in *Sosa*. Def. Mot. 3:17-19 (citing *Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004)). However, the very same case law cited by Defendants as justification for their argument says exactly the opposite. This case precedent confirms that Plaintiffs' allegations clearly fall within this "narrow class" of actions that the courts have recognized as justiciable. *Sosa,* 542 U.S. at 729.

Defendants' motion implies that *Sosa's* doorkeeping requirement precludes cases raising political questions, whereas *Sosa* only holds that doorkeeping is required to evaluate whether or not an allegation brought under ATS falls under a clear and well-accepted norm of customary international law, and whether the balancing tests called for under *Baker v. Carr* and *Sabbatino* have been met. *Sosa,* 542 U.S. at 733 n.21. Defendants cite two cases as a means of defining the bounds of this "narrow class." *See* Def. Mot. 3 (citing *Sosa*, 542 U.S. at 692 and *Doe v. Qi*, 349 F. Supp.2d 1258 (N.D. Cal. 2004). *Sosa* states that an ATS allegation that is a violation of well-established and universally accepted human rights standards is justiciable, and specifically recognizes torture as a violation of the law of nations that meets these standards. *Sosa,* 542 U.S.

at 762.  Following *Sosa,* the District Court for the Northern District of California has stated that

"it is well established that torture constitutes *jus cogens* violations."  *Qi,* 349 F. Supp.2d at 1296

(citing *Siderman de Blake v. Republic of Argentina*, 965 F.2d 699, 714-15 (9th Cir. 1992)).  *Qi*

further found that arbitrary detention and cruel, inhuman or degrading treatment are also

actionable under ATS.  *Qi,* 349 F. Supp.2d at 1296.  Thus, the claims at issue in the present case

cannot be dismissed as the Defendants suggest simply because they have political or foreign

policy overtones.

It would be a waste of this court's and both parties' time to adopt the tailored Case

Management Order proposed by Defendants when the cases cited by Defendants as justification

for the appropriateness of such a plan clearly state that Plaintiffs' specific allegations fall squarely

within the "narrow class of claims allowed" to be brought under ATS.  Moreover, it is generally

the role of the courts, not the executive, to interpret the law of nations and thus whether or not a

specific violation is actionable under ATS.  The Supreme Court in *Sosa* did note the possibility of

"case-specific deference to the political branches" where interference with a special mechanism

(the South Africa Truth and Reconciliation Commission for example) that had been established

locally to resolve those types of claims would result from a U.S. court action.  *Sosa*, 542 U.S. at

733 n. 21.  The district court held that the U.S. claims would directly "interfere with policy

embodied by [South Africa's] Truth and Reconciliation Commission," a stance which the U.S.

endorsed both as a matter of foreign policy and via a Statement of Interest (hereafter "SOI") to

the court.  *In re South African Apartheid Litigation*, 238 F. Supp.2d 1379 (JPML 2002)).

However, unlike the plaintiffs in the *Apartheid* case, the Plaintiffs in the instant case seek relief

for claims which are not justiciable in any form in China, let alone in a form that has been

endorsed by the United States.  In enacting the ATCA and especially the TVPA, Congress made

clear its intention to provide a judicial forum in the U.S. for dealing with claims involving torture

PLAINTIFFS' OPPOSITION TO
DEFENDANTS' MOTION FOR AN EARLY
CASE MANAGEMENT CONFERENCE

7

Case No. C07-02151 CW

1  abuses, and that these types of claims should not be precluded because of foreign policy

2  overtones.  Defendants are misapplying and misconstruing the statements in *Sosa* when they

3  suggest that the *Sosa* standards preclude this lawsuit.

### D.  Defendants Misrepresent Plaintiffs' Purpose in Initiating This Litigation

Defendants claim that the Plaintiffs' case "challenges several decades of U.S. foreign policy

toward China, in that one of its stated aims is to curtail American investment in China," similarly

grossly mischaracterizes reality.  Def. Mot. 3:24-25.  Plaintiffs have brought these claims, not to

curtail investment in China as Defendants claim, but to both obtain relief for the abuses they have

suffered as a result of Defendants' actions and to encourage other companies operating in

oppressive regimes such as China to think carefully and conscientiously about how to responsibly

do business in these countries without enabling the most serious form of abuses that these regimes

inflict upon their citizens.  Nor are Plaintiffs "challenging" decades of U.S. foreign policy.  If

anything, the lawsuit confirms and supports ongoing efforts by the U.S. Government to bring

attention to and to present these abuses, including the annual State Department human rights

country reports that single out China for special criticism of their arbitrary detention and torture

practices.

### III.  The Issues Raised by the Defendants Require the Further Factual and Issue Development that the Regular Case Management Process Is Designed To Provide

Since the Defendants have sought in their Motion to bring a number of important issues

and questions to the Court's attention, Plaintiffs feel obliged to quickly highlight a few key points

in response, not to address and explore these issues in depth, or to seek resolution of these matters

at this point in the process, but to further indicate the premature nature of seeking a conference

with the Court to address them on an earlier basis, and the value and importance of maintaining

and carrying out the regular case management process to develop these issues for proper and

more complete presentation to the Court.  Proper treatment of these issues requires the more

PLAINTIFFS' OPPOSITION TO
DEFENDANTS' MOTION FOR AN EARLY                                         8                    Case No. C07-02151 CW
CASE MANAGEMENT CONFERENCE

1   informed factual and analytical basis that the case management system offers, even for

2   preliminary discussions regarding the proper handling of these issues in early stages of the

3   litigation process.  Among the specific issues identified by the Defendants as justification for

4   seeking an early conference that demonstrate why that approach would be premature, and why the

5   regular case management process is needed to properly address these matters on a more effective

6   basis are those described below:

7

8     **A. The Defendants' Personal Jurisdiction Challenges Are Not Conclusive, and
    Require Further Factual Development and Legal Analysis Through the Regular
    Case Management Process and/or Preliminary Discovery**

9

10    Defendants seek to raise a number of issues or questions concerning whether the Court can

11  exercise personal jurisdiction over various Yahoo! entities.   These matters cannot be resolved as

12  simply as the Defendants suggest.  Due to the complex corporate structure of Yahoo!, Inc. and its

13  affiliates, major changes in the organizational structure that have taken place in recent years

14  (perhaps in part with a view towards attempting to shield various corporate entities from liability)

15  and the difficulty in finding much of the critical information regarding the organizational

16  structures and responsibilities of the entities in the public domain, some limited preliminary

17  disclosure and factual development is required before the Court can properly consider these

18  issues.  A useful analogy that can be drawn is to the authority of courts to order discovery on

19  jurisdictional issues even before the court has determined whether it has personal jurisdiction over

20  a particular defendant.  *See, e.g.*, *Insurance Corp. of Ireland, Ltd. v. Compagnie des Bauxites de

21  Guinee*, 456 U.S. 694 (1982) (allowing discovery aimed at establishing foreign company's

22  contacts with the forum state); *Data Disc, Inc. v. Systems Technology Associates, Inc.*, 557 F.2d

23  1280, 1285 n.1 (9th Cir. 1977); *Wells Fargo & Co. v. Wells Fargo Express Co.,* 556 F.2d 406,

24  430 n.24 (9th Cir. 1977) (stating that discovery "should be granted where pertinent facts bearing

25  on the question of jurisdiction are controverted…or where a more satisfactory showing of the

26

27

28

facts is necessary") (internal citation omitted). The Court should allow the fact development and disclosure process of the case management system to run its course, or provide for some type of preliminary discovery to take place, before trying to address these complex jurisdictional questions. The Defendants' suggestion that the Court can summarily address these issues on an early basis without providing an opportunity to develop the necessary factual information through the case management process makes no logical sense.

**B. The Regular Case Management Process Will Best Facilitate the Fact Finding Process Necessary to Demonstrate the Impropriety of the Defendants Disclosing Internet User Information to Chinese Authorities**

Similarly, Defendants' suggestion that they were obliged to comply with information requests from law enforcement authorities in China, and that their actions in this regard were necessary and lawful, requires a far more in-depth analysis than Defendants suggest. The issues relating to Defendants' actions in complying with Chinese authorities' requests for personal information of internet users is very complex and will require the benefit of the regular case management process to reveal the extent to which such requests were legitimate, whether Defendants had reason to know that complying with those requests would produce major human rights abuses, and whether their approach comported with accepted business practices and U.S law. The fact finding and discussion that will occur during the regular case management process will make it possible to determine what the prevailing and reasonable industry practices of other companies doing business in repressive countries might be, and will reveal the extent to which Defendants' actions deviated from such reasonable standards. For example, at a hearing before the U.S. House of Representatives Committee on International Relations on February 15, 2006, Jack Krumholtz, Managing Director of Federal Government Affairs and Associate General Counsel of Microsoft Corporation, testified that his company follows the practice of making sure that "[c]ustomers' personal information is stored on servers located in the United States, so requests for that

1   information from the Chinese have to be handled under procedures that are provided under the

2   U.S.-China Mutual Legal Assistance Treaty" and pursuant to U.S. law.  *The Internet in China: A*

3   *Tool for Freedom or Suppression?, p. 156,  available at*

4   http://commdocs.house.gov/committees/intlrel/hfa26075.000/hfa26075_0f.htm.  Elliot Schrage,

5   Vice President for Corporate Communications and Public Affairs, Google, Inc., also testified to

6   this issue, noting that Google "made a fundamental, strategic decision that we were not going to

7   offer services like G-mail or Blogger, services that provide us commercial value, . . . [and] that

8   we would not provide those services inside of China because we did not want to be put in a

9   position where we would have possess[ion] of data that might create the kinds of problems we are

10   discussing today." *Id.* at 157 (referring to "privacy and confidentiality of information").  The

11   transcript of this hearing provides an apt illustration of how other companies, similarly situated to

12   Defendants, took affirmative steps to avoid compromising users' private information in order to

13   avoid, as Mr. Schrage put it, "be[ing] in a position to give it," and place these users in jeopardy.

14   *Id.*  The regular case management process must be adhered to in order that both Parties be

15   afforded the opportunity through initial fact gathering and disclosures to fully explore whether the

16   acts of the Defendants in providing the information to China should be considered reasonable and

17   appropriate under the circumstances.

18   **IV.   Solicitation of the Views of the Political Branches of the U.S. Government On This
         Case Would Not Be Appropriate and Would Not Justify The Requested
         "Suspension" of the Case Management Process**

19   One of the "bifurcated" procedures that the Defendants seek to press upon the Court in

20   place of the regular case management process would be to solicit the views of the "political

21   branches" of the U.S. Government on the case (Def. Mot. 3:10), and to suspend the discovery and

22   case management process until these views can be obtained.  In support of this approach they cite

23   the potential for the case to "impact foreign relations," and the claim that the case "challenges

1   several decades of U.S. foreign policy towards China." *Id.* at 3:23-24.  They also cite the

2   Supreme Court's urging of "caution" in passing judgment on the acts of sovereign governments

3   and foreign officials in the case of *Sosa v. Alvarez-Machain.  Sosa,* 542 U.S. at 692.  All of these

4   arguments are misleading and misplaced and do not constitute a valid basis for "suspending" the

5   litigation as has been requested.

6

7           This case has been filed against Yahoo! Inc. and its affiliates, not against the Government

8   of China or its officials.  To the extent that the actions of the Government of China relate to the

9   litigation, or that the case impacts foreign relations, these matters must be assessed pursuant to the

10  standards that the U.S. Supreme Court set out in the cases of *Baker v. Carr*, 369 U.S. 186 (1962),

11  and *Sabbatino v. Banco Nationale de Cuba*, 376 U.S. 398 (1964), recognizing that U.S. Courts

12  retain jurisdiction over legal disputes despite potential political or foreign relations implications

13  where clear and well-established legal standards are applicable to the matter in dispute that courts

14  traditionally are called upon to apply.  Nor do these supposed foreign policy issues implications

15  justify suspension of the regular discovery and case management procedures, as Defendants are

16  proposing.

17

18      **A.  Since Immunity and Act of State Doctrine Issues Are Not Relevant to This Case,
            Soliciting a Statement of Interest From the Political Branches Would Be
19          Inappropriate**

20          Plaintiffs do not accept the Defendants' underlying premise that solicitation of the

21  Government's views is appropriate or necessary.  Plaintiffs submit that a solicitation of the

22  Government's views would amount to an unauthorized and uncalled for reliance on the political

23  process, that is antithetical to the principle of the rule of law and to the requirement that an

24  impartial, objective and non-political determination be made of the legal issues and claims that

25  have been presented, without reference to or reliance upon political considerations.  Plaintiffs

26  believe that this approach would violate principles set out by Congress in the TVPA mandating

27

28

PLAINTIFFS' OPPOSITION TO                              12
DEFENDANTS' MOTION FOR AN EARLY
CASE MANAGEMENT CONFERENCE                                           Case No. C07-02151 CW

that these types of issues and cases be adjudicated by the courts without giving deference to the political and diplomatic processes.

The solicitation of a SOI would be inappropriate in this case given both the dual facts that neither a foreign government nor foreign officials are defendants in this case, and that the U.S. Government has very clearly and frequently taken the position that major human rights abuses are taking place in China on a systemic basis that violates international law.

Since the Defendants in this case are not the Government of China, nor officials of that Government, issues of immunity and the act of state doctrine are not relevant. Courts have solicited a SOI from the U.S. Government when a lawsuit concerns the direct involvement of a foreign government as a party to such a lawsuit. In *National Coalition Government of Union of Burma v. Unocal, Inc*, for example, the court requested a SOI from the Government, reasoning that, "a court presented with a foreign government's lawsuit must consider whether the Executive Branch has demonstrated its willingness to allow that government to assert its claims in the United States court system." *National Coalition Government of Union of Burma v. Unocal, Inc*, 176 F.R.D. 329, 339 (C.D.Cal. 1997); *see also Estados Unidos Mexicanos v. DeCoster*, 229 F.3d 332, 342 (1st Cir. 2000) (where one party to the lawsuit was a government entity, "[t]he district court commendably invited comment from the U.S. Department of State"). Due in part to the court's deference to the government's SOI, the case was dismissed as to the NCGUB. This result can be explained by the fact that this portion of the *Unocal* case concerned a government-in-exile (the NCGUB), "not…formally recognized by the United States," and therefore involved questions that would inevitably reflect on the U.S.'s treatment of another nation's sovereignty. *Id.* at 340. The district court in *Unocal* concluded that "permitting the NCGUB to sue in its capacity as the purported government-in-exile of Burma would clearly require the court to 'interfere in sensitive matters of foreign policy," yet still left the door open for individual plaintiffs to litigate against

1    Unocal in subsequent lawsuits. *Id.* at 340 (citing *Pfizer, Inc. v. Government of India*, 434 U.S.

2    308, 319 (1978)).

3        Unlike the plaintiff in *Unocal*, however, no party in the instant case is an actual or purported

4    government entity or official, and thus no "sensitive matter of foreign policy" is directly

5    implicated.  Although it may be appropriate for a court to solicit the U.S. Government's statement

6    of interest when a lawsuit names a foreign government or a foreign official as a party, these are

7    not the circumstances of the instant case.  Moreover, it is a well-established principle in cases

8    alleging torture that "the act of state doctrine should not be applied…because no state can claim

9    the right to engage in these practices" as a matter of government or government approved policy.

10   Derek Baxter, *Protecting the Power of the Judiciary: Why the Use of State Department*

11   *"Statements of Interest" in Alien Tort Statute Litigation Runs Afoul of Separation of Power*

12   *Concerns*, 37 Rutgers L.J. 807, 825 n.103 (2006); *see also In re Estate of Marcos Human Rights*

13   *Litig.,* 978 F.2d 493, 500 (9th Cir. 1992); *Siderman*, 965 F.2d at 717.  Since acts of torture are not

14   considered to be legitimate state actions, they are not entitled to the protection of the act of state

15   doctrine and thus the act of state concerns that Defendant seeks to raise are not implicated in the

16   instant case.

17   **B.  Even if a Statement of Interest Were Submitted, It Would Not Be Dispositive with Respect to Any Determinations of the Final Outcome of the Case**

18       Even if the Court should determine that obtaining a SOI is appropriate in order to clarify

19   the Government's views on this case, it is well established that such a request is not necessarily

20   controlling with respect to any final determinations of justiciability.  The *Sosa* court's statement

21   that there is a "strong argument that federal courts should give serious weight to the Executive

22   Branch's view of the case's impact on foreign policy," goes on to suggest that the deference given

23   by a court to the Executive has always varied on a case-by-case basis to be determined by the

24   court, based on a variety of factors that must be weighed and balanced.  *Sosa,* 542 U.S. at 733.

1   The recent Ninth Circuit holding in *Alexis Holyweek Sarei v. Rio Tinto, PLC* illustrates this

2   principle.   *Alexis Holyweek Sarei v. Rio Tinto, PLC***,** Nos. 02-56256, 02-56390, 2007 WL

3   1079901 (9th Cir. Apr. 12, 2007). There, the Court of Appeals for this Circuit held that "the SOI

4   submitted in this case, even when given serious weight, does not establish that any of the final

5   three *Baker* factors is 'inextricable from the case,'" and therefore "we hold that none of the

6   plaintiffs' claims present nonjusticiable political questions." *Id.* (citing *Baker*, 369 U.S. at 217).

7   Moreover, as the Court in *Rio Tinto* noted, "[t]he Supreme Court has been clear that 'it is error to

8   suppose that every case or controversy which touches foreign relations lies beyond judicial

9   cognizance,' and that the doctrine 'is one of "political questions," not of "political cases."'" *Id.* at

10  *8 (quoting *Baker,* 369 U.S. at 211, 217).  The Ninth Circuit then concluded that the plaintiffs'

11  claims in *Rio Tinto* did not present non-justiciable political questions because they "relate to a

12  foreign conflict in which the United States had little involvement (so far as the record

13  demonstrates), and therefore that merely 'touch [upon] foreign relations.'" *Id.* at *8 (citing *Baker*,

14  369 U.S. at 211).

15         Since all ATS cases by definition "touch foreign relations" in the sense that they relate to

16  actions taken by foreign governments abroad, this fact alone does not preclude litigating these

17  issues, and should not be used as a justification for "suspending" the case management process as

18  the Defendants request.  To assert otherwise would defeat the very nature and purpose of the

19  TVPA statute, which Congress specifically designed to allow foreign nationals to seek relief for

20  abuses committed outside the United States where no remedy in their home country is available.

21  *See* 138 Cong. Rec. S. 2667, March 3, 1992. Although this case may indeed have political

22  overtones, Defendants wrongly assume that this fact automatically removes these issues from the

23  Court's jurisdiction, which is not true.

24         The legislative history recognizes that TVPA litigation may have some implications on

---

15

foreign policy, but that the concerns for creating accountability for torture override. Congress explained that one of the most enduring principles of U.S. foreign policy was a commitment to individual human rights and the rule of law, and that the United States has sought to assume a special responsibility in the world community to promote human rights and prevent or discourage torture. 135 Cong. Rec. H. 6423, October 2, 1989. The purpose of the TVPA was to ensure that courts assumed this role because "one of the ways in which the United States can promote and enforce peremptory norms of international law is through enforcement of human rights in our own domestic courts." *Id.* At a Congressional hearing, Senator Grassley asked whether the proposed Bill would improperly involve the judicial branch in foreign affairs. Senator Specter replied that the proposed TVPA would not improperly involve the judicial branch in foreign affairs, because "[t]orture is universally condemned by the family of nations. No nation officially supports or condones torture. Therefore, I do not expect that this Act will entangle the judiciary in sensitive foreign policy matters." *Id.* Congressmen Broomfield explained during House debate, "There are, of course, situations in which application of this statute could create difficulties in our relations with friendly countries. But this is a small price to pay in order to see that justice is done for the victims of torture." 137 Cong. Rec. H. 11244, November 25, 1991.

Defendants' assertion is also inconsistent with the great majority of case law, which shows that cases touching on foreign relations can certainly be justiciable. The Defendants' position is not an accurate reading of the controlling standard set out in *Baker* and *Sabbatino*, and not consistent with substantial case law precedent. In fact, the Second Circuit noted that "judges should not reflexively invoke the [political question doctrine and act of state doctrine] to avoid difficult and somewhat sensitive decisions in the context of human rights." *Kadic v. Karadzic*, 70 F.3d 232, 249 (2nd Cir. 1995) (holding that "[n]ot every case 'touching foreign relations' is nonjusticiable" and that "[a]lthough these cases present issues that arise in a politically charged

context, that does not transform them into cases involving nonjusticiable political questions").

There is no doubt that this case has political and foreign policy overtones, that there are individuals, businesses and even governments who have strong views on how this case might impact future litigation and corporate practice. However, Congress and most U.S. courts have moved away from the position that these cases should be decided with these political or foreign policy concerns as the sole and controlling consideration. To the contrary, and consistent with our legal system's strong commitment to the rule of law, the prevailing trend has been to insulate court cases from political influences, and to substantially reduce opportunities for the intrusion of political and foreign policy considerations into the adjudicatory process, especially where the legal standards to be applied are clear and expressly recognized. Therefore, the presence of these potentially sensitive issues does not divest the court of jurisdiction, and certainly does not justify "suspending" the regular court process pending solicitation and receipt of the U.S. Government's views.

Plaintiffs dispute Defendants' claim that the lawsuit "challenges three decades" of U.S. foreign policy. Def. Mot. 3:24. The exact opposite is true. Consistently, for a number of years, the U.S. Department of State Country Reports on Human Rights, and annual reports on International Religions Freedom have placed China at or near the top of the list of the most serious human rights violators. For example, the most recent Country Report on Human Rights Practices in China, released March 6, 2007, notes that "the [Chinese] government's human rights record remained poor, and in certain areas deteriorated…[with] an increased number of high-profile cases involving the monitoring, harassment, detention, arrest, and imprisonment of journalists, writers, activists, and defense lawyers, many of whom were seeking to exercise their rights under law," citing the use of "torture and coerced confessions of prisoners" and "stricter control and censorship of the Internet" as well. Country Reports on Human Rights Practices,

PLAINTIFFS' OPPOSITION TO
DEFENDANTS' MOTION FOR AN EARLY
CASE MANAGEMENT CONFERENCE

Case No. C07-02151 CW

(Mar. 6, 2007) *available at* http://www.state.gov/g/drl/rls/hrrpt/2006/78771.htm.

In fact, the Report specifically references the parties in the present case and the subject matter of this litigation in terms very critical of the Government of China. The Report states that "citizens writing on the Internet were detained, arrested, and sentenced on state secrets and subversion charges during the year" and specifically refers to the role played by the Defendants in producing these results. *Id.* The Report makes specific reference by name to Plaintiff Shi Tao, noting that "Yahoo provided information to security authorities, including access to private e-mail accounts, used in the prosecution of journalist Shi Tao" and more importantly that "Yahoo's Chinese Web site issued a joint proposal calling for the Internet industry to…accept government supervision." *Id.* The U.S. Department of State has thus directly acknowledged the very abuses for which Plaintiffs seek relief in this case, and has gone on record criticizing the Government of China's and the Defendants' actions in this case in the clearest of terms. Defendants contend that "reliance on generalized reports about abuses in China [ ] is inadmissible hearsay." Def. Mot. 7:3. However, the very case Defendants cite to support this contention notes that "[t]he State Department's annual human rights reports have been held to fall within the public records exception to the hearsay rule under *Fed. R. Evid. 803(8)*, and is thus admissible." *Qi*, 349 F. Supp.2d at 1310 n. 39. It is clear, therefore, that the U.S. Government has consistently and frequently publicly condemned the very abuses for which Plaintiffs seek remedy. Delaying the case management process to solicit the U.S. Government's opinions on these grounds is therefore without merit, particularly given the fact that the Department of State has itself officially acknowledged the illegality of the abuse of one of the specific Plaintiffs in this case.

Moreover, the House Report on the TVPA suggest that far from interfering with foreign policy, the maintenance of TVPA lawsuits of this type is in fact mandated by U.S. treaty obligations. It points out that the Convention Against Torture essentially obligated State parties

to "adopt measures to ensure that [those committing these abuses] are held accountable for their acts." H.R. Rep. 103-367 *3.

It is true that a request for a SOI may also be considered necessary or appropriate where agreements or declarations exist between two governments that purport to settle the very issues that parties would seek to litigate. In *In re Nazi Era Cases Against German Defendants Litigation*, for example, the plaintiff sought recovery from a German company for forced labor during World War II. *In re Nazi,* 129 F. Supp.2d at 370. The court ruled that recovery was precluded because the lawsuit challenged the validity of a diplomatic agreement addressing these issues, and "since the United States has spoken to the validity of the Foundation [established by the agreement] via its Statement of Interest" reiterating therein its support of the Foundation through an Executive Agreement it had formed with Germany. *Id.* at 387. The district court reasoned that "based on the weight of history" and in light of the SOI and Executive agreement it was "clearly demonstrate[d] that the claims against German Industry presently before the Court constitute political questions best left to the political branches." *Id.* The defendants in the instant case can point to no existing Executive Agreement, let alone a treaty, that would create a conflict with an international agreement and bring the plaintiffs' claims into the political question category.

### C. Because Determining the Justiciability of Claims Requires a Comprehensive Record of the Pleadings and Facts, the Regular Discovery and Case Management Process Should Not Be Delayed Pending Receipt of a Statement of Interest

Defendants' request for a bifurcated and premature case management schedule includes the contention that before proceeding in this case, a SOI from the "political branches" of the United States should be solicited by the Court. To support this contention, Defendant cites the possibility of an outright dismissal based on the allegation that "plaintiffs' case potentially violates the 'act of state' doctrine, poses nonjusticiable 'political questions,' or should be

PLAINTIFFS' OPPOSITION TO
DEFENDANTS' MOTION FOR AN EARLY
CASE MANAGEMENT CONFERENCE

Case No. C07-02151 CW

1    dismissed under the doctrine of 'international comity.'"  Def. Mot. 4:11-13. However, delaying

2    the regular case management schedule while awaiting such a submission falsely presupposes that

3    a SOI from the United States would be both appropriate and dispositive with respect to these

4    issues, when in fact there is no indication based on current case law to believe this to be true.

5

6           Whether a SOI would indeed be appropriate, and should affect the outcome of this case, is

7    a question for this court to review after receiving more adequate information about the

8    circumstances of the case, and whether these political views would be relevant pursuant to the

9    *Baker* and *Sabbatino* standards.  In *Renee v. Geary*, the Supreme Court applied the *Baker* and

10   *Sabbatino* balancing tests in holding that "proper resolution of the justiciability issues presented

11   here requires examination of the pleadings and record to determine the nature of the dispute and

12   the interests of the parties in having it resolved in this judicial proceeding." *Renee v. Geary*, 501

13   U.S.312, 316 (1991).  *See also In re Nazi Era Cases Against German Defendants Litigation*, 129

14   F. Supp.2d 370, 375 (D.N.J. 2001) (relying on *Renee* to support the principle that "[t]o resolve a

15   justiciability issue, a Court should examine the pleadings and the record to determine the nature

16   of the underlying dispute and the interests of the parties in having the dispute resolved").  This

17   type of balancing cannot take place theoretically or in a vacuum, but must make use of the fact

18   development, the pleadings and the case management process is designed to produce. Without

19   this opportunity for factual and analytical development of these issues, or even the benefit of the

20   Defendants' response to Plaintiffs' complaint, this Court should not be put in the position of

21   making premature determinations of whether or not solicitation of a SOI is appropriate or

22   necessary.  Under no circumstances is the suspension of the regular court process warranted

23

24

25   pending resolution of these questions.

26           Suspending regular case management procedures pending solicitation and submission of a

27

28   SOI by the U.S. Government could cause significant and unnecessary delays in the litigation

20

PLAINTIFFS' OPPOSITION TO
DEFENDANTS' MOTION FOR AN EARLY                                    Case No. C07-02151 CW
CASE MANAGEMENT CONFERENCE

process.  In the most recent ATCA/TVPA case litigated by the Plaintiffs' counsel where a Statement of Interest from the U.S. Government was solicited, it took almost five months from the time the request by the Court was made until the Government's views were submitted to the Court.  *Li Weixun v. Bo Xilai*, Case No. 1:04CV00649 (D.D.C.).  That type of delay should not be encouraged, especially where Plaintiffs remain in detention in China and are subject to great personal risk, and where additional individuals are at risk of having personal information disclosed by the Defendants in a similar way, potentially leading to their arbitrary arrest and torture.

## V.  Conclusion

For the foregoing reasons, and given the inappropriateness of the Defendants' seeking a second amendment to the Case Management schedule that was ordered by the Court on June 19, Defendants' Motion should be denied in its entirety.  Since the Defendants' Motion is without merit, and a summary denial is justified, no Motions Hearing is necessary or appropriate.

Respectfully submitted this 29th day of June, 2007,

> MORTON SKLAR
> THERESA HARRIS
> WORLD ORGANIZATION FOR HUMAN
> RIGHTS USA
>
> By: */s/ Morton Sklar*
> _____
> Morton Sklar
>
>
> ROGER MYERS
> HOLME ROBERTS & OWEN LLP
>
> By: */s/ Roger Myers*
> _____
> Roger Myers
>
>
> Attorneys for Plaintiffs
> WANG XIAONING, YU LING and SHI TAO

1

2 Karen Parker
(CA State Bar No. 112486)
3 Association of Humanitarian Lawyers
154 5th Avenue
4 San Francisco, CA 94118
Telephone: (415) 668-2752
5 E-mail: ied@agc.org

6 *With the assistance of:*
Albert Ho Chun-Yan
7 Legal Representative for Shi Tao
Hong Kong

8 Rebecca Babarsky, University of Michigan
Law School
9 Shannon Barrows, University of Chicago Law
School
10 Paul Bozzello, Harvard Law School
11 *Legal Interns*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF COMPLIANCE**

This opposition on behalf of the Plaintiffs in the above captioned case complies with all Federal and Local Rule requirements, including the page limit of 25 pages for the narrative text set out in Rule 7-3(a). It is written in 12 point Times New Roman font and covers a total of 7,006 words and 21 pages.

Signed and Certified to this 29th day of June, 2007.


By: */s/ Morton Sklar*
       Morton Sklar
       Executive Director
       World Organization for Human Rights USA
       2029 P Street NW, Suite 301
       Washington, DC 20036